Case 2:18-cr-20800-SJM-APP  ECF No. 414, PageID.3719  Filed 06/02/22  Page 1 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5        vs.

 6    D-1 DR. RAJENDRA BOTHRA        Case No. 18-20800
      D-3 DR. GANIU EDU              Hon. Stephen J. Murphy, III
 7    D-4 DR. DAVID LEWIS
      D-5 DR. CHRISTOPHER RUSSO,
 8
                          Defendants.
 9    _____/

10                 JURY TRIAL EXCERPT: VOLUME 5

11          BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                   United States District Judge
12           Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
13                  Detroit, Michigan  48226
                     Monday, May 23, 2022
14
      APPEARANCES:
15
      For the Plaintiff            BRANDY R. McMILLION
16    United States of America:    BRANDON C. HELMS
                                   U.S. Attorney's Office
17                                 211 W. Fort Street
                                   Suite 2001
18                                 Detroit, Michigan  48226
                                   313-226-9622
19
      For the Defendant            ARTHUR J. WEISS
20    D-1 Dr. Rajendra Bothra:     30445 Northwestern Highway
                                   Suite 225
21                                 Farmington Hills, Michigan  48334
                                   248-855-5888
22

23                                 (Appearances continued next page)

24

25
```

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3720   Filed 06/02/22   Page 2 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

2

```
 1   APPEARANCES:   Continued

 2   For the Defendant           ALAN T. ROGALSKI
     D-1 Dr. Rajendra Bothra:    Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
     For the Defendant           ROBERT S. HARRISON
 6   D-3 Dr. Ganiu Edu:          Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9   For the Defendant           RONALD WILLIAM CHAPMAN, II
     D-4 Dr. Davis Lewis:        Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16   For the Defendant           LAURENCE H. MARGOLIS
     D-5 Dr. Christopher         Margolis Law Firm
17   Russo:                      214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25             (313) 234-2616 • www.transcriptorders.com
```

TABLE OF CONTENTS

Government Witnesses:                                          Page

NEEL MEHTA

   Cross-Examination by Mr. Weiss                              4

EXHIBITS

Identification                               Offered     Received

NONE

```
1              Detroit, Michigan
2              Monday, May 23, 2022
3                      _  _  _
4              (Proceedings in progress at 1:50 p.m., all parties
5              present, jury present)
6                      N E E L   M E H T A
7      was called as a witness herein, and after previously being
8      first duly sworn to tell the truth and nothing but the truth,
9      testified on his oath as follows:
10             THE COURT:  Okay.  Thank you very much.  Want to get
11     started, Mr. Weiss?
12                      CROSS-EXAMINATION
13     BY MR. WEISS:
14     Q.  Good afternoon.
15     A.  Good afternoon.
16             MR. WEISS:  Your Honor, with the Court's permission,
17     may I approach the witness?
18             THE COURT:  Continuing permission granted, so you can
19     do that.
20             MR. WEISS:  I would beg the Court's indulgence.  If
21     the witness can step down, I would like him just to point to a
22     couple areas on my back.
23             THE COURT:  Why don't you -- Linda's going to want
24     the mic.  Can you make it out, Linda?
25             THE COURT REPORTER:  I can if you keep your voice up.
```

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3723   Filed 06/02/22   Page 5 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

5

