Case 2:18-cr-20800-SJM-APP  ECF No. 416, PageID.3957  Filed 06/02/22  Page 1 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

1

1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION

3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5        vs.

6    D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
7    D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
8
                         Defendants.
9    _____/

10               **JURY TRIAL EXCERPT: VOLUME 8**

11         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                 United States District Judge
12         Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
13                 Detroit, Michigan  48226
                   Thursday, May 26, 2022
14
     APPEARANCES:
15
     For the Plaintiff          BRANDY R. McMILLION
16   United States of America:  BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
     For the Defendant          ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                              (Appearances continued next page)

24

25

Case 2:18-cr-20800-SJM-APP   ECF No. 416, PageID.3958   Filed 06/02/22   Page 2 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

2

```
 1   APPEARANCES:  Continued

 2   For the Defendant          ALAN T. ROGALSKI
     D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                              2000 Town Center
                                Suite 2700
 4                              Southfield, Michigan  48075
                                248-784-5055
 5
     For the Defendant          ROBERT S. HARRISON
 6   D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                40950 Woodward Avenue
 7                              Suite 100
                                Bloomfield Hills, Michigan  48304
 8                              248-283-1600

 9   For the Defendant          RONALD WILLIAM CHAPMAN, II
     D-4 Dr. Davis Lewis:       Chapman Law Group
10                              1441 West Long Lake Road
                                Suite 310
11                              Troy, Michigan  48098
                                248-644-6326
12
                                JEFFREY G. COLLINS
13                              Collins & Collins, P.C.
                                1323 Broadway
14                              Suite 800
                                Detroit, Michigan  48226
15                              313-963-2303

16   For the Defendant          LAURENCE H. MARGOLIS
     D-5 Dr. Christopher        Margolis Law Firm
17   Russo:                     214 South Main Street
                                Suite 202
18                              Ann Arbor, Michigan  48104
                                734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25             (313) 234-2616 • www.transcriptorders.com
```

USA v Rajendra Bothra, et al • 18-20800

TABLE OF CONTENTS

Government Witnesses:                                    Page

HENDERSON BUTLER

   Cross-Examination by Mr. Chapman                       5


EXHIBITS

| Identification | Offered | Received |
|---|---|---|
| Defendant Lewis Exhibit 3-A, FBI documents for Henderson Butler | 15 | 15 |
| Defendant Lewis Exhibit 4-A, Video recording of Henderson Butler with PA Brent Russell | 53 | 53 |

```
 1              Detroit, Michigan
 2              Thursday, May 26, 2022
 3                      _  _  _
 4              (Proceedings in progress at 9:45 a.m., all parties
 5              present, jury present)
 6                   H E N D E R S O N   B U T L E R
 7     was called as a witness herein, and after previously being
 8     first duly sworn to tell the truth and nothing but the truth,
 9     testified on his oath as follows:
10              MR. CHAPMAN:  Your Honor, the defense has discussed
11     going out of order for this witness.  Is it okay if I continue?
12              THE COURT:  Sure, yep.  We're going to go with Mr.
13     Chapman to start.
14              MR. CHAPMAN:  Thank you, Your Honor.
15              THE COURT:  I have a question while you're
16     approaching.  Is it true that when you went into those
17     appointments, you didn't -- you didn't have any of those
18     issues?
19              THE WITNESS:  You mean pain?  No.  Back issues?  No,
20     I didn't have any issues.
21              THE COURT:  You didn't have any issues?
22              THE WITNESS:  No, none at all.
23              THE COURT:  And the government provided an MRI to the
24     practice that they said was yours but it wasn't yours?
25              THE WITNESS:  No, it was not mine.
```

1        THE COURT:  So those other -- you were fine when you

2   walked in there?

3        THE WITNESS:  Yeah, pretty -- yes.

4        THE COURT:  All right.  Go ahead, Mr. Chapman.

5        MR. CHAPMAN:  Thank you, Your Honor, and we do intend

6   to show that MRI.

7        THE COURT:  Well, I'm trying to save you some time

8   'cuz -- anyway, go ahead.

9        MR. CHAPMAN:  Thank you.

10                     CROSS-EXAMINATION

11  BY MR. CHAPMAN:

12  Q.  Mr. Butler, my name is Ron Chapman.  I represent Dr.

13  Lewis --

14  A.  Nice to meet you.

15  Q.  -- along with Jeffrey Collins.

16        Nice to meet you too.

17        During the opening portion of your direct exam you

18  talked about a situation in 2010.  Do you recall talking about

19  that?

20  A.  My initial?

21  Q.  Yes.

22  A.  In 2010?  No, I don't.

23  Q.  But the only question is on direct exam did you talk about

24  a situation in 2010?

25  A.  On the cross-exam?

Case 2:18-cr-20800-SJM-APP   ECF No. 416, PageID.3962   Filed 06/02/22   Page 6 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

6

1    Q.   Direct exam.

2    A.   Oh, yes, yes, yes.

3    Q.   Now, that situation that you were involved in, you -- you

4    were arrested, were you not?

5    A.   No.

6    Q.   You weren't arrested?

7    A.   No, I was not arrested.

8    Q.   Okay.  Well, back in 2010, isn't it true that you met

9    somebody who wanted you to sign some documents?

10   A.   Someone who wanted me to sign some legal documents of --

11   Q.   Medical documents.

12   A.   Yes.

13   Q.   Okay.  I can't recall that person's name.  Do you?

14   A.   No.

15   Q.   All right.  That person approached you and asked you to

16   sign certain forms that authorized medical treatment, is

17   that --

18   A.   Yes.

19   Q.   -- right?

20        And that --

21        THE COURT REPORTER:  Excuse me.  Mr. Butler, you have

22   to wait -- whoever is asking you the question, you have to wait

23   until they're done talking --

24        THE WITNESS:  Okay.

25        THE COURT REPORTER:  -- before you answer because --

Case 2:18-cr-20800-SJM-APP  ECF No. 416, PageID.3963  Filed 06/02/22  Page 7 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

7

1          THE WITNESS:  All right.

2          THE COURT REPORTER:  -- I can't take two at the same

3    time.

4          THE WITNESS:  All right.  I apologize.

5          THE COURT REPORTER:  That's okay.  Thank you, Mr.

6    Chapman.

7    BY MR. CHAPMAN:

8    Q.  That medical treatment was physical therapy?

9    A.  I can't remember.

10   Q.  Okay.  That person submitted those documents to

11   physicians' offices who billed for services under your name,

12   correct?

13   A.  I believe so.

14   Q.  And those services were billed to Medicare and other

15   insurance companies?

16   A.  I -- I believe so.

17   Q.  Those providers who used those false documents would then

18   receive compensation as a result of your signature, correct?

19   A.  I believe so.  I don't know.  I don't know for a fact.  I

20   don't know.

21   Q.  And this person would approach you routinely, almost --

22   A.  Yes.

23   Q.  -- once a month, in order to get your signature on many

24   documents?

25   A.  Yes.

1    Q.  Did you read those documents?

2    A.  No.

3    Q.  Did you recall what they said?

4    A.  Not really.

5    Q.  That person would pay you a hundred dollars and sometimes

6    more per signature on each document?

7    A.  Yes.

8    Q.  And -- and those documents would then be sent to clinics?

9    A.  I suppose so.

10   Q.  Now, I think I saw during some prior testimony that that

11   person originally drove a car that was quite modest?

12   A.  I believe so, yeah.

13   Q.  And eventually you saw him show up in a Mercedes?

14   A.  Possibly, yes.

15   Q.  And you realized that something may be going on here,

16   right?

17   A.  No, I -- possibly, yeah.

18   Q.  Was that your first indication that you were involved in

19   criminal activity?

20   A.  No.

21   Q.  No.  You knew when you were signing those documents --

22   A.  Yes.

23   Q.  -- and receiving money, you were involved in criminal

24   activity?

25   A.  Yes.

1  Q.  Okay.  Just to make sure we get a very clear record here,

2  wait until I get the full question out.

3  A.  No problem.

4  Q.  And then I'll give you some time to talk, okay?

5         So do you recall how much money you collected from

6  signing these documents?

7  A.  Varied.  There was no set amount.

8  Q.  Supplemented your income, right?

9  A.  I assume it did.

10  Q.  I understand it varied, but do you have any idea how much

11  you collected in total from engaging in this criminal activity?

12  A.  No, I don't.

13  Q.  Was it -- understanding you don't have a great

14  recollection, was it $10,000 or a hundred thousand dollars?

15  A.  It was closer to 10,000.

16  Q.  Closer to ten.

17         And how long did you engage in this activity for?

18  A.  Six, seven months maybe.  I don't know.

19  Q.  And then you got a little bit concerned after you looked

20  at your beneficiary statements, right?

21  A.  Not particularly, no.

22  Q.  Oh, you didn't get concerned?

23  A.  No.

24  Q.  Now, your mom is the payee for your Medicare claims, is

25  that right?

1  A.  She was a payee for my Social Security disability, yes,

2  she was.

3  Q.  Okay.  And -- and the mail went to her house, right?

4  A.  Yes.

5  Q.  And you went to her house to go check your statements to

6  see how much fraudulent healthcare was billed under your name?

7  A.  No, I did not go there.  I lived there.

8  Q.  Okay.  But you checked the mail to see how much fraudulent

9  healthcare was billed under your name?

10 A.  No, I never checked that.

11 Q.  Isn't it true that you testified in a trial that that's

12 how you realized how much had been billed under your name?

13 A.  No, I didn't say that.

14 Q.  You don't recall that testimony?

15 A.  No.

16        THE COURT:  All right.  Let's just stick with the --

17 we don't need to get into the minutia.  We're impeaching and --

18 and doing a good job of it, but we don't need to get that far

19 into it.

20        Go ahead, Mr. Chapman.

21 A.  Excuse me.  I remember he showed me statements from --

22 from -- from the pain office, but as far as me looking at my

23 own Medicare billing report addressed to me coming to my home,

24 I never did that and I still don't.

25 BY MR. CHAPMAN:

1   Q.   Okay.  Mr. Butler, it's important that you wait for a

2   question before --

3   A.   Okay.

4   Q.   -- before you talk, okay?

5   A.   Okay.

6   Q.   After realizing how much fraudulent healthcare was billed

7   under your name, you contacted an attorney?

8   A.   No, I did not contact attorney for that particular reason.

9   Q.   But you contacted an attorney?

10  A.   Yes.

11  Q.   Now, at some point you came into contact with the FBI,

12  correct?

13  A.   Yes.

14  Q.   Now, you weren't charged for all of those fraudulent

15  healthcare transactions that you initiated, correct?

16  A.   I disagree with that statement.  I did not initiate them.

17  Q.   Understood.  You were never charged with a crime for that

18  conduct?

19  A.   No.

20  Q.   The federal prosecutors never arrested you for that

21  conduct?

22  A.   I was never arrested.  I was interrogated.

23  Q.   Interrogated.

24          But then ultimately you ended up on a witness stand

25  to testify about that conduct?

1    A.  I believe so.

2    Q.  Because you reached a deal with the government that they

3    wouldn't charge you?

4    A.  That was not the reason why.

5    Q.  You just volunteered?

6    A.  I can't really recall the specifics of it.  I'm not going

7    to make a inaccurate statement when I'm sworn.  I don't

8    remember.  That's 12 years ago.  I have no idea.

9    Q.  You don't remember why you committed a crime, weren't

10   charged with it and ultimately testified?

11   A.  Well, I know why -- I know why I committed the crime.

12   That's not the question.

13   Q.  Now, since that date you have been in frequent contact

14   with the FBI, correct?

15   A.  I wouldn't say frequent but far more -- more than I used

16   to be.

17   Q.  Maybe frequent was a bad choice of words.

18   A.  Yes, it was.

19   Q.  You started in November 1st, 2010 receiving payments from

20   the FBI for undercover visits, correct?

21   A.  I did not receive any money in November of 2010 from the

22   FBI.

23   Q.  Okay.

24          MR. CHAPMAN:  Your Honor, I'd like to show the

25   witness what will be marked for identification as Dr. Lewis

1   Exhibit A, I believe 3 is the next in order.

2           THE COURT:  Very well.

3           MR. CHAPMAN:  Thank you.

4           THE COURT:  Let me see what I have here.  I was

5   keeping a defense list somewhere in here.  You go ahead and do

6   that and I'll...

7           MR. CHAPMAN:  Thank you.  I'm showing it to the

8   government.

9           MR. HELMS:  What's the number?

10          MR. CHAPMAN:  A-3.

11          And understanding that we have continuing ability to

12  approach, Your Honor?

13          THE COURT:  Yes, yes, yes.  No need to ask again.

14  BY MR. CHAPMAN:

15  Q.  Now, Mr. Butler I've given you my only copy of the

16  documents, but I think I know them well enough to talk a bit.

17  Do you see those documents in front of you?  They have an

18  indication that they're from the FBI, is that right?

19  A.  Yes.

20  Q.  And those -- those are related to a confidential source,

21  correct?

22  A.  Okay.

23  Q.  And -- and do you know your confidential source number?

24  A.  My number?

25  Q.  Yeah.

1   A.   No, I don't know my number.

2   Q.   Do you know the various names that you used as a

3   confidential source for the FBI?

4   A.   Not offhand, no.

5   Q.   No.

6   A.   No.

7   Q.   Okay.  I just want you to go ahead and leaf through those

8   documents and see if that is consistent with the types of

9   payments that you received from the FBI for undercover work.

10  When you're done, feel free to look up.

11  A.   Oh, yeah.

12          (Brief pause)

13          Same thing.  Yeah, I would assume, yeah.

14  Q.   Okay.

15  A.   They're -- they're accurate, yeah.  They came from the

16  FBI, that's true.

17  Q.   Trust the FBI's telling the truth on --

18  A.   Absolutely.

19  Q.   Okay.

20  A.   As far as what they pay me, absolutely.

21          MR. CHAPMAN:  Just grabbing the document from the

22  witness.

23          THE COURT:  Yes, sir.

24  Q.   It's your testimony to this jury that you never received

25  any payments from the FBI in November of 2010, is that correct?

```
1   A.  I don't believe I did, no.

2           MR. CHAPMAN:  Your Honor, I'd like to move for

3   admission of Dr. Lewis Defense Exhibit A-3.

4           MR. HELMS:  Objection, Your Honor.

5           THE COURT:  I have 3-A, but that's fine.  Mr. ...

6           MR. HELMS:  I don't think this witness can lay a

7   foundation for this document.

8           THE COURT:  I think he's established that it's a

9   confidential source document, public record from the FBI that

10  addresses the behavior he engaged in with them, so I will admit

11  Defense Exhibit Lewis 3-A over objection.

12          Go right ahead, Mr. Chapman, please.

13          MR. CHAPMAN:  Thank you, Your Honor.

14          Can we please have it on the Elmo?

15  BY MR. CHAPMAN:

16  Q.  Just wanted to show you, Mr. Butler, and the jury as well,

17  page 2 of Exhibit 3-A.  Mr. Butler, do you see that date there,

18  November 1st, 2010?

19  A.  Yes.  Yes.

20  Q.  Is the name here James Brennan?

21  A.  Yes.

22  Q.  Does that name look familiar to you?

23  A.  Yes.

24  Q.  What is that name from?

25  A.  He's a agent.  He was a representative of the FBI --
```

1    Q.   Somebody --

2    A.   -- that had contact with me.

3    Q.   -- somebody that you worked with, right?

4    A.   Yes.

5    Q.   And do you see the payment here, $1,200?

6    A.   Yes.

7    Q.   Would you like to change your testimony about receiving a

8    payment from James Brennan of $1,200 on November 1st?

9    A.   On November -- on November 1st?

10   Q.   2010.  Mr. Butler, you just said the FBI doesn't lie and

11   these documents are accurate.

12   A.   Well, I must have received the payment.

13   Q.   Okay.

14   A.   Yeah.  I mean it's just -- you're asking me to confirm

15   information from 12 years ago.  I'm not going to do it unless I

16   see it written.

17        THE COURT:  All right.  You received a $1,200 payment

18   from the FBI in 2010, you don't know the exact date, is that

19   fair?

20        THE WITNESS:  Yeah, pretty much, yeah.  Thank you.

21        THE COURT:  All right.  Go ahead, Mr. Chapman.

22        MR. CHAPMAN:  Thank you, Your Honor.

23   BY MR. CHAPMAN:

24   Q.   And, in fact, excluding buy money, money that was given to

25   you to spend on certain things during undercover operations,

Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

1  you received a total of $16,800 from the FBI between

2  November 2010 and April 2021, correct?

3  A.  Sounds about right, yes.

4  Q.  Now, what -- what did you do for work during this time?

5  A.  That's -- that's -- I'm -- I've -- that -- I was -- I was

6  supplying information that they required.

7  Q.  Let me rephrase the question.  Outside of being a

8  confidential informant, what did you do for work at that time?

9  A.  It all depended on what mood I was in.  I worked in a

10 office, worked in a factory, I'd do whatever I wanted to do.

11 Q.  Did you work at Detroit Axle as you mentioned?

12 A.  It was not called Detroit Axle at the time; it was

13 something -- something else.  It was a place down the street

14 from the Pain Center.

15 Q.  Okay.  And it was truthful you did work there?

16 A.  Yes, I did work there.

17 Q.  So during this time you held various jobs?

18 A.  Yes.

19 Q.  What was your annual income between November 2010 and

20 April 2021 if you could average?

21 A.  My average income from 2010 to 2021?

22 Q.  Mm-hmm.

23 A.  It all depend on just -- I didn't have a average income.

24 It all depend on what type of job I had and where I was

25 working.

```
1   Q.  Can you give us an idea of what you made this year?
2   A.  This year so far?  I haven't worked this year.  I haven't
3   made any money.
4   Q.  Any idea what you made in 2021?
5   A.  Yes.
6   Q.  Can you tell us?
7   A.  About 9,000.  I mean honest working, about $9,000.
8   Q.  And what did you make in dishonest working?
9   A.  None.
10  Q.  Oh.  So we differentiate the two?
11  A.  Absolutely, 'cuz I know you do.
12  Q.  Okay.  So you said you made about $9,000 last year in
13  honest working, and during the course of your undercover
14  operations you made $16,000 approximately?
15  A.  Not in -- not last year.
16  Q.  Okay.  Last year you received a few payments from the FBI,
17  didn't you?  The $1,500 payment on April 12th, 2021?
18  A.  Yes.
19  Q.  Yep.  And then in 2020 you received a $5,000 payment on
20  June 8th of 2020?
21  A.  Yes.
22  Q.  Now, Mr. Butler, I was curious, during your testimony you
23  seemed to indicate that you were engaged in undercover
24  operations at clinics like the Pain Center because you just
25  like to do it?
```

1    A.   I do.

2    Q.   But that's not the only reason, right?

3    A.   To me it is.

4    Q.   You were doing it because you were getting paid, right?

5    A.   I wasn't doing it because I was getting paid.  I was doing

6    it to lock up crooked doctors.

7    Q.   You never got paid for the operations at the Pain Center?

8    A.   I never got paid for the operations?

9    Q.   Yeah, for the undercover operations.

10   A.   I'm quite sure I did.

11   Q.   You did get paid?

12   A.   Yeah, but that was not my -- you implying that's my main

13   reason for doing what I -- what I do and it's not.  I don't do

14   this for money.

15   Q.   You have a motivation against doctors?

16   A.   Yes, I do.  I have a motivation against drugs that hurt

17   people.

18   Q.   You have a deep-set motivation against doctors?

19   A.   I got a motivation.

20   Q.   And you make the assumption that these doctors needed your

21   services because you assumed they were doing something

22   unlawful, isn't that right?

23   A.   No.

24   Q.   Mr. Butler, you used to have a crack addiction?

25   A.   Yes.

1    Q.  And when did you start your crack addiction?

2    A.  I didn't start a crack addiction.  I'm 67 years old.  When

3    I was 22 years old, the first time I tried cocaine I injected a

4    half a gram, okay?  I'm not a crack addict.

5    Q.  So you admitted that you were a crack addict previously,

6    correct?

7    A.  I've never been what you consider an addict.

8    Q.  You only used crack once?

9    A.  I used it more than once.

10   Q.  In fact, one of your urine drug screens at Summit Medical

11   indicated that you were positive cocaine -- with -- for cocaine

12   while you were working with the FBI, right?

13   A.  I don't have any comment on what happened at Summit.

14   Q.  I have -- I have questions about what happened at Summit.

15   You tested positive for cocaine while you were going to see

16   these so-called crooked doctors, isn't that right?

17   A.  Possible.

18   Q.  You went out to a dealer?

19   A.  I'm not going -- not -- not -- unh-unh.

20   Q.  I'm asking the questions, sir.

21   A.  No, no.

22   Q.  You went out --

23   A.  You're not asking the questions.

24          THE COURT REPORTER:  Wait, wait.

25   A.  You're not asking the questions.

Case 2:18-cr-20800-SJM-APP   ECF No. 416, PageID.3977   Filed 06/02/22   Page 21 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

21

```
1              THE COURT:  Hold on a minute.  Hold on a minute.

2              THE WITNESS:  Well, he's not asking the questions.

3              THE COURT REPORTER:  Wait.  Stop talking please.

4              THE COURT:  You got -- listen, Mr. Butler.  I -- Mr.

5    Butler, Mr. Butler, I want you to calm down.  Listen, just

6    listen to the question.

7              THE WITNESS:  Okay.

8              THE COURT:  And then answer it.

9              And Mr. Chapman, I think if we can take

10   straightforward, broad impeachment testimony from this man,

11   we'll be best off.  Go right ahead.

12             MR. CHAPMAN:  Thank you, Your Honor.

13   BY MR. CHAPMAN:

14   Q.  Mr. Butler, I'm going to be as calm as possible, okay?

15   You went out to a drug dealer at some point while you were

16   going undercover at Summit Medical?

17   A.  Yes.

18   Q.  You procured some crack cocaine, yes?

19   A.  Yes.

20   Q.  You took that crack cocaine?

21   A.  Yes.

22   Q.  You were working with the FBI at that time?

23   A.  Yes.

24   Q.  Did you inform the FBI that you were engaging in illicit

25   drug dealers -- deals while you were going undercover?
```

1    A.   When I was asked, I did.

2    Q.   You did.

3         And -- and -- and they informed -- they informed you

4    that that was okay?

5    A.   No, they did not.

6    Q.   No.  Did they cease doing business with you?

7    A.   For some periods, yes.  It -- the implication was if I

8    don't straighten up, I will have nothing else to do with them,

9    they won't have anything else to do with me.

10   Q.   Thank you, Mr. Butler.

11        MR. CHAPMAN:  Your Honor?

12        THE COURT:  Yes.

13        MR. CHAPMAN:  We've asked the government for all

14   information pertaining to this undercover.  This is the first

15   time learning that he had informed the FBI of illicit drug use.

16   We didn't receive that information in reports or in the

17   informant file.  That's *Brady* material, Your Honor, and *Jencks*

18   material.

19        THE COURT:  Okay.  We can take that up later and

20   I'll -- I'll hear about it at length and I may even order

21   briefing, but for now let us proceed to deal with Mr. Butler.

22   Go right ahead.

23        MR. CHAPMAN:  Your Honor, I'm sorry, but I am

24   concerned that we proceed with cross-examination without full

25   and complete information about this witness.

```
 1              THE COURT:  Well --
 2              MR. CHAPMAN:  My client will not be able to get the
 3    full benefit of my cross-examination unless he's able to have
 4    Jencks and Brady.
 5              THE COURT:  Well, I'll tell you what.  If -- if
 6    there's further issues, we can -- we can bring him back, but --
 7              MR. CHAPMAN:  Sounds good.  Thank you, Your Honor.
 8              THE COURT:  -- we'll -- we'll make sure everybody has
 9    a -- a fair hearing and a thorough examination.
10              Go ahead, Mr. Chapman.
11    BY MR. CHAPMAN:
12    Q.  How many times while you were working with the FBI did you
13    use crack cocaine while going undercover?
14    A.  I don't know.
15    Q.  Can you give us an estimate?
16    A.  Four, five times maybe.
17    Q.  Four or five times.
18              And each time you informed the FBI of what you were
19    doing?
20    A.  When it was reported that I was -- had failed a drug test,
21    I'm quite sure they let me know that they weren't happy and
22    they weren't -- they were not going to continue to tolerate it.
23    Q.  But they did tolerate it, didn't they?
24    A.  No, not particularly, not -- not as -- no, they really
25    didn't tolerate it.
```

1    Q.  And then somehow after they say they don't tolerate it,

2    you go clean, is that right?

3    A.  That's not -- that's not why I went clean.

4    Q.  Okay.  But you did go clean?

5    A.  Yes.

6    Q.  You stopped using crack cocaine?

7    A.  I stopped using drugs.

8    Q.  Now, these dealers that you went to -- well, let's back

9    up.  Were there drugs other than cocaine that you were using?

10   A.  What part of my life you talking about?

11   Q.  During the time that you were visiting Summit Medical and

12   the time that you were visiting --

13   A.  No.

14   Q.  -- TPC and the time you were working with the federal

15   government.

16   A.  No.

17   Q.  No.  Just cocaine?

18   A.  Just cocaine.

19   Q.  When you went to these dealers to purchase crack cocaine,

20   I'm curious, did any of those dealers do a physical examination

21   on you?

22        MR. HELMS:  Objection, Your Honor.

23   A.  Are you serious?  Are you serious.

24        THE COURT:  Hold on a minute.  Hold on a minute.

25   A.  That's ridiculous.

1      THE COURT:  Hey, Mr. Butler, I'm going to admonish

2  you right now that you got to knock it off, and if you don't

3  knock it off, I'm going to have to take measures against you,

4  okay?

5      THE WITNESS:  All right.  Please, Your Honor, I

6  apologize, sir.

7      THE COURT:  No, no, I accept your apology, but for

8  the second time now calm down.

9      THE WITNESS:  Okay.

10      THE COURT:  And answer the question and that's it.

11      Now, hold on because we have a -- a -- a objection

12  pending.

13      MR. HELMS:  Yeah.  Argumentative, badgering,

14  relevance.

15      THE COURT:  I don't think that's a well-placed

16  question and I'll sustain the objection.

17      Go ahead, Mr. Chapman.

18  BY MR. CHAPMAN:

19  Q.  Mr. Butler, did any of them -- I'll just -- I'll move on

20  from that.

21      Mr. Butler, you -- you informed us on direct exam

22  yesterday that you were just visiting the Pain Center because

23  you liked to do it.  Was that your testimony?

24  A.  If that -- that's -- if that's what I said yesterday, yes.

25  Q.  But, in fact, you were doing it because you were getting

1  paid as well?

2  A.  No, that was not my main reason.  Payment from the FBI is

3  not enough to -- for me to consider doing anything, okay?

4  Q.  Before you went in -- we're just now going to talk about

5  the Pain Center.

6  A.  Really.

7  Q.  Before you went into the Pain Center --

8         THE COURT:  Well, I'm curious, Mr. Chapman, whether

9  this witness was being paid for -- at -- by the FBI when he

10  appeared on these videos.  Maybe you could ask -- ask that

11  question and get an answer.

12  BY MR. CHAPMAN:

13  Q.  Were you getting paid by the FBI while you appeared on

14  these videos?

15  A.  No.

16  Q.  Going to show you another page of Defense Exhibit 3-A.

17  Mr. Butler, do you recall getting a $5,000 payment --

18  A.  After the Pain Center was closed, yes, I do.

19  Q.  Let me finish the question.  Do you recall getting a

20  $5,000 payment on June 8th of 2020?

21  A.  Yes.

22  Q.  It's a big check, right?

23  A.  I beg your pardon?

24  Q.  It's a big check, right, $5,000?

25  A.  It wasn't a check.

1    Q.   Oh, it was cash?

2    A.   I said it wasn't a check.  I didn't say it was cash.

3    Q.   Was it cash?

4    A.   You said it was a check.

5    Q.   Was it cash, Mr. Butler?

6    A.   Yes, it was cash.

7    Q.   Thank you.

8          Now, you say that that wasn't for your work at the

9    Pain Center, right?

10   A.   I didn't say that.

11   Q.   Mr. Butler, you just testified that you weren't getting

12   paid for your work at the Pain Center.

13         THE COURT:  No, he said he wasn't being paid at the

14   time he went into the Pain Center.

15         THE WITNESS:  Thank you.

16         THE COURT:  He answered a different question.  Go

17   ahead, Mr. Chapman.

18         MR. CHAPMAN:  Thank you, Your Honor.

19   BY MR. CHAPMAN:

20   Q.   You see the period covered on this document?

21   A.   Okay.

22   Q.   March 20th, 2016?

23   A.   Okay.

24   Q.   To December 7th, 2018?

25   A.   Okay.

1    Q.   That was the time that you were going into the Pain

2    Center, is that right?

3    A.   Yeah.

4    Q.   Okay.  And the amount that you received was $5,000, right?

5    A.   That's what it says.

6    Q.   And was that a check or cash?

7    A.   Cash.

8    Q.   Cash.

9         And that was from Special Agent Mark Kroger, correct?

10   A.   If that's what it says, it's correct.

11   Q.   And Mark Kroger was the very same person that you met in

12   the vehicle after doing your undercover visits at the Pain

13   Center?

14   A.   Incorrect.

15   Q.   Did you ever meet Mark Kroger in a vehicle after doing an

16   undercover visit at the Pain Center?

17   A.   No comment.  I'm not going to answer that.

18        THE COURT:  You gotta answer.

19   A.   I can't remember if I met Mark at the -- at the Pain --

20   Mark was not my primary contact while I was at the Pain Center.

21   Q.   Mark Kroger was involved in the operations into the Pain

22   Center, correct?

23   A.   Might have been.

24   Q.   Do you know?

25   A.   I don't know.  I deal with my primary contact.

1   Q.  Mr. Butler, this payment was for your services for the FBI

2   at the Pain Center, correct?

3   A.  Right.

4   Q.  Thank you.

5          Now, before going into a clinic like the Pain Center,

6   you develop an undercover persona, right?

7   A.  Not really.

8   Q.  You just appear as yourself?

9   A.  Pretty much.

10  Q.  So everything that you presented at the Pain Center was

11  something that was true to you, right?

12  A.  Something everybody thought was true to me.

13  Q.  So you do have back pain?

14  A.  No, I have no back pain.

15  Q.  And so that -- there's no pain radiating down to your

16  legs?

17  A.  Not at all.

18  Q.  You haven't had it for ten years?

19  A.  For 67 years I haven't had it.

20  Q.  Okay.  You've never gone to physical therapy for six

21  months?

22  A.  No.

23  Q.  Right?

24         You haven't received medication legitimately from any

25  doctor for that back pain, right?

1    A.  For pain?  Not particularly, no.

2    Q.  All of those things were untruthful statements made to

3    these doctors, right?

4    A.  I assume they were.  I assume they were.

5    Q.  You made them up?

6    A.  No, I didn't make them up.

7    Q.  They're not lies?

8    A.  They were utilized.

9    Q.  Utilized.  So somebody gave them to you?

10   A.  I didn't make them up.

11   Q.  What were you told -- well, who made them up, Mr. Butler?

12   A.  I didn't -- I didn't make them up.

13   Q.  Who made them up?

14   A.  I -- I don't know the particular individual who made they

15   can up.

16   Q.  Well, Mr. Butler, you went into the Pain Center and

17   complained of certain things that were wrong with you, and if

18   you're saying that you didn't make them up, you got them from

19   somebody else, right?

20   A.  Yes.

21   Q.  And who was that person?

22   A.  Many people.

23   Q.  Many people from the FBI?

24   A.  And other places too.

25   Q.  Other law enforcement?

1   A.   And non-law enforcement, other people.

2   Q.   So you -- you collected these symptoms from a group of

3   other people to create a persona to go into the Pain Center?

4   A.   Yeah, mm-hmm.

5   Q.   Okay.  And the reason why you presented with those

6   symptoms is so you could see if you would get treatment for

7   pain, right?

8   A.   Yes.

9   Q.   Now, did you ever talk to a doctor to see if some of the

10  things you were complaining of would lead a doctor to believe

11  that that pain was legitimate?

12  A.   I didn't -- I didn't have that discussion with the doctor.

13  Q.   No.  You never talked to any medical professional to say,

14  "Hey, if I complain of radiating back pain, might that give a

15  doctor the impression that something's really wrong with me?"

16  A.   No.  What doctor would I talk to?

17  Q.   Well, you're talking to the FBI.  They know doctors,

18  right?

19  A.   They aren't doctors.  You're asking me did I talk -- did I

20  talk to a doctor.  The answer is no.

21  Q.   The next question is did you talk to the FBI to get

22  permission to say some of those things about your pain?

23  A.   We discussed it.

24  Q.   And who did you discuss it with?

25  A.   Whoever I had -- whoever was my -- I -- I directed my

1    operation at the particular place I was assigned.

2    Q.  For this case who did you discuss it with?

3    A.  Mr. Peterson.

4    Q.  Andrew Peterson?

5    A.  Andrew Peterson.

6    Q.  He was involved in sending you into the clinic?

7    A.  Yes.

8    Q.  And he's with the FBI?

9    A.  Yes.

10   Q.  And you asked him if it was okay to say "I have pain level

11   seven to eight"?

12   A.  I was told what would be okay.

13   Q.  He told you that it was okay?

14   A.  I was told what would be okay.

15   Q.  Mr. Butler, I promised to be calm with you.

16   A.  Yes.

17   Q.  Can you be calm with me?

18   A.  No, I cannot.

19   Q.  You can't?

20   A.  No.

21   Q.  You need a break?

22   A.  No.

23          THE COURT:  Listen, listen.  Why can't you be calm?

24          THE WITNESS:  I'm -- now, he's -- he's giving -- he's

25   trying to -- he's trying to rise me.  I'm not going to be rised

1    [sic], but --

2          THE COURT:  Well, then don't be rised [sic].

3          THE WITNESS:  Oh, no, no.

4          THE COURT:  Of course.  He's a defense attorney.

5    He's going to try to rise you, all right?

6          THE WITNESS:  Well, this is -- this is -- he's

7    playing his roles, I got to play mine.

8          THE COURT:  That's right.

9          THE WITNESS:  Yeah.

10          THE COURT:  Now, you play your role --

11          THE WITNESS:  Yeah.

12          THE COURT:  -- and be calm and just answer the

13    questions.

14          THE WITNESS:  Okay.

15          THE COURT:  Okay.  Go ahead, Mr. Chapman.

16          THE WITNESS:  Thank you, sir.

17          MR. CHAPMAN:  Thank you, Your Honor.  Thank you, Mr.

18    Butler.

19    BY MR. CHAPMAN:

20    Q.  Did you ask Mr. Peterson it -- if it was okay to complain

21    of a level seven to eight pain?

22    A.  I don't know if we ever discussed that.

23    Q.  Okay.  Did you ask Mr. Peterson if it was okay to complain

24    of pain radiating down to your legs?

25    A.  We had a general discussion about what the appropriate

1    description of my discomfort would make me eligible to be

2    treated at the Pain Center.

3    Q.   Mr. Peterson didn't tell you to walk into the Pain Center

4    and say, "Everything's okay with me today," right?

5    A.   Of course not.

6    Q.   Of course not.

7         You had to complain of some medical ailments?

8    A.   Yeah.

9    Q.   Because you wouldn't be seen?

10   A.   Yes.

11   Q.   And you knew that?

12   A.   I know a lot.

13   Q.   Right.  You never asked Mr. Peterson if it was okay for

14   you to indicate that that pain had existed for ten years?

15   A.   I never asked if it would be okay?

16   Q.   Did you ask?

17   A.   I can't remember.

18   Q.   You can't remember.

19   A.   I can't remember if I asked him or not.

20   Q.   Now, let's get to the issue of the MRI.  You indicated to

21   the jury that the MRI that Dr. Lewis went over was not an MRI

22   of your back?

23   A.   No, I've never had an MRI.  I can't remember having an MRI

24   unless it was -- I might have had one at -- at -- at Summit,

25   the Summit Place.  I'm not sure.  I mean I don't know if that

1    was the one.  I don't know if that was the one that they was

2    presented to them, but I believe that's the only MRI I've ever

3    had.

4    Q.  Isn't it true you got paid by the FBI for going into an

5    X-ray and an MRI machine?

6    A.  I got paid for that by -- by the FBI for a lot of things.

7    Q.  My question is very specific and you can say no.

8    A.  I don't --

9    Q.  Isn't it -- isn't it true that --

10   A.  I'm quite sure if I was assigned on an investigation of a

11   particular place and one of the things that I did was have an

12   X-ray done and was compensated, it had to be part of my

13   compensation, yeah.

14   Q.  Okay.

15   A.  But for being paid for a particular action that I do at a

16   particular time on a particular case is not relevant to my

17   relationship with the FBI.

18   Q.  Understood, Mr. Butler.

19          So it's your testimony that the FBI gave you an MRI

20   to walk in with?

21   A.  They gave -- gave -- they gave it to me.  I didn't -- I

22   didn't have it.

23   Q.  You -- you got it from the FBI?

24   A.  Or the Pain Center get it from Summit Place.  I don't know

25   where they got it from.

Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

1   Q.  Mr. Butler, we saw from the video that was played by the

2   government that you presented to the clinic and you handed

3   an -- an MRI report to somebody, is that right?

4   A.  I guess so.

5   Q.  Okay.  And -- and that MRI report, where did you get it

6   from?

7   A.  Mr. Peterson.

8   Q.  Did you --

9   A.  I believe so.

10  Q.  Did you ask where Mr. Peterson got it from?

11  A.  That's not my -- it's not my job, not my business.

12  Q.  I didn't ask what you thought it was.

13  A.  No, no, of course not.

14  Q.  Okay.

15  A.  I don't -- I don't investigate the FBI.

16  Q.  Did you look at that MRI to see what the medical

17  complaints on it were or the medical processes?

18  A.  Generally.

19  Q.  Generally.

20       Did that match any problems that were going on with

21  you at that time?

22  A.  I don't know, but --

23  Q.  It was --

24  A.  -- eventually -- eventually it would.

25  Q.  Because your back got bad eventually?

1  A.  No, it didn't get any worse.  It just matched the MRI.

2  Q.  I'm going to show you what's been marked as Government's

3  107A.  You testified earlier that you have never had an MRI on

4  your back.  It sounds like you then tested -- testified that

5  you might have.

6  A.  I don't -- I have no idea.

7  Q.  You don't recall?

8  A.  I don't recall a lot of things, sir.

9  Q.  Isn't it true that you did an undercover operation at

10  Summit Physicians Group?

11  A.  Yes.

12  Q.  And during that operation you did get into an MRI machine?

13  A.  That's what I just made a statement on.

14  Q.  Okay.

15  A.  Yes.

16  Q.  And that MRI would be of your back?

17  A.  I would assume so, yes.

18  Q.  Okay.  I'm going to show you --

19  A.  Oh, this is it.  Okay.  Is that it?  Okay.

20  Q.  Is that the address of Summit Physicians Group?

21  A.  I would assume so.

22  Q.  Is that your name, Mr. Butler?

23  A.  That's not my name but that's who they -- that's -- I'm

24  Henderson Butler, III.

25  Q.  Understood.  If we imagined that there's a Roman numeral

1  III, on that would that be your name?

2  A.  Yeah.  Imagine that.

3  Q.  I'm the second as well.  I understand.

4  A.  Yeah.

5  Q.  I can --

6  A.  I'm the father of the fourth and a grandfather of the

7  fifth.

8  Q.  Congratulations.

9  A.  Thank you.

10       THE COURT:  Let's -- let's stick with the issues in

11  the case, guys.  Go ahead.

12  Q.  Is your date of birth October 9th, 1954?

13  A.  Yes, it is.

14  Q.  Okay.  And now I'm going to show you what's listed on your

15  MRI.  Did you mention to Summit Physicians Group that you had

16  pain for ten years?

17  A.  I don't know if I said -- I -- I guess so.  I -- that's

18  what they have down there, I guess I did.

19  Q.  But if there's an MRI report in your medical record from

20  Summit, you would agree that that's actually an MRI of your

21  back?

22  A.  No, I would agree it's a copy of an MRI from Summit.

23  Whether this is accurate of what they found on my back, I would

24  not agree to.  I'm not -- I'm not sure of that.

25  Q.  Do you have any reason to believe that Summit Physicians

1    Group was fraudulently altering MRIs?

2    A.  No comment.

3    Q.  Do you have any reason to believe that Summit Physicians

4    Group was fraudulently altering MRIs?

5    A.  No comment.

6    Q.  No comment is not an option to questions here.

7    A.  That case --

8         MR. CHAPMAN:  Would you please direct the witness to

9    answer the question?

10        THE COURT:  Yeah, except I don't think it's relevant

11   what he believes about Summit Group.  But listen, you can't no

12   comment.

13        THE WITNESS:  I mean that -- that's a active trial.

14   They're -- they're -- they're --

15        THE COURT:  Listen.

16        THE WITNESS:  Yep.  Okay.  All right.

17        THE COURT:  Answer the question.

18        THE WITNESS:  I mean -- repeat the question please.

19        THE COURT:  No, we --

20        MR. CHAPMAN:  Can we strike the portion of that

21   witness's answer?

22        THE COURT:  We're striking all this stuff.  His

23   belief as to what's going on at Summit is irrelevant.  Let's

24   move forward.

25   BY MR. CHAPMAN:

Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

1   Q.  I'm going to show you the findings of that MRI.  Do you

2   know whether this is the MRI you discussed with Dr. David Lewis

3   sitting in the clinic?

4   A.  I assume so.

5   Q.  You assume so.

6        Because this would have been in your Summit Medical

7   record?

8   A.  If this is the MRI that Dr. Lewis was discussing with me,

9   you're right.  I have no idea.  I didn't look at my Summit

10  Place file.

11  Q.  Well, this is what I'm trying to clear up.  You handed an

12  MRI to Dr. Lewis --

13  A.  Right.

14  Q.  -- from Mr. Peterson, right?

15  A.  Fine.  Yes.

16  Q.  And that's different than the MRI that you would have had

17  in your Summit Medical record, correct?

18  A.  I don't know.  I don't know.  I have no idea.

19  Q.  You underwent an actual MRI at Summit?

20  A.  Yes.

21  Q.  You received a fake MRI from Mr. Peterson?

22  A.  I received a fake MRI?  Yeah, I guess so, or it might have

23  been a copy of this one.  I doubt it.

24  Q.  Which one were you reviewing with Dr. Lewis?

25  A.  I don't know.  He never showed me.  He never showed me the

1    MRI that I -- he was discussing with me.

2    Q.  Okay.  Your first visit was with Dr. Edu, correct?

3    A.  Yes.

4    Q.  And during that visit a back brace was ordered?

5    A.  Yeah.  Not by me.

6    Q.  I understand that.  You testified on direct exam that

7    during that visit you never said that you'd attempted

8    chiropractic therapy, is that right?

9    A.  Yes.

10   Q.  Isn't it true that a medical assistant sat with you for

11   some time prior to you seeing Dr. Edu?

12   A.  Possible.

13   Q.  Isn't it true that during that medical assistant visit you

14   informed the medical assistant that you'd attempted

15   chiropractic therapy?

16   A.  Evidently not.  I doubt it.  It's not a -- it's -- I never

17   saw a video of me saying that, so I -- I would say no, that's

18   not accurate.

19          MR. CHAPMAN:  Going to pull up the video, Your Honor,

20   and we'll try to keep it as brief as possible.

21          THE COURT:  Thank you very much.

22          MR. CHAPMAN:  I should probably reference the --

23   okay.  I'm showing the witness and the jury what's been marked

24   as Government's Exhibit 1.  Let's go ahead and play

25   Government's 1.

```
 1            (Video being played)
 2            MR. HELMS:  Your Honor, I object to relevance at this
 3     point.  Is there another portion where we talk about
 4     chiropractic --
 5            THE COURT:  Yeah.  What are we doing here?  I think
 6     we ought to move to what we're -- what we're -- what we're
 7     getting to.
 8            MR. CHAPMAN:  Your Honor, I was going to go into the
 9     fact that a medical assistant was filling out the form --
10            THE COURT:  Okay.
11            MR. CHAPMAN:  -- as a result of his answers --
12            THE COURT:  Okay.
13            MR. CHAPMAN:  -- and -- and potentially checked the
14     wrong box while she was engaged in it.
15            THE COURT:  Okay.  That's potentially -- we have seen
16     video evidence of that that's been received by the Court.  So
17     unless there's something more significant, I think you made the
18     point and can go to your next question.
19            MR. CHAPMAN:  Thank you, Your Honor.
20            THE COURT:  Thank you.
21     BY MR. CHAPMAN:
22     Q.  After you visited with that medical assistant, Mr. Butler,
23     you saw Dr. Edu, correct?
24     A.  Yes.
25     Q.  All right.  Now, you informed -- and I hope we don't have
```

1   to play the video of this, but you informed the medical

2   assistant at that time, and we're going to get to that, that

3   you saw Summit Visiting Physicians, right?

4   A.  Yes.

5   Q.  And -- and you indicated to them that you were previously

6   a patient six months ago at Summit?

7   A.  You mean let the Pain Center know that I was at Summit?

8   Q.  Yes.

9   A.  Yes.

10  Q.  And you inferred the medical assistant that you received

11  medication from Summit?

12  A.  I don't know -- I told her but she could easily find out

13  if I did.

14  Q.  From your MAPS report?

15  A.  Absolutely, yeah.

16  Q.  Okay.  You informed them that you'd received MS Contin and

17  hydrocodone, correct?

18  A.  Yes.  I -- I -- that's -- if it -- if -- if -- if it was

19  on my medical -- my Social Security report or whatever, my Part

20  D report, that's what I did 'cuz I never took any of it.

21  Q.  So at that time the physicians at the Pain Center would

22  know that you were previously under the care of a pain

23  physician and you were receiving oxycodone and hydrocodone?

24  A.  Whatever Summit wrote, they could assume I was receiving

25  it.

1   Q.  And let me revise my question.  I believe it was MS

2   Contin.  Do you recall that?

3   A.  I have no idea, but if you say so, I have to believe you

4   'cuz I have no idea about what pain medication really is.

5   Q.  Now, the medical assistant in that video attempted to get

6   your Summit chart.  Do you recall that?

7   A.  What physician assistant?

8   Q.  The medical assistant that was just in the video.

9   A.  Attempted to get my Summit chart?

10  Q.  Yes.

11  A.  No, I never noticed -- you talking about she?

12  Q.  Yes.

13  A.  I don't know.  That's the first day I was there.  I don't

14  have no idea what she was trying to get.

15  Q.  I'm just asking you if you recall her attempting to get

16  your Summit chart.  It's okay if you don't remember.

17  A.  No, I really don't, no.

18  Q.  Okay.  At some point during that video she walks into the

19  room, let me know if you recall this, and says, "I called over

20  to Summit.  They said they couldn't fax over the chart and I'm

21  going to have to get it some other time."

22  A.  Okay.

23  Q.  Do you agree that that happened?

24  A.  That's possibly, yeah.  I'm not -- I'm not going to

25  disagree.  It's possible.

1    Q.  So at the time Dr. Edu sat down with you, nobody at the

2    Pain Center had received your Summit chart?

3    A.  Okay.

4    Q.  You agree?

5    A.  If -- I don't -- look, I don't know what the Pain Center

6    had received before anyone sat down with me.  For me to make

7    that determination would not be factual and would not be in --

8    an accurate statement for me to make under oath to tell the

9    truth.

10   Q.  Okay.  But at that point the medical assistant said, "We

11   weren't able to get it today," right?

12   A.  Evidently not.

13   Q.  You then come back for the next visit and you see Dr.

14   Bothra?

15   A.  For the next visit or the -- you talking about the first

16   time I saw Edu or the second time?

17   Q.  Okay.  It was Dr. Edu, then Dr. Edu again, and then Dr.

18   Bothra.

19   A.  Right.

20   Q.  Right.  Okay.  And there was some space between the first,

21   second and third visit, right?

22   A.  If -- between the second and third, yeah.

23   Q.  Can you tell us why there was so much time that elapsed

24   between March of 2016 and August of 2016?

25   A.  No, I really can't.

Case 2:18-cr-20800-SJM-APP   ECF No. 416, PageID.4002   Filed 06/02/22   Page 46 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

46

1    Q.  You just didn't go back in?

2    A.  Evidently.  I mean had to be -- had -- had to be something

3    going on.  For me to give you an accurate description of what

4    was going on, was it the FBI caused me not being there, was it

5    my reason for not being there, I cannot give you an accurate,

6    honest answer and I'm -- so I'm not.

7    Q.  I -- I accept that, Mr. Butler.

8    A.  That's okay.  Yeah.

9    Q.  Thank you.

10        You were supposed to come back in April of 2016 for

11   your followup visit?

12   A.  Okay.

13   Q.  Right?  But you didn't do that?

14   A.  No, evidently not.

15   Q.  Do you have a conversation with the FBI about whether or

16   not you should go back?

17   A.  Absolutely.

18   Q.  Do you have any idea what they said?

19   A.  I know that I was in a car accident.  I do believe it

20   might have been around that time, early in 2016.  I don't know

21   if the car accident had any issue with my availability to

22   attend it.

23   Q.  Was that when you fell asleep at the wheel and hit a light

24   pole?

25   A.  Yes.

```
1    Q.   Did that happen?

2    A.   Yeah, that was -- yes.  So you know about it.

3    Q.   I know about a lot of things, Mr. Butler.

4    A.   When did it -- when did that happen?

5              THE COURT:  All right.  Sit tight, Mr. Butler, and

6    wait for the next question.

7              THE WITNESS:  Okay.

8              THE COURT:  Go ahead, Mr. Chapman.

9    BY MR. CHAPMAN:

10   Q.   If that was in your Summit Medical chart, and I don't want

11   to have to go through and show you --

12   A.   Okay.

13   Q.   -- would that have -- would that car accident have

14   happened before you ever went into the Pain Center?

15             THE COURT REPORTER:  Mr. Butler, take your hand away

16   from your mouth please.

17   A.   Oh.  2016?  Yeah.

18   Q.   Okay.

19   A.   Yeah.

20   Q.   So this car accident wasn't the reason you didn't come

21   back to the Pain Center?

22   A.   Couldn't have been.  It couldn't have been, yeah.

23   Q.   Couldn't have been?

24   A.   Okay.

25   Q.   Do you recall why you didn't come back for your regularly
```

1    scheduled monthly visit?

2    A.  I really can't -- I really can't give you a reason.

3    Q.  All right.  August 29th, 2016 you decide to go back in.

4    Tell us why you were sent back in by the FBI.

5    A.  I don't know why.

6    Q.  Don't know?

7    A.  No, but I tell you why I went.  Because I was told to go.

8    Q.  The FBI told you to go?

9    A.  Pretty much.

10   Q.  The FBI paid you to go?

11   A.  I don't know at the time.  I did not get paid at the time

12   of my visit.

13   Q.  So then we have August 29th, 2016.  You don't return again

14   until November of 2017, is that right?

15   A.  Okay.  If -- if -- if that's what they say.

16   Q.  You had a long break of treatment, right?

17   A.  Okay.

18   Q.  Well over a year?

19   A.  Okay.

20   Q.  Dr. Bothra's upset with you?

21   A.  Okay.

22   Q.  He says, "If you don't do what you need to do, we can't

23   treat you," right?

24   A.  Right.

25   Q.  Right.  And he says, "We're going to have to discharge you

1   from this clinic unless you're able to follow instructions."

2   A.  Yes.  Okay.

3   Q.  So you see Dr. Bothra, yes?

4   A.  He saw me.

5   Q.  Ah.  After seeing Dr. Bothra -- you testified that nothing

6   medical was done during that visit?

7   A.  With Dr. Bothra?

8   Q.  Yes.

9   A.  Nothing.

10  Q.  But you did turn your MRI in at that point, right?

11  A.  Okay.

12  Q.  Well, do you recall?

13  A.  I don't recall anything that happened during that visit

14  with Dr. Bothra unless I see it on video.

15  Q.  Just from the videos.

16  A.  Yeah.

17  Q.  Dr. Bothra does send you to physical therapy, doesn't he?

18  A.  Yes.

19  Q.  Because you complained of pain?

20  A.  I don't know why he sent me but he told me to go --

21  Q.  But you --

22  A.  -- down the street.

23  Q.  -- you did --

24  A.  I -- sure I did.  I did everything Dr. Bothra wanted me to

25  do.

1   Q.  You said it was radiating down your back?

2   A.  Said it was what?

3   Q.  Radiating down your back to your legs.

4   A.  Okay.

5   Q.  Yep.  You said it was going on for ten years?

6   A.  Okay.

7   Q.  And he wrote you an order for physical therapy?

8   A.  Okay.

9   Q.  And you went to that physical therapy?

10  A.  Yes.

11  Q.  And you did what you were supposed to do at that physical

12  therapy?

13  A.  Okay.

14  Q.  And, in fact, during that physical therapy you made sure

15  to howl in pain a couple of times just to make it look real,

16  didn't you?

17  A.  Or laughing hysterically.  I don't know.  Was it hollering

18  or laughing?  I don't know.

19  Q.  Well, that's the question.  Were you hollering in pain a

20  few times?

21  A.  No.  It was -- it was ridiculous.

22  Q.  You don't recall hollering in pain at all?

23  A.  I sort of -- I may have faked it a couple of times.

24  Q.  You may have faked pain a couple of times?

25  A.  I had to.

1  Q.  You had to because you needed to convince everybody there

2  that you were a real pain patient?

3  A.  No, I didn't have to convince them that I was a real pain

4  patient.  They didn't care whether I was a real pain patient.

5  They were concerned that they were going to get paid.

6  Q.  Mr. Butler, you've answered my question.

7        THE COURT:  All right.  That's not responsive.

8  That's stricken.

9        And I have a question.  Was this -- was this physical

10 therapy at the Pain Center or nearby, Mr. Butler?

11       THE WITNESS:  It was at the Pain -- it was at a

12 facility two blocks away that was --

13       THE COURT:  Okay.

14       THE WITNESS:  -- that was owned by the Pain Center.

15       THE COURT:  All right.  Go ahead, Mr. Chapman.

16 BY MR. CHAPMAN:

17 Q.  After physical therapy you come in and you see Mr.

18 Russell?

19 A.  Okay.

20 Q.  Who's a PA?

21 A.  Okay.

22 Q.  Government didn't play that video during your direct exam?

23 A.  That's okay.  That's all right.

24 Q.  I'm asking you if they played it.

25 A.  Did they -- did they play it?

1    THE COURT:  They didn't.  They didn't.

2  A.  I don't recall seeing Russell, no.

3  Q.  We can agree that wasn't played.

4  A.  Okay.

5    (Brief pause)

6    THE COURT:  Okay.  Where are we going?

7    MR. CHAPMAN:  Your Honor, we're going to have to -- I

8  was just trying to figure out if I have to admit this video and

9  whether or not it was already admitted by the government, but

10 defense does have to admit it so I need to lay a brief

11 foundation, Judge.

12   THE COURT:  Okay.

13 BY MR. CHAPMAN:

14 Q.  Mr. Butler, you went into the Pain Center on 12-27-2017,

15 is that right?

16 A.  If you say so, sir.  I -- I -- look, you know when I went

17 more so than I do 'cuz you -- you have the dates.

18   THE COURT:  All right.

19 A.  I don't have the dates.

20   THE COURT:  The records that were shown to the jury

21 by the government establish that -- that fact.

22   Go ahead, Mr. Chapman.

23 BY MR. CHAPMAN:

24 Q.  And you recorded that visit from beginning to end?

25 A.  If I was there.

1          MR. CHAPMAN:  Your Honor, at this time I move to

2     admit Defense Exhibit 4-A.

3          THE COURT:  Is there going to be any objection to the

4     video of the Butler visit with Russell?

5          MR. HELMS:  Assuming that's what it is, no objection,

6     Your Honor.

7          THE COURT:  Okay.  Thank you all very much.  4-A is

8     received.

9          (Video being played)

10          MR. CHAPMAN:  We have to go to the next video.

11          (Video being played)

12          THE COURT:  All right.  Can we stop this please?  Is

13     there anything else from the video you need to establish to ask

14     your next question?

15          MR. CHAPMAN:  Yes, Your Honor.  These videos are very

16     important.  It sets up Mr. Butler's entire course of treatment.

17     I'd request that I'd be allowed to play every visit that Mr.

18     Butler attended.

19          THE COURT:  Well, I don't -- I don't -- you're

20     cross-examining him.  I mean you -- you -- you can impeach him,

21     which you've done extensively.  You can say something's

22     different from what he testified to than what's on the -- but I

23     don't -- I don't see where this is going, frankly.  We can

24     accept the fact that most of the video was played, he met with

25     Russell and ask our next question I would think.

Case 2:18-cr-20800-SJM-APP  ECF No. 416, PageID.4010  Filed 06/02/22  Page 54 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

54

1        MR. CHAPMAN:  Your Honor, Mr. Butler testified that

2   he felt like he was being pressured to receive injections.

3        THE COURT:  Right.

4        MR. CHAPMAN:  This is the conversation that sets up

5   the reason why he's sitting in front of Dr. Lewis for a consult

6   where injections were the issue.  This is vital to this

7   patient's course of treatment.

8        THE COURT:  Okay.  Well, it seems to me the video

9   evidence is no pressure to get an injection.

10       MR. CHAPMAN:  If the government will stipulate that

11  Mr. Butler was never pressured to get an injection, I'll

12  certainly avoid playing the video, Your Honor.

13       MR. HELMS:  I do not stipulate to that, Your Honor.

14       THE COURT:  Okay.  All right.  Finish it off.

15       (Video being played)

16       THE COURT:  So this is pressure to get an injection?

17  I mean I don't see it.  Go ahead.  Let's move this along.  Come

18  on now, we're wasting a ton of time.

19       MR. CHAPMAN:  That's the --

20       THE COURT:  Let's go.

21       MR. CHAPMAN:  -- that's the end of this video, Your

22  Honor.  I do have another video with Russell that I do need to

23  play.

24       THE COURT:  I don't think you do need to play it.

25  What's different on that video than what's on this video?  This

1    is a waste of time. He went to see these people. Go ahead.

2    What's the next question?

3    BY MR. CHAPMAN:

4    Q.  At that point in time, Mr. Butler, you were offered

5    options: to continue physical therapy and medication or to

6    receive injections, correct?

7    A.  I don't know if I -- I don't know if you can with --

8    with -- I wouldn't consider like that, but the options, those

9    three options were available, yes.

10   Q.  Mr. Russell said, "If you need a pain shot, we can do

11   that. If PT working is -- is working, we can do that, or we

12   can consider injections."

13   A.  All right. If you consider those presenting options, I

14   agree with you.

15   Q.  Okay. And you received a refill on pain medication at

16   that point in time?

17   A.  If -- if -- if you -- I -- I have to agree with you. I --

18   Q.  And then you went back to PT a few more times?

19   A.  I agree with you.

20   Q.  Nobody forced you to go in and get an injection?

21   A.  Nobody forced me ever to get an injection so I never got

22   one.

23   Q.  Okay. Now, you go to physical therapy two days later on

24   December 29th, 2017, right?

25   A.  Okay.

1  Q.  And then you go a little less than a month later on

2  January -- well, half a month later, January 11th, 2018, right?

3  A.  Okay.

4  Q.  And then you see Mr. Russell again?

5  A.  Okay.

6  Q.  And we won't go forward and play all that video, but would

7  you agree with me that Mr. Russell did not force you to get an

8  injection during that visit?

9  A.  If you say so.  I really -- I don't -- I cannot explicitly

10 confirm or deny what happened during that visit.

11        THE COURT:  From your memory, did you ever get

12 pressured by Dr. Russell --

13        THE WITNESS:  No.

14        THE COURT:  -- during a visit with --

15        THE WITNESS:  No, not the --

16        THE COURT REPORTER:  Wait.  Let the judge finish

17 please.

18        THE WITNESS:  Oh, I'm sorry.

19        THE COURT:  Did you ever get pressured by Dr. Russell

20 to get an injection from your memory during any of the time you

21 saw him?

22        THE WITNESS:  It was mentioned to me I could receive,

23 but I don't consider --

24        THE COURT:  Pressure?

25        THE WITNESS:  -- that pressure, no.

1          THE COURT:  Okay.  Go ahead, Mr. Chapman.

2          MR. CHAPMAN:  Thank you.

3    BY MR. CHAPMAN:

4    Q.  So after those two visits with Dr. Russell, and let me

5    just catalog this, you see Dr. Edu, you see Dr. Bothra, you see

6    PA Russell twice.  Each of those times you get medication, you

7    don't have to undergo an injection, right?

8    A.  That's what happened, yeah.

9    Q.  Yep.  Then you see Dr. Lewis?

10   A.  (Nods in the affirmative.)

11   Q.  Dr. Lewis --

12         THE COURT REPORTER:  Wait.  He -- you have to answer

13   out loud.

14         MR. CHAPMAN:  Thank you.

15         THE COURT REPORTER:  You're nodding your head.

16         THE WITNESS:  Oh.

17         THE COURT REPORTER:  I need you to answer out loud.

18         MR. CHAPMAN:  She can't take down a nod.

19         THE WITNESS:  Oh, I'm so sorry.

20         THE COURT REPORTER:  You've got to keep your hand

21   away from your mouth.

22         THE WITNESS:  Oh, I'm sorry.  Okay.  All right.

23   Okay.  I apologize.

24         THE COURT REPORTER:  So can you answer out loud your

25   answer?

1    Q.   You sit down with Dr. Lewis at that next visit?

2    A.   Yes.

3    Q.   You inform him that you have pain radiating down your leg?

4    A.   No, he informed me.

5    Q.   You informed him that you had pain radiating down

6    sometimes one leg, sometimes the other.  Don't you recall

7    making that statement?

8    A.   I recall him reading it to me.

9    Q.   Okay.  From your chart?

10   A.   But I didn't make the statement to him.  He read it to me.

11   Q.   Okay.  And he informs you that there are five bones in

12   your lower back, right?

13   A.   Yes.

14   Q.   And between those bones are disks?

15   A.   Yes.

16   Q.   And some of your disks are having problems?

17   A.   Yes.

18   Q.   And that was based off of viewing the MRI?

19   A.   Okay.

20   Q.   He was sitting down looking at the MRI at the time?

21   A.   Okay.

22   Q.   And while looking at the MRI, he's talking to you about

23   all of the problems he saw on that MRI?

24           THE COURT:  Okay.  The jury knows this, they saw it.

25   What's your point?

1          MR. CHAPMAN:  I'll move on, Your Honor.

2          THE COURT:  Please do.

3          THE WITNESS:  Excuse me.

4          THE COURT:  Let's take a recess.  It's 10:45.  You

5    may step down.  We're going to take a break now.

6          THE WITNESS:  Okay.  Thank you, sir.

7          THE COURT:  Yep.  Ladies and gentlemen, don't talk

8    about the case on your -- on your break please.  Let's all rise

9    for our jury at this time.

10          (Jury excused at 10:45 a.m.)

11          THE COURT:  Okay.  Mr. Butler, you may be on your

12   way.  We'll take a ten-minute recess.  Let's have the lawyers

13   stay here.

14          (Witness excused at 10:46 a.m.)

15          Okay.  Everybody may be seated.  So I don't know --

16   and I hope you understand what -- what has happened here.  This

17   particular witness, in my opinion, has been a complete and --

18   and unmitigated disaster for the United States.

19          First of all, the up -- upshot of his testimony is

20   that he was paid to, quote-unquote, get these defendants, first

21   of all.

22          Secondly, there wasn't a single honest thing he did

23   on any of the videos and got paid for.

24          Thirdly, the behavior I say by the doctors was

25   largely innocuous.

1        Now, the case to me is coming down to whether or not

2    the defendants knew that the billings that were supplied to

3    Medicare or Medicaid or the insurance companies were false or

4    not.  All right.

5        This guy was completely destroyed within the first

6    ten minutes of his cross-examination when it was determined and

7    demonstrated that he's been a long-time paid informant whose

8    only job is to get doctors for the United States in exchange

9    for cash.

10       Now, we don't need to go much further with this guy.

11   We do not need to have defense attorneys restate what's been

12   seen on the video by the jurors.  It's insulting to them and

13   it's a waste of time.  Now, let's get down to business and get

14   this case moving along.  It doesn't seem to me to be that big

15   of a case.  The question is whether these billings were known

16   to the doctors or not.

17       We'll take a ten-minute --

18       MR. CHAPMAN:  Your Honor?

19       THE COURT:  No.  We'll take a ten-minute recess.

20       (Court in recess at 10:48 a.m.)

21       (Proceedings resumed at 11:03 a.m., all parties

22       present)

23       THE LAW CLERK:  All rise for the jury.  The Court is

24   back in session.

25       (Jury entered the courtroom at 11:03 a.m.)

Case 2:18-cr-20800-SJM-APP   ECF No. 416, PageID.4017   Filed 06/02/22   Page 61 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

61

 1        THE COURT:  Okay.  Our ladies and gentlemen are back,
 2   everybody's in their spots.
 3        Mr. Chapman and -- where's our witness?  Come on up,
 4   Mr. Butler.  Everybody may be seated.  And we're pressing
 5   forward.  Go right ahead.
 6        MR. CHAPMAN:  Thank you, Your Honor.
 7        THE COURT:  Thank you.
 8   BY MR. CHAPMAN:
 9   Q.  Mr. Butler, going back to the March 19th, 2018 visit with
10   Dr. Lewis, it was your testimony that you believed you were not
11   pressured to get injections, is that right?
12        THE COURT REPORTER:  Can you take your mask off
13   please?
14   A.  It was -- what did you -- excuse me.
15   Q.  You testified just before the break that you were not
16   pressured to get injections, right?
17   A.  On -- on at a particular visit or in general?
18   Q.  In general.
19   A.  No.
20        MR. HELMS:  Objection, Your Honor.  I believe the
21   question related to Mr. Russell.
22        THE COURT:  Well, he rephrased it.  What's your
23   answer to that question, Witness?
24   A.  What is -- what was -- what is the question?  Repeat the
25   question.

```
 1    BY MR. CHAPMAN:
 2    Q.  Mr. Butler, you weren't pressured to get injections while
 3    you were at TPC in any visit, were you?
 4    A.  I really can't answer that.  I mean I -- I -- I -- my
 5    opinion of pressure is -- that's a variable.  If you can -- you
 6    want to give me a precise measurement of what I could consider?
 7    In my -- if you -- you're asking me my opinion.
 8    Q.  I don't know.
 9             THE COURT:  All -- all he's asking you is if you felt
10    pressured to get injections during your time at the Pain
11    Center.
12    A.  Sure.  I mean that's what they wanted.  That's what they
13    wanted to do.
14    Q.  Okay.  But again, did you feel pressured?
15    A.  It was a redundant request to me to get a injection.
16    Q.  All right.  And the first time the topic of injections was
17    approached by a doctor was when you were sitting with Dr.
18    Lewis, correct?
19    A.  If you say so.
20    Q.  And that was after you had already been to the pain
21    clinic, the Pain Center 11 times?
22    A.  Okay.
23    Q.  Yeah.  And during that visit Dr. Lewis said, "You're not
24    here to get narcotics," right?
25    A.  Okay.  If you -- you tell me what he said.  I can't
```

1    remember.

2    Q.   And then he explained to you all of the issues in your

3    back according to the MRI, correct?

4    A.   No, it's not correct.

5    Q.   That's not correct?

6    A.   He explained to me what he wanted me to believe was wrong

7    with my back.

8    Q.   After looking at the MRI that you presented?

9    A.   I don't know what he looked at.

10   Q.   You don't have any training in reading MRIs, right?

11   A.   I got common sense.

12   Q.   You don't know if that MRI showed a normal back or a very

13   bad back, do you?

14   A.   I know what hurts and what don't hurt.  My back has never

15   bothered me.

16   Q.   Okay.  But that MRI said differently, didn't it, Mr.

17   Butler?

18   A.   Well, that MRI was not -- was not accurate.

19   Q.   Okay.

20   A.   If you want to -- if you want to know how my back was

21   doing --

22   Q.   Mr. Butler, you've answered my question.

23   A.   Okay.  Want to know how my back was doing, ask me.

24   Q.   Thank you, Mr. Butler.

25            At the conclusion of that visit Dr. Lewis informed

1    you that in order to get the pain relief that you need outside

2    of just taking pain medications, you can undergo a series of

3    injections and he can sign you up?

4    A.   Okay.

5    Q.   And then you agreed to that, didn't you?

6    A.   Agreed to what, to --

7    Q.   To receive injections.

8    A.   Told him I'd consider it.  First time -- talking about

9    first time, second time or third time?

10   Q.   The first time you saw Dr. Lewis he told you that you

11   could get these to relieve your pain and you agreed to undergo

12   injection therapy?

13   A.   Next week, yes.

14   Q.   Next week.

15          Now, you're undercover.  You don't actually intend on

16   getting on the table?

17   A.   Never from anyone anytime.  Whether I'm being -- whether I

18   work for you or not, nobody's shooting me in my back.

19   Q.   So you knew that you would have to show up and potentially

20   face receiving injections and you'd have to develop an excuse

21   to get out of it, right?

22   A.   I knew -- I knew how not to get a shot.

23   Q.   Did you talk to the FBI agents about --

24   A.   I knew how not to get a shot.

25   Q.   Mr. Butler, let me finish the question.  You knew how to

1    not get a shot?

2    A.   (Nods in the affirmative.)

3    Q.   You knew the types of -- can you answer that question

4    audibly?

5    A.   I knew how not to get a shot, yes, I did.

6    Q.   You knew the types of things that you could say to a

7    doctor to get them to reschedule or cancel an injection?

8    A.   Yes.

9    Q.   And one of the things you thought to say is "I'm scared of

10   needles, I can't do this"?

11   A.   One of the things, yes.

12   Q.   But you didn't tell Dr. Lewis during his first visit with

13   you that you were too scared of needles to even consider an

14   injection, right?

15   A.   He didn't ask.

16   Q.   He didn't ask if you were too scared of needles?

17   A.   No.

18   Q.   But you didn't volunteer?

19   A.   He didn't ask.

20   Q.   Okay.  It's your belief that it's his responsibility to

21   ask you if you're scared of needles, otherwise you feel

22   pressured?

23   A.   He's not a priest.  He's not a priest.  I don't offer

24   confessions.  If you ask me a question, I'll answer it.

25           THE COURT:  Hey, hey, hey, hey, hey, let's just yes

 1    or no, all right?

 2            THE WITNESS:  Okay.

 3            THE COURT:  Okay.

 4    BY MR. CHAPMAN:

 5    Q.  So you show up for the next appointment with Dr. Lewis

 6    April 11th, 2018 knowing you're now going to be not in the --

 7    the -- the clinic room, you're going to be in a procedure room?

 8    A.  Yes.

 9    Q.  And that's where -- that's where you show up, to the

10    procedure room?

11    A.  Yes.

12    Q.  And you were going through the steps to have this

13    procedure performed with the medical assistants?

14    A.  If you say so.

15    Q.  And you start shouting about how you're too scared and you

16    can't undergo injections because you're scared of needles?

17    A.  Okay.

18    Q.  And that's what you planned on saying when you showed up

19    to that visit?

20    A.  If you say so.

21    Q.  Did you tell the FBI that that's what you were going to do

22    when you showed up that day to get out of treatment?

23    A.  No.

24    Q.  No.  You made it up yourself?

25    A.  I -- no.

```
 1    Q.  But ultimately -- well, who made it up then?
 2    A.  It's not made up.  It's the way it goes.
 3    Q.  You actually are scared of needles?
 4    A.  No comment.  I'm not going to answer that.
 5    Q.  Well, you have to --
 6              THE COURT:  You have to answer the question.
 7    A.  Am I -- am I --
 8              THE COURT:  It's a simple question.
 9    A.  Am I scared of needles?
10    Q.  Yes.
11    A.  I'm scared of needles in my hand or in somebody else's
12    hand?
13    Q.  Are you scared of needles period?
14    A.  No.
15    Q.  So as it ends, no injections, right, you don't get any
16    injections?
17    A.  I beg your pardon?
18    Q.  You don't get any injections at the conclusion of that
19    visit with Dr. Lewis?
20    A.  True, that's true.
21    Q.  But he still gives you the medication, right?
22    A.  If -- if you say so.
23    Q.  Well, I'm asking you, did you walk away with a
24    prescription for medication?
25    A.  Of course.
```

1  Q.  Of course.

2  A.  Absolutely.

3  Q.  Your injections are rescheduled?

4  A.  Okay.

5  Q.  Because you agreed at the conclusion of that visit that

6  you would try to get yourself in the right mental space to be

7  able to have an injection done.

8  A.  Okay.

9  Q.  Right?

10       Now, you got paid for the first visit, you got paid

11  for the second visit, you were getting paid for this visit with

12  Dr. Lewis, weren't you?

13  A.  What do you mean, get -- what you mean, got paid?

14  Q.  By the FBI.

15  A.  When?

16  Q.  When you returned for your injection visit.

17  A.  I didn't get paid when I returned for anything.

18  Q.  You got paid later though.  You knew you were going to get

19  paid.

20  A.  I didn't know anything.  I don't know that.

21  Q.  You thought you were going in there for free?

22  A.  It's not important why I went in there.

23  Q.  Mr. Butler, isn't it true --

24  A.  I did not -- I don't know whether I'm going to get paid

25  when I'm -- when I'm on assignment for the FBI.  I don't know

1   if I'm going to get paid at all.

2   Q.  Mr. Butler, answer me straight.  You knew the more visits

3   that you got into the TPC -- I'm sorry, into TPC, the more

4   money you would make from the federal government?

5   A.  That is an erect -- that's -- that's not true.  That's --

6   you're making that assumption and you're incorrect.  That's not

7   how my game rolls.

8   Q.  But you agreed to reschedule the injection?

9   A.  Yes.

10  Q.  You didn't say, "I can't do this, I'm scared of needles.

11  I'm fine with physical therapy and the pain medication alone."

12  A.  I have said that numerous times.

13  Q.  But you didn't say that to Dr. Lewis?

14  A.  It wasn't heard by any member of -- of Pain Center.

15  Q.  Didn't say it to Dr. Lewis that day?

16  A.  Not that day but I said it to him before.

17  Q.  You agreed to be rescheduled?

18  A.  That day.

19  Q.  And you were rescheduled?

20  A.  Yes, that day.

21  Q.  So you come back in for the next visit.

22          Now, who drove you to the Pain Center on June 29th,

23  2018, your last visit with Dr. Lewis?

24  A.  Me.

25  Q.  But the FBI was around, right?

1    A.   Did they say they were around?

2    Q.   I'm asking you.

3    A.   Well, I'm quite sure they were.

4    Q.   They were, waiting for you outside, right?

5    A.   If you say so, sir.

6    Q.   If you had a procedure done that day, they could have

7    driven you home?

8    A.   No.

9    Q.   No.  But instead you tell Dr. Lewis or the medical

10   assistant that you didn't bring a driver?

11   A.   I didn't.

12   Q.   Because you knew what you needed to say to get out of

13   actually receiving treatment, right?

14   A.   You asked me did I bring a driver.  I said no.

15   Q.   But you knew what you needed to say to get out of

16   receiving treatment, right?

17   A.   Among -- I could have said that, among other things, to

18   not get treatment.

19   Q.   Dr. Lewis clearly explains the form that instructed you

20   that you needed a driver that day?

21   A.   Oh, yeah, sure.

22   Q.   And he refuses to provide the injection because it

23   wouldn't be safe for you to drive home if you previously

24   received sedation?

25   A.   Okay.

1    Q.  He could have performed the injection and charged you for

2    it, right?

3    A.  Whatever.

4    Q.  Sent you right out the door.

5    A.  That's the first time he mentioned a driver to me.

6    Q.  But you saw it on the paperwork?

7    A.  Did I?

8    Q.  I'm asking you.

9    A.  Evidently not.

10   Q.  Okay.  You come back to the clinic again to see Dr. Patel?

11   A.  Okay.

12   Q.  That young gentleman that --

13   A.  Yeah.

14   Q.  -- you saw in the last video?

15   A.  Mm-hmm.

16   Q.  Now, previously at the Pain Center, your complaint of pain

17   ranged from six to eight, didn't it?

18   A.  No.  No.

19   Q.  That's your testimony, you didn't complain?

20   A.  No.  My thing, I only said four was the maximum number I

21   ever used.

22   Q.  Mr. Butler, you've told a medical assistant, you told Dr.

23   Edu, and it's also documented in your chart that you complained

24   that your pain was a level eight, isn't that right?

25   A.  If you say so.

```
 1              MR. HELMS:  Objection, Your Honor.
 2   A.  No.
 3              MR. HELMS:  I believe it mischaracterizes the
 4   witness's testimony.
 5   A.  No.  No.
 6              MR. HELMS:  And the videos.
 7              THE COURT:  Okay.  The --
 8              MR. CHAPMAN:  Well, it certainly --
 9              THE COURT:  Jury will remember the testimony and saw
10   the video, so I'll note the objection.
11              Go ahead, Mr. Chapman.
12   BY MR. CHAPMAN:
13   Q.  You think you wouldn't have said a level eight because --
14   A.  I would not.
15   Q.  -- that would have been problematic for you to complain of
16   severe pain in a doctor's office, right?
17   A.  I don't think I admitted to severe pain.  I don't think I
18   admitted to -- I'm not sure, but I don't think I ever did.
19   Q.  You said that your pain previously was radiating down to
20   your legs, that it happened for ten years, and it hurt really
21   bad when you were driving a bus?
22   A.  That's not what I said.
23              MR. HELMS:  Objection, Your Honor.  Asked and
24   answered at this point about --
25              MR. CHAPMAN:  Your Honor, I'm getting into the fact
```

1     that his pain complaint when he was --

2             THE COURT:  It's overruled.  Go right ahead.

3     BY MR. CHAPMAN:

4     Q.  Your pain before you saw Dr. Patel was going on for ten

5     years, right?

6     A.  You mean the -- mean as to what I said?

7     Q.  What you said.

8     A.  Yeah, that's what I said.

9     Q.  It radiated down to your legs?

10    A.  That's what I said.

11    Q.  It hurt when you were driving the bus?

12    A.  That's what I said.

13    Q.  And you said that was your job?

14    A.  Driving a bus?

15    Q.  Yes.

16    A.  I've never driven a bus.

17    Q.  But you said that was your job?

18    A.  Oh, okay.

19    Q.  You can't remember your lies?

20    A.  No, I remember lies.

21            THE COURT:  Hold on.  That's improper.

22    A.  I can't remember -- I can't remember --

23            THE COURT:  Stop.  Stop.  Stop.

24            MR. CHAPMAN:  I'll withdraw the question, Your Honor.

25            THE COURT:  Thank you, sir.

```
 1    BY MR. CHAPMAN:
 2    Q.  Now, when you see Dr. Patel, despite saying all of that to
 3    all of the other people, you say your pain is a level two to
 4    three?
 5    A.  He's not the first doctor to hear that at Pain Center.
 6    Q.  I'm asking you a specific question about your visit with
 7    Dr. Patel.
 8    A.  That's what I told him, two to --
 9    Q.  Can you answer that question?
10    A.  -- three.
11           THE COURT REPORTER:  Wait.  Please let him finish.
12    Q.  You said that --
13           THE COURT:  Mr. Butler, Mr. Butler, look at me.  I
14    want you to calm down.
15           THE WITNESS:  Okay.  Yes, sir.
16           THE COURT:  Do you need a glass of water?  We got one
17    for you.
18           THE WITNESS:  No, no thank you.
19           THE COURT:  All right.  Okay.  Listen.  Look -- look
20    at me, sir, Mr. Butler.  Listen, respond.  Nothing to be angry
21    about.
22           THE WITNESS:  Okay.
23           THE COURT:  Nothing to be engaged -- there you go,
24    there you go.  That's it, Mr. Butler.
25           THE WITNESS:  All right.  I'm sorry.
```

1          THE COURT:  Nice and calm.

2          Go ahead, Mr. Chapman.

3          MR. CHAPMAN:  Thank you, Your Honor.

4    BY MR. CHAPMAN:

5    Q.  Now, this time you come back and see Dr. Patel, you

6    complain of a level two to three pain?

7    A.  Okay.

8    Q.  Yeah?

9    A.  Yes.

10   Q.  Are you aware that Mr. Patel was also -- Dr. Patel was

11   also working for the FBI at that time?

12         MR. HELMS:  Objection, Your Honor.  Assumes facts not

13   in evidence.

14         THE COURT:  That's sustained.  Go ahead.

15   BY MR. CHAPMAN:

16   Q.  You described your pain to Dr. Patel as a mild headache in

17   your back?

18   A.  Okay.

19   Q.  Yeah?

20         Dr. Patel also prescribes you hydrocodone?

21   A.  Okay.

22   Q.  But he also suggests that you try a drug called Mobic?

23   A.  Okay.

24   Q.  And that's because your pain complaint was less severe

25   than it was during previous visits, right?

```
1    A.  Okay.
2           MR. HELMS:  Objection, Your Honor.  Mischaracterizes
3    the testimony as to previous visits.
4           MR. CHAPMAN:  Your Honor, it certainly conflicts with
5    his testimony but his testimony is inaccurate.
6           THE COURT:  It's overruled.  If he can answer it,
7    he -- he can answer it, and I think he did.  Go right ahead.
8    BY MR. CHAPMAN:
9    Q.  You changed your complaint of pain when you saw Dr. Patel?
10   A.  No.
11   Q.  No.
12          MR. CHAPMAN:  Almost done, Your Honor.  Just want to
13   make sure I have touched on everything.
14          THE COURT:  Okay.
15   BY MR. CHAPMAN:
16   Q.  You testified earlier during cross that you received about
17   $16,800 from the FBI?
18   A.  Total, forever?
19   Q.  Mm-hmm.
20   A.  If you say so, sir.
21   Q.  Did you declare that income on your tax?
22   A.  None of your business.  That -- that has nothing to do
23   with this case.  I'm not answering that.
24          THE COURT:  Yeah, it does.  Answer the question.  Did
25   you file --
```

```
 1            THE WITNESS:  Can I be -- no.
 2            THE COURT:  You did not?
 3            THE WITNESS:  No.
 4            THE COURT:  Okay.  Very good.  Go right ahead.
 5  BY MR. CHAPMAN:
 6  Q.  And finally, do you have any recollection which FBI agents
 7  you told that you were using cocaine, crack cocaine?
 8  A.  All of them.
 9  Q.  Every single agent you encountered you informed them of
10  that?
11  A.  I'm quite sure I have.
12  Q.  Okay.  Now, Mr. Butler, in addition to the activity that
13  you engaged in in 2010 signing false charts, have you been
14  involved in any other criminal activity between 2010 and the
15  present?
16  A.  Yeah, I had an assault charge in I think 2013 with my
17  sister and that's about it.
18  Q.  Was that in California?
19  A.  No, that was here.
20  Q.  Okay.  And did you spend six months in --
21            MR. HELMS:  Your Honor, I'm going to object to this
22  under Rule 609.  It's beyond ten years and not relevant.
23            MR. CHAPMAN:  It's for a different purpose, Your
24  Honor: benefit conferred by the government.
25            THE COURT:  Let me -- let me catch up here a little
```

1    bit.

2    A.   You asked me if I was in California?

3    Q.   Hang on one second, sir.

4    A.   Yeah.

5          THE COURT:  Well, I'll let you go into that a

6    little -- a little bit, and then we both know what the ultimate

7    question's going to be and I think you should get to that

8    quickly.  Go ahead, Mr. Chapman.

9          MR. CHAPMAN:  I'll -- I'll do as quickly as possible,

10   Your Honor.

11         THE COURT:  Yep.

12   BY MR. CHAPMAN:

13   Q.   So you -- you have an assault charge against your sister.

14   You spent six months in Oakland County Jail as a result?

15   A.   No.

16   Q.   Was that dismissed?

17   A.   That particular case.  I didn't go to Oakland County Jail

18   for six months for that particular case.

19   Q.   Which case did you go to Oakland County Jail for six

20   months?

21   A.   It wasn't that one.

22   Q.   Which case?

23   A.   You tell me.  You got my record.

24   Q.   Was it uttering and publishing?

25   A.   Probably.

1    Q.  And that's the act of writing false checks?

2    A.  Probably.

3    Q.  When did you engage in uttering and publishing?

4    A.  When did I get caught?

5    Q.  When did you get caught?

6    A.  2005.

7    Q.  Okay.  There's also a warrant out in California that you

8    had for a while, right?

9    A.  Probably.

10   Q.  Last time you testified in 2010 on the witness stand, you

11   said you were in the process of getting that taken care of?

12          MR. HELMS:  Objection, Your Honor.

13   A.  Probably.

14          THE COURT:  Well, hold on.  Let's see.

15   BY MR. CHAPMAN:

16   Q.  Did you get that warrant taken care of?

17   A.  Everything's taken care of.  I'm clean as you.

18   Q.  I doubt that, Mr. Butler

19   A.  I am, cleaner than you.

20          THE COURT:  Stop the dialogue and arguing.  Ask the

21   question you want to know the answer to, Mr. Chapman.  Go

22   ahead.

23          MR. CHAPMAN:  Thank you, Your Honor.  Well, I -- I

24   need to -- to round this out briefly, Judge.

25   BY MR. CHAPMAN:

1   Q.  In addition to the use of crack cocaine, the medical

2   records, healthcare fraud issue that you weren't prosecuted

3   for, between 2010 and the present did you engage in any other

4   criminal activity?

5   A.  No.

6   Q.  No.  Okay.  And you're testifying here today?

7   A.  Yes.

8   Q.  And it's your belief that you're not testifying in

9   exchange for anything?

10  A.  It's my belief?

11  Q.  Yes.

12  A.  I'm not getting shit.

13  Q.  Okay.

14          THE COURT:  All right.  That's improper.

15          THE WITNESS:  Excuse me.

16          THE COURT:  I don't want vulgarity in the courtroom.

17          THE WITNESS:  I'm sorry.  I'm sorry.

18  A.  I'm not getting any --

19          THE COURT:  But I do want to know --

20  A.  -- remuneration for this.

21          THE COURT:  -- I do want to know whether or not the

22  FBI helped you in any way avoid trouble on the case in

23  California or the uttering and publishing case.

24          THE WITNESS:  No.

25          THE COURT:  All right.  Go ahead, Mr. Chapman.  Let's

Case 2:18-cr-20800-SJM-APP ECF No. 416, PageID.4037 Filed 06/02/22 Page 81 of 83
Jury Trial Excerpt: Volume 8 • Thursday, May 26, 2022

81

1    finish it off and go right ahead.

2    BY MR. CHAPMAN:

3    Q.  But you weren't charged for your drug use and you weren't

4    charged in the 2010 case, is that correct?

5    A.  It wasn't -- what -- I wasn't charged with what drug use?

6    Q.  The cocaine use we've talked about quite a bit here today.

7    A.  Since I was 22 or when?

8    Q.  The time that you were using it while in the FBI's employ,

9    you weren't charged for that, right?

10   A.  Never.  I've never been charged with using cocaine.

11   Q.  Okay.

12           MR. CHAPMAN:  Just one second, Your Honor.

13           (Brief pause)

14   Q.  Mr. Butler, thank you for your time.  That's all the

15   questions I have.

16           THE COURT:  All right.  Thank you, Mr. Chapman.

17           Anybody else want to cross-examine?  No?

18           MR. ROGALSKI:  No, Your Honor.

19           MR. HARRISON:  No questions.

20           THE COURT:  Okay.

21           MR. MARGOLIS:  No.

22           THE COURT:  All right.  Very good.  Redirect from Mr.

23   Helms briefly, if any.

24           MR. HELMS:  No redirect, Your Honor.

25           THE COURT:  Okay.  All right.  Mr. Butler, you may

1    step down and be on your way.  Thanks for coming to federal

2    court.

3              THE WITNESS:  Thank you, sir.

4              THE COURT:  Yep.  You're welcome.  Your testimony's

5    done and let's go for our next witness.

6              (Witness excused at 11:23 a.m.)

7              (Excerpt concluded)

8                              —   —   —

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3     United States District Court, Eastern District of Michigan,

4     appointed pursuant to the provisions of Title 28, United States

5     Code, Section 753, do hereby certify that the foregoing pages 1

6     through 82 comprise a full, true and correct transcript excerpt

7     of the proceedings taken in the matter of United States of

8     America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis

9     and D-5 Christopher Russo, Case No. 18-20800, on Thursday, May

10    26, 2022.

11

12                           s/Linda M. Cavanagh
                             Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                           Federal Official Court Reporter
                             United States District Court
14                           Eastern District of Michigan

15

16

17

18

19    Date: June 2, 2022
      Detroit, Michigan

20

21

22

23

24

25