```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION


 3
      UNITED STATES OF AMERICA,
 4
                           Plaintiff,
 5         vs.

 6    D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
      D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7    D-4 DR. DAVID LEWIS
      D-5 DR. CHRISTOPHER RUSSO,
 8
                           Defendants.
 9    _____/

10                    JURY TRIAL: VOLUME 5

11         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                     United States District Judge
12            Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
13                   Detroit, Michigan  48226
                      Monday, May 23, 2022
14
      APPEARANCES:
15
      For the Plaintiff         BRANDY R. McMILLION
16    United States of America: BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
      For the Defendant         ARTHUR J. WEISS
20    D-1 Dr. Rajendra Bothra:  30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                              (Appearances continued next page)

24

25
```

```
1    APPEARANCES:  Continued

2    For the Defendant          ALAN T. ROGALSKI
     D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
3                               2000 Town Center
                                Suite 2700
4                               Southfield, Michigan  48075
                                248-784-5055
5
     For the Defendant          ROBERT S. HARRISON
6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                40950 Woodward Avenue
7                               Suite 100
                                Bloomfield Hills, Michigan  48304
8                               248-283-1600

9    For the Defendant          RONALD WILLIAM CHAPMAN, II
     D-4 Dr. Davis Lewis:       Chapman Law Group
10                              1441 West Long Lake Road
                                Suite 310
11                              Troy, Michigan  48098
                                248-644-6326
12
                                JEFFREY G. COLLINS
13                              Collins & Collins, P.C.
                                1323 Broadway
14                              Suite 800
                                Detroit, Michigan  48226
15                              313-963-2303

16   For the Defendant          LAURENCE H. MARGOLIS
     D-5 Dr. Christopher        Margolis Law Firm
17   Russo:                     214 South Main Street
                                Suite 202
18                              Ann Arbor, Michigan  48104
                                734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

```
1                    TABLE OF CONTENTS

2   Government Witnesses:                          Page

3   NEEL MEHTA

4     Direct Examination by Ms. McMillion            7
      Cross-Examination by Mr. Weiss               101
5

6

7

8

9

10

11

12

13

14

15

16                       EXHIBITS

17  Identification              Offered    Received

18  NONE

19

20

21

22

23

24

25
```

4

```
1            Detroit, Michigan
2            Monday, May 23, 2022
3                        _ _ _
4            (Proceedings commenced at 10:07 a.m., all parties
5            present)
6            THE LAW CLERK:  All rise.  The United States District
7    Court for the Eastern District of Michigan is now in session,
8    the Honorable Stephen J. Murphy, III presiding.
9            (Jury entered the courtroom at 10:20 a.m.)
10           THE COURT:  Okay.  All of our jurors are here,
11   they're all in their spots.  Everybody may be seated.
12           David, would you like to call the case and get our
13   lawyers here?
14           THE LAW CLERK:  The Court now calls Case No.
15   18-20800, United States versus Rajendra Bothra, et al.
16           Counsel, please state your appearances for the
17   record.
18           MS. McMILLION:  Good morning, Your Honor.  May it
19   please the Court, Brandy McMillion appearing on behalf of the
20   United States.
21           MR. HELMS:  Good morning, Your Honor.  Brandon Helms
22   on behalf of the United States.
23           THE COURT:  Welcome.
24           MR. HARRISON:  Morning, Your Honor.  Robert Harrison
25   appearing on behalf of Ganiu Edu who sits behind me.
```

```
1              THE COURT:  Welcome.
2              MR. WEISS:  Good morning, Your Honor.  May it please
3     the Court, Arthur Weiss, co-counsel for Dr. Bothra.
4              MR. ROGALSKI:  Good morning, Your Honor.  Alan
5     Rogalski appearing on behalf of Dr. Bothra as well.
6              THE COURT:  Okay.
7              MR. CHAPMAN:  Good morning, Your Honor.  Ronald
8     Chapman on behalf of Dr. Lewis who is to my left.
9              THE COURT:  Okay.
10             MR. COLLINS:  And good morning, Your Honor.  Jeffrey
11    Collins also on behalf of Dr. Lewis.
12             THE COURT:  Welcome.
13             MR. MARGOLIS:  Good morning, Your Honor.  Laurence
14    Margolis on behalf of Dr. Christopher Russo.
15             THE COURT:  Okay.  Welcome, one and all.  It's good
16    to see you back.  All of our defendants are here, everybody's
17    here, we're ready to go.
18             Welcome back, ladies and gentlemen.  I don't have the
19    exact time but I know you were all here on time.  I'm told you
20    had a birthday and you brought doughnuts and/or coffee for your
21    juror who has to be on jury duty on his birthday.  So -- so
22    that's a very nice thing and it is another sign of a very
23    collegial jury, so I was glad to hear that.
24             We're going to have testimony today from now, which
25    is 10:20, till about 3:00 or 3:15, and then we'll end the day
```

1    and send you home and get back to our regular schedule of 8:30

2    to 2:00 to 2:30 tomorrow after -- or tomorrow morning, but in

3    the meantime everything's worked out great and we're ready to

4    get back to work, okay?  Hope you had a great weekend.

5            What would the government like to do?  I know Dr.

6    Kufner was here, but I heard you might have a -- a -- a -- a

7    out of town witness you would like to intercede at this time?

8            MS. McMILLION:  Yes, Your Honor.  At this time the

9    government would like to call Dr. Neel Mehta --

10           THE COURT:  Okay.

11           MS. McMILLION:  -- who is here from New York.

12           THE COURT:  Okay.  So we're going to go with Dr.

13   Mehta out of order 'cuz he's from out of town.  I don't think

14   the defense has any objection to this, but we'll ask for the

15   doctor to come on in and get him sworn and ready to testify.

16           So years ago when my daughter was young and sweet she

17   would -- she'd give me these jokes to tell the jury if we had

18   down time, and I reminded her of that the other -- the other

19   night and she -- you know, she's 17 now so she's all

20   embarrassed and she said, "Tell them this one, Dad.  What does

21   the witch say when she's getting ready to go?  Broom broom."

22   Get it?  Okay.  That was from a cute little girl who's now 17.

23           So come on up, Dr. Mehta.  Right here, sir.

24                 N E E L   M E H T A

25   was called as a witness herein, and after being first duly

```
1    sworn to tell the truth and nothing but the truth, testified on
2    his oath as follows:
3              THE WITNESS:  I do.
4              THE COURT:  Okay.  Have a seat in the chair.  I'm
5    going to direct you to move -- remove your mask while you're
6    testifying so the court reporter and the jury can hear you.  Be
7    as comfortable as you can and speak toward the mic but not too
8    close.
9              Ms. McMillion, go right ahead.
10             MS. McMILLION:  Thank you, Your Honor.
11                        DIRECT EXAMINATION
12   BY MS. McMILLION:
13   Q.   Good morning, Dr. Mehta.
14   A.   Good morning.
15   Q.   Can you please state your name for the record?
16   A.   My first name is Neel, N-e-e-l, and my last is name is
17   Mehta, M-e-h-t-a.
18   Q.   Where do you reside?
19   A.   I reside in Darien, Connecticut.
20   Q.   And what is your profession?
21   A.   I'm a pain management specialist.
22   Q.   And how long have you been practicing as a pain management
23   specialist?
24   A.   I've been practicing since 2010.
25   Q.   Can you please explain your educational training for the
```

1    jury?

2    A.   So beyond medical school, I did a internship in internal

3    medicine and then went on to do anesthesiology residency for

4    three years and then completed a fellowship in pain management

5    which I completed in 2010.

6    Q.   And what's a fellowship?

7    A.   So fellowship is further specialization.  It's where you

8    focus on one particular aspect, so in this case it was pain

9    management, to learn about the broad-based diagnosis and

10   treatment of pain.  And that -- in that one year you spend time

11   both seeing patients, receiving lectures and treating patients

12   as -- as part of your practice, and then you complete the

13   fellowship and then go on to start working.

14   Q.   Do you have any board certifications?

15   A.   I do.  So I'm board certified in anesthesiology and board

16   certified in pain management.

17   Q.   What about any other academic appointments or positions?

18   A.   So I wear a few hats.  I am the Chief, Division Chief of

19   our Department of Pain Management, which is under the

20   Department of Anesthesiology at Weill-Cornell in New York City,

21   and that medical school is affiliated with New York

22   Presbyterian Hospital, so I serve as the Director of Pain

23   Management at New York Presbyterian Hospital in New York City.

24          I also am one of the co-directors of our

25   comprehensive spine center, a spine center that's joint with

```
 1    neurosurgery, orthopaedic surgery, pain management, neurology
 2    and physical medicine and rehabilitation.
 3              And then I also have teaching roles, so I am a
 4    Associate Professor of Clinical Anesthesiology, and involved in
 5    that I have teaching in research roles in my division.
 6    Q.   Do you belong to any professional societies or
 7    organizations?
 8    A.   I do.  Pain management has a number of societies.
 9    Locally, I am president of Eastern Pain Association, which
10    happens to be one of the oldest pain associations or pain
11    society.  I'm also a member of the American Society of Pain and
12    Neuroscience, a member of the North American Neuromodulation
13    Society, a member of the American Society of Regional
14    Anesthesia which has focus on pain management, a member of the
15    American Society of Anesthesiology.
16    Q.   Have you received any award or honors in your field?
17    A.   I have.  I've received at our -- in our own institution
18    I've received teaching awards, which is voted upon by our
19    fellows.  I've received that two years in a row.  I've received
20    a Rising Star Award from the Society of Interventional Pain,
21    and I've received a -- again, a Young Leader Award by the
22    American Society of Pain and Neuroscience.
23    Q.   Have you published any articles in peer review journals?
24    A.   Yes, I've published around 30 articles on various topics
25    in pain management, including pharmacologic treatments and
```

1    interventional treatments.

2    Q.   What about any other academic publications that aren't

3    journals?

4    A.   So I've published book chapters, so my specific topics in

5    a -- in a larger book, and recently I published a book as an

6    editor on foot and ankle pain.

7    Q.   You stated that in your current role you wear multiple

8    hats, one of which is serving as Associate Professor of

9    Anesthesiology as well as the clinical side to that program, is

10   that right?

11   A.   That's right.

12   Q.   How much of your time would you estimate is dedicated to

13   criminal prac -- to clinical practice?

14   A.   Well, on -- on paper it's a lot at 70 percent of my time,

15   but in reality you're always doing clinical work.  But I see

16   patients 70 percent of the time during the week, and then I

17   have weekend responsibilities for the hospital-based pain

18   management needs.

19   Q.   What are your primary duties as an associate professor

20   at -- of the clinical program -- and the clinical program

21   director?

22   A.   So first is clinical care, both for my own practice but

23   also oversight on to the other physicians in our practice.  We

24   have a total of nine physicians and three nurse practitioners;

25   actually just joined -- a fourth one just joined.  So I oversee

1    the clinical practice of these -- practice of that and looking

2    at quality measures and overall treatment.

3            I also am involved in teaching, so I'm -- as part of

4    the clinical role you do a lot of bedside teaching of medical

5    students, residents, fellows, physician assistant students,

6    nurse practitioner students, visiting physicians as well.

7            And then I have -- part of my clinical work may also

8    overlap with my research work.  I'm involved in clinical trials

9    either as a lead investigator or a what we call

10   sub-investigator where I'm responsible for the research of a

11   larger multi-center study at my particular site.

12   Q.  Prior to becoming the clinical director at Cornell, did

13   you have any other medical positions?

14   A.  So I started practicing in 2010.  About six months into

15   practice I was appointed director of our outpatient medicine

16   center, and then in 2012 I was appointed as overall clinical

17   chief.

18   Q.  Have you given any lectures or speeches in pain

19   management?

20   A.  I have, I've given a number of those.  So I give lectures

21   regularly to our residents and fellows and medical students

22   at -- in our own institution.  I've given it at various

23   departments in our institution including the Department of

24   Anesthesiology, but also neurosurgery, geriatric medicine,

25   psychiatry.

1           And then I'm invited to speak at other institutions

2    like Yale or Westchester Medical Center or various places

3    around -- around the country.

4           And then I have also spoken at various pain society

5    meetings, whether they're local in -- in the New York area,

6    in -- in a more national level or even internationally.

7    Q.   Can you explain for the jury what does interventional pain

8    management involve?

9    A.   So, you know, interventional pain management is sort of a

10   subset of overall pain management.  Interventional looks at

11   various techniques involving injections or minor procedures to

12   try to treat pain.  Could be acute issues, something that's

13   relatively recent, or a chronic, longstanding pain.  And

14   there's a variety of procedures that can be performed for that,

15   and that's part of the training in pain fellowship.

16   Q.   As a clinical professor are you responsible for teaching

17   students about those techniques?

18   A.   Yes.  So we teach students, residents and fellows those

19   techniques, that's right.

20   Q.   So as an anesthesiologist generally, is it fair to say

21   you're well versed not only in pain management but also with

22   interventional pain techniques?

23   A.   Yes, it's part and parcel to be, you know, well versed in

24   both, that's right.

25           MS. McMILLION:  Your Honor, at this time the

1    government would move to have Dr. Mehta qualified in pain

2    management and interventional pain therapies.

3             THE COURT:  Okay.  Ladies and gentlemen, as I -- as I

4    said I believe Friday, I don't -- I don't use the term that

5    Ms. -- Ms. McMillion did.  What I will instruct you instead is

6    that Dr. Mehta has extensively testified about credentials that

7    will -- that have demonstrated in my view and will permit him

8    to testify to you to assist you in understanding pain

9    management techniques, other concepts that are relevant to this

10   case and perhaps construe in some complex evidence that --

11   in -- in ways that'll make it more understandable to you.

12             So I will recognize him for that purpose under

13   federal Rule 702 and you may go right ahead.  I don't take that

14   there's any objection.  I don't see any objection.  Go ahead,

15   Ms. McMillion.

16             MS. McMILLION:  Thank you, Your Honor.

17   BY MS. McMILLION:

18   Q.   Dr. Mehta, are you under contract with the United States

19   Attorney's Office to give your testimony here today?

20   A.   Yes, I am under contract.

21   Q.   And have you testified in court before under similar

22   circumstances?

23   A.   I have testified in court but not under previous

24   government contract.

25   Q.   How many times have you served in testifying in court

```
 1    proceedings?
 2    A.   I've served approximately four times in court.
 3    Q.   Is testifying your -- in your primary line of work?
 4    A.   No.  It is -- testifying is -- is merely a small subset of
 5    my overall time and -- and income.
 6    Q.   Have you done medical assessments in situations other than
 7    where you're required to testify?
 8    A.   I've done medical assessments for medical malpractice or
 9    injuries, I've done independent medical exams, and then
10    obviously my clinical work day to day.
11    Q.   How are you being compensated for your work with the U.S.
12    Attorney's Office?
13    A.   I'm being compensated based on time involved in -- in
14    preparation for -- for review and manu -- expert report
15    writing, and then my time here today away from my practice and
16    my family.
17    Q.   And are you charging the United States Attorney's Office
18    your standard rates?
19    A.   That is correct, it's a standard rate.
20    Q.   Okay.  Can you please explain for the jury what did you
21    review in order to come to an opinion on this case?
22    A.   So I can refer to my report as to the exact items that
23    were reviewed, but basically they were medical records, there
24    were interviews with staff --
25                MR. WEISS:  Excuse me.
```

1       THE COURT:  Yeah.

2       MR. WEISS:  Excuse me, Doctor.

3       I don't mind him looking at the document to refresh

4  his memory if he needs refreshment, but then I'd ask that he

5  testify from his memory rather than from reading a document.

6       THE COURT:  I agree.

7       MR. WEISS:  Thank you.

8       THE COURT:  You should not read documents into the

9  record, but if you need to refer to something in front of you

10  to remind you what you did look at, that's no problem, okay,

11  Doctor?  Go right ahead.

12       THE WITNESS:  Thank you.

13  A.   So as I -- as I mentioned, it was patient records; there

14  were interviews with staff of the practice; there were

15  interviews of patients; there were undercover videos; there was

16  billing data involved with the practice; there was the Michigan

17  prescription registry, the MAPS they -- they call that; and

18  then the overall federal indictment that was provided to me.

19  BY MS. McMILLION:

20  Q.   Okay.  So I'm going to be asking you a series of questions

21  throughout the day, and the defense counsel will be doing so as

22  well, which is going to require your opinion, and in order to

23  avoid having to repeat it over and over again, I just want to

24  make sure that you understand the standard at which we're

25  talking about today.  I'm not going to be asking you about

1    negligence but rather to determine whether something is outside
2    the course of professional practice or for no legitimate
3    medical purpose. And is that the standard that you applied
4    when you were doing your review of all of this information?
5    A.   That is correct, yes.
6    Q.   Before we get into the specifics of the Pain Center, let's
7    talk generally about pain management. Can you explain for the
8    jury what pain management encompasses in terms of clinical care
9    of a patient?
10   A.   So -- so pain management is -- is obviously -- it can be
11   relatively simple in certain cases where it's a -- it's a minor
12   injury or relatively recent injury, or it can be incredibly
13   complicated, multi-factorial where there may be years of
14   history involved in this, years of treatment and other
15   encompassing things that we call as a -- as a whole
16   multidisciplinary care.
17           So what is involved in pain management is a thorough
18   history, taking as much information about the nature of the
19   pain, the characteristics of the pain, where is it located,
20   what makes it better, what makes it worse. It's very
21   investigative to -- to get as much information to then process
22   and understand some of the things that are happening along with
23   this.
24           With that you'll look at prior treatment, if any.
25   You'll look at any imaging or other tests that were involved

1   there.  If there were surgeries involved in the past, you would

2   look at that.

3          You'd also take a thorough history of the overall

4   medical history such as do they have other comorbidities.  Are

5   they -- do they have heart disease, do they have diabetes, do

6   they have other things that may limit their treatments or also

7   impact what is causing the pain.

8          You also will take a psychiatric history.  You'll ask

9   things about anxiety, depression, sleep.

10         You'll ask about their overall day-to-day activities.

11  Are they able to care for themselves, are they able to wake up

12  in the morning, brush, shave, shower on their own, is that

13  difficult, is there impact there.  Is there impact in, say,

14  their working, are they -- are they able to function at work or

15  are there limitations with that.

16         You'll look at things like are they able to stand for

17  a period of time, are they able to sit without pain, are they

18  able to walk, how far can they walk.

19         And some of these have standardized questionnaires

20  that are in the literature as being vetted as standard

21  questions to ask patients so that you can make a comparison on

22  just how impactful the pain is.

23         Obviously you take into account what the patient's

24  telling you and you try to correlate that with the

25  characteristics of pain, say, sharp, stabbing, throbbing,

1    burning, that may give you some buzzwords to be able to tell

2    you the nature of the cause of -- of pain there.

3    Q.   You stated --

4    A.   I'm sorry, go ahead.

5    Q.   You stated that there are some guidance and some

6    literature.  In the normal course of professional medical

7    practice, are there standards by which anesthesiologists and

8    pain management specialists work under?

9    A.   There are -- there are a variety of standards out there

10   and variety of guidelines.  There are things that are taught

11   in -- in your training and that have gone -- have been derived

12   from expert sort of guidance that's been published in the

13   literature, and for the most part they -- they overlap quite a

14   bit, there is a lot of similarities between them, again,

15   looking at thorough history, thorough physical encompassing a

16   lot of the information there, and -- and then decision

17   processes for treatments based on that.

18   Q.   Are you familiar with the guidelines associated with pain

19   medication prescribing that would have been in place during the

20   timeframe of this case which was 2013 to 2018?

21   A.   There -- there are a variety of -- of guidelines.  Some of

22   them in those time periods could be from various pain societies

23   and also the Center for Disease Control as well.

24   Q.   So I'd like to walk through some of those guidelines.  Are

25   you familiar with the March 2016 CDC guidelines for prescribing

1    opioids for chronic pain?

2    A.   I am familiar with that.

3    Q.   What about the American Society of Interventional Pain

4    Physicians 2012 guide for responsible opioid prescribing in

5    non-chronic or non-cancer pain?

6    A.   I'm familiar with that.  I've -- I've read it in the past

7    and then it was updated I think in 2017 I believe or sometime

8    around that.

9    Q.   With respect to prescribing and those guidelines, do they

10   provide any guidance or specific recommendations to physicians

11   in evaluating and treating chronic pain as it relates to

12   prescribing?

13   A.   Sure.  There are some high-level themes in prescribing,

14   you know, controlled substances to -- to patients.  Number one

15   is to really understand what are you treating, what's the

16   nature of the pain, is there a better suited opportunity for

17   treatment that may not involve opioids, or if it's going to be

18   opioids, what's the lowest sort of dose and drug that could be

19   used to still achieve a meaningful benefit for that patient.

20         And then another high-level theme that comes across a

21   lot of these guidelines is reassessment.  So you start -- well,

22   actually let me back up one second before that, before we even

23   get to that.  When you institute the medication for the first

24   time, you will talk about risk factors, right, so you

25   understand is there a red flag for this patient, is there a

1    concern that perhaps this patient has a preexisting addiction

2    that we need to look at.  We may use some tools for -- for that

3    to assess, things like urine drug screens to look for

4    substances in the urine that may not be something that you want

5    to prescribe an opioid to, like a patient that has illegal

6    drugs in their -- their system or that they may have other

7    opioids already in their system that weren't necessarily

8    disclosed.  So you're trying to correlate that.

9            You're also looking at the risk of potentially --

10           MR. WEISS:  Your Honor, excuse me.  We're getting

11   into a narrative now.  I think it's beyond what the scope of

12   the question originally was.

13           THE COURT:  Okay.  Why don't you finish up that

14   portion of your answer, Doctor, and then we'll try to go more

15   by question and answer.  Go right ahead.

16           THE WITNESS:  So a high level -- you're looking at

17   the risk of prescribing the opioid and you're looking at what

18   the potential benefit is and you reassess that as you go.

19           THE COURT:  Thank you.  Go right ahead.

20   BY MS. McMILLION:

21   Q.  As part of your review in this case, did you review the

22   Michigan guidelines for use of controlled substances for the

23   treatment of pain?

24   A.  Yes, I did.

25   Q.  Okay.  And all these guidelines we're talking about, are

 1    they what doctors who practice in pain management generally
 2    would use in the United States?
 3    A.   That's correct.  There's a lot of similarities across the
 4    various states.
 5    Q.   Okay.  I'd like to talk to you a little bit about the
 6    goals of interventional pain management.  You talked a little
 7    bit to the jury about the differences in interventional
 8    therapies.  Can you explain what the goal is to use
 9    interventional therapy in treating pain management pain?
10    A.   A high-level goal of interventional pain management is to
11    try to either reduce the level of pain or restore what we call
12    function, again, trying to get them either, say, the goal of
13    back to work if that was the goal or sleep better at night
14    or -- or have just better day-to-day quality of life.  So
15    you're trying to -- that's the -- the overall goal.
16              And the -- the different types of procedures target
17    different structures.  Some involve more steroid-based
18    injections to reduce a level of inflammation, and others
19    involve trying to -- for a lay term, try to burn the nerve or
20    quiet down a nerve that may be involved in feeling pain.
21    Q.   Are there any conservative types of treatments that are
22    done to meet interventional pain goals?
23    A.   Well, conservative treatments would -- would often be
24    exhausted before interventional pain treatments, so that may
25    include basic medications like anti-inflammatories, physical

1    therapy, but then even in the interventional therapies there

2    are sort of focused injections that might be to where the

3    underlying problem is.

4    Q.   When doing interventional treatments, is it standard

5    protocol for patients to all receive the same treatment

6    procedures?

7    A.   No, the interventional pain therapy is tailored to each

8    patient, patient.  It's an individual assessment.  You look at

9    things like where is the pain, is it on one side versus the

10   other.  You know, if it was only one side, then you would only

11   target that one side.  If it's -- if it's -- correlates to one

12   particular level of the spine, then you focus on that aspect of

13   the spine.

14   Q.   I think you stated that it's tailored individualized.

15   Should you prescribe -- excuse me -- should you be prescribing

16   individual therapies without undergoing any individual

17   assessments of the patient?

18   A.   No, you would responsibly need to do an individual

19   assessment.

20   Q.   Can you explain for the jury with respect to injections,

21   and I know you spoke a little bit about the differences, what

22   are the different types of injections that are used in

23   interventional therapies?

24   A.   So most commonly would be things like steroid injection.

25   So you would -- you would focus a steroid that's injected

1    around an area that you think is inflamed, may have some

2    inflammation they -- they use as a medical term.  So that could

3    be a particular joint like the shoulder or a hip or knee.  You

4    could inject steroid around the spine in something called the

5    epidural space.  So the epidural space is just outside the

6    spinal cord and that's where the nerve roots that would be

7    potentially impacted by things like herniated disks or other

8    pressure on those nerves.  The steroid there's purpose there is

9    to reduce the level of inflammation, and if the inflammation

10   subsides, there's a chance that the pain will subside or at

11   least reduce, and again, improvement of function as part of

12   that goal.

13          And then another type of therapy that is often used

14   is radiofrequency ablation.  Radiofrequency ablation is the use

15   of specialized heat to a nerve that we may think only has a

16   role in detecting pain.  So on a spine there's a -- there are a

17   series of nerves that they just feel pain in the joints of the

18   spine, the joints that allow you to bend, referred to as facet

19   joints.  So you would do a diagnostic block first to test that

20   theory where you would place numbing agent or Novocaine type

21   drug focused on that nerve.  If you got satisfactory pain

22   relief with that, then eventually you could go on to do the

23   radiofrequency procedure where you'd target it with heat in

24   this specialized needle.

25   Q.   Would you say that with respect to the different types of

```
 1    injections in treating pain management, that that's a first
 2    option of resolution?
 3    A.   It's -- it's part of it.  I mean the first option would be
 4    things, again as we talked about, the conservative therapy, but
 5    on the interventional side they would be potentially used, yes,
 6    early on.
 7    Q.   Is there on average, based on your training and
 8    experience, the amount of time it takes for, say, back pain to
 9    resolve?
10    A.   In -- in the acute setting, most back pain resolves within
11    six weeks.  That's sort of been shown in the -- in the
12    literature.  And then in other types of more chronic settings,
13    some of the treatment may take a few weeks to -- to notice the
14    benefit, it may take longer, but yes.
15    Q.   On average, is there any guidance about the amount of time
16    a physician should wait before they start injection procedures
17    to treat pain?
18    A.   Again, it's -- it's -- on average, in certain settings
19    like acute pain where there -- the patient's experiencing sort
20    of first episodes, you will look at conservative therapy again
21    to see how long that could potentially benefit before jumping
22    to interventional therapies.  Also in the interventional
23    therapies you may decide that something like facet treatments
24    is a little bit more downstream in chronic pain rather than the
25    acute pain setting.
```

1          But it -- the higher level thing, again, is to look

2     at what sort of individualized treatment and where that patient

3     has been in their journey of treatment.

4     Q.   If you were to evaluate the average pain management

5     practice, would you expect that the majority of patients coming

6     in would be getting treated for facet joint injections?

7     A.   No.  I mean I'd say it's a common procedure, but it would

8     be a variation between the various types of interventional

9     therapies across most practices.

10    Q.   In terms of injections, and I think you spoke a little bit

11    about this, can you explain the difference between a bilateral

12    injection as opposed to just a unilateral injection?

13    A.   So it -- it literally refers to whether you're treating

14    one side, unilateral being either right or left, or bilateral

15    refers to you're going to treat both sides.

16    Q.   And what types of things would you have to evaluate to

17    determine if it should be bilateral versus unilateral

18    treatment?

19    A.   So number one is, again, where is the pain.  If the

20    patient says that "my pain is really only on the left side,"

21    then that's a unilateral focus, a unilateral treatment there.

22    If the patient says it's diffused or a little bit more even on

23    both sides, then you may think to treat both sides.

24    Q.   Are bilateral procedures typically indicated in all facet

25    joint injections?

1    A.   No.  I mean I -- in most practices you'll have a mix

2    between unilateral and bilateral.

3    Q.   From a billing perspective, how is bilateral versus

4    unilateral injections -- how does that differ?

5         MR. WEISS:  Your Honor, excuse me.  I'm going to

6    object as to this.  We didn't question his credentials

7    regarding being a pain management specialist, but I've heard

8    nothing to indicate that he is a billing specialist.

9         THE COURT:  You might want to establish a little more

10   foundation for that, and if you do, I think he can answer the

11   question.

12        Go ahead, Ms. McMillion.

13        MS. McMILLION:  Thank you, Your Honor.

14        MR. WEISS:  Thank you, Judge.

15   BY MS. McMILLION:

16   Q.   Dr. Mehta, with respect to your practice, are you

17   responsible for billing facet joint injections?

18   A.   I'm responsible for every encounter and the billing for

19   that including facet injections.

20   Q.   And as a part of the facet joint injections, do you

21   determine whether you're going to do a procedure unilaterally

22   or bilaterally?

23   A.   Yes, I do make that determination about one side,

24   unilateral, versus both sides, bilateral.

25   Q.   And do you have any knowledge of how the billing differs

```
 1   for those two -- two different types of procedures?

 2   A.   I do, I have -- I have knowledge of that.

 3   Q.   And is that part of your personal practice?

 4   A.   It's part of my personal practice and it's also policy for

 5   us to train each physician on the billing practices because

 6   they are responsible ultimately for the billing of what

 7   encounters they provide to patients.

 8   Q.   And you've provided that training to residents or

 9   physician's assistants in your facility?

10   A.   So I've provided that to our fellows, to our nurse

11   practitioners and physician assistants and also to any

12   physician that is involved in -- in care in our practice

13   because I'm the medical director of the practice.  And it's not

14   just a one-time thing, it's an annual -- annual compliance

15   thing.

16        MS. McMILLION:  Your Honor, based on that foundation,

17   I'd ask that the witness be able to answer the question.

18        THE COURT:  I think so.

19   BY MS. McMILLION:

20   Q.   Dr. Mehta, can you explain for the jury the difference in

21   billing, whether it be unilateral versus bilateral, how does

22   that work?

23   A.   So unilateral, again one side, you're paid a fixed sum of

24   money.  And maybe perhaps in a hypothetical setting, just to

25   understand the numbers, let's say you receive a hundred dollars
```

1    for one side.  If you were to do the same day both sides as

2    opposed to just one side, you would receive 50 percent more, so

3    a total of $150 to do both sides.  If you did only one side and

4    then in a future visit did the opposite side, again you would

5    receive a hundred dollars, so the total being 200 for that.

6    Q.  So if I understand you correctly, if you do them

7    bilaterally, you get a percentage of the second side?

8    A.  Yes.

9    Q.  But if you do them unilaterally on separate dates, you

10   would get full percentages for both procedures?

11          MR. WEISS:  Your Honor?

12          THE COURT:  Yes.

13          MR. WEISS:  I don't know who's paying the hundred or

14   the hundred and fifty.  We don't know what the insurance is.

15   We don't what -- know who's paying this.  There's no foundation

16   here.  I would imagine that Blue Cross may pay different than

17   Medicare that may pay different than Aetna.  So just throwing

18   numbers out without grounding them to something, with due

19   respect I object.

20          MS. McMILLION:  Your Honor, I believe --

21          THE COURT:  Go ahead, go ahead, respond.

22          MS. McMILLION:  Your Honor, I believe the witness

23   said for example to just use roundabout numbers.  There is -- I

24   don't believe that the testimony that it was particular to any

25   one insurance company.

1          THE COURT:  Okay.  All right.  I'll note that

2    objection as will the jury.  Ladies and gentlemen, there is not

3    a high degree of specificity in -- from this witness in

4    response to the last question.  At this point I think the

5    witness is talking in generalities and giving examples that

6    will help you understand more specific evidence.  Bear in mind

7    that there are different standards in -- in Medicaid, Medicare,

8    private insurance, Blue Cross versus others.  That may be

9    explained to you later, it may not be.  But for now, in terms

10   of trying to understand the billing procedures and programs,

11   I'm going to allow this testimony, okay?

12          MR. WEISS:  Thank you, Judge.

13          THE COURT:  All right.  Yep, thank you both.

14          Go right ahead.

15   BY MS. McMILLION:

16   Q.   Dr. Mehta, can you also explain for the jury the

17   difference in multi levels when it comes to facet injections?

18   A.   So the spine has multiple levels, as many people may know.

19   For example, L3-4 is the junction or joint between L3, lumbar

20   3, and lumbar 4.  There are numerous levels in the lumbar spine

21   just as there are in the cervical spine and in the thoracic

22   spine, and there are times where treatment may be warranted to

23   do multiple levels to try to address the pain.

24   Q.   Okay.  So I'm going to break that up a little bit 'cuz I'm

25   definitely not a doctor.

 1   A.   Right.

 2   Q.   You used thoracic spine, cervical spine, lumbar spine?

 3   A.   Yes.

 4   Q.   Can you just explain where on the back those things occur?

 5            THE WITNESS:  Your Honor, if -- if -- if I can stand

 6   up and demonstrate.

 7            THE COURT:  Yeah, of course, that's fine.  In fact,

 8   you can step down if you -- well, you shouldn't do that 'cuz

 9   you need the mic, but yeah, go right ahead.

10            THE WITNESS:  Okay.  I think I can show.  So if

11   everybody can see, I'm pointing at my neck, and sort of bottom

12   of the head to about the shoulder level, that's the cervical

13   spine, referring to the neck area.

14            Then the transition at that point then goes to the

15   thoracic spine which is generally the area where your ribs are

16   in the front and wrap around to the back, and your last rib

17   then starts the lumbar spine.  So it goes numbers T -- T1

18   through T-12, and then at T-12 it transitions to the lumbar

19   spine which is traditionally our lumbar low back area.

20            And then below the lumbar spine at L5, it

21   traditionally will then transition to something called the

22   sacral spine or the sacrum, so that's -- that's sort of just

23   above the tailbone around that lower buttock area, so forth.

24   Q.   Thank you.  From a billing perspective, can you explain

25   the difference in billings for multi levels?

1   A.   Similar -- similar to the -- the difference between one

2   side versus both sides, there is additional payment in general

3   for doing multiple levels versus a single level.

4   Q.   So I want to talk a little bit about the crossover between

5   interventional procedures and opioid therapy for the treatment

6   of pain.  Is there a correlation between opioid therapy and

7   interventional procedures like injections?

8   A.   There's a correlation in the sense that it might be an

9   approach in multimodal therapy.  So there will be patients

10  where it may be just interventional therapy, and there may be

11  patients where there's both potential treatments as well, or

12  there may be just medication-based therapies, so it's

13  individualized again for that respective patient.

14  Q.   Is there any relationship between the goals of

15  interventional procedures to reduce opioid therapies?

16  A.   One of the goals of -- of interventional therapy besides

17  reduction in pain, improvement in function is to potentially

18  reduce medication that may have harm associated like opioids or

19  other drugs that have potential side effects that we want to

20  reduce.

21  Q.   Given that overlap, is there ever -- is it ever

22  appropriate to tie interventional treatments to the acts of

23  prescribing?

24  A.   No.

25  Q.   Why not?

1    A.   It -- it should be, again, individualized assessment.  It

2    should be shared decision making between the patients as

3    to what -- and -- and the providers to what is there, and

4    really being able to -- to tell a patient that you're only

5    going to get one thing if you choose to do the other is not --

6    is not usual practice.

7    Q.   Is that a practice that should ever be mandated?

8    A.   No, that should not be mandated.

9    Q.   Physicians are required to keep medical documentation of

10   each of their visits, is that correct?

11   A.   All -- all practitioners should be required to -- to keep

12   medical records of the visits, that's correct.

13   Q.   What is the purpose of retaining medical records?

14   A.   The purpose is to, one, explain what your thoughts are and

15   what your -- what the history was so that you can refer back.

16   But two, it's documentation to help show what the treatment

17   course was for things like billing and -- and justification of

18   what you provided.

19   Q.   So I'm going to walk through a little bit about medical

20   records and what should be included in there.  Are progress

21   notes parts of medical records?

22   A.   That's correct, progress notes are a part of the medical

23   record.

24   Q.   What types of things are included in progress notes?

25   A.   So it -- sort of in the title of progress note is, again,

Case 2:18-cr-20800-SJM-APP  ECF No. 425, PageID.4149  Filed 06/13/22  Page 33 of 172
Jury Trial: Volume 5 • Monday, May 23, 2022

33

1    the description of -- of what the pain may be, what the
2    patient's stating at that particular time of the visit, overall
3    sort of background on what medications are being used,
4    what's -- what's elapsed from, say, the prior visit, it'll be a
5    potential for physical exam, and then some sort of what we call
6    medical decision making which is that now, tying in everything
7    that you have put together from this visit, what are your
8    overall diagnoses that you're making and what's your decision
9    on treatment, whether it includes further investigations or
10   decisions to do something with medication or procedures.
11   Q.  In a pain practice you stated was procedures.  Would there
12   be procedure in operative notes?
13   A.  Yes, there would be other operative notes to describe what
14   the procedure was entailing.
15   Q.  And what about diagnostic type procedures, would those be
16   documented in your medical records?
17   A.  They would be documented.  Especially when performing
18   diagnostic procedures, it means that you're using the
19   information from that procedure to make a decision on what to
20   do next.
21   Q.  With respect to pain treatment, what would you expect to
22   see in the medical record as it relates to levels of pain?
23   A.  So I would look to see what the patient's describing in
24   terms of levels of pain and characteristics of pain and then
25   any sort of changes that may have occurred from the treatments

1    that were provided either at that visit or -- or at -- you

2    know, since the last visit.

3    Q.   Given that some of these patients are treated over time,

4    can you copy and paste prior progress notes to future progress

5    notes in your medical records?

6    A.   No, you should not copy and paste in whole there.  Now,

7    there may be pieces of information that you want to carry

8    forward such as information that was relevant from, say, prior

9    surgeries or things that you want to carry over, but the whole

10   note sort of copied forward is -- is not -- is not good.

11   Q.   Can doctors document things in a patient chart or a

12   progress note based on things that have happened in the past?

13   A.   Yes, they -- they can document things that have happened

14   in the past, that's right.

15   Q.   And if you're documenting a visit for today, is it outside

16   the course to include, say, answers from questions from a day

17   before?

18   A.   No, it's not outside -- I mean, again, if they're sharing

19   information that's relevant from, say, something that occurred

20   the day before, then it's -- it's okay to have that in the --

21   in the note.

22   Q.   Okay.  Is there a requirement or -- maybe not requirement.

23   Scratch that.  Is there guidance with respect to whether

24   patient charts should be kept contemporaneous to the services

25   that are being provided?

1    A.   You -- the -- the high-level guidance is that you want to

2    be thorough and accurate in terms of what you're assessing and

3    providing to the -- to the patient.

4    Q.   Okay.  So I want to talk to you about your opinion as to

5    the Pain Center and Interventional Pain Center that you

6    reviewed in this case.  And keeping in mind the standard that

7    we discussed, applying that criminal standard of outside the

8    course of professional medical practice, did you find in your

9    review of the Pain Center practice that there were some things

10   that were outside the course of professional medical practice?

11   A.   Unfortunately I did, yes.

12   Q.   And can you generally just state what those things were?

13   A.   It was concerning that the number of procedures and the

14   types of procedures that were repeatedly given to patients that

15   did not seem to have medical necessity.

16        MR. CHAPMAN:  Your Honor, I'm going to object to

17   foundation of this question.  No testimony has been entered

18   that -- that this witness looked at the entirety of the

19   practice, and he seems to be making general statements about

20   TPC as a whole.

21        THE COURT:  Okay.  Thank you.  That -- that is

22   overruled, but I will instruct the jury -- well, before I do

23   that, let me just advise Ms. McMillion that it would be

24   preferable for you to clear up what he did and did not look at

25   as he went about making those conclusions because I sense that

1   there is validity to the point that not all patient files

2   were -- were looked at, but that -- that's something you should

3   probably clear up.  Otherwise, I'm going to overrule the

4   objection and let him testify about his findings with regard to

5   what he did look at.

6           Go right ahead.

7           MS. McMILLION:  Your Honor, we can come back to his

8   overall assessment of the clinic after we get into the

9   specifics if that is the Court's preference.

10          THE COURT:  Your -- your choice, in which case I will

11  advise the jury they can consider the answer that the witness

12  just gave, but you're going to have to remember we're coming

13  back to the -- those points later.

14          Go right ahead.

15  BY MS. McMILLION:

16  Q.   Dr. Mehta, did you have an opportunity to review patient

17  records in this case?

18  A.   I did, yes, I did have an opportunity to review patient

19  records.

20  Q.   And do you have an estimate of how many patient charts you

21  reviewed in this case?

22  A.   There were a number of -- I believe it was six or seven.

23  I'm sorry, I'm blanking on the -- on the moment right now.

24  Q.   Just with respect to your opinions.  But how many patient

25  charts were provided to you from the Pain Center?

1    A.   A large number of them.  I -- I don't -- I don't have the

2    exact number but...

3    Q.   Okay.  I want to talk to you and walk you through some

4    specific examples of your findings and then we'll go back to

5    kind of overall theme with respect to your findings.  I'm

6    obviously not going to have you go through everything you

7    reviewed.  Did you have an opportunity to review the patient

8    chart for a patient named Jack Lacey?

9    A.   I did, I had an opportunity to review that.

10          MS. McMILLION:  Ms. Adams, can I have you bring up

11   Exhibit 115, page 3 please?

12   BY MS. McMILLION:

13   Q.   And can you see that there on your screen, Dr. Mehta?

14   A.   I can.

15   Q.   Dr. Mehta, can you explain from this clinical data note or

16   I think it says clinical data general at the top of there from

17   the patient chart how Dr. -- or how Mr. Lacey presented to the

18   clinic for his first visit?

19   A.   So this is a 29-year-old, he was 29 years old at this

20   time, a male patient, and he presented with primarily neck pain

21   for about three years and was thought to be related to the --

22   or the history was based on a motor vehicle accident, and prior

23   to that he did not have pain and, you know, prior to the

24   accident.

25   Q.   Did Mr. Lacey have any imaging done as a part of his

1   visit?

2   A.   As a part of this visit they had a CAT scan that was from

3   four years prior of the cervical spine, and then they had a

4   lumbar X-ray that they -- was done in early 2016.

5   Q.   And from the X-ray spine is there any documentation as to

6   its relevance to Mr. Lacey's presentation to the clinic?

7   A.   There's documentation here that it was unremarkable, which

8   would mean that it didn't seem to have any significant findings

9   on it.  And again, we're talking about neck pain, so lumbar

10  being way down lower wouldn't necessarily apply anyways.

11  Q.   Okay.

12           MR. HARRISON:  Excuse me, Your Honor.  Could you ask

13  the witness to please pull the microphone closer to him?

14           THE WITNESS:  Sorry about -- sorry about that.

15           MR. HARRISON:  I'm having difficulty; he comes in and

16  out.

17           THE COURT:  Okay.  Just keep your voice up and keep

18  that mic close to you.

19           Go ahead, Ms. McMillion, and thank you both.

20           MS. McMILLION:  Ms. Adams, if I can have you

21  highlight the top right corner of that.

22  BY MS. McMILLION:

23  Q.   And Dr. Mehta, can you tell us what we're looking at here?

24  A.   So this is a -- a plan as to what the medical decision

25  making will be for treatment.

```
 1              So number one, a neck brace.

 2              Number two was urine -- urine drug screen.

 3              Number three was gel packs.

 4              Number four was physical therapy and possibly a

 5   chiropractor, so physical therapy/chiro.  Number four again I

 6   think is listed as EMG, nerve conduction test of both upper

 7   arms or upper extremities.

 8              And then number five is return to care in two weeks

 9   for a CESI, which in this case would appear to be abbreviation

10   for cervical epidural steroid injection.

11   Q.  Can you explain what a cervical epidural steroid injection

12   is?

13   A.  Yes.  So a cervical epidural steroid injection goes back

14   to that concept of targeted steroid injection around the nerves

15   that are thought to be inflamed.  So using a needle and some

16   sort of image guidance, you're now applying an

17   anti-inflammatory, being the steroid, directly around what may

18   be thought to be the source of pain.

19   Q.  Okay.

20              MS. McMILLION:  And then if you -- Ms. Adams, you can

21   pull out.

22   BY MS. McMILLION:

23   Q.  Are you aware from your review of the records in this case

24   whether there was prescribing that occurred at this first

25   visit?
```

1   A.   In this one the patient did have a prescription.  I need
2   to look back at my notes again.  This one had on the note you
3   can see at the bottom there tramadol 50 milligrams BID, which
4   refers to twice a day, 30 pills were given.  And then Baclofen,
5   which is a muscle relaxant, and that also was 10 milligrams
6   twice a day, 30 pills were given for that.  So this is
7   considered to be a two-week supply as documented there.
8   Q.   Were there any concerns about the prescribing that
9   occurred during this first visit?
10  A.   Well, again, you'd want to have some understanding if
11  you're going to prescribe a controlled substance like tramadol
12  about the sort of past history of controlled substances, maybe
13  utilize a urine drug screen, but no, overall I think tramadol
14  was within reason there.
15        MS. McMILLION:  Ms. Adams, can I have you advance to
16  page 4, and if you can highlight the note down at the bottom
17  for that 7-18-2018 visit.
18  BY MS. McMILLION:
19  Q.   And Dr. Mehta, can you explain what the followup treatment
20  was that occurred here I guess a little over a month later?
21  A.   So on 7 -18 the patient had undergone the first cervical
22  epidural steroid injection prior to this date on June 27th.
23  This is a visit now to discuss the benefit of that last
24  epidural, and also a cervical -- the second cervical epidural
25  steroid injection was administered on this -- this date.  It --

1    they document that the last cervical epidural steroid injection
2    helped.
3    Q.   So if you had documentation that a steroid injection
4    helped, would you automatically prescribe another steroidal
5    injection?
6    A.   No, not automatically.  That'd be, again, a -- a decision
7    together with the patient.  If the patient overall is improved,
8    I would not, you know, perform any second epidural.
9    Q.   If the patient had reported that the injections weren't
10   working, would you prescribe it to see if it would work a
11   second time?
12   A.   If it wasn't working, then you -- you dive a little
13   deeper.  You may say did the pain improve for just a day, did
14   it improve sort of maybe half or a just a small portion, and
15   you sort of tease that out.  But if it was no benefit at all,
16   then I'd be unlikely to recommend a second epidural.
17          MS. McMILLION:  Ms. Adams, if I can have you advance
18   to page 93 please.
19   BY MS. McMILLION:
20   Q.   And Dr. Mehta, I believe you testified that one of those
21   first plans of care was a neck brace at number one.  Can you
22   tell the jury what they're looking at here?
23   A.   So this is a prescription or letter of medical necessity
24   to provide a brace, a neck brace.  So in the top part is the
25   overall diagnosis being cervical disk prolapse, degenerative

1   disk disease, and the recommendation is to use a neck brace,

2   and the treatments that were tried and prior to recommending

3   the -- the brace are checked off there, which are physical

4   therapy, medications and chiropractic therapy.

5   Q.   So based on your review of this document, it would suggest

6   that there's already been PT, that there's already been

7   medications and already been chiropractic care?

8   A.   That's correct.

9         MS. McMILLION:  Ms. Adams, if I can have you go back

10  to page 3.

11  BY MS. McMILLION:

12  Q.   And Dr. Mehta, from here with this practice note for that

13  first date which is dated the same day as that documentation

14  for medical necessity, can you tell if there have been physical

15  therapy, chiropractic care?

16  A.   In the middle of the note where it says -- a circle with a

17  slash there, I don't know how to zoom in on that but -- yep.

18  Oh, just, let's see.  So we'll count maybe the fourth line

19  there, there's a circle with a slash that says -- that stands

20  for no, "no neck brace or PT."  So it would make me believe

21  that there was no physical therapy prescribed or experienced at

22  that time.

23        MS. McMILLION:  Ms. Adams, if you can zoom back out.

24  BY MS. McMILLION:

25  Q.   And I believe you said I think it's the second number

1   four --

2          MS. McMILLION:  Can you blow back up that corner, the

3   top right corner?

4   BY MS. McMILLION:

5   Q.   -- the second number four you listed, it said EMG nerve

6   block?

7   A.   No, it -- it's EMG/NCS.

8   Q.   Can you tell the jury what EMG/NCS means?

9   A.   So EMG stands for electromyography and NCS stands for

10  nerve conduction study.

11  Q.   And can you tell the jury what is -- what happens with an

12  EMG/NGS?

13  A.   NCS.

14  Q.   NCS?

15  A.   Yes.  So this is a specialized test to understand

16  potentially what is a -- a reason for pain down the arms in --

17  in this -- if -- if we're making the assumption that this is

18  going to be on the cervical spine.

19          So EMG, electromyography, is looking at overall

20  strength of -- of the muscles when given a electrical current.

21  And how do you give that electrical current?  Well, you put

22  small needles along the arms starting up around the neck and

23  going down on both sides.  And so you're testing the response

24  of a muscle when a electrical current to try to stimulate it to

25  contract is there.

1        And then you're also looking at nerve conduction.  So

2   nerve conduction is really just almost like a measurement of

3   speed of how far, how quickly the nerve is firing.

4        So when I explain it to patients, I often will say

5   that this is a test to help us understand when we aren't really

6   sure what's causing the pain.  So I'll order it for things

7   where an MRI may not be helpful.

8        So the -- the nerve conduction portion of this is

9   kind of like a traffic report.  In a healthy, sort of normal

10  nerve, the nerve should fire at full speed.  Anywhere that it's

11  slowing down may be a potential as to where the problem is

12  occurring, and you look to see where -- where that occurs and

13  then correlate back to the nature of the pain.

14  Q.   Are EMG tests routinely used in these types of

15  circumstances?

16  A.   I would say that imaging like MRI, CAT scan, X-rays is

17  used much more than EMG.  I would say EMGs are meant to bolster

18  the diagnosis to help understand what's -- what's occurring,

19  especially when it's not completely clear based on imaging.

20  Q.   From your review of these records, were you able to

21  determine if there were any bolstering or correlation with the

22  CT scan that is indicated here on the chart?

23  A.   In my review, it -- it did not match the findings on the

24  CT scan.

25  Q.   And when you look at this course of action in total, what,

1    if anything, does this documentation say about the treatment of
2    this patient?
3    A.   Well, it -- the treatment is that it's sort of -- again,
4    if we take in context with a lot of the records I reviewed,
5    it -- it's sort of a protocol in that a lot of these things are
6    repetitively recommended for patients, and also that an
7    epidural is already recommended for the patient and we're still
8    looking at investigative information there.
9    Q.   Is there anything in these records to suggest that the
10   patient had any input so -- whatsoever in this course of
11   action?
12   A.   Nothing to suggest that patient was -- you know, was
13   interested in doing this.  I mean it -- it would be something
14   that you would normally discuss the -- the reason for the
15   treatment, the potential risks and what the alternatives are.
16          MS. McMILLION:  And Ms. Adams, if I can have you pull
17   up Exhibit 115C, page 9.
18   BY MS. McMILLION:
19   Q.   And Dr. Mehta, can you tell us what we're looking at here?
20   A.   So this is a progress note of physical therapy for Jack
21   Lacey and his neck pain.
22   Q.   And when did this service -- when is this service reported
23   to have occurred?
24   A.   On the bottom right it would be July 15th, 2016.
25          MS. McMILLION:  Ms. Adams, if I can have you bring up

1    Exhibit 91, and I recognize that's really small.  I'm going to

2    have you bring up the services dated July 15th, 2016.

3    BY MS. McMILLION:

4    Q.  And Dr. Mehta, can you see that there?

5    A.  I can.

6    Q.  And what is being billed for Mr. Lacey on July 15th, 2016?

7    A.  The specific treatments of physical therapy.

8    Q.  And who is the rendering provider of that physical

9    therapy?

10   A.  Dr. Edu.

11   Q.  Is there anything in the records that suggest Dr. Edu

12   provided physical therapy to this patient?

13   A.  It does not suggest that.

14   Q.  Can a doctor bill for someone else doing physical therapy

15   on a patient?

16   A.  To my knowledge, no.

17         MS. McMILLION:  You can take that down.

18   BY MS. McMILLION:

19   Q.  I'm going to turn your attention to another patient.  Did

20   you have an opportunity to review the patient chart for Ms.

21   Glenda Roscoe?

22   A.  Yes, I did.

23         MS. McMILLION:  Ms. Adams, if I can have you bring up

24   Exhibit 121A, page 14.

25   BY MS. McMILLION:

1   Q.   And Dr. Mehta, if you can just take a look at that first
2   page of clinical data.
3   A.   Yes.
4   Q.   And did you have an opportunity to review this entire
5   record?
6   A.   I reviewed what -- what was provided to me for this --
7   this patient, yes.
8   Q.   And with respect to Ms. Roscoe, can you summarize for the
9   jury her presentation and then treatment of -- or the services
10  she received from the Pain Center?
11  A.   So this is a patient on December 17th, 2013 who comes in
12  and complains of what I believe to represent the abbreviation
13  chronic, chronic neck and back pain, and bilateral looks like
14  knee -- knee pain, and potentially related to an auto accident
15  on November 30th, 2012.
16  Q.   And rather than walk you through --
17        MS. McMILLION:  You can pull that out, Ms. Adams.
18  Can you hit next for the next page?
19  BY MS. McMILLION:
20  Q.   And does this track her continued care across the time
21  that she was a patient at the Pain Center?
22  A.   That's correct, it does.
23        MS. McMILLION:  Go on to the next, next.
24  BY MS. McMILLION:
25  Q.   And are all these patient notes with respect to visits

1    that Ms. Roscoe would have had in interactions with the Pain

2    Center?

3    A.   That's correct.

4         MS. McMILLION:  Next?

5    BY MS. McMILLION:

6    Q.   And she received coverage or treatment at the Pain Center

7    over an extended period of time, is that fair?

8    A.   That's correct.

9    Q.   So rather than walk you through each one of these

10   individually, can you give the jury a sense of Ms. Roscoe's

11   treatment from the Pain Center?

12   A.   So it -- it appears, again, if we look back to Mr. Lacey

13   again, it's this idea of sort of prescriptive and

14   protocol-based therapy, so a recommendation for an epidural

15   steroid injection on the first visit, potential for a brace and

16   then medication.

17   Q.   And did Ms. Roscoe go from the epidural to any other type

18   of injections?

19   A.   So there were a number of injections.  So an epidural was

20   repeated three times with two-week intervals, and then

21   progression of the treatment shifted in March of 2014 to

22   treating the facet joints, and then later on in March to start

23   to treat the sacroiliac joints, and I don't believe we've

24   described what the sacroiliac joint is.

25   Q.   Could you please do so?

1  A.   Yeah.  So the sacroiliac joint is the joint that connects

2  the lower part of the spine, that sacrum area that we talked

3  about just below the hip area and -- and -- and towards the

4  center just above the tailbone, and it connects to the hips.

5  So it's, in the lay term, the connection of the bottom of the

6  spine to the hips.  It's a large joint that can experience

7  pain.

8        So there was treatment in March injecting steroid

9  into those respective joints on both -- both sides, left and

10 right, and that was repeated.

11       And then the nerves that would detect pain in the

12 sacroiliac joint were undergone ablation, radiofrequency

13 ablation, one side at a time.

14       And then again, further on, therapies of the

15 shoulder, repeat of facet diagnostic injections, then

16 potentially radiofrequency of -- of one side of the facet

17 joints, then the other side of the facet joints.  That was in

18 2015.

19       But overall there's a number of treatments.

20 Q.   In your review of the patient chart, is it fair to say

21 that -- or do you have an opinion as to whether this patient

22 received excess -- an excessive amount of injections?

23 A.   What's concerning is that there are a lot of procedures,

24 there's a lot of injections, and they're in relatively close

25 fashion to each other and then go on to be potentially repeated

1    as time goes on.

2          MS. McMILLION:  Ms. Adams, if I can have you bring up

3    121A, page 17, if you can blow up those last two, 5-6 and 5-20.

4    BY MS. McMILLION:

5    Q.  And Dr. Mehta, in this portion that's blown up here for

6    5-6 and 5-20, did Ms. Roscoe receive radiofrequency --

7    radiofrequency ablation procedures?

8    A.  She did.  On the top right-hand side you can see RF and

9    then what appears to be an R circled to signify right side and

10   then SI to abbreviate sacroiliac joint.

11   Q.  And then --

12   A.  And then further down -- so that was on May 6th, 2014

13   according to the stamp.

14          And then later was May 20th, 2014, two weeks later,

15   the same procedure was performed but now on the left side.

16   Q.  Was there anything in this patient chart that would

17   have -- that it indicated it would have been medically

18   necessary to separate those two procedures?

19   A.   No, nothing to -- to indicate that.  And in many of the

20   procedures that were performed, sedation was provided.  So if

21   you have sedation, the one potential reason to separate

22   procedures is that it may be very painful to tolerate at one

23   time to do both sides.  If you provide sedation, you sort of

24   address that concern and you should be able to do both sides on

25   the same day.

1   Q.   If the procedures for 5-16 and 5-20 had been done at the

2   same time, would they have been paid the same way if they were

3   separated from 5-6 and 5-20?

4   A.   As we talked about before, by doing them separate, overall

5   you would receive additional reimbursement.

6           MS. McMILLION:   Ms. Adams, if I can have you pull up

7   Exhibit 74.

8   BY MS. McMILLION:

9   Q.   And Dr. Mehta, I will show you what's been previously

10  admitted as Government's Exhibit 74, which is the MAPS history

11  for Ms. Roscoe.

12          Did you have an opportunity to review the interview

13  reports of patients in this case?

14  A.   Yes, I did.

15  Q.   And if we look at the prescribing on May 6th, 2014 --

16          MS. McMILLION:   Can you blow that up, Ms. Adams?

17  BY MS. McMILLION:

18  Q.   -- as well as February 7th, 2015, can you state for the

19  jury what prescriptions were provided to Ms. Roscoe?

20  A.   On both dates hydrocodone 10 milligrams with a combination

21  of Tylenol acetaminophen 325 milligrams was provided to the

22  patient, and a quantity of 90 pills was provided during that

23  time.

24  Q.   And who prescribed that on May 6th?

25  A.   On May 6th it was Dr. Bothra.

1    Q.   And on February 7th, 2015?

2    A.   It was Dr. Edu.

3    Q.   If a patient reported that they were required to receive

4    injections in order to receive prescriptions, can you tell us

5    if the issuance of those prescriptions would be outside the

6    course of professional medical practice?

7    A.   It'd be very concerning if that was what was happening and

8    that would be outside of the medical practice.

9    Q.   Why?

10   A.   Again, it's individualized treatment.  One should not

11   dictate the other, and you certainly don't want to push a

12   patient to have anything unnecessarily just to receive

13   something else that they may need.

14   Q.   I'd like to turn your attention to another patient, Monica

15   Gibson.  Did you have an opportunity to review her patient

16   chart?

17   A.   Yes, I did.

18           MS. McMILLION:  Ms. Adams, if I can have you bring up

19   Exhibit 110A, page 28, and if I can have you bring up that

20   first patient note there.

21   BY MS. McMILLION:

22   Q.   Again, Dr. Mehta, can you tell how this patient presented

23   to the Pain Center and then what the -- the plan of treatment

24   was?

25   A.   So this -- and mind you that the handwriting is difficult,

1   but that -- this patient presented with chronic low back pain,

2   neck pain and it appears may even have shoulder-related

3   problems too, and that it's had several surgeries on her -- on

4   her hand, fingers, and that there was a history of -- of

5   multiple auto accidents.

6   Q.   I think --

7   A.   And in terms of the -- I don't know if you want to move on

8   to the treatment or...

9   Q.   Yeah.  Up in that top right corner can you say or state

10  what that notes?

11  A.   So it appears that it has a recommendation for a back

12  brace with an arrow that points down, that an old one was

13  broken, a recommendation for physical therapy with parentheses,

14  appears to be the word "hand," and then right shoulder, and

15  there I think that's a injection potentially there.

16          MS. McMILLION:  And Ms. Adams, if I can have you

17  bring up Exhibit -- or just forward that to page 89.

18          MS. ADAMS:  Eighty-nine?

19          MS. McMILLION:  Eight-nine.

20  BY MS. McMILLION:

21  Q.   And Dr. Mehta, is this -- can you explain for the jury

22  what this is?

23  A.   As we talked about in -- in the earlier patient, this also

24  is a prescription/letter to explain the need for a back brace.

25  Q.   With -- with respect to back braces, does this also say

1    the treatments that have been tried as well as -- there in the

2    center of the page?

3    A.   That's correct.  If you see the line that says "Treatments

4    tried thus far," it's checkmarked "physical therapy and

5    medications."

6          MS. McMILLION:  And again, Ms. Adams, if I can have

7    you go back to page 27.

8    BY MS. McMILLION:

9    Q.   And Dr. Mehta, here from that first visit is there any --

10   or I believe -- is this the first?  I might be on the wrong

11   page.  I apologize.  Hold on one second.

12         MS. McMILLION:  Page 28.  There we go, back to that

13   first visit.

14   BY MS. McMILLION:

15   Q.   Is there anything in this note to suggest that physical

16   therapy has already been done or that it's being -- or is it

17   that it's being ordered?

18   A.   It appears that it's -- it's just being ordered.

19   Q.   I want to talk to you a little bit about the back braces.

20         MS. McMILLION:  You can take that down.

21   BY MS. McMILLION:

22   Q.   This patient received a back brace on her first visit, and

23   there's the letter of medical necessity that you walked through

24   with the jury.  I believe you did the same thing with Mr.

25   Lacey.  From your review of the files, were you able to

1  determine if there was any standards of protocol as it related
2  to back braces in this case?
3  A.   It appeared that each potential patient had a
4  recommendation and -- and received a back brace on the initial
5  visit.
6  Q.   Would you recommend the use of DMEs like back braces in
7  every case?
8          MR. CHAPMAN:  Your Honor, objection to what this
9  doctor would recommend.  I think he's here to testify about
10  standards and...
11          MS. McMILLION:  I'll rephrase, Your Honor.
12          THE COURT:  Thank you.  Go right ahead.
13  BY MS. McMILLION:
14  Q.   Would the standards of medical practice generally accepted
15  in the United States recommend the use of a back brace on every
16  patient?
17          MR. WEISS:  Well, Your Honor, I'm going to object as
18  to that.  The testimony so far has been guidelines, so if now
19  we're jumping to standards, there's no foundation that there
20  have been any standards presented to this jury upon which to
21  evaluate that testimony.
22          MS. McMILLION:  Your Honor, if --
23          THE COURT:  Go ahead.
24          MS. McMILLION:  Can I respond?  I do believe that
25  this witness has testified as to the guidelines and standards

1    that are set forth in the CDC guidelines, the ASIIP.  We walked

2    through a number of them in the beginning.

3              THE COURT:  Okay.

4              MR. WEISS:  Your Honor, I don't mean to cut the Court

5    off, I apologize.

6              THE COURT:  Go ahead.

7              MR. WEISS:  Before you rule --

8              THE COURT:  Yeah.

9              MR. WEISS:  -- the testimony's been very clear that

10   these have been guidelines.  They're not standards, they're not

11   rules, they're not anything other than recommendations, and I

12   would take umbrage at the suggestion that on this record

13   there's any evidence of a standard that the doctor testified to

14   earlier this morning.  They've been all guidelines.

15             THE COURT:  All right.

16             MR. CHAPMAN:  Your Honor, I would also like to add

17   that the two guidelines that were mentioned earlier in the

18   testimony only related to opiate prescribing.  None of them

19   contained any statements about back braces.

20             THE COURT:  Okay.  My sense, correct me if I'm wrong,

21   Ms. McMillion, is that you are asking the witness to talk about

22   the purpose of the treatment and whether it was legitimate in

23   the usual course of professional practice.  I confess, I'm not

24   deeply familiar with the distinction between standards and

25   guidelines as developed in the record, but if -- if you're just

1    limiting to legitimate medical purposes, maybe that's what you

2    ask about.

3            MS. McMILLION:  Your Honor, I'm happy to rephrase and

4    not use the word standards.

5            THE COURT:  Okay.  Okay.

6            MR. WEISS:  Thank you.

7            THE COURT:  All right.

8            MR. CHAPMAN:  Your Honor, I -- I -- I have to also

9    mention that the phrase "legitimate medical purpose" or

10   "outside the course of professional practice" is an opiate

11   prescribing standard.

12           THE COURT:  Mm-hmm.

13           MR. CHAPMAN:  There's been no testimony about a back

14   brace standard, and I think before this witness testifies about

15   violation of any guideline or standard, the existence of a

16   standard or guideline must first be established.

17           THE COURT:  Well, what do you think about that, Ms.

18   McMillion?

19           MS. McMILLION:  Your Honor, if you would like me to

20   further lay the foundation as it relates to durable medical

21   equipment and this witness's experience with that, I'm happy to

22   do so.

23           THE COURT:  Okay.  Then that's what we'll do.  Go

24   right ahead and thank you all.

25           MS. McMILLION:  Thank you, Your Honor.

```
 1   BY MS. McMILLION:
 2   Q.   Dr. Mehta, in your practice as an anesthesiologist in pain
 3   management, do you have experience dealing with durable medical
 4   equipment?
 5   A.   I -- I do.  In my practice I have prescribed back braces
 6   such as durable medical equipment in the past.
 7   Q.   As part of your training and the training that you give to
 8   others, are there any indications as to when durable medical
 9   equipment would be necessary or not necessary?
10   A.   There is.  In general, the -- the recommendation for
11   things like back braces would be for patients that have
12   undergone or -- or have experienced some sort of trauma where
13   they have a fracture of one of their spine vertebral bodies, so
14   one of the respective bones in the spine has been fractured
15   and -- and a brace may be used to stabilize that.
16          Other indications for the brace may be, again, trauma
17   where there's concern of instability where the bones may be
18   shifting, and there's concern about whether that's going to
19   lead to compression of the spinal cord where you could have
20   catastrophic type things like paralysis, so you may wear a
21   cervical collar for that.
22          There also may be times where symptomatically on
23   occasion you use a brace maybe as a reminder to control how
24   much you're going to move or to help support things.
25          But routinely you wouldn't necessarily recommend
```

1    bracing, and I will say that in my practice it is -- it is

2    something used rarely.

3    Q.   With respect to back braces, is there any training as it

4    relates to any potential harm versus benefit of using back

5    braces?

6    A.   As with any treatment, there is concerns about the -- the

7    harm.  And in back braces, one of the things that may occur is

8    that if prolonged usage, you may find that there is eventual

9    weakening of the muscles that are involved in stabilizing, say,

10   the neck or the back.  I often talk to patients about that in

11   the sense of think of it as using a crutch all the time.

12   You're using these things to -- these -- to help support

13   things, but eventually the natural stabilizers of your body

14   start to become weaker.  So it's -- it is a common discussion

15   about the use of bracing, especially things that can be

16   purchased over the counter, and we talk about in limited

17   fashion you may use those but in -- in -- in general we don't

18   recommend them.

19   Q.   With respect to the Pain Center practice and your review

20   of the medical records there, did you find -- do you have an

21   opinion with respect to the use of durable medical equipment in

22   that practice?

23   A.   My -- my opinion here was that the use of durable medical

24   equipment was above and much more often than what was in usual

25   standard practice and in my personal experience.  Also these

```
1   were tended to be custom braces, not over-the-counter type
2   things, so there's additional cost that would be, you know,
3   concerning for this.
4   Q.   And if you were to see custom braces in a practice, would
5   you expect -- what would you expect in terms of the prescribing
6   of those braces?
7   A.   So number one, there would be some sort of measurement to
8   decide what size of a custom brace to use.  There would be
9   demonstration and fitment and then also followup on how that's
10  impacting, you know, what's -- what's -- what's the difference
11  with using the -- this new therapy.
12  Q.   With respect to your review of the medical records in this
13  case, were you able to determine if there was followup for the
14  DMEs that were prescribed by the Pain Center?
15  A.   I did not find any -- any meaningful documentation of --
16  of durable medical equipment progress.
17  Q.   Thank you.  I'd like to turn your attention to another
18  patient.
19        MS. McMILLION:  Ms. Adams, if I can have you bring up
20  119B and if you can bring up page 6.
21  BY MS. McMILLION:
22  Q.   Dr. Mehta, did you have an opportunity to review the
23  patient chart for a patient named Michelle Morzynske?
24  A.   Yes, I did review Michelle Morzynske.
25  Q.   And if you look there on your screen, this appears to be
```

1    the clinical data information from a 9-16-16 visit.  Can you

2    please explain for the jury based on this medical record how

3    she presented at the clinic?

4    A.   So again, you know, challenges of reading handwritten

5    notes, but it appears that this patient experiences, number

6    one, chronic back pain and potentially radiation of that pain

7    in a ten-year history of it.

8                Number two, bilateral or both sides hip --

9    hip-related pain.

10               And then there's some -- I think number three relates

11   to potential for scoliosis.

12               Number four talks about some of the past medical

13   problems like hypertension or high blood pressure and coronary

14   artery disease.

15               And then number five talks about depression.

16   Q.   There on the side, can you walk the jury through the

17   treatment plan there?

18   A.   So the treatment plan, again, appears to be in no -- no

19   particular order, but MRI of the lumbar spine on the right-hand

20   side is listed there.  PT for the back.  The -- the use of a

21   urine drug screen I believe there.  And then it was a little

22   bit unclear as to just below urine drug screen what that --

23   what that next thing was there.

24   Q.   And then it looks like down below that, is that two weeks?

25   A.   Yes, and then followup in -- in two weeks.

1   Q.   Okay.  Do you know if this patient returned to the clinic

2   two weeks later?

3   A.   I believe it was a longer period of time before the

4   patient came back.  A followup visit was I think on April 3rd,

5   2017 which was almost seven months later.

6   Q.   And you stated here that UDS would be that a urine drug

7   screen was ordered for this patient?

8   A.   Mm-hmm, that's right.

9        MS. McMILLION:  Ms. Adams, if I can have you advance

10  to page 48.

11  BY MS. McMILLION:

12  Q.   And Dr. Mehta, can you explain to the jury what we're

13  looking at here?

14  A.   So we're looking at a report of the urine drug screen.

15  The urine drug screen, I don't know if we've established

16  what -- what the purpose is of that, but the urine drug screen

17  is to look at evidence of what drugs are in the patient's

18  system.  And at a high level you're looking to understand,

19  number one, are there drugs in there that a patient talks about

20  having taken and is that consistent?  If it's inconsistent,

21  meaning you're -- you're detecting a drug like an opioid and

22  it -- there's no prescription of that on record, then that

23  would be considered inconsistent and concerning.

24       And then the second thing is you're also testing for

25  illegal substances like cocaine or heroin.

1          And then the third thing is that if you do prescribe
2     an opioid to someone or some sort of controlled substance, on
3     followup urine drug screens you would expect to see them at
4     some amount in that followup urine screen.
5     Q.   And can you tell here, was this urine drug screen
6     collected on the date of that first visit for Ms. Morzynske?
7     A.   So there was positive for opioids there.  And then I think
8     if we scroll down -- so that's -- that's the three lines there,
9     the hydrocodone, hydromorphone.  I should also talk about that,
10    why are there multiple lines or multiple drugs.  Some drugs are
11    broken down and start to form a different what we call
12    metabolite, or if you take a particular drug, when it breaks
13    down, it forms another compound and that can also be detected
14    too.
15    Q.   And so this particular patient was positive for
16    hydrocodone as well as hydromorphone?
17    A.   Correct.
18    Q.   And the dihydrocodeine?
19    A.   Correct.
20          MS. McMILLION:  Ms. Adams, if I can have you move to
21    the next page.
22    BY MS. McMILLION:
23    Q.   And I believe this is a continuation of that.  Can you see
24    if there were any other positive screens there?
25    A.   So if you look about midway down, hydroxy alprazolam,

1    you'll see inconsistent there.  So that's what we call a

2    benzodiazepine.  Drugs like Xanax or Valium are in those class

3    of -- of drugs.

4            MS. McMILLION:  And Ms. Adams, if I can have you go

5    to the next page.

6    BY MS. McMILLION:

7    Q.   And are there positive drug results indicated here?

8    A.   Again, the sort of conclusion of benzodiazepine, that

9    category of -- of drugs, is shown to be positive there so it's

10   found in the system.

11   Q.   And is there any other ones?

12   A.   And then the opioids, again, as we -- as we talked about,

13   so this is sort of like a summary report here.

14   Q.   Are there any issues or risks associated with taking

15   benzodiazepines with opioids?

16   A.   So numerous guidelines and, you know, teachings are that

17   combination of sedative agents like opioids, like

18   benzodiazepines, like sleep medicines can be harmful to a

19   patient, and so the -- the goal is to try to minimize multiple

20   prescriptions of drugs that can cause sedation like that.

21           MS. McMILLION:  Ms. Adams, if I can have you go back

22   to page 7.  If you can blow up that top part.

23   BY MS. McMILLION:

24   Q.   I believe you testified that Ms. Morzynske came back to

25   the clinic on April 3rd of 2017, is that correct?

1   A.   That's right.

2   Q.   And is there anything in this chart note that suggests

3   that any of those risks you were just talking about with

4   benzodiazepines and opioids was discussed with Ms. Morzynske?

5   A.   In this one it does not appear that it's discussed at all.

6   No, it's not discussed at all.

7   Q.   Down at the bottom --

8        MS. McMILLION:   Ms. Adams, can you come out or come

9   down?  Thank you.

10  BY MS. McMILLION:

11  Q.   -- there's a plan there.  Can you tell me what that plan

12  of care suggests?

13  A.   So there's three things documented in the plan in that

14  middle part of the screen.

15       Number one is a caudal epidural steroid injection.  I

16  don't believe we've talked about what a caudal epidural is, but

17  it's another steroid injection, this time targeting around the

18  tailbone to try to get as many of the low back lumbar and

19  sacral nerve fibers as possible.

20       And then number two is a prescription for Norco or

21  another controlled substance, opioid, 10 milligrams three times

22  a day.

23       And then a line that -- number three that says "tried

24  and failed Neurontin," which is a drug that's used for

25  treatment of neuropathic pain.

1    Q.   Would the issuance of Norco in this circumstance have been

2    outside the course of professional medical practice given that

3    prior drug screen?

4    A.   So it is concerning given that there were inconsistencies

5    in the prior drug screen of opioids being present and now a

6    prescription for Norco is being provided to the patient, and

7    then also we talked about the presence of benzodiazepines in

8    the last urine drug screens.  So at least, at a minimum, we

9    want to have that discussion with the patient about using both

10   of those medications.

11   Q.   With respect to your overall review --

12             MS. McMILLION:  You can take that down.

13   BY MS. McMILLION:

14   Q.   -- of the Pain Center practice and the use of urine drug

15   screens, were you able to -- do you have an opinion with

16   respect to their use of urine drug screens?

17             MR. CHAPMAN:  Your Honor, same objection as previous,

18   a foundation of the witness testifying to an overall review of

19   the Pain Center.

20             MS. McMILLION:  Your Honor?

21             THE COURT:  Yeah, go ahead.

22             MS. McMILLION:  The overall review of the records

23   that you reviewed --

24             THE COURT:  Yeah.

25             MS. McMILLION:  -- at the Pain Center.

1          THE COURT:  I think that's allowable.  Go ahead,
2    witness, if you would, you can answer that question.
3          THE WITNESS:  So my opinion on the use of urine drug
4    screens from the review of my -- my review of the records was
5    that urine drug screens were used, but the results weren't
6    necessarily looked upon or acted upon to change the course of
7    prescribing.
8    BY MS. McMILLION:
9    Q.   When you have a abnormal urine drug screen, which I
10   believe you explained to be the actual prescribed drug not in
11   your system or an illicit drug in your system when it's not
12   supposed to be, is that required to -- or is it suggested in
13   the guidelines that that should be documented, documented in
14   the patient records?
15   A.   Yes.  And I'll add one more finding that we talked about
16   earlier, which is that you mentioned the drug you prescribe not
17   being there, we talked about the illegal stuff being in the
18   urine, and then the third thing being drugs that weren't
19   prescribed showing up in the -- in the urine, say, like another
20   opioid that may have been received elsewhere.
21   Q.   And what would those type of things from a urine drug
22   screen suggest?
23   A.   There'd be concerns.  Each one has its own sort of
24   concern.  So I think it's understandable if there's illegal
25   drugs in the -- in the urine screen like cocaine or so, it's

1    highly concerning and therefore you would want to, at a

2    minimum, discuss that with the patient, potentially counsel

3    them and refer them to addiction services and avoid prescribing

4    other controlled substances.

5           If there is concern about other controlled substances

6    in the urine that weren't prescribed and not aware of, again,

7    counseling on that, discussion about it and potentially

8    discontinuing the use of the controlled substance that you were

9    going to prescribe.

10          And then the third situation of where you prescribe

11   the controlled substance and it's not showing up in the urine

12   is a discussion as to last time we gave you a certain amount of

13   medication, we would expect, based on the quantity, that you're

14   taking it on a regular basis.  Say, for example, if we give you

15   90 pills and 30 days in a typical month, it'd be expected that

16   usually you would take that drug every day and so you would

17   have some presence of that in the urine.  If it's not showing

18   up, then it would warrant a conversation as to why that is.  Is

19   it that you no longer need it?  Did something improve in the

20   situation that you don't need the drug or that concern about

21   where is that drug going, is it being diverted somewhere else.

22   Q.  And in each of those instances would you document that as

23   part of the medical record?

24   A.  I would document it as to the findings and what action was

25   going to be taken.

1    Q.   Thank you.  I'd like to turn your attention to another

2    patient.  Did you have the opportunity to review the patient

3    chart for a patient named Andrew Peterson?

4    A.   Yes, I did.

5    Q.   And did you also have an opportunity to watch undercover

6    videos of Mr. Peterson's visits to the Pain Center?

7    A.   Yes, I did.

8    Q.   And what was your opinion regarding the treatment of Mr.

9    Peterson comparing what was documented to what you saw in those

10   videos?

11   A.   My opinion was that the actual visit that was observed on

12   the video did not reflect what was documented in the medical

13   record.

14          MS. McMILLION:  Ms. Adams, if I can have you bring up

15   Exhibit 7, clip 7A-2, and can you play that for Dr. Mehta

16   please?

17          (Video being played)

18          Now, Ms. Adams, if I can have you bring up

19   Exhibit 120A and if you can blow up that first line of data.

20   BY MS. McMILLION:

21   Q.   Dr. Mehta, this is what's been previously marked and

22   admitted as Government's Exhibit 120A which is a summary of the

23   electronic medical record for Mr. Andrew Peterson.

24          MS. McMILLION:  It's still kind of small, so Ms.

25   Adams, if I can have you bring up maybe just "Subjective" and

1    "Objective," those first couple columns.  There, that's better.

2    BY MS. McMILLION:

3    Q.   Dr. Mehta, can you tell us -- well, first I'll give you a

4    second to review that.  Have you seen this document before?

5    A.   Yes, I have.

6    Q.   Okay.  So I'll give you a second to look it over.  Are you

7    ready?

8    A.   I'm ready.

9    Q.   Can you tell us if what is entered in this medical record

10   is commensurate with what you observed on the video?

11   A.   So let's first talk about the -- the chief complaint, so

12   that's all the way to the left.  We -- we describe what the

13   patients were recording or -- or reporting to us.  So he talks

14   about shoulder pain and lower back pain, so that we -- we saw

15   in the video.

16        Then we talk about the subjective part, so subjective

17   meaning what the patient is describing to us and also the

18   questions that we may ask and how they respond to that.  So it

19   talks about the low back pain and shoulder pain.  Now, in this

20   case it happens to be written as left, although it's

21   probably -- he described right side.

22        Then it talks about the level of pain.  He describes

23   sort of three to four on there without medications that he's

24   using currently .  So that I -- I saw on the video.

25        What's concerning is that when we get to the

1    objective part, which is the physical exam.  So if we break

2    that down line by line, general is the overall appearance of

3    the patient.  He's alert and oriented, which means that he's

4    awake and he knows sort of where he is and who he is and the --

5    the time of day and so forth.  And he's following commands,

6    meaning the questions that she's asking of him, he's responding

7    to that.

8            And he's NAD, no apparent distress, so there's

9    nothing life threatening and concerns like he's short of breath

10   or sweating a lot or so.

11           He has an appropriate mood and affect, so he's got an

12   appropriate level of -- of how he's -- interaction.  He's --

13   he's calm, he's responding appropriately.  He's not quiet or

14   very angry or anything like that.

15           And he's a clear historian.  You can make eye

16   contact, although we're -- we're basically just seeing the

17   camera on one side, but we agree with all that.

18           Where it starts to change is now the head and neck

19   is -- you're looking at just visual of the head and the pupils

20   of the eyes.  The mouth, is there saliva there.  Is there any

21   sign of bulging veins on the neck.  So that's -- that's the

22   second line.  No problem there.

23           The third is the lung exam.  So CTA stands for clear

24   to ascultation.  Ascultation means that you've listened to the

25   lungs.  It didn't appear in the video that there was any

1    listening of lungs that you would have most likely with a

2    stethoscope.  There was no wheezing, no shortness of breath, so

3    you could say that there was no observed wheezing or shortness

4    of breath.

5         Then the next part is ABD.  That stands for abdomen.

6    So as part of this record it says that the abdomen was soft and

7    benign.  Soft means that you laid hands on it and there's

8    nothing really firm and that you can press into the belly and

9    nothing is eliciting pain into the belly.

10        The musculoskeletal exam is paraspinal muscle

11   tenderness.  So that involves that when you press on the

12   muscles of potentially the neck or the back, it's not specified

13   here, but that a physical touch to the muscles caused

14   tenderness for what the patient's reporting.  It didn't appear

15   on the video that any hands were being laid on the patient.

16        And then if we go on, symmetric muscle development,

17   you're looking at muscles to see that they're equal.  If

18   somebody had atrophy or -- or wasting away of the muscles, it

19   would look thinner.

20        Muscle strength, five out of five all groups.  So

21   again, that strength means that you are applying resistance and

22   you're checking how much the patient is able to push back at

23   you.  Five out of five, say, for example, the biceps, if I hold

24   my resistance here on the patient's wrist, the patient squeezes

25   against my hand, and five out of five means that they're able

1    to do that at full strength.  It didn't appear that that
2    occurred on the video.
3           Decreased range of motion.  That's what appeared on
4    the video.  She asked to bend in various ways, and it appeared
5    that range of motion was limited that -- based on -- on pain
6    there.
7           Increased pain with flexion and extension, lumbar
8    facet loading.  Again, certain maneuvers of bending and so
9    forth that look like that could cause pain that they're
10   reporting there.
11          The gait, which means walking, it seemed like the
12   patient was mainly stationary, it didn't appear any -- any
13   walking there.
14          Skin, warm and dry.  We'll take for word that they
15   were able to see that.
16          And then neurologic, reflexes of upper extremity and
17   lower extremity.  So many of you have been in a doctor's
18   office, you had that reflex hammer to your knee.  You know that
19   there's a physical motion to test reflexes in the lower
20   extremity, say, the knee or ankles, and upper extremity would
21   be along the biceps and potentially along the wrist.  That
22   didn't appear to occur.
23          And then CN stands for cranial nerves, so those are
24   all the nerves in the brain that control things like movement
25   of the face, the eyes and so forth.  Those were grossly intact.

1   That didn't appear to be tested either specifically.

2   Q.   Thank you.

3        MS. McMILLION:  Ms. Adams, can I have you bring up

4   Exhibit 97 and advance to page 2, and if you could blow up the

5   very first one.

6   BY MS. McMILLION:

7   Q.   Dr. Mehta, I'm showing what's been previously marked as

8   Government's Exhibit 97 which is a summary of the billings for

9   Mr. Peterson.

10        MS. McMILLION:  Ms. Adams, can you highlight just

11  that very first line, maybe make it a little larger?

12  BY MS. McMILLION:

13  Q.   And Dr. Mehta, can you see that top line there?

14  A.   Yes, I can.

15  Q.   And is that dated January 4th, 2018?

16  A.   Yes, I can.  That's -- that is 1 -- January 4th, 2018, I

17  agree.

18  Q.   Okay.  So that is the billing that would have corresponded

19  with this visit.

20        Can you see what is being reported there in that

21  second column as the procedure code that's being billed for

22  this?

23  A.   So the number 99203 in that second column refers to office

24  evaluation and management, so the -- the act of seeing the

25  patient, taking a history, performing a physical exam and your

1    medical decision making.

2    Q.   And then if you look over just a little bit more.  And

3    I'll represent on the first page that last two columns you see

4    are the billing provider and the rendering provider.  Can you

5    see who is listed there?

6    A.   It's listed as Dr. Bothra, and didn't appear that Dr.

7    Bothra was in that video.

8            MS. McMILLION:  Okay.  You can take that down.

9    BY MS. McMILLION:

10   Q.   With that 99203 billing code, did what you reviewed in the

11   video or even in the medical documentation support the 99203

12   billing code there?

13   A.   So the -- the documentation actually supports a higher

14   level visit, potentially 99204, but the video, with the lack of

15   the physical exam that was performed, would actually suggest a

16   code 99202, a lower visit than what is actually documented as

17   the bill.

18   Q.   So is it fair to say the 99203 in your opinion was not an

19   accurate billing of the services provided to Mr. Peterson on

20   that date?

21   A.   Correct.

22           MS. McMILLION:  Ms. Adams, if I can have you bring up

23   Exhibit 73.

24   BY MS. McMILLION:

25   Q.   And Dr. Mehta, I'll represent to you that this is

1  previously admitted Government's Exhibit 73 which is the MAPS

2  summary for Mr. Peterson.  And there on that first line can you

3  tell the jury what was prescribed to Mr. Peterson on that date?

4  A.   So on January 4th, 2018 by the nurse practitioner, Ms.

5  Bezpalko, a prescription was provided for hydrocodone, the

6  opioid combination with Tylenol acetaminophen, 7.5/325

7  respectively for those two drugs, the quantity of 60 pills.

8  Q.   Is hydrocodone acetaminophen commonly referred to as

9  Norco?

10  A.   That's correct.

11  Q.   Okay.  And based on your review of that video as well as

12  the patient chart, do you have an opinion of whether issuance

13  of this prescription would have been outside the course of

14  professional medical practice?

15  A.   It was outside the course of professional medical

16  practice.

17  Q.   And why would that be?

18  A.   Again, patient was stating that they had not used

19  medication for a long period of time.  The patient didn't

20  necessarily have a severe level of pain.  A plan was still

21  being worked up on in terms of investigation of the back

22  condition.  They were still looking at obtaining the MRI of the

23  shoulder to understand what was happening there.  So those --

24  all those things would warrant that caution should be used and

25  potentially not to prescribe the -- the opioid on that visit.

1    Q.    Thank you.

2              MS. McMILLION:  Ms. Adams, if I can have you bring up

3    Exhibit 11 and play clip 11A-1 for Dr. Mehta and the jury.

4              (Video being played)

5              Ms. Adams, if I can have you bring Exhibit 120D and

6    if you can blow up that center section there, yeah, from the

7    date down to the center, that'll work.

8    BY MS. McMILLION:

9    Q.    And Dr. Mehta, we're showing you what has been previously

10   marked as Government's Exhibit 120D which is an electronic

11   medical record for Mr. Peterson on June 26th, 2018.  Have you

12   had an opportunity to review this?

13   A.    Yes, I have.

14   Q.    And can you tell us if what is entered in this record is

15   commensurate with what you observed in the video?

16   A.    It -- it doesn't appear to match what's in the video.

17   Q.    And can you tell us how?

18   A.    So one, the opening line of -- under chief complaint, the

19   patient complains of lower back pain.  I don't recall anything

20   being discussed about lower back pain.

21              They talked about the shoulder pain, but then the

22   next line it says located bilaterally, so he's talking about

23   pain potentially being on both shoulders.  I don't recall that

24   ever being described in the -- in the video.

25              And then he states the pain is moderate, is severe

1    and is mild.  I'm not sure what that means.  It seems to hit

2    all three categories of -- of severity.

3          And then the patient states that the condition is

4    worsened by bending forward, sitting, standing, lifting and

5    walking.  I don't think any of that was described in -- in the

6    video.  I don't -- I don't recall hearing any of that.  And it

7    also is a little but unclear as to how that's affected with

8    shoulder-related pain like things like walking and sitting and

9    standing.

10         And then if we go on, if we skip the part where he

11   says on a pain scale of 0 to 10 where it says 3 out of 10, they

12   did talk about that.

13         Now we're talking about shoulder pain, again, located

14   on the right side.  Problem occurs constantly.  It's worsened

15   by repetitious movements and bending forward.  I -- I don't

16   understand what the bending relationship is there and it's not

17   on the video.  And so again it's a little bit unclear what's

18   being documented here versus what's observed and -- and

19   discussion during the video.

20         MS. McMILLION:  Ms. Adams, if I can have you bring up

21   Exhibit 73 back up.

22   BY MS. McMILLION:

23   Q.   And this is the MAPS report that you were just reviewing.

24   If you look there mid-page, was there a prescription issued on

25   June 26th, 2018?

1  A.  Yes, there was.  On June 26th, 2018, the same drug that we

2  described before, Norco, a quantity of 60 pills was prescribed.

3  Q.  And would the issuance of this prescription here have been

4  outside the course of professional medical practice based on

5  your review of the visit with Dr. Lewis?

6  A.  Yes, it would for a couple of reasons.  Number one, the

7  severity of pain is -- is 3 out of 10.  It's a pretty minor

8  level of pain.

9       Also concerning was that the urine drug screen was

10  missed.  So again, we are trying to review from the first time

11  the urine drug screen.  You would want to have some sort of

12  concrete result from that before continuing on opioids or at

13  least be concerned about that.

14       And then third is this sort of concern about

15  potentially other sedating drugs that the patient's asking for.

16  It should be a red flag about what's -- what's the patient

17  requesting and are these combination of various therapies

18  potentially harmful.

19  Q.  I believe in the video there was discussion about

20  receiving injections directly to that shoulder joint, correct?

21  A.  That's correct.

22  Q.  And Dr. Lewis discussed being sedated to do so.  Do you

23  recall that?

24  A.  He talked about sedation, that's right.

25  Q.  Are injections normally done under sedation?

1   A.   Dr. Lewis actually mentioned himself that, you know, you

2   don't need it for this, and generally the bulk of injections

3   performed, whether it be shoulder, neck, back or other parts of

4   the body, aren't performed under sedation.

5   Q.   So with respect to your review of not only Mr. Peterson

6   but the patient records that you reviewed for the Pain Center,

7   did you find any general observations with respect to whether

8   patients were receiving sedation during their injection

9   appointments?

10  A.   There was high utilization, if not all patients receiving

11  some sort of sedation during these procedures.

12  Q.   And is sedation billed separately from the actual

13  procedure itself?

14  A.   Depending on the type of sedation, it can be billed

15  separately.  In many of the instances here this was separate

16  anesthesia provided for that and thus a separate billable

17  event.

18          THE COURT:  Moving on?

19          MS. McMILLION:  Yes.

20          THE COURT:  Why don't we take our lunch break now.

21  It's 12:36.  We've been at it for about two hours and

22  15 minutes.  We're making good progress.

23          Ladies and gentlemen, why don't you take your lunch

24  break.  We'll target to have you back in your jury room by

25  1:00, which is about 25 minutes, and we'll probably get started

```
 1   here sometime after 1:00 o'clock.
 2          But don't talk about the case during your lunch
 3   break.  I understand it's cool but nice outside.  If you wanted
 4   to take a walk or get something to eat, now's the time and
 5   we'll see you in about a half an hour, okay?
 6          Let's all rise for our jurors.
 7          (Jury excused at 12:36 p.m.)
 8          THE COURT:  Okay.  We'll take our lunch recess now.
 9          (Court in recess at 12:37 p.m.)
10          (Proceedings resumed at 1:16 p.m., all parties
11          present)
12          THE LAW CLERK:  All rise.  The court is back in
13   session.
14          (Jury entered the courtroom at 1:16 p.m.)
15          THE COURT:  All right.  All jurors are back, they're
16   now in their seats.  Everybody may be seated.  Our parties and
17   lawyers are back and Ms. McMillion's ready to resume.
18          I did want to mention just a quick followup when I
19   gave you that instruction about the witness testimony that was
20   delivered to help you understand the issues in the case, the
21   more complex issues that you may not be familiar with.  As you
22   have heard, the doctor has rendered many of -- much of his
23   testimony in the form of opinions, and -- and that's okay
24   because he's testifying from items that he's not familiar with,
25   giving his opinions to -- to help you understand the evidence
```

1  in the case.

2          However, just be aware, those opinions, you'll decide

3  whether to give them credibility or not, and in light of all

4  the evidence, to believe or not to believe, that's what you're

5  going to decide.  You are the judges of the credibility and the

6  facts of the case, okay?  So I did want to remind you of that.

7          Go ahead, Ms. McMillion.

8          MS. McMILLION:  Thank you, Your Honor.

9  BY MS. McMILLION:

10  Q.  Dr. Mehta, picking back up where we left off --

11          MS. McMILLION:  Ms. Adams, if I can have you please

12  bring up Government's Exhibit 11 and play clip A-1.

13          (Video being played)

14          MS. McMILLION:  Exhibit 11.  My apologies, Ms. Adams,

15  Exhibit 10A-1.

16          (Video being played)

17          MR. HARRISON:  Excuse me.  Excuse me, Your Honor.

18  Your Honor --

19          THE COURT REPORTER:  Mr. Harrison, will you please

20  take your mask off?

21          MR. HARRISON:  Your Honor, I'm objecting because it

22  doesn't show the beginning of the video where it visualizes Dr.

23  Edu across the hall reviewing a file and then comes in.

24          THE COURT:  Well, if there -- if -- would you object

25  to playing back, Ms. McMillion, to show the complete sequence

1    which Mr. Harrison wants the jury to see?

2            MS. McMILLION:  Your Honor, with respect to this

3    clip, we clipped the video so as not to show the over hour

4    waiting time that the patients had in the practice, and so the

5    clip is only the interaction with the doctor.

6            THE COURT:  Are you willing to agree that the portion

7    you clipped out did show Dr. Edu reviewing a file across the

8    hall before he walked into this room?

9            MS. McMILLION:  Your Honor, I could review that maybe

10   during the next break to see if that is actually accurate.

11           THE COURT:  Okay.  We'll take the objection under

12   advisement at this time then.

13           MR. HARRISON:  Thank you, Your Honor.

14           THE COURT:  Okay.  Thank you.  Go ahead.

15           (Video being played)

16           MS. McMILLION:  Ms. Adams, can you start that video

17   from the beginning please?

18           (Video being played)

19           Now, Ms. Adams, if I can have you bring up

20   Government's Exhibit 120A and if you could blow up the lower

21   left corner of those -- lower left, sorry, just that last

22   patient visit.

23   BY MS. McMILLION:

24   Q.  And Dr. Mehta, this again I'll represent is a summary of

25   the electronic medical record for Mr. Peterson that's

1    previously been admitted.  You had an opportunity to review

2    this, correct?

3    A.   That's correct.

4    Q.   And as it relates to what you reviewed in the video and

5    the documentation here in the medical records, can you tell us

6    if the video was commensurate with what you observed or the

7    record is commensurate with what you observed in the video?

8    A.   So the chief complaint, the shoulder and the low back

9    pain, is commensurate, as is the history of presenting illness,

10   the middle column on this particular screen.

11        But when we get to the physical exam, much of what we

12   talked about in the last encounter of physical touching and --

13   and physical exam maneuvers was not -- was not performed.  As

14   you can see in the video, it's mainly a dialogue, and therefore

15   all this doesn't match with what we -- what we saw on the

16   video.

17        MS. McMILLION:  And Ms. Adams, if I can have you

18   bring up Government's Exhibit 73.

19   BY MS. McMILLION:

20   Q.   And Dr. Mehta, there, the third line down on May 29th,

21   2018, was Mr. Peterson prescribed a controlled substance that

22   day?

23   A.   That's correct.  On -- on 5-29-2018 Dr. Edu prescribed the

24   Norco as we described before.

25   Q.   And similar to your prior evaluation, can you state

 1    whether issuance of this controlled substance prescription

 2    would have been outside the course of professional medical

 3    practice?

 4    A.   It is outside the course of professional medical practice

 5    given what we've seen in terms of the evaluation and medical

 6    decision making.

 7    Q.   Thank you.  Before we move to another patient, I want to

 8    take you back to patient Michelle Morzynske.

 9            MS. McMILLION:  And Ms. Adams, if I can have you

10    bring up -- one second, Your Honor.

11            (Brief pause)

12            Exhibit 119B, and if I can have you advance to page 4

13    and if you can blow that up.

14    BY MS. McMILLION:

15    Q.   And here can you state what occurred during this visit,

16    Dr. Mehta?

17    A.   So in this visit the plan was described on -- on

18    April 3rd, 2017 or, sorry, the urine drug screen results was

19    discussed that showed that there was hydrocodone and also this

20    drug buprenorphine that was inconsistent with there, and so

21    that was discussed with the patient.  The chart was reviewed

22    and then a plan was for another urine drug screen and then a

23    caudal epidural steroid injection.

24    Q.   And did the patient receive that caudal epidural steroid

25    injection on that date?

1  A.  She did, yes.

2  Q.  And based on the charting that you have for Ms. Morzynske,

3  do you have an opinion as to whether that caudal epidural was

4  medically necessary?

5  A.  It was not medically necessary.

6  Q.  Thank you.  I want to turn your attention to patient

7  Denise Souligney.  Did you have an opportunity to review Ms.

8  Souligney's patient chart?

9  A.  Yes, I did.

10       MS. McMILLION:  And Ms. Adams, can I have you bring

11  up Exhibit 122A, and if I can have you advance to page 83.  You

12  got 84.  Maybe go back up.

13       I'm sorry, you can take that down.  Exhibit 122B, and

14  if you can advance to page 83 and if you can blow up that top

15  note.

16  BY MS. McMILLION:

17  Q.  And Dr. Mehta, can you explain for the jury how this

18  patient presented at the Pain Center?

19  A.  So this patient presented with longstanding history of --

20  of pain, chronic pain, and for further evaluation, complaining

21  of neck pain, left shoulder pain, left elbow pain, mid-back

22  pain, low back pain, both hips, right leg and the right knee,

23  and then -- I'm sorry.

24  Q.  That's fine.  And then if you look over there on the

25  right-hand corner, can you tell us what services were suggested

1    that day?

2    A.   So on the right column there you can see it says "Plan"

3    and then a dash mark, it says "schedule bilateral sacroiliac,

4    SI joint injection."

5              The next line refers to the I believe NPO, meaning do

6    not eat anything, which means they intend to have -- provide

7    sedation there.

8              They recommended a back brace.

9              Recommended -- and then ordered a urine drug screen,

10   the gel packs, a lumbosacral MRI and a cervical MRI.

11   Q.   And did you have an opportunity to go through this entire

12   patient chart?

13   A.   Yes, I did.

14   Q.   And is it fair to say that Ms. Souligney was a patient of

15   the Pain Center for an extended period of time?

16   A.   That is correct.  There was a long period with numerous

17   treatments.

18   Q.   And can you explain for the jury the course of her

19   treatment over that time frame?

20   A.   Well, in a high level there was a number of injections.

21   We start out in 2016, we have both left and right sacroiliac

22   joint injections.  Approximately two weeks later, repeat of

23   those same two injections.

24             Then approximately, again, two weeks later, the

25   radiofrequency of one side of the sacroiliac joint, and then

1    two weeks after that a repeat or, sorry, a radiofrequency of

2    the opposite side of the SI joint.

3            Then a couple months go by and now attention is

4    turned to the lumbar facets.  Both sides of the lumbar facets,

5    L2 to L5, but then a repeat of that a week -- approximately a

6    week later, and then again later on, short period later,

7    radiofrequency ablation.

8            These treatments then continued into 2017.  In early

9    2017 --

10            MR. WEISS:  Excuse me, Your Honor.  It appears the

11    witness is reading from a document and I thought we discussed

12    that this morning.

13            THE COURT:  Okay.  Are you -- well, let me just

14    remind the doctor, you can summarize your work by reverting to

15    the document to refresh your recollection, but you should not

16    be reading it into evidence.

17            So go right ahead, okay?

18    BY MS. McMILLION:

19    Q.   Dr. Mehta, if you could just take a moment and review

20    that.  And can you tell me, how many procedures did Ms.

21    Souligney receive at the Pain Center, injection procedures?

22    A.   It -- just quick summary, greater than ten.

23    Q.   Greater than ten.

24            And is there documentation in Mrs. Souligney's

25    medical chart regarding any back surgeries?

1    A.   Yes, there was documentation of a lumbar fusion between L3

2    and L5.

3    Q.   And can you just explain for the jury what a lumbar fusion

4    means?

5    A.   So lumbar fusion means -- it's essentially like carpentry

6    work.  You're taking in something like a metal or cement or

7    some sort of way to lock in the multiple levels of the spine

8    there, so L3, L4 and L5 the bones are essentially stabilized or

9    connected together and they are no longer moving there.

10   Q.   With respect to the injections in the L3, L4, L5, would it

11   be medically necessary to undergo injections if a back fusion

12   had already occurred?

13   A.   So for the treatment for back pain following a fusion, one

14   could look above or below the fusion areas, but to inject

15   around the -- or in the areas of the fusion would be medically

16   unnecessary.

17   Q.   And did the Pain Center, in fact, inject into the areas

18   that had been fused?

19   A.   Yes, they did.

20        MS. McMILLION:  Ms. Adams, if I can have you bring up

21   Exhibit 75, and I'd say probably two-thirds of the way down

22   there.

23   BY MS. McMILLION:

24   Q.   Dr. Mehta, if you can look at March 14th, 2018.  Was this

25   patient prescribed controlled substances on that day?

```
1    A.    Yes.  On March 14th, 2018 the patient received, again,

2    hydrocodone acetaminophen 10/32, quantity of 90 pills,

3    prescribed by Dr. Russo.

4    Q.    And if this patient was required to receive back

5    injections in order to get that prescription, would that be

6    outside the course of professional medical practice?

7    A.    Yes, it would.

8    Q.    Okay.  Thank you.  If I could turn your attention to

9    another patient, patient Victoria Loose.  Dr. Mehta, did you

10   have an opportunity to review Mrs. Loose patient's file?

11   A.    Yes, I did.

12          MS. McMILLION:  Ms. Adams, if I can have you bring up

13   Exhibit 116E.

14          MR. WEISS:  Your Honor?

15          THE COURT:  Yes.

16          MR. WEISS:  Before Ms. Loose's exhibits are portrayed

17   on the screen --

18          THE COURT:  Yes.

19          MR. WEISS:  -- last week the government moved for

20   Mrs. Loose's charts to be admitted.  We did not object.

21          THE COURT:  Right.

22          MR. WEISS:  This morning shortly before 8:00 o'clock

23   I did receive an email from the government that contained

24   approximately 384 which appears to be additional pages of

25   charts perhaps from Ms. Loose.  Technically those 384 pages
```

1    were not admitted or even moved to be admitted.  And so I -- I

2    guess I'm asking of the government through the Court to explain

3    what it is we got and whether or not the government's going to

4    incorporate that in their presentation today.

5           THE COURT:  All right.  Well, I -- I don't know

6    anything about the 384 pages, but are those -- I'm sure they

7    were -- the government was acting pursuant to rule when

8    providing them, or case law, but are any of those matters going

9    to be taken before the witness now?

10          MS. McMILLION:  Your Honor, with respect to

11   Exhibit 116E, this was the physical patient chart of Ms. Loose

12   which was produced to the defense.  I believe when we moved to

13   admit the 116E that was on the thumb drives that the defense

14   counsel had, there was a duplication of 116A and 116E.  These

15   are not new productions.  These have previously been provided

16   in discoverment [sic] -- discovery, and this was just a

17   producing of the file for the correct exhibit.

18          THE COURT:  Okay.  All right.  That's fine.  But

19   everything you're going to talk about is in evidence, correct?

20          MR. WEISS:  Well, see, that's the issue, Judge,

21   because --

22          THE COURT:  Right.

23          MR. WEISS:  -- Mr. Rogalski and I spent several hours

24   yesterday evening talking about this and going through it, and

25   admittedly we found some areas of omissions.  It appears that

```
 1    what was sent to me this morning sort of fills in those
 2    omissions.  So if it wasn't part of the --
 3            THE COURT:  I don't -- I don't -- this is not -- this
 4    is not for -- for jury time, but I think we ought to move to
 5    the next exhibit because it appears to be some -- it appears to
 6    me that the government has provided some materials to the
 7    defense subsequent to the admission of other materials in
 8    evidence, and unless you're willing to conscribe your
 9    examination to the materials that are in evidence that these
10    individuals have seen, then we ought to move on to the next
11    topic, okay?
12            MR. WEISS:  Thank you, Judge.
13            MS. McMILLION:  Thank you, Your Honor.
14            THE COURT:  All right.  You're welcome.
15    BY MS. McMILLION:
16    Q.   Dr. Mehta, with respect to Mrs. Loose's patient chart, did
17    you have an opportunity to review that chart in its entirety?
18    A.   Yes, I did.
19    Q.   And can you summarize for the jury the services that Ms.
20    Loose received as -- as part of her treatment at the Pain
21    Center?
22    A.   There were a number of treatments.  She was a longstanding
23    patient.  There were a number of injections over the course of
24    the years there and then also medications including things like
25    Norco.
```

1    Q.   And did Ms. Loose receive radiofrequency ablation

2    procedures at the Pain Center?

3    A.   Ms. Loose received numerous radiofrequency ablations.

4    Q.   And how were those performed?

5    A.   They were performed in a similar fashion as we've talked

6    about in earlier patients.  Sorry.  That there were diagnostic

7    procedures performed and then individual sides for the

8    radiofrequency portion of that on the lumbar facets.  Then

9    there were also radiofrequencies of the sacroiliac joints done

10   again as we talked about.  Also, ultimately when these

11   procedures were completed in -- in times later, the diagnostic

12   procedures were performed again on areas that were -- already

13   had radiofrequency ablation.

14   Q.   Okay.  So let's break that down a little bit.  First I'm

15   going to talk about the diagnostic procedures being done

16   bilaterally, is that correct?

17   A.   Correct.

18   Q.   And then those were followed up you said with

19   radiofrequency ablation procedures that were done unilaterally?

20   A.   Yes.

21   Q.   Can you explain if that would be medically necessary?

22   A.   It would be medically unnecessary to do them broken up in

23   individual time periods, so going from bilateral block,

24   diagnostic block to individual side radiofrequency and then

25   subsequent visit to have another radiofrequency visit on the

1    opposite side.

2    Q.   And with this particular patient would the billing be the

3    same breakdown if you separated out the radiofrequency ablation

4    procedures?

5    A.   The billing would be similar, as we've described before.

6    Q.   And what would be the distinction there with respect to

7    separating it?

8    A.   There would be a higher payment to separate the two

9    individual radiofrequencies.

10   Q.   You also stated that there were repeat injection of the --

11   I'm not going to try to say this -- the SI joints?

12   A.   Yes.  So there were numerous over the years sacroiliac

13   joint injections done bilaterally that short time afterwards

14   would have then radiofrequency done unilaterally and then again

15   back on the other side a short time after that.

16   Q.   From your review of the patient charts, did you determine

17   that there were diagnostic testing done for the same joints

18   that had already been burned through the radiofrequency

19   ablation process?

20   A.   That -- that's correct.  So when a patient has the

21   diagnostic blocks and a decision is made to do the

22   radiofrequency, the radiofrequency is completed.  If the

23   patient returns with pain later, generally you just repeat

24   the -- the radiofrequency again unless there's a concern that

25   there's a new issue of pain.

Jury Trial: Volume 5 • Monday, May 23, 2022

95

```
 1              And maybe I can add one more element there is that
 2    the radiofrequency has a -- a time period that it may work for.
 3    Q.   Yes.
 4    A.   It's not a lifetime.
 5    Q.   Can you explain for the jury how long a radiofrequency
 6    ablation procedure -- or relief from a procedure usually lasts?
 7    A.   We -- we counsel patients that radiofrequency procedures
 8    may last anywhere from six months to one year.
 9    Q.   Did you also have an opportunity to review Mrs. Loose's
10    chart with respect to urine drug screens?
11    A.   Yes, I did.
12    Q.   And what did you find there?
13    A.   So let me refer to -- just refresh my memory here.
14              (Brief pause)
15              There were urine drug screens performed over the
16    years of her treatment.  Not all were addressed in the -- in
17    the chart in terms of decision making based on those results,
18    and there were inconsistencies in those results that were not
19    addressed.
20    Q.   And in -- in those instances, would it have been outside
21    the course of professional medical practice to continue to
22    prescribe controlled substances?
23    A.   That is correct based on that, those findings.
24              MS. McMILLION:  Your Honor, if I can have one second.
25              THE COURT:  Yes.
```

1          (Brief pause)

2    Q.   Dr. Mehta, we talked a little bit -- and I told you I'd

3    come back to your overall findings as it related to the Pain

4    Center.  You had an opportunity to go through the patient

5    charts that we've discussed here today, correct?

6    A.   That's correct.

7    Q.   Have you reviewed other patient charts in addition to the

8    ones that we've outlined here for the jury?

9    A.   Yes.  The government has provided over a hundred other

10   charts that I was able to review.

11   Q.   And based on your review of those charts, did you have a

12   general view of how the practice runs in terms of prospective

13   or routine courses of treatment based on the charts you

14   reviewed?

15        MR. CHAPMAN:  Your Honor, objection.  This is outside

16   the scope of the witness's disclosure.  There was no mention of

17   a hundred charts or specific opinions related to those charts

18   in the discovery provided by the government.

19        THE COURT:  Okay.

20        MS. McMILLION:  Your Honor --

21        THE COURT:  Go ahead.

22        MS. McMILLION:  -- if I can respond, the expert did

23   state what he reviewed in anticipation of his testimony.  The

24   expert did also provide overall findings at it related to the

25   Pain Center in his disclosure.

```
1              THE COURT:  Okay.  That's overruled.  I don't know
2    what he -- what he gave and didn't give, and Mr. Chapman and
3    others can cross-examine on that.  But he testified he looked
4    at or was given that, looked at it, and I assume that will be
5    what his opinions are based on.
6              Go ahead, Ms. McMillion.
7              MS. McMILLION:  Thank you, Your Honor.
8    BY MS. McMILLION:
9    Q.   So Dr. Mehta, can you -- did you have a general view of
10   how the practice was run in terms of prospective or routine
11   courses of treatment based on the records that you reviewed?
12   A.   I did.  Those opinions are that it was concerning the
13   number of patients that were receiving medically unnecessary
14   procedures and that they were almost prescriptively every six
15   weeks to -- for radiofrequency repeats, every two weeks for
16   epidural injections, often the maximum allowable injections
17   that were allowed for these potential patients.
18             And then in addition to that, I was also concerned
19   about the medically inappropriate use of -- of opioid
20   prescribing.
21   Q.   I'd like to show you what's been marked as Government's
22   Exhibit 39.
23             MS. McMILLION:  Ms. Adams, can you pull that up?
24   BY MS. McMILLION:
25   Q.   And I'll represent to you that this is previously admitted
```

1    into evidence and this is a summary of the counts in the

2    indictment.  Did you have an opportunity to review the

3    indictment in this case?

4    A.   Yes, I did.

5    Q.   And with respect to offering your medical opinion here

6    today, were you able to look at each one of these dates of

7    service to determine medical necessity?

8    A.   Yes, I was.

9    Q.   And with respect to Counts 2 through 13 for those

10   purported dates of service, is it your -- what is your opinion

11   as it relates to those counts?

12   A.   That they were medically unnecessary there.

13        MS. McMILLION:  Ms. Adams, if I can have you go to

14   page 2.

15   BY MS. McMILLION:

16   Q.   And as to Counts 19 through 29 for Dr. Edu, do you have an

17   opinion with respect to the medical necessity there?

18   A.   I do.  These were medically unnecessary.

19        MS. McMILLION:  Ms. Adams, next page.

20   BY MS. McMILLION:

21   Q.   And as to Counts 30 and 31 to Dr. David Lewis, do you have

22   an opinion there?

23   A.   The same, that these were medically unnecessary.

24   Q.   And as to Counts 32 through 36 with respect to Dr. Russo?

25   A.   The same, that these were medically unnecessary.

1    MS. McMILLION:  Ms. Adams, if I can have you pull up

2    Exhibit 40.

3    BY MS. McMILLION:

4    Q.  And Dr. Mehta, I'll represent that I'm showing you what's

5    been previously marked and admitted as Government's Exhibit 40

6    which outlines the counts as it relates to the prescribing in

7    this case.  Have you had an opportunity to review those counts?

8    A.  Yes, I have.

9    Q.  And as to Counts 44 through 46 for Dr. Bothra, do you have

10   an opinion on whether those counts -- whether those controlled

11   substances were issued outside the course of professional

12   medical practice?

13   A.  Yes, they were.

14   Q.  As to Counts 51 and 52 to Dr. Edu, do you have an opinion

15   about those prescriptions?

16   A.  The same, they -- yes, they were outside the course of

17   professional medical practice.

18   Q.  As to Count 53 for Dr. Lewis?

19   A.  The same, outside the course of professional medical --

20   medical practice and not in good faith.

21   Q.  And also as to Counts -- Count 54 as to Dr. Russo?

22   A.  The same there.

23   Q.  And what is that opinion?

24   A.  The same, that it was outside the course of professional

25   medical practice and that it was --

```
 1              MR. MARGOLIS:  Objection, Your Honor.
 2              THE COURT:  Sustained.  You -- you -- I don't want
 3      you to take a position on good faith, Doctor.  You can -- you
 4      can talk about within or without the usual course of
 5      professional practice and for a legitimate purpose but not --
 6      not beyond that.
 7              Go ahead, Ms. McMillion, please.
 8              MS. McMILLION:  Your Honor, can I just have one
 9      second with co-counsel?
10              THE COURT:  Yes.
11              (Brief pause)
12              MS. McMILLION:  Just one last question, Your Honor.
13              THE COURT:  Okay.  I'm going to strike the testimony
14      from the record about good faith.  That's not an issue for the
15      jurors to decide, okay?
16              Go ahead, Ms. McMillion.
17      BY MS. McMILLION:
18      Q.  Just one quick followup question, Dr. Mehta.  With respect
19      to prescribing of opioids and benzodiazepine, I think you
20      talked a little bit there about the risk associated with that.
21      Can you explain how those risks present with whether a
22      prescription is issued outside the course?
23      A.  So the concern about patients that are taking both of
24      those medications is that there's a concern of respiratory --
25      first of all, sedation, you can have extreme sedation which can
```

1    be harmful and potentially respiratory compromise in overdose,

2    so there's a risk of harm or death with those medications.

3          MS. McMILLION:  Nothing further for this witness,

4    Your Honor.

5          THE COURT:  Okay.  Thank you very much.

6          Want to get started, Mr. Weiss?

7                     CROSS-EXAMINATION

8    BY MR. WEISS:

9    Q.  Good afternoon.

10   A.  Good afternoon.

11         MR. WEISS:  Your Honor, with the Court's permission,

12   may I approach the witness?

13         THE COURT:  Continuing permission granted, so you can

14   do that.

15         MR. WEISS:  I would beg the Court's indulgence.  If

16   the witness can step down, I would like him just to point to a

17   couple areas on my back.

18         THE COURT:  Why don't you -- Linda's going to want

19   the mic.  Can you make it out, Linda?

20         THE COURT REPORTER:  I can if you keep your voice up.

21         THE COURT:  Keep your voice up.

22   BY MR. WEISS:

23   Q.  Doctor, if you were going to give me an injection in the

24   cervical area, where would you do it?

25   A.   The cervical -- well, first we'd need to clarify what

1    injection we're asking to perform, but the general region of

2    the cervical spine is up here.

3    Q.   So it would be the back of my neck?

4    A.   That's correct.

5    Q.   Okay.  And if I was going to ask you to do an injection in

6    my caudal area, where would you give it?

7    A.   The caudal would be down in your tailbone.

8    Q.   Okay.  So there's a significant difference between

9    cervical and the caudal?

10   A.   That's correct.

11   Q.   Okay.  Thank you.  You may be seated.

12   A.   We're -- we're like looking through the...

13   Q.   Does that help your line of vision?

14   A.   Yes, thank you.

15            MR. WEISS:  Are you guys good?

16   Q.   You work at a university hospital?

17   A.   A university?  Yes, I -- I work in the university

18   hospital.

19   Q.   Okay.  Have you ever worked in an urban private practice?

20   A.   Well, the university -- our practice is a private practice

21   and it's in an urban setting.

22   Q.   Okay.  All right.  And you see patients that come to the

23   hospital?

24   A.   I do.

25   Q.   Okay.  And are you -- are they referred to you?

1    A.   There are patients that self-refer as well.

2    Q.   Okay.  And is there other criteria as to patients that you

3    will and will not see and treat?

4    A.   We -- we look for medical records.  If a patient says that

5    they're a pediatric case below the age of 12, I won't see them.

6    We generally want a history given to us beforehand.

7    Q.   Okay.  And so you -- you screen the patients that you will

8    see?

9    A.   That's correct.

10   Q.   Okay.  You take all types of insurance or noninsurance?

11   A.   We take -- across the practice all insurances are taken

12   including government, private and -- and worker's comp and no

13   fault.

14   Q.   All right.  When were you initially contacted by the

15   government in this matter?

16   A.   Honestly, I don't know the -- exactly.  I want to say

17   sometime before the pandemic.  It's been -- it's been some

18   time.

19   Q.   Can you sort of give us a time frame?  The pandemic

20   started when, the end of '19, beginning of 2020?

21   A.   Beginning of 2020.  I -- I believe it was around that time

22   period if -- if not just before or after.  I don't -- I don't

23   recall honestly.

24   Q.   So if I told you that the indictment came down in December

25   of 2018, it would have been a considerable amount of time after

Jury Trial: Volume 5 • Monday, May 23, 2022

```
 1   the indictment?
 2   A.   I -- I -- honestly I do not know the time that the initial
 3   contact was offhand.
 4   Q.   Okay.  You were presented a copy of the indictment at or
 5   about the initial contact, correct?
 6   A.   That's correct.
 7   Q.   Okay.  So the indictment had already been handed down,
 8   correct?
 9   A.   Correct.
10   Q.   You already knew what the allegations were --
11   A.   Correct.
12   Q.   -- from the government's perspective, and so you didn't
13   have any input in those -- in creating those allegations or
14   drafting the indictment?
15   A.   That's correct.
16   Q.   Okay.  And the government came to you and indicated that
17   they wanted to hire services of someone who could provide
18   expert testimony to support the allegations that were already
19   in an indictment that you had nothing to do with creating, fair
20   statement?
21   A.   No.  They actually -- the initial contact was to review
22   and see if these things were medically appropriate or not.
23   Q.   So you didn't know what the allegations were?
24   A.   They -- they -- I knew the allegations, but their initial
25   contact was not to support the allegation but to review the
```

1   case.

2   Q.   But when you indicated this morning to the jury as to the

3   materials that you reviewed, you did mention the indictment,

4   did you not?

5   A.   I was aware of it, yes.

6   Q.   Well, there's a difference between aware of it and

7   reviewing it.  And again, my recollection is, my notes reflect,

8   that you indicated you reviewed the indictment.  Is that

9   accurate?

10  A.   That's -- that's accurate.

11  Q.   Okay.  So it was more than just being aware of it out in

12  the netherworld somewhere; you actually read it and reviewed

13  it?

14  A.   Yes.

15  Q.   Okay.  And when it came time for you to draft a -- an

16  opinion letter, your opinion letter made -- or report made

17  reference to specific counts in the indictment, correct?

18  A.   That's correct.

19  Q.   Okay.  So you were called upon by the government not only

20  to make opinions or proffer opinions but to tie those opinions

21  to allegations that were in the indictment, correct?

22  A.   Again, to render an opinion based on what the --

23  Q.   But in relation to the allegations contained in the

24  indictment, correct?

25  A.   Yes.

Jury Trial: Volume 5 • Monday, May 23, 2022

1   Q.   Okay.  And the government indicated -- or excuse me, you

2   responded to the government's question about being compensated

3   for reviewing and whatever else they had you do, correct?

4   A.   Correct.

5   Q.   Okay.  And is that an hourly rate?

6   A.   That's correct.

7   Q.   Okay.  Would you relate to the jury what that hourly rate

8   is?

9   A.   Yes.  It's $500 per hour.

10  Q.   Okay.  And you prepared as a hired expert prior to your

11  relationship in this case, correct?

12  A.   That's correct.

13  Q.   Okay.  And it's fair to say that if you don't proffer the

14  opinion that the people or entity are asking you to proffer,

15  they don't go any further with you, correct?

16  A.   Or I don't go further with them, yes.

17  Q.   Okay.  All right.  But you -- you get the -- the gist?

18  A.   Yes.

19  Q.   Either you're on their page or you're on no page at all?

20  A.   Correct.

21  Q.   Okay.  So in terms of -- we know that you were provided

22  with the indictment, correct?

23  A.   Yes.

24  Q.   And we know that you were provided some patient charts,

25  correct?

1    A.   Correct.

2    Q.   All right.  And we know at least as to the charts that

3    you've identified or the patients that you've identified today,

4    that you saw the charts of those various patients, correct?

5    A.   Correct.

6    Q.   All right.  Now, some were the actual paper charts,

7    correct?

8    A.   Correct.

9    Q.   And some were summaries of electronic medical records,

10   correct?

11   A.   That's correct.

12   Q.   Okay.  So the charts that were electronic medical records,

13   you never saw the full chart, correct?

14   A.   It was what was transcribed from --

15   Q.   It's a summary, right?

16   A.   They were beyond summaries.

17   Q.   Either yes or no, either it was a summary or it wasn't,

18   and I think your testimony earlier today was they were

19   summaries.

20   A.   They were complete charts of -- of those patients.

21   Q.   Well, then it's not a summary, then it's a complete chart.

22   A.   It's -- it's a -- a summary --

23   Q.   My question's really simple.

24        THE COURT:  Hold on.

25   Q.   Let me take a different --

```
1          THE COURT:  Let -- let him answer, Mr. Weiss, before
2    you jump in again.  Go ahead please.
3    A.  So when we see records like physical exam, medical
4    decision making, the HPI, that's not in my view a summary.
5    That's literally taking the pieces of the information of the
6    chart and putting it together.
7          MR. WEISS:  I beg -- I beg the Court's indulgence,
8    Your Honor.
9          (Brief pause)
10         For the record, Your Honor, what is on the screen now
11   has previously been admitted as Government's Exhibit 120A as in
12   apple.
13   BY MR. WEISS:
14   Q.  Do you see that, sir?
15   A.  I do.
16   Q.  Okay.  Does that look to you like the paper charts that
17   we've seen earlier today?
18   A.  It physically does not appear the same but it contains
19   similar type information.
20   Q.  Containing similar information doesn't necessarily make it
21   a complete chart, does it?
22   A.  The understanding when I worked with the government on
23   this was that these were compiled from what was available as
24   the medical record.
25   Q.  All right.  So what was compiled from --
```

```
1              THE COURT REPORTER:  Mr. Weiss, I really need you by
2    the microphone.
3              MR. WEISS:  I'm sorry.
4    Q.  What was compiled -- I think your phrase was what was
5    compiled from available medical records, correct?
6    A.  It was --
7    Q.  Sir, isn't that what you just said?
8    A.  That's correct.
9    Q.  Okay.
10             THE COURT:  Hold on a minute.  Does everybody have
11   this on their television screen 'cuz I don't have it on mine.
12   Defendants do?
13             MS. McMILLION:  Yes, Your Honor.
14             THE COURT:  Witness does?
15             THE WITNESS:  I do.
16             THE COURT:  Okay.  All right.  I'll watch the
17   overhead.
18             Go ahead, Mr. Weiss.  I'm sorry about that.
19             MR. WEISS:  Thank you, Judge.
20             THE COURT:  Yep.  Sorry about that.
21   BY MR. WEISS:
22   Q.  What was compiled from available medical records, correct?
23   A.  (Nods in the affirmative.)
24   Q.  Is that a yes?
25   A.  That's correct.
```

1    Q.   Okay.  So someone compiled, put together a summary of what

2    was available from the records, correct?

3    A.   That's correct.

4    Q.   Okay.  We don't know what was unavailable, do we?

5    A.   We don't.

6    Q.   Okay.  And we don't know who did the compiling, do we?

7    A.   I -- I am not privy to that information.

8    Q.   Okay.  And we don't know what was included and what was

9    excluded, correct?

10   A.   We also don't know if --

11   Q.   Sir, just answer my question, not someone else's question.

12   We don't know what was included and what was excluded, do we?

13   A.   That's correct.

14   Q.   Okay.  And for that matter, we don't know what was

15   retrievable and what was not retrievable, correct?

16   A.   Again, what I was told --

17   Q.   That's a yes or no.  We don't know what was retrievable

18   and what was not retrievable, correct?

19   A.   Correct.

20   Q.   Okay.  Thank you.

21            And did the government -- 'cuz you never -- strike

22   that.

23            You never met with any of the defense attorneys prior

24   to today, correct?

25   A.   No, I have not.

1    Q.   Okay.  You've spoken to the government, correct?

2    A.   That's correct.

3    Q.   Approximately how many times, say, over the last two-plus

4    years, either in person, telephonically, electronically, how

5    many times did you converse or communicate with them?

6    A.   Numerous times.

7    Q.   Could you give us a number?

8    A.   I'd say 50 times or so.

9    Q.   Fifty, 5-0?

10   A.   Mm-hmm.

11   Q.   Okay.  Is that a yes?

12   A.   That -- yes.

13   Q.   I want to make sure that Ms. Cavanagh's able to take it

14   down.

15        Did anyone from the government advise you that during

16   the period of time that's alleged in the indictment that there

17   were approximately 24,700 patients at these -- at these

18   clinics?

19   A.   I knew that there was a large number of patients.  I don't

20   recall --

21   Q.   Not a precise number.

22        THE COURT REPORTER:  Wait, one at a time.  Mr. Weiss,

23   you keep cutting the witness off.

24        MR. WEISS:  I'm sorry.

25        THE COURT REPORTER:  "I don't recall..."

1    A.   I don't recall the exact number but I knew that there was

2    a large number of patients.

3    Q.   Would you dispute if I told you it was approximately

4    24,700?

5    A.   I don't dispute.

6    Q.   Thank you.

7              And I think today you testified to six or seven

8    patients?

9    A.   As -- as far as the detail, yes.

10   Q.   Okay.  And then there's these other hundred that you say

11   you were given, correct?

12   A.   Correct.

13   Q.   Do we have the identities of those patients?

14   A.   We have not spelled those out here, no.

15   Q.   Do you have the identities of those patients?

16   A.   I have records of those, yes.

17   Q.   Okay.  And are you able to provide the jury with the names

18   of those hundred patients?

19   A.   Not today, no.

20   Q.   No.  Okay.

21             And did you reference these hundred patients in your

22   report that you authored, what, about two years ago?

23   A.   As an overall opinion, yes.

24   Q.   But you didn't identify them, did you?

25   A.   I did not.

1    Q.   You did not provide a specific analysis of them, did you?

2    A.   I did not.

3    Q.   And in terms of whether it's the six or seven that you

4    testified to today and maybe this other hundred, who determined

5    which patient charts would be given to you?

6    A.   It was the government that provided the charts to me.

7    Q.   Okay.  So let's just say for the sake of discussion that

8    you got a hundred, 120, even 200 charts.  That still leaves

9    about 24,500 charts-plus that you did not review, correct?

10   A.   That's correct.

11   Q.   And as you sit there today under oath, you can't opine as

12   to what is in those charts or, for that matter, what's not in

13   those charts?

14   A.   Which charts are we referring to?

15   Q.   The other 24,500.

16   A.   I -- I don't have -- no, I don't have the ability to do

17   that.

18   Q.   So you can't say whether they got optimal care or didn't

19   get optimal care?

20   A.   I was given by the --

21   Q.   My question is you can't say what you weren't given,

22   correct?

23   A.   I cannot say what I wasn't given.

24   Q.   Thank you.

25            All right.  Now, have you ever watched a military

1    parade?

2    A.   Yes.

3    Q.   Either in person or on T.V. or in the movies, on the news?

4    A.   Yes.

5    Q.   You've watched them?

6    A.   I believe so, yes.

7    Q.   Okay.  And you've got hundreds or thousand of marines or

8    soldiers and they're marching in lockstep, correct?

9    A.   Correct.

10   Q.   They're marching in unison, correct?

11   A.   Correct.

12   Q.   Everyone is on the same beat?

13   A.   Correct.

14   Q.   There's no difference between each individual and that

15   entire mass of who's ever in the parade, correct?

16   A.   That's correct.

17   Q.   It's remarkable to see, fair statement?

18   A.   It is.

19   Q.   Okay.  Now, when we deal with medicine and we have

20   thousands and thousands of doctors, they don't march in that

21   same unison, do they?

22   A.   Not at -- to what you're trying to draw an analogy.

23   Q.   Don't try to think what I'm --

24        MS. McMILLION:  Objection, Your Honor.

25   BY MR. WEISS:

```
1    Q.   Just answer the question.
2            MS. McMILLION:  I'm going to object to the relevance
3    as to bands marching.
4            THE COURT:  It's relevant to set up the question that
5    the doctor's going to answer, which is whether or not medical
6    professionals perform in lockstep.
7            Go ahead and answer that if you can, Doctor, please.
8            THE WITNESS:  They don't perform in exact lockstep as
9    a band --
10   BY MR. WEISS:
11   Q.   Thank you.
12   A.   -- but they are --
13   Q.   Sir, can you answer my question please?
14           MS. McMILLION:  Your Honor, I'm going to ask --
15           MR. WEISS:  Your Honor, it's my question.  I can
16   indicate whether it's being responsive or not.
17           THE COURT:  I think -- I think the jury gets the
18   message, and ladies and gentlemen, this is jousting between
19   counsel and witness.  It happens sometimes, it's fine, but
20   you'll take the evidence that you hear and evaluate.
21           And you go ahead, Mr. Weiss.
22           MR. WEISS:  Thank you, Your Honor.
23   BY MR. WEISS:
24   Q.   You referenced, in response to some of the government's
25   questions, the term MME.  You recall that, sir?
```

1   A.   That's right.

2   Q.   Okay.  And that references morphine milligram equivalent,

3   correct?

4   A.   That's correct.

5   Q.   Okay.  And that was a phrase that was promulgated by a

6   governmental agency, correct?

7   A.   You're referring -- you're referring to --

8   Q.   MME.

9   A.   Which governmental agency?

10  Q.   Well, I just started with the governmental agency and then

11  we'll narrow it down.

12  A.   Okay.  Yes.

13  Q.   Okay.  And was it the Center for Disease Control, the CDC?

14  A.   They were not the ones that founded the term but they did

15  put it in their guidelines.

16  Q.   Okay.  And which governmental agency founded the term?

17  A.   It's actually from various societies in the literature and

18  so forth.

19  Q.   Okay.  And MME was or is a method of determining how

20  different -- excuse me.  It's a bad question.

21        Different painkillers have different potency,

22  correct?

23  A.   It's a way of sort of --

24  Q.   Well, my question is do different painkillers have

25  different potencies?

1    A.   It'd be difficult to answer your question exactly the

2    way --

3    Q.   Okay.  Then that's fine.  I'll try to answer a question

4    or -- or promulgate a question that you can answer.

5             Not all painkillers are the same, correct?

6    A.   At high level, that's correct, yes.

7    Q.   Or at any level they're not the same, are they?

8    A.   There are definitely similarities between them but --

9    Q.   My question was they're not the same, not similar.  My

10   question was they're not the same, yes or no?

11   A.   They are not exactly the same.

12   Q.   Thank you.

13            Okay.  So to try to determine dosaging and

14   prescribing, the various societies came up with a methodology

15   that they call MME, or morphine milligram equivalent, so they

16   could compare if a patient got a particular type of medication

17   versus another type of medication, correct?

18   A.   That's correct.

19   Q.   Okay.  And in 2016 the Centers for Disease Control, CDC,

20   came out with a set of guidelines, correct?

21   A.   That's correct.

22   Q.   Okay.  Now, you indicated this morning that, in part, your

23   opinions that you gave at testimony were premised upon these

24   CDC 2016 guidelines, correct?

25   A.   That's correct, in part.

Jury Trial: Volume 5 • Monday, May 23, 2022

1    Q.   Okay.  And the CDC quite specifically in their guidelines

2    indicated that these guidelines were directed towards primary

3    care physicians, correct?

4    A.   It was part of it, yes.

5    Q.   Okay.  All right.  Didn't reference pain management

6    specialists, did they?

7    A.   It was --

8    Q.   Just a yes or no.

9    A.   They did not reference pain management.

10   Q.   Thank you.  Okay.

11        And it talks about the lowest possible effective dose

12   is what a primary care physician should prescribe if he or she

13   sees fit to prescribe opioid medication, correct?

14   A.   Correct.

15   Q.   Okay.  All right.  Now, you've heard the term legacy

16   patient?

17   A.   Yes.

18   Q.   Okay.  A legacy patient is someone who has a history with

19   pain management, correct?

20   A.   A history of pain management, yes.

21   Q.   Okay.  And generally speaking, when someone gets where

22   they feel pain, they'll go to their family practitioner or

23   they'll go to a primary care physician, correct?

24   A.   That's possible, yes.

25   Q.   Okay.  And that individual will attempt to treat the pain,

1    correct?

2    A.   That's correct.

3    Q.   Okay.  And let's do a little history.  Back in the 1980s,

4    painkillers were very seldom prescribed for patients other than

5    terminal cancer patients, correct?

6    A.   That's correct.

7    Q.   Okay.  And as we got into the 90s, the pendulum sort of

8    swung somewhat and that physicians became more prevalent at

9    prescribing pain medication, correct?

10   A.   That's correct.

11   Q.   Okay.  And part of that was due to some of the big

12   pharmaceutical suppliers who were advertising their particular

13   or their manufactured pain pills, correct?

14   A.   That's correct.

15   Q.   Okay.  In fact, it got to the point where some primary

16   care physicians and family practitioners felt that if they

17   weren't prescribing large or fairly large doses of painkillers,

18   that they may be engaging in malpractice?

19   A.   There was thoughts about that, yes.

20   Q.   Okay.  And, in fact, at least one of the large

21   pharmaceutical companies told physicians that their medication

22   was not addictive, correct?

23   A.   That's correct.

24   Q.   And when a physician started to complain about patients

25   exhibiting signs of addiction, that pharmaceutical company said

1    that's pseudoaddiction, prescribe more painkillers?

2    A.   That was said, yes.

3    Q.   Okay.  And that was by Purdue Pharmaceutical, correct?

4    A.   Yes.

5    Q.   And you know Purdue Pharmaceutical, don't you?

6    A.   I do.

7    Q.   In fact, you were instrumental in getting a $1 million

8    grant from Purdue, were you not?

9    A.   It was a grant with a colleague, yes.

10   Q.   Yes, for Purdue.

11          And you also got about $35,000 from Cardinal, another

12   big pain medication manufacturer that was involved in the 90s

13   and the early 2000s, correct?

14   A.   Perhaps we can expand on that if I can give context.

15   Q.   Just answer my question.  You got $35,000 from Cardinal,

16   yes or no?

17   A.   I did receive $35,000 --

18   Q.   Thank you.

19   A.   -- from Cardinal.

20   Q.   All right.  Now, in around the late -- well, around 2010

21   when people started keeping statistics about opioid overdoses

22   and what these large pharmaceutical companies had done, the

23   alarm bells started to ring, did they not?

24   A.   Correct.

25   Q.   Okay.  Some people estimate that during that opioid crisis

1    a half a million people died getting too much pain medication,

2    correct?

3    A.   Correct.

4    Q.   Cost millions and millions and millions of dollars,

5    correct?

6    A.   Correct.

7    Q.   Okay.  So the government around 2016, we've already

8    indicated, came up with guidelines, right?

9    A.   Correct.

10   Q.   Now, they weren't supposed to be rules, correct?

11   A.   Correct.

12   Q.   They weren't supposed to be standards, correct?

13   A.   They were guidelines.

14   Q.   Guidelines.  Thank you.

15          So they're not rules and they're not standards,

16   they're not laws, they're not regulations; they're simply

17   suggestions or recommendations, correct?

18   A.   Correct.

19   Q.   And it made a point several times throughout the

20   guidelines they were not designed or intended to supplant the

21   discretion of the attending physician, correct?

22   A.   Correct.

23   Q.   Thank you.

24          But as what happens a lot with even a governmental

25   suggestion or guideline, some areas took them as gospel,

1    correct?

2    A.   Some areas, who are you referring to?

3    Q.   You know, it's -- you're right, should be a better

4    question.

5         Some pharmacies started to issue policies, and I'm

6    talking about nationwide pharmacies, about what they would fill

7    and what they wouldn't fill because they were afraid it was

8    contrary to a guideline?

9    A.   Correct.

10   Q.   So they established hard and fast policies even though it

11   was designed as a guideline for primary care physicians, right?

12   A.   Correct.

13   Q.   And insurance companies to deny coverage came up with

14   their own policies based upon what was a guideline for primary

15   care physicians, correct?

16   A.   Correct.

17   Q.   And even law enforcement agencies started to enforce what

18   they thought was a hard and fast rule when it was simply a

19   guideline for primary care physicians, correct?

20   A.   It was beyond that but -- but they did talk about the CDC

21   guidelines.

22   Q.   In fact, a lot of physicians got downright afraid and so

23   the pendulum swung back, correct?

24   A.   Correct.

25   Q.   All right.  Now, the 2016 guidelines were not the last

1    concept to be thrown into this mix, correct?

2    A.   Correct.

3    Q.   The AMA the following year, the American Medical

4    Association, issued its own paper criticizing those guidelines,

5    correct?

6    A.   Correct.

7    Q.   Okay.  Felt that they were too rigid, correct?

8    A.   Correct.

9    Q.   Even though they were guidelines, they felt they were too

10   rigid?

11   A.   There were elements that they felt were too rigid, yes.

12   Q.   Okay.  And they were concerned about patients not being

13   cared for, correct?

14   A.   As an overarching blanket, yes.

15   Q.   All right.  Again, because the pendulum had swung back,

16   insurance companies, law enforcement, pharmacies and even some

17   physicians were -- didn't want to run afoul of a guideline.

18   Patients weren't being taken care of, right?

19   A.   There was risk of that, yes.

20   Q.   Okay.  Patients weren't getting the medication that they

21   were entitled to receive, correct?

22   A.   There were instances of that.

23   Q.   The instances of suicide was increasing at alarming rate,

24   correct?

25   A.   Correct.

1    Q.   In fact, the CDC indicated that in the first year they had

2    over 3,000 complaints, right?

3    A.   Correct.

4    Q.   Eighty-four percent were afraid that they wouldn't get

5    their legitimate painkillers, correct?

6    A.   I don't know the exact numbers but there were concerns,

7    yes.

8    Q.   Okay.  Forty-two percent indicated that they were con --

9    seriously contemplating suicide 'cuz they couldn't get

10   treatment, correct?

11   A.   Again, I don't have a way to cite the statistics that

12   you're reporting.

13   Q.   I think you mentioned earlier today that that some

14   patients can build up a tolerance to painkillers, correct?

15   A.   Correct.

16   Q.   Okay.  And that's just -- that's just part of the -- the

17   medicine that people like yourself and these physicians deal

18   with every day, that people may develop a tolerance, correct?

19   A.   That's correct.

20   Q.   Okay.  And sometimes it's the quantity of the medication

21   they received?

22   A.   Correct.

23   Q.   Sometimes it's the amount of years over which they've

24   received the medication?

25   A.   Correct.

1  Q.  And their prior history and their physiological makeup,

2  correct?

3  A.  Correct.

4  Q.  Okay.  So in addition to the CDC and the AMA, we have

5  ASIPP.  You're familiar with ASIPP?

6  A.  Yes.

7  Q.  And would you relate to the jury what ASIPP is as you

8  understand it?

9  A.  So ASIPP is a pain management society.  It stands for

10  American Society of Interventional Pain Physicians.

11  Q.  Are you a member of that society?

12  A.  I have been in the past, yes.

13  Q.  Are you currently a member?

14  A.  I am not.

15  Q.  Okay.  And they came up with their own guidelines,

16  correct?

17  A.  Correct.

18  Q.  Okay.  And they're not the only society or organization of

19  pain physicians that issued guidelines as well, correct?

20  A.  Correct.

21  Q.  Okay.  So we have a number of -- well, we have the CDA, we

22  have the AMA, we've got ASIPP, we've got other organizations

23  that are all issuing guidelines, correct?

24  A.  Correct.

25  Q.  Sometimes they're on the same page and sometimes they're

1   not, correct?

2   A.   They're not exactly the same as the CDC but they still

3   have elements of that in there.

4   Q.   Okay.  And organizations being what they are, sometimes

5   they follow the -- the political dictates of their members,

6   correct?

7   A.   The political dictates of their members, I'm not sure what

8   you mean.

9   Q.   If you don't understand, just indicate that you don't.

10  A.   I'm not -- I'm not aware of what you mean.

11  Q.   Okay.  All right.  But sometimes politics gets involved in

12  the formulation of guidelines in the practice of medicine,

13  correct?

14  A.   Politic -- I'm -- I'm -- I don't know how to answer that.

15  Q.   Okay.  That's fine.

16        So you got all of these guidelines and you ask a

17  physician to practice his or her craft when all these things

18  are floating around, correct?

19  A.   Correct.

20  Q.   Okay.  And just so we're clear, the indictment alleges,

21  and it's just an allegation, between 2013 and 2018, right?

22  A.   Correct.

23  Q.   Okay.  The CDC didn't come out with their guidelines until

24  2016, correct?

25  A.   Correct.

1   Q.   And of all the things we would like our pain management

2   physicians to do and to be, clairvoyance is not one of them,

3   correct?

4   A.   I'm not sure how you're using the word clairvoyance.

5   Q.   In 2013, did you expect any of these physicians to be able

6   to predict what the CDC would do in 2016?

7   A.   No.

8   Q.   All right.  That's what I mean about being clairvoyant.

9   A.   Okay.

10  Q.   But I appreciate the clarification.  Thank you, sir.

11       The government asked you about do most lower pain

12  problems, lower pain -- lower back pain clear -- clear up

13  within three months.  Do you recall that?

14  A.   I believe so, yes.

15  Q.   Okay.  And your answer was in the affirmative, that they

16  do, correct?

17  A.   In the acute pain situations, yes.

18  Q.   Okay.  Well, let's talk a little bit about that 'cuz you

19  mentioned the word acute.  Acute pain generally refers to pain

20  that is resolved or hasn't lingered for over three months,

21  correct?

22  A.   More the latter statement, yes.

23  Q.   Okay.

24  A.   Yeah.

25  Q.   So if you have acute pain and you go to your primary care

1    physician and he or she, either it's Tylenol or aspirin or

2    maybe even one or more of the Schedule IIs, if that pain goes

3    away within that three-month period, people in your field

4    generally refer to it as acute pain, correct?

5    A.   That is correct.

6    Q.   Okay.  But when we have pain that is not resolved within

7    that three-month period and lingers and continues on past the

8    three months, we can refer to it as chronic pain, correct?

9    A.   That's correct.

10   Q.   Okay.  So by definition, chronic pain is not going to go

11   away less than three months?

12   A.   It would not go away but it has a chance to change.

13   Q.   It has a chance, yeah, sure, and I have a chance to win

14   the Lotto.  We don't know when it's going to go away, do we?

15   A.   We don't have a prediction, no.

16   Q.   Thank you.

17           In fact, being uncertain as to when that pain's going

18   to go away, we're not certain if it will ever go away, correct?

19   A.   Correct.  We talked about functional changes, pain

20   improvements, right.

21   Q.   Okay.  So a lot of pain is progressive?

22   A.   Progressive in the sense that it's getting worse?

23   Q.   Getting worse and continues.

24   A.   There's a chance of that.

25   Q.   Okay.

1    A.   Yes.

2    Q.   And particularly when we're dealing with back pain and the

3    patient gets older, it can progress?

4    A.   It can progress.

5    Q.   Okay.  All right.  Let -- and let's talk a little bit

6    about progressive pain, okay?  How does arthritis affect back

7    pain?

8    A.   Arthritis can or cannot be a contributor to pain.

9    Q.   Okay.  And generally speaking, people get arthritis, at

10   least where it becomes noticeable or pronounced, as they get

11   older, correct?

12   A.   There's a chance of that, yes.

13   Q.   Okay.  And there's also rheumatism?

14   A.   Yes.

15   Q.   And that can contribute to pain?

16   A.   Correct.

17   Q.   And again, we -- some of the patient population seems to

18   get that as they get older?

19   A.   That's correct.

20   Q.   Okay.  And we don't have, we meaning med -- medicine,

21   doesn't have a lot of really good answers as to how to deal

22   with arthritis and rheumatism, fair statement?

23   A.   That's a fair statement.

24   Q.   Okay.  So a patient, through no fault of his or her

25   physician, may be on some form of treatment or pain medication

1    for long periods of time, correct?

2    A.   That's correct.

3    Q.   Okay.  And through no fault of the physician, it could go

4    on for months or years, correct?

5    A.   That's correct.

6    Q.   Having nothing to do with the competency of the physician,

7    fair statement?

8    A.   Correct.

9    Q.   Or the billing practices of that particular clinic,

10   correct?

11   A.   That's correct.

12   Q.   It's just a matter that medicine, at least in the area of

13   pain management, doesn't have all the answers?

14   A.   We're -- we're talking about individual patients, but yes.

15   Q.   Yeah.  Okay.  You don't have all the answers?

16   A.   Correct.

17   Q.   And I don't mean that to be in a negative or condescending

18   sense; it's just the nature -- it's just the nature of the

19   beast.

20   A.   Correct.

21   Q.   You guys are doing research and trying to get the answers,

22   but at least between 2013 and 2018 pain management didn't have

23   all the answers, correct?

24   A.   Correct.

25   Q.   Okay.  And we talked a few moments ago about the pendulum

1    swinging back and forth in terms of virtually no pain

2    medication, maybe overprescribing in the 19 -- 1990s, early

3    2000s, and then cutting back around 2010 or so.

4            When the primary care physicians and the family

5    practitioners sort of saw the writing on the wall and started

6    to cut back, some of them did the best they could with their

7    patients, correct?

8    A.   Correct.

9    Q.   Some of them just cut the patients loose, correct?

10   A.   That's -- that's true too.

11   Q.   I'm not going to treat you anymore for whatever reason,

12   just go away.

13   A.   Yes.  They -- they would either refer them or, yes, they

14   may do that too.

15   Q.   Okay.  And some of them did refer them, correct?

16   A.   Correct.

17   Q.   Okay.  In the patient charts that you reviewed that the

18   government gave you, were you able to ascertain the number of

19   those patients that were referred to my client and his

20   colleagues from another physician?

21   A.   There were a number of them.

22   Q.   Okay.  When you refer a patient to another physician -- do

23   you do that, by the way?

24   A.   I do.

25   Q.   Do you generally refer the patient to a physician that you

1    respect and trust or someone that you could care less about?

2    A.   To someone I care and trust about.

3    Q.   Okay.

4    A.   Or trust.

5    Q.   And to your knowledge, do most physicians do that?

6    A.   Yes.

7    Q.   Okay.  So the fact that these patients, at least a

8    significant number of them, were referred by other physicians

9    is an indication that maybe they knew what they were doing and

10   that they were good physicians, correct?

11   A.   That they were good physicians, yes.

12   Q.   Okay.  Thank you.

13        Now, the guidelines in 2016 from the CDC was not the

14   last that we heard from the CDC, correct?

15   A.   Correct.

16   Q.   Okay.  I believe in 2019 the authors of the CDC guidelines

17   write an article for the New England Journal of Medicine,

18   correct?

19   A.   Correct.

20   Q.   Okay.  And the authors of -- of the 2016 guidelines were

21   critical of the way governmental agencies, insurance companies,

22   pharmacies, law enforcement were all massaging their guidelines

23   to fit what they wanted to do, correct?

24   A.   I wouldn't say that.

25   Q.   Okay.  That's fine.  All right.  But they were critical of

1    what that happened and how those guidelines were being utilized

2    by various segments of our population, correct?

3    A.   They were concerned about unintended consequences of their

4    guidelines, yes.

5    Q.   Okay.  And unintended consequences meant that a lot of

6    patients were not getting their legitimate medication, correct?

7    A.   Correct.

8    Q.   They were concerned that a lot of pharmacies were not

9    filling legitimately issued -- or excuse -- legitimate -- yeah,

10   legitimately issued prescriptions?

11   A.   Correct.

12   Q.   They were concerned about their colleagues being looked at

13   by governmental agencies and law enforcement as somehow doing

14   something wrong?

15   A.   Correct.

16   Q.   Thank you.

17          And just a couple of months ago they came out with a

18   draft of a whole new set of guidelines, correct?

19   A.   I wouldn't say it was all new.  It was -- it was an update

20   on those.

21   Q.   Okay.  And it dealt with the critiques that we've

22   previously discussed this afternoon?

23   A.   Correct.

24   Q.   And it discussed some admittedly new areas where research

25   post-2016 has taken us, correct?

1    A.   Some, yes.

2    Q.   In fact, post-2018, correct?

3    A.   Maybe you can specify what research you're referring to.

4    Q.   Well, I'm talking about they were going into areas of --

5    on the basis of studies that were published in 2020, 2021 about

6    new methodologies or prospective new methodologies of creating

7    chronic pain.

8    A.   I mean perhaps you can give me details on those, but there

9    was more evidence taken into those guidelines, I would say

10   that, yes.

11   Q.   Okay.  And there were a number of studies published since

12   the time of this indictment as to where pain management may end

13   up going?

14   A.   They're not studies.  They're opinion pieces or guidelines

15   that may evolve, yes.

16   Q.   All right.  I'll -- I'll -- I'll accept your opinion

17   pieces and studies.

18        The opinions relating to pain management are still

19   evolving?

20   A.   Yeah, I -- I would say that they're evolving with small

21   modifications of what we've seen, right, yes.

22   Q.   All right.  But that's the way medicine as a whole works,

23   correct?

24   A.   Correct.

25   Q.   Someone does a study, publishes their results, and other

```
1    physicians in that area either try to duplicate those results
2    or build upon those results and go off on to something else,
3    correct?
4    A.   Correct.
5    Q.   After all, pain management is supposed to be evidence
6    based?
7    A.   Correct.
8    Q.   And evidence is not derived from simply one study?
9    A.   Correct.
10   Q.   You want to see massive studies?
11   A.   As many as you can.
12   Q.   Okay.  And even when someone publishes it, the literature
13   is full of some people support it, some people critique it,
14   some -- sometimes you're in a no-man's-land as to where you're
15   going to go and what you're going to do?
16   A.   There can be differing opinions, yes.
17   Q.   Thank you.
18          And one of the 2022 draft guidelines that build upon
19   the 2016 guidelines deals with discontinuing a patient,
20   correct?
21   A.   Correct.
22   Q.   All right.  They're concerned about the -- I think pain
23   management physicians use the word taper?
24   A.   Correct.
25   Q.   Okay.  And would you explain to the jury what taper or
```

1  tapering is?
2  A.   Tapering is basically over time reduction in the number of
3  either pills or dosage of the medication so the overall usage
4  of that medication is declining.  That can be over short or
5  long periods.
6  Q.   Okay.  And they are suggesting to the clinician to be
7  really careful about tapering, correct?
8  A.   They're suggesting to be aware of that.
9  Q.   Yeah.  Okay.
10  A.   Yeah.
11  Q.   In fact, I think it uses the phrase forced tapering.
12  A.   Forced tapering, which is a different phenomenon, yes.
13  Q.   Okay.  And that's when the physician hard and fast, "I'm
14  going to cut you in half, I'm going to do this," without taking
15  into account what the patient is going through, correct?
16  A.   Well, it's part of the overall broader perspective, yes.
17  Q.   Okay.  But they counsel against this forced tapering
18  phenomenon, correct?
19  A.   In the absence of other treatments.
20  Q.   Okay.  And so whether it's weaning or tapering, I mean in
21  one part of the 2022 guidelines even a ten percent reduction
22  may be unwarranted given what the patient presents, correct?
23  A.   I wouldn't say ten percent but --
24  Q.   I'm not saying it; it's -- it's in the 2022 draft.
25  A.   There can be cases, yes.  The ten percent could be --

1    Q.   Okay.  It does --
2            THE COURT REPORTER:  Wait.  Mr. Weiss, you keep
3    cutting the witness off.
4            MR. WEISS:  And I -- all right.
5    Q.   In the 2022 draft it mentions ten percent, correct?
6    A.   It does.
7    Q.   Okay.  One of the other topics that the government asked
8    you about was bilateral procedures.  Do you recall that, sir?
9    A.   I do.
10   Q.   Okay.  And there are times when a bilateral procedure is
11   appropriate, correct?
12   A.   Correct.
13   Q.   Okay.  And the government also questioned you about
14   sedation, correct?
15   A.   Correct.
16   Q.   And there's some controversy, there's some disagreement
17   among clinicians about how often to use sedation, correct?
18   A.   I would say it -- probably not very much, no.
19   Q.   Not very -- okay.
20           Do you recall back in 2020 being part of a
21   point-counterpoint?
22   A.   Yes.
23   Q.   Okay.  And you and another clinician advocated for
24   conscious sedation, correct?
25   A.   There was --

1   Q.   Just -- it's a yes or no.  Did you advocate for conscious

2   sedation at that point-counterpoint?

3   A.   It was for specific cases.  If you want to cite that

4   paper, that's --

5   Q.   We'll get to the paper in a second.

6   A.   Okay.

7   Q.   But you did advocate for it, correct?

8   A.   I advocated for --

9   Q.   Okay.

10  A.   -- particular --

11  Q.   Okay.  And there were other physicians --

12          THE COURT REPORTER:  Mr. Weiss, you cut his answer

13  off.  "I advocated for..."

14  A.   Particular instances.

15  Q.   Okay.  And there were other physicians that advocated

16  against, correct?

17  A.   That's correct.

18  Q.   Okay.  And I think as part of your argument for conscious

19  sedation, you referenced 64 percent of clinics utilize

20  conscious sedation in their procedures.  Do you recall that

21  number, sir?

22  A.   That was a background --

23  Q.   Well, background, but you use the number 64, correct?

24  A.   But it was not a -- a judgment on whether that's

25  appropriate or inappropriate.  Is that what you're trying to --

1    Q.   So you referenced 64 even though it may not have been
2    accurate?
3    A.   It was purely just a prevalence.
4    Q.   It was just a premise?
5    A.   Prevalence.
6    Q.   Prevalence?
7         So did you or did you not make up the number 64?
8    A.   No, I did not make it up.
9    Q.   So you got that from somewhere, correct?
10   A.   Correct.
11   Q.   So someone did a study of pain management clinics in and
12   around 2016, and 64 percent of them were using some form of
13   sedation when they did their procedures, correct?
14   A.   Correct.
15   Q.   Thank you.
16        Let's talk a moment about durable medical equipment,
17   correct?
18   A.   Mm-hmm, yes.
19   Q.   Okay.  It's not really a question.  I apologize.
20        A brace, durable medical equipment, goes outside the
21   body, correct?
22   A.   Correct.
23   Q.   Okay.  So you don't need any surgery?
24   A.   I -- are you trying to equate the two?
25   Q.   Well, no, no, I'm just trying to ask a question.  To put a

1   back brace on, such as my colleague has, it doesn't require any

2   surgery to apply it, correct?

3   A.   Okay.  So no, the placement of it does not require

4   surgery.

5   Q.   Okay.  And it doesn't constitute a Schedule II opioid,

6   does it?

7   A.   It does not.

8   Q.   Okay.  And it is probably one of the most innocuous

9   quivers that a pain management physician has in her -- one of

10  the most innocuous, yeah --

11          THE COURT:  Arrow --

12  Q.   -- arrows --

13          THE COURT:  -- that he has in his quiver.

14  Q.   -- in his quiver.

15          THE COURT:  Or she.

16          Go ahead.

17  Q.   Correct?

18  A.   You've got --

19  Q.   One of the most innocuous arrows that a pain management

20  physician has in his or her quiver to help the patient with

21  back pain, correct?

22  A.   In terms of the risk of a brace, is that what you're

23  asking for, or durable medical equipment?

24  Q.   All I'm asking is --

25  A.   I don't -- I don't think of --

1  Q.  Okay.

2  A.  -- arrows --

3  Q.  Just trying to figure out -- since it doesn't involve

4  surgery, it doesn't involve ingesting anything, it doesn't

5  involve being sedated.  All it is is placing an object on the

6  outside of the body in the hope that it may help that

7  particular patient.  So in terms of the -- the -- what the pain

8  management specialist has at her -- his or her disposal, it's

9  relatively innocuous?

10 A.  So again, I mean you're -- you're specifying risk of harm

11 with this treatment, that's what you're trying to allude to?

12 Q.  I'm just trying to ascertain whether or not in the entire

13 spectrum of items that the pain management physician can do,

14 the brace has got to be towards the end of the most innocuous.

15 A.  So I -- I will say that it is on the lower end of risk to

16 the patient, correct.

17 Q.  Okay.  When the government gave you -- or strike that.

18      I think we've already indicated that pain management

19 is not infallible, correct?

20 A.  Infallible?

21 Q.  Infallible meaning that it doesn't cure everyone?

22 A.  Correct.

23 Q.  Okay.  In fact, the literature talks about that if a

24 particular methodology has a 30 percent success rate, then

25 that's pretty good, correct?

1    A.   Actually, no.  Thirty percent is actually thought to be

2    close to placebo.

3    Q.   I see.  Okay.  Are you familiar with Raj's *Practical Pain*

4    *Management of Pain*?

5    A.   Yes.

6    Q.   An authoritative text, correct?

7    A.   It is a good quality text, yes.

8    Q.   Okay.  And we've already talked about the CDC guidelines

9    in 2016?

10   A.   Correct.

11   Q.   And we've talked about the 2022 draft of the CDC

12   guidelines, correct?

13   A.   Correct.

14   Q.   Okay.  And one item we haven't spoken about but maybe we

15   should get to it before I go further is are you familiar with

16   the *Pain Management Best Practices*?

17   A.   Yes.

18   Q.   Okay.  Do you find that to be an authoritative text?

19   A.   I do, yes.

20   Q.   And are you familiar with the *Pain Physician*?

21   A.   Yes.

22   Q.   Okay.  Authoritative publication?

23   A.   It's a good quality journal.

24   Q.   Pardon?

25   A.   It's a good quality journal

1    Q.   Okay.  And I think we also referenced the AMA critique

2    that came out in 2020 of the 2016 guidelines, correct?

3    A.   Correct.

4    Q.   All right.  And it is your position that 30 percent

5    success rate doesn't mean anything?

6    A.   It needs to be taken in context of the study, so --

7    Q.   Okay.

8    A.   Yes.

9    Q.   All right.  Did the -- what about 60 percent, how would

10   you feel about that?

11   A.   Sixty percent success rate of a treatment?

12   Q.   Yeah, 60 percent of patient population felt that a

13   particular procedure was providing benefit to them.

14   A.   Yes.

15   Q.   Okay.

16   A.   I would agree with that.

17   Q.   How about -- let's go a little bit lower, 57 or

18   58 percent.  Would that be something that should be pursued by

19   the clinician?

20   A.   It's, again, looking at a study for a particular group of

21   patients in that study, did they have success.  Yes, that --

22   I -- I would agree with that number.

23   Q.   Okay.  Did the government tell you that a survey of

24   patients was done involving hundreds and hundreds of patients?

25            MS. McMILLION:  Objection, Your Honor.  Facts not in

```
1    evidence.
2            MR. WEISS:  I just asked whether they told him.
3            THE COURT:  I think that's okay.  Go ahead and finish
4    your question, Mr. Weiss.
5    BY MR. WEISS:
6    Q.  Did they tell you that?
7    A.  I don't think you finished what you were asking.
8    Q.  Did the government tell you that the Pain Center did a
9    survey of hundreds and hundreds of patients?
10   A.  No.
11   Q.  I think the approximate number was about 1500.  They did
12   not?
13   A.  No.
14   Q.  So then they didn't tell you what the success rate of
15   bracing was for that patient population?
16   A.  I did not know that, no.
17   Q.  Okay.  But if it was 57, 58 percent, according to you,
18   that would be significant, correct?
19   A.  Fifty-eight percent of patients felt it helped, is that
20   what you're saying?
21   Q.  Yes.
22   A.  It would be significant.
23   Q.  Okay.  And when a clinician goes down a particular path,
24   they may have an idea of what will work and what won't, but
25   they have to go on the basis of their education and training
```

```
 1    and experience, correct?

 2    A.   Correct.

 3    Q.   And their -- as part of experience, what's worked for them

 4    in the past and their patient population, correct?

 5    A.   Correct.

 6    Q.   Of all the patients that the government gave you charts

 7    for, admittedly you never saw any of them, correct?

 8    A.   We talked about the paper charts and we talked about --

 9    Q.   No, did you see them?  Did you actually treat them in --

10    A.   Oh, individual patients?  No.

11    Q.   Okay.

12              THE COURT REPORTER:  Wait, wait.  You both talked on

13    top of each other.  "Did you actually treat them in..."  Mr.

14    Weiss, then you said...

15    Q.   Clinical setting.

16    A.   I did not.

17              THE COURT REPORTER:  Thank you.

18              THE COURT:  Let's remind the jurors that the

19    questions of counsel are not evidence; the answers of the

20    witnesses are.  So in terms of studies that were -- that were

21    conducted, there's no proof of that, but there is a conclusion

22    that if a study achieved 58 percent success, that would be

23    significant.  So that's the evidence in the case, okay?  All

24    right.

25              Go ahead, Mr. Weiss.
```

 1          MR. WEISS:  Thank you, Your Honor.
 2    BY MR. WEISS:
 3    Q.   You indicated as part of your preparation in this matter
 4    that you viewed undercover videos.
 5    A.   That's correct.
 6    Q.   You recall that?
 7          And some of them were played to the jury earlier
 8    today, correct?
 9    A.   Correct.
10    Q.   All right.  Are you familiar with a patient by the name of
11    Andrew Peterson?
12    A.   Yes.
13    Q.   Okay.  He presented to the clinic five, six times?
14    A.   I believe so, yes.
15    Q.   All right.  And you reviewed the videos of all of those
16    encounters?
17    A.   I believe three to four of them.
18    Q.   Okay.
19    A.   Yeah.
20    Q.   The ones that the government gave you?
21    A.   Correct.
22    Q.   Okay.  So they didn't give you all of them?
23    A.   I can't recall to --
24    Q.   Okay.
25    A.   -- the extent of all those videos.

1   Q.  But whatever ones you reviewed, okay, my next question's

2   going to be based on that.  The government asked you about the

3   propriety or impropriety of the issuance of a prescription on

4   having an injection, correct?

5   A.  Correct.

6   Q.  Okay.  And you gave your opinion on that, correct?

7   A.  Correct.

8   Q.  In any of the videos where Andrew Peterson was a patient,

9   did any of the clinicians indicate no injection, no script?

10  A.  They did not.

11  Q.  Thank you.

12          MR. WEISS:  Your Honor, may I have some guidance as

13  to how long the Court intends to go this afternoon?

14          THE COURT:  Um, I'd -- roughly another half hour or

15  so.  How long do you intend to go this afternoon?

16          MR. WEISS:  I think it'll be a little bit longer than

17  that, and I'm going into an area that I'm going to need to set

18  up some audiovisual and that's why I was asking 'cuz I'm going

19  to beg the Court's indulgence on time.

20          THE COURT:  Well, we can take a comfort break, right,

21  ladies and gentlemen?  They don't seem particularly

22  enthusiastic.  But how long do you need to set up the

23  technology?

24          MR. WEISS:  I'm going to have to talk to Mr.

25  Rogalski.  It's going to take a few moments.

```
1        THE COURT:  All right.  Let's take a comfort break
2    till 3:00, we'll go to about 3:20, maybe 3:30, and then we'll
3    call it a day, okay?
4        MR. WEISS:  Thank you, Your Honor.
5        THE COURT:  And if you're done in that time, that's
6    good.  If not, we'll be here tomorrow.
7        All right.  Let's rise for our jury, ten-minute
8    break.
9        (Jury excused at 2:54 p.m.)
10        (Court in recess)
11        (Proceedings resumed at 3:00 p.m., all parties
12        present)
13        THE LAW CLERK:  All rise for the jury.  Court is back
14    in session.
15        (Jury entered the courtroom at 3:01 p.m.)
16        THE COURT:  Okay.  Everybody may be seated.  Good
17    timing on that one.  We called a ten-minute break and we went
18    for 11.  That was excellent.
19        Mr. Weiss is ready to go and we're back at it at
20    3:01 p.m.
21        MR. WEISS:  Thank you, Judge.
22    BY MR. WEISS:
23    Q.  Sir, does the name Henderson Butler mean anything to you?
24    A.  Not that I can recall.
25    Q.  Okay.  Did the government reference that an undercover by
```

1    the name of Henderson Butler went to the clinic on several

2    occasions?

3    A.   I can't recall offhand.

4    Q.   Okay.

5         MR. WEISS:  I believe -- Your Honor, with the Court's

6    permission, we would like to play what's previously been

7    admitted as Government's Exhibit 1.

8         THE COURT:  Okay.

9         MR. WEISS:  Thank you.

10        (Video being played)

11        THE COURT:  What are we doing here?  I don't

12   understand why we're playing all this tape.

13        MR. WEISS:  One of the issues -- excuse me.  One of

14   the government complaints that this witness testified to was

15   regarding the unnecessary utilization of a back brace,

16   durable -- durable medical equipment.

17        THE COURT:  Okay.

18        MR. WEISS:  There was no training, there was no

19   instruction, it was just thrown at them.  To my knowledge, this

20   is the only interview where a back brace is given to a patient

21   that is on tape, and it shows everything leading up to it as

22   well as Brittany Caldwell, the physician assistant, fitting the

23   individual, Henderson Butler, showing how to utilize it and Mr.

24   Butler at the end commenting how good it feels.  I think in

25   order to have a complete picture of what went on at the pain

1    clinic regarding durable medical equipment, I respectfully

2    submit the jury should review this in its entirety.

3                THE COURT:  Okay.  Have you seen this?

4                THE WITNESS:  Not that I recall.

5                THE COURT:  Okay.  All right.  I think we can speed

6    through some of these things like him whistling in the bathroom

7    or whatever he's doing here.

8                MR. WEISS:  I didn't want to cut anything out, but

9    if -- if the Court --

10               THE COURT:  I don't think --

11               MR. WEISS:  -- would like us to get to --

12               THE COURT:  -- I -- yeah, I think we can -- if the

13   government's okay with that, and I'm sure they are, I think we

14   can move this along a little bit.

15               MS. McMILLION:  Your Honor, we're perfectly fine with

16   just fast forwarding to where he meets with --

17               THE COURT:  Yeah, yeah, yeah, yeah.

18               MS. McMILLION:  -- the physician assistant.

19               THE COURT:  Yeah, I think that's a good idea.

20               MR. WEISS:  As long as you'll allow Mr. Rogalski to

21   use his discretion to fast forward.

22               THE COURT:  Yeah.

23               MR. WEISS:  And I don't think there's an objection

24   either.

25               THE COURT:  Yeah, I -- I -- I think that's a good

1    idea.  Thank you very much.

2              MR. WEISS:  Thank you, Your Honor.

3              (Video being played)

4    BY MR. WEISS:

5    Q.   Sir, is it your testimony that you've never seen this

6    video before?

7    A.   Correct.

8    Q.   Pardon?

9    A.   That's correct.

10   Q.   Okay.  So you saw the physician assistant Brittany

11   Caldwell fit the brace on the patient, correct?

12   A.   Correct.

13   Q.   She adjusted it for him, correct?

14   A.   That's correct.

15   Q.   Showed him how to do it, correct?

16   A.   Correct.

17   Q.   And he commented at least twice on how good it felt,

18   correct?

19   A.   That's correct.

20   Q.   Okay.  So is it fair to say that for this particular

21   patient on that particular day, no one just threw a back brace

22   at him and had him leave the clinic, correct?

23   A.   Not in this instance.

24   Q.   Okay.  Thank you.

25             MR. WEISS:  Your Honor, that completes the -- this

1    one area.  I notice that it's 3:23.  I don't know if this was

2    approximately the time the Court wanted to break for the day.

3            THE COURT:  I think you can -- we can make a little

4    more headway 'cuz we didn't -- that was a long video and we

5    didn't accomplish much during it, so I think we ought to press

6    on a little bit.

7    BY MR. WEISS:

8    Q.  Is it fair to say that clinical decisions should be based

9    on a relationship between the clinician and the patient?

10   A.  If you're -- if you're referring to shared decision

11   medical making with the patient?

12   Q.  I'm -- I'm referring to when the clinician is going to

13   make decisions and make recommendations, that there has to be a

14   relationship between the clinician and the patient.

15   A.  So you're -- for clarification, you're saying that there's

16   an established patient/doctor relationship and that's how --

17   Q.  Not necessarily established because even at the first

18   meeting, even at the initial intake, chances are at the end of

19   that meeting the clinician is going to make recommendations and

20   suggestions to that patient, correct?

21   A.  Correct.

22   Q.  Okay.  So the two of them at least have established some

23   type of rapport so the clinician's suggestions and

24   recommendations perhaps will be more readily accepted and have

25   a greater understanding of why those recommendations are being

1    made.

2    A.   It's possible, yes.

3    Q.   Okay.  All right.  And particularly when we deal with

4    chronic pain, it becomes a little bit more acute because by

5    definition, the person's in a little bit of discomfort,

6    correct?

7    A.   You're -- you're suggesting acute on chronic pain, is

8    that -- no.

9    Q.   No, I'm suggesting that because the person has chronic

10   pain, there may be some physical discomfort as a result of that

11   chronic pain?

12   A.   Yes, they have pain.  Yes, they have discomfort.

13   Q.   Okay.

14   A.   Yes.

15   Q.   Okay.  And so if you're in pain, then there's some

16   discomfort associated with that and it becomes a little bit

17   more difficult to perhaps concentrate or communicate because

18   either your back is throbbing or your shoulder or something

19   else is causing you that constant pain, correct?

20   A.   It's theoretically possible but not always the case.

21   Q.   Okay.  All right.  And just so we're clear, at least as it

22   relates to musculoskeletal pain, some studies estimate that 43

23   percent of the adult population in the United States has some

24   level of pain emanating from that area.

25   A.   There's been all sorts of statistics, but that's -- that's

1    about --

2    Q.  You don't dispute the 43 percent that I'm referencing to

3    you, do you?

4    A.  I mean if you want to cite the reference, but it --

5    you're -- you're giving me a number, so I know it is a

6    prevalence.  There is low back pain --

7    Q.  How about -- how about for CDC recommendations of 2016,

8    okay?

9    A.  Okay.

10   Q.  And the sources of that 43 percent can be because of

11   arthritis?

12   A.  Correct.

13   Q.  Rheumatism?

14   A.  Correct.

15   Q.  Chronic back or neck problems?

16   A.  Well, that's sort of a open-ended thing, but yes,

17   that's --

18   Q.  I didn't write it.

19          Frequent headaches?

20   A.  Yes.

21   Q.  Okay.  And they also estimate that at least 11 percent of

22   adults have pain on a daily basis?

23   A.  Correct.

24   Q.  Okay.  And long-term treatment may be necessary for some

25   of these patients that present, correct?

1    A.   That's correct.

2    Q.   Okay.  And that may include nonopioids --

3    A.   Not --

4    Q.   -- according to the -- the course of treatment?

5    A.   Correct.

6    Q.   It may include non-pharmacy -- pharmacological treatments

7    at all, correct?

8    A.   Correct.

9    Q.   But it may necessitate injections?

10   A.   Correct.

11   Q.   And opioids or narcotics, correct?

12   A.   Correct.

13   Q.   All right.  In fact, and I think we touched upon this a

14   little bit earlier this afternoon, generally speaking, when a

15   patient presents with acute pain and they go to their primary

16   care physician or their family practitioner, that clinician

17   will prescribe something to treat the pain, correct?

18   A.   Potentially, yes.

19   Q.   And a lot of times it works?

20   A.   That's correct.

21   Q.   But a significant segment of our population, particularly

22   adults, it doesn't always work?

23   A.   Correct.

24   Q.   Okay.  And so you go to an interventionalist to try to

25   deal with the source of the pain, correct?

1    A.   Correct.

2    Q.   And by definition, an interventionalist will, within his

3    or her discretion and education and experience, recommend

4    interventional procedures, correct?

5    A.   Correct.

6    Q.   Okay.  And some of those procedures can be injections?

7    A.   Correct.

8    Q.   They can be diagnostic?

9    A.   Correct.

10   Q.   They can be therapeutic?

11   A.   Correct.

12   Q.   And if the criteria are met, I think you referred to it as

13   RFA, radiofrequency ablations?

14   A.   You -- you mentioned criteria, but yes, I did talk about

15   radiofrequency ablation.

16   Q.   Yeah, okay.  And again, you go through the -- and we'll go

17   through it if not this afternoon, hopefully tomorrow.

18              THE COURT:  How much -- how much total more do you

19   have, Mr. Weiss?

20              MR. WEISS:  I would think at least an hour, Judge.

21              THE COURT:  Okay.  Why don't we go ten more minutes

22   and then we'll call it a day.

23              MR. WEISS:  Thank you.

24   BY MR. WEISS:

25   Q.   Most of these guidelines that we've talked about this

1    afternoon reference that if opioids are going to be prescribed,

2    that it be part of a multimodal, multi -- multidisciplinary

3    approach, correct?

4    A.   Correct.

5    Q.   Okay.  You don't want to just prescribe opioids in the

6    absence of anything else?

7    A.   Correct.

8    Q.   Okay.  And so from a academic perspective, if somebody is

9    simply seeking pills, there's no reason for them to be at an

10   interventionalist, correct?

11   A.   You -- if that's the only thing that they want and they

12   don't agree to any of the other therapies?

13   Q.   Yes.

14   A.   And you have concern about what those medications are

15   going to be used for?

16   Q.   Yes.

17   A.   Correct.

18   Q.   Okay.

19   A.   Yes.

20   Q.   So on one level, refusing to take injections when the

21   clinician feels that that is part of the multimodal,

22   multidisciplinary approach and only wants painkillers, the

23   physician may consider it appropriate to say, "It's got to be

24   part of the entire protocol 'cuz I'm not just going to write

25   you a painkiller."

1  A.   That's correct.

2  Q.   Okay.  So on one level, no injections, no pills may be the

3  appropriate methodology for treating or dealing with that

4  particular pill seeker?

5  A.   It's some patients that way, yes.

6  Q.   Okay.  Thank you.

7       You mentioned billing as part of your testimony on

8  direct examination, correct?

9  A.   Correct.

10 Q.   Okay.  A number of the recommendations by the CDC and some

11 of the private organizations also called to task insurance

12 companies, whether they be governmental or private, in terms of

13 refusing to adequately compensate the clinician for various

14 procedures that -- that the clinician feels are appropriate.

15 A.   This may be what you're referring to as the political

16 things earlier?

17 Q.   No, I'm not referring to political.  I'm talking about

18 finances, okay?

19      Some insurance carriers -- well, let me back that up.

20 Different insurance carriers have different coverages, correct?

21 A.   Correct.

22 Q.   Okay.  Some will pay for X number of injections per year,

23 some will pay for Y number of injections per year, correct?

24 A.   Correct.

25 Q.   Okay.  It doesn't necessarily mean that X is the optimal

Case 2:18-cr-20800-SJM-APP   ECF No. 425, PageID.4275   Filed 06/13/22   Page 159 of 172

Jury Trial: Volume 5 • Monday, May 23, 2022

159

```
 1   number; it simply means that that's all they're going to pay
 2   for, correct?
 3   A.   Generally those numbers are based on evidence that they
 4   cite in the -- in their guidelines.
 5   Q.   And also their bottom line as well, correct?
 6   A.   That -- that is a factor, yes.
 7   Q.   You've been in this area for I don't know how many years.
 8   Did you know an insurance company that just gives money away?
 9   A.   No, I do not.
10   Q.   Okay.  Do you have to fight sometimes with insurance
11   carriers or people in your clinic or in your university to --
12   you think something's appropriate, and whether it's a
13   governmental pay or a private pay, there are problems?
14   A.   That's true.
15   Q.   Even though you're recommending and you want to do what
16   you believe in all of your expertise and training that this is
17   the appropriate thing, and you've got some bean counter that's
18   saying, "Dr. Mehta, no."
19   A.   I wouldn't say bean counter, but there are definitely
20   people who are clinically trained that are -- that potentially
21   we're having a conversation with, yes.
22   Q.   And generally those people are not physicians?
23   A.   They can be a variety of people, but I -- I -- I
24   understand what you're trying to ask.
25   Q.   In other words, you have a relatively -- and I don't mean
```

1    to be condescending, but you have a person that has not gone to

2    medical school telling you what you can do and what you can't

3    do or, more precisely, what they will reimburse you for?

4    A.   Sometimes, you're right, yes.

5    Q.   Okay.  Thank you.

6    A.   But there is usually an appeal process also that allows

7    you to then go and speak to what we call a I guess, you know,

8    peer-to-peer discussion.

9    Q.   And how long does that appeal process take?

10   A.   It could be as short as one day, it could be months,

11   you're right.

12   Q.   And in those months that patient is suffering?

13   A.   Potentially, yes.

14   Q.   Thank you.

15            In terms of the nonpharmaceutical approaches to

16   interventional pain management, there is physical therapy,

17   correct?

18   A.   Yes.

19   Q.   There's occupational therapy?

20   A.   Yes.

21   Q.   There is psychological therapy?

22   A.   Yes.

23   Q.   And there are the interventional approaches such as

24   injections?

25   A.   Yes.

```
1    Q.  So when we talk about multidisciplinary or multimodal,
2    we're talking about all of these various components that are
3    in -- and I -- I'll -- I'll make it -- I'll screw it up
4    again -- arrows in the clinician's quiver, correct?
5    A.  I'm going to read about your analogy, but yes, that's --
6    Q.  Okay.
7    A.  -- it's part of their tool belt.
8    Q.  Did I at least say it right?
9    A.  I have no way to verify.
10            THE COURT:  I thought -- I thought he did a fabulous
11   job.
12            MR. WEISS:  I appreciate that, Judge.  Thank you.
13            THE COURT:  All right.  All right, Mr. Weiss, what --
14   what -- what's -- what -- what point are we getting to here, if
15   you don't mind my asking?
16            MR. WEISS:  There's been talk about -- well, do you
17   really want me to make an argument?
18            THE COURT:  No.  I just want you to get to the point.
19   We're chewing up enormous amount of times with this -- with
20   this doctor, and -- and we're going to be here numerous weeks
21   and I want to get -- get out what we need to get out without a
22   lot of chatter surrounding it, if you know what I mean.
23            MR. WEISS:  I'll -- should I continue, Your Honor?
24            THE COURT:  Yeah.
25            MR. WEISS:  Okay.
```

Jury Trial: Volume 5 • Monday, May 23, 2022

1          THE COURT:  If you make your point and then we'll

2   break for the day.

3          MR. WEISS:  All right.

4   BY MR. WEISS:

5   Q.  Are you familiar with agreements that the patient has with

6   the physician?

7   A.  Grievance?  I'm sorry.

8   Q.  Agreements?

9   A.  Agreements?

10  Q.  Yes.

11  A.  Yes.

12  Q.  Okay.  Did you review agreements in the patient charts

13  that you looked at?

14  A.  Are you referring to the contracts and sort of the

15  policies --

16  Q.  Well, sort of like the --

17         THE COURT REPORTER:  Wait, wait, wait.  You cut him

18  off again, Mr. Weiss.  "Are you referring to the contracts and

19  sort of the policies..."

20  A.  Policies that a patient may sign on their visit?

21  Q.  For example, did you see narcotic agreements in the files

22  that you looked at?

23  A.  Yes.

24  Q.  Okay.  And did those agreements specify what was expected

25  of the patient and what the patient was agreeing to, correct?

1    A.   Correct.

2    Q.   Okay.  And the patient was advised that if there was

3    medication, they were supposed to take it the way it was

4    prescribed and intended, correct?

5    A.   Correct.

6    Q.   Okay.  And that there would be periodic screenings and

7    testing to assure compliance with the doctor's request,

8    correct?

9    A.   Correct.

10   Q.   Okay.  And urinary drug testing is one of those

11   methodologies --

12   A.   Correct.

13   Q.   -- that the clinician can utilize to determine, one, are

14   the medications that I am prescribing being taken, correct?

15   A.   Correct.

16   Q.   They're taken in conformity with my instructions or dosing

17   instructions, correct?

18   A.   Correct.

19   Q.   That they're not to the -- that they're not being

20   supplemented by medications elsewhere?

21   A.   Meaning other medications?

22   Q.   Other medications from another clinician or even on the

23   street.

24   A.   Correct.

25   Q.   Okay.  So if the clinician is prescribing Norco, clinician

1  wants to make sure that OxyContin is not being taken by the

2  patient at the same time, correct?

3  A.   Correct.

4  Q.   Or cocaine or heroin or fentanyl or Xanax or any other of

5  a whole host of prescriptions that the clinician is not

6  prescribing, correct?

7  A.   Correct.

8  Q.   You saw earlier today the interaction between Andrew

9  Peterson and Tatyana Bezpalko?

10  A.   Correct.

11  Q.   Okay.  And the patient, Mr. Peterson, was inquiring about

12  Soma?

13  A.   Correct.

14  Q.   Okay.  And the clinician refused to write for Soma?

15  A.   Correct.

16  Q.   For a number of reasons that she articulated, correct?

17  A.   Correct.

18  Q.   Okay.

19        THE COURT:  How's that?  Good -- good spot to break?

20        MR. WEISS:  If it's good for the Court, it's good for

21  me, Judge.

22        THE COURT:  Good for me, yeah, yeah.

23        MR. WEISS:  Thank you.

24        THE COURT:  Okay.  If only I had an arrow in my

25  quiver, ladies and gentlemen.  All right.

1          Thank you, Mr. Weiss.  Doctor, you may step down.

2          (Witness excused at 3:40 p.m.)

3          And I think we've had a really good day.  We had

4     about five hours together with a -- with a lunch break that

5     went well.  So hopefully this will be the only day we have an

6     unusual schedule.

7          But in the meantime, keep up your good efforts.

8     You're doing great.  You're here on time.  You're obviously

9     engaged and paying attention.  Don't talk about the case

10    outside of court.  If anybody wants to talk about it with you,

11    let us know.

12         But we're grateful for your service as always and

13    we'll ask you to be back here tomorrow before 8:30 a.m.  We'll

14    go to 2:30 at the latest and keep moving along, all right.

15    Thank you.

16         Let's all rise for our jurors now.

17         (Jury excused at 3:40 p.m.)

18         Okay.  Everybody may be seated.

19         What's the latest?  Somebody wanted to object to

20    something, or Mr. Helms, what's on your mind?

21         MR. HELMS:  Your Honor, I wanted an opportunity to

22    respond to Mr. Weiss's objection about Exhibit 116E, which is

23    the patient file for Victoria Loose, and just clarify the

24    production that was made.

25         THE COURT:  This the discovery issue, right?  You --

```
 1   you --
 2            MR. HELMS:  Not -- not exactly, Your Honor.  116E,
 3   which we moved into evidence, is the physical file.
 4            THE COURT:  Yeah.
 5            MR. HELMS:  This is in the 116E in the courtroom
 6   during the entire scope of this trial.
 7            THE COURT:  Yeah.
 8            MR. HELMS:  And it was provided for inspection before
 9   trial.
10            THE COURT:  Yeah.
11            MR. HELMS:  We noticed over the weekend that the
12   scanned version of 116E was not correct.  I'm not sure what
13   happened.  So we -- we rescanned it and sent it to the
14   defendants.  But this is the version that was moved into
15   evidence and it's been the same version throughout this trial.
16            THE COURT:  All right.  So everything they have is in
17   evidence, and -- and it's a simple matter of comparing what's
18   in evidence with what's been scanned, right?
19            MR. HELMS:  Yes, Your Honor.
20            THE COURT:  All right.  Okay.  Sir?
21            MR. WEISS:  Your Honor, I know we've discussed this a
22   couple of times, but it gets nuanced and it becomes more
23   problematic.
24            THE COURT:  Okay.
25            MR. WEISS:  Dr. Bothra was moved to Livingston County
```

Case 2:18-cr-20800-SJM-APP   ECF No. 425, PageID.4283   Filed 06/13/22   Page 167 of 172
Jury Trial: Volume 5 • Monday, May 23, 2022

167

```
1    last Wednesday.  He still does not have his materials that he's
2    acquired over the last three and a half years that were there.
3    Particularly with a witness such as Dr. Mehta and when I have
4    to get around to cross-examining Dr. Kufner, I am going to need
5    the expertise and training and advice that Dr. Bothra can
6    provide me.  And I don't for a moment doubt his mental acuity,
7    but he's got three and a half years of materials that -- that
8    are still at Milan that would assist him and in turn assist
9    both Mr. Rogalski and myself in representing him.
10            THE COURT:  All right.
11            MR. WEISS:  I -- I recognize the limitations, but I
12   think I'd be remiss if I didn't bring it to the Court's
13   attention.
14            THE COURT:  Okay.  Well, that's noted.  I'm glad you
15   brought it up.  I'll -- I'll continue to look -- look into it.
16   I haven't really had occasion to even have an opportunity to
17   speak with anybody since the last time we discussed this
18   actually, but I'll -- I'll follow up on that.
19            MR. WEISS:  Thank you.
20            THE COURT:  I -- I would imagine just, you know, out
21   of common sense that the lawyers have, you know, records that
22   the doctor can -- can -- can access, but I recognize he's got
23   his own materials and commonly those are sent along with a
24   transfer and I'll do my best to effectuate the fact that they
25   are, okay?
```

| | |
|---|---|
| 1 | MR. WEISS:  The records may be duplicative of what |
| 2 | Mr. Rogalski and I have, but Dr. Bothra's notes and commentary |
| 3 | are something that we're not privy to. |
| 4 | THE COURT:  I understand. |
| 5 | MR. WEISS:  Secondly, my client was given a razor |
| 6 | yesterday. |
| 7 | THE COURT:  Yeah. |
| 8 | MR. WEISS:  And he figured he would use it this |
| 9 | morning so he'd look appropriate for court. |
| 10 | THE COURT:  Yeah. |
| 11 | MR. WEISS:  To his chagrin, they came about an hour |
| 12 | later and took it back and said, "No, you get these on Sundays |
| 13 | and Wednesdays." |
| 14 | Well -- and I don't mean to -- to tease Mr. -- my |
| 15 | co-counsel Mr. Chapman, but I don't think it's an appropriate |
| 16 | look for my client to have several days of stubble.  I don't |
| 17 | want the jury to think that he is not attentive and he doesn't |
| 18 | take these proceedings seriously, and I -- I really believe |
| 19 | that he should be able to shave on a daily basis so he looks |
| 20 | appropriate and professional and not do this twice a week. |
| 21 | They may be good for -- for pretrial hygiene or going in on a |
| 22 | plea or a sentencing, but being in front of a jury of 15 I |
| 23 | respectfully submit is remiss. |
| 24 | THE COURT:  Well, take that -- take that up in front |
| 25 | of the -- or the marshals, and I'll -- I'll put that on my |

1    to-do list as well.  I do know that everybody is -- is wearing

2    masks which doesn't disclose any, you know, poor look or

3    anything and I've seen no sign of disrespect or anything of

4    that nature.  But I grant your -- the accuracy of your point

5    and -- and I'll -- you know, again, I can't micromanage that

6    type of issue, it's -- it's very specific, but I will let the

7    marshals know that you raise that, okay?

8            MR. WEISS:  I appreciate that and thank you for

9    allowing me to make a record, Your Honor.

10           THE COURT:  Of course, always.

11           Hold on a second.  Ms. McMillion, you want to respond

12    to that or...

13           MS. McMILLION:  I did not, Your Honor.  I had a

14    different issue and I'll let Mr. Chapman go ahead.

15           THE COURT:  Okay.  Mr. Chapman's got something to

16    say.  Go ahead.

17           MR. CHAPMAN:  Judge, just -- just a minor point, Your

18    Honor.

19           THE COURT:  You need a shave, sir.

20           MR. CHAPMAN:  I -- I understand.  I'd also like the

21    record to reflect that Mr. Helms also occasionally carries --

22           MR. HELMS:  This is a beard, Your Honor.

23           THE COURT:  Just kidding around.  Go ahead.  Go

24    ahead.

25           MR. CHAPMAN:  I just would like the Court to instruct

1    the witness not to discuss the substance of his testimony while

2    off the witness stand during this break.

3              THE COURT:  Yeah, right.  That's -- that's common.

4    Doctor, I'm sure you know you shouldn't be discussing your

5    testimony with government agents or attorneys.  In fact, I

6    wouldn't discuss it with anybody, but -- but since they asked

7    me to tell you that, I'm telling you, okay?

8              THE WITNESS:  Yes, Your Honor.

9              THE COURT:  All right.  Good.

10             MS. McMILLION:  Your Honor, I have another issue to

11   discuss with the Court with respect to an upcoming witness, and

12   I don't know if the Court wants to deal with this issue now

13   while we're outside the presence of the jury and they're not

14   waiting.  But we do anticipate calling a witness in the next

15   two witnesses and we would need a sidebar to discuss that

16   witness's testimony.

17             THE COURT:  Even if the jury's not here we need a

18   sidebar?

19             MS. McMILLION:  Yes, Your Honor.

20             THE COURT:  Okay.  When's this person going to come

21   in?

22             MS. McMILLION:  Depending on how long cross takes

23   tomorrow, potentially tomorrow, so that's why I wanted to raise

24   it with the Court this afternoon so we wouldn't have the jury

25   waiting tomorrow.

```
 1              THE COURT:  Okay.  It's quite late and I think we're
 2    all pretty tired, not the least of which is me, and I think
 3    what we should do is take this up when I give them their
 4    ten-minute comfort break tomorrow morning, maybe it'll be a
 5    15-minute comfort break, and we can talk at the bench about
 6    your witness issue, okay?
 7              MS. McMILLION:  Thank you, Your Honor.
 8              THE COURT:  Does that sound okay?
 9              MS. McMILLION:  Yes.
10              THE COURT:  I mean I'm pretty flexible within the --
11    within the, you know, rules of reason.  We need to get folks in
12    here and out of here.  But if people are coming in from out of
13    town, you know, I know you know and you're all doing very well
14    on this, but bear that in mind as well, all right?
15              All right.  Thank you for your service and your
16    efforts.  I thought it was a good day and we'll see you
17    tomorrow morning at 8:30.
18              THE LAW CLERK:  Court is now in recess.
19              (Court in recess at 3:48 p.m.)
20              (Proceedings in the above-entitled matter adjourned
21              to Tuesday, May 24, 2022)
22                                -  -  -
23
24
25
```

Jury Trial: Volume 5 • Monday, May 23, 2022

172

```
 1                    C E R T I F I C A T I O N

 2          I, Linda M. Cavanagh, Official Court Reporter of the

 3    United States District Court, Eastern District of Michigan,

 4    appointed pursuant to the provisions of Title 28, United States

 5    Code, Section 753, do hereby certify that the foregoing pages 1

 6    through 171 comprise a full, true and correct transcript of the

 7    proceedings taken in the matter of United States of America vs.

 8    D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5

 9    Christopher Russo, Case No. 18-20800, on Monday, May 23, 2022.

10

11                                  s/Linda M. Cavanagh
                                    _____
12                                  Linda M. Cavanagh, RDR, RMR, CRR, CRC
                                    Federal Official Court Reporter
13                                  United States District Court
                                    Eastern District of Michigan

14

15

16

17

18    Date: June 9, 2022
      Detroit, Michigan
19

20

21

22

23

24

25
```