Case 2:18-cr-20800-SJM-APP ECF No. 426, PageID.4289 Filed 06/13/22 Page 1 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

1

1            UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF MICHIGAN
2                  SOUTHERN DIVISION

3
   UNITED STATES OF AMERICA,
4
                     Plaintiff,
5       vs.

6  D-1 DR. RAJENDRA BOTHRA        Case No. 18-20800
   D-3 DR. GANIU EDU              Hon. Stephen J. Murphy, III
7  D-4 DR. DAVID LEWIS
   D-5 DR. CHRISTOPHER RUSSO,
8
                     Defendants.
9  _____/

10              **JURY TRIAL: VOLUME 6**

11      BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                United States District Judge
12       Theodore Levin United States Courthouse
                231 West Lafayette Boulevard
13              Detroit, Michigan  48226
                Tuesday, May 24, 2022
14
   APPEARANCES:
15
   For the Plaintiff          BRANDY R. McMILLION
16 United States of America:  BRANDON C. HELMS
                              U.S. Attorney's Office
17                            211 W. Fort Street
                              Suite 2001
18                            Detroit, Michigan  48226
                              313-226-9622
19
   For the Defendant          ARTHUR J. WEISS
20 D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                              Suite 225
21                            Farmington Hills, Michigan  48334
                              248-855-5888
22

23                 (Appearances continued next page)

24

25

```
 1    APPEARANCES:  Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
           To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                          Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4291   Filed 06/13/22   Page 3 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

3

```
1                         TABLE OF CONTENTS

2    Government Witnesses:                              Page

3    NEEL MEHTA

4       Cross-Examination Continued by Mr. Weiss        4
        Cross-Examination by Mr. Harrison               44
5       Cross-Examination by Mr. Chapman                65
        Cross-Examination by Mr. Margolis               118
6       Redirect Examination by Ms. McMillion           161

7

8

9

10

11

12

13

14
                            EXHIBITS
15
     Identification                   Offered    Received
16
     NONE
17

18

19

20

21

22

23

24

25
```

1        Detroit, Michigan

2        Tuesday, May 24, 2022

3                      —  —  —

4        (Proceedings in progress at 9:15 a.m., all parties

5        present, jury present)

6        THE COURT:  I would ask -- there's the doctor.  You

7   want to come on up, Dr. Mehta, and resume your stand.  And I

8   know Mr. Weiss is ready to go as well, and we'll go right back

9   to where we were yesterday.  You're still under oath, Doctor,

10  so remember that.

11       THE WITNESS:  Yes, Your Honor.

12                   N E E L   M E H T A

13  was called as a witness herein, and after previously being

14  first duly sworn to tell the truth and nothing but the truth,

15  testified on his oath as follows:

16       THE COURT:  And Mr. Weiss, the floor is yours.

17              CROSS-EXAMINATION CONTINUED

18  BY MR. WEISS:

19  Q.  Good morning.

20  A.  Good morning.

21  Q.  I think when we left off yesterday, we had watched the

22  undercover video involving Henderson Butler.  Do you recall

23  that, sir?

24  A.  Yes, I do.

25  Q.  And then I think you and I were discussing some of the

1    aspects of the 2016 CDC proposed guidelines?

2    A.   2016 proposed guidelines?  I think those are already

3    published.

4    Q.   Well, but they're guidelines, right?

5    A.   Right.

6    Q.   Okay.  And in those guidelines they reference 90 MMEs.  Do

7    you recall that?

8    A.   I do.

9    Q.   Okay.  And just to make sure we're on the same page, would

10   you again advise the jury what MME stands for?

11   A.   So morphine milliequivalents is what MME stands for.  It

12   was an attempt to be able to -- again, sort of like converting

13   currency, to be able to equate different types of opioids.

14   It's based on experience, expert, you know, consensus, and it's

15   generally accepted as a -- a way to convert, say, something

16   like morphine to oxycodone to fentanyl to be able to give some

17   equal pain relief with that.

18   Q.   And at that time the CDC was recommending optimumly that

19   dosages for the day should be 90 or less, correct?

20   A.   Correct.

21   Q.   Okay.  And then there was even reference to maybe even 50

22   or less if the -- if the clinician was able to do that,

23   correct?

24   A.   That's correct.

25   Q.   Okay.  Did you -- while you were reviewing Dr. Bothra's

1    charts of the various patients that the government gave you,

2    did you do an analysis of what his average MME was for the

3    patients that you analyzed?

4    A.  I did.

5    Q.  Okay.  And they were in the 20 to 30 range, correct?

6    A.  Approximately.

7    Q.  The guidelines also reference tapering, correct?

8    A.  Correct.

9    Q.  Okay.  And tapering is where a physician tries to reduce a

10   particular patient's MMEs or daily intake of, say, a Schedule

11   II painkiller?

12   A.  Correct.

13   Q.  Okay.  And they also acknowledge that it is challenging

14   for the clinician, particularly when the clinician has a

15   patient who has been on opioids for a considerable period of

16   time?

17   A.  That's correct.

18   Q.  Okay.  There cannot only be a physical dependency but a

19   psychological dependency as well?

20   A.  Correct.

21   Q.  Okay.  And it can result, if the tapering is too severe,

22   in physical difficulties to the patient?

23   A.  That's correct.

24   Q.  Even to the point of hospitalization?

25   A.  Potentially.

1    Q.   Okay.  We discussed MAPS.  Do you recall that, sir?

2    A.   Correct.

3    Q.   Okay.  And MAPS is the Michigan Automated Prescription

4    System or Service, correct?

5    A.   Correct.

6    Q.   Okay.  And you have familiarity with MAPS?

7    A.   I do.

8    Q.   Now, these systems at times vary from state to state,

9    correct?

10   A.   Correct.

11   Q.   In fact, not all states have them?

12   A.   It's evolved over the years, but you're -- you're correct,

13   yes.

14   Q.   Okay.  And Michigan has one?

15   A.   That's correct.

16   Q.   And it's fairly comprehensive?

17   A.   Correct.

18   Q.   Okay.  And correct me if I'm wrong, that when a physician

19   writes a prescription and the patient takes it to the pharmacy,

20   the pharmacy notifies the state?

21   A.   Correct.

22   Q.   MAPS, correct?

23   A.   Correct.

24   Q.   So the state is notified that a particular physician wrote

25   a particular prescription for a particular patient for a

1    particular pharmaceutical at a particular dosage, correct?

2    A.  Correct.

3    Q.  And all of that information each and every time that a

4    patient goes to fill his or her script at a pharmacy is sent to

5    the state?

6    A.  To the MAPS, yes.

7    Q.  To MAPS.  Okay.

8         And then MAPS can be accessed by state or federal law

9    enforcement, correct?

10   A.  Correct.

11   Q.  Okay.  So the notion or the suggestion that somehow a

12   physician can hide his or her prescriptions is really a fallacy

13   because the state's going to find out about it each and every

14   time, correct?

15   A.  From what they prescribe.

16   Q.  Yes.

17   A.  Yes, it would not be --

18   Q.  Okay.

19   A.  Correct.

20   Q.  So there's no hiding from the state when you're writing --

21   A.  It depends on where the patient fills the prescription,

22   but if they're filling in Michigan in a -- in a pharmacy in

23   Michigan.

24   Q.  Did you have any information at all, of all of the

25   information or all of the charts and all of the documentation

```
 1    that the government gave you in this case, that any patient
 2    filled his or her prescription outside the state of Michigan?
 3    A.  No.  I'm just answering your question, that's all.
 4    Q.  All right.  So then there's no hiding these prescriptions
 5    for these patients?
 6    A.  Correct.
 7            MR. WEISS:  Excuse me one moment, Judge.
 8            THE COURT:  Yes.
 9            (Brief pause)
10    Q.  Is it fair to say, sir, that chronic pain is more
11    prevalent in older adults?
12    A.  I'm not sure how to answer that.  I mean chronic pain
13    certainly appears in older patients.  Whether it's more
14    prevalent than others, it's hard to know.
15    Q.  We talked yesterday about the -- oops, I'm sorry,
16    apologize, Ms. Cavanagh -- Pain Management Best Practices.
17    You're familiar with that?
18    A.  Yes.
19    Q.  You recognize it as authoritative?
20    A.  I do.
21    Q.  Okay.  And in this publication it advises that chronic
22    pain is one of the most common costly and incapacitating
23    conditions in older adults.  Do you agree with that, sir?
24    A.  I agree with that statement.
25    Q.  Okay.  And it also has severe consequences for women,
```

1   correct?

2   A.   Yes.

3   Q.   Okay.  And the publication references the stigma

4   associated with people who are on Schedule II painkillers,

5   correct?

6   A.   Correct.

7   Q.   Okay.  They can be viewed as pill seeking?

8   A.   They potentially could be, yes.

9   Q.   Could be viewed as addicts?

10  A.   Could be.

11  Q.   Malingerers?

12  A.   That's correct.

13  Q.   Okay.  And the stigma is particularly associated with

14  minorities and females, correct?

15  A.   It's concerning, but yes.

16  Q.   All right.  But we know from the FDA approving Schedule II

17  painkillers for the treatment of pain as being safe and

18  effective, that those people are entitled to be treated just

19  like any other patient for any other infliction, fair

20  statement?

21  A.   I think your statement is a little open-ended, but, you

22  know, all people should be able to have access to opioids when

23  appropriate.

24  Q.   Okay.  Thank you.

25          In your practice -- I believe there was some

1   testimony earlier on, but in your practice, have you ever run

2   across a patient that complained about the stigma that he or

3   she received because she -- he or she was getting Schedule II

4   painkillers?

5   A.   Yes, I've had that, patients have had that -- those

6   experiences.

7   Q.   And they've articulated those complaints to you?

8   A.   Yes.

9   Q.   Okay.  And have any of them ever indicated that they wish

10  at times that they had cancer so that maybe people would

11  understand that they're entitled to those Schedule II

12  painkillers?

13  A.   I understand what you're trying to say.  No one has

14  particularly said that, but -- but I understand what you're --

15  you're trying to get at.

16  Q.   You've heard of that phenomenon from some of your

17  colleagues?

18  A.   I've heard of it, yes.

19  Q.   Okay.  Do you recall the analysis that the CDC conducted

20  in their 2022 draft regarding the breakdown between disciplines

21  as to where Schedule II painkillers were being prescribed or by

22  who pain -- Schedule II painkillers were being prescribed?

23  A.   Are you referring to the specialties of -- of physicians

24  that were prescribing?

25  Q.   Yes.  For example, primary care physicians, according to

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4300   Filed 06/13/22   Page 12 of 179
Jury Trial: Volume  6 • Tuesday, May 24, 2022

12

1     the CDC draft, prescribe approximately 37 percent of all

2     opioids.  Do you agree with that?

3     A.  I agree.  There's more quantity of primary care physicians

4     versus pain management.

5     Q.  And that when it comes to pain management specialists,

6     they prescribed about 8.9 percent of opioids prescribed in the

7     United States, fair statement?

8     A.  As a quantity, yes.

9     Q.  Okay.  And they're only slightly ahead of dentists who

10    prescribe 8.6 percent of opioids in the United States?

11    A.  Correct.

12    Q.  All right.  However, pain management physicians and

13    rehabilitation clinicians prescribe the highest rates of

14    Schedule II in the United States, correct?

15    A.  Correct.

16    Q.  Okay.  The 2022 draft also spoke at length about the

17    challenge for clinicians and patients who have already received

18    long-term high doses of Schedule II painkillers by the time

19    that patient presents in the office of a pain management

20    specialist.

21    A.  Is there a question?

22    Q.  Yes.

23    A.  Were you asking if I agree with that statement or...

24    Q.  Yes.

25    A.  Yes, there -- there is a challenge.

1  Q.  Okay.  And so did you do an analysis of the patients whose

2  charts the government gave you as to the amount of time that

3  those patients had been taking Schedule II painkillers before

4  they showed up at the TPC or the IPC?

5  A.  So there were records and documentation of the history.

6  Q.  And did you perform an analysis as to the amount of time

7  that those few patients whose charts the government gave you

8  were on high doses of Schedule II painkillers before they came

9  to the TPC and the IPC?

10 A.  So in terms of analysis, yes, I did look at records.

11 Q.  Okay.  And they were fairly lengthy, correct?

12 A.  In some cases, yes.

13 Q.  All right.  And at significantly high doses?

14 A.  Not necessarily.  There were patients that came with no

15 opioid usage; there were patients that came with brief opioid

16 times; there were patients that came that had not had opioids

17 for many months; and there were patients that had higher doses

18 coming into the practice.

19 Q.  Which were the patients that had no opioid use prior to

20 coming to the IPC or the TPC?

21 A.  There were patients that had six months or so or several

22 months before.

23 Q.  My question was please identify, give the names of the

24 patients whose files and charts you reviewed that had no opioid

25 exposure prior to coming to the IPC or the TPC.

1   A.  Well, I'll give you, for example, Andrew Peterson who for
2   many months had said that he had not taken opioids.
3   Q.  And as we know, Andrew Peterson was not a real patient; he
4   was an undercover FBI agent, correct?
5   A.  That's correct.
6   Q.  Okay.  Besides the fake patient, who else?
7   A.  I would need to go back to the names, but I -- I can look
8   if you give me a moment.
9   Q.  Well, I don't want to waste a lot of the Court's time.
10  You don't have any names off the top of your head?
11  A.  Not off the top of my head.
12  Q.  Okay.  Ones that only had brief use of opioids prior to
13  coming to the TPC or the IPC?
14  A.  It'd be the same thing, I'd need to look back at my
15  records.
16  Q.  Okay.  So you don't know.  As you sit there right now, you
17  don't know?
18  A.  Not off the top of my head.
19  Q.  Okay.  And again, you reviewed six or seven charts that
20  you testified about and a hundred or so, according to your
21  testimony, that you really don't recall, correct?
22  A.  Off the top of my head, no.
23  Q.  Okay.
24  A.  That's...
25  Q.  And I think I mentioned to you the 30 percent threshold

1    that I believe the literature felt was a significant success

2    rate for a particular treatment.  Do you recall I asked you

3    questions about that?

4    A.  You asked a question about the studies of -- of, you know,

5    pain relief and what's significant.

6    Q.  And I --

7    A.  I think I would like to just have an opportunity to

8    address the way your --

9    Q.  Please answer my question.  I asked you about 30 percent,

10   you said no, that was really placebo and sort of cast it aside.

11   Do you recall that?

12   A.  But you just used a term that I would like to differ with.

13   Q.  All right.  So my question to you is do you agree, 'cuz

14   this appears at a couple of places in the 2022 draft,

15   "Clinically meaningful improvement has been defined as a

16   30 percent improvement in scores for both pain and function."

17   Do you agree with that?

18   A.  That I agree.

19   Q.  Okay.  The government asked you a series of questions

20   regarding the type of injections that some of the patients

21   received.  Do you recall that?

22   A.  Correct.

23   Q.  Okay.  And some of the injections were bilateral.  You

24   recall that?

25   A.  The bulk of them were bilateral.

```
 1    Q.  Okay.  And you had some criticism about that.  Do you
 2    recall that?
 3    A.  I do.
 4    Q.  Okay.  But do you recognize that the studies indicate that
 5    69 percent of patients that have cervical spine issues get a
 6    bilateral injection?
 7    A.  Yes.  This was --
 8    Q.  Okay.
 9    A.  -- higher than 69 percent.
10    Q.  Thank you.
11         And 64 percent of thoracic patients that have spine
12    issues can get a bilateral injection, correct?
13    A.  There were no thoracic injections in these -- in these
14    patients.
15    Q.  My -- my question, sir, was 64 percent in the literature
16    who have thoracic spine issues can get a bilateral injection,
17    correct?
18    A.  Actually, let's take a moment and --
19    Q.  No, no.
20    A.  Where -- where are you citing?
21    Q.  If you don't agree with my question, you can say no,
22    that's your prerogative.
23    A.  You're -- you're giving numbers that --
24    Q.  No.
25         MS. McMILLION:  Objection, Your Honor.  This is
```

1    getting argumentative.  If counsel would like to state which

2    literature he's referring to, then the witness would be able to

3    answer it.

4            THE COURT:  Well, that's probably a good -- a good

5    idea, but, you know, I would say this.  I would say in response

6    to an open-ended question, if the lawyer's looking for a yes or

7    no answer, if the witness can give that, fine, and if there's

8    need for further explanation, I'll give you some redirect time

9    as well.

10           Go ahead, Mr. Weiss.

11   BY MR. WEISS:

12   Q.  I think my question was, sir, 64 percent of thoracic spine

13   patients at times will get a bilateral injection, yes or no?

14   A.  I will have to say that I need to see the source that

15   you're citing.

16   Q.  Okay.  And what about 72 percent of lumbar spine?

17   A.  Again, my same answer, I'll need to see the source that

18   you're citing.

19   Q.  Okay.  And if I indicated to you that it was *Raj* that we

20   talked about yesterday, "Bilateral involvement was fine -- was

21   found in 69 percent of patients in the cervical spine,

22   64 percent in the thoracic spine and 72 percent in the lumbar

23   spine."

24           MR. WEISS:  And for the record, that's on page 1012

25   of the treatise that I showed the doctor and he indicated was

1    authoritative.

2    Q.  So do you agree or disagree with that particular

3    statement?

4    A.  So I will agree with that statement.

5    Q.  Thank you.

6         And do you agree that "the use of a diagnostic block

7    to confirm facet joint as a primary pain generator has been

8    widely accepted in the pain management community"?

9    A.  I agree.

10   Q.  "Utilization of imaging such as MRIs, CT scans and X-rays,

11   while can be of assistance, are not always definitive."  Do you

12   agree with that?

13   A.  I agree.

14   Q.  All right.  "In fact, at times where the imaging shows

15   normal, it can be the source of a particular pain generator."

16   Correct?

17   A.  That's correct.

18   Q.  So it is not definitive by any means?

19   A.  Correct.

20   Q.  And we also talked about radiofrequency ablations,

21   correct?

22   A.  Correct.

23   Q.  And we talked at times they were done at different levels,

24   correct?

25   A.  Correct.

1   Q.  In fact, it's usually -- an RF or an RFA, radiofrequency

2   ablation, is usually performed at three levels, correct?

3   A.  Not necessarily.

4   Q.  Okay.  Do you agree with the statement, "RF facet

5   treatment is usually performed in at least three levels"?

6   A.  I'm -- I'm not sure what you're saying.  I mean I -- I

7   don't do it, and I know that there's a number of guidelines

8   that also would suggest otherwise.

9   Q.  But you don't dispute that in Raj on page 1045, and I'm

10  quoting now, "RF facet treatment is usually performed in at

11  least three levels."  Quote, end quote.

12  A.  I agree with that.

13  Q.  Okay.  Having pain post-procedure is relatively normal,

14  correct?

15  A.  It -- it can be a known side effect, yes.

16  Q.  Okay.  And then over the period of time, it may reduce,

17  eliminate or not affect the pain at all?

18  A.  Correct.

19  Q.  Doesn't mean that the doctor did anything wrong; it's just

20  that's the way that particular procedure is, correct?

21  A.  That's correct.

22  Q.  And it is widely accepted in the pain management community

23  nonetheless, correct?

24  A.  Correct.

25  Q.  Now, if you go to the doctor and complain about feeling

1   feverish, the doctor can take your temperature, correct?

2   A.  That's correct.

3   Q.  Okay.  And you've got a thermometer that is fairly

4   accurate and can indicate exactly, with a fair degree of

5   precision, what your temperature is, correct?

6   A.  Correct.

7   Q.  And if you're not feeling particularly well and the

8   physician runs some blood work, he or she can ascertain whether

9   or not you may have diabetes, correct?

10  A.  That's correct.

11  Q.  And again, with a fair amount of precision, the testing is

12  responsive to what the physician needs and can discuss it with

13  the patient, correct?

14  A.  Correct.

15  Q.  Okay.  When it comes to pain management, we don't have a

16  thermometer per se, correct?

17  A.  Correct.

18  Q.  We don't have a blood diagnostic tool that will give us

19  some definitive indication of what that pain is like we can

20  tell with blood sugar, correct?

21  A.  Correct.

22  Q.  Pain is subjective?

23  A.  There is a subjective component, correct.

24  Q.  Your four out of ten may be the same or different than my

25  seven out of ten, correct?

1  A.  Potentially.

2  Q.  Okay.  I mean different people have different pain

3  thresholds, it's just the nature of the beast?

4  A.  Yes.

5  Q.  Okay.

6  A.  Although we try to give --

7  Q.  You've answered my question.  Thank you.

8       And some people tolerate pain better than others?

9  A.  That's correct.

10 Q.  And so to an extent, the physician has to be able to rely

11 upon what the physician believes is the good faith articulation

12 by the patient of what that pain level is on a zero to 10

13 scale, correct?

14 A.  Correct.

15 Q.  Okay.  And sometimes patients are truthful and sometimes

16 they're not, correct?

17 A.  Correct.

18 Q.  Okay.  And the clinician doesn't really receive a lot of

19 training, if any, as to -- to divine, simply by talking to the

20 patient, which ones are telling him or her the truth and which

21 ones are lying?

22 A.  I disagree with that question.

23 Q.  Okay.  That's fine.

24      When we talked about radiofrequency ablations, you

25 indicated that the nerve is destroyed during the procedure,

1   correct?

2   A.   Correct.

3   Q.   And the theory behind that is because the nerve is

4   destroyed, that it won't send the pain signal to the brain that

5   there is some type of pain coming from that particular area

6   where the nerve is?

7   A.   For example, the facet joint, yes.

8   Q.   Okay.  All right.  So as a layperson, I sort of described

9   that fairly good?

10  A.   I'll give you credit, yes.

11  Q.   Thank you.  I appreciate that.

12          But nerves have a tendency to grow back, correct?

13  A.   Yes.

14  Q.   Regardless of how efficient or appropriate the physician

15  or clinician did the procedure, correct?

16  A.   That's correct.

17  Q.   Okay.  And generally, it can grow in a six- to 12-month

18  period?

19  A.   Correct.

20  Q.   Sometimes a little quicker, sometimes a little longer, but

21  again, it's not because the physician did anything wrong;

22  that's just the way the human body deals with an RFA?

23  A.   That's correct, it could.

24  Q.   And there's nothing wrong or impermissible with repeating

25  that RFA if, in fact, it grows back and there's pain back in

1    that area, correct?

2    A.   On that individual patient.

3    Q.   Yes.  All right.  So relief can be relatively short-lived

4    but nonetheless the procedure be successful?

5    A.   Short-lived is what definition?

6    Q.   Six to 12 months.

7    A.   Six to 12 months is -- is -- yes, that could happen.

8    Q.   I mean for the patient that's been in excruciating pain,

9    that six to 12 months may be an eternity, but in the entire

10   scheme of things, having to come back in six to 12 months may

11   be something that the patient would hope that he or she didn't

12   have to go through.

13   A.   Are you asking me to agree with that or...

14   Q.   Agree or disagree as you see fit.

15   A.   I'd agree with that, yes.

16   Q.   Thank you.

17        Medicine, for the most part, is evidence based,

18   correct?

19   A.   Correct.

20   Q.   Okay.  In the area of pain management, some aspects are

21   evidence based, correct?

22   A.   Correct.

23   Q.   But not all?

24   A.   Correct, I'll give you that.

25   Q.   Okay.  In fact, in their 2016 guidelines, they indicated

1    that "evidence is insufficient for every clinical decision that

2    a provider needs to make about the use of opioids for chronic

3    pain," correct?

4    A.  Correct.

5    Q.  Okay.

6         MR. WEISS:  I'm sorry, Judge.  Beg the Court's

7    indulgence.

8         THE COURT:  Okay.

9    Q.  Sir, you prepared a report in this matter, did you not?

10   A.  I did.

11   Q.  And it was dated October 31st, 2020?

12   A.  Yes.

13   Q.  Correct?

14        And that was -- that was a report that you sent to

15   the government?

16   A.  Correct.

17   Q.  Okay.  And the government gave to defense counsel?

18   A.  Correct.

19   Q.  Okay.  And that report was to summarize what you observed

20   after reading the charts and all of the other documentation and

21   materials that the government gave you, correct?

22   A.  Correct.

23   Q.  And how many times did you review that report before you

24   submitted it?

25   A.  Many times.

1   Q.  Okay.  And you felt that your report was, to your belief,

2   a hundred percent accurate?

3   A.  In reading it again, I've realized that there are

4   typographical things there, but yes, to the best of my ability

5   at that time, it was as -- what I thought was a final document.

6   Q.  Okay.  And did you ever revise it?

7   A.  After the fact --

8   Q.  Yeah.

9   A.  -- of submission?  No.

10  Q.  Okay.  And it's been what, a year and a half?

11  A.  Correct.

12  Q.  Okay.  And so there was never any written revision?

13  A.  Correct.

14  Q.  Correct?

15       And except for some typos, this report is as accurate

16  in your estimation as your testimony this morning and

17  yesterday, correct?

18  A.  Correct.

19  Q.  Okay.  Do you have the report handy there, sir?

20  A.  I do.

21  Q.  Okay.  Would you turn to page 13?

22  A.  Yes.

23  Q.  Okay.  And I believe you made reference to it yesterday in

24  response to questioning by -- by the government.  You have like

25  some abbreviations at the bottom of that page, correct?

1    A.   Correct.

2    Q.   Okay.  And the bottom abbreviation is the letters CESI,

3    correct?

4    A.   Correct.

5    Q.   Which is your abbreviation for cervical epidural steroid

6    injection, correct?

7    A.   Correct.

8    Q.   Okay.  And then I would ask you to turn to page 19 and 20,

9    and there it deals with your analysis of the charts pertaining

10   to the patient Glenda Roscoe, correct?

11   A.   Correct.

12   Q.   Okay.  And on page 20 there's an entry for February 6th,

13   2014, correct?

14   A.   Yes.

15   Q.   Okay.  And you indicate CESI, which, consistent with your

16   abbreviation, means cervical epidural steroid injection,

17   correct?

18   A.   Correct.  This is one of the errors that I was mentioning.

19   Q.   Ah.  But you never corrected it, sir?

20   A.   It -- I realized it after I was reading in preparation for

21   this case.

22   Q.   And did you tell anyone?

23   A.   Just recently.

24   Q.   Well, when the government questioned you about this report

25   yesterday, you didn't say there were some typos, did you?

```
1    A.  I did not.
2    Q.  Okay.  You didn't tell the judge, you didn't tell the
3    jury, you didn't tell any of us?
4    A.  Correct.
5    Q.  Okay.  Now, let's bring up the chart and let's go to
6    February 6th, 2014.  All right.  Now, let's look over to the
7    column on the far right.
8              MR. CHAPMAN:  Mr. Weiss, I'm sorry, excuse me.
9              Your Honor, we don't not have a view on our screen.
10   It appears it has been disconnected.
11             MS. McMILLION:  We don't either, Judge.
12             (Brief pause)
13             MR. CHAPMAN:  We have it now, Your Honor.  Thank you.
14   BY MR. WEISS:
15   Q.  So do you have it, sir, on your screen?
16   A.  I do.
17   Q.  Okay.  So in the far right it has caudal.  Do you see
18   that?
19   A.  I see that.
20   Q.  Okay.  Now, a typo is when you misspell a word, correct?
21   A.  Correct.
22   Q.  Okay.  Improper grammar?
23   A.  Correct.
24   Q.  Improper punctuation?
25   A.  Correct.
```

1   Q.   Okay.  But as we started out my examination yesterday,

2   there is a substantial difference between cervical and caudal,

3   isn't there?

4   A.   There is.

5   Q.   Okay.  And you indicated that you reviewed this several

6   times before submitting it to the government and it was

7   accurate, right?

8   A.   To the best of my ability, yes.

9   Q.   And so this is what you do day in and day out.  You're a

10  pain management specialist.  That's what you told the Court,

11  right?

12  A.   Correct.

13  Q.   If there's anyone on the face of the earth that should

14  know the difference between a cervical and a caudal injection,

15  it should be you, right?

16  A.   I -- I do know the difference, yes.

17  Q.   You do, but it says caudal there.  You reviewed it how

18  many times?

19  A.   Several times.

20  Q.   And you didn't catch it, is that your testimony?

21  A.   I did not catch it.  It was a --

22  Q.   Okay.  All right.  But typos generally don't happen in

23  pairs or quadruplets or quintuplets, do they?  They're

24  isolated, right?

25  A.   When using Microsoft Word as an autocorrect, it can.

Case 2:18-cr-20800-SJM-APP  ECF No. 426, PageID.4317  Filed 06/13/22  Page 29 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

29

```
1   Q.  Okay.  All right.  Now, we have more than just caudal in
2   the chart, don't we?
3   A.  We have caudal ESI II.
4   Q.  All right.  But it appears more frequently just on that
5   piece of paper, correct?
6   A.  Where are you referring to?
7   Q.  Well, for example, that particular patient I believe
8   signed a consent form.
9           MR. WEISS:  All right.  That's for 12-26.  Do we have
10  for 2-6-14?
11          MR. ROGALSKI:  Oh, I'm sorry.  2-6?
12          MR. WEISS:  Yes.
13  BY MR. WEISS:
14  Q.  Do you see about three lines from the top the word
15  "caudal" written?
16  A.  Yes.
17  Q.  Okay.  And you had this form when you reviewed the
18  documentation from the government, correct?
19  A.  Correct.
20  Q.  Okay.  And there was also a pre-op form as well that Ms.
21  Roscoe executed, correct?
22  A.  Correct.
23  Q.  Okay.
24          MR. WEISS:  Could we bring that up please?
25  Q.  And do you see under "Impression/Diagnosis/Plan" about
```

1    middle of the screen?

2    A.   Yes.

3    Q.   The word "caudal," correct?

4    A.   Yes.

5    Q.   Okay.  Now, it's your testimony that your particular

6    software you type in caudal and it prints out cervical, is that

7    what you're telling us?

8    A.   Not prints out.

9    Q.   Types up?

10   A.   If you --

11   Q.   Okay.

12   A.   You want me to explain or -- I know you don't so...

13   Q.   What I want to understand is how often -- how often have

14   you hit -- or how long have you had the problem with putting in

15   caudal and coming up cervical?

16   A.   How long have I had the problem?  It's basically when I've

17   started this on Microsoft Word.

18   Q.   And when was that?

19   A.   In the past two years.

20   Q.   Okay.  So you know to be particularly attuned to the fact

21   that you can type in caudal and it will come up cervical,

22   correct?

23   A.   I'm learning that now, yes.

24   Q.   Oh, now you're learning it?

25   A.   In this recent time.

```
1    Q.  Is this -- is this humorous to you, sir?
2    A.  No, I'm not -- I'm not finding it --
3    Q.  The fact that you -- that you made a mistake, do you find
4    that just somewhat flippant?
5    A.  No, sir.  I -- I definitely own up to the mistake and it
6    is not my intention to --
7    Q.  All right.  There was also an anesthesia --
8    anesthesiological record created as well.
9            (Brief pause)
10           MR. WEISS:  Excuse me, Your Honor.
11   Q.  Sir, the -- the procedure note that you have under screen,
12   the fourth line down where it says "Procedure," do you see
13   where it's typed in "caudal epidural"?
14   A.  I do.
15   Q.  Okay.  So you're knowledgeable that your software, you
16   type in one name -- one word and another word comes out.  So
17   when you review this a couple of times, your report, you're
18   attuned to the fact that there may be a, according to you, a
19   problem between caudal and cervical, and so you keep seeing
20   caudal repeated and repeated and repeated for just this one
21   procedure and yet it doesn't dawn on you before you submit your
22   report to the government that, "Hey, maybe I should just take a
23   double look at all my CESIs," do you?
24   A.  It's the same mistake that I've owned up to.
25   Q.  Okay.  All right.  And then there is a post-op form as
```

1    well and again we have caudal, correct?

2    A.  Where are you referring to?

3    Q.  It was there a moment ago.  "Impression/Diagnosis/Plan,"

4    you see that?

5    A.  Caudal, yes.

6    Q.  Okay.  Then let's go to February 20th, 2014 on page 20 of

7    your report.  CESI, right?

8    A.  Correct.

9    Q.  Okay.  And just so we're clear, in your abbreviations,

10   correct, on page 13, we'll go through it this morning, but

11   right now we're coming up to the second procedure which was a

12   caudal injection, correct?

13   A.  Correct.

14   Q.  And I think as we go through it this morning, there are

15   about seven or eight caudal injections where you wrote or typed

16   in CESI, correct?

17   A.  (Nods in the affirmative.)

18   Q.  Is that a yes?

19   A.  Correct.

20   Q.  Okay.  So you're reviewing these charts, you see, if

21   you've read them, that at least on these seven or eight

22   occasions what the patient got was a caudal injection which is

23   significantly different than a cervical, correct?

24   A.  Correct.

25   Q.  And when it comes to a -- an abbreviation, you don't even

1    have an abbreviation for caudal?

2    A.   Correct.

3    Q.   Okay.  So you want us to believe that this was just a

4    typographical error, but you don't even have caudal in your

5    abbreviation code.  You didn't even address caudal in --

6    anywhere in your report and you just cast it aside as a

7    clerical error?

8    A.   That's what I --

9    Q.   Okay.

10   A.   -- what I believe to have happened, yes.

11   Q.   All right.

12            MR. WEISS:  Would you bring up February 20th, 2014

13   please?

14   Q.   The column on the right, "caudal," correct?

15   A.   That's correct.

16   Q.   Okay.  And there are, just to speed things along, consent

17   forms, pre-op forms, anesthesia records, operating room reports

18   and post-op forms that all reference caudal for February 20th,

19   2014 for Glenda Roscoe, correct?

20   A.   Correct.

21   Q.   So so far we've gotten two and we don't even have it in

22   your abbreviation code, correct?

23   A.   Correct.

24   Q.   Okay.  Now, let's go to -- let's go to Victoria Loose.

25   All right.  Let's go to Victoria Loose, correct?  All right.

1    And let's go to February 18 -- excuse me, 2014, April 18th,

2    which is on the bottom of page 21 of your report, correct?

3    A.   Correct.

4    Q.   Okay.  And there you have CESI, correct?

5    A.   Correct.

6    Q.   Okay.  And --

7         MR. ROGALSKI:  Which date?

8         MR. WEISS:  April 18th, 2014.

9    Q.   Doctor, instead of doing that one for a second, let's do

10   2013, which is also on the bottom of 21, and I'm going to

11   direct your attention to September 21st, 2013.

12   A.   Correct.

13   Q.   CS -- CESI?

14   A.   Correct.

15   Q.   Okay.  And now we're going to bring up the chart for

16   September 21st, 2013.  Do you see on there the about four lines

17   from the bottom, "Procedure" --

18        MR. ROGALSKI:  Let me get to that date, I'm sorry.

19        MR. WEISS:  All right.

20   Q.   All right.  You see four lines from the top, "Procedure,

21   caudal"?

22   A.   That's correct.

23   Q.   Correct.  Okay.  And so there's a consent form, a pre-op

24   form, anesthesia record, operating room report, post-op form,

25   all reference the word caudal, correct?

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4323   Filed 06/13/22   Page 35 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

35

1  A.  Correct.
2  Q.  And I believe there's a letter to the referring physician
3  dated September 20, 2013?
4  A.  Correct.
5  Q.  Okay.  No cervical there, correct?
6  A.  Correct.
7  Q.  Okay.  And then you also have for couple weeks later,
8  October 7th, CESI, correct?
9  A.  Correct.
10 Q.  Okay.  And again, would you agree with me, so we could
11 speed things up a little bit, that the chart refers to caudal?
12 A.  Correct.
13 Q.  The consent form, the pre-op, the anesthesia record, the
14 operating room report and the post-op report all refer to
15 caudal?
16 A.  Correct.
17 Q.  And then a month later on November 7th, CESI?
18 A.  Correct.
19 Q.  And all of the documentation refers to caudal, correct?
20 A.  Correct.
21 Q.  Okay.  And then we go into 2014, February 18, you've got
22 CESI?
23 A.  Correct.
24 Q.  And we know that that's caudal as well, correct?
25 A.  Correct.

1    Q.  And all of the related documentation refers to caudal?

2    A.  Correct.

3    Q.  Not CESI.

4            And then we go to 2015, August 4th, CESI.

5    A.  Correct.

6    Q.  And we know that the chart and all of the related

7    documentation refer to caudal?

8    A.  Correct.

9    Q.  Then we go to 2017, or let's just stop for a second.

10   Let's go to 2016 if you would, and let's go to the top of page

11   23.  Do you see that?

12   A.  Yes.

13   Q.  July 5th, 2016, it has a caudal epidural injection, right?

14   A.  Correct.

15   Q.  So according to your testimony, you must have -- your

16   software system must have had haywire because you typed in

17   caudal and it actually appeared as caudal, correct?

18   A.  Correct.

19   Q.  And then August 26th, right below it, you typed in the

20   word caudal because it was a caudal procedure, correct?

21   A.  Correct.

22   Q.  And still no malfunction with your software, correct?

23   A.  Correct.

24   Q.  It typed out the exact thing that it was supposed to be,

25   right?

1    A.  It's spelled differently but I -- I can -- anyways, I know

2    you're asking me a yes or no question.

3    Q.  It's -- it's caudal, right?

4    A.  It says caudal.

5    Q.  Okay.  And 'cuz you typed in caudal?

6    A.  I typed in caudal.

7    Q.  Because the charts said caudal, correct?

8    A.  Correct.

9    Q.  And all the related documentation said caudal?

10   A.  Correct.

11   Q.  But Microsoft didn't have a problem with page 23 at the

12   top, right?

13   A.  Correct.

14   Q.  But if we go further down to 2017, which is on the same

15   page, March 21st and April 8th have CESI?

16   A.  Correct.

17   Q.  And we know that both of those entries in your report are

18   erroneous, right?

19   A.  Erroneous meaning...

20   Q.  Erroneous meaning wrong because they were caudal, not

21   cervical?

22   A.  On those, I'll need to go back and look.  Honestly, I

23   don't remember for those off the top of my head.

24   Q.  Okay.  All right.  Do you want me to show all the

25   documentation or will you accept my word that -- that the

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4326   Filed 06/13/22   Page 38 of 179
Jury Trial: Volume  6 • Tuesday, May 24, 2022

38

1   charts and the -- all the forms indicate caudal?

2   A.  I'll accept your word for that.

3   Q.  Thank you.

4           So on the same page, page 23 of your report, you can

5   type in the word caudal and it comes up caudal.  Couple lines

6   later you can type in the word caudal and according to you it

7   comes up CESI?

8   A.  That's correct.

9   Q.  Okay.  And so now I think we've had seven or eight of

10  these typos, and when you read it and proofread it and

11  proofread it and you're reading caudal and you're reading CS --

12  CESI, according to you it just didn't register?

13  A.  Are you asking a yes or no question?

14  Q.  Yeah, I am.  It didn't register 'cuz you didn't -- you --

15  you didn't correct it?

16  A.  I did not.

17  Q.  And a year and a half since you prepared it, you never

18  called anybody over here and said --

19          THE COURT:  You're -- you're -- you're giving a

20  speech.  Ask a question and don't give a speech if you would,

21  Mr. --

22  BY MR. WEISS:

23  Q.  Did you at any time after October -- October 31st, 2020

24  notify the government that you have all these typos?

25  A.  Unfortunately, it was just recently.

1   Q.  Okay.  So the answer is no, you did not?

2   A.  It -- I -- I just acknowledged that I did recently.

3   Q.  Okay.

4        MR. WEISS:  Mr. Rogalski, just go to the top so we

5   can indicate the date.

6   Q.  All right.  The date of service is September 25th, 2018.

7   Do you agree with me, sir?

8   A.  Correct.

9   Q.  And, in fact, it's part of Government's -- I don't know if

10  you can just scroll down a little bit -- 116H, okay?

11       Now, if we go up a little bit, "Patient

12  was informed" -- excuse me, "Patient informed cocaine found on

13  her urine 7-2 -- excuse me -- 2018."  Says that, correct?

14  A.  I'm sorry, could you repeat the question?

15  Q.  It's under "Chief complaint."  The sentence starts,

16  "46-year-old female here for recheck of pain."

17  A.  Yes.

18  Q.  Okay.  And then it goes, "Patient informed cocaine found

19  on urine 7-2-2018."

20  A.  Yes.

21  Q.  Correct?  Okay.  "Patient is upset about this finding,

22  says she does not -- states she does not use -- she does not do

23  cocaine nor does she do heroin as found on urine as a new

24  patient."  And you don't disagree with me that she had

25  previously tested positive for heroin, correct?

1    A.   Correct.

2    Q.   Okay.  "Patient informed me that the remaining agents have

3    interviewed her about our practice and she states, quote, 'I

4    hopes they shut you guys down.'" End quote.  Right?

5    A.   Correct.

6    Q.   Okay.  Let's go down a little bit further.  All right.

7    Under "Assessment, U" -- let's go up a little bit further.

8    Under "Assessment, UDS."  And what does UDS stand for, sir?

9    A.   Urine drug screen.

10   Q.   Okay.  "7-2-2018, positive cocaine.  This is the second

11   time cocaine has been found on urine along with Carolyn at the

12   start of her time with us.  Patient will be referred to

13   addiction medicine."  Correct?

14   A.   Correct.

15   Q.   Okay.  And then we go down to "Plan: Patient is refusing

16   referral to addiction medicine and refusing all narcotic --

17   non-narcotic therapies.  Patient states, 'I hope you guys get

18   shut down.' End quote.  Patient informed no narc -- no, or

19   known, narcotics -- no narcotics until completion of addiction

20   medicine.  She may return for further back injections.

21   Followup: Patient will be seen again as needed, paren, (no

22   narcotics until completion of addiction medicine.)"  Close

23   paren.

24        That record indicates that there were positives to

25   the urine drug screens, correct?

1    A.   Correct.

2    Q.   And the clinician addressed them, correct?

3    A.   Correct.

4    Q.   Okay.

5             (Brief pause)

6    Q.   Doctor, while they're looking for that, let me ask you,

7    the charts that you reviewed, there was imaging of the various

8    procedures, correct?

9    A.   Correct.

10   Q.   Okay.  And again, from the trained eye, one would be able

11   to ascertain the difference between an injection in the caudal

12   area versus an injection in the cervical area, correct?

13   A.   Correct.

14   Q.   And the imaging showed that as well as all the forms we

15   had, correct?

16   A.   Correct.

17   Q.   Sir, on the screen now is some imaging of Victoria Loose.

18   Were you shown these images by the government?

19   A.   Yes.

20   Q.   Okay.  Now, in the center there's some really dark areas.

21   Some are sort of rectangular, some are curved like an arc, and

22   others are sort of oblique lines, correct?

23   A.   Correct.

24   Q.   Are you able to ascertain what is being shown as a result

25   of those darkened areas?

1   A.   The darkened areas are the screws of a -- of a surgery

2   fusion.

3   Q.   Okay.  So if I was to tell you that this is the way

4   Victoria Loose presented when she came first to the TPC and the

5   IPC with all of that metallic hardware in her back, you

6   wouldn't dispute that, correct?

7   A.   Correct.

8   Q.   And the fact that she was having pain, significant pain,

9   even going through I believe two surgeries -- are you familiar

10  with the concept failed surgery syndrome?

11  A.   Yes, I am.

12  Q.   Okay.  Would you please explain to the jury what that is?

13  A.   So failed -- it -- the full name that it used to be

14  called, it was failed back surgery syndrome.  Now it's called

15  post-laminectomy syndrome.  It's the concept of continued pain

16  following spine surgery in the absence of knowing why.  It can

17  be back pain, it can be leg pain or a combination of the two.

18  It can be one-sided, bilateral, both legs, one leg, various

19  parts of that.  So that -- that's the overall concept.

20  Q.   All right.  And are you familiar with a spine stimulant?

21  A.   I don't use that term but I think I know what you're

22  trying to say.

23  Q.   Let's make sure we're on the same page.  If you don't use

24  the phrase spine stimulant, what phrase or what do you describe

25  it as?

1  A.  Spinal cord stimulation.

2  Q.  Okay.  And please relate to the jury what that is.

3  A.  So spinal cord stimulation is a electronic device, very

4  much like a pacemaker.  So a pacemaker in your heart tries to

5  correct electrical activity in a heart that's firing

6  abnormally.  Somewhat similar to that, a device where there are

7  wires placed along the spinal cord in this area called the

8  epidural space just outside the spine, it's connected to a

9  battery that sends a signal via the wires and it tries to alter

10  how the pain signals are firing.  So it's a nonpharmacologic

11  way to try to treat back and leg pain, especially in cases like

12  post-laminectomy syndrome.

13  Q.  Okay.  And when you reviewed Victoria Loose's charts, how

14  many times did the clinicians recommend to her that she go to

15  someone who could provide her with that type of stimulation?

16  A.  A few times, yes.

17  Q.  Yeah.  And each time she said no?

18  A.  Correct.

19  Q.  In fact, they went so far as to even give her a disk

20  explaining the procedure?

21  A.  Information, yes.

22  Q.  And she fought the clinicians.  She didn't want the disk,

23  she didn't want to look into it, correct?

24  A.  I wasn't there at that so I don't know that part but...

25  Q.  But the charts reference what her responses were to the

1    overtures, do they not?

2    A.  She did not respond to it.

3    Q.  Okay.  In fact, they recommended a letter to a mental

4    health therapist to see whether or not her fear may not be able

5    to be appropriately overcome because nothing else was really

6    working, correct?

7    A.  Correct.

8    Q.  And, in fact, at one point she indicated that she would

9    look into it but then she changed her mind?

10   A.  Correct.

11   Q.  Okay.  They tried their best for a very difficult patient,

12   correct?

13   A.  I -- I'll disagree with that statement.

14   Q.  Okay.  Thank you.

15            THE COURT:  All done?

16            MR. WEISS:  Yes, Your Honor.  Thank you.

17            THE COURT:  Okay.  All right.  Thank you very much.

18   Excellent.

19            Who's next?  Mr. Harrison I think?

20            MR. HARRISON:  Yes, I'll go next, Your Honor.

21            THE COURT:  Let -- let me ask you to take your mask

22   down so that the mic picks you up, but go right ahead.

23                      CROSS-EXAMINATION

24   BY MR. HARRISON:

25   Q.  Good morning, Dr. Mehta.  My name is Bob Harrison and I

1    represent Dr. Edu.

2    A.  I'm sorry, I didn't realize it was you sitting.

3    Q.  I'm sorry.

4    A.  I didn't realize it was you sitting, I'm sorry.  I was

5    looking in the wrong direction.  Good morning.

6    Q.  Yeah, I'm sitting with the permission of Judge Murphy.

7    A.  I understand.  Thank you.

8    Q.  It's not disrespect to you.

9    A.  No, none taken.  Thank you.

10   Q.  Okay.  My name is Bob Harrison and I represent Dr. Edu

11   who's seated behind me.

12   A.  Yes, sir.

13          MR. HARRISON:  I would like you to go back to, Ms.

14   Adams, Exhibit 115A-0003.

15   BY MR. HARRISON:

16   Q.  This is the first page of encounters with Jack Lacey,

17   correct?

18   A.  Correct.

19   Q.  We've seen it before with you, correct?

20   A.  Correct.

21   Q.  And would you agree with me that his chief complaint was

22   neck pain that started three years ago due to a motor vehicle

23   accident?

24   A.  Correct.

25   Q.  And that it was noted that he was allergic to Vicodin and

1    codeine?

2    A.   Just looking, yes, I see that on the right-hand side in

3    the middle of the page.

4    Q.   And does that suggest to you that he had tried them

5    before?

6    A.   That's correct.

7    Q.   And do you also see written there that he had anxiety?

8    A.   Correct.

9    Q.   And do you see that the motor vehicle accident happened

10   when he was a driver of a car that hit a tree?

11   A.   I do.

12   Q.   And going please to page 4 of that exhibit -- I'm sorry,

13   hold on please.  Going back to 03, does it indicate that the

14   pain is sharp?

15   A.   Yes, yes, it does.

16   Q.   Aching?

17   A.   Yes.

18   Q.   Intermittent?

19   A.   Yes.

20   Q.   Severe?

21   A.   Yes.

22   Q.   And to speed it up, I'll read a few more things and then

23   you can either agree or disagree with them, okay?  [Inaudible]

24   with driving --

25              THE COURT REPORTER:  I'm sorry, I didn't hear that

```
1    first word.
2    Q.   "Worse with driving, lifting, nothing helped the pain,
3    tried Flexeril without relief, no next brace or PT."
4    A.   I agree.
5    Q.   Okay.  Yesterday when you were describing this, you I
6    believe testified as if what was written was he's not going to
7    get a neck brace or PT.  Did you intend that?
8    A.   I don't believe I said that.
9    Q.   If you said it, you didn't mean it that way?
10   A.   I don't recall saying that at all.
11   Q.   Okay.  And there was noted that there was a CAT scan
12   report of November 2nd, 2012?
13   A.   Correct.
14   Q.   And then on the right-hand side of the page you see that
15   it says -- well, why don't you read it, item number 1.
16   A.   I'm sorry, can you refer where you're reading?
17   Q.   Yes.  On page 003, at the top right-hand side of the page,
18   there are five things listed.  Would you read item number 1?
19   A.   "Neck brace."
20   Q.   Okay.  Does it indicate almost halfway down that he
21   suffered from anxiety?
22   A.   Yes.
23   Q.   And at the bottom of the page can you see that tramadol
24   50 milligrams a day was prescribed along with Baclofen for two
25   weeks?
```

1    A.  That's correct.

2    Q.  Okay.

3         THE COURT REPORTER:  Excuse me, Mr. Harrison.  Did

4    you 50 or 15?

5         MR. HARRISON:  5-0.

6         THE COURT REPORTER:  Thank you.

7    Q.  Would you agree with me that tramadol 50 milligrams is a

8    very, very low-level pain pill?

9    A.  It is a low-level opioid.

10   Q.  Well, one percent opium?

11   A.  It's a synthetic so it's a synthetic substance.

12   Q.  Okay.  And on 0004 I'm going to ask you some questions

13   about the middle of the page but I want to ask you this.  Do

14   you know what Blue Cross Network is?

15   A.  Blue Cross Network is an insurance.

16   Q.  Okay.  Did you come to learn in your analysis of the

17   operations of the Pain Clinic that only two physicians there

18   were authorized to see Blue Care Network patients?

19   A.  Correct.

20   Q.  And that Dr. Edu was one of those two?

21   A.  Correct.

22   Q.  Okay.  Now, looking at the middle of that page on the left

23   side, it says 6-30-16, correct?

24   A.  Correct.

25   Q.  And does it indicate that Norco 10 milligrams,

1    325 milligrams of acetaminophen, 60 pills, along with Baclofen

2    was written?

3    A.  It is written, yes, I agree.

4    Q.  Okay.  And then you see an arrow and it indicates Acynta

5    [sic] was prescribed instead, correct?

6    A.  Nucynta, yes.

7    Q.  Nucynta.  Okay.

8          And did you determine that the patient refused the

9    Norco as a part of your analysis of this case?

10   A.  It was actually concerning because on the previous page,

11   as you had described, an allergy for Vicodin, and then Norco

12   which has similar compounds was being prescribed here.

13   Q.  So that it was not given to him because of that, correct?

14   A.  Well, I -- I can refer to what was documented in that an

15   attempt was made to prescribe Nucynta.  That's what I'm

16   inferring from there.

17   Q.  Okay.  And then underneath that it says, "Insurance

18   doesn't cover," correct?

19   A.  Correct.

20   Q.  And then it indicates that tramadol 100 milligrams was

21   issued instead, correct?

22   A.  Correct.

23         MR. HARRISON:  Then, Ms. Adams, can we have page 005

24   of that exhibit?

25   BY MR. HARRISON:

1  Q.  Does it indicate that this patient was given a bilateral

2  C2-C4 cervical facet injection?

3  A.  Yes, it does.

4  Q.  And does it indicate at the next visit what kind of

5  improvement he had from that facet injection?

6  A.  Um, it says the "bilateral -- bilateral cervical facet

7  procedure" -- I'm sorry, I'm just reading it again.  Yes,

8  90 percent.

9  Q.  Over 90 percent pain relief?

10  A.  Correct.

11  Q.  Correct?  Okay.

12        And would you agree with me that that would be then

13  appropriate to administer a second diagnostic intervention?

14  A.  Correct.

15  Q.  Okay.  And when that is helpful or successful, then the

16  CD -- CDC guidelines approve a radiofrequency ablation,

17  correct?

18  A.  I'm going to disagree with your use of CDC guidelines and

19  the interventional procedure.

20  Q.  I'm sorry.  The CMS guidelines.

21  A.  CMS guidelines, yes.

22  Q.  Yeah.  Okay.  And that radiofrequency ablation was done to

23  the nerves at C4 -- C2-C4, correct?

24  A.  C2 through C4.

25  Q.  Correct.  Does anything strike you as unusual or

1   inappropriate about the notation with -- regarding that

2   procedure, the radiofrequency ablation?

3   A.   The notation of it?

4   Q.   Not the notation of it.  Was there something inappropriate

5   about performing that C2 through C4 bilateral radiofrequency

6   ablation?  I'm sorry, the facet, the bilateral facet procedure?

7   A.   So it was not bilateral; it was right-sided.

8            THE COURT REPORTER:  I'm sorry, what sided?

9            THE WITNESS:  Right-sided.

10           THE COURT REPORTER:  Thank you.

11  Q.   Well, was there anything wrong with performing the

12  bilateral cervical facet procedure?

13  A.   I'm -- I'm sorry, I'm going to just ask for a

14  clarification.  We're referring to the bottom of 9-20 --

15  9-23-16?

16  Q.   We're talking about August 15th, 2016.

17  A.   Okay.  I'm sorry.  I thought you had previously asked

18  about the radiofrequency.  So --

19  Q.   I misstated it.

20  A.   So perhaps you could just start again just so we're not --

21  Q.   Was there anything inappropriate that you can see about

22  doing a bilateral C2 through C4 facet injection?

23  A.   On August 15th?

24  Q.   Yes.

25  A.   No.

1    Q.  Okay.  On September 23rd, 2016 does it indicate that the

2    patient, Mr. Lacey, rated his pain as eight out of ten?

3    A.  It indicates eight to nine out of ten.

4    Q.  Okay.  Now, it's pretty clear that these procedures were

5    performed on Mr. Lacey's neck, correct?

6    A.  That's correct.

7            MR. HARRISON:  Ms. Adams, could we have page 19 of

8    Dr. Mehta's report?

9            MS. McMILLION:  Objection, Your Honor.  Dr. Mehta's

10   report is not into evidence.  It was simply used to refresh the

11   witness's recollection.

12           THE COURT:  If it's not in evidence, Mr. Harrison,

13   you can use it to impeach or refresh but we should not show it

14   to the jury.

15           MR. HARRISON:  Okay.  Yes, Your Honor.

16           (Brief pause)

17           I'm sorry for this, Your Honor.

18           THE COURT:  That's okay.

19           MR. HARRISON:  On page 18, Ms. Adams --

20           MS. ADAMS:  Can't pull it up.

21           MS. McMILLION:  Same objection, Your Honor.

22   BY MR. HARRISON:

23   Q.  All right.  On page 18 of your report, sir, can you look

24   at that?

25   A.  Yes.

1   Q.   And did you write that "the patient was initially seen on
2   June 16th, 2016"?
3   A.   Correct.
4   Q.   "With a history of motor vehicle accident and a history of
5   present illness"?
6   A.   Correct.
7   Q.   "His CT scan of cervical spine from 2012 showed mild
8   bulging at C4-C5 level," correct?
9   A.   Correct.
10  Q.   Does it say, "On the initial visit a back brace, physical
11  therapy and EMG were ordered"?
12  A.   Correct.
13  Q.   Okay.  And going further down, "There was no followup on
14  the use or change in symptoms with back brace," is that true?
15  A.   Correct.
16  Q.   So in this instance, when you type into your word -- word
17  processing system, your Microsoft Word, when you typed the word
18  "neck," did it type "back"?
19  A.   No, it did not.
20  Q.   But you wrote "back" twice, didn't you?
21  A.   You're correct.
22  Q.   Was that what you call a typographical error?
23  A.   It was not.
24  Q.   It was an error?
25  A.   It was an error.

1    Q.   Twice?

2    A.   Correct.

3    Q.   Now, I'm going to call your attention to another part of

4    your report.  In the middle of page 19, sir, relating to Jack

5    Lacey --

6    A.   I'm sorry, could you repeat that?

7    Q.   In the middle of page 19, and this is where you were

8    discussing Jack Lacey, okay?

9    A.   Yes.

10   Q.   Did you write "Counts 45/46, unlawful distribution"?

11   A.   I did.

12   Q.   And did you say, "The patient continued to receive opioids

13   despite inconsistent urine drug screen results and no

14   discussion is noted in charts regarding the inconsistencies"?

15   A.   Correct.

16   Q.   And did you further write, "The patient kept receiving

17   opioids throughout his course as a patient in the practice"?

18   A.   Correct.

19   Q.   And did you write, "Each of these prescriptions was

20   outside the course of professional medical practice and not in

21   good faith"?

22   A.   Correct.

23   Q.   Now, would you look at the indictment please?

24   A.   I don't have the indictment in front of me.

25             MR. HARRISON:  Ms. Adams, can you display it on

1   page -- what?

2           MS. McMILLION:  It's not loaded.

3           MR. HARRISON:  It's not loaded either?

4           MR. MARGOLIS:  Bob, would you like me to hand this to

5   you?

6           MR. HARRISON:  Pardon me?

7           MR. MARGOLIS:  Would you like me to hand this to you?

8           MR. HARRISON:  Yes.

9           MR. MARGOLIS:  May I approach, Your Honor?

10          THE COURT:  Yes.

11  BY MR. HARRISON:

12  Q.  Have you read it?

13  A.  Have I read this in the past, is that --

14  Q.  The Counts 44 through 46?

15  A.  I'm sorry.  Perhaps you can help me with the page numbers.

16  Q.  Page 28.

17  A.  Correct.

18  Q.  In your report you said, "The substantive counts relating

19  to Jack Lacey," and your second paragraph, "was Counts 45 and

20  46," which I had you read, correct?

21  A.  Correct.

22  Q.  And when you look at the indictment, Counts 45 and 46

23  don't relate to Dr. Edu at all.  They charge someone else with

24  those offenses, isn't that true?

25          MS. McMILLION:  Objection, Your Honor.  Counsel's

```
 1   questioning is with regard to the defendant, not the patient,
 2   and so that would then state facts not in evidence.
 3           THE COURT:  Okay.  Well, we can clear that up, but I
 4   take it the answer -- I take it the answer -- actually I
 5   don't -- I don't know the answer.  Go ahead, Witness, if you
 6   can answer that question.  Is the Defendant Edu charged in that
 7   count?
 8           THE WITNESS:  Not in that count as far as I can tell.
 9   I -- it's outside the -- my expertise on that.
10   BY MR. HARRISON:
11   Q.  Was that the -- was that a typographical error?
12   A.  I -- it's an error.  I don't -- it's -- I don't believe it
13   to be typographical.
14   Q.  And it's not a result of your Microsoft software?
15   A.  No.
16   Q.  It's your fault, right?
17   A.  I'll take the mistake, yes.
18   Q.  You made a mistake and wrote in your report that Dr. Edu
19   was charged with two counts that he wasn't charged with at all,
20   correct?
21           MS. McMILLION:  Objection, Your Honor.  Misstates the
22   report.
23           THE COURT REPORTER:  Ms. McMillion, could you please
24   remove your mask?
25           MS. McMILLION:  Objection, Your Honor.  Misstates
```

1    facts in evidence as well as misstating the report.

2            THE COURT:  Okay.

3            MR. HARRISON:  I can lay it out again, Your Honor.

4            THE COURT:  Well, I don't think we need to do that.

5    I think -- I think the point's been made, and rather than

6    ruling on the objection 'cuz I don't have all these documents,

7    especially the indictment right in front of me, I'm not -- I'm

8    going to reserve ruling, and -- and again, Ms. -- Ms. McMillion

9    can clear it up on redirect should she choose.

10            So go ahead, Mr. Harrison.

11   BY MR. HARRISON:

12   Q.  On another matter, did you -- well, can I have -- where is

13   she?  On page 24 of your report at the bottom, the bottom, last

14   full paragraph, did you again talk about Counts 45 and 46,

15   unlawful distribution?

16   A.  I did.

17   Q.  And where you talk about that, you're describing your

18   analysis of the treatment of Victoria Loose, correct?

19   A.  Correct.

20   Q.  And looking at that paragraph, except for one word that

21   describes gender, is that paragraph identical to the paragraph

22   I had you read regarding Jack Lacey?

23   A.  Correct.

24   Q.  Okay.  So you wrote a paragraph and you reproduced it.

25   You wrote it first regarding a male and then you wrote it again

1   regarding a female, right?

2   A.  Correct.

3   Q.  And the only thing you changed was the gender.  Rather

4   than "his course as a patient," you wrote "her course as a

5   patient," correct?

6   A.  Correct.

7   Q.  Now, this is a report, and we'll get to how much it's

8   costing the government, but this report you wrote that could

9   devastatingly impact the defendants in this case, right?

10  A.  Correct.

11  Q.  And you cautioned us yesterday in medical reports that you

12  shouldn't cut and paste, right?

13  A.  Correct.

14  Q.  Yet you cut and pasted in this incredibly important expert

15  report, didn't you?

16  A.  Correct.

17  Q.  Returning very briefly to Jack Lacey's medical records,

18  Exhibit 115A, page 0006, the very bottom of that page, would

19  you please read what was written above and to the right of

20  12-9-16?

21  A.  Above and to the right?

22  Q.  I can't hear you.

23  A.  I'm sorry.

24  Q.  I'm sorry.

25  A.  You're -- you're --

1    Q.   Above and to the left of 0006.

2    A.   Are you referring to the plan or are you referring to the

3    HPI or --

4    Q.   Where it starts "UDT negative opioids."  It's the fourth

5    page of the medical records.

6    A.   Yes.  No, I'm looking -- I'm sorry.  You mean in the

7    circle, is that where you're referring to?

8    Q.   Yes.

9    A.   So "UDT 9-23-16 negative for opioids," is that --

10   Q.   Yes.  And what else does it say?  Now the bottom where it

11   says "UDT negative opioids," the very bottom.

12   A.   Yes.

13   Q.   Okay.  Read that for us.  It's not much.

14   A.   "Second time discussed with patient, last warning."

15   Q.   "Second time, last warning," is that right?

16   A.   Correct.

17   Q.   And that was because he was negative for opioids?

18   A.   Correct.

19   Q.   And he was dispensed a prescription for opioids that

20   should have lasted until that date, correct?

21   A.   Correct.

22   Q.   Now please turn the page to 0008, a visit of 1-17-16.  Are

23   you at the page, sir?

24   A.   Yes, I am.

25   Q.   And does it say, "Pill count, expected number, 42 pills,"

1  right?

2  A.  Correct.

3  Q.  And then it says, "Actual 23," correct?

4  A.  Correct.

5  Q.  Then it says, "Difference 19"?

6  A.  Correct.

7  Q.  "Filled on 1-8-17," is that right?

8  A.  It -- it says those words.

9  Q.  Read the next few sentences.

10  A.  So it says, "Plan.  No more meds in the future if next

11  urine drug test fails to show pain meds present."

12  Q.  "Prescribed."

13  A.  Or "prescribed," I'm sorry.

14  Q.  Now, will you turn to 007, the next page, for the

15  4-15-2000 -- see where it says "UDT negative for opioids,

16  3-14-17"?

17  A.  Yes.

18  Q.  And I think I may have skipped over a page here.  Before

19  we get to that page, I'm going to ask if Ms. Adams would pull

20  up 115A, page 42.  Do you have it, sir?

21  A.  Yes.

22  Q.  And about a little past halfway down, does it say,

23  "Quantity prescribed 60"?

24  A.  Yes.

25  Q.  And does it say, "Quantity remaining"?

1    A.   Yes.

2    Q.   Does it say "A333"?

3    A.   Yes.

4    Q.   Do you know what A333 stands for?

5    A.   I believe it was the prescription number but I don't know

6    exactly.

7    Q.   Percocet?

8    A.   It -- the medication, yes.

9    Q.   Okay.  And does it in parentheses say "(23)" end

10   parentheses?

11   A.   Correct.

12   Q.   And then circled does it say "G32"?

13   A.   Correct.

14   Q.   Parenthesis "(12)" end parenthesis?

15   A.   Correct.

16   Q.   And does it say "Naproxen"?

17   A.   Correct.

18   Q.   What is Naproxen?

19   A.   It's an anti-inflammatory.

20   Q.   Okay.  So does that suggest that Mr. Lacey for the pill

21   count added 12 Naproxen to his Percocet so that he could come

22   up with the right number of pills he was supposed to have?

23   A.   I -- I have no way of verifying that.  It just says that

24   these were the pills that were counted.

25   Q.   Going back to 0007, would you read -- from where it says,

1  "UDT negative opioids 3-14-17," would you read where the arrow

2  points to?

3  A.  "Only to prescribe methadone 10 milligrams twice a day

4  today."

5  Q.  And what is under that?

6  A.  "I will stop prescribing if next visit fails to show

7  opioid" I think that's "prescribed.  Discussed with patient

8  today and he agrees."

9  Q.  Okay.  So does that indicate to you that Dr. Edu refused

10  to prescribe his prior medications and was giving him methadone

11  instead?

12  A.  He stopped prescribing one controlled substance and

13  prescribed another controlled substance.

14  Q.  And is methadone traditionally used to take people off of

15  other opioids?

16  A.  It has a dual purpose so it -- it can.

17  Q.  One of the purposes is to help people get off of opioids,

18  correct?

19  A.  It -- it has a special designation for that.  This is

20  outside of that scope.

21  Q.  Well, can -- did you divine that?

22  A.  Can I define...

23  Q.  Did you divine it?  Did you -- did you say -- when you

24  said it has a different purpose, how did you know that?

25  A.  So methadone has two designations.  A pain management

1  physician would be using it for treatment of pain.  That's in

2  their scope of practice.  Methadone also has a treatment for

3  addiction, and that's traditionally given at a methadone

4  clinic.

5  Q.  Okay.

6       MR. HARRISON:  May I have a moment, Your Honor?

7       THE COURT:  Yes.

8       (Brief pause)

9  Q.  Dr. Mehta, do you believe that in your best judgment, an

10  anesthesiologist should be criminally charged if all they did

11  was to provide sedation because the other doctor who performed

12  the procedure performed what the government deemed to be

13  unnecessary?

14       MS. McMILLION:  Objection, Your Honor.  Outside the

15  scope of this witness's ability to talk about what is

16  criminally liable.

17       MR. HARRISON:  Not asking him for a criminal law

18  answer.  I'm asking him for his belief.

19       THE COURT:  Well, I think as -- as asked, the

20  question is objectionable.  But I would say if you're able to

21  rephrase to ask him do you think there's criminal liability for

22  that behavior, if he can answer that, he -- he should.

23       Go ahead, Mr. Harrison.

24  BY MR. HARRISON:

25  Q.  You think that there is -- that it is criminal behavior if

1    all an anesthesiologist does is administer sedation while

2    someone else performs a procedure that's improper, that that

3    anesthesiologist should also be charged?

4    A.  An anesthesiologist providing an anesthetic --

5    Q.  Yeah.

6    A.  -- is responsible for the care of the patient and is

7    equally responsible to understand the merits and needs for the

8    anesthetic to be provided.

9    Q.  So you are saying that that anesthesiologist should know

10   all discussions and actions taken by the person who performs

11   the procedure?

12   A.  It should be -- not all discussions, no, I -- I do not

13   hold them responsible.

14   Q.  Do you know what vicarious liability means?

15        MS. McMILLION:  Objection, Your Honor.  Again, we're

16   getting into --

17        THE COURT:  I think that's sustained.  That's outside

18   of this gentleman's topic area.

19        Go -- go ahead, Mr. Harrison.

20        MR. HARRISON:  I'm through with this witness.

21        THE COURT:  Okay.  All right.  Thank you, sir.

22        Hold on a sec, Mr. Chapman.  I'm going do a little

23   trial management here if I can.  How long do you think you

24   would go, Mr. Margolis?

25        MR. MARGOLIS:  It's going to be a bit.  I was hoping

```
 1    to get a bathroom break as well.
 2            THE COURT:  Say it again.
 3            MR. MARGOLIS:  It'll be about half an hour to an
 4    hour.
 5            THE COURT REPORTER:  Would you take your mask off
 6    please?
 7            MR. MARGOLIS:  Sorry.
 8            It'll be about half an hour to an hour depending on
 9    where it goes.
10            THE COURT:  Okay.  All right.  Well, we'll get
11    started with Mr. Chapman then.  Go right ahead.
12            MR. CHAPMAN:  Thank you, Your Honor.
13            Your Honor, before I get into the thick of things,
14    when does the Court anticipate taking a break just so I can
15    time it?
16            THE COURT:  Say if you go 20 minutes, let's -- let's
17    chat with each other in 20 minutes and see if that's a good
18    time.
19            MR. CHAPMAN:  Sounds good, Your Honor
20            THE COURT:  Okay.  How's our jury doing?  You guys
21    warm?  No?  Got a little sweat breaking out up here, so... .
22    Of course I'm wearing this thing, so...
23            All right.  Go ahead, Mr. Chapman.
24            MR. CHAPMAN:  Thank you, Your Honor.
25                            CROSS-EXAMINATION
```

```
1    BY MR. CHAPMAN:

2    Q.  Good morning, Dr. Mehta.  My name is Ron Chapman.  I

3    represent Dr. Lewis.  I'm going to ask you some questions.

4    A.  Good morning.

5    Q.  First, you've never met Dr. Lewis before?

6    A.  I have not.

7    Q.  Before this case you had no idea who he was?

8    A.  That's correct.

9    Q.  Okay.  But you did author a report in this case as we've

10   discussed thoroughly?

11   A.  Correct.

12   Q.  And that report --

13          THE COURT REPORTER:  Mr. Chapman?

14          MR. CHAPMAN:  Sure.

15   BY MR. CHAPMAN:

16   Q.  And that report was finalized on October 31st, 2020?

17   A.  Correct.

18   Q.  Approximately how long did it take you to draft that

19   report?

20   A.  Off the top of my head, I don't remember the hours, but it

21   was a significant amount of time.

22   Q.  Did you personally draft it?

23   A.  Yes.

24   Q.  Every word?

25   A.  I tried to as much of it as -- in terms of the exact
```

1  language.  I asked for help with the government to understand

2  if I was writing something appropriate for the specific counts,

3  but for the language of the medical portion, that is my -- my

4  authorship.

5  Q.  Okay.  I -- I don't understand the answer.  I'm going to

6  reask the question.  Did you draft every word?

7  A.  I did, yes.

8  Q.  You personally drafted every word?

9  A.  I typed every word.

10  Q.  Okay.  But there are times where you sent this report to

11  the government?

12  A.  Correct.

13  Q.  And they added portions?

14  A.  No.

15  Q.  They made suggestions about what should be modified?

16  A.  They made suggestions, yes, at -- at -- at top -- at

17  particular points, correct.

18  Q.  Approximately how many times did that occur?

19  A.  Probably five times or so.

20  Q.  And it's your testimony that those modifications were only

21  related to legal portions of the report?

22  A.  Correct.

23  Q.  Did one of those portions that was modified by the

24  government relate to the standard that you use to analyze these

25  cases?

1    A.   No.

2    Q.   Well, I'm curious about that because it appears that the

3    standard that you used in this case was a carbon copy of the

4    exact language the government always uses in these reports.

5    Did you base this standard portion of your report on other

6    government reports?

7    A.   It's -- it's language that, yes, to help understand how to

8    write out the standard, but it's a medical standard that I

9    believe to abide myself by and by other physicians.

10   Q.   Let's try that again.  The portion in your report where

11   you discuss the standard that you apply to this case, did every

12   word come from your mind?

13   A.   No, not -- not every word.

14   Q.   Where did you get those words?

15   A.   From previous reports, yes.

16   Q.   Previous government reports?

17   A.   Correct.

18   Q.   Reports that were issued against other physicians?

19   A.   Correct.

20   Q.   Okay.  So the standard that you applied was not a standard

21   that you created or that you know as a medical professional?

22   A.   I did use that.  The language to help articulate that is

23   what I looked for reference.

24   Q.   Again, it's important to listen to the question.  The

25   standard that you used was not a standard that came from your

1   mind but was one that came from the mind of the government?

2   A.   I'm going to disagree with that.

3   Q.   Okay.  So you knew what the standard was before you wrote

4   this report, each and every word, but you also reviewed

5   government reports and that seemed to magically match your --

6   your thinking about the standard in this case?

7   A.   The terminology and the way to articulate something can be

8   written in -- in a few different ways, as you probably would

9   recall, so -- or know, so yes, the language would match what a

10  previous report had said.

11  Q.   Okay.  So every word of the standard in your report

12  matches a prior government report but those are actually your

13  words, is that your testimony?

14  A.   It was written from another document, yes.

15  Q.   Okay.  It was copied from another document?

16  A.   Correct.

17  Q.   Thank you.

18          Doctor, how much did this report cost the government?

19  A.   It's a significant amount of time.  So I apologize, I

20  don't have my exact billings, but I think that it's to the tune

21  of -- all the work provided could be about 25,000 if I -- if I

22  tried to recall.

23  Q.   How many hours did you spend reviewing this case?

24  A.   A large number of hours.

25  Q.   Your rate is 500 an hour?

1    A.   Correct.

2    Q.   Okay.  And you charged 25,000?

3    A.   For all the effort that has been put into this case.

4    Q.   Is that up to date, 25,000?

5    A.   Not for the time spent in these past couple of days.

6    Q.   Okay.  So it's an additional cost for appearing at trial?

7    A.   Correct.

8    Q.   Hoping one of my esteemed colleagues can tell me how many

9    hours in total.

10         So you would estimate that you spent about 50 hours

11   in total, right?

12   A.   On the case.

13   Q.   Up -- up to -- up to now?

14   A.   Yes.

15   Q.   And during those 50 hours it's your testimony that you

16   reviewed six charts in detail, right?

17   A.   Correct.

18   Q.   And you reviewed a hundred charts with less detail?

19   A.   Correct.

20   Q.   Okay.  And of those six charts that you reviewed in

21   detail, you've already identified a number of mistakes that you

22   made in your report, right?

23   A.   Correct.

24   Q.   There were seven or eight mistakes regarding the use of

25   caudal versus cervical?

1    A.   Correct.

2    Q.   There was a mistake where you -- you mentioned back

3    instead of neck for one of Dr. Edu's patients, right?

4    A.   Correct.

5    Q.   There's a -- there was a mistake where you -- you

6    indicated that there was no conversation about patient Jack

7    Lacey's urine drug screen when, in fact, there was a

8    conversation, there was a pill count, there was an indication

9    of discharge, and then there was a weaning dose of medication

10   prescribed, right?

11   A.   I'll disagree with the latter portion of that statement,

12   but there was a conversation.

13   Q.   Okay.  That was a mistake.

14   A.   The -- the conversation and the action did not match.

15   Q.   It was a mistake to say there was no conversation when, in

16   fact, there was a conversation?

17   A.   Correct.

18   Q.   It was a mistake to say there was no action when, in fact,

19   there was an action?

20   A.   I'll disagree with that.

21   Q.   Okay.  It was also a mistake where you appeared to copy

22   and paste entries of your report related to one patient in two

23   portions of your report related to another patient, right?

24   A.   You're referring to a specific area?

25   Q.   The part that Mr. Harrison just walked through with you

1    where you copied and pasted and you admitted to doing so.

2    A.   On the count, yes.

3    Q.   Yeah.  Okay.  You've got about 13, 14 mistakes?

4    A.   Correct.

5    Q.   Okay.  And those are mistakes that have impacted these

6    physicians that are sitting right here, right?

7    A.   Correct.

8    Q.   How do you feel about charging the government $25,000 for

9    a document that at least contains 14 mistakes?

10   A.   I feel terrible.

11           MS. McMILLION:  Your Honor?

12           THE COURT:  I -- I think that's sustained.

13           Go ahead, Mr. Chapman.

14           MR. CHAPMAN:  Thank you, Your Honor.

15   BY MR. CHAPMAN:

16   Q.   Are there any other corrections that you would like to

17   make to your report before we proceed?

18   A.   In similar nature, I -- I think we've talked about there

19   are similar type mistakes of caudal versus cervical in other

20   patients.

21   Q.   And that's the only additional mistake that you'd like to

22   point out to the jury today?

23   A.   Also on the Andrew Peterson portion, there was visits with

24   other providers prior to the one I documented on, Dr. Lewis.

25   Q.   I really appreciate you telling me about that because

1    we're going to have to have a conversation about that.

2            Any -- any other mistakes you'd like to point out?

3    A.  As far as I know, that's it.

4    Q.  When did you first realize these mistakes were made?

5    A.  As I began to prepare for this case in this last, you

6    know, week or so.

7    Q.  And specifically what day?

8    A.  Probably last Wednesday or so.

9    Q.  Did you notify the government of those mistakes?

10   A.  Not on Wednesday.

11   Q.  When did you notify the government of those mistakes?

12   A.  On Sunday.

13   Q.  Did you modify your report on Sunday?

14   A.  I did not modify it in my notes that I took about the

15   mistakes.

16   Q.  Did you feel the need to mention those mistakes in your

17   direct testimony in front of this jury?

18   A.  Whenever being asked about it, I did -- I did disclose it.

19   Q.  You disclosed mistakes during your direct exam testimony?

20   A.  During the direct exam testimony, no, I did not.

21   Q.  You didn't notify any of the defense counsel that they

22   were in possession of a 31-page report that cost $25,000 that

23   appears to be riddled with mistakes?

24   A.  I did not acknowledge the mistakes to anyone there.

25   Q.  Okay.  We'll get to Andrew Peterson soon, but I want to go

```
 1    back to discussing the standard that is applied in these types
 2    of cases.  First, let's just frame this.  You're aware that Dr.
 3    Lewis is only charged with conduct related to two patients,
 4    correct?
 5            MS. McMILLION:  Objection, Your Honor.  Misstates the
 6    charges against Dr. Lewis.
 7            MR. CHAPMAN:  I should restate that, Your Honor.
 8            THE COURT:  Okay.  Restate.  Go ahead.
 9    BY MR. CHAPMAN:
10    Q.  You're -- you're aware that Dr. Lewis is only charged
11    with -- with substantive counts, healthcare fraud and drug
12    trafficking, related to conduct to two patients, right?
13    A.  Two patients, yes.
14    Q.  There's a conspiracy count for both healthcare fraud and
15    drug trafficking, but the only substantive counts relate to two
16    patients?
17    A.  Correct.
18    Q.  Thank you.  And there's a standard that you use to
19    evaluate each one of those charges, healthcare fraud and drug
20    trafficking, right?
21    A.  Correct.
22    Q.  Let's talk about the drug trafficking standard first, and
23    feel free to reference your report.  I believe the portion
24    we're going to look at is on page 2.  But, well, let me just
25    preface this by asking, you don't believe that minor
```

1  noncompliance with guidelines would be considered a criminal

2  violation of the drug trafficking statute, right?

3  A.  I would say that's an open-ended answer or question so

4  I -- I -- I don't know how to answer that.

5  Q.  My -- my question is about your belief.  You don't believe

6  that minor noncompliance with guidelines triggers your standard

7  and creates criminal conduct?

8  A.  Minor in -- like in terms of -- perhaps you can define

9  what minor is.

10  Q.  We can go into some specifics.  With respect to the drug

11  trafficking standard here, you state the following: "References

12  in this report to activity or conduct being outside the course

13  of professional medical practice or outside the standard of

14  care is activity or conduct that does not comport with any

15  accepted standard of medical care in the United States."  Is

16  that what you say in your report?

17  A.  Correct.

18  Q.  Now, you -- you've testified in cases before, right?

19  A.  Correct.

20  Q.  You testified four times?

21  A.  Yes.

22  Q.  And all four were civil cases?

23  A.  Yes.

24  Q.  And in civil cases, the standard that is used to judge a

25  doctor's conduct is the standard of care, correct?

1    A.   Correct.

2    Q.   And the standard of care is what any reasonable physician

3    would do?

4    A.   Correct.

5    Q.   If a physician violates the standard of care, they may

6    have to pay the patient some damages for their treatment?

7    A.   Correct.

8    Q.   All right.  Simply deviating from the standard of care is

9    not alone something that triggers the standard that you've

10   created here, right?

11   A.   Simply deviating from the standard of care, correct.

12   Q.   Yes.  So -- so if a physician departs from the standard of

13   care, you wouldn't automatically opine that they have

14   prescribed outside the course of professional practice?

15   A.   Depends on what the deviation is.

16   Q.   Okay.

17   A.   So that's -- that's what we're -- I think the case is is

18   looking at this pattern.

19   Q.   So it's looking at how severe the deviation from the

20   standard of care is?

21   A.   Severe, frequency, so forth, yes.

22   Q.   So you believe that if a physician -- if a physician

23   deviates from the standard of care enough, that conduct would

24   be enough to trigger criminal responsibility?

25   A.   I'm looking at the utilization of the -- what the clinical

1   treatment is, right.  So there is a standard.  And I'm also

2   looking at the responsibility of particular -- if we're talking

3   about opioids, then the responsibility and legal liabilities of

4   using opioids.

5   Q.  I think it's important to listen to the question.  It's

6   your testimony that if a physician violates the standard of

7   care enough, they have triggered your criminal standard?

8   A.  No, I would disagree with that.

9   Q.  You disagree with that.  So much more is required to

10  become a criminal as a physician than just deviating from the

11  standard of medical care?

12  A.  We're looking at medical necessity for these, right, so

13  we're looking at this -- that's what I'm trying to explain.

14  Q.  Do you state the words medical necessity anywhere in the

15  standard that you've put in your report?

16  A.  No, not there.

17  Q.  Okay.  But now on the stand you say we're looking for

18  medical necessity?

19  A.  It's -- it's part of what I'm trying to look at in this

20  overall case.

21  Q.  But you don't state it in your report?

22  A.  No.

23  Q.  Okay.  In fact, what you state in your report is conduct

24  that is outside the course of professional practice, the

25  criminal standard here, or outside the standard of care is

1    activity that doesn't comport with any accepted standard of

2    care.  What you're essentially saying, Doctor, is that if a

3    physician deviates from the standard of care, they trigger your

4    criminal standard and can face liability.  Isn't that what you

5    say in your report?

6    A.  It's what I've articulated there.  I'm trying to say that

7    it's beyond -- we're -- we're not talking about a malpractice

8    type standard.

9    Q.  Okay.  But you state and give a malpractice standard in

10   your report, don't you?  You've said in your report that "if a

11   reasonable physician wouldn't engage in this conduct, I'm

12   considering it criminal in nature."  Isn't that what you've

13   said?

14   A.  Yes.

15   Q.  Yeah.  So this --

16          MS. McMILLION:  Objection, Your Honor.  That

17   misstates the report.

18          THE COURT:  Well --

19          MR. CHAPMAN:  He -- he said it doesn't, Your Honor.

20          THE COURT:  Yes.  That's a redirect question.  Go

21   ahead.

22   BY MR. CHAPMAN:

23   Q.  So the 31 pages that we have here, as far as they relate

24   to drug trafficking, are 31 pages of your view of violations of

25   a civil standard?

Case 2:18-cr-20800-SJM-APP  ECF No. 426, PageID.4367  Filed 06/13/22  Page 79 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

79

1   A.   No, that's -- I apologize.  You know, I -- I'm trying to

2   process what you're trying to say to me and it's coming

3   quickly.  I'll take time to -- to respond to you, but no, that

4   is not the case.

5   Q.   Okay.  You apply some other standard that requires a more

6   serious deviation, right?

7   A.   Correct.

8   Q.   And where do you apply that standard in your report, where

9   do you state that?

10  A.   In here, in the standards portion here.

11  Q.   You go on to state, "If the activity or conduct at issue

12  involves issuance of a prescription outside the course of

13  professional medical practice or outside the standard of care,

14  it means that the prescription was issued without any

15  legitimate medical reason or would not have been issued by a

16  doctor acting in accordance with standards of practice

17  generally accepted in the United States."  That's what you

18  state in your report?

19  A.   Can you refer to where you're reading from?

20  Q.   Same page 2, the standards portion.  I just continued on

21  from where we read before.

22  A.   Okay.

23  Q.   Do you need me to read it again?

24  A.   It's what I stated, yes.

25  Q.   Okay.  So you say if conduct by a doctor is different than

1   what is generally accepted in the United States, they trigger

2   your criminal standard.

3   A.  That's not what I've stated there but...

4   Q.  You say, "If a prescription is issued outside the course

5   of professional practice or outside the standard of care, it

6   was issued without a legitimate medical reason or would not

7   have been issued by a doctor acting in accordance with the

8   standards of practice generally accepted in the United States."

9   A.  Yes, that's what I've said.

10  Q.  You're saying that if a doctor doesn't prescribe in

11  accordance with what is generally accepted in the United

12  States, they become criminals?

13  A.  That's -- that is true.

14  Q.  That's what you put in your report.  That's identical to

15  the civil malpractice standard you used in your four cases,

16  right?

17  A.  No, that's not fair.

18  Q.  You're free to disagree, sir.  Thank you.

19          Now, in order to create your generally accepted in

20  the United States standard, you use a couple of documents and

21  your own experience, is that right?

22  A.  Correct.

23  Q.  Okay.  So basically what you're saying is when we look at

24  the ASIPP guidelines, the CDC guidelines and also your

25  experience as a physician, that creates a standard of generally

1    accepted conduct?

2    A.  Correct.

3    Q.  All right.  And if these physicians deviated from that

4    generally accepted conduct, then you think that's a departure

5    from your standard and they should be liable?

6    A.  That's how I use it for review.

7    Q.  That's how you looked at the case?

8    A.  Yes.

9    Q.  Okay.  So let's go to the only substantive count --

10            THE COURT:  Are you finished with the standards now?

11            MR. CHAPMAN:  I am, Your Honor, yes.

12            THE COURT:  I think that'd be a good -- good time to

13   break for lunch.  So it's 11:28.  Let's take 30 minutes and try

14   to point toward a noon return.  Don't talk about the case among

15   yourselves, ladies and gentlemen.  If you want to take a little

16   stroll or get some fresh air or some food, now's the time.  I

17   know many of you brought your lunches.  Have a good lunch break

18   and we'll see you back here in about 30 minutes.

19            Let's all rise for our jurors.

20            (Jury excused at 11:29 a.m.)

21            THE COURT:  And we'll take our midday recess.

22            THE LAW CLERK:  Court is now in recess.

23            (Court in recess at 11:29 a.m.)

24            (Proceedings resumed at 12:12 p.m., all parties

25            present)

1      THE LAW CLERK:  All rise for the jury.  The Court is

2  back in session.

3      (Jury entered the courtroom at 12:23 p.m.)

4      THE COURT:  Okay.  All jurors back, everyone's in

5  their spots, all may be seated.

6      And we'll continue to press on.  Mr. Chapman is at

7  the mic and ready to go.  Yes, sir.

8      MR. CHAPMAN:  Thank you, Your Honor.

9  BY MR. CHAPMAN:

10  Q.  Dr. Mehta, I'd like to now turn your attention to the

11  section of the report dealing with patient Andrew Peterson.

12  Just by way of reference, and I don't want you to read from it

13  right now, but feel free to flip to page 31.  That's where you

14  talk about Andrew Peterson.

15      Dr. Mehta, you're aware that Dr. Lewis is charged

16  with unlawfully prescribing hydrocodone to Andrew Peterson,

17  right?

18  A.  Correct.

19  Q.  And you're aware that that prescription was issued on

20  June 28th, 2018?

21  A.  I believe so, yes.

22  Q.  Okay.  It's the first sentence in your report?

23  A.  Yes, but you asked me not to read it so I --

24  Q.  I know.

25  A.  Yeah.

1    Q.  Okay.  And you believe that that prescription was issued

2    outside the course of professional practice?

3    A.  Correct.

4    Q.  All right.  Now, during your direct exam there were three

5    reasons you indicated that the prescription was outside the

6    course of professional practice and I want to go through those.

7    First, that you believed that the patient complained of only

8    minor pain during that visit, right?

9    A.  Correct.

10   Q.  Second, you believed that conservative treatments were not

11   attempted?

12   A.  Or offered.

13         THE COURT REPORTER:  I'm sorry, did you say were

14   offered or or offered?

15         THE WITNESS:  Or offered.

16   Q.  So conservative treatments were not attempted or offered?

17   A.  Correct.

18   Q.  All right.  And then you also believed that his urine drug

19   screen was negative?

20   A.  Correct.

21   Q.  Okay.  Addition -- in addition, there was some mention of

22   this patient asking for Soma and you thought that was

23   concerning?

24   A.  Correct.

25   Q.  All right.  Now, we talked a bit about the standard, and

1  the way that you evaluated that prescription was by utilizing

2  your experience as a physician, the ASIPP guidelines and the

3  CDC guidelines, correct?

4  A.  Correct.

5  Q.  Okay.  Can you please -- well, let's go back and talk

6  about those guidelines.  Two of the documents you mentioned,

7  the CDC guidelines and the ASIPP guidelines, specifically

8  indicate that they do not create a standard of care, correct?

9  A.  Correct.

10  Q.  And before finding fault with a physician's conduct, as

11  you indicated in the standard section of your report, you want

12  to ensure that that physician is deviating from at least a

13  standard of care?

14  A.  Correct.

15  Q.  Because if their conduct is above the standard of care, we

16  shouldn't even be here, right?

17  A.  Correct.

18  Q.  And specifically, you've talked about the ASIPP guidelines

19  in your report, and it's your belief that Dr. Lewis deviated

20  from the ASIPP guidelines when issuing that prescription?

21  A.  Well, not in -- in whole in that it was part of what I

22  looked at in terms of the whole practice and Dr. Lewis's

23  practice.

24  Q.  We're going to need to be a lot more specific than that,

25  Doctor.  Do you believe that Dr. Lewis deviated from the ASIPP

1  guidelines in issuing that prescription to Andrew Peterson?

2  A.  Yes.

3  Q.  Okay.  And you believe that because of that, that was a

4  violation of the standard of care?

5  A.  Not just solely because of that, but it was in part of the

6  entire opinion that I make.

7  Q.  Okay.  Like to read a portion of the ASIPP guidelines and

8  see if you agree with me that the guidelines state that.

9  "These guidelines are developed for use by physicians

10  practicing interventional pain management and do not constitute

11  inflexible treatment recommendations."  Do you agree with that

12  statement?

13  A.  Yes.

14  Q.  Did you apply the ASIPP guidelines as inflexible treatment

15  recommendations?

16  A.  As inflexible?  Yes.

17  Q.  Okay.  You applied them as inflexible recommendations?

18  A.  I'm sorry.  Trying to -- I'll go slower for your

19  questions.  They are -- they are part of what I looked to

20  review but I didn't solely apply those.

21  Q.  Okay.  Can you please tell me where in the ASIPP

22  guidelines, and I'm happy to provide a copy for you if you

23  need, it states that if a patient has a negative urine drug

24  screen, they should be immediately refused a prescription for

25  pain medication?

1    A.  It doesn't say that specifically.

2    Q.  Okay.  So in prescribing medication to Andrew Peterson in

3    absence of a positive urine drug screen, Dr. Lewis didn't

4    violate the ASIPP guidelines?

5    A.  It is part of the overall medical decision making that you

6    make.  So in the absence of -- of the opioid present in a urine

7    drug screen, the guidelines will go to say one should consider

8    the appropriateness of continued opioid therapy.

9    Q.  Is it your belief that in absence of specific deviations

10   from guidelines, you can simply just say the spirit of the

11   prescription violated the guidelines, is that what your

12   testimony is?

13   A.  The spirit?  Maybe you can...

14   Q.  Maybe I can rephrase.  Do you have any specific deviations

15   of the guidelines that you can point to for the prescription to

16   Andrew Peterson?

17   A.  It's -- there are -- I'll have to refer to perhaps the

18   notes that you have or the actual guidelines, but there are

19   overall impressions of how to evaluate and treat these patients

20   with opioids.  So it is not a specific line by line as the way

21   you're describing, but it's the overall decision making on the

22   appropriateness of the opioid and interpretation of results.

23   Q.  So you'd agree with me that you can't point a specific

24   deviation of the ASIPP guidelines?

25   A.  It's not a specific line, that's what I will say.

1  Q.  Thank you.

2        Are you able to point to any specific deviation of

3  the ASIPP guidelines where a prescription was provided to a

4  patient who presented with three out of ten pain radiating down

5  to the legs?

6  A.  It is not specific to the number.

7  Q.  Okay.  So no specifics.

8        Let's talk about the CDC guidelines.  Are you able to

9  point to a specific portion of the CDC guidelines that says

10 when a patient tests negative for a prescribed controlled

11 substance, they should immediately be refused medication?

12 A.  Again, it would be what I offered before, which is that

13 it's not a specific line like that.

14 Q.  Do you believe personally that a patient should be refused

15 medication when they test negative?

16 A.  It's definitely a red flag that I should be further

17 thinking about the appropriateness of ongoing opioid therapy.

18 Q.  That wasn't my question.  We can talk about red flags

19 later.  Do you believe that a patient should be refused

20 medication automatically because they tested negative for a

21 prescribed controlled substance?

22 A.  No.

23 Q.  In fact, what all the guidance says is that when a patient

24 tests negative, and you mentioned this on direct, there should

25 be a conversation between the physician and the patient?

1    A.   Correct.
2    Q.   And you're aware that there was a conversation between Dr.
3    Lewis and Andrew Peterson?
4    A.   Correct.
5    Q.   You saw the video?
6    A.   Correct.
7    Q.   And during that conversation Dr. Lewis said, "You were
8    negative for the hydrocodone we prescribed to you."
9    A.   Correct.
10   Q.   That's the type of statement that a physician would make
11   when they've reviewed a urine drug screen or test and want to
12   inquire as to why it was negative?
13   A.   Correct.
14   Q.   So you can tell by that question that Dr. Lewis looked at
15   the urine drug test?
16   A.   Correct.
17   Q.   Now, Andrew Peterson, and we don't need to replay the
18   videos unless your memory needs to be refreshed, responded with
19   the fact that he couldn't get in for his appointment on time
20   and it took a while to reschedule, correct?
21   A.   Correct.
22   Q.   And, in fact, it would have been a red flag in your mind
23   if Andrew Peterson tested positive for the medication as
24   opposed to negative, right?
25   A.   It would be -- if he had tested positive and he had had a

1   long period of time, yes, that would also be a red flag.

2   Q.  Because where did he get the additional medication?

3   A.  It's something that's not a definitive answer, but perhaps

4   he -- it's not -- let me stop by saying that.  If he had taken

5   the medication closer to the time of the test and not taken it

6   earlier, then yes, that may have also led to that result.

7   Q.  So red flag if he tests positive and a red flag if he

8   tests negative?

9   A.  To be able to interpret in the context, yes.

10  Q.  Okay.  Andrew Peterson's response to the negative urine

11  drug test was a reasonable response given by a patient who

12  wasn't able come in within the month, right?

13  A.  Correct.

14  Q.  Patients have said that to you before, right?

15  A.  Correct.

16  Q.  And they've tested negative before, right?

17  A.  Correct.

18  Q.  And you didn't cut them off of their medication before,

19  right?

20  A.  Correct.

21  Q.  Is it your testimony that Dr. Lewis's conduct, which

22  appears to be identical to your conduct, is concerning?

23  A.  Again, it's the overall concern of the practice, not --

24  not just this one individual circumstance.

25  Q.  Okay.  Now we see.  It's your overall concern with the

1    practice, not specifically with the conduct of Dr. Lewis as it

2    relates to Andrew Peterson, that's your issue, right?

3    A.  On that particular episode, correct.

4    Q.  Okay.  You mentioned as part of your critique of Dr. Lewis

5    that conservative treatments weren't offered or attempted,

6    correct?

7    A.  Correct.

8    Q.  I want to talk about your review in this case.  When you

9    first entered into a contract with the government to provide a

10   review, you would have agreed to use the best of your medical

11   abilities and knowledge to review this case, right?

12   A.  Correct.

13   Q.  And in order to provide an opinion about a physician and

14   their conduct, you would have wanted to look at everything that

15   the physician would have known about in order to analyze

16   whether the prescription was legitimate?

17   A.  Correct.

18   Q.  You would have wanted to look at patient files?

19   A.  I would like to look at as much as available, that's

20   correct.

21   Q.  Patient files?

22   A.  Correct.

23   Q.  Videos?

24   A.  Videos of?

25   Q.  Undercover visits.

1   A.  Oh, yes.

2   Q.  Okay.  If -- if they were available?

3   A.  Correct.

4   Q.  And you did look at patient files and videos in this case?

5   A.  Correct.

6   Q.  And you scrutinized those patient files and videos to see

7   if Dr. Lewis did the things that are required by your standard?

8   A.  Correct.

9   Q.  You looked at all the videos?

10  A.  All the videos that were offered to me.

11  Q.  All the videos related to Andrew Peterson?

12  A.  Correct.

13  Q.  That were offered to you?

14  A.  (Nods in the affirmative.)

15  Q.  But there were some videos that weren't offered to you,

16  isn't that right?

17  A.  I'm not sure.

18  Q.  There are some videos of Andrew Peterson during his

19  initial visits to the clinic that the government didn't supply

20  you with?

21  A.  I don't know the answer to that.

22  Q.  You don't know the answer to that.  Okay.

23          Let's go to page 31 in your report.  You say, "Dr.

24  Lewis saw the patient for initial visit on 6-28-18."  Do you

25  say that in your report?

```
1    A.   I do.
2    Q.   You believed that at the time you authored this report, I
3    suppose you believed up until the time you realized the
4    mistakes in your report on Sunday, that Dr. Lewis was the first
5    person at TPC to see Andrew Peterson?
6    A.   That's correct.
7    Q.   You've later learned that that's incorrect?
8    A.   Correct.
9    Q.   Which means you've learned that there are videos and
10   medical records that you didn't review?
11   A.   That I was able to review later, yeah.
12   Q.   Okay.  When did you review these additional videos and
13   medical records?
14   A.   These were -- I reviewed them again on Sunday.
15   Q.   Just on Sunday?
16   A.   Mm-hmm.
17   Q.   So up until Sunday you believe Dr. Lewis was the first
18   person to see Andrew Peterson.  On Sunday you realize he wasn't
19   the first person?
20   A.   To my knowledge, as far as I can recall.
21   Q.   Did you modify your report after realizing the mistake on
22   Sunday?
23   A.   I did not.
24   Q.   Did you look through those videos to see if maybe some of
25   the things you think Dr. Lewis didn't do were done by other
```

Jury Trial: Volume 6 • Tuesday, May 24, 2022

1   people?

2   A.   They were -- I did look at that, yes.

3   Q.   Okay.  And you found that there were additional things in

4   terms of treatment for Andrew Peterson that were done on prior

5   visits, right?

6   A.   That were offered, yes.

7   Q.   Yeah.  Now, it is reasonable for a physician to rely on

8   the statements made by other providers in the course of

9   treatment of a patient?

10  A.   Correct.

11  Q.   In fact, you -- are you an attending physician?

12  A.   Yes.

13  Q.   You as an attending physician rely on the statements made

14  by your residents as to what they've done with the patient?

15  A.   Correct.

16  Q.   Now, you sometimes want to verify, right, because they're

17  residents?

18  A.   Right.

19  Q.   But you can rely on it, right?

20  A.   Right.

21  Q.   Because residents are doctors?

22  A.   Correct.

23  Q.   Dr. Lewis is permitted to rely on the statements and

24  treatments done by physician assistants, right?

25  A.   Correct.

```
1    Q.  He's allowed to rely on the statements made by medical
2    assistants?
3    A.  Correct.
4    Q.  He's able to rely on the statements made by a radiologist
5    in a report?
6    A.  Correct.
7    Q.  He doesn't need to independently verify the accuracy of
8    that information, right?
9    A.  He's allowed to rely on it.  He's also in a supervisory
10   role for some of the people that you've stated in there.  And
11   then we also believe that when possible, you can also review
12   radiology images in addition to looking at the report.  But,
13   yes, I understand what you're saying.
14   Q.  Certainly.  That makes a lot of sense.
15        Now, the critique that you offered with respect to
16   Dr. Lewis's treatment of Andrew Peterson is that a minimal
17   examination was performed and a medical decision making
18   involved a plan for the controlled substance Norco.  Did you
19   say that in your report?
20   A.  Yes, I did.
21   Q.  So minimal exam and Norco was one of the medications
22   prescribed.
23        You also state that he was prescribed Zanaflex and
24   recommended for a shoulder injection despite still needing to
25   try conservative measures.
```

1        Now, my question for you, Dr. Mehta, is did you look

2   into the videos that you didn't see until Sunday to determine

3   if other conservative treatments were looked at or attempted

4   and whether or not there was a more thorough physical

5   examination done of Andrew Peterson?

6   A.  So the answer is yes to your question.

7   Q.  And you actually found that on his initial visit,

8   January 4th, 2018, Tatyana Bezpalko conducted a physical

9   examination of Andrew Peterson?

10  A.  On a separate encounter, yes.

11  Q.  Yes.  And it's reasonable for Dr. Lewis to see the results

12  of that physical examination and to incorporate that into his

13  medical decision making?

14  A.  From a prior visit, is that what you're referring to?

15  Q.  Yes.

16  A.  It -- he -- he can -- he can review that then, but there

17  is his own physical examination, medical decision making to be

18  made --

19  Q.  Can you point --

20  A.  -- on this -- on this particular visit.

21  Q.  Can you point to part of the ASIPP guidelines that says a

22  physical examination must be performed at every visit?

23  A.  It doesn't say that specifically.

24  Q.  Can you point to the portion of the CDC guidelines that

25  says a physical examination must be done every visit?

```
1   A.   Doesn't say that specifically.
2   Q.   In fact, the topic of discussion between Dr. Lewis and
3   Andrew Peterson was an MRI, correct?
4   A.   An MRI, yes.
5   Q.   Yes.  And an MRI of a shoulder will tell you a lot more
6   than a physical examination will, isn't that right?
7   A.   I disagree with that.
8   Q.   You disagree.  But it will tell you exactly what is going
9   on in that shoulder joint, correct?
10  A.   It is just another tool for your decision making.  It
11  gives you insight into what may be explaining what's happening.
12  Q.   So Dr. Lewis has a prior physical examination from another
13  provider and an MRI in his hand that determines the patient has
14  shoulder problems and a subjective complaint of pain, and it's
15  your belief that it was still inappropriate for a pain
16  medication?
17  A.   I'd like to further answer that by saying you're -- you're
18  referring to an examination performed on a separate visit, not
19  at the time of the visit that Dr. Lewis was conducting.
20  Q.   And you don't have any guidelines to suggest that a
21  separate physical examination must be performed at every single
22  visit?
23  A.   When you're starting to go beyond just --
24  Q.   The question is specifically about guidelines, not about
25  your opinions or your beliefs or what concerns Dr. Mehta.  The
```

1    question is about where in the guidelines does it say you must

2    do a physical examination for every single visit?

3    A.   When doing a decision on opioid, you would want to have a

4    more thorough examination.

5    Q.   That's -- that's nonresponsive to my question.  I'm asking

6    you where in the guidelines that you've cited -- sir, you could

7    have cited any guidelines you wanted to in your report to

8    support your belief and you cited two guidelines.  Where in

9    your guidelines does it say you must do a physical examination

10   every single visit?

11   A.   It does not say that.

12   Q.   Doesn't say it.

13        You're also aware that in the prior visits,

14   conservative measures were attempted but didn't work for Andrew

15   Peterson, correct?

16   A.   Correct.

17   Q.   You heard him say in the video when Tatyana asks whether

18   physical therapy was tried, he clearly indicates that it didn't

19   work?

20   A.   Correct.

21   Q.   Okay.  You don't mention in your report that the patient

22   said physical therapy didn't work; you said conservative

23   treatments weren't offered, right?

24   A.   That's correct, I did say it.

25   Q.   You reviewed all the medical records in this case?

1    A.  Correct.

2    Q.  But you still believe that, at least up until Sunday, that

3    Dr. Lewis was the first person to see this person at TPC?

4    A.  Correct.

5    Q.  Okay.

6             (Brief pause)

7             MR. CHAPMAN:  Government was gracious enough to point

8    me to the fact that Andrew Peterson's patient chart is 120B so

9    I'm --

10            MS. McMILLION:  That might not be true, sorry.

11            (Brief discussion held off the record)

12            MR. CHAPMAN:  I'm sorry for the delay, Your Honor.

13   We're just trying to figure out exhibit numbers.

14            THE COURT:  Okay.

15            (Brief discussion held off the record)

16   BY MR. CHAPMAN:

17   Q.  Doctor, I'm going to show you Government's Exhibit 120B,

18   page 8, which has already been admitted.  Is this one of the

19   pages that you looked at during your review in this case?

20   A.  I believe so.

21   Q.  And you see the date here, 1-4-2018, correct?

22   A.  Correct.

23   Q.  And this is an encounter form indicating the patient was

24   seen this date?

25   A.  Correct.

1  Q.  So when you looked at this page prior to Sunday, did you

2  not come to the conclusion that his first encounter was on

3  January 4th, 2018?

4  A.  No, I did not come to that conclusion.

5  Q.  You did not.  Okay.

6        And then the provider that he saw on 1-4-2018 is

7  circled as Tatyana, is that right?

8  A.  Correct.

9  Q.  And after you saw that circled word, Tatyana, that name,

10  did you not come to the conclusion that Dr. Lewis wasn't the

11  first person to see Andrew Peterson that day?

12  A.  I did not.

13  Q.  Okay.  I'm guessing that if you didn't see that page, I'm

14  going to show you 120B, page 9, maybe you didn't see this page.

15  Does Andrew Peterson say where the pain is located?

16  A.  I see that, yes.

17  Q.  You see in shoulder and back, right?

18  A.  Correct.

19  Q.  Okay.  So Andrew Peterson is seeking pain treatment that

20  day, right?

21  A.  Correct.

22  Q.  So this visit wasn't for something else, right?

23  A.  Correct.

24  Q.  It's for the same reason Dr. Lewis saw him?

25  A.  Correct.

1    Q.  Now, Andrew Peterson indicates that he saw a doctor in the
2    past in Wisconsin, right?
3    A.  Correct.
4    Q.  And he indicates that a doctor previously treated him in
5    Wisconsin, correct?
6    A.  Correct.
7    Q.  There's a question here on the encounter form, "Have you
8    received either of the following: physical therapy and
9    chiropractic care?"  Would you consider physical therapy and
10   chiropractic care to be conservative measures?
11   A.  I would.
12   Q.  Those are nonopioid treatments, right?
13   A.  Correct.
14   Q.  And you think that pain management physicians should see
15   if nonopioid treatments have been conducted and were
16   successful?
17   A.  Correct.
18   Q.  And in this case, at the very least it says that he
19   attempted these, correct?
20   A.  Correct.
21   Q.  Would the fact that he's now in a pain management
22   physician's office suggest that those were unsuccessful?
23   A.  It would be taken into context, but not necessarily.
24   Q.  But common sense, right?  If these were successful with
25   his doctor in Wisconsin, he probably wouldn't be stepping into

1   a pain management clinic?

2   A.   The -- you could interpret it several ways.  You could say

3   you had this problem in the past and you've had physical

4   therapy in the past and come to the physician's office for

5   repeat physical therapy.  This at this point is just telling us

6   "I have a pain and I've had this treatment in the past."  It

7   doesn't go to the conclusion that you've mentioned.

8   Q.   But you know from watching the videos, at least on Sunday,

9   that those treatments weren't successful?

10  A.   Correct.

11  Q.   Now, it's also important for a physician like Dr. Lewis

12  and a PA working at the practice, it's important what other

13  medications might have been tried and whether or not they

14  worked, right?

15  A.   Correct.

16  Q.   In this case Andrew Peterson reports he's previously taken

17  oxycodone, and then there's hydro and Norco as question marks,

18  and then there's another drug, I believe it's Nexium, is that

19  correct?

20  A.   Yes.

21  Q.   And then Flexeril and Soma, and he also attempted

22  Gabapentin but doesn't know the dosage, right?

23  A.   Correct.

24  Q.   Some of these medications would be considered conservative

25  measures?

Jury Trial: Volume  6 • Tuesday, May 24, 2022

```
 1    A.   Some of them, yes.
 2    Q.   That would be likely Flexeril, perhaps Gabapentin,
 3    although that might be controversial, right?
 4    A.   Correct.
 5    Q.   But certainly we also know that at least according to
 6    Andrew Peterson's report, he'd attempted higher strength
 7    medications like oxycodone, hydrocodone and Norco?
 8    A.   Correct.
 9    Q.   Okay.  So we know that he's at least attempted those
10    medications in the past?
11    A.   Correct.
12    Q.   After seeing those forms and hearing Andrew Peterson on
13    video indicating that these other methodologies were attempted,
14    is it still your belief that conservative measures weren't
15    attempted for Andrew Peterson?
16    A.   It is not.
17    Q.   It's not your belief anymore?
18    A.   Correct.
19    Q.   So if you had the chance to retype out this report, you
20    might change it to say conservative measures were attempted?
21    A.   On that one, yes.
22    Q.   Thank you.
23         You're also aware, and I'm showing you again
24    Government's 120B, that Andrew Peterson came back one more
25    time -- well, let me just make sure we walk through this
```

1    appropriately.  First visit he sees Ms. Bezpalko.  The next

2    visit he sees Mr. Brent Russell who you know is a PA as well,

3    correct?

4    A.  Correct.

5    Q.  And then the next visit he sees Dr. Edu, correct?

6    A.  Correct.

7    Q.  And then after that he sees Dr. Lewis?

8    A.  Correct.

9    Q.  So, in fact, Dr. Lewis wasn't the first person Andrew

10   Peterson saw; in reality he was the fourth?

11   A.  Correct.

12   Q.  All right.  And this sheet here indicates that Andrew

13   Peterson saw Dr. Edu, and you're aware from your detailed

14   review of these records that Andrew Peterson was prescribed

15   hydrocodone at each visit before he saw Dr. Lewis?

16   A.  Correct.

17   Q.  Okay.  Is it your belief then, sir, that Dr. Lewis should

18   have abruptly stopped Andrew Peterson's hydrocodone

19   prescription?

20   A.  It should have been discussed with him but not abruptly

21   stopped, no.

22   Q.  No, he should have continued to prescribe, right?

23   A.  Should have made a decision on what treatment he was going

24   to make.  Whether that's an opioid, whether that was the best

25   suited one at that time, I'm not sure.

1   Q.   Okay.  So okay to continue the prescription, but you would

2   have liked to see a little bit more in terms of treatment plan?

3   A.   Correct.

4   Q.   Now, do you recall Dr. Lewis in the first statement he

5   made to Andrew Peterson was quite aggressive: "When are you

6   going to get surgery?"

7   A.   Right.

8   Q.   Right?  Dr. Lewis was saying, "We need surgery to fix this

9   joint."  Well, he wasn't saying, "We need it."  He was saying,

10  "You should get a consult for it," right?

11  A.   Right.

12  Q.   Pain for two years following an acute injury, you may want

13  to talk to an orthopaedic surgeon?

14  A.   Correct.

15  Q.   That would have been another conservative, non-opiate

16  measure?

17  A.   I mean I -- I wouldn't say it's a conservative, nonopioid

18  measure, but it's a -- it's a treatment.

19  Q.   I see what you're saying and I think that's a very fair

20  statement.  Surgery's not always the best option for people,

21  right?

22  A.   Correct.

23  Q.   But it's important to consider alternatives to opiates

24  such as surgery to see if that might correct the underlying

25  disease as opposed to masking it with medication?

1  A.  Correct.

2  Q.  And Dr. Lewis wanted Andrew Peterson to do that, right?

3  A.  He did.

4  Q.  Okay.  He also suggested using some corticosteroid in the

5  joint, actually I think it was right shoulder, in the joint to

6  reduce some of the inflammation?

7  A.  Correct.

8  Q.  Have you had a chance to review -- I think we talked --

9  you testified about this a while ago.  Have you had a chance to

10  review the 2022 draft of the CDC guidelines?

11  A.  We've talked about it, yes.

12  Q.  And you've reviewed it?

13  A.  Correct.

14  Q.  Do you believe that that would be an authoritative

15  document when evaluating a physician's conduct?

16  A.  Correct.

17  Q.  Because you used the 2016, and so it makes sense that the

18  update is helpful as well?

19  A.  Correct.

20  Q.  This is a rather long document so if you'll bear with me.

21  Now, sir, are you aware that the 2022 CDC guidelines actually

22  state, "Interventional approach -- approaches such as

23  arthrocentesis and intra-articular gluco" -- I'm sorry, this

24  word is tripping me up today and it didn't trip me up

25  yesterday.  "Interventional approaches such as arthrocentesis

1  and intra-articular glucocorticoid injection for pain

2  associated with rheumatoid -- rheumatoid arthritis,

3  osteoarthritis and subacromial corticosteroid injection for

4  rotator cuff disease can provide short-term improvement in pain

5  and function."  Long sentence, but are you aware that the 2022

6  guidelines discuss that specifically?

7  A.  Yes.

8  Q.  Dr. Lewis was attempting to recommend to this patient a

9  very similar corticosteroid injection into the shoulder to

10  relieve inflammation, correct?

11  A.  Correct.

12  Q.  And relieving inflammation can reduce pain?

13  A.  That's correct.

14  Q.  And relieving inflammation can reduce a patient's

15  dependence or use of opiates?

16  A.  Correct.

17  Q.  In fact, Dr. Lewis mentioned to Andrew Peterson that if

18  he's able to get these injections, medication may be able to be

19  decreased?

20  A.  Correct.

21  Q.  So what Dr. Lewis was doing with Andrew Peterson was

22  continuing his medication while discussing treatment

23  alternatives that could result in a tapering and elimination of

24  opiate medications?

25  A.  Correct.

1   Q.   Dr. Mehta, this wasn't a pill mill, right?

2   A.   That's not what I -- I don't even know how to answer that.

3   Q.   These aren't the activities of a pill mill doctor, right?

4   A.   Are you -- maybe you want to define what a pill mill

5   doctor is.

6   Q.   Somebody flagrantly giving out medications to anybody who

7   asks for them.  That's not what was happening here?

8   A.   No, not -- I wouldn't say that.

9   Q.   We have conservative treatment with a low dose opiate and

10  a suggestion for treatments that will resolve the pain, right?

11  A.   Correct.

12  Q.   In fact, the 2022 CDC guidelines would actually recommend

13  against a rapid taper or reduction in opiates in this case,

14  right?

15  A.   In this case it's not the same sort of opioid that they're

16  describing in terms of longstanding opioid, high dose opioid,

17  high number of quantity.  So a reduction or taper or

18  elimination could have been appropriate in this case.

19  Q.   It could have been, but the CDC recommends 10 percent per

20  month?

21  A.   CDC is one particular guideline, but 10, 20, 30 percent

22  could be discussed.

23  Q.   Okay.  So a prescription could still be given, but if a

24  taper was agreed on by Andrew Peterson and Dr. Lewis, that

25  would start at 10 or 20 percent a month?

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4396   Filed 06/13/22   Page 108 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

108

1   A.  Well, remember, it's not just a sole decision of Mr.

2   Peterson.  It's a medical decision that Dr. Lewis is going to

3   make.

4            THE COURT REPORTER:  Doctor, could you pull the

5   mic --

6            THE WITNESS:  I'm sorry.

7            THE COURT REPORTER:  -- just -- no, you're -- just a

8   little closer please.

9   Q.  It's -- it's a dual decision between the physician and

10  patient, right?

11  A.  Ultimately the responsibility falls on the physician to

12  actually provide the prescription.

13  Q.  Certainly that's the case, the physician needs to

14  determine the medical need.  But when a patient has already

15  been put on opiate pain medication as part of their treatment

16  plan, the decision to taper according to the CDC should be

17  shared between the physician and the patient?

18  A.  Should be shared, meaning a discussion, plan, but there

19  are instances of where the decision may not be in full

20  agreement by the patient.

21  Q.  Certainly.  If the patient's diverting, right?

22  A.  If -- what -- whatever the reason.  It could be that it's

23  causing harm, it could be that it's diversion, it could be that

24  a patient's not utilizing the medication and therefore does not

25  need it.

1    Q.  Great.  Any evidence that Andrew Peterson was diverting

2    pain medication, and I mean the persona of Andrew Peterson, as

3    it appeared to Dr. Lewis?

4    A.  Persona?  I mean there was a -- I think we talked about

5    earlier red flags, conversations that were had about which type

6    of medications Mr. Peterson was requesting, had previously

7    used, something that you want to use caution in prescribing to

8    any patient.

9    Q.  See, Dr. Mehta, I -- I say evidence and you say red flags,

10   and I think we have a bit of a disagreement here.  There is no

11   evidence that Andrew Peterson, the patient that presented to

12   Dr. Lewis, was diverting his controlled substance medication,

13   correct?

14   A.  There is things to suggest that there were discrepancies

15   in how the opioids were being used.

16   Q.  Those discrepancies didn't rise to the level of ripping a

17   patient off of their medication, right?

18   A.  It should have been considered.

19   Q.  Considered but not definitive?

20   A.  It is -- is something that I believe, yes, you could have

21   discontinued the medication.

22              THE COURT:  Okay.  How much longer here, Mr. Chapman?

23              MR. CHAPMAN:  I'm -- I'm not sure, Your Honor.

24              THE COURT:  Well, we're getting into overkill and I

25   want to get this man out of here today.  I'd like you to do

1     maybe 20 minutes, we'll go 20 or 30 minutes with Mr. Margolis

2     and we'll get the government on redirect, because we are

3     beating the same lamp repeatedly now, so let's move it up.

4              MR. CHAPMAN:  I can move on, Your Honor.

5              THE COURT:  Yep.  Thank you.

6     BY MR. CHAPMAN:

7     Q.  You're also aware that the 2022 CDC guidelines discuss a

8     minimum effective dose of medication for a patient, correct?

9     A.  Correct.

10    Q.  And they discuss that minimum effective dose of being 5 to

11    10 MME per dose or 20 to 30 MME per day?

12    A.  Correct.

13    Q.  Prescribing lower than that may have absolutely no effect

14    on a patient, right?

15    A.  Disagree with that.

16    Q.  Well, that's what the term lowest starting dose means,

17    doesn't it?

18    A.  Well, again, it can be tailored to each patient.  This is

19    a guideline but it's decided per patient.

20    Q.  Let me read from the CDC and see if your position is the

21    same.  "The lowest starting dose for opiate-naive patients is

22    often equivalent to a single dose of approximately 5 to 10 MME

23    or a daily dosage of 20 to 30 MME."  That is the CDC saying for

24    most patients, a starting minimum effective dose is 20 to 30

25    MME?

1    A.  I will disagree with that.

2    Q.  Okay.  What was Andrew Peterson's starting dose by Ms.

3    Bezpalko?

4    A.  Go back to -- it was Norco 5, 5 milligrams.

5    Q.  And what's the MME?  I think it's a one-to-one ratio?

6    A.  Correct, so 5.

7    Q.  How many -- how many MME per day?

8    A.  Again, that's probably around the 15 to 20.

9    Q.  15 to 20.  So right around the minimum effective dose, at

10   least according to the CDC but not you?

11   A.  Correct.

12   Q.  Okay.  Let's move on to patient Victoria Loose.  We talked

13   about the opiate prescribing standard, but there's another

14   standard that you used to evaluate this case and that is the

15   healthcare fraud standard, right?

16   A.  Correct.

17   Q.  And when evaluating the injections that were offered by

18   the Pain Center, you needed to determine whether or not those

19   injections were medically necessary?

20   A.  Correct.

21   Q.  And you looked at all of the records available to you?

22   A.  Correct.

23   Q.  Of six patients that you testified on the witness stand?

24   A.  Correct.

25   Q.  I promise you I will not use the word caudal during my

1  examination about this witness, but I want to go into some
2  other territory.  In your report, I'm referencing page 24
3  related to the counts against Dr. Lewis, you state, "The
4  patient received multiple injections in absence of conservative
5  treatment and without documented evidence of benefit and
6  therefore medically unnecessary."  Is that what you said?
7  A.  To continue.
8  Q.  Yeah.  Is it -- is it your belief that Victoria Loose
9  didn't have conservative treatments prior to coming to the Pain
10  Center?
11  A.  I -- it is -- no, that is not my belief.
12  Q.  You'd like to change your report?
13  A.  I would like to modify that, yes.
14  Q.  To include that she did have conservative treatments?
15  A.  Correct.
16  Q.  In fact, we heard from Mr. Weiss there was apparently a
17  spinal cord stimulator that was used?
18  A.  Correct.
19  Q.  We knew that she was referred by Dr. Mark Rosenberg for
20  treatment, right?
21  A.  Correct.
22  Q.  And that person was an orthopaedic surgeon?
23  A.  Correct.
24  Q.  And that person performed multiple back surgeries on this
25  patient?

1    A.  Correct.

2    Q.  You're aware that she was undergoing physical therapy as

3    well?

4    A.  Correct.

5    Q.  And those are considered conservative treatments?

6    A.  Yes.

7    Q.  Okay.  So if you could modify your report now, you would

8    add in all of those treatments and you would determine that she

9    received conservative treatments prior to injections being

10   performed?

11   A.  Yes to that statement.

12   Q.  Thank you.

13        Now, let's -- since we've changed our first opinion,

14   let's go to the second.  Without documented benefit, is it your

15   testimony that Dr. Lewis performed an SI joint injection on

16   Victoria Loose without documentation of benefit?

17   A.  The benefit that was documented was basically on the same

18   day of the procedure, so...

19   Q.  Okay.  You would like the benefit to be documented on a

20   subsequent day?

21   A.  Correct.

22   Q.  Did you look through the entire record to determine if on

23   a subsequent visit benefit was documented?

24   A.  Benefit was documented but then ultimately went, again,

25   another preplanned procedure.

1  Q.  Okay.

2  A.  So --

3  Q.  You say in your report that no benefit was documented, but

4  you say on the witness stand that "my problem is that benefit

5  was documented on the same date, and even though it was

6  documented on a subsequent date, another procedure was planned

7  for that date."  Is that what you're saying on the witness

8  stand?

9  A.  The subsequent date of the procedure or the next procedure

10 then documented the benefit of the prior procedure, but it was

11 already predetermined that that procedure was going to occur.

12 Q.  Do you know whether or not if the patient said there was

13 no benefit when checking in for her procedure that day, the

14 next procedure would have occurred?

15 A.  Repeat that what you said.

16 Q.  Sure.  Do you know whether or not Victoria Loose would

17 have undergone a subsequent procedure if she walked into the

18 clinic that day and said the last one didn't work?

19 A.  I don't know that.

20 Q.  No.  But benefit was documented because the patient said

21 she benefitted and she underwent a second procedure that day?

22 A.  She underwent a second procedure.

23 Q.  Because benefit was documented?

24 A.  It was documented.

25 Q.  Would you like to change your report that says no benefit

1    was documented?

2    A.  I would change that statement, yes.

3    Q.  Okay.

4         MR. CHAPMAN:  I think I was able to speed things up,

5    Your Honor.  I just have a few more questions.

6         THE COURT:  Excellent.  Thank you so much.

7    BY MR. CHAPMAN:

8    Q.  Dr. Mehta, you've testified on direct exam that you are a

9    board certified anesthesiologist?

10   A.  Correct.

11   Q.  Isn't it true that your board certification has (coughing

12   in courtroom)?

13        THE COURT REPORTER:  Wait, I didn't hear that.

14   A.  I'm sorry.

15   Q.  Isn't it true that your board certification has expired?

16   A.  No, that's not true.

17   Q.  Isn't it true that on December 31st, 2020 your board

18   certification lapsed?

19   A.  That's not true.

20   Q.  Okay.  Isn't it true that on your CV it indicates your

21   board certification lapsed?

22   A.  A CV may have been dated at that time but it's not lapsed.

23   It's never been lapsed.  If I can explain what -- what it is,

24   it's the ABA, the Anesthesia Board Association, basically

25   changed the rulings on board certification so there's no more

1  exams every ten years.  Now there is something called

2  Maintenance of Certification, and that's what I am doing and

3  compliant with.

4  Q.  Isn't it true that when you look yourself up on the board

5  certification website that lists your credentials, it says

6  expired?

7  A.  I -- I have not looked, but I've completed all the tests.

8  Q.  Okay.

9  A.  So if that is the case, then that's an error, but I am

10  definitely board certified

11  Q.  Did you submit your Maintenance of Certification to the

12  appropriate authorities?

13  A.  It's through the Anesthesia Board, yes.

14  Q.  Now, finally, your review in this case, you testified you

15  reviewed six charts, but you also reviewed a hundred charts as

16  well, right?

17  A.  Correct.

18  Q.  The six charts that you reviewed you reviewed in a

19  detailed way?

20  A.  More detail, yes.

21  Q.  Okay.  But as we see, there were some mistakes made?

22  A.  Correct.

23  Q.  The hundred charts, how much time did it take you to

24  review those hundred charts?

25  A.  I don't remember that specifically.

1    Q.  Do you know how many pages you reviewed?

2    A.  It was a large number of pages.

3    Q.  Did you review those with the same rigor that you reviewed

4    the six charts?

5    A.  I put in my best effort on all of them.

6    Q.  Is it possible that some mistakes were made in your review

7    of the hundred charts?

8    A.  It is possible, yes.  I -- I'm -- I'm human, yes.

9    Q.  Okay.

10           MR. CHAPMAN:  May I have a moment, Your Honor?

11           THE COURT:  Yes.

12   Q.  Doctor, I appreciate your time today.  I don't have any

13   further questions, okay?

14           THE COURT:  Okay.  Thank you, Mr. Chapman.

15           And Mr. Margolis will finish up.  Go right ahead.

16           MR. MARGOLIS:  Thank you, Your Honor.

17           THE COURT REPORTER:  Mr. Margolis, I just exited out

18   of my program.  Excuse me one second.

19           (Brief pause)

20           Excuse me one second.

21           MR. MARGOLIS:  Take your time.

22           (Brief pause)

23           THE COURT REPORTER:  All right.  I'm so sorry for the

24   interruption.

25           MR. MARGOLIS:  Thank you.  May I proceed, Your Honor?

```
1              THE COURT:  Yes, please do.
2                        CROSS-EXAMINATION
3    BY MR. MARGOLIS:
4    Q.  Dr. Mehta, good afternoon.
5    A.  Good afternoon.
6    Q.  My name is Laurence Margolis.  I represent Dr. Christopher
7    Russo.  One of the benefits of going last is that I have the
8    opportunity to hear all of these good lawyers and whittle down,
9    and the Court always appreciates my brevity so I will try to be
10   brief.
11   A.  Thank you.
12   Q.  Get you back on that plane to New York in short order
13   hopefully.
14   A.  Thank you.
15   Q.  One thing I do want to get straight because I'm a little
16   confused about the -- the time situation and what was
17   discovered Sunday before trial, the errors, the mistakes, so
18   I'm going to briefly go over that again.
19   A.  Okay.
20   Q.  You were retained in this matter sometime in the early
21   part of 2020, is that correct?
22   A.  I -- I don't recall.
23   Q.  You said -- I think you said the early COVID period, is
24   that...
25   A.  Sometime around that time.
```

1    Q.   How does that happen, do they -- do you sign a contract,

2    were you retained, a retention letter?  How do they -- how do

3    you contract with the government?

4    A.   There was a contract, yes.

5    Q.   A written contract?

6    A.   Yes.

7    Q.   You signed your name on it?

8    A.   Correct.

9    Q.   Okay.  With a pen?

10   A.   Correct.

11   Q.   Okay.  Faxed it over or emailed it to them?

12   A.   That's right.

13   Q.   Okay.  And that was -- but you don't have the date, you

14   don't have that in front of you?

15   A.   I don't have it in front of me, I'm sorry.

16   Q.   Okay.  And then over the course of the next months I

17   assume, five, six, seven months, you received documentation

18   from Ms. McMillion's office, is that correct?

19   A.   Correct.

20   Q.   And you said you -- you had 50 or so conversations or

21   communications with her during the course of this job for you?

22   A.   Correct.

23   Q.   And -- and many of those I assume were before you signed

24   the report on October 31st of 2020, correct?

25   A.   Correct.

1    Q.  Do you know how many of those were?  Was it -- was it all

2    of them, the majority of them?  I mean you talked to her after

3    that too I assume.

4    A.  I wouldn't be able to answer.  I don't know the answer.

5    Q.  Okay.  And you signed your report on the 31st of 2020?

6    A.  Correct.

7    Q.  And then now we are going on two years from that date,

8    correct?

9    A.  Correct.

10   Q.  And the day before trial is when you discover there were

11   errors to that report?

12   A.  I discovered a few days before, as I mentioned.

13   Q.  I thought you said Sunday --

14   A.  I --

15   Q.  -- the day -- the day before you come in to testify.

16   A.  No, even a few days before that as I was prepping for this

17   I did discover that.

18   Q.  Okay.  And you got on the phone and called Ms. McMillion's

19   office?

20   A.  Not on that day.

21   Q.  Okay.  And you made no modifications in writing to that

22   report before your testimony today?

23   A.  No, not submitted to anybody.

24   Q.  Okay.  Mr. Weiss started, and I was trying to keep count

25   of the various errors to his report or your report.  I'm

1    counting between 10 and 15 up until your testimony right now.

2    Is that a fair number, there's been between 10 and 15 errors to

3    this expert report you submitted?

4    A.  Yeah.  If you -- maybe 10, 10, 12, something like that.

5    But I think if you look in the overall number of things that

6    were reviewed and number of procedures documented, it is a

7    small percentage of those.

8    Q.  The seven patient files you reviewed, is that what you're

9    speaking of in terms of the --

10   A.  And the number --

11   Q.  -- conclusions about them in the report?

12         THE COURT REPORTER:  Wait, wait, wait.  You both

13   talked on top of each other.  "...is that what you're speaking

14   of in terms of the..."

15   Q.  Review of the report I think is what I said.

16   A.  Yes.  And I'm referring to the number of individual

17   procedures and so forth that I was trying to document.

18   Q.  Okay.  Okay.  And some of those errors were typographical

19   I think you said?

20   A.  Correct.

21   Q.  Some of them were caused by a computer spellcheck?

22   A.  Correct.

23   Q.  And some of them were substantive, as Mr. Harrison pointed

24   out with a copy and paste situation that he talked about?

25   A.  Correct.

1    Q.   And then you said that there may be other errors still
2    that you found?
3    A.   Correct.
4    Q.   Something about a -- a -- a caudal epidural?
5    A.   Well, that's the same thing you were alluding to earlier.
6    Q.   Well, you -- I -- I -- you said that you had found
7    additional errors I believe that you hadn't discussed yet.  I'm
8    trying to understand what other errors may be in the report
9    that we haven't talked about yet.
10   A.   To my knowledge, I don't believe there are other errors.
11   Q.   Okay.  So you're comfortable that everything else in this
12   report is true and accurate to the best of your ability?
13   A.   I mean obviously if I read it again, I would -- I would --
14   Q.   Take your time.
15   A.   -- try to proofread.
16   Q.   We got a little time.  Read it again.  Read it regarding
17   MM first, Michelle Morzynske, Dr. Russo's client who you
18   alleged he gave an unnecessary caudal epidural to.  That's
19   Count 32 in the government's indictment.  And I can put up the
20   record if you need me to, Doctor.  I think I will put it up.
21   A.   Yes.  It was -- here it was also the caudal versus
22   cervical issue.
23   Q.   Okay.
24   A.   That was my mistake.
25   Q.   So --

1    A.  And then there was one other mistake that I noted which

2    is --

3    Q.  Hold on, I'm sorry.  Let me write this down.  What was

4    that first thing you just said, sir?

5    A.  There are a few instances where I mentioned cervical and

6    it's actually a caudal epidural.

7    Q.  So I assume you're referring to page 26 of your report is

8    the first mention of cervical epidural steroid injection or is

9    there another one I missed?

10   A.  I believe it's page 27.

11   Q.  Yep, page 27 at the top?

12   A.  Correct.

13   Q.  And then in the -- and so that's wrong, it's not cervical

14   is your testimony today?

15   A.  It's -- it's to be caudal.

16   Q.  Okay.  And this is not one of the errors that you caught

17   in the last few days after having this matter for almost going

18   on two years now?  This is a new catch for you?

19   A.  I only caught it recently.

20   Q.  As in now?

21   A.  No, I -- I have it on my page here as noted, but we have

22   not discussed it.

23   Q.  Is that one of the ones that you let the government know

24   about was wrong in your report?

25   A.  I mentioned that there were errors where -- that I mis --

1    mistook cervical and caudal.

2    Q.  And -- but you didn't mention specifically in relation to

3    Dr. Russo?

4    A.  I did disclose a bunch of errors.  I -- I think I -- I did

5    as well.

6    Q.  Okay.  And there's actually three different places in your

7    report in reference to substantive Count 32 against Dr. Russo

8    where you say cervical epidural steroid, right?

9    A.  Correct, there's three.

10   Q.  And so for each one that's wrong in your report?

11   A.  Correct.

12   Q.  And actually that's the complete bases of the charge of

13   your -- your -- your conclusion: "The patient received a

14   cervical epidural steroid injection without clear indication

15   and was requesting to be treated for her low back pain."  So

16   that's not a typographical error, that's not one of the acronym

17   typographical errors like Mr. Weiss was pointing out, correct?

18   A.  You've asked two things there, but the -- it is not a

19   typographical error and that -- that it's not a autocorrect

20   issue, but I do know and -- and I'm aware that a cervical

21   epidural is not applied for back pain.

22   Q.  Okay.  Low back pain is often treated with a caudal

23   epidural, is that correct, sir?

24   A.  Correct.

25   Q.  And that was the bases, that error three times on the same

1    page was the bases of your opinion relative to the fraud charge

2    against Dr. Russo, correct?

3    A.   Correct.

4    Q.   And you didn't find it for a year and a half after taking

5    50,000 or 50 hours' worth of time?

6    A.   I believe I've answered that, yes.

7    Q.   So would you like to retract your statement from

8    yesterday?

9    A.   Which statement?

10   Q.   About Dr. Russo doing an unnecessary caudal epidural?

11   A.   No, I would not like to retract that.

12   Q.   Why is that?

13   A.   We're discussing in the report the difference of cervical

14   versus caudal in the sense you're referring to the mistake.

15   Q.   Fair enough.  Fair enough.

16   A.   So if I intended to write caudal, that's the basis of my

17   decision.

18   Q.   Why was a caudal -- so you're -- you're -- what you're

19   saying is you did intend to write caudal?

20   A.   Correct.

21   Q.   You just missed it three different times on the page?

22   A.   I believe you asked me that, but yes.

23   Q.   Okay.  And what was your -- what is your opinion as to why

24   a caudal epidural was not warranted in this instance?

25   A.   Part of it is the overall findings on the MRI which are,

1    again, disk bulges in multiple locations that are L3-4, L4-5,

2    L5-S1.

3    Q.  And what about that would make it not indicative of

4    caudal?

5    A.  It's overall a relatively minor or it could be argued as a

6    normal finding.

7    Q.  Could be argued.  Can reasonable minds differ?

8    A.  I'd say that it -- the standard would be that it's a

9    conservative finding and a minor finding there.

10   Q.  Let's go over the chart and see if there's any other

11   errors and then we'll get to the MRI, okay?

12   A.  Yes.

13        MR. MARGOLIS:  Your Honor, is that up?  Is it not

14   seemingly working?

15        THE COURT:  Well, who's displaying?  Defense?

16        MR. MARGOLIS:  I should be connected.  I did it this

17   morning.  Let's try this.  There we go.

18   Q.  So this is Michelle Morzynske's clinical report from

19   9-16-16, is that correct?

20   A.  9-19.

21   Q.  Sorry, 9-19.

22        You -- your report states at page 26 at the bottom

23   that the patient was initially seen by Dr. Russo, is that

24   correct?

25   A.  Correct, yeah.

1   Q.   Okay.  And where did you come with that finding, Doctor,

2   where'd you get that information?  It says Dr. Pashley on the

3   report, on the clinical data.

4   A.   That's true.

5   Q.   Do you know who Dr. Pashley -- does Dr. Pashley even work

6   for the Pain Center, have you ever seen him -- his name as an

7   employee?

8   A.   I don't recall Dr. Pashley as a --

9   Q.   If I told you Dr. Pashley was the referring physician,

10  would you accept that statement as true?

11  A.   Yes.

12  Q.   If I told you that was Dr. Bothra's handwriting, would you

13  have any reason to doubt that?

14  A.   I have no reason to doubt it.

15  Q.   So you were supplied the information that this was Dr.

16  Russo, is that fair to say?

17  A.   Correct.

18  Q.   And you did no due diligence to see whether or not it

19  actually was Dr. Russo, correct?

20  A.   To the best of my ability I tried to attribute it to who

21  it was.

22  Q.   To the best of your ability.  You're an intelligent man,

23  right?  We've heard your credentials.  You're working for the

24  U.S. government right now at $500 an hour.  You didn't ask

25  them, "Who is that doctor?  I've never seen the name Dr.

1    Pashley before."  Right?  You didn't ask them to check the

2    handwriting sample for you to see if it was Dr. Russo's or Dr.

3    Bothra's, is that correct?

4    A.  I did not ask those questions.

5    Q.  So you didn't do it to best of your ability; you just

6    relied on what was handed to you, correct?

7    A.  In good faith, yes.

8    Q.  Thank you.

9         So Dr. Bothra sees this individual first time.  She

10   presents to Bothra and she complains of low back pain.  She's

11   had it for the last ten years, is that fair to say, according

12   to the report?

13   A.  Correct.

14   Q.  She complains of radicular pain, right?

15   A.  I actually wasn't sure.  I thought that that was not

16   radicular, so I wasn't sure what that was.

17   Q.  The second under number 1, is that not look like radicular

18   pain now that we're talking about it?

19   A.  It says the word radicular but there's a -- I -- I don't

20   know if that was a N or a -- I thought that was --

21   Q.  Okay.

22   A.  -- not radicular.  I'm --

23   Q.  Okay.

24   A.  -- sorry about that.

25   Q.  No worries.  It's perhaps on the MRI though, right?  She

1    says that -- oh, what is radicular pain, by the way, can you
2    tell the jury what that is?
3    A.  Radicular pain is pain going down extending towards the
4    extremities.
5    Q.  Pain that shoots down the leg?
6    A.  Correct.
7    Q.  Not new pain from -- from lifting a heavy box or -- or
8    doing furniture over the weekend that we had to do, right?
9    A.  I'm sorry?
10   Q.  It's not acute pain that just happened over the weekend
11   from lifting a heavy box?
12   A.  Based on the time, it's -- no.  It's ten years.
13   Q.  Thank you.
14          Dr. Bothra also describes a bilateral -- chronic
15   bilateral hip pain on Ms. Morzynske.
16          MR. CHAPMAN:  We lost it.
17          MR. MARGOLIS:  Oh, geez.  I'm going to have to keep
18   doing it.  Can you see it now?
19          THE COURT:  I can.  Go ahead.
20   BY MR. MARGOLIS:
21   Q.  Dr. Bothra also describes chronic bilateral hip pain on
22   this woman, is that correct?
23   A.  That's correct.
24   Q.  Diagnosis, scoliosis of the spine?
25   A.  Correct.

1    Q.   Hypertension and coronary artery disease?

2    A.   Correct.

3    Q.   Depression?

4    A.   Right.

5    Q.   There's an X-ray of both hips, shows minor degenerative

6    changes, yes?

7    A.   Correct.

8    Q.   Also an X-ray of her lumbosacral spine.  Do you see that?

9    A.   I can't see that part of the --

10            THE COURT REPORTER:  I'm sorry, I didn't hear.

11   A.   I can't see that portion.

12            Yes, so there is an X-ray of lumbosacral spine.

13   Q.   Thank you.  Thank you for correcting my pronunciation.

14            Degenerative changes are noted, yes?

15   A.   Correct.

16   Q.   Degenerative disk disease noted on X-ray by radiologist,

17   mild scoliosis?

18   A.   Correct.

19   Q.   Spurring, lung spurs are seen on the X-ray?

20   A.   Correct.

21   Q.   There was also an X-ray of the cervical spine of the neck,

22   sorry, cervical spine?

23   A.   You'll have to scroll further down.

24   Q.   Sorry.  Is that not in that chart?

25            So what is Dr. Bothra's orders there?  Can you see

1   that?

2   A.   On the right-hand side, I believe that's where it says

3   urine drug screen, it is gel packs, PT.

4   Q.   What is PT, sir?

5   A.   Physical therapy.

6   Q.   Thank you.

7        And he orders an MRI scan of her lumbar spine,

8   correct?

9   A.   Correct.

10  Q.   Wants to see her back in two weeks?

11  A.   Correct.

12  Q.   He doesn't prescribe her a back brace, correct?

13  A.   Correct.

14  Q.   She would have been a decent candidate for one perhaps

15  with that history, no?

16  A.   Not sure.  I don't think so.

17  Q.   You're not denying that it wouldn't have been a bad

18  candidate with all that degenerative disk disease?

19  A.   Well, I think degenerative disk disease is something that

20  we should probably define.  I know that you may not allow me to

21  do that.

22  Q.   Well, we'll move on.  You can do that on -- on redirect.

23        He also ordered Baclofen.  Do you see that?

24  A.   You'll have to -- Baclofen, yes.

25  Q.   Ten times.  "Patient not due for pain meds."  Do you see

1    that?

2    A.  Yes.

3    Q.  So Dr. Bothra doesn't order her a back brace, doesn't give

4    her any pain medicines, and he prescribes her a non-narcotic,

5    non-Schedule II relaxant.  Is that -- what -- what's Baclofen?

6    A.  A muscle relaxant.

7    Q.  Thank you.

8            Ms. Morzynske doesn't come back right away.  Do you

9    remember she's the one where her husband wasn't getting the

10   medication and she said, "I'm out of here, I'm never coming

11   back"?  There was that big dispute.  Do you remember that?

12   A.  Yes.

13   Q.  Louis I think is his name, Louis Morzynske.

14   A.  Correct.

15   Q.  I don't want to talk about him, but what is interesting

16   about him, and I believe if you recall, his X-rays or his MRIs

17   were actually in Michelle Morzynske's file.  Do you remember

18   that?

19   A.  I do recall that.

20   Q.  And he actually had cervical imaging, right?

21   A.  Correct.  If I -- actually I don't -- I can't recall --

22   Q.  I think --

23   A.  -- off the hand.

24   Q.  Well, you are accurate because that is my recollection as

25   well.  And that just made me think that perhaps that is the

1    reason you kept writing cervical, cervical, cervical throughout

2    Dr. Russo's treatment of Ms. Morzynske because you read -- and

3    I did the same thing reviewing this case.  His -- because he --

4    they wouldn't take him as a patient so they threw his stuff,

5    his records in the file.

6              MS. McMILLION:  Your Honor, is there a question?

7              THE COURT:  Yeah.

8    BY MR. MARGOLIS:

9    Q.  Is it possible that's how you mixed up the cervical/caudal

10   in this instance, sir?

11   A.  I genuinely don't know how that happened.

12   Q.  So it's possible?

13   A.  Anything is possible, but I -- I think we've talked about

14   the mistake that I've made.

15   Q.  Seven months later she comes back in.  There's a note

16   there, "UDT 9-19-16."  That was a test she took there.

17   "Positive for opiates.  New patient."  Do you see at the bottom

18   of the top chart there?

19   A.  Correct.

20   Q.  Okay.  Now we're scrolling down to Dr. Russo's

21   handwriting, Dr. Russo's notes.  I know it says Dr. Bothra.

22   Medical assistants make mistakes, happens all the time, yes?

23   A.  Sounds like mistakes that I've made.

24   Q.  It's a little bit different.

25   A.  Yes, sir.

1    Q.   So "52-year-old female, seen once."   He -- Dr. Russo

2    underlines that.   Do you see that?

3    A.   Yes.

4    Q.   "Wait seven months to return for low back pain and hip

5    pain."   Dr. Russo reviews her MRI scan with her, and I'd like

6    to go over that a little bit because it's above my pay grade,

7    as they say, but I think it's helpful to discuss exactly what

8    the radiologist and then Dr. Russo relied on.

9              Now, Mr. Chapman went through this in some detail and

10   I'll just go back to it.   It's completely reasonable for one

11   doctor to rely on another doctor's imaging, radiology reports

12   to base -- to inform and base Dr. Russo or that other doctor's

13   opinion, is that fair?   A poorly worded question.

14   A.   I mean I guess in a -- a broader sense, that when I refer

15   a patient to one of my colleagues, the colleague relies on what

16   I have determined.

17   Q.   Yes.

18   A.   But each case is looked at individually.   If I see a

19   patient a long time back and there's different issues, then I

20   would expect my colleague to take into account what I write but

21   also make their own medical evaluation and decision making.

22   Q.   Understood.   As far as imaging, radiology reports, MRIs,

23   X-rays, that reliance is completely reasonable and happens all

24   the time?

25   A.   Correct, yes.

1   Q.   Okay.  So this MM's MRI shows "L2-3 bilateral nerve hole

2   [sic] narrowing."

3   A.   Neuroforaminal.

4   Q.   Thank you.

5          THE COURT REPORTER:  Wait, I'm sorry, what?

6          THE WITNESS:  Neuro, n-e-u-r-o, f-o-r-a-m-i-n-a-l.

7   Q.   I appreciate you doing that because I was about to

8   struggle with it.

9   A.   I should test you.

10  Q.   "L3-L4 disk bulge, right greater than left."  Do you see

11  that?

12  A.   Correct.

13  Q.   "Nerve -- nerve hole narrowing may affect the right L3

14  nerve root."  That's the radiologist talking, right?

15  A.   Correct.

16  Q.   He's able to rely on other doctors.

17  A.   Right.

18  Q.   Practicing -- practicing medicine builds on itself as they

19  say, right?

20  A.   Correct.

21  Q.   "Facet arthritis is noted at this level," yes?

22  A.   Correct.

23  Q.   "MRI shows facets may be enlarged and inflamed."

24  A.   Correct.

25  Q.   "No FJI," facet joint injection, "because the pain

1    radiates."  Is that correct?

2    A.  Where -- where are you reading that?  I'm sorry.

3    Q.  Sorry.  "Disk bulge."  So that is what would be standard

4    for an interpretation by a pain doctor, correct?  You don't do

5    facet joint injections if the pain's radiating, is that fair?

6    A.  No, they -- they -- you -- it is possible.  There are

7    radiating patterns of facet-related pain.

8    Q.  Okay.  But typically, customarily, if it's radiating pain,

9    radicular pain, that doesn't indicate for facet injections, is

10   that a reasonable interpretation?

11   A.  It is thought that facet is more axial or back pain.

12   Q.  That's -- that's all I'm talking about.

13   A.  Yeah.  Okay.

14   Q.  Thank you.

15          "L4-L5 level there is a disk bulge" -- did I already

16   go over that -- "with bilateral nerve hole narrowing.  Also has

17   facet arthritis at this level."  And then it says, "L5-S1

18   level, bottom of spine where it joins the sacrum, the sacrum."

19   And what is -- what does that mean, "L5-S1 level, bottom of

20   spine where it joins the sacrum"?

21   A.  Where are you reading that?  I'm sorry.

22   Q.  Where is that?

23   A.  I don't see the word sacrum.

24   Q.  "Disk bulge" -- so I'm just interpreting what most likely

25   Dr. Russo explained to me about this.

1        MS. McMILLION:  Objection, Your Honor.  That calls

2   for speculation as to what counsel is interpreting it to be.

3        MR. MARGOLIS:  I totally agree, Judge.

4        THE COURT:  Good.  Go ahead.

5   BY MR. MARGOLIS:

6   Q.  Also notes "Facet arthritis at this level"?

7   A.  Which level are we referring to?  I'm sorry, just --

8   Q.  L5-S1.

9   A.  Correct.

10  Q.  So she has arthritis up and down her back, is that fair to

11  say?

12  A.  She has arthritis at multiple levels, yes.

13  Q.  The nerves against her leg are being scraped against those

14  small little nerve holes as they try to squirt out of the

15  spine, is that what the radiation, the radicular pain is?

16  A.  It's -- again, it's -- I think you're trying to give a lay

17  explanation.

18  Q.  Correct.

19  A.  I truly respect that.  Again, you know, there is context

20  of MRI findings in trying to make a determination of what the

21  treatment would be.  In this -- in this case this patient has

22  disk bulges.  They have some areas of facet arthritis.  Yes, I

23  would say that's the case.

24  Q.  Okay.  Says, "She declines physical therapy, hurts too

25  much," right?

1    A.   Correct.

2    Q.   "Sent by her PCP to get her pills."

3    A.   Correct.

4    Q.   "Dr. Russo plans to do a caudal epidural."  Do you see

5    that?

6    A.   Correct.

7    Q.   Steroid injection?

8    A.   An epidural steroid injection.

9    Q.   He prescribes her Norco 10 three times a day, correct?

10   A.   Correct.

11   Q.   Relatively low dosage -- dosage according to the CDC and

12   your testimony today, yesterday?

13   A.   Correct, similar dose opioid.

14   Q.   Baclofen?

15   A.   Correct.

16   Q.   And he also --

17   A.   Can you scroll -- scroll down?  I think you're --

18   Q.   Sorry.

19   A.   Are you trying to read from something or are you just...

20   Q.   And he also notes that Ms. Morzynske tried and failed a

21   nerve pain pill, the non-narcotics, said it doesn't work for

22   her.

23   A.   Neurontin.

24   Q.   Thank you.

25               THE COURT REPORTER:  I'm sorry?

```
 1          THE WITNESS:  Neurontin.
 2   Q.  And do you see that note there with the star next to it?
 3   A.  I do.
 4   Q.  What does that say to you?
 5   A.  Would you like me to read it?
 6   Q.  Oh, that's a different note, I'm sorry.  This is the note
 7   I'm talking about here.  In your report, let's go to your
 8   report for a second, you discuss that "she tested positive for
 9   Benzepines that were not addressed by the doctor."  Do you
10   see that note right there, Doctor?
11   A.  Which -- which part of the note?
12   Q.  At the top where the arrow is saying "discussed with
13   patient"?
14   A.  Correct.
15   Q.  So that's not true actually.  Dr. Russo did discuss that
16   with Ms. Morzynske, didn't he?
17   A.  He discussed the two things that are documented there but
18   not the benzodiazepine.
19   Q.  Well, he had a discussion with her about drugs and
20   narcotics and being safe according to that.
21          MS. McMILLION:  Again, Your Honor, if the defense
22   counsel has a question, but his interpretation of what happened
23   is not at issue here.
24          THE COURT:  Okay.  All right.  Well, we know that and
25   the jury knows 'cuz I've told them several times, questions are
```

1  not evidence.  The evidence is coming from the answers on the

2  stand.  I think Mr. Margolis likes to say things to make

3  transitions and we've had a little dialogue.

4          And keep going, Mr. Margolis, please.

5  BY MR. MARGOLIS:

6  Q.  According to that, Doctor, Dr. Russo tried different

7  options to treat Ms. Morzynske, didn't he?  Low dose, caudal

8  epidural, Baclofen, physical therapy, all that was tried with

9  this patient, correct?

10 A.  Correct.

11 Q.  Multimodal approach, correct?

12 A.  Correct.

13 Q.  A specialized treatment plan, some narcotic, low dose,

14 plus the epidural?

15 A.  Correct.

16 Q.  It's what you testified to yesterday, it's what you said

17 the guidelines call for?

18 A.  Called for multimodal treatment, yes.

19 Q.  Correct.  Ms. Morzynske, if you recall, if you -- do you

20 recall her storming off after that and calling back the clinic

21 and complaining, do you remember that?

22 A.  I mean I was not there at that time but --

23 Q.  I'm saying from the record.

24 A.  From the record, yes.  There was a note recording her

25 behavior.

1   Q.  Correct.  We can go over that if you like.  "Michelle

2   Morzynske called the office and stated that she or her husband

3   will not be returning to the Pain Center because we would not

4   give her husband Louis anything for pain and what we are doing

5   for them isn't helping.  Michelle stated she and Louis will go

6   to another pain center and she just wanted to let us know.

7   Michelle requests pain meds that we would not" and we assume

8   "give her."

9         So she and her husband are pill seeking, is that fair

10  to say?

11  A.  There is concern about that, yes.

12  Q.  Of course.  She wants the hard stuff and Dr. Russo

13  wouldn't give it to her, is that fair from that?

14  A.  I mean if you're -- you're -- referring hard stuff to

15  being the opioids.

16  Q.  Stronger, correct.

17  A.  Stronger medication.

18  Q.  Yes.

19  A.  She's looking for medication.

20  Q.  "Pain meds that we won't give her."  He gave her low dose,

21  she storms off mad because it's not high enough.  That can be

22  interpreted as "you didn't give me something strong enough,"

23  fair?

24  A.  Correct.

25  Q.  Okay.  She does come back however.  Three weeks later she

1    shows up for her caudal epidural.  Dr. Russo reviews her urine

2    drug screen.  There's hydrocodone and Suboxone in her system.

3    He notes this, that he discussed her urine results with her,

4    yes?  We already went over that.

5    A.  Correct.

6    Q.  This shows due diligence by Dr. Russo with his patient,

7    correct?

8    A.  I think we've talked about the interpretation of the

9    results and so forth, but yes, he had a urine screen and he was

10   making interpretation.

11   Q.  Physical therapy, Neurontin, low dose, trying a multimodal

12   approach with a difficult patient?

13   A.  Again, I think we're using this term low dose.  It's still

14   an opioid.

15   Q.  Of course.  We're all aware of that, Doctor.  Thank you.

16   A.  Right.

17   Q.  He performs it with fluoroscopic guidance, and there was a

18   nice picture of it in the file.  Do you recall seeing that?

19   A.  Yes.

20   Q.  Confirms that Dr. Russo placed the needle in the epidural

21   space in the spinal canal.  That's how those work, correct?

22   A.  Correct.

23   Q.  She never came back after that, did she?

24   A.  Correct.

25   Q.  A back brace was never ordered, correct?

1    A.   Correct.

2    Q.   She had signed a narcotic agreement, correct?

3    A.   Correct.

4    Q.   And Dr. Russo, I don't believe he prescribed her any

5    opioids on the day of her injection, is that correct?

6    A.   No.

7    Q.   It's not correct or no, he didn't?

8    A.   He did not.

9    Q.   No pills given to him that -- given to her that day.  So

10   this person had, according to the chart, failed conservative

11   treatments, and you're still saying a caudal epidural was not

12   the right thing to do, right?

13   A.   Again, in the interpretation of the overall results of the

14   MRI findings and also X-rays, so forth, a caudal doesn't really

15   make sense in that patient.

16   Q.   Okay.  Is that not something that reasonable minds,

17   reasonable doctors could take a different approach on?

18   A.   I think that most would -- would say that a caudal isn't

19   necessarily indicated there.  That's my -- my belief.

20   Q.   But most means that some would, yes?

21   A.   Again, there may be folks that think that a caudal is.  I

22   mean I -- I noticed that in this practice they use quite a few

23   caudal epidurals.

24   Q.   Well, let's talk about those folks.  Mr. Weiss brought up

25   a journal, a society, ASIPP, that you used to be a member of?

1   A.  Correct.

2   Q.  And they -- they publish articles called "Focused Review."

3   Have you seen some of those "Focused Review" articles that are

4   published in the journal?

5   A.  Correct.

6   Q.  And have you heard of Vijay Singh or Laxmaiah Manchikanta?

7   A.  Yes.

8   Q.  You've heard of Dr. Manchikanta?

9   A.  Correct.

10  Q.  He's a recognized authority, he's the -- the guru?

11  A.  He's an accomplished pain physician.

12  Q.  They call him Lax, right?

13  A.  Lax.

14          THE COURT REPORTER:  I'm sorry, they call him what,

15  Lax?

16          MR. MARGOLIS:  Lax.

17  Q.  Are you familiar with the 2002 Volume 5 Pain Physician

18  Review that he and Dr. Sing, [phonetic], Singe [phonetic] --

19  how am I saying that bad?

20  A.  Sing [phonetic].

21  Q.  Thank you.

22          Wrote called "Role of caudal epidural injections in

23  the management of chronic low back pain."  Have you read that

24  2002 publication peer review?

25  A.  I've not read that 2002 one.  I mean that's quite a bit of

1    time, as we've talked about.

2    Q.  Okay.  I'd like to read you Lax's indications and then his

3    conclusions about caudal epidurals and you can tell me whether

4    you agree or disagree, okay?

5    A.  Okay.

6    Q.  "Caudal epidural steroid injections" --

7             THE COURT REPORTER:  Wait, wait.  Slow down.

8             MR. MARGOLIS:  Sorry.

9    Q.  "Caudal epidural steroid injections are indicated in

10   patients with chronic low back pain who have failed to respond

11   to conservative modalities of treatments.  The procedure should

12   always be performed under fluoroscopy.  While caudal epidural

13   steroid injections may be performed for any type of low back

14   pain with or without lower extremity pain nonresponsive to

15   conservative modalities of treatment, they are properly

16   indicated in patients negative for facet joint pain or patients

17   who have a combination of discogenic component with facet joint

18   pain."  Do you agree with Lax's interpretation there of what's

19   indicated?

20   A.  That's a conclusion made in 2002.  I think we've gone

21   beyond doing caudal epidurals there.

22   Q.  So let me read the conclusion and you tell me whether or

23   not you disagree with Lax there, Dr. Manchikanta.  "Caudal

24   epidural steroid injections are simple, safe and effective

25   techniques for managing chronic low back pain.  Considering the

1   cumulative evidence available in the literature, caudal

2   epidural steroid injections are as effective as numerous other

3   interventions applied in managing chronic low back pain, if not

4   superior.

5           "An interventional pain physician needs to

6   individualize the choice of treatment to each patient and

7   personal experience.  They are best performed under

8   fluoroscopic visualizations."

9           So you're telling me you disagree with Dr.

10  Manchikanta, with Lax?

11  A.  I think you actually read a statement that's very

12  important to say there.

13  Q.  Okay.

14  A.  If you want to read it again, you -- you --

15  Q.  Which part?

16  A.  The individual assessment.

17  Q.  "Needs to individualize the choice of treatment to each

18  patient and personal experience."

19  A.  Correct.

20  Q.  I --

21  A.  So in this patient, and also since 2002, caudal epidurals

22  have not been utilized for these types of conditions, and I --

23  I believe even Dr. Manchikanta has gone on to modify what he

24  has utilized as treatment for these types of indications.  This

25  is a statement from 2002.

1   Q.  We're not talking in the Dark Ages, sir; that was 20 years

2   ago.

3   A.  We -- we just talked about evolution of pain care.

4   Q.  They're still safe and simple, yes?

5   A.  They're safe, they're simple.

6   Q.  They still provide relief from pain, yes?

7   A.  They can.

8   Q.  Relief from low back pain, yes?

9   A.  Would there have been a better suited treatment is what

10  I --

11  Q.  Okay.  That's fair, that's fair.  But saying it's

12  medically unnecessary and he's committing a crime because of

13  doing something that is safe, simple, effective, recognized,

14  provides the patients relief is different, right?

15  A.  I would say yes, I agree with that statement.

16  Q.  Thank you.

17          I want to talk about DS or Denise Souligney.  She is

18  on page -- starting at page 28.  This is a complicated patient,

19  this was a complicated patient, yes?

20  A.  Correct.

21  Q.  Do you remember -- do you remember Ms. Souligney's file?

22  A.  It was extensive.

23  Q.  Quite.  I won't go over each and every treatment of Ms.

24  Souligney's, but I do want to establish the extent and nature

25  of her injuries.  And if you recall offhand, you can tell me,

1    but you don't have her medical record in front of you probably,

2    do you?

3    A.  I do not.

4    Q.  Okay.  Let me know if you -- you disagree with my

5    assessment of her injuries.  5-16 -- 5-3-16 Ms. Souligney

6    presents to the Pain Center at its Eastpointe location.  You're

7    familiar that there were a couple different offices or

8    locations that were under the umbrella of the Pain Center?

9    A.  Correct.

10   Q.  And the Eastpointe was where Dr. Kufner -- that was his

11   exclusive domain.  Did you have knowledge of -- do you know

12   that?

13   A.  I recall reading that, yes.

14   Q.  Okay.  She presents with failed lumbar back surgery

15   syndrome.  That's failed back syndrome.  I think you were

16   talking about that earlier.

17   A.  Correct.

18   Q.  That's when -- what is it?  Can you tell me what that is

19   just so I can explain to the jury?  I -- I forgot what you

20   said.

21   A.  About failed back surgery?

22   Q.  Yes.

23   A.  So it's, again, the -- the condition of pain that goes on

24   beyond after the surgery.  Also we talked about that it's maybe

25   called post-laminectomy syndrome.

1    Q.   Thank you.

2    A.   It may be back pain, leg pain, you know, specific areas,

3    combinations of those two.

4    Q.   And it's failed because the surgeon can't do any more for

5    it and the pain is still there.  Is that why they call it

6    failed back -- back syndrome surgery or...

7    A.   Yeah.  It -- actually, the reason for the name change is

8    that surgeons were -- resented the -- the fact that it was

9    called failed.  It's an absence of further surgical indication

10   and the patient still has pain.

11   Q.   Surgeons can be tense about that kind of stuff.

12           After a surgery like that, the patient will have rods

13   and screws, plates in the back?

14   A.   Correct.

15   Q.   For life?

16   A.   Unless surgically removed.

17   Q.   Unless they do another surgery, yes.

18   A.   Correct.

19   Q.   She also presents with a host of other pain complaints

20   from past surgeries.  Do you recall that?

21   A.   Correct.

22   Q.   Both knees, her left elbow, both shoulders, both hips,

23   neck and low back.  Is that fair to say, is that accurate?

24   A.   Correct.

25   Q.   All surgeries?

1    A.   She had a number of surgeries too, yes.

2    Q.   Prosthetic or fake joint in her knees, elbow, neck and

3    back?

4    A.   Correct.

5    Q.   Like with the back surgery, she has pins and screws and

6    plates throughout her entire body?

7    A.   Correct.

8    Q.   Based on that history alone, you would agree -- if you

9    don't, let me know -- that she has legitimate pain, legitimate

10   complaints, pain complaints?

11   A.   That's correct.

12   Q.   The fact that she was on pain pills and a little Xanax is

13   not overwhelmingly surprising to us?

14   A.   You know, again, the fact that she's on medication is not

15   surprising.  We can argue that what's the appropriate ones,

16   but...

17   Q.   That's fine.  I don't want to argue about it yet.

18           Dr. Kufner sees her in '16 and -- well, let's talk

19   about all his -- I don't want to go through each and every one,

20   but he performed, Dr. Kufner performed, a litany of procedures

21   on this woman over the course of 14 months, give or take.  In

22   2016 Kufner did 11 separate injections, is that correct?  And

23   I'm counting bilateral as two.

24   A.   Got it.  I was trying to add them up.

25   Q.   Yep.  Yep.

1    A.   I mean there were a number of them.  I don't want to waste

2    the Court's time adding each one up.

3    Q.   So according to my count, between May 25th of '16 through

4    9-6 of '17, Dr. Kufner did -- performed 18 separate injections

5    on Denise Souligney.  Is that square with what you have to say

6    or -- or see?

7    A.   That's -- I believe that's correct, yes.

8    Q.   This was not Dr. Russo's patient up until Dr. Kufner left

9    and turned her over to him.  Do you -- did you get that from

10   the records?

11   A.   I believe so.

12   Q.   All right.  And Dr. Kufner actually had scheduled -- Dr.

13   Russo was charged in Counts 33 and 34 for SI joint injections

14   or -- and one SI joint injection, is that correct?

15   A.   I don't recall exactly, but...

16   Q.   Because it's not clear from your report exactly why Dr.

17   Russo was charged, is it?  You said, "Substantive counts

18   relating to" -- this is on page 30 of your report, bottom of

19   the page.  "Substantive counts relating to DS: Counts 28 and

20   29, 33 and 36, 40 and 42," and you say healthcare fraud.  "The

21   patient received numerous injections in the absence of

22   conservative treatment and without documented evidence of

23   benefit and therefore medically unnecessary to continue.  The

24   patient also underwent radiofrequency ablation of facet joints

25   L-3 through 5 that were previously fused and thus not

1    medically -- medically necessary."  Is that -- did I read that

2    right, Doctor?

3    A.   Correct.

4    Q.   So who did L3-L5?

5    A.   I would need to go back to the record to --

6    Q.   On page 29, dated 8-30 -- or actually no, he might have

7    done it twice.  Dr. Russo never did L3 through 5 RFA, correct?

8    A.   I would need to be able to look at the record to -- to

9    verify that.

10   Q.   Well, if I tell you it was Dr. Kufner, do you have any

11   reason to doubt what I'm saying?

12   A.   Correct.  I -- no, I don't have a reason to doubt you.

13   Q.   Thank you.  Thank you.

14        Dr. Kufner left the clinic sometime in late October,

15   early November I believe.  Are you aware that Dr. Kufner left

16   the clinic?

17   A.   I'm aware.

18   Q.   Okay.  Are you aware he filed a lawsuit against Dr. Bothra

19   and the Pain Center?

20   A.   I'm not aware of that.

21   Q.   A qui tam, a qui tam case?

22   A.   I'm not aware of that.

23   Q.   You're not aware that he filed it in July of that 2017?

24        MS. McMILLION:  Objection, Your Honor.  Asked and

25   answered.

```
1              THE COURT:  Sustained.  Keeping going, Mr. Margolis.
2    BY MR. MARGOLIS:
3    Q.  We've talked about reliance on another doctor's care plan,
4    right?  You've mentioned it today, yesterday.  It's not
5    unreasonable for one doctor to rely on another.  He should do
6    his own assessment, make sure it's warranted, but it's common
7    in the practice of medicine.
8    A.  Correct.
9    Q.  So if Dr. Kufner schedules a procedure that is warranted
10   in the records, medical records, with a patient, a patient of
11   this type, significance of injury, it's not unreasonable for
12   Dr. Russo to follow that treatment plan, is it?
13   A.  It would be expected that any doctor would want to make
14   their own evaluation and plan to decide on whether that
15   procedure is appropriate.  If, for example, one of my
16   colleagues were to ask me to do a procedure on their patient
17   and I felt it was not appropriate, I would not perform it
18   because ultimately I would be the one responsible.
19   Q.  Of course.  But if the patient had expressed a reduction
20   in pain from previous procedures to that area and the pain had
21   returned, is there any reason not to do the procedure again?
22   A.  But it would be, again, to take more detail into the
23   specifics of what the procedure was.  Should every single thing
24   that was done in that previous one be repeated?  And we talked
25   about the areas of fusion.  And so could it be a slightly
```

1  different procedure?  It's ultimately a separate event and

2  needs to be decided at -- with the appropriateness of that

3  particular time.

4  Q.  Between the doctor and the patient?

5  A.  Correct.

6  Q.  And that was in '17, and -- and you gave your opinion just

7  about three years after the fact and claimed, without any

8  specificity in your report, that it was medically unnecessary,

9  is that fair to say?

10  A.  Correct.

11  Q.  And is it probably deemed medically unnecessary because of

12  what you saw Dr. Kufner doing over the course of the last

13  15 months?  Did that impact or affect your decision about that

14  one procedure that he did on 11-16 or the procedure Dr. Russo

15  did on 11-16?

16  A.  It was that individual procedure itself.

17  Q.  Okay.  But you -- can you tell me right now what was wrong

18  with that procedure?

19  A.  Which -- which date are you referring to?

20  Q.  Well, Dr. Russo was charged with performing the SI joint

21  injection on 11-16-17.

22  A.  No, I would not be able to answer -- answer that.

23  Q.  Thank you.

24          And another point that is not clear in your report,

25  over the course -- it lists -- and I'm still on page 29 -- that

1    Dr. Kufner had been prescribing her Norco, this is Ms.

2    Souligney, Norco 10 four times a day.  Number 120, that means

3    four times a day, right?

4    A.  Yes.

5    Q.  Baclofen 10/60.  Her MAPS were okay.  Do you see those at

6    the -- the top half of the page on 7-20 is what I'm looking at.

7    A.  Correct.

8    Q.  And then down after Dr. Russo has taken over, her Norco is

9    reduced, isn't it?  Look at 2-21.

10   A.  Correct.

11   Q.  And actually on 11-16, the date of the procedure, is --

12   says Norco 10 milligrams, but it doesn't list -- list the --

13   A.  Quantity.

14   Q.  -- quantity, but do you have any reason to doubt me that

15   that was the day that Dr. Russo reduced her medicine?

16   A.  I do not.

17   Q.  So his first day stepping in to do a procedure, Dr. Russo

18   follows Dr. Kufner's care plan with this impossible --

19   impossibly injured, horrendously injured patient and he reduces

20   her meds, yes?

21   A.  Correct.

22   Q.  Then he performs radiofrequency ablation on 3-14 to DS.

23   Do you see that?

24   A.  Correct.

25   Q.  And that's what's been listed in Counts 35 and 36 of the

1    government's indictment.

2           Similarly to what we don't see about why it's not

3    medically necessary, you're not able to tell me what was wrong

4    with that procedure, right, from looking at your report, are

5    you?

6    A.  Trying to understand why it was not bilateral at that

7    case.

8    Q.  Which?

9    A.  On 3-14.

10   Q.  Was that the reason for your opinion, because that's not

11   something that I saw in your report.  Is that something you

12   have come up with now?

13   A.  Um, it is one -- one -- the ongoing treatment that I was

14   concerned about for this -- that -- that case.

15   Q.  That's what I assumed.

16   A.  Yeah.

17   Q.  From Dr. Kufner before Dr. Russo even got there, yes?

18   A.  Correct.

19   Q.  And he's not charged with the other procedures, he's only

20   charged with the one on 3-14?

21   A.  Correct.

22   Q.  Are you aware of -- thank you.

23   A.  Yes.

24   Q.  Thank you.

25           THE COURT:  Okay.  You're closing in on an hour.  Are

1    you --

2         MR. MARGOLIS:  Really?

3         THE COURT:  Yeah, very definitely.

4         MR. MARGOLIS:  I'll finish, Judge.  Thank you.

5         THE COURT:  Okay.  Thank you.

6    BY MR. MARGOLIS:

7    Q.  And those procedures, I don't want to say invasive,

8    horribly invasive, but they're -- they can be painful, right?

9    A.  They can be.

10   Q.  Tell me what, in several seconds for this Court or

11   several -- 30 seconds, why and what kind of pain and what

12   happens to the person from a radiofrequency ablation, sorry.

13   A.  They're a needle-based procedure.

14   Q.  But they're under sedation so the procedure itself

15   shouldn't hurt too much?

16   A.  If they're under sedation, it should be lower in terms of

17   pain.

18   Q.  But it's the pain after the fact that they sometimes feel,

19   is that fair to say?

20   A.  It's generally a soreness.

21   Q.  I thought some people could feel horrible pain for like a

22   week or something after and then it takes -- or couple days and

23   then it takes effect?

24   A.  That's not typical.

25   Q.  Okay.  So it's not -- doesn't take a week or two to -- for

1   the medicine -- or for it to work, the -- the fusion, the --

2   the burning of the nerves?

3   A.   There's a delayed response.  I think that's a different

4   question.

5   Q.   Okay.  So they can still feel the pain that doesn't go

6   away from what the procedure is supposed to do until a certain

7   time period?

8   A.   That's true.

9   Q.   Okay.  And -- and for a longstanding patient who's in

10  pain, it's not unreasonable for a doctor to give low dose

11  opioid to -- after a procedure like that, correct?

12  A.   On an individual basis, perhaps.

13  Q.   Okay.  And that is what in your report you identify a

14  Count 54 against Dr. Russo.  You charge him with being --

15  sorry, you didn't charge him with anything.  He is charged with

16  being a drug trafficker for giving that prescription to after

17  the RFA.  Do you see page 31 at the top, "The patient received

18  repeated prescriptions for Norco to entice the patient to

19  further undergo, which the patient reported that she only

20  underwent -- each of these was outside the course of" --

21          THE COURT REPORTER:  Wait.

22          MR. MARGOLIS:  Sorry.

23          THE COURT REPORTER:  "... was outside the course

24  of..."

25          MR. MARGOLIS:  "Professional medical practice."  I'll

1    leave it that.

2    Q.  So you kind of group 54 and 55 there.  I believe 55 was

3    probably Dr. Kufner's count; I know it was.  But you're not

4    saying it's completely unreasonable for Dr. Russo to prescribe

5    a low dose opioid after that procedure, right?

6    A.  We would talk about the quantity of pills, you know.  So

7    could you prescribe something for the temporary relief and how

8    long that would be needed for is I guess also discussed.

9    Q.  But part of that was the conclusion about it was given for

10   more injections.  Do you see that in there, "for future"?  You

11   said further injections, that he gave it on 3-14-18 for further

12   injections.  Do you see that "further" word there?

13   A.  Yes.

14   Q.  But if you look at her chart, she didn't have any more

15   injections, did she?

16   A.  Correct.

17   Q.  Dr. Russo never ordered any after that date, right?

18   A.  As -- as far as I know, I think the records also came to

19   an end too if I recall, but I have -- I'll have to go back and

20   look at that.

21   Q.  No, you can speak to the government.  There are EMRs at

22   that time.

23   A.  Okay.

24   Q.  So you weren't aware that Dr. Hersh Patel, another doctor,

25   continued to prescribe the same dose that Dr. Russo did?  Do

```
1    you know Dr. Patel?

2    A.  I do know Dr. Patel.

3    Q.  Have you spoken with him about this matter?

4    A.  I have not.

5    Q.  Have you spoken with him since you've been hired in this

6    case?

7    A.  I have not.  Well, I -- let me rephrase that.  I've spoken

8    to him but I have not talked about the case.

9    Q.  Are you friends?

10   A.  We are colleagues, yes.

11   Q.  See each other socially?

12   A.  No.

13   Q.  Don't go out to dinner with the fam, with the wives?

14   A.  No, sir.

15          MR. MARGOLIS:  Judge, I'm wrapping up.

16          THE COURT:  Okay.

17   BY MR. MARGOLIS:

18   Q.  But let me just hone in -- strike that.  I can --

19          MR. MARGOLIS:  Let me go consult with my client.

20          (Brief pause)

21   Q.  You recall after Dr. Russo took over the treatment of Ms.

22   Souligney that they tried to titrate her Xanax down?

23   A.  I actually do recall that, yes.

24   Q.  And that's a good thing, right?

25   A.  Correct.
```

1    Q.   Thank you.

2    A.   Thank you.

3           THE COURT:  Thank you, Mr. Margolis.

4           Now, ladies and gentlemen, I'm going to advise you

5    it's 2:17 and I'm going to ask Ms. McMillion to conduct her

6    redirect exam and finish this up because we just -- we've been

7    at this for two full days now and we can't go any longer, okay?

8    So I'm going to ask your indulgence on that.

9           Go ahead, Ms. McMillion.

10          MS. McMILLION:  Thank you, Your Honor.

11                        REDIRECT EXAMINATION

12   BY MS. McMILLION:

13   Q.   Dr. Mehta, I will try my best to be brief.

14   A.   I understand.

15   Q.   And actually I'm going to go backwards from where we were

16   yesterday as opposed to the things we've talked about today.

17   A.   Yes.

18   Q.   And just ask some followup questions with respect to some

19   of the questions that you've had on cross-examination.

20          MS. McMILLION:  Ms. Adams, would you pull up

21   Exhibit 75, page 1 please?

22   BY MS. McMILLION:

23   Q.   And I'm showing you what's been marked as Government's

24   Exhibit 75, page 1.  You were just having a conversation with

25   counsel for Dr. Russo on cross-examination regarding patient

1    Denise Souligney.  This is her MAPS record.  Can you tell when

2    her MAPS -- from her MAPS records when her prescriptions were

3    decreased?

4    A.  There was a brief change on 12-22-2017 and then the next

5    change was July 13th, 2018.

6    Q.  And from -- if you go up to October 17th, 2017, what was

7    she receiving on that date?

8    A.  Can you just repeat the date?

9    Q.  October 17th, 2017.

10   A.  October 17th, 2017 was 120 pills.

11   Q.  And what did she get on November 17th, 2017?

12   A.  That also -- that was 90 pills.

13   Q.  And prior to the October 17th date, with the exception of

14   the first one, was she receiving 120 hydrocodone acetaminophen

15   every month?

16   A.  Prior to that day, yes.

17   Q.  And so her prescription was decreased on November 17th,

18   2017, correct?

19   A.  Correct.

20   Q.  And who was that done by?

21   A.  That was done by Dr. Kufner.

22   Q.  So that wasn't done by Dr. Russo, was it?

23   A.  Correct.

24   Q.  Thank you.  You had some conversations about Ms.

25   Morzynske.  Ms. Morzynske was a patient at the Pain Center, and

1    I won't bring back up all of the medical records to go through

2    it, so to the best of your recollection.  If you do need

3    anything to refresh, please let me know.  But I believe you

4    testified she was a patient at the Pain Center, was not seen

5    for seven months and then returned?

6    A.  Correct.

7    Q.  When she was -- she came to the Pain Center, she had a

8    urine drug screen, is that correct?

9    A.  Correct.

10   Q.  And that urine drug screen was positive for opiates at her

11   first visit?

12   A.  Yes, I believe so.

13   Q.  As well as benzodiazepines at her first visit?

14   A.  Correct.

15   Q.  And then she doesn't return to the clinic again for seven

16   months because she didn't receive any opiates that first visit,

17   is that correct?

18   A.  Correct.

19   Q.  There were conversations with counsel for Dr. Russo about

20   Ms. Morzynske was seen, she was given a prescription, then she

21   wasn't, then she didn't come back for a while, and then there's

22   notes in her file about whether she would remain a patient of

23   the practice, and then she does eventually come back.  Is that

24   correct?

25   A.  That's right.

1    Q.  And I believe in the words of counsel for Dr. Russo, he

2    described Ms. Morzynske as a pill seeker?

3    A.  Correct.

4    Q.  Would you agree with that statement?

5    A.  Correct.

6    Q.  And so when you're dealing with a pill seeker, would it be

7    a red flag that someone tests positive for opiates as well as

8    benzodiazepines on their first visit and then don't return to

9    the clinic until seven months later?

10   A.  It would be a concern, yes.

11   Q.  And would that concern have any issuance on the fact that

12   there's no notation of a discussion on that in her patient

13   chart?

14   A.  Correct.

15   Q.  And that she still receives a prescription from [sic]

16   opiates from Dr. Russo?

17   A.  Correct.

18   Q.  There was a lot of conversation about your report and

19   caudal versus cervical, CESI or -- I'm sorry, let me not make a

20   mistake.  Let me read it correctly.  Caudal versus cervical,

21   CESI being an abbreviation, and there was discussions about

22   when you drafted this report back in October of 2020, is that

23   correct?

24   A.  Correct.

25   Q.  And subsequent to drafting this report, I believe you

1  testified that within the last week or so you started to

2  prepare for this case?

3  A.   Correct.

4  Q.   And you went back through your report at that time?

5  A.   Correct.

6  Q.   And is that when you noticed that there were instances

7  where you may have had autocorrect put cervical instead of

8  caudal?

9  A.   Correct.

10  Q.   Or CESI?

11  A.   Correct.

12  Q.   And then was it also at that time that you reviewed this

13  report in respect to the opinions that you made in this case?

14  A.   Correct.

15  Q.   And the patient charts and the information that you had

16  reviewed?

17  A.   Correct.

18  Q.   And we met on Sunday to discuss coming to testify today,

19  correct?

20  A.   Correct.

21  Q.   And as part of that conversation, is that the time that

22  you notified the government that there were some typos in this

23  report?

24  A.   Correct.

25  Q.   And you were set to testify less than 12 hours after that,

1    is that correct?

2    A.  Correct.

3    Q.  Were you instructed to ensure that the testimony you gave

4    on the record was actual and factual as it related to the

5    treatment of these patients and what you observed in their

6    medical records?

7    A.  Correct.

8    Q.  And did you, in fact, do that?

9    A.  Yes, I did.

10   Q.  With respect to Mr. Lacey, let's go back to him, there's

11   another question about whether he was counseled, whether he was

12   getting pill counts, whether there were things that were done

13   conservative as to Mr. Lacey.  I believe defense counsel stated

14   that there was a pill count done and that there were additional

15   medications added to that pill count.

16   A.  Correct.

17   Q.  And I believe that was naproxen?

18   A.  Correct.

19   Q.  And was it your understanding or at least the inference

20   that was given to you with respect to that questioning that Mr.

21   Lacey was adding those pills to his pill count to somehow

22   substantiate the count of pills that he should have had?

23           MR. CHAPMAN:  Your Honor, I'm going to object to

24   leading.  This has been going on for quite a while now.

25           THE COURT:  Okay.  Why don't you ask a more

| | |
|---|---|
| 1 | open-ended question, Ms. McMillion.  Go right ahead. |
| 2 | BY MS. McMILLION: |
| 3 | Q.  Mr. Lacey, do you recall -- or sorry, Dr. Mehta, do you |
| 4 | recall discussing the testimony of Mr. Lacey? |
| 5 | A.  I do. |
| 6 | Q.  Do you recall discussing the testimony about the pill |
| 7 | count? |
| 8 | A.  Yes. |
| 9 | Q.  Was there anything with respect to the pill count that was |
| 10 | raised on your cross-examination that would have created a red |
| 11 | flag? |
| 12 | A.  I believe they were trying to infer that perhaps there was |
| 13 | a mixing of pills and that maybe that would alter the count, |
| 14 | and -- but this was separated out and naproxen, they were able |
| 15 | to identify that. |
| 16 | Q.  If there was a mixing of pills, would that have been a red |
| 17 | flag as a physician prescribing opioids? |
| 18 | A.  Yes. |
| 19 | Q.  Would you have continued to prescribe opioids in that |
| 20 | circumstance? |
| 21 | A.  I would not. |
| 22 | Q.  I'm going to take you back to some of the conversations |
| 23 | very early on in your testimony yesterday and even today. |
| 24 | There's been a lot of conversations about the CDC guidelines |
| 25 | from 2016.  I believe that counsel for Dr. Russo just brought |

1    up a 2002 article from a journal.  There's been a lot of

2    discussion about the 2022 revisions to the CDC guidelines.  And

3    I believe you testified as well as in your report you

4    referenced the 2012 guidelines from ASIPP.

5    A.   Correct.

6    Q.   As well as the Michigan use -- or let me not say that

7    wrong.  Hold on one second.  The 2009 clinical guidelines for

8    use of chronic opioid therapy and chronic non-pain --

9    non-cancer pain.  Is that also a reference that you've gone

10   through?

11   A.   That's correct.

12   Q.   As well as the Michigan guidelines for use of controlled

13   substances for the treatment of pain?

14   A.   Correct.

15   Q.   And there were a number of other articles and journals

16   that the defense counsel took you through?

17   A.   Correct.

18   Q.   Would you consider whatever articles, journals,

19   publications, whatever may have been out at the time, that as a

20   pain management specialist you would be versed in those issues?

21        MR. CHAPMAN:  Your Honor, I'm -- I'm hearing Ms.

22   McMillion testify more than this witness.

23        MS. McMILLION:  I'm asking a question.

24        MR. CHAPMAN:  And again I'm going to object to

25   leading.

```
1            THE COURT:  Okay.  I'll allow that question and
2    remind Ms. McMillion again that you have to ask open-ended
3    questions so that the doctor can give the answer.  Go ahead
4    please.
5    A.  We would expect them to be well versed, yes, to try to
6    read those -- those guidelines and understand them and try to
7    apply them in the best way possible to your -- your practice.
8    BY MS. McMILLION:
9    Q.  Do you apply those guidelines when you're doing an
10   evaluation of what is outside the course of professional
11   medical practice?
12   A.  I do apply those.
13   Q.  And I believe you testified on cross-examination about the
14   evolution of pain management.
15   A.  Correct.
16   Q.  How has pain management evolved from, say, 2020 -- 2002 to
17   2022?
18   A.  I feel like it has changed tremendously and it is
19   something that we learn and we evolve.  Some things that we
20   used to do we no longer do, and there are things that we
21   realize that we perhaps were making mistakes.  I think to give
22   you more specifics, you know, things like opioids were more
23   liberally prescribed, and as we have come -- come around, we
24   realize that exposure to opioids, no matter how little or much,
25   can be potentially detrimental.  In fact, some of the work done
```

1    here in this Michigan -- in the State of Michigan by colleagues

2    at University of Michigan highlights concerns of just brief

3    exposure of opioids to patients that are having surgery.

4         So again, I'm not -- I know there's a time limit.

5    The understanding is that we need to just provide patients with

6    the best possible thing with lowest potential harm.

7         MR. WEISS:  Your Honor --

8    Q.  And in 20 --

9         MR. WEISS:  -- excuse me.  I'm going to object as to

10   that.  Asking these gentlemen to know what is occurring now

11   versus during the period of the indictment is not really

12   appropriate.  So if there's --

13        MS. McMILLION:  Your Honor, if I may respond.

14        MR. WEISS:  -- if there's going to be an exposition

15   as to what is going on now with the State of Michigan, we ought

16   to have some definition as to parameters as to when this is

17   going on and when it was known.

18        THE COURT:  Okay.

19        MS. McMILLION:  Your Honor?

20        THE COURT:  The objection is -- go ahead.

21        MS. McMILLION:  I believe Mr. Weiss has brought up

22   the 2022 CDC guidelines a thousand times in his

23   cross-examination and that's now.

24        THE COURT:  Okay.  All right.  The objection is

25   overruled.  The question about the progression of pain

1    treatment in the last 20 years until date is unobjectionable.

2    The answer is unobjectionable except for the last part

3    regarding what was going on in Michigan which is not relevant

4    and stricken.

5              Go right ahead, Ms. McMillion.

6              MR. WEISS:  Thank you.

7    BY MS. McMILLION:

8    Q.  Dr. Mehta, by 2013 to 2018 were trained physicians versed

9    in the opioid epidemic?

10   A.  Yes.

11   Q.  You talked about the standard with respect to evaluation

12   of these claims that you utilized in your report evaluating

13   that 2013 to 2018 time frame.

14             MR. WEISS:  Your Honor, I'm going to the utilization

15   of the term standards.  They were guidelines.

16             THE COURT:  Okay.  That's fair.

17             Go ahead, Ms. McMillion.

18             MR. WEISS:  Thank you.

19             MS. McMILLION:  Well, I'm not talking about the

20   guidelines, Your Honor.  I'm talking about the standard

21   applied.

22             THE COURT:  Oh.

23             MS. McMILLION:  The criminal liability standard that

24   was applied in the evaluation of this case.

25             THE COURT:  Okay.  With regard to Mr. Chapman's

1    inquiry?

2              MS. McMILLION:  Yes.

3              THE COURT:  Okay.  Go right ahead.  I will take back

4    my ruling on that.  That's a -- a clean question.  Go right

5    ahead.

6    BY MS. McMILLION:

7    Q.  So you talked about the standard of prescribing outside

8    the course of professional medical practice, and it stated that

9    means that if it -- in terms -- in issuance of a prescription,

10   that means that the prescription was issued without any

11   legitimate medical reason or would not have been issued by a

12   doctor acting in accordance with the standards of practice

13   generally accepted in the United States.  In applying that

14   standard, did you use all of those reference materials that

15   we've discussed?

16   A.  I -- as much as possible, yes, I tried to use those.

17   Q.  There was some cross-examination with respect to whether

18   doctors rely on other doctors' assessments of patients.  Do you

19   recall that?

20   A.  Yes.

21   Q.  As a treating physician prescribing opioids, do you rely

22   on the medical assessments by medical assistants?

23   A.  You -- you -- you rely on them, yes.  You -- you --

24   Q.  Do you do any followup to that?

25   A.  Yes.  I mean you -- you are ultimately responsible.  You

1   are responsible in the sense that you're the one prescribing

2   the medication, but also you're responsible for oversight on

3   those folks as well.

4   Q.  So if you have a medical assistant or a physician

5   assistant who has done something, is there followup necessary

6   before prescribing?

7   A.  It would be to -- to confirm that -- that information that

8   you're looking to rely on.

9   Q.  Okay.  Yesterday there was some conversation about the use

10  of bilateral injections versus unilateral injections, and I

11  believe counsel for Dr. Bothra came and quoted some percentages

12  to you about the number of percentages of patients who get

13  bilateral injections and then thoracic bilateral injections.

14  Do you recall that?

15  A.  Yes.

16  Q.  Can you explain to the jury what the issue with bilateral

17  versus unilateral injections were with this practice?

18  A.  In my review, almost all of them were bilateral, a very,

19  very high percentage.  I don't have the exact number, but if

20  somebody told me it was in -- the exact calculation was in the

21  90s, I'd believe that too.

22  Q.  And why is that an issue?

23  A.  It means that it was something that didn't have an

24  individual assessment to look at each patient to say is the

25  pain on one side versus both sides.  Yes, there are -- there

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4462   Filed 06/13/22   Page 174 of 179
Jury Trial: Volume  6 • Tuesday, May 24, 2022

174

1    are patients in my practice that get bilateral treatments, but

2    I have a number of patients also that get unilateral

3    treatments.  It did not appear that that was happening here.

4    Q.  With respect to the difference between a bilateral facet

5    injection and then a unilateral radiofrequency ablation

6    procedure, can you explain for the jury your issue with that?

7    A.  So my -- my issue with that was that if you've made the

8    determination that it's a bilateral procedure or bilateral

9    condition, left and right, and now your -- your plan is to do

10   the radiofrequency, then, especially when giving sedation, you

11   should execute the bilateral there unless there's some reason

12   that is not clear that there was a decision made to do it one

13   at a time.  But when every case is like that, then you start to

14   get concerned that's a practice decision.

15          MS. McMILLION:  Your Honor, if I can just have one

16   second.

17          THE COURT:  Mm-hmm.

18          (Brief pause)

19   BY MS. McMILLION:

20   Q.  You testified I believe that you reviewed over a hundred

21   patient charts in this case, is that correct?

22   A.  Correct.

23   Q.  Did you have any reason to believe that the charts that

24   you were reviewing were in any way incomplete?

25   A.  No.  I -- I basically asked and -- if there was complete

Case 2:18-cr-20800-SJM-APP   ECF No. 426, PageID.4463   Filed 06/13/22   Page 175 of 179
Jury Trial: Volume 6 • Tuesday, May 24, 2022

175

1    charts, and I was informed that these were the ones that were

2    available at that time and -- and, you know, upon the review.

3    Q.  Did you receive paper charts?

4    A.  I did.

5    Q.  Did you also receive electronic medical records?

6    A.  I did.

7    Q.  I believe there was testimony yesterday about -- and I'm

8    not going to try to quote counsel for Dr. Bothra's -- but about

9    people acting in lockstep and parades marching.  In your review

10   of this practice, did these -- did these four defendants act in

11   lockstep?

12   A.  I mean, again, that's an adjective that's hard to -- to,

13   you know, completely match, but there was concerns about

14   similar patterns and behaviors that made it felt like it wasn't

15   individual assessments in practice but rather sort of I almost

16   want to say the protocol that was utilized.

17           MR. CHAPMAN:  Your Honor, I have to object to the use

18   of the term concerns.  There's no federal standard or CMS

19   standard that incorporates Dr. Mehta's personal concerns.

20           THE COURT:  All right.  Well, those were concerns

21   that you had from your review of the evidence, correct, Doctor?

22           THE WITNESS:  Yes, Your Honor.

23           THE COURT:  All right.  With that distinction, I'll

24   let it -- I'll let it ride.

25           Go ahead, Ms. McMillion.

1    BY MS. McMILLION:

2    Q.  Dr. Mehta, you have been taken through several

3    authoritative texts and guidelines, not standards in this case.

4    You've reviewed all of that in preparation for your testimony

5    today.  Has your opinion on the medical necessity for any of

6    the charged counts changed while you've testified here today

7    with respect to healthcare fraud?

8    A.  No, they have not.

9    Q.  Has your opinion for the unlawful -- your opinion on the

10   unlawful distribution of the controlled substances changed

11   based on everything with your testimony including here today?

12   A.  No, no, they have not.

13   Q.  And defense counsel walked you through some substantive

14   counts in this case, but you were also asked to evaluate the

15   practice overall.  And did you have an overall opinion with

16   respect to whether things were being provided under medical

17   necessity from a healthcare fraud perspective?

18   A.  My concern of the overall practice was that were there

19   were things that were provided that were not medically

20   necessary.

21   Q.  And with respect to the prescribing of this practice, do

22   you have an opinion overall with respect to the issuance of

23   controlled substance prescriptions?

24   A.  The same concern that was outlined at my -- my -- as a

25   practice, that opioids were prescribed outside the -- the usual

```
 1    course.

 2              MS. McMILLION:  Notion further, Your Honor.

 3              THE COURT:  Okay.  All right.  That's a wrap.  Thank

 4    you all very much.  We have had an extensive examination of the

 5    doctor and you may step down and be on your way.

 6              THE WITNESS:  Thank you, Your Honor.

 7              (Witness excused at 2:41 p.m.)

 8              THE COURT:  Okay.  All right.  2:41, that's not too

 9    bad.  We started at 9:15 and we went a little over time, but it

10    was worthwhile 'cuz we made some progress, okay?

11              So I would urge you to drive safely.  Try to relax

12    when you get home tonight, get some rest.  Do not talk about

13    the case among yourselves.  Be back here at 8:30 tomorrow

14    morning.  Hopefully we won't have any traffic conditions that

15    are undue and we will continue to march forward.  You're a

16    great jury with great concentration and timeliness and we're

17    most appreciative of your service.

18              Let's all rise for our jurors now.

19              (Jury excused at 2:42 p.m.)

20              THE COURT:  Okay.  We'll adjourn for the day.  Thank

21    you all for your hard work and we'll get back at it tomorrow.

22              Are you going to bring Kufner back tomorrow or where

23    are we going on -- on the next...

24              MR. HELMS:  We'll start with Dr. Kufner, Your Honor.

25              THE COURT:  Okay.  All right.  You all have a good
```

```
 1    night.
 2              (Court in recess at 2:42 p.m.)
 3              (Proceedings in the above-entitled matter adjourned
 4         to Wednesday, May 25, 2022)
 5                        —  —  —
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
1                    C E R T I F I C A T I O N

2              I, Linda M. Cavanagh, Official Court Reporter of the

3     United States District Court, Eastern District of Michigan,

4     appointed pursuant to the provisions of Title 28, United States

5     Code, Section 753, do hereby certify that the foregoing pages 1

6     through 178 comprise a full, true and correct transcript of the

7     proceedings taken in the matter of United States of America vs.

8     D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5

9     Christopher Russo, Case No. 18-20800, on Tuesday, May 24, 2022.

10

11                              s/Linda M. Cavanagh
                                Linda M. Cavanagh, RDR, RMR, CRR, CRC
12                              Federal Official Court Reporter
                                United States District Court
13                              Eastern District of Michigan

14

15

16

17

18    Date: June 9, 2022
      Detroit, Michigan
19

20

21

22

23

24

25
```