```
 1            THE COURT:  Keep your voice up.
 2  BY MR. WEISS:
 3  Q.  Doctor, if you were going to give me an injection in the
 4  cervical area, where would you do it?
 5  A.  The cervical -- well, first we'd need to clarify what
 6  injection we're asking to perform, but the general region of
 7  the cervical spine is up here.
 8  Q.  So it would be the back of my neck?
 9  A.  That's correct.
10  Q.  Okay.  And if I was going to ask you to do an injection in
11  my caudal area, where would you give it?
12  A.  The caudal would be down in your tailbone.
13  Q.  Okay.  So there's a significant difference between
14  cervical and the caudal?
15  A.  That's correct.
16  Q.  Okay.  Thank you.  You may be seated.
17  A.  We're -- we're like looking through the...
18  Q.  Does that help your line of vision?
19  A.  Yes, thank you.
20            MR. WEISS:  Are you guys good?
21  Q.  You work at a university hospital?
22  A.  A university?  Yes, I -- I work in the university
23  hospital.
24  Q.  Okay.  Have you ever worked in an urban private practice?
25  A.  Well, the university -- our practice is a private practice
```

1    and it's in an urban setting.

2    Q.   Okay.  All right.  And you see patients that come to the

3    hospital?

4    A.   I do.

5    Q.   Okay.  And are you -- are they referred to you?

6    A.   There are patients that self-refer as well.

7    Q.   Okay.  And is there other criteria as to patients that you

8    will and will not see and treat?

9    A.   We -- we look for medical records.  If a patient says that

10   they're a pediatric case below the age of 12, I won't see them.

11   We generally want a history given to us beforehand.

12   Q.   Okay.  And so you -- you screen the patients that you will

13   see?

14   A.   That's correct.

15   Q.   Okay.  You take all types of insurance or noninsurance?

16   A.   We take -- across the practice all insurances are taken

17   including government, private and -- and worker's comp and no

18   fault.

19   Q.   All right.  When were you initially contacted by the

20   government in this matter?

21   A.   Honestly, I don't know the -- exactly.  I want to say

22   sometime before the pandemic.  It's been -- it's been some

23   time.

24   Q.   Can you sort of give us a time frame?  The pandemic

25   started when, the end of '19, beginning of 2020?

1    A.  Beginning of 2020.  I -- I believe it was around that time

2    period if -- if not just before or after.  I don't -- I don't

3    recall honestly.

4    Q.  So if I told you that the indictment came down in December

5    of 2018, it would have been a considerable amount of time after

6    the indictment?

7    A.  I -- I -- honestly I do not know the time that the initial

8    contact was offhand.

9    Q.  Okay.  You were presented a copy of the indictment at or

10   about the initial contact, correct?

11   A.  That's correct.

12   Q.  Okay.  So the indictment had already been handed down,

13   correct?

14   A.  Correct.

15   Q.  You already knew what the allegations were --

16   A.  Correct.

17   Q.  -- from the government's perspective, and so you didn't

18   have any input in those -- in creating those allegations or

19   drafting the indictment?

20   A.  That's correct.

21   Q.  Okay.  And the government came to you and indicated that

22   they wanted to hire services of someone who could provide

23   expert testimony to support the allegations that were already

24   in an indictment that you had nothing to do with creating, fair

25   statement?

1   A.   No.  They actually -- the initial contact was to review

2   and see if these things were medically appropriate or not.

3   Q.   So you didn't know what the allegations were?

4   A.   They -- they -- I knew the allegations, but their initial

5   contact was not to support the allegation but to review the

6   case.

7   Q.   But when you indicated this morning to the jury as to the

8   materials that you reviewed, you did mention the indictment,

9   did you not?

10  A.   I was aware of it, yes.

11  Q.   Well, there's a difference between aware of it and

12  reviewing it.  And again, my recollection is, my notes reflect,

13  that you indicated you reviewed the indictment.  Is that

14  accurate?

15  A.   That's -- that's accurate.

16  Q.   Okay.  So it was more than just being aware of it out in

17  the netherworld somewhere; you actually read it and reviewed

18  it?

19  A.   Yes.

20  Q.   Okay.  And when it came time for you to draft a -- an

21  opinion letter, your opinion letter made -- or report made

22  reference to specific counts in the indictment, correct?

23  A.   That's correct.

24  Q.   Okay.  So you were called upon by the government not only

25  to make opinions or proffer opinions but to tie those opinions

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3727   Filed 06/02/22   Page 9 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

9

1    to allegations that were in the indictment, correct?

2    A.  Again, to render an opinion based on what the --

3    Q.  But in relation to the allegations contained in the

4    indictment, correct?

5    A.  Yes.

6    Q.  Okay.  And the government indicated -- or excuse me, you

7    responded to the government's question about being compensated

8    for reviewing and whatever else they had you do, correct?

9    A.  Correct.

10   Q.  Okay.  And is that an hourly rate?

11   A.  That's correct.

12   Q.  Okay.  Would you relate to the jury what that hourly rate

13   is?

14   A.  Yes.  It's $500 per hour.

15   Q.  Okay.  And you prepared as a hired expert prior to your

16   relationship in this case, correct?

17   A.  That's correct.

18   Q.  Okay.  And it's fair to say that if you don't proffer the

19   opinion that the people or entity are asking you to proffer,

20   they don't go any further with you, correct?

21   A.  Or I don't go further with them, yes.

22   Q.  Okay.  All right.  But you -- you get the -- the gist?

23   A.  Yes.

24   Q.  Either you're on their page or you're on no page at all?

25   A.  Correct.

1    Q.  Okay.  So in terms of -- we know that you were provided

2    with the indictment, correct?

3    A.  Yes.

4    Q.  And we know that you were provided some patient charts,

5    correct?

6    A.  Correct.

7    Q.  All right.  And we know at least as to the charts that

8    you've identified or the patients that you've identified today,

9    that you saw the charts of those various patients, correct?

10   A.  Correct.

11   Q.  All right.  Now, some were the actual paper charts,

12   correct?

13   A.  Correct.

14   Q.  And some were summaries of electronic medical records,

15   correct?

16   A.  That's correct.

17   Q.  Okay.  So the charts that were electronic medical records,

18   you never saw the full chart, correct?

19   A.  It was what was transcribed from --

20   Q.  It's a summary, right?

21   A.  They were beyond summaries.

22   Q.  Either yes or no, either it was a summary or it wasn't,

23   and I think your testimony earlier today was they were

24   summaries.

25   A.  They were complete charts of -- of those patients.

1    Q.  Well, then it's not a summary, then it's a complete chart.

2    A.  It's -- it's a -- a summary --

3    Q.  My question's really simple.

4         THE COURT:  Hold on.

5    Q.  Let me take a different --

6         THE COURT:  Let -- let him answer, Mr. Weiss, before

7    you jump in again.  Go ahead please.

8    A.  So when we see records like physical exam, medical

9    decision making, the HPI, that's not in my view a summary.

10   That's literally taking the pieces of the information of the

11   chart and putting it together.

12        MR. WEISS:  I beg -- I beg the Court's indulgence,

13   Your Honor.

14        (Brief pause)

15        For the record, Your Honor, what is on the screen now

16   has previously been admitted as Government's Exhibit 120A as in

17   apple.

18   BY MR. WEISS:

19   Q.  Do you see that, sir?

20   A.  I do.

21   Q.  Okay.  Does that look to you like the paper charts that

22   we've seen earlier today?

23   A.  It physically does not appear the same but it contains

24   similar type information.

25   Q.  Containing similar information doesn't necessarily make it

| | |
|---|---|
| 1 | a complete chart, does it? |
| 2 | A.  The understanding when I worked with the government on |
| 3 | this was that these were compiled from what was available as |
| 4 | the medical record. |
| 5 | Q.  All right.  So what was compiled from -- |
| 6 | THE COURT REPORTER:  Mr. Weiss, I really need you by |
| 7 | the microphone. |
| 8 | MR. WEISS:  I'm sorry. |
| 9 | Q.  What was compiled -- I think your phrase was what was |
| 10 | compiled from available medical records, correct? |
| 11 | A.  It was -- |
| 12 | Q.  Sir, isn't that what you just said? |
| 13 | A.  That's correct. |
| 14 | Q.  Okay. |
| 15 | THE COURT:  Hold on a minute.  Does everybody have |
| 16 | this on their television screen 'cuz I don't have it on mine. |
| 17 | Defendants do? |
| 18 | MS. McMILLION:  Yes, Your Honor. |
| 19 | THE COURT:  Witness does? |
| 20 | THE WITNESS:  I do. |
| 21 | THE COURT:  Okay.  All right.  I'll watch the |
| 22 | overhead. |
| 23 | Go ahead, Mr. Weiss.  I'm sorry about that. |
| 24 | MR. WEISS:  Thank you, Judge. |
| 25 | THE COURT:  Yep.  Sorry about that. |

1   BY MR. WEISS:

2   Q.  What was compiled from available medical records, correct?

3   A.  (Nods in the affirmative.)

4   Q.  Is that a yes?

5   A.  That's correct.

6   Q.  Okay.  So someone compiled, put together a summary of what

7   was available from the records, correct?

8   A.  That's correct.

9   Q.  Okay.  We don't know what was unavailable, do we?

10  A.  We don't.

11  Q.  Okay.  And we don't know who did the compiling, do we?

12  A.  I -- I am not privy to that information.

13  Q.  Okay.  And we don't know what was included and what was

14  excluded, correct?

15  A.  We also don't know if --

16  Q.  Sir, just answer my question, not someone else's question.

17  We don't know what was included and what was excluded, do we?

18  A.  That's correct.

19  Q.  Okay.  And for that matter, we don't know what was

20  retrievable and what was not retrievable, correct?

21  A.  Again, what I was told --

22  Q.  That's a yes or no.  We don't know what was retrievable

23  and what was not retrievable, correct?

24  A.  Correct.

25  Q.  Okay.  Thank you.

1    And did the government -- 'cuz you never -- strike
2    that.
3         You never met with any of the defense attorneys prior
4    to today, correct?
5    A.  No, I have not.
6    Q.  Okay.  You've spoken to the government, correct?
7    A.  That's correct.
8    Q.  Approximately how many times, say, over the last two-plus
9    years, either in person, telephonically, electronically, how
10   many times did you converse or communicate with them?
11   A.  Numerous times.
12   Q.  Could you give us a number?
13   A.  I'd say 50 times or so.
14   Q.  Fifty, 5-0?
15   A.  Mm-hmm.
16   Q.  Okay.  Is that a yes?
17   A.  That -- yes.
18   Q.  I want to make sure that Ms. Cavanagh's able to take it
19   down.
20        Did anyone from the government advise you that during
21   the period of time that's alleged in the indictment that there
22   were approximately 24,700 patients at these -- at these
23   clinics?
24   A.  I knew that there was a large number of patients.  I don't
25   recall --

1    Q.  Not a precise number.

2           THE COURT REPORTER:  Wait, one at a time.  Mr. Weiss,

3    you keep cutting the witness off.

4           MR. WEISS:  I'm sorry.

5           THE COURT REPORTER:  "I don't recall..."

6    A.  I don't recall the exact number but I knew that there was

7    a large number of patients.

8    Q.  Would you dispute if I told you it was approximately

9    24,700?

10   A.  I don't dispute.

11   Q.  Thank you.

12          And I think today you testified to six or seven

13   patients?

14   A.  As -- as far as the detail, yes.

15   Q.  Okay.  And then there's these other hundred that you say

16   you were given, correct?

17   A.  Correct.

18   Q.  Do we have the identities of those patients?

19   A.  We have not spelled those out here, no.

20   Q.  Do you have the identities of those patients?

21   A.  I have records of those, yes.

22   Q.  Okay.  And are you able to provide the jury with the names

23   of those hundred patients?

24   A.  Not today, no.

25   Q.  No.  Okay.

 1              And did you reference these hundred patients in your

 2    report that you authored, what, about two years ago?

 3    A.  As an overall opinion, yes.

 4    Q.  But you didn't identify them, did you?

 5    A.  I did not.

 6    Q.  You did not provide a specific analysis of them, did you?

 7    A.  I did not.

 8    Q.  And in terms of whether it's the six or seven that you

 9    testified to today and maybe this other hundred, who determined

10    which patient charts would be given to you?

11    A.  It was the government that provided the charts to me.

12    Q.  Okay.  So let's just say for the sake of discussion that

13    you got a hundred, 120, even 200 charts.  That still leaves

14    about 24,500 charts-plus that you did not review, correct?

15    A.  That's correct.

16    Q.  And as you sit there today under oath, you can't opine as

17    to what is in those charts or, for that matter, what's not in

18    those charts?

19    A.  Which charts are we referring to?

20    Q.  The other 24,500.

21    A.  I -- I don't have -- no, I don't have the ability to do

22    that.

23    Q.  So you can't say whether they got optimal care or didn't

24    get optimal care?

25    A.  I was given by the --

1   Q.  My question is you can't say what you weren't given,
2   correct?
3   A.  I cannot say what I wasn't given.
4   Q.  Thank you.
5          All right.  Now, have you ever watched a military
6   parade?
7   A.  Yes.
8   Q.  Either in person or on T.V. or in the movies, on the news?
9   A.  Yes.
10  Q.  You've watched them?
11  A.  I believe so, yes.
12  Q.  Okay.  And you've got hundreds or thousand of marines or
13  soldiers and they're marching in lockstep, correct?
14  A.  Correct.
15  Q.  They're marching in unison, correct?
16  A.  Correct.
17  Q.  Everyone is on the same beat?
18  A.  Correct.
19  Q.  There's no difference between each individual and that
20  entire mass of who's ever in the parade, correct?
21  A.  That's correct.
22  Q.  It's remarkable to see, fair statement?
23  A.  It is.
24  Q.  Okay.  Now, when we deal with medicine and we have
25  thousands and thousands of doctors, they don't march in that

```
 1   same unison, do they?
 2   A.  Not at -- to what you're trying to draw an analogy.
 3   Q.  Don't try to think what I'm --
 4         MS. McMILLION:  Objection, Your Honor.
 5   BY MR. WEISS:
 6   Q.  Just answer the question.
 7         MS. McMILLION:  I'm going to object to the relevance
 8   as to bands marching.
 9         THE COURT:  It's relevant to set up the question that
10   the doctor's going to answer, which is whether or not medical
11   professionals perform in lockstep.
12         Go ahead and answer that if you can, Doctor, please.
13         THE WITNESS:  They don't perform in exact lockstep as
14   a band --
15   BY MR. WEISS:
16   Q.  Thank you.
17   A.  -- but they are --
18   Q.  Sir, can you answer my question please?
19         MS. McMILLION:  Your Honor, I'm going to ask --
20         MR. WEISS:  Your Honor, it's my question.  I can
21   indicate whether it's being responsive or not.
22         THE COURT:  I think -- I think the jury gets the
23   message, and ladies and gentlemen, this is jousting between
24   counsel and witness.  It happens sometimes, it's fine, but
25   you'll take the evidence that you hear and evaluate.
```

1           And you go ahead, Mr. Weiss.

2           MR. WEISS:  Thank you, Your Honor.

3    BY MR. WEISS:

4    Q.  You referenced, in response to some of the government's

5    questions, the term MME.  You recall that, sir?

6    A.  That's right.

7    Q.  Okay.  And that references morphine milligram equivalent,

8    correct?

9    A.  That's correct.

10   Q.  Okay.  And that was a phrase that was promulgated by a

11   governmental agency, correct?

12   A.  You're referring -- you're referring to --

13   Q.  MME.

14   A.  Which governmental agency?

15   Q.  Well, I just started with the governmental agency and then

16   we'll narrow it down.

17   A.  Okay.  Yes.

18   Q.  Okay.  And was it the Center for Disease Control, the CDC?

19   A.  They were not the ones that founded the term but they did

20   put it in their guidelines.

21   Q.  Okay.  And which governmental agency founded the term?

22   A.  It's actually from various societies in the literature and

23   so forth.

24   Q.  Okay.  And MME was or is a method of determining how

25   different -- excuse me.  It's a bad question.

1          Different painkillers have different potency,

2    correct?

3    A.   It's a way of sort of --

4    Q.   Well, my question is do different painkillers have

5    different potencies?

6    A.   It'd be difficult to answer your question exactly the

7    way --

8    Q.   Okay.  Then that's fine.  I'll try to answer a question

9    or -- or promulgate a question that you can answer.

10          Not all painkillers are the same, correct?

11   A.   At high level, that's correct, yes.

12   Q.   Or at any level they're not the same, are they?

13   A.   There are definitely similarities between them but --

14   Q.   My question was they're not the same, not similar.  My

15   question was they're not the same, yes or no?

16   A.   They are not exactly the same.

17   Q.   Thank you.

18          Okay.  So to try to determine dosaging and

19   prescribing, the various societies came up with a methodology

20   that they call MME, or morphine milligram equivalent, so they

21   could compare if a patient got a particular type of medication

22   versus another type of medication, correct?

23   A.   That's correct.

24   Q.   Okay.  And in 2016 the Centers for Disease Control, CDC,

25   came out with a set of guidelines, correct?

1    A.   That's correct.

2    Q.   Okay.  Now, you indicated this morning that, in part, your

3    opinions that you gave at testimony were premised upon these

4    CDC 2016 guidelines, correct?

5    A.   That's correct, in part.

6    Q.   Okay.  And the CDC quite specifically in their guidelines

7    indicated that these guidelines were directed towards primary

8    care physicians, correct?

9    A.   It was part of it, yes.

10   Q.   Okay.  All right.  Didn't reference pain management

11   specialists, did they?

12   A.   It was --

13   Q.   Just a yes or no.

14   A.   They did not reference pain management.

15   Q.   Thank you.  Okay.

16        And it talks about the lowest possible effective dose

17   is what a primary care physician should prescribe if he or she

18   sees fit to prescribe opioid medication, correct?

19   A.   Correct.

20   Q.   Okay.  All right.  Now, you've heard the term legacy

21   patient?

22   A.   Yes.

23   Q.   Okay.  A legacy patient is someone who has a history with

24   pain management, correct?

25   A.   A history of pain management, yes.

Case 2:18-cr-20800-SJM-APP  ECF No. 414, PageID.3740  Filed 06/02/22  Page 22 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

22

1    Q.   Okay.  And generally speaking, when someone gets where

2    they feel pain, they'll go to their family practitioner or

3    they'll go to a primary care physician, correct?

4    A.   That's possible, yes.

5    Q.   Okay.  And that individual will attempt to treat the pain,

6    correct?

7    A.   That's correct.

8    Q.   Okay.  And let's do a little history.  Back in the 1980s,

9    painkillers were very seldom prescribed for patients other than

10   terminal cancer patients, correct?

11   A.   That's correct.

12   Q.   Okay.  And as we got into the 90s, the pendulum sort of

13   swung somewhat and that physicians became more prevalent at

14   prescribing pain medication, correct?

15   A.   That's correct.

16   Q.   Okay.  And part of that was due to some of the big

17   pharmaceutical suppliers who were advertising their particular

18   or their manufactured pain pills, correct?

19   A.   That's correct.

20   Q.   Okay.  In fact, it got to the point where some primary

21   care physicians and family practitioners felt that if they

22   weren't prescribing large or fairly large doses of painkillers,

23   that they may be engaging in malpractice?

24   A.   There was thoughts about that, yes.

25   Q.   Okay.  And, in fact, at least one of the large

1    pharmaceutical companies told physicians that their medication

2    was not addictive, correct?

3    A.  That's correct.

4    Q.  And when a physician started to complain about patients

5    exhibiting signs of addiction, that pharmaceutical company said

6    that's pseudoaddiction, prescribe more painkillers?

7    A.  That was said, yes.

8    Q.  Okay.  And that was by Purdue Pharmaceutical, correct?

9    A.  Yes.

10   Q.  And you know Purdue Pharmaceutical, don't you?

11   A.  I do.

12   Q.  In fact, you were instrumental in getting a $1 million

13   grant from Purdue, were you not?

14   A.  It was a grant with a colleague, yes.

15   Q.  Yes, for Purdue.

16           And you also got about $35,000 from Cardinal, another

17   big pain medication manufacturer that was involved in the 90s

18   and the early 2000s, correct?

19   A.  Perhaps we can expand on that if I can give context.

20   Q.  Just answer my question.  You got $35,000 from Cardinal,

21   yes or no?

22   A.  I did receive $35,000 --

23   Q.  Thank you.

24   A.  -- from Cardinal.

25   Q.  All right.  Now, in around the late -- well, around 2010

1    when people started keeping statistics about opioid overdoses
2    and what these large pharmaceutical companies had done, the
3    alarm bells started to ring, did they not?
4    A.  Correct.
5    Q.  Okay.  Some people estimate that during that opioid crisis
6    a half a million people died getting too much pain medication,
7    correct?
8    A.  Correct.
9    Q.  Cost millions and millions and millions of dollars,
10   correct?
11   A.  Correct.
12   Q.  Okay.  So the government around 2016, we've already
13   indicated, came up with guidelines, right?
14   A.  Correct.
15   Q.  Now, they weren't supposed to be rules, correct?
16   A.  Correct.
17   Q.  They weren't supposed to be standards, correct?
18   A.  They were guidelines.
19   Q.  Guidelines.  Thank you.
20          So they're not rules and they're not standards,
21   they're not laws, they're not regulations; they're simply
22   suggestions or recommendations, correct?
23   A.  Correct.
24   Q.  And it made a point several times throughout the
25   guidelines they were not designed or intended to supplant the

1    discretion of the attending physician, correct?

2    A.  Correct.

3    Q.  Thank you.

4         But as what happens a lot with even a governmental

5    suggestion or guideline, some areas took them as gospel,

6    correct?

7    A.  Some areas, who are you referring to?

8    Q.  You know, it's -- you're right, should be a better

9    question.

10        Some pharmacies started to issue policies, and I'm

11   talking about nationwide pharmacies, about what they would fill

12   and what they wouldn't fill because they were afraid it was

13   contrary to a guideline?

14   A.  Correct.

15   Q.  So they established hard and fast policies even though it

16   was designed as a guideline for primary care physicians, right?

17   A.  Correct.

18   Q.  And insurance companies to deny coverage came up with

19   their own policies based upon what was a guideline for primary

20   care physicians, correct?

21   A.  Correct.

22   Q.  And even law enforcement agencies started to enforce what

23   they thought was a hard and fast rule when it was simply a

24   guideline for primary care physicians, correct?

25   A.  It was beyond that but -- but they did talk about the CDC

1    guidelines.

2    Q.  In fact, a lot of physicians got downright afraid and so

3    the pendulum swung back, correct?

4    A.  Correct.

5    Q.  All right.  Now, the 2016 guidelines were not the last

6    concept to be thrown into this mix, correct?

7    A.  Correct.

8    Q.  The AMA the following year, the American Medical

9    Association, issued its own paper criticizing those guidelines,

10   correct?

11   A.  Correct.

12   Q.  Okay.  Felt that they were too rigid, correct?

13   A.  Correct.

14   Q.  Even though they were guidelines, they felt they were too

15   rigid?

16   A.  There were elements that they felt were too rigid, yes.

17   Q.  Okay.  And they were concerned about patients not being

18   cared for, correct?

19   A.  As an overarching blanket, yes.

20   Q.  All right.  Again, because the pendulum had swung back,

21   insurance companies, law enforcement, pharmacies and even some

22   physicians were -- didn't want to run afoul of a guideline.

23   Patients weren't being taken care of, right?

24   A.  There was risk of that, yes.

25   Q.  Okay.  Patients weren't getting the medication that they

1  were entitled to receive, correct?

2  A.  There were instances of that.

3  Q.  The instances of suicide was increasing at alarming rate,

4  correct?

5  A.  Correct.

6  Q.  In fact, the CDC indicated that in the first year they had

7  over 3,000 complaints, right?

8  A.  Correct.

9  Q.  Eighty-four percent were afraid that they wouldn't get

10  their legitimate painkillers, correct?

11  A.  I don't know the exact numbers but there were concerns,

12  yes.

13  Q.  Okay.  Forty-two percent indicated that they were con --

14  seriously contemplating suicide 'cuz they couldn't get

15  treatment, correct?

16  A.  Again, I don't have a way to cite the statistics that

17  you're reporting.

18  Q.  I think you mentioned earlier today that that some

19  patients can build up a tolerance to painkillers, correct?

20  A.  Correct.

21  Q.  Okay.  And that's just -- that's just part of the -- the

22  medicine that people like yourself and these physicians deal

23  with every day, that people may develop a tolerance, correct?

24  A.  That's correct.

25  Q.  Okay.  And sometimes it's the quantity of the medication

1    they received?

2    A.   Correct.

3    Q.   Sometimes it's the amount of years over which they've

4    received the medication?

5    A.   Correct.

6    Q.   And their prior history and their physiological makeup,

7    correct?

8    A.   Correct.

9    Q.   Okay.  So in addition to the CDC and the AMA, we have

10   ASIPP.  You're familiar with ASIPP?

11   A.   Yes.

12   Q.   And would you relate to the jury what ASIPP is as you

13   understand it?

14   A.   So ASIPP is a pain management society.  It stands for

15   American Society of Interventional Pain Physicians.

16   Q.   Are you a member of that society?

17   A.   I have been in the past, yes.

18   Q.   Are you currently a member?

19   A.   I am not.

20   Q.   Okay.  And they came up with their own guidelines,

21   correct?

22   A.   Correct.

23   Q.   Okay.  And they're not the only society or organization of

24   pain physicians that issued guidelines as well, correct?

25   A.   Correct.

1   Q.  Okay.  So we have a number of -- well, we have the CDA, we

2   have the AMA, we've got ASIPP, we've got other organizations

3   that are all issuing guidelines, correct?

4   A.  Correct.

5   Q.  Sometimes they're on the same page and sometimes they're

6   not, correct?

7   A.  They're not exactly the same as the CDC but they still

8   have elements of that in there.

9   Q.  Okay.  And organizations being what they are, sometimes

10  they follow the -- the political dictates of their members,

11  correct?

12  A.  The political dictates of their members, I'm not sure what

13  you mean.

14  Q.  If you don't understand, just indicate that you don't.

15  A.  I'm not -- I'm not aware of what you mean.

16  Q.  Okay.  All right.  But sometimes politics gets involved in

17  the formulation of guidelines in the practice of medicine,

18  correct?

19  A.  Politic -- I'm -- I'm -- I don't know how to answer that.

20  Q.  Okay.  That's fine.

21          So you got all of these guidelines and you ask a

22  physician to practice his or her craft when all these things

23  are floating around, correct?

24  A.  Correct.

25  Q.  Okay.  And just so we're clear, the indictment alleges,

1  and it's just an allegation, between 2013 and 2018, right?

2  A.  Correct.

3  Q.  Okay.  The CDC didn't come out with their guidelines until

4  2016, correct?

5  A.  Correct.

6  Q.  And of all the things we would like our pain management

7  physicians to do and to be, clairvoyance is not one of them,

8  correct?

9  A.  I'm not sure how you're using the word clairvoyance.

10  Q.  In 2013, did you expect any of these physicians to be able

11  to predict what the CDC would do in 2016?

12  A.  No.

13  Q.  All right.  That's what I mean about being clairvoyant.

14  A.  Okay.

15  Q.  But I appreciate the clarification.  Thank you, sir.

16        The government asked you about do most lower pain

17  problems, lower pain -- lower back pain clear -- clear up

18  within three months.  Do you recall that?

19  A.  I believe so, yes.

20  Q.  Okay.  And your answer was in the affirmative, that they

21  do, correct?

22  A.  In the acute pain situations, yes.

23  Q.  Okay.  Well, let's talk a little bit about that 'cuz you

24  mentioned the word acute.  Acute pain generally refers to pain

25  that is resolved or hasn't lingered for over three months,

1 correct?

2 A.  More the latter statement, yes.

3 Q.  Okay.

4 A.  Yeah.

5 Q.  So if you have acute pain and you go to your primary care

6 physician and he or she, either it's Tylenol or aspirin or

7 maybe even one or more of the Schedule IIs, if that pain goes

8 away within that three-month period, people in your field

9 generally refer to it as acute pain, correct?

10 A.  That is correct.

11 Q.  Okay.  But when we have pain that is not resolved within

12 that three-month period and lingers and continues on past the

13 three months, we can refer to it as chronic pain, correct?

14 A.  That's correct.

15 Q.  Okay.  So by definition, chronic pain is not going to go

16 away less than three months?

17 A.  It would not go away but it has a chance to change.

18 Q.  It has a chance, yeah, sure, and I have a chance to win

19 the Lotto.  We don't know when it's going to go away, do we?

20 A.  We don't have a prediction, no.

21 Q.  Thank you.

22      In fact, being uncertain as to when that pain's going

23 to go away, we're not certain if it will ever go away, correct?

24 A.  Correct.  We talked about functional changes, pain

25 improvements, right.

1    Q.   Okay.  So a lot of pain is progressive?

2    A.   Progressive in the sense that it's getting worse?

3    Q.   Getting worse and continues.

4    A.   There's a chance of that.

5    Q.   Okay.

6    A.   Yes.

7    Q.   And particularly when we're dealing with back pain and the

8    patient gets older, it can progress?

9    A.   It can progress.

10   Q.   Okay.  All right.  Let -- and let's talk a little bit

11   about progressive pain, okay?  How does arthritis affect back

12   pain?

13   A.   Arthritis can or cannot be a contributor to pain.

14   Q.   Okay.  And generally speaking, people get arthritis, at

15   least where it becomes noticeable or pronounced, as they get

16   older, correct?

17   A.   There's a chance of that, yes.

18   Q.   Okay.  And there's also rheumatism?

19   A.   Yes.

20   Q.   And that can contribute to pain?

21   A.   Correct.

22   Q.   And again, we -- some of the patient population seems to

23   get that as they get older?

24   A.   That's correct.

25   Q.   Okay.  And we don't have, we meaning med -- medicine,

1    doesn't have a lot of really good answers as to how to deal

2    with arthritis and rheumatism, fair statement?

3    A.   That's a fair statement.

4    Q.   Okay.  So a patient, through no fault of his or her

5    physician, may be on some form of treatment or pain medication

6    for long periods of time, correct?

7    A.   That's correct.

8    Q.   Okay.  And through no fault of the physician, it could go

9    on for months or years, correct?

10   A.   That's correct.

11   Q.   Having nothing to do with the competency of the physician,

12   fair statement?

13   A.   Correct.

14   Q.   Or the billing practices of that particular clinic,

15   correct?

16   A.   That's correct.

17   Q.   It's just a matter that medicine, at least in the area of

18   pain management, doesn't have all the answers?

19   A.   We're -- we're talking about individual patients, but yes.

20   Q.   Yeah.  Okay.  You don't have all the answers?

21   A.   Correct.

22   Q.   And I don't mean that to be in a negative or condescending

23   sense; it's just the nature -- it's just the nature of the

24   beast.

25   A.   Correct.

1    Q.  You guys are doing research and trying to get the answers,

2    but at least between 2013 and 2018 pain management didn't have

3    all the answers, correct?

4    A.  Correct.

5    Q.  Okay.  And we talked a few moments ago about the pendulum

6    swinging back and forth in terms of virtually no pain

7    medication, maybe overprescribing in the 19 -- 1990s, early

8    2000s, and then cutting back around 2010 or so.

9          When the primary care physicians and the family

10   practitioners sort of saw the writing on the wall and started

11   to cut back, some of them did the best they could with their

12   patients, correct?

13   A.  Correct.

14   Q.  Some of them just cut the patients loose, correct?

15   A.  That's -- that's true too.

16   Q.  I'm not going to treat you anymore for whatever reason,

17   just go away.

18   A.  Yes.  They -- they would either refer them or, yes, they

19   may do that too.

20   Q.  Okay.  And some of them did refer them, correct?

21   A.  Correct.

22   Q.  Okay.  In the patient charts that you reviewed that the

23   government gave you, were you able to ascertain the number of

24   those patients that were referred to my client and his

25   colleagues from another physician?

1    A.  There were a number of them.

2    Q.  Okay.  When you refer a patient to another physician -- do

3    you do that, by the way?

4    A.  I do.

5    Q.  Do you generally refer the patient to a physician that you

6    respect and trust or someone that you could care less about?

7    A.  To someone I care and trust about.

8    Q.  Okay.

9    A.  Or trust.

10   Q.  And to your knowledge, do most physicians do that?

11   A.  Yes.

12   Q.  Okay.  So the fact that these patients, at least a

13   significant number of them, were referred by other physicians

14   is an indication that maybe they knew what they were doing and

15   that they were good physicians, correct?

16   A.  That they were good physicians, yes.

17   Q.  Okay.  Thank you.

18         Now, the guidelines in 2016 from the CDC was not the

19   last that we heard from the CDC, correct?

20   A.  Correct.

21   Q.  Okay.  I believe in 2019 the authors of the CDC guidelines

22   write an article for the New England Journal of Medicine,

23   correct?

24   A.  Correct.

25   Q.  Okay.  And the authors of -- of the 2016 guidelines were

1   critical of the way governmental agencies, insurance companies,

2   pharmacies, law enforcement were all massaging their guidelines

3   to fit what they wanted to do, correct?

4   A.  I wouldn't say that.

5   Q.  Okay.  That's fine.  All right.  But they were critical of

6   what that happened and how those guidelines were being utilized

7   by various segments of our population, correct?

8   A.  They were concerned about unintended consequences of their

9   guidelines, yes.

10  Q.  Okay.  And unintended consequences meant that a lot of

11  patients were not getting their legitimate medication, correct?

12  A.  Correct.

13  Q.  They were concerned that a lot of pharmacies were not

14  filling legitimately issued -- or excuse -- legitimate -- yeah,

15  legitimately issued prescriptions?

16  A.  Correct.

17  Q.  They were concerned about their colleagues being looked at

18  by governmental agencies and law enforcement as somehow doing

19  something wrong?

20  A.  Correct.

21  Q.  Thank you.

22        And just a couple of months ago they came out with a

23  draft of a whole new set of guidelines, correct?

24  A.  I wouldn't say it was all new.  It was -- it was an update

25  on those.

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3755   Filed 06/02/22   Page 37 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

37

1    Q.   Okay.  And it dealt with the critiques that we've

2    previously discussed this afternoon?

3    A.   Correct.

4    Q.   And it discussed some admittedly new areas where research

5    post-2016 has taken us, correct?

6    A.   Some, yes.

7    Q.   In fact, post-2018, correct?

8    A.   Maybe you can specify what research you're referring to.

9    Q.   Well, I'm talking about they were going into areas of --

10   on the basis of studies that were published in 2020, 2021 about

11   new methodologies or prospective new methodologies of creating

12   chronic pain.

13   A.   I mean perhaps you can give me details on those, but there

14   was more evidence taken into those guidelines, I would say

15   that, yes.

16   Q.   Okay.  And there were a number of studies published since

17   the time of this indictment as to where pain management may end

18   up going?

19   A.   They're not studies.  They're opinion pieces or guidelines

20   that may evolve, yes.

21   Q.   All right.  I'll -- I'll -- I'll accept your opinion

22   pieces and studies.

23        The opinions relating to pain management are still

24   evolving?

25   A.   Yeah, I -- I would say that they're evolving with small

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3756   Filed 06/02/22   Page 38 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

38

1    modifications of what we've seen, right, yes.

2    Q.  All right.  But that's the way medicine as a whole works,

3    correct?

4    A.  Correct.

5    Q.  Someone does a study, publishes their results, and other

6    physicians in that area either try to duplicate those results

7    or build upon those results and go off on to something else,

8    correct?

9    A.  Correct.

10   Q.  After all, pain management is supposed to be evidence

11   based?

12   A.  Correct.

13   Q.  And evidence is not derived from simply one study?

14   A.  Correct.

15   Q.  You want to see massive studies?

16   A.  As many as you can.

17   Q.  Okay.  And even when someone publishes it, the literature

18   is full of some people support it, some people critique it,

19   some -- sometimes you're in a no-man's-land as to where you're

20   going to go and what you're going to do?

21   A.  There can be differing opinions, yes.

22   Q.  Thank you.

23          And one of the 2022 draft guidelines that build upon

24   the 2016 guidelines deals with discontinuing a patient,

25   correct?

1    A.  Correct.

2    Q.  All right.  They're concerned about the -- I think pain

3    management physicians use the word taper?

4    A.  Correct.

5    Q.  Okay.  And would you explain to the jury what taper or

6    tapering is?

7    A.  Tapering is basically over time reduction in the number of

8    either pills or dosage of the medication so the overall usage

9    of that medication is declining.  That can be over short or

10   long periods.

11   Q.  Okay.  And they are suggesting to the clinician to be

12   really careful about tapering, correct?

13   A.  They're suggesting to be aware of that.

14   Q.  Yeah.  Okay.

15   A.  Yeah.

16   Q.  In fact, I think it uses the phrase forced tapering.

17   A.  Forced tapering, which is a different phenomenon, yes.

18   Q.  Okay.  And that's when the physician hard and fast, "I'm

19   going to cut you in half, I'm going to do this," without taking

20   into account what the patient is going through, correct?

21   A.  Well, it's part of the overall broader perspective, yes.

22   Q.  Okay.  But they counsel against this forced tapering

23   phenomenon, correct?

24   A.  In the absence of other treatments.

25   Q.  Okay.  And so whether it's weaning or tapering, I mean in

1   one part of the 2022 guidelines even a ten percent reduction

2   may be unwarranted given what the patient presents, correct?

3   A.  I wouldn't say ten percent but --

4   Q.  I'm not saying it; it's -- it's in the 2022 draft.

5   A.  There can be cases, yes.  The ten percent could be --

6   Q.  Okay.  It does --

7            THE COURT REPORTER:  Wait.  Mr. Weiss, you keep

8   cutting the witness off.

9            MR. WEISS:  And I -- all right.

10  Q.  In the 2022 draft it mentions ten percent, correct?

11  A.  It does.

12  Q.  Okay.  One of the other topics that the government asked

13  you about was bilateral procedures.  Do you recall that, sir?

14  A.  I do.

15  Q.  Okay.  And there are times when a bilateral procedure is

16  appropriate, correct?

17  A.  Correct.

18  Q.  Okay.  And the government also questioned you about

19  sedation, correct?

20  A.  Correct.

21  Q.  And there's some controversy, there's some disagreement

22  among clinicians about how often to use sedation, correct?

23  A.  I would say it -- probably not very much, no.

24  Q.  Not very -- okay.

25            Do you recall back in 2020 being part of a

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3759   Filed 06/02/22   Page 41 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

41

1    point-counterpoint?

2    A.   Yes.

3    Q.   Okay.  And you and another clinician advocated for

4    conscious sedation, correct?

5    A.   There was --

6    Q.   Just -- it's a yes or no.  Did you advocate for conscious

7    sedation at that point-counterpoint?

8    A.   It was for specific cases.  If you want to cite that

9    paper, that's --

10   Q.   We'll get to the paper in a second.

11   A.   Okay.

12   Q.   But you did advocate for it, correct?

13   A.   I advocated for --

14   Q.   Okay.

15   A.   -- particular --

16   Q.   Okay.  And there were other physicians --

17          THE COURT REPORTER:  Mr. Weiss, you cut his answer

18   off.  "I advocated for..."

19   A.   Particular instances.

20   Q.   Okay.  And there were other physicians that advocated

21   against, correct?

22   A.   That's correct.

23   Q.   Okay.  And I think as part of your argument for conscious

24   sedation, you referenced 64 percent of clinics utilize

25   conscious sedation in their procedures.  Do you recall that

1    number, sir?

2    A.  That was a background --

3    Q.  Well, background, but you use the number 64, correct?

4    A.  But it was not a -- a judgment on whether that's

5    appropriate or inappropriate.  Is that what you're trying to --

6    Q.  So you referenced 64 even though it may not have been

7    accurate?

8    A.  It was purely just a prevalence.

9    Q.  It was just a premise?

10   A.  Prevalence.

11   Q.  Prevalence?

12        So did you or did you not make up the number 64?

13   A.  No, I did not make it up.

14   Q.  So you got that from somewhere, correct?

15   A.  Correct.

16   Q.  So someone did a study of pain management clinics in and

17   around 2016, and 64 percent of them were using some form of

18   sedation when they did their procedures, correct?

19   A.  Correct.

20   Q.  Thank you.

21        Let's talk a moment about durable medical equipment,

22   correct?

23   A.  Mm-hmm, yes.

24   Q.  Okay.  It's not really a question.  I apologize.

25        A brace, durable medical equipment, goes outside the

1    body, correct?

2    A.   Correct.

3    Q.   Okay.  So you don't need any surgery?

4    A.   I -- are you trying to equate the two?

5    Q.   Well, no, no, I'm just trying to ask a question.  To put a

6    back brace on, such as my colleague has, it doesn't require any

7    surgery to apply it, correct?

8    A.   Okay.  So no, the placement of it does not require

9    surgery.

10   Q.   Okay.  And it doesn't constitute a Schedule II opioid,

11   does it?

12   A.   It does not.

13   Q.   Okay.  And it is probably one of the most innocuous

14   quivers that a pain management physician has in her -- one of

15   the most innocuous, yeah --

16          THE COURT:  Arrow --

17   Q.   -- arrows --

18          THE COURT:  -- that he has in his quiver.

19   Q.   -- in his quiver.

20          THE COURT:  Or she.

21          Go ahead.

22   Q.   Correct?

23   A.   You've got --

24   Q.   One of the most innocuous arrows that a pain management

25   physician has in his or her quiver to help the patient with

1   back pain, correct?

2   A.  In terms of the risk of a brace, is that what you're

3   asking for, or durable medical equipment?

4   Q.  All I'm asking is --

5   A.  I don't -- I don't think of --

6   Q.  Okay.

7   A.  -- arrows --

8   Q.  Just trying to figure out -- since it doesn't involve

9   surgery, it doesn't involve ingesting anything, it doesn't

10  involve being sedated.  All it is is placing an object on the

11  outside of the body in the hope that it may help that

12  particular patient.  So in terms of the -- the -- what the pain

13  management specialist has at her -- his or her disposal, it's

14  relatively innocuous?

15  A.  So again, I mean you're -- you're specifying risk of harm

16  with this treatment, that's what you're trying to allude to?

17  Q.  I'm just trying to ascertain whether or not in the entire

18  spectrum of items that the pain management physician can do,

19  the brace has got to be towards the end of the most innocuous.

20  A.  So I -- I will say that it is on the lower end of risk to

21  the patient, correct.

22  Q.  Okay.  When the government gave you -- or strike that.

23          I think we've already indicated that pain management

24  is not infallible, correct?

25  A.  Infallible?

1    Q.   Infallible meaning that it doesn't cure everyone?

2    A.   Correct.

3    Q.   Okay.  In fact, the literature talks about that if a

4    particular methodology has a 30 percent success rate, then

5    that's pretty good, correct?

6    A.   Actually, no.  Thirty percent is actually thought to be

7    close to placebo.

8    Q.   I see.  Okay.  Are you familiar with *Raj's Practical Pain*

9    *Management of Pain*?

10   A.   Yes.

11   Q.   An authoritative text, correct?

12   A.   It is a good quality text, yes.

13   Q.   Okay.  And we've already talked about the CDC guidelines

14   in 2016?

15   A.   Correct.

16   Q.   And we've talked about the 2022 draft of the CDC

17   guidelines, correct?

18   A.   Correct.

19   Q.   Okay.  And one item we haven't spoken about but maybe we

20   should get to it before I go further is are you familiar with

21   the *Pain Management Best Practices*?

22   A.   Yes.

23   Q.   Okay.  Do you find that to be an authoritative text?

24   A.   I do, yes.

25   Q.   And are you familiar with the *Pain Physician*?

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3764   Filed 06/02/22   Page 46 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

46

1    A.   Yes.

2    Q.   Okay.  Authoritative publication?

3    A.   It's a good quality journal.

4    Q.   Pardon?

5    A.   It's a good quality journal

6    Q.   Okay.  And I think we also referenced the AMA critique

7    that came out in 2020 of the 2016 guidelines, correct?

8    A.   Correct.

9    Q.   All right.  And it is your position that 30 percent

10   success rate doesn't mean anything?

11   A.   It needs to be taken in context of the study, so --

12   Q.   Okay.

13   A.   Yes.

14   Q.   All right.  Did the -- what about 60 percent, how would

15   you feel about that?

16   A.   Sixty percent success rate of a treatment?

17   Q.   Yeah, 60 percent of patient population felt that a

18   particular procedure was providing benefit to them.

19   A.   Yes.

20   Q.   Okay.

21   A.   I would agree with that.

22   Q.   How about -- let's go a little bit lower, 57 or

23   58 percent.  Would that be something that should be pursued by

24   the clinician?

25   A.   It's, again, looking at a study for a particular group of

1   patients in that study, did they have success.  Yes, that --

2   I -- I would agree with that number.

3   Q.  Okay.  Did the government tell you that a survey of

4   patients was done involving hundreds and hundreds of patients?

5       MS. McMILLION:  Objection, Your Honor.  Facts not in

6   evidence.

7       MR. WEISS:  I just asked whether they told him.

8       THE COURT:  I think that's okay.  Go ahead and finish

9   your question, Mr. Weiss.

10  BY MR. WEISS:

11  Q.  Did they tell you that?

12  A.  I don't think you finished what you were asking.

13  Q.  Did the government tell you that the Pain Center did a

14  survey of hundreds and hundreds of patients?

15  A.  No.

16  Q.  I think the approximate number was about 1500.  They did

17  not?

18  A.  No.

19  Q.  So then they didn't tell you what the success rate of

20  bracing was for that patient population?

21  A.  I did not know that, no.

22  Q.  Okay.  But if it was 57, 58 percent, according to you,

23  that would be significant, correct?

24  A.  Fifty-eight percent of patients felt it helped, is that

25  what you're saying?

1  Q.  Yes.

2  A.  It would be significant.

3  Q.  Okay.  And when a clinician goes down a particular path,

4  they may have an idea of what will work and what won't, but

5  they have to go on the basis of their education and training

6  and experience, correct?

7  A.  Correct.

8  Q.  And their -- as part of experience, what's worked for them

9  in the past and their patient population, correct?

10 A.  Correct.

11 Q.  Of all the patients that the government gave you charts

12 for, admittedly you never saw any of them, correct?

13 A.  We talked about the paper charts and we talked about --

14 Q.  No, did you see them?  Did you actually treat them in --

15 A.  Oh, individual patients?  No.

16 Q.  Okay.

17       THE COURT REPORTER:  Wait, wait.  You both talked on

18 top of each other.  "Did you actually treat them in..."  Mr.

19 Weiss, then you said...

20 Q.  Clinical setting.

21 A.  I did not.

22       THE COURT REPORTER:  Thank you.

23       THE COURT:  Let's remind the jurors that the

24 questions of counsel are not evidence; the answers of the

25 witnesses are.  So in terms of studies that were -- that were

1   conducted, there's no proof of that, but there is a conclusion

2   that if a study achieved 58 percent success, that would be

3   significant.  So that's the evidence in the case, okay?  All

4   right.

5           Go ahead, Mr. Weiss.

6           MR. WEISS:  Thank you, Your Honor.

7   BY MR. WEISS:

8   Q.  You indicated as part of your preparation in this matter

9   that you viewed undercover videos.

10  A.  That's correct.

11  Q.  You recall that?

12          And some of them were played to the jury earlier

13  today, correct?

14  A.  Correct.

15  Q.  All right.  Are you familiar with a patient by the name of

16  Andrew Peterson?

17  A.  Yes.

18  Q.  Okay.  He presented to the clinic five, six times?

19  A.  I believe so, yes.

20  Q.  All right.  And you reviewed the videos of all of those

21  encounters?

22  A.  I believe three to four of them.

23  Q.  Okay.

24  A.  Yeah.

25  Q.  The ones that the government gave you?

1  A.  Correct.

2  Q.  Okay.  So they didn't give you all of them?

3  A.  I can't recall to --

4  Q.  Okay.

5  A.  -- the extent of all those videos.

6  Q.  But whatever ones you reviewed, okay, my next question's

7  going to be based on that.  The government asked you about the

8  propriety or impropriety of the issuance of a prescription on

9  having an injection, correct?

10  A.  Correct.

11  Q.  Okay.  And you gave your opinion on that, correct?

12  A.  Correct.

13  Q.  In any of the videos where Andrew Peterson was a patient,

14  did any of the clinicians indicate no injection, no script?

15  A.  They did not.

16  Q.  Thank you.

17       MR. WEISS:  Your Honor, may I have some guidance as

18  to how long the Court intends to go this afternoon?

19       THE COURT:  Um, I'd -- roughly another half hour or

20  so.  How long do you intend to go this afternoon?

21       MR. WEISS:  I think it'll be a little bit longer than

22  that, and I'm going into an area that I'm going to need to set

23  up some audiovisual and that's why I was asking 'cuz I'm going

24  to beg the Court's indulgence on time.

25       THE COURT:  Well, we can take a comfort break, right,

1    ladies and gentlemen?  They don't seem particularly

2    enthusiastic.  But how long do you need to set up the

3    technology?

4            MR. WEISS:  I'm going to have to talk to Mr.

5    Rogalski.  It's going to take a few moments.

6            THE COURT:  All right.  Let's take a comfort break

7    till 3:00, we'll go to about 3:20, maybe 3:30, and then we'll

8    call it a day, okay?

9            MR. WEISS:  Thank you, Your Honor.

10           THE COURT:  And if you're done in that time, that's

11   good.  If not, we'll be here tomorrow.

12           All right.  Let's rise for our jury, ten-minute

13   break.

14           (Jury excused at 2:54 p.m.)

15           (Court in recess)

16           (Proceedings resumed at 3:00 p.m., all parties

17           present)

18           THE LAW CLERK:  All rise for the jury.  Court is back

19   in session.

20           (Jury entered the courtroom at 3:01 p.m.)

21           THE COURT:  Okay.  Everybody may be seated.  Good

22   timing on that one.  We called a ten-minute break and we went

23   for 11.  That was excellent.

24           Mr. Weiss is ready to go and we're back at it at

25   3:01 p.m.

```
 1            MR. WEISS:  Thank you, Judge.
 2   BY MR. WEISS:
 3   Q.  Sir, does the name Henderson Butler mean anything to you?
 4   A.  Not that I can recall.
 5   Q.  Okay.  Did the government reference that an undercover by
 6   the name of Henderson Butler went to the clinic on several
 7   occasions?
 8   A.  I can't recall offhand.
 9   Q.  Okay.
10            MR. WEISS:  I believe -- Your Honor, with the Court's
11   permission, we would like to play what's previously been
12   admitted as Government's Exhibit 1.
13            THE COURT:  Okay.
14            MR. WEISS:  Thank you.
15             (Video being played)
16            THE COURT:  What are we doing here?  I don't
17   understand why we're playing all this tape.
18            MR. WEISS:  One of the issues -- excuse me.  One of
19   the government complaints that this witness testified to was
20   regarding the unnecessary utilization of a back brace,
21   durable -- durable medical equipment.
22            THE COURT:  Okay.
23            MR. WEISS:  There was no training, there was no
24   instruction, it was just thrown at them.  To my knowledge, this
25   is the only interview where a back brace is given to a patient
```

1    that is on tape, and it shows everything leading up to it as

2    well as Brittany Caldwell, the physician assistant, fitting the

3    individual, Henderson Butler, showing how to utilize it and Mr.

4    Butler at the end commenting how good it feels.  I think in

5    order to have a complete picture of what went on at the pain

6    clinic regarding durable medical equipment, I respectfully

7    submit the jury should review this in its entirety.

8              THE COURT:  Okay.  Have you seen this?

9              THE WITNESS:  Not that I recall.

10             THE COURT:  Okay.  All right.  I think we can speed

11   through some of these things like him whistling in the bathroom

12   or whatever he's doing here.

13             MR. WEISS:  I didn't want to cut anything out, but

14   if -- if the Court --

15             THE COURT:  I don't think --

16             MR. WEISS:  -- would like us to get to --

17             THE COURT:  -- I -- yeah, I think we can -- if the

18   government's okay with that, and I'm sure they are, I think we

19   can move this along a little bit.

20             MS. McMILLION:  Your Honor, we're perfectly fine with

21   just fast forwarding to where he meets with --

22             THE COURT:  Yeah, yeah, yeah, yeah.

23             MS. McMILLION:  -- the physician assistant.

24             THE COURT:  Yeah, I think that's a good idea.

25             MR. WEISS:  As long as you'll allow Mr. Rogalski to

1    use his discretion to fast forward.

2            THE COURT:  Yeah.

3            MR. WEISS:  And I don't think there's an objection

4    either.

5            THE COURT:  Yeah, I -- I -- I think that's a good

6    idea.  Thank you very much.

7            MR. WEISS:  Thank you, Your Honor.

8            (Video being played)

9    BY MR. WEISS:

10   Q.  Sir, is it your testimony that you've never seen this

11   video before?

12   A.  Correct.

13   Q.  Pardon?

14   A.  That's correct.

15   Q.  Okay.  So you saw the physician assistant Brittany

16   Caldwell fit the brace on the patient, correct?

17   A.  Correct.

18   Q.  She adjusted it for him, correct?

19   A.  That's correct.

20   Q.  Showed him how to do it, correct?

21   A.  Correct.

22   Q.  And he commented at least twice on how good it felt,

23   correct?

24   A.  That's correct.

25   Q.  Okay.  So is it fair to say that for this particular

1  patient on that particular day, no one just threw a back brace

2  at him and had him leave the clinic, correct?

3  A.  Not in this instance.

4  Q.  Okay.  Thank you.

5        MR. WEISS:  Your Honor, that completes the -- this

6  one area.  I notice that it's 3:23.  I don't know if this was

7  approximately the time the Court wanted to break for the day.

8        THE COURT:  I think you can -- we can make a little

9  more headway 'cuz we didn't -- that was a long video and we

10  didn't accomplish much during it, so I think we ought to press

11  on a little bit.

12  BY MR. WEISS:

13  Q.  Is it fair to say that clinical decisions should be based

14  on a relationship between the clinician and the patient?

15  A.  If you're -- if you're referring to shared decision

16  medical making with the patient?

17  Q.  I'm -- I'm referring to when the clinician is going to

18  make decisions and make recommendations, that there has to be a

19  relationship between the clinician and the patient.

20  A.  So you're -- for clarification, you're saying that there's

21  an established patient/doctor relationship and that's how --

22  Q.  Not necessarily established because even at the first

23  meeting, even at the initial intake, chances are at the end of

24  that meeting the clinician is going to make recommendations and

25  suggestions to that patient, correct?

Case 2:18-cr-20800-SJM-APP ECF No. 414, PageID.3774 Filed 06/02/22 Page 56 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

56

1    A.   Correct.

2    Q.   Okay.  So the two of them at least have established some

3    type of rapport so the clinician's suggestions and

4    recommendations perhaps will be more readily accepted and have

5    a greater understanding of why those recommendations are being

6    made.

7    A.   It's possible, yes.

8    Q.   Okay.  All right.  And particularly when we deal with

9    chronic pain, it becomes a little bit more acute because by

10   definition, the person's in a little bit of discomfort,

11   correct?

12   A.   You're -- you're suggesting acute on chronic pain, is

13   that -- no.

14   Q.   No, I'm suggesting that because the person has chronic

15   pain, there may be some physical discomfort as a result of that

16   chronic pain?

17   A.   Yes, they have pain.  Yes, they have discomfort.

18   Q.   Okay.

19   A.   Yes.

20   Q.   Okay.  And so if you're in pain, then there's some

21   discomfort associated with that and it becomes a little bit

22   more difficult to perhaps concentrate or communicate because

23   either your back is throbbing or your shoulder or something

24   else is causing you that constant pain, correct?

25   A.   It's theoretically possible but not always the case.

1  Q.  Okay.  All right.  And just so we're clear, at least as it

2  relates to musculoskeletal pain, some studies estimate that 43

3  percent of the adult population in the United States has some

4  level of pain emanating from that area.

5  A.  There's been all sorts of statistics, but that's -- that's

6  about --

7  Q.  You don't dispute the 43 percent that I'm referencing to

8  you, do you?

9  A.  I mean if you want to cite the reference, but it --

10  you're -- you're giving me a number, so I know it is a

11  prevalence.  There is low back pain --

12  Q.  How about -- how about for CDC recommendations of 2016,

13  okay?

14  A.  Okay.

15  Q.  And the sources of that 43 percent can be because of

16  arthritis?

17  A.  Correct.

18  Q.  Rheumatism?

19  A.  Correct.

20  Q.  Chronic back or neck problems?

21  A.  Well, that's sort of a open-ended thing, but yes,

22  that's --

23  Q.  I didn't write it.

24          Frequent headaches?

25  A.  Yes.

1    Q.   Okay.  And they also estimate that at least 11 percent of

2    adults have pain on a daily basis?

3    A.   Correct.

4    Q.   Okay.  And long-term treatment may be necessary for some

5    of these patients that present, correct?

6    A.   That's correct.

7    Q.   Okay.  And that may include nonopioids --

8    A.   Not --

9    Q.   -- according to the -- the course of treatment?

10   A.   Correct.

11   Q.   It may include non-pharmacy -- pharmacological treatments

12   at all, correct?

13   A.   Correct.

14   Q.   But it may necessitate injections?

15   A.   Correct.

16   Q.   And opioids or narcotics, correct?

17   A.   Correct.

18   Q.   All right.  In fact, and I think we touched upon this a

19   little bit earlier this afternoon, generally speaking, when a

20   patient presents with acute pain and they go to their primary

21   care physician or their family practitioner, that clinician

22   will prescribe something to treat the pain, correct?

23   A.   Potentially, yes.

24   Q.   And a lot of times it works?

25   A.   That's correct.

1  Q.  But a significant segment of our population, particularly

2  adults, it doesn't always work?

3  A.  Correct.

4  Q.  Okay.  And so you go to an interventionalist to try to

5  deal with the source of the pain, correct?

6  A.  Correct.

7  Q.  And by definition, an interventionalist will, within his

8  or her discretion and education and experience, recommend

9  interventional procedures, correct?

10  A.  Correct.

11  Q.  Okay.  And some of those procedures can be injections?

12  A.  Correct.

13  Q.  They can be diagnostic?

14  A.  Correct.

15  Q.  They can be therapeutic?

16  A.  Correct.

17  Q.  And if the criteria are met, I think you referred to it as

18  RFA, radiofrequency ablations?

19  A.  You -- you mentioned criteria, but yes, I did talk about

20  radiofrequency ablation.

21  Q.  Yeah, okay.  And again, you go through the -- and we'll go

22  through it if not this afternoon, hopefully tomorrow.

23        THE COURT:  How much -- how much total more do you

24  have, Mr. Weiss?

25        MR. WEISS:  I would think at least an hour, Judge.

```
 1            THE COURT:  Okay.  Why don't we go ten more minutes
 2   and then we'll call it a day.
 3            MR. WEISS:  Thank you.
 4   BY MR. WEISS:
 5   Q.  Most of these guidelines that we've talked about this
 6   afternoon reference that if opioids are going to be prescribed,
 7   that it be part of a multimodal, multi -- multidisciplinary
 8   approach, correct?
 9   A.  Correct.
10   Q.  Okay.  You don't want to just prescribe opioids in the
11   absence of anything else?
12   A.  Correct.
13   Q.  Okay.  And so from a academic perspective, if somebody is
14   simply seeking pills, there's no reason for them to be at an
15   interventionalist, correct?
16   A.  You -- if that's the only thing that they want and they
17   don't agree to any of the other therapies?
18   Q.  Yes.
19   A.  And you have concern about what those medications are
20   going to be used for?
21   Q.  Yes.
22   A.  Correct.
23   Q.  Okay.
24   A.  Yes.
25   Q.  So on one level, refusing to take injections when the
```

1    clinician feels that that is part of the multimodal,

2    multidisciplinary approach and only wants painkillers, the

3    physician may consider it appropriate to say, "It's got to be

4    part of the entire protocol 'cuz I'm not just going to write

5    you a painkiller."

6    A.  That's correct.

7    Q.  Okay.  So on one level, no injections, no pills may be the

8    appropriate methodology for treating or dealing with that

9    particular pill seeker?

10   A.  It's some patients that way, yes.

11   Q.  Okay.  Thank you.

12       You mentioned billing as part of your testimony on

13   direct examination, correct?

14   A.  Correct.

15   Q.  Okay.  A number of the recommendations by the CDC and some

16   of the private organizations also called to task insurance

17   companies, whether they be governmental or private, in terms of

18   refusing to adequately compensate the clinician for various

19   procedures that -- that the clinician feels are appropriate.

20   A.  This may be what you're referring to as the political

21   things earlier?

22   Q.  No, I'm not referring to political.  I'm talking about

23   finances, okay?

24       Some insurance carriers -- well, let me back that up.

25   Different insurance carriers have different coverages, correct?

1    A.   Correct.

2    Q.   Okay.  Some will pay for X number of injections per year,

3    some will pay for Y number of injections per year, correct?

4    A.   Correct.

5    Q.   Okay.  It doesn't necessarily mean that X is the optimal

6    number; it simply means that that's all they're going to pay

7    for, correct?

8    A.   Generally those numbers are based on evidence that they

9    cite in the -- in their guidelines.

10   Q.   And also their bottom line as well, correct?

11   A.   That -- that is a factor, yes.

12   Q.   You've been in this area for I don't know how many years.

13   Did you know an insurance company that just gives money away?

14   A.   No, I do not.

15   Q.   Okay.  Do you have to fight sometimes with insurance

16   carriers or people in your clinic or in your university to --

17   you think something's appropriate, and whether it's a

18   governmental pay or a private pay, there are problems?

19   A.   That's true.

20   Q.   Even though you're recommending and you want to do what

21   you believe in all of your expertise and training that this is

22   the appropriate thing, and you've got some bean counter that's

23   saying, "Dr. Mehta, no."

24   A.   I wouldn't say bean counter, but there are definitely

25   people who are clinically trained that are -- that potentially

1    we're having a conversation with, yes.

2    Q.   And generally those people are not physicians?

3    A.   They can be a variety of people, but I -- I -- I

4    understand what you're trying to ask.

5    Q.   In other words, you have a relatively -- and I don't mean

6    to be condescending, but you have a person that has not gone to

7    medical school telling you what you can do and what you can't

8    do or, more precisely, what they will reimburse you for?

9    A.   Sometimes, you're right, yes.

10   Q.   Okay.  Thank you.

11   A.   But there is usually an appeal process also that allows

12   you to then go and speak to what we call a I guess, you know,

13   peer-to-peer discussion.

14   Q.   And how long does that appeal process take?

15   A.   It could be as short as one day, it could be months,

16   you're right.

17   Q.   And in those months that patient is suffering?

18   A.   Potentially, yes.

19   Q.   Thank you.

20          In terms of the nonpharmaceutical approaches to

21   interventional pain management, there is physical therapy,

22   correct?

23   A.   Yes.

24   Q.   There's occupational therapy?

25   A.   Yes.

1    Q.   There is psychological therapy?

2    A.   Yes.

3    Q.   And there are the interventional approaches such as

4    injections?

5    A.   Yes.

6    Q.   So when we talk about multidisciplinary or multimodal,

7    we're talking about all of these various components that are

8    in -- and I -- I'll -- I'll make it -- I'll screw it up

9    again -- arrows in the clinician's quiver, correct?

10   A.   I'm going to read about your analogy, but yes, that's --

11   Q.   Okay.

12   A.   -- it's part of their tool belt.

13   Q.   Did I at least say it right?

14   A.   I have no way to verify.

15        THE COURT:  I thought -- I thought he did a fabulous

16   job.

17        MR. WEISS:  I appreciate that, Judge.  Thank you.

18        THE COURT:  All right.  All right, Mr. Weiss, what --

19   what -- what's -- what -- what point are we getting to here, if

20   you don't mind my asking?

21        MR. WEISS:  There's been talk about -- well, do you

22   really want me to make an argument?

23        THE COURT:  No.  I just want you to get to the point.

24   We're chewing up enormous amount of times with this -- with

25   this doctor, and -- and we're going to be here numerous weeks

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3783   Filed 06/02/22   Page 65 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

65

```
 1    and I want to get -- get out what we need to get out without a
 2    lot of chatter surrounding it, if you know what I mean.
 3            MR. WEISS:  I'll -- should I continue, Your Honor?
 4            THE COURT:  Yeah.
 5            MR. WEISS:  Okay.
 6            THE COURT:  If you make your point and then we'll
 7    break for the day.
 8            MR. WEISS:  All right.
 9    BY MR. WEISS:
10    Q.  Are you familiar with agreements that the patient has with
11    the physician?
12    A.  Grievance?  I'm sorry.
13    Q.  Agreements?
14    A.  Agreements?
15    Q.  Yes.
16    A.  Yes.
17    Q.  Okay.  Did you review agreements in the patient charts
18    that you looked at?
19    A.  Are you referring to the contracts and sort of the
20    policies --
21    Q.  Well, sort of like the --
22            THE COURT REPORTER:  Wait, wait, wait.  You cut him
23    off again, Mr. Weiss.  "Are you referring to the contracts and
24    sort of the policies..."
25    A.  Policies that a patient may sign on their visit?
```

1    Q.  For example, did you see narcotic agreements in the files

2    that you looked at?

3    A.  Yes.

4    Q.  Okay.  And did those agreements specify what was expected

5    of the patient and what the patient was agreeing to, correct?

6    A.  Correct.

7    Q.  Okay.  And the patient was advised that if there was

8    medication, they were supposed to take it the way it was

9    prescribed and intended, correct?

10   A.  Correct.

11   Q.  Okay.  And that there would be periodic screenings and

12   testing to assure compliance with the doctor's request,

13   correct?

14   A.  Correct.

15   Q.  Okay.  And urinary drug testing is one of those

16   methodologies --

17   A.  Correct.

18   Q.  -- that the clinician can utilize to determine, one, are

19   the medications that I am prescribing being taken, correct?

20   A.  Correct.

21   Q.  They're taken in conformity with my instructions or dosing

22   instructions, correct?

23   A.  Correct.

24   Q.  That they're not to the -- that they're not being

25   supplemented by medications elsewhere?

1    A.  Meaning other medications?

2    Q.  Other medications from another clinician or even on the

3    street.

4    A.  Correct.

5    Q.  Okay.  So if the clinician is prescribing Norco, clinician

6    wants to make sure that OxyContin is not being taken by the

7    patient at the same time, correct?

8    A.  Correct.

9    Q.  Or cocaine or heroin or fentanyl or Xanax or any other of

10   a whole host of prescriptions that the clinician is not

11   prescribing, correct?

12   A.  Correct.

13   Q.  You saw earlier today the interaction between Andrew

14   Peterson and Tatyana Bezpalko?

15   A.  Correct.

16   Q.  Okay.  And the patient, Mr. Peterson, was inquiring about

17   Soma?

18   A.  Correct.

19   Q.  Okay.  And the clinician refused to write for Soma?

20   A.  Correct.

21   Q.  For a number of reasons that she articulated, correct?

22   A.  Correct.

23   Q.  Okay.

24          THE COURT:  How's that?  Good -- good spot to break?

25          MR. WEISS:  If it's good for the Court, it's good for

```
1    me, Judge.
2              THE COURT:  Good for me, yeah, yeah.
3              MR. WEISS:  Thank you.
4              THE COURT:  Okay.  If only I had an arrow in my
5    quiver, ladies and gentlemen.  All right.
6              Thank you, Mr. Weiss.  Doctor, you may step down.
7              (Witness excused at 3:40 p.m.)
8              And I think we've had a really good day.  We had
9    about five hours together with a -- with a lunch break that
10   went well.  So hopefully this will be the only day we have an
11   unusual schedule.
12             But in the meantime, keep up your good efforts.
13   You're doing great.  You're here on time.  You're obviously
14   engaged and paying attention.  Don't talk about the case
15   outside of court.  If anybody wants to talk about it with you,
16   let us know.
17             But we're grateful for your service as always and
18   we'll ask you to be back here tomorrow before 8:30 a.m.  We'll
19   go to 2:30 at the latest and keep moving along, all right.
20   Thank you.
21             Let's all rise for our jurors now.
22             (Jury excused at 3:40 p.m.)
23             Okay.  Everybody may be seated.
24             What's the latest?  Somebody wanted to object to
25   something, or Mr. Helms, what's on your mind?
```

```
 1              MR. HELMS:  Your Honor, I wanted an opportunity to
 2     respond to Mr. Weiss's objection about Exhibit 116E, which is
 3     the patient file for Victoria Loose, and just clarify the
 4     production that was made.
 5              THE COURT:  This the discovery issue, right?  You --
 6     you --
 7              MR. HELMS:  Not -- not exactly, Your Honor.  116E,
 8     which we moved into evidence, is the physical file.
 9              THE COURT:  Yeah.
10              MR. HELMS:  This is in the 116E in the courtroom
11     during the entire scope of this trial.
12              THE COURT:  Yeah.
13              MR. HELMS:  And it was provided for inspection before
14     trial.
15              THE COURT:  Yeah.
16              MR. HELMS:  We noticed over the weekend that the
17     scanned version of 116E was not correct.  I'm not sure what
18     happened.  So we -- we rescanned it and sent it to the
19     defendants.  But this is the version that was moved into
20     evidence and it's been the same version throughout this trial.
21              THE COURT:  All right.  So everything they have is in
22     evidence, and -- and it's a simple matter of comparing what's
23     in evidence with what's been scanned, right?
24              MR. HELMS:  Yes, Your Honor.
25              THE COURT:  All right.  Okay.  Sir?
```

1     MR. WEISS:  Your Honor, I know we've discussed this a

2  couple of times, but it gets nuanced and it becomes more

3  problematic.

4     THE COURT:  Okay.

5     MR. WEISS:  Dr. Bothra was moved to Livingston County

6  last Wednesday.  He still does not have his materials that he's

7  acquired over the last three and a half years that were there.

8  Particularly with a witness such as Dr. Mehta and when I have

9  to get around to cross-examining Dr. Kufner, I am going to need

10  the expertise and training and advice that Dr. Bothra can

11  provide me.  And I don't for a moment doubt his mental acuity,

12  but he's got three and a half years of materials that -- that

13  are still at Milan that would assist him and in turn assist

14  both Mr. Rogalski and myself in representing him.

15     THE COURT:  All right.

16     MR. WEISS:  I -- I recognize the limitations, but I

17  think I'd be remiss if I didn't bring it to the Court's

18  attention.

19     THE COURT:  Okay.  Well, that's noted.  I'm glad you

20  brought it up.  I'll -- I'll continue to look -- look into it.

21  I haven't really had occasion to even have an opportunity to

22  speak with anybody since the last time we discussed this

23  actually, but I'll -- I'll follow up on that.

24     MR. WEISS:  Thank you.

25     THE COURT:  I -- I would imagine just, you know, out

1    of common sense that the lawyers have, you know, records that

2    the doctor can -- can -- can access, but I recognize he's got

3    his own materials and commonly those are sent along with a

4    transfer and I'll do my best to effectuate the fact that they

5    are, okay?

6           MR. WEISS:  The records may be duplicative of what

7    Mr. Rogalski and I have, but Dr. Bothra's notes and commentary

8    are something that we're not privy to.

9           THE COURT:  I understand.

10          MR. WEISS:  Secondly, my client was given a razor

11   yesterday.

12          THE COURT:  Yeah.

13          MR. WEISS:  And he figured he would use it this

14   morning so he'd look appropriate for court.

15          THE COURT:  Yeah.

16          MR. WEISS:  To his chagrin, they came about an hour

17   later and took it back and said, "No, you get these on Sundays

18   and Wednesdays."

19          Well -- and I don't mean to -- to tease Mr. -- my

20   co-counsel Mr. Chapman, but I don't think it's an appropriate

21   look for my client to have several days of stubble.  I don't

22   want the jury to think that he is not attentive and he doesn't

23   take these proceedings seriously, and I -- I really believe

24   that he should be able to shave on a daily basis so he looks

25   appropriate and professional and not do this twice a week.

1  They may be good for -- for pretrial hygiene or going in on a

2  plea or a sentencing, but being in front of a jury of 15 I

3  respectfully submit is remiss.

4          THE COURT:  Well, take that -- take that up in front

5  of the -- or the marshals, and I'll -- I'll put that on my

6  to-do list as well.  I do know that everybody is -- is wearing

7  masks which doesn't disclose any, you know, poor look or

8  anything and I've seen no sign of disrespect or anything of

9  that nature.  But I grant your -- the accuracy of your point

10 and -- and I'll -- you know, again, I can't micromanage that

11 type of issue, it's -- it's very specific, but I will let the

12 marshals know that you raise that, okay?

13         MR. WEISS:  I appreciate that and thank you for

14 allowing me to make a record, Your Honor.

15         THE COURT:  Of course, always.

16         Hold on a second.  Ms. McMillion, you want to respond

17 to that or...

18         MS. McMILLION:  I did not, Your Honor.  I had a

19 different issue and I'll let Mr. Chapman go ahead.

20         THE COURT:  Okay.  Mr. Chapman's got something to

21 say.  Go ahead.

22         MR. CHAPMAN:  Judge, just -- just a minor point, Your

23 Honor.

24         THE COURT:  You need a shave, sir.

25         MR. CHAPMAN:  I -- I understand.  I'd also like the

1    record to reflect that Mr. Helms also occasionally carries --

2              MR. HELMS:  This is a beard, Your Honor.

3              THE COURT:  Just kidding around.  Go ahead.  Go

4    ahead.

5              MR. CHAPMAN:  I just would like the Court to instruct

6    the witness not to discuss the substance of his testimony while

7    off the witness stand during this break.

8              THE COURT:  Yeah, right.  That's -- that's common.

9    Doctor, I'm sure you know you shouldn't be discussing your

10   testimony with government agents or attorneys.  In fact, I

11   wouldn't discuss it with anybody, but -- but since they asked

12   me to tell you that, I'm telling you, okay?

13             THE WITNESS:  Yes, Your Honor.

14             THE COURT:  All right.  Good.

15             MS. McMILLION:  Your Honor, I have another issue to

16   discuss with the Court with respect to an upcoming witness, and

17   I don't know if the Court wants to deal with this issue now

18   while we're outside the presence of the jury and they're not

19   waiting.  But we do anticipate calling a witness in the next

20   two witnesses and we would need a sidebar to discuss that

21   witness's testimony.

22             THE COURT:  Even if the jury's not here we need a

23   sidebar?

24             MS. McMILLION:  Yes, Your Honor.

25             THE COURT:  Okay.  When's this person going to come

1    in?

2              MS. McMILLION:  Depending on how long cross takes

3    tomorrow, potentially tomorrow, so that's why I wanted to raise

4    it with the Court this afternoon so we wouldn't have the jury

5    waiting tomorrow.

6              THE COURT:  Okay.  It's quite late and I think we're

7    all pretty tired, not the least of which is me, and I think

8    what we should do is take this up when I give them their

9    ten-minute comfort break tomorrow morning, maybe it'll be a

10   15-minute comfort break, and we can talk at the bench about

11   your witness issue, okay?

12             MS. McMILLION:  Thank you, Your Honor.

13             THE COURT:  Does that sound okay?

14             MS. McMILLION:  Yes.

15             THE COURT:  I mean I'm pretty flexible within the --

16   within the, you know, rules of reason.  We need to get folks in

17   here and out of here.  But if people are coming in from out of

18   town, you know, I know you know and you're all doing very well

19   on this, but bear that in mind as well, all right?

20             All right.  Thank you for your service and your

21   efforts.  I thought it was a good day and we'll see you

22   tomorrow morning at 8:30.

23             THE LAW CLERK:  Court is now in recess.

24             (Court in recess at 3:48 p.m.)

25             (Proceedings in the above-entitled matter adjourned

1    to Tuesday, May 24, 2022)

2            —   —   —

Case 2:18-cr-20800-SJM-APP   ECF No. 414, PageID.3794   Filed 06/02/22   Page 76 of 76
Jury Trial Excerpt: Volume 5 • Monday, May 23, 2022

76

1                      C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 75 comprise a full, true and correct transcript excerpt

7    of the proceedings taken in the matter of United States of

8    America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis

9    and D-5 Christopher Russo, Case No. 18-20800, on Monday, May

10   23, 2022.

11

12                              s/Linda M. Cavanagh
                                Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17

18

19   Date: June 2, 2022
     Detroit, Michigan
20

21

22

23

24

25