Case 2:18-cr-20800-SJM-APP ECF No. 427, PageID.4468 Filed 06/13/22 Page 1 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

1

```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3
    UNITED STATES OF AMERICA,
4
                         Plaintiff,
5    vs.

6    D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
7    D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
8
                         Defendants.
9    _____/

10                  JURY TRIAL EXCERPT: VOLUME 14

11          BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                   United States District Judge
12          Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
13                 Detroit, Michigan  48226
                   Monday, June 6, 2022
14
    APPEARANCES:
15
    For the Plaintiff         BRANDY R. McMILLION
16   United States of America: BRANDON C. HELMS
                               U.S. Attorney's Office
17                             211 W. Fort Street
                               Suite 2001
18                             Detroit, Michigan  48226
                               313-226-9622
19
    For the Defendant         ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra: 30445 Northwestern Highway
                               Suite 225
21                             Farmington Hills, Michigan  48334
                               248-855-5888
22

23                             (Appearances continued next page)

24

25
```

Case 2:18-cr-20800-SJM-APP  ECF No. 427, PageID.4469  Filed 06/13/22  Page 2 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

2

```
 1    APPEARANCES:  Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
            To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                         Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4470   Filed 06/13/22   Page 3 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

3

1    <u>TABLE OF CONTENTS</u>

2    <u>Government Witnesses:</u>                                    <u>Page</u>

3    HERSH PATEL

4        Direct Examination by Mr. Helms                        4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4471   Filed 06/13/22   Page 4 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

4

<u>EXHIBITS</u>

| Identification | Offered | Received |
|---|---|---|
| Government Exhibit No. 154, Dr. Patel Independent Contractor Agreement | 12 | 12 |
| Government Exhibit No. 163, 7/16/2018 audio recording of Dr. Patel shadowing Dr. Lewis | 25 | 25 |
| Government Exhibit No. 164, 7/17/2018 audio recording of Dr. Patel shadowing Dr. Edu | 43 | 43 |
| Government Exhibit No. 165, Dr. Patel audio recording of patient Rena Jones office visit | 53 | 53 |
| Government Exhibit No. 165A, Transcript of Rena Jones office visit | | 53 |
| Government Exhibit No. 166, Dr. Patel audio recording of patient Marisca Pendarvis office visit | | 53 |
| Government Exhibit No. 166A, Transcript of Marisca Pendarvis office visit | 63 | 63 |

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

```
1            Detroit, Michigan
2            Monday, June 6, 2022
3                       —  —  —
4            (Proceedings in progress at 11:24 a.m., all parties
5            present, jury present)
6            MR. HELMS:  Yes, Your Honor.  Our next witness is Dr.
7    Hersh Patel and he's here now.
8            THE COURT:  Okay.  Very good.  How are you today?
9            THE WITNESS:  Fine.  How are you?
10           THE COURT:  Good.  Raise your right hand.
11                    H E R S H   P A T E L
12   was called as a witness herein, and after being first duly
13   sworn to tell the truth and nothing but the truth, testified on
14   his oath as follows:
15           THE WITNESS:  Yes.
16           THE COURT:  Okay.  Good.  Have a seat.  Try to be
17   comfortable in that black chair.  Take your mask off.
18           THE WITNESS:  Sure.
19           THE COURT:  And then you can speak toward the mic so
20   it picks you up.  Don't get too close.
21           Mr. Helms, go right ahead.
22                    DIRECT EXAMINATION
23   BY MR. HELMS:
24   Q.  Good morning, Dr. Patel.
25   A.  Good morning.
```

```
1    Q.   Could you please state your full name for the record?

2    A.   My name is Hersh Patel.

3    Q.   Are you a former employee of the Pain Center?

4    A.   Yes.

5    Q.   Before we get to that, let's talk about your background.

6    What is your educational background?

7    A.   So I -- I'm -- I -- I -- I'm a doctor, physician by

8    training, and I did my specialty in anesthesiology after med

9    school and then a subspecialty in pain management.

10   Q.   When did you graduate from med school?

11   A.   I graduated in 2013.

12   Q.   And immediately after med school what did you do?

13   A.   I did an intern year at Hahnemann University Hospital in

14   internal medicine for one year.

15   Q.   And -- and next?

16   A.   And then after that I did an anesthesiology residency for

17   three years at New York University.

18   Q.   And in your last year of residency what was your title?

19   A.   I was the chief resident at that time.

20   Q.   What does it mean to be chief resident?

21   A.   The chief resident is selected amongst our peers as the

22   one that showed I guess like the most leadership attributes and

23   then also someone that showed a lot of ability to do -- perform

24   the work as an anesthesiologist the best amongst the class.

25   Q.   And how many people were in your class in New York
```

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4474   Filed 06/13/22   Page 7 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

7

1    University?

2    A.   Twenty-two per class, so 66 total.

3    Q.   Okay.  After your year as chief residence, what did you

4    do -- chief resident, what did you do?

5    A.   I did a fellowship in pain medicine at New York

6    University.

7    Q.   And how long was that?

8    A.   That was one year.

9    Q.   And approximately when did that end?

10   A.   That ended in 2018.

11   Q.   Do you have any board certifications?

12   A.   Yes.  I'm double board certified in anesthesiology and

13   Pain Medicine by the American Board of Anesthesiology.

14   Q.   Are you involved with any medical -- medical societies in

15   Delaware that are particularly relevant?

16   A.   I'm currently part of the Medical Society of Delaware and

17   serve on multiple boards and committees with them.

18   Q.   What's your primary role in that society?

19   A.   So I'm -- I'm chair of one committee and a member of

20   multiple committees, providing recommendations specifically

21   along the lines of pain management in the state because that's

22   my specialty, and helping -- helping Medical Society of

23   Delaware give its recommendations for the state on

24   recommendations about any sort of pain management legislation.

25   Q.   Are you currently employed?

Case 2:18-cr-20800-SJM-APP  ECF No. 427, PageID.4475  Filed 06/13/22  Page 8 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

8

1  A.  Yes.

2  Q.  Where?

3  A.  At ChristianaCare which is a hospital system in Delaware.

4       THE COURT REPORTER:  I'm sorry, at where?

5       THE WITNESS:  ChristianaCare.

6       THE COURT REPORTER:  Okay.  Thank you.

7  Q.  How large is ChristianaCare?

8  A.  ChristianaCare, it's -- well, it serves 80 percent of the

9  Delaware population.  It spans all throughout Delaware and then

10 we just took over hospital systems in Maryland and may be

11 taking over some hospitals in Pennsylvania.

12 Q.  What is your current position at ChristianaCare?

13 A.  I'm currently the section chief which means that I direct

14 both the inpatient and outpatient programs for pain management

15 there.

16 Q.  And what would be your primary responsibilities as section

17 chief?

18 A.  So my primary responsibility is creating the operations

19 and policies around pain management for the entire hospital

20 system and then coordinating care for all the patients that

21 require any sort of pain services in the hospital setting and

22 then in the outpatient setting.

23 Q.  And as section chief do you have any role in observing

24 doctors?

25 A.  Yes.  So I'm also in charge of credentialing for the

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4476   Filed 06/13/22   Page 9 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

9

1   hospital system, and because we serve such a large population

2   of Delaware, I credential almost all the pain providers that

3   are in our state, and so I have -- I have the responsibility of

4   monitoring the different pain practices that are in the state

5   that are private and approving their credentialing with our

6   hospital.

7   Q.   Let's move now to your initial contact with the Pain

8   Center.  How did you hear about the Pain Center?

9   A.   I heard about the Pain Center through a recruiter.

10  Q.   And why were you looking for a job in Michigan?

11  A.   So my wife is a psychiatrist.  She was finishing up her

12  residency at Henry Ford Hospital here in Michigan and we were

13  about to have our first child.  Initially I was actually going

14  to be opening up a private practice in New Jersey, but because

15  of our newborn, I decided I wanted to come to Michigan and be

16  with the family, so I contacted the recruiter who got me in

17  touch with the Pain Center.

18  Q.   Do you send a resumé to the recruiter?

19  A.   I did.

20  Q.   And then what happened?

21  A.   The resumé was sent to Dr. Bothra and the -- we -- we set

22  up a time to have a phone conversation.  He was interested in

23  pursuing my employment there, and so we decided we would have a

24  time that we got together and discuss the -- the -- the

25  position and kind of what the employment opportunity looked

1    like in person.

2    Q.  And did you go to visit in person?

3    A.  I did.  So one of the -- I believe it was in November of

4    2017 I ended up going there on a Saturday on one of his

5    procedure days and I ended up observing him, observing the

6    procedures and just learning more about the position.

7    Q.  And what location were you at?

8    A.  I was at the Warren site.

9    Q.  Okay.  And how did that meeting go with Dr. Bothra or

10   Bothra?

11   A.  So I mean overall, like, I felt that he -- he was

12   providing -- he was giving me an opportunity to practice pain

13   the way I wanted to and that I would be an independent

14   contractor being able to make decisions the way I wanted and

15   providing interventional pain care at that site.

16          I think a big question for me was always about the --

17   well, what are the -- are we going to be prescribing opioids,

18   and the answer was always just that we're going to be -- we --

19   we don't do much, we do the minimal amount.

20          And kind of like when we kind of went through the

21   office, the office setting and all that, there was -- there

22   wasn't much there, so I didn't really have much to base my

23   decision off of besides the interaction that I had with Dr.

24   Bothra and the four or five cases that I went in with him on.

25   Q.  After that meeting did Dr. Bothra ask you for references?

1    A.   Yes.

2    Q.   Who did you use as references?

3    A.   I asked Dr. Letison [sic] who's an anesthesiologist, Dr.

4    Gharibo who is the Medical Director of Pain at that time and --

5    Q.   Do you recall a Dr. Michael Wajda?

6    A.   Oh, Dr. Wajda.  Yeah, he was our Program Director for

7    Anesthesiology.

8    Q.   Were you close with Dr. Gharibo?

9    A.   Yes.  He was my mentor and continues to be my mentor even

10   now.

11   Q.   What happened after you provided references?

12   A.   After I had my -- after I give those references, I

13   received an email with terms for the contract and we started

14   negotiating what that contract would look like.

15   Q.   And did you ultimately sign a contract?

16   A.   I did end up signing that contract sometime in December.

17   Q.   There should be a binder near you with Exhibit 154.

18   Actually, I can come help you.

19            (Brief pause)

20            Dr. Patel, do you recognize Exhibit 154?

21   A.   Yes, this was the contract that I signed.

22   Q.   And do you know when you signed it?

23   A.   I think it was sometime in December of 2017.

24   Q.   If you look in the beginning, maybe the first paragraph,

25   there's an effective date.  Do you see that?

1    A.   February 14th of 2018.

2            MR. HELMS:  Your Honor, at this time I would move

3    Exhibit -- Exhibit 154 into evidence.

4            THE COURT:  Okay.  That's received.  Go right ahead.

5            MR. HELMS:  Ms. Adams, we don't need to bring it up

6    just yet.

7    BY MR. HELMS:

8    Q.   Dr. Patel, what was your title under the contract?

9    A.   I was an independent contractor, Exclusive Employee

10   Independent Contractor.

11   Q.   Okay.  And we'll discuss this more later, but once you

12   started, did you feel like you were an independent contractor?

13   A.   No.  A lot of the -- the problem is like the -- the way

14   that it was -- the oper -- the way that everything was

15   structured, you were either -- you either did what was there

16   already or you just weren't following -- you -- you -- there --

17   there was no time or ability to make any sort of independent

18   medical decisions.

19   Q.   What time or what date did the contract specify would be

20   your first official day?

21   A.   July 16th, 2018.

22   Q.   And how were you to be compensated under the agreement?

23   A.   So I was given a base salary and then a percentage of

24   collections based off of the procedures I did and the amount of

25   patients I saw.

1   Q.   What were the bonuses that you would receive for various

2   procedures?

3   A.   Um, the -- for procedures it was 80 percent of collections

4   unless it was auto related, then it was 40, and then for office

5   visits I think it was 40 percent, but none of this included the

6   ancillary services.

7   Q.   You -- you did or did not -- you were or not going to

8   receive bonuses for ancillary services under the contract?

9   A.   I was not receiving bonuses for ancillary services.

10  Q.   And what was your understanding of what ancillary services

11  were?

12  A.   So they were urine drug screens, durable medical

13  equipment, physical therapy, chiropractic care, so the things

14  that I was told Dr. Bothra was make -- was able to make his

15  money off of.

16  Q.   Well, yeah.  So did Dr. -- did Dr. Bothra ever tell you

17  specifically who benefitted financially from the ancillary

18  services?

19  A.   Yes.

20  Q.   And who was that person?

21  A.   Dr. Bothra.

22  Q.   Okay.  Under Section 10F of the agreement, how much notice

23  did you need to provide before you submitted any resignation?

24  A.   I had to give a 90-day notice after my resig -- after to

25  be able to resign from that position.

1    Q.   Okay.  Let's turn now to when you started at the Pain

2    Center.  Did you have an unofficial start before your official

3    start date of July 16th, 2016?

4    A.   Yeah, I actually volunteered to come in the week before.

5    I mean this was my first job out of fellowship.  I actually

6    wanted to have ownership over it and really provide quality

7    care and understand the system before I started treating my

8    first patient, so I ended up going to the clinic a couple days

9    before my start date.

10   Q.   Was that the week before?

11   A.   The week before.

12   Q.   And who -- did you shadow any doctors at the Pain Center?

13   A.   Yeah.  At that time I shadowed Dr. Edu, Dr. Bothra and Dr.

14   Lewis.

15   Q.   Was Dr. Edu the first doctor you shadowed?

16   A.   Yes.

17   Q.   What happened while you shadowed Dr. Edu?

18   A.   Um, so I mean I was kind of thrown off by it, but we saw

19   quite a few patients over a short period of time and he had a

20   very structured questioning mechanism that he had, and every

21   patient received some sort of narcotic script and there was no

22   physical examination that was done which really threw me off

23   or -- yeah.  And so --

24   Q.   And what -- with respect to those visits, what about --

25   you said there's no physical examination.  What kind of

1    questions would Dr. -- or questions or information would Dr.

2    Edu provide regarding opioids?

3    A.  So -- and there -- there was no discussion about the

4    safety or efficacy of the medication or talking about whether

5    it's helping, whether it's -- you know, what the risks are of

6    taking this medication or what's going to happen if they take

7    this long term.  There was -- there was no discussion about the

8    opioids itself; it was just a script that was given.

9    Q.  And during that time shadowing Dr. Edu did you notice

10   anything about the -- the EMR system or the medical records

11   system in place?

12   A.  Yeah, so the medical -- the EMR system that was being used

13   was kind of like a checkbox, and so as long as you hit enough

14   of the checkboxes, it filled up the -- the -- the -- the

15   document or like the actual progress note enough so that it

16   looked like there was a lot being done, but in reality none of

17   that was really being done.

18   Q.  Did Dr. -- did Dr. Edu ask questions of his patients about

19   whether they had prior conservative treatments like physical

20   therapy?

21   A.  No.

22   Q.  Did he say anything about how many patients each doctor at

23   the Pain Center saw in a day?

24   A.  He mentioned -- he mentioned during my time there that --

25   that -- that they were seeing up to 80 patients a day at times.

1    I don't remember him giving an exact range.

2    Q.  Okay.  What was your initial reaction to what you were

3    observing with Dr. Edu?

4    A.  I mean initially I was just kind of -- I thought, you

5    know, why -- how is this possible, like why -- like this can't

6    be the reality of things, and I -- I really just thought that

7    this was causing so much patient harm unwittingly but it's --

8    it was being done, and it felt like it was almost like a

9    factory that was created just to make a lot of money and not

10   really help anyone.

11   Q.  Did you bring any of your concerns during that first

12   unofficial week to Dr. Bothra?

13   A.  Yes.

14   Q.  What did you tell him?

15   A.  I asked about the prescribing habits and the decision

16   making that was going on, and I mean each time I was just told

17   that this isn't an academic practice.  This demographic, this

18   isn't how you treat this population or this demographic, they

19   require a different way of treatment.

20   Q.  Were you satisfied with his response?

21   A.  No.  I felt even more frustrated afterwards.

22   Q.  Did you shadow anyone else during that first unofficial

23   week?

24   A.  I shadowed Dr. Lewis as well.

25   Q.  Okay.  And did you -- did you shadow Dr. Bothra for any

1  procedures?

2  A.  Yes.

3  Q.  Okay.  Was there anything that stands out to you with

4  respect to the procedures that Dr. Bothra did during that first

5  unofficial week?

6  A.  So I think the biggest thing that stood out to me was

7  the -- well, first the sterility factor.  All the syringes were

8  being made early in the morning with no sterility involved.

9  They were using the same vial to draw on multiple syringes,

10  keeping the syringes completely open, using the same gloves,

11  just dumping them onto a basket that had labels just saying

12  this -- this is for SNRB, this is for local.  And the

13  medications were just the same medication for each syringe, no

14  thought about like, you know, if this patient has some sort of

15  medical history like diabetes or something, are we going to be

16  using the steroid, are we not.

17          And then when the procedure was actually being done,

18  most of the time I was kind of shocked at like there -- there

19  was no safety mechanisms being used like contrast injection to

20  see if there's any intravascular --

21          THE COURT REPORTER:  Doctor, I have to ask you to

22  slow down.

23          THE WITNESS:  Sorry about that.

24          THE COURT REPORTER:  "...to see if there's any

25  intravascular..."

1   A.   To see if there's any sort of intravascular injection, so

2   into the arteries or veins, to prevent things like stroke from

3   happening.  And the needles were being placed way outside of

4   where I would expect them to be placed, and so I wasn't sure

5   how we were calling it the procedure that it was actually

6   being -- that -- said being done.

7   Q.   What about with the patient visits you saw with Dr. Lewis,

8   was anything concerning there?

9   A.   So same thing with Dr. Lewis, I mean the pace of the

10  procedures being done and the inaccuracy of the injections.

11  Most of it just seemed like they were trying to get the needles

12  in just enough so that -- or just to the right spot so that it

13  looks almost okay on imaging, but in reality they were missing

14  the target by centimeters.

15  Q.   Did you witness any patients express hesitancy to Dr.

16  Lewis about receiving injections?

17  A.   Yes.

18  Q.   And how did Dr. Lewis respond to that?

19  A.   So anytime there was any sort of hesitancy about getting

20  an injection done, the patient would be told we're going to

21  start cutting -- you're going to have your meds cut down or

22  that you need to go for surgery, or most of the time it was

23  just you're going -- your meds are going to be taken away.

24  Q.   Still in that first unofficial week, did you happen to

25  notice when doctors would fill out forms like procedure notes?

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

1   A.   Yes.  So when -- when the procedures were being -- before

2   the procedure was done, there was an entire -- there was a wall

3   full of procedure notes and they were already kind of prefilled

4   with whatever information they would need for billing.  And so

5   they would grab a sheet a even before they went to go do the

6   procedure, they would fill it out, put the pre- and post-pain

7   scores and go do the procedure and come back.

8            I think the biggest problem I saw with that was that

9   a lot of what we do as interventional pain physicians is we're

10  trying to figure out is this intervention helping the patient,

11  and the fact was that they were making up these numbers and

12  there was no one doing an assessment of whether or not these

13  procedures were actually helping or hurting.

14  Q.   And you said they.  Who specifically did you see do that?

15  A.   I saw Dr. Bothra, Dr. Lewis, Dr. Edu.

16  Q.   Other than the things we've mentioned, did you see

17  anything else that concerned you during that first shadow week?

18  A.   Overall, I mean I think it's just the urine kind of being

19  everywhere, that was something that kind of threw me off a lot.

20  There was vials of urine, bags and bags of urine just kind of

21  collected all over the space.  Didn't understand why there --

22  there needed to be so much urine collection.  The goodie bag of

23  things that they were kind of giving out to every new patient.

24  Why did every new patient need a back brace, an ice pack and,

25  you know, the -- the -- the -- the bag in general.  It seemed

1  like it was -- sorry.

2  Q.  Go ahead, you can finish your answer.

3  A.  It just seemed like it was like a billing thing or like

4  they were just trying to bill for extra.

5  Q.  Did you ask any of the doctors about these things that you

6  saw?

7  A.  I did.

8  Q.  And what would they tell you?

9  A.  That this is just how it's done and that this is how we --

10        MR. COLLINS:  Your Honor, he needs to specify, all

11  due respect, who he's speaking with.

12        THE COURT:  I would agree.

13  BY MR. HELMS:

14  Q.  Did you ask any of the defendants at the tables here about

15  these issues?

16  A.  Yes.  I spoke to Dr. Edu about it, and I mean the response

17  was usually that this -- this is how -- this is the -- this is

18  what we do to help the patients.  This is also how we get --

19  how -- this is how we say thank you to Dr. Bothra or like kind

20  of give back to what -- you know, because he gave so much to

21  us.

22  Q.  Can -- can you elaborate on that?  What do you mean that

23  he said, "This is what -- how we say thank you"?

24  A.  As in a lot of what -- the -- the money that they were

25  making off of was based off of the procedures and the -- the

1   patients that they were seeing.  So Dr. Bothra was getting most

2   of his revenue from the ancillary services, so the physical

3   therapy, the urine drug screens, the durable medical equipment

4   or the back braces, things like that, and so to support him,

5   this was kind of what they did.

6   Q.  Specifically, with respect to the prescriptions that you

7   were seeing -- you were seeing being issued, was there anything

8   concerning there?

9   A.  So for me it was -- I think the thing that threw me off

10  the most was the age of patients receiving some of these

11  narcotics.  I mean to see a 20-year-old go through back

12  injections and get medications was kind of just -- you know,

13  it -- it's a whole life that's being destroyed.

14         But outside of that, it was kind of the way that the

15  medications were just being handed to the patient without any

16  sort of discussion about alternatives or any sort of risks,

17  benefits, things like that.

18         I think those are kind of the two big things that

19  bother me.

20  Q.  So during this first unofficial week when you're seeing

21  these things, did you do anything?

22  A.  I -- I -- I brought up my concerns with a few people, but

23  I also started kind of fearing my own future.  I mean this was

24  my first job outside of fellowship and I -- I -- I felt like I

25  was getting involved with something that I didn't find to be

```
1    ethical, and so I actually brought a recorder and started
2    recording conversations.
3    Q.  Before we get to that, did you contact anyone outside of
4    the Pain Center about what you were seeing?
5    A.  Yeah, so I did contact a few peers, I went to some
6    colleagues that graduated before me, kind of see how their
7    practices were, talked to them about is this normal.
8              THE COURT REPORTER:  Doctor, I really need you to
9    slow down please.
10             THE WITNESS:  Sorry about that.
11   Q.  And Dr. Patel, just I'm asking you -- I'm going to be
12   asking you who you reached out to.  I don't want you to tell me
13   what they said, okay?
14   A.  Okay.
15   Q.  Okay.
16   A.  I reached out to colleagues, I reached out to mentors like
17   Dr. Gharibo and also reached out to the DEA.
18   Q.  After you talked to Dr. Gharibo and your -- your other
19   people you reached out to, how did you feel about the concerns
20   you had been having?
21   A.  I felt like I was validated.
22   Q.  So you then contacted the DEA?
23   A.  Yes.
24   Q.  How did you contact the DEA?
25   A.  I found a phone number online and had a phone
```

1    conversation, and then I was asked to email all that
2    information directly to them.
3    Q.  And did you do that?
4    A.  Yes.
5    Q.  And was this before your official start on July 16th,
6    2018?
7    A.  Yes.
8    Q.  Okay.  And then over that weekend before your official
9    start, did you do anything?
10   A.  Yeah.  I got my -- I got a recorder.
11   Q.  And whose idea was it for you to record people?
12   A.  My own.
13   Q.  Had you discussed that with any federal agency before you
14   started doing it?
15   A.  No.
16   Q.  Okay.  And why did you decide that you were going to
17   record people?
18   A.  Because I wanted to protect myself and make sure that if
19   something did come about with all of the unethical things that
20   we were seeing, I wanted to make sure that I -- I -- I had some
21   sort of support showing that I was trying to do the right thing
22   here.
23   Q.  Let's move to your first official day on July 16th, 2018.
24   In general, what did you do that day?
25   A.  So that day I did some shadowing and then saw some new

 1   patients.

 2   Q.  And who did you shadow?

 3   A.  I was shadowing Dr. -- I believe it was Dr. Lewis.

 4   Q.  Did you record your interactions in the shadowing with Dr.

 5   Lewis?

 6   A.  Yes.

 7   Q.  Before that day, did you know who you were going to be

 8   shadowing?

 9   A.  No.

10   Q.  Okay.  We're going to get into some of those recordings in

11   a moment, but in general, what did you learn from Dr. Lewis on

12   that first day shadowing?

13   A.  Basically that visits were two to three minutes tops and

14   that there was a one-size-fits-all for every patient and that

15   the end goal was to get procedures, get ancillary services in

16   trade for some medication.

17   Q.  And did Dr. Lewis have any discussion with you about the

18   importance of billing for ancillary services?

19   A.  Yes.

20   Q.  What would -- what did he say about that?

21   A.  He said that that's how we give back to Dr. Bothra.

22   Q.  Dr. Patel, in the binder, and I'll come over there too,

23   you should have an Exhibit 163, well, a page tab for 163.

24   A.  Mm-hmm.

25   Q.  Dr. Patel, on -- on your first day you -- you recorded

1    interactions with Dr. Lewis and others, correct?

2    A.  Yes.

3    Q.  Okay.  And you've reviewed that -- you've listened to that

4    recording before today?

5    A.  Yes.

6    Q.  And do you know approximately how long that recording is?

7    A.  It's probably around nine to ten hours.

8    Q.  Okay.  And have you also listened to clips and excerpts

9    taken from that recording?

10   A.  Yes.

11   Q.  And is Exhibit 163 that entire recording?

12   A.  Yes.

13          MR. HELMS:  Your Honor, at this time I would move

14   Exhibit 163 into evidence.

15          THE COURT:  Received.  Go right ahead.

16   BY MR. HELMS:

17   Q.  Between seeing patients on that first day with Dr. Lewis,

18   would he talk to you about the Pain Center in general and give

19   you advice?

20   A.  Yes.

21          MR. HELMS:  Ms. Adams, could we play clip 163A-1?

22          (Audio recording being played)

23   BY MR. HELMS:

24   Q.  Dr. Patel, what did you understand Dr. Lewis to be telling

25   you on that day?

 1   A.   That this was going to be a very fast-paced clinic, that

 2   we see high volumes, and you kind of just have to keep chugging

 3   to get through.

 4              MR. HELMS:  Ms. Adams, can we play clip 163A-3?

 5              (Audio recording being played)

 6   BY MR. HELMS:

 7   Q.   Dr. Patel, what was your reaction to that -- those

 8   comments that day?

 9   A.   So I think for me, it was -- I was thrown off by the fact

10   that we're not really looking to actually provide any sort of

11   medical care.  It sounded like we were just trying to get

12   documentation, like we're just trying to get some numbers down,

13   get information in so that we could get our billables.  And so

14   I think for me it was a lot of introspection about why -- why

15   are we even acting like doctors here and like that -- that that

16   kind of shows, you know, that -- that -- that -- that model

17   of -- I would say like a McDonald's drive-thru that they had

18   going.

19   Q.   During that clip at one point you said, "That's awesome."

20   Was that how you were feeling in the moment?

21   A.   No.  I was actually just trying to figure out how I'm

22   going to get out -- out of there most of the time.  And at the

23   end of the day, like, I was surrounded by people that believed

24   that what they were doing was not causing any harm, and as a

25   new fellow I -- I didn't have a voice there and I think that

1   scared me the most, so I was just going with whatever

2   conversations that were coming up.

3           MR. HELMS:  Ms. Adams, can we play clip 163A-4 next

4   and -- and stop at around the 58-second mark?

5           (Audio recording being played)

6           You can stop it there, Ms. Adams.

7   BY MR. HELMS:

8   Q.  Could you explain to the jury, Dr. Patel, what you

9   understood Dr. Lewis to be telling you about office code visits

10  there?

11  A.  So he was saying that even if when we -- when he goes to

12  see the patient and information isn't captured, he'll -- as

13  long as the EMR record can show that things were done, like a

14  physical examination or a history taking, then you could

15  still -- that he still bills for that higher code for better

16  reimbursement.  So even if nothing was done in the room itself,

17  as long as it was documented as if it was done, it should be

18  billed at a higher code or it would be billed as a higher code.

19  Q.  So were the patient file notes actually commensurate in

20  scope with what Dr. Lewis actually did in the visits?

21  A.  No.  So for the most part, I mean I -- the -- the visits

22  really consisted of going in there, talking about what

23  injection was going to be done next, saying refills, talking

24  about the refill.  And then I -- there was some -- there were

25  sometimes where he would go through some of the pain symptoms,

1   talking about where is it located, does it go down the legs,

2   things like that, but that was pretty much it.

3           MR. HELMS:  Ms. Adams, can we play next 163A-5?

4           (Audio recording being played)

5   BY MR. HELMS:

6   Q.  Dr. Patel, what was Dr. Lewis saying here about the Pain

7   Center patients?

8   A.  I mean -- I mean sounds like he was saying that most of

9   them are abusers of the medication and that if we give them

10  access to something that can be abused, they will abuse it.

11  And I -- I guess the -- there -- he -- he's pretty much saying

12  like that demographic or the population that they treat are

13  mostly just people suffering from some sort of drug addiction.

14  Q.  Did you have a reaction to that at the time?

15  A.  I mean I felt that it was -- it was kind of horrifying

16  that a clinic that should be a behavioral health clinic helping

17  these patients recover from their life of addiction and

18  suffering, getting them back to a safer community is being, you

19  know, hosted by a group of guys that are pretty much just doing

20  a bunch of injections and giving out medications, so I was --

21  that -- that -- it was really frustrating to hear that.

22          MR. HELMS:  Ms. Adams, could you play clip 163A-28

23  and start around the 50-second mark?

24          (Audio recording being played)

25          You can stop it there, Ms. Adams.

1   BY MR. HELMS:

2   Q.   Dr. Patel, how did Dr. Lewis's comments about patients

3   here coincide with how he treated his patients in office

4   visits?

5   A.   I mean I think it kind of explains a lot.  The -- the SLS,

6   I mean shitty life syndrome, is something that shouldn't be

7   taken lightly.  I think that is something that people suffer

8   from on a day-to-day basis and they don't get the right

9   support.  And I think when we're -- you know, the -- if we're

10  feeding them narcotics, that that's only worsening their entire

11  life situation.  But, yeah, I mean it kind of reflects on how

12  he treated the patients in the room too, don't give them the

13  time -- sorry.

14  Q.   How would he treat patients in the room?

15  A.   Didn't give them the time to talk.  Didn't give them time

16  to explain their story.  Didn't give them options on how to

17  actually recover from these traumas and injuries and their

18  shitty life syndrome.

19          MR. HELMS:  Ms. Adams, can we play clip 163A-7?

20          (Audio recording being played)

21  BY MR. HELMS:

22  Q.   Dr. Patel, what was Dr. Lewis saying there to you?

23  A.   That you kind of just -- he was making up documentation

24  for the sake of documenting for these auto cases.  And I guess

25  like the second part to it was that the auto cases were being

1  shifted over to Dr. Bothra mostly.

2  Q.  Do you know why the auto cases were being shifted to --

3  shifted over to Dr. Bothra?

4  A.  Because they reimburse a lot more than a standard

5  insurance policy patient.

6          MR. HELMS:  And Ms. Adams, can you next play clip

7  163A-11?  I'll note this has a lot of background noise so it's

8  a little bit harder to hear.

9          (Audio recording being played)

10  BY MR. HELMS:

11  Q.  Dr. Patel, I know that was hard to hear, but what -- what

12  was your understanding of what Dr. Lewis was telling you here?

13  A.  It sounded like he was talking about the procedure

14  volumes, that as you increase volume, as -- as you increase the

15  amount of procedures that you do, you'll be able to make a lot

16  more money, and it was just about doing it faster and faster,

17  really no discussion about whether you're actually doing the

18  right thing for the patient or not, but obviously the more

19  procedures we do, the more money we can make.

20          MR. HELMS:  Ms. Adams can you play 163A-12?

21          (Audio recording being played)

22  BY MR. HELMS:

23  Q.  What was Dr. Lewis saying here?

24  A.  So he was talking about the ancillary services, the DME,

25  urine, physical therapy, how it -- it makes a lot of money for

1   Dr. Bothra, and if we're able to increase the cut that we get

2   from the bonuses, that we would get a cut of that piece as well

3   eventually, and the procedure volumes that -- because we do so

4   much volume, you can make a lot of money here.

5   Q.   Now, we've already heard several clips where Dr. Lewis is

6   mentioning money to you and money made off of procedures.  Had

7   you done anything to indicate that you were -- had you asked

8   about that or indicated you wanted to know more about that?

9   A.   About the procedures?  Sorry.

10  Q.   About the compensation.  Had you indicated that you wanted

11  to know about compensation or was that unsolicited?

12  A.   No, I didn't really ask about the compensation.

13        MR. HELMS:  Ms. Adams, can we play clip 163A-18 next?

14        (Audio recording being played)

15  BY MR. HELMS:

16  Q.   What did you understand Dr. Lewis to be telling you here?

17  A.   So basically if we started prescribing higher doses of

18  narcotics, we would go under the radar and we could potentially

19  get into trouble because of the system, so to try to stay under

20  the radar, we prescribed lower doses of the medication.

21  Q.   When you said "yeah yeah" in this clip, were you actually

22  agreeing with Dr. Lewis?

23  A.   No, not at all.

24  Q.   What -- what were you actually thinking at the time?

25  A.   At that time I was thinking it's pretty egregious that

1   we're basically saying that all patients need narcotics.  We're

2   not really talking about what we could do to help patients come

3   off of them or give them any of the other support that they

4   need.  There was more -- I was just -- again, this was a system

5   that -- a factory that they pretty much created, and I was just

6   a part of it at that point and I didn't have any other -- I

7   didn't have an ear to actually even listen to my concerns.  It

8   sounded like everything was just being brushed off.

9           MR. HELMS:  Ms. Adams, can we play clip 163A-20?

10          (Audio recording being played)

11   BY MR. HELMS:

12   Q.  So Dr. Patel, can you explain briefly to the jury what you

13   were hearing here?

14   A.  So he's -- we're -- he's discussing two different

15   procedures.  One is called a caudal epidural steroid injection

16   and one is a lumbar epidural steroid injection.  So both

17   injections are trying to put some sort of solution into what's

18   known as the epidural space, and that's basically when you have

19   pain that goes down the legs.

20          The problem is that the caudal epidural is a totally

21   different location than the lumbar.  Lumbar is considered to be

22   the lower back.  Caudal is supposed to be -- is closer to the

23   tailbone area.  And so they -- they're generally used to treat

24   different nerve roots.

25          So the spine's kind of broken up into different

1    segments, and so underneath the lumbar segment there's sacral.

2    So the sacral nerve roots are the ones that go into the pelvic

3    area, and the lumbar nerve roots are the ones that go down the

4    legs.  And so generally a caudal epidural is only used if

5    you're really targeting those sacral nerve roots, so if you

6    have lumbosacral radiculopathy, and not so much for lumbar.

7    And if it is something in the lumbar region, you should be

8    doing what's called a lumbar epidural, but that takes more

9    time.

10          And so he's making the argument that you should --

11   that he does caudal epidurals because it's quicker.  May not be

12   best for the patient, it may not be needed, but it is quicker.

13          MR. HELMS:  Ms. Adams, can we play clip 163A-29?

14          (Audio recording being played)

15   BY MR. HELMS:

16   Q.  Dr. Patel, what was Dr. Lewis telling you here?

17   A.  So in this clip we're talking about what's called a

18   radiofrequency ablation, and that's basically where we're

19   trying to burn the nerves that go into the facet joints, and

20   he's talking about specifically how he does the cervical facet

21   joint, RFA.

22          So it sounds like initially we talked about using

23   motor and sensory stimulation.  So the motor and sensory

24   stimulation is a test that we do to make sure that we're not

25   burning off a motor nerve or something that will make us lose

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4501   Filed 06/13/22   Page 34 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

34

1    function or cause nerve injury or weakness long term, and so

2    he's claiming that we don't need to do those things.

3          When we look at the guidelines that were -- that have

4    been out for a very long time, like the -- the sensory part of

5    it, yeah, we don't need much of, but the motor is mandatory.

6    The motor nerve -- motor testing prevents us from having any

7    sort of nerve damage that could cause permanent weakness --

8    permanent weakness in the lower extremities.

9          MR. COLLINS:  Your Honor, objection as to his

10   opinion.

11   A.  And so --

12         THE COURT:  Well, hold on a minute.  I think the

13   latter part of that answer does veer into an opinion, and so I

14   would just ask you to redirect the witness at this time, Mr.

15   Helms.  Go right ahead.

16         MR. HELMS:  Yes, Your Honor.

17   BY MR. HELMS:

18   Q.  Dr. Patel, in the clip you -- you agreed with Dr. Lewis

19   that you don't do motor and sensory testing.  Is that actually

20   true?

21   A.  No.

22   Q.  So in your practice what do you do?

23   A.  We do motor testing on all patients and that's to prevent

24   any sort of nerve injury.

25         MR. HELMS:  Ms. Adams, can we play clip 163A-32 and

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4502   Filed 06/13/22   Page 35 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

35

1    start around the 37-second mark?

2            (Audio recording being played)

3    BY MR. HELMS:

4    Q.  So Dr. Patel, what was Dr. Lewis saying here?

5    A.  So he was saying that in his previous position he was

6    making around 275,000, but now with this opportunity, because

7    of the amount of volume that they see, that he's able to make a

8    lot more.

9    Q.  Did you ever have any similar discussions with Dr. Bothra

10   or Dr. Edu?

11   A.  Yes, with both.

12   Q.  What would they say?

13   A.  They would say that I have an opportunity to make millions

14   here and that if -- if I just continue to practice and do what

15   they're doing, I -- I could be making a lot of money as well.

16           MR. HELMS: Your Honor, I just checked the time.  I'm

17   going to be moving into some videos or recordings or patient

18   visits.  Should I stop here or...

19           THE COURT:  I think now would be a good time for a

20   lunch break.  It's 12:21.  We can take a 40- or 45-minute

21   break, be back at 1:00, go till 4:00 and call it a good day,

22   okay?

23           Ladies and gentlemen, enjoy your lunch.  Feel free to

24   walk outside and relax if you want.  Don't talk about the case

25   while you're on your break and we'll see you in about

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4503   Filed 06/13/22   Page 36 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

36

1    45 minutes.

2              Let's all rise for our jurors now.

3              (Jurors excused at 12:22 p.m.)

4              You can step down, Doctor.  Thank you.

5              (Witness excused at 12:22 p.m.)

6              THE LAW CLERK:  The Court is now in recess.

7              (Court in recess at 12:22 p.m.)

8              (Proceedings resumed at 1:07 p.m., all parties

9              present)

10             THE LAW CLERK:  All rise for the jury.  The Court is

11   back in session.

12             (Jury entered the courtroom at 1:19 p.m.)

13             THE COURT:  Okay.  Everybody is in their spots and we

14   may all be seated.

15             Back to work with Mr. Helms examining Dr. Patel.  Go

16   right ahead.

17   BY MR. HELMS:

18   Q.  Dr. Patel, we're going to move now to some clips of

19   recordings you made with patient visits at the Pain Center

20   while you were shadowing Dr. Lewis, okay?

21   A.  (Nods in the affirmative.)

22             MR. HELMS:  Ms. Adams, can we pull up 163A-23?

23             (Audio recording being played)

24   BY MR. HELMS:

25   Q.  Dr. Patel, do you know if this was a new patient or an

Case 2:18-cr-20800-SJM-APP ECF No. 427, PageID.4504 Filed 06/13/22 Page 37 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

37

1   established patient visit?

2   A.   This is a new patient visit.

3   Q.   Did you have any concerns about this visit?

4   A.   So I think the biggest concern was that there was no

5   questions about any of the medical history, anything that she's

6   tried in the past to help with the pain outside of the pain

7   medications.  There was no discussion about what the actual

8   symptoms were and trying to rule out other issues that could be

9   causing the pain that she's experiencing, and just the -- the

10  brevity of the visit, like not getting enough information out

11  of it, no physical examination and just kind of throwing out

12  these ancillary services without giving options, just saying

13  you have to use our physical therapy, our chiropractor and

14  going on with it.

15  Q.   Now, wouldn't the medical assistants at the Pain Center do

16  a -- a medical history with the patient before they saw the

17  doctor?

18  A.   They generally write down the history, the medical and

19  surgical history of the painter, yes.

20  Q.   So isn't it okay for you just to rely on that?

21  A.   No.  So the -- the -- as a physician, you're making

22  clinical decisions --

23          MR. COLLINS:  Again, Your Honor, objection as to

24  opinion.

25          MR. HELMS:  Your Honor, I was asking as to his

Case 2:18-cr-20800-SJM-APP  ECF No. 427, PageID.4505  Filed 06/13/22  Page 38 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

38

1   practice, not --

2           THE COURT:  Let's limit it to --

3           MR. COLLINS:  He doesn't have a practice.

4           THE COURT:  Well, I think he can limit it to how he

5   was practicing with these patient write-ups at the Pain Center

6   when he worked there and how he relied on them.  That's what we

7   should limit the testimony to.

8           Go ahead, Doctor, if you would please.

9           THE WITNESS:  So when I was there I would do a full

10  evaluation for the patient and actually find out if the medical

11  history was accurate or not because there was a lot of pieces

12  that were generally missing that a medical assistant isn't

13  trained to get that information from the patient with.  So

14  like -- and a lot of the -- the clinical findings would lead to

15  my decision making, and so it was really important to make sure

16  I was doing the physical exam to find the actual source of the

17  pain because even if they have back pain, that didn't mean that

18  it was coming from the back necessarily.  It could be a knee

19  issue causing the gait instability, it could be a hip pathology

20  causing the back pain, things of that sort.

21  BY MR. HELMS:

22  Q.  How did this visit compare to all of the other new patient

23  visits that you -- you shadowed Dr. Lewis on?

24  A.  This was pretty typical of -- actually it almost felt like

25  he was asking more questions than usual, but this is typical of

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4506   Filed 06/13/22   Page 39 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

39

1    the type of new patient consultation he had.

2            MR. HELMS:  Ms. Adams, can we pull up 163A-15?

3            (Audio recording being played)

4            Ms. Adams, can we also play clip 163A-16, which is

5    shortly after this visit?

6            MS. ADAMS:  I'm sorry, what did you say?

7            MR. HELMS:  163A-16.

8            (Audio recording being played)

9            MR. HELMS:  You can stop it there, Ms. Adams.  Can

10   you stop it there?

11   BY MR. HELMS:

12   Q.  Dr. Patel, anything concerning to you when you were

13   witnessing this visit?

14   A.  I mean the first thing that stands out is I guess the way

15   that he's interrupting the -- the patient from actually

16   explaining what she's experiencing and what's happening.  The

17   C-section is probably one of the most important things to hear

18   out because the fact that she has a baby, she might be breast

19   feeding, so there's no followup questions about that.  If she's

20   taking a narcotic, it's going into the baby's bloodstream,

21   could potentially go into the breast milk.  So it's something

22   that you want to avoid in patients like this.

23           MR. HELMS:  Ms. Adams, can you play clip 163A-33 and

24   start it around the 28-second mark?

25           (Audio recording being played)

1    BY MR. HELMS:

2    Q.  Dr. Patel, anything about this visit that was concerning

3    to you?

4    A.  I mean it continues on like that kind of structured,

5    every -- every patient fits one size picture.  And I think one

6    of the things that really concerns me is that the patient is

7    already diverting medication or like taking medication from his

8    mother, and yet we're still prescribing him medication even

9    though he's using someone else's controlled substances, and

10   there's no question asked about that or concern.

11   Q.  I'm going to move now to some established patient visits

12   that you observed Dr. Lewis on.

13            MR. HELMS:  Ms. Adams, can we play clip 163A-2?

14            (Audio recording being played)

15   BY MR. HELMS:

16   Q.  Dr. Patel, did you have any concerns about this patient

17   visit?

18   A.  It was very quick.  There was no assessment done about

19   whether or not the narcotics that he was about to prescribe

20   were actually being used appropriately or if he had any

21   medications left over.  It was just a script being given.  And

22   the whole conversation was just about the next procedure, and

23   it almost felt like he was leading the patient to talk about

24   the procedure that he wanted rather than asking about what's

25   actually happening with the patient.

1    MR. COLLINS:  Objection as to how it felt to him,

2    Your Honor, his opinion.

3    THE COURT:  I think it's acceptable for him to

4    characterize his view of how he evaluated the conversation.

5    Go ahead, Mr. Helms.

6    BY MR. HELMS:

7    Q.  Dr. Patel, how did this office visit compare to other

8    established patient visits that you have observed Dr. Lewis on?

9    A.  This was typical of almost all the followups.

10    MR. HELMS:  Ms. Adams, can we play 163A-19?

11    (Audio recording being played)

12    BY MR. HELMS:

13    Q.  Dr. Patel, how would you have reacted to this patient's

14    mention of swelling from an injection?

15    A.  Well, so considering the timeline and the fact that the

16    second injection didn't work, I would be concerned that maybe

17    the needle placement wasn't appropriate or there was a

18    complication from the procedure, and so I would probably do a

19    full assessment, at least a physical exam to see why that

20    swelling is happening.  And if there is concerns that it's

21    coming from the heart or kidneys, still do somewhat of a workup

22    for her because it is a complaint that happened and it happened

23    recently.  So I would definitely be working up to see if this

24    was a complication of the actual procedure.

25    Q.  Okay.

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4509   Filed 06/13/22   Page 42 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

42

1          MR. HELMS:  Your Honor, the next clip we're going to

2     play is 163A-35, and there's a couple portions we're going to

3     skip through just because it's the -- the patient is with a

4     father, the patient is the father, his son is interpreting for

5     him, and so there's some foreign language discussion that we'll

6     just skip through.

7               THE COURT:  Okay.

8               MR. HELMS:  So Ms. Adams, can we pull up 163A-35?

9               (Audio recording being played)

10              Can we skip to 2:03 here Ms. Adams?

11              (Audio recording being played)

12              Skip to 4:55 now, Ms. Adams.

13              (Audio recording being played)

14    BY MR. HELMS:

15    Q.  Dr. Patel, any concerns about this visit?

16    A.  So the first thing that caught my attention was about the

17    injection: if he didn't get the injections, they would start

18    taking away his medications.

19              And I think the -- the other part to it that

20    concerned me was the patient brought up a concern, and the

21    concern, rather than being addressed, was being dismissed.

22    Whenever a procedure is discussed, you're always supposed to

23    talk about the risks and adverse effects or the risks and

24    benefits of the procedure, and it seemed like none of that was

25    being discussed.  In fact, it was just said that there are no

1    complications or there are no issues with getting these

2    procedures.  So it felt like it was very misleading for the

3    patient.

4    Q.  Was this the only time you heard Dr. Lewis tell a patient

5    that if he didn't get injections, his medication would be cut?

6    A.  No, that was -- sorry.

7    Q.  How often would you hear that?

8    A.  I -- I heard it pretty frequently.

9    Q.  On your second day at the Pain Center, July 17th, 2018,

10   did you record any interactions that day?

11   A.  Yes.

12   Q.  And if you take a look in your binder at Exhibit 164.

13   A.  Yeah.

14   Q.  Did you review the recording associated with Exhibit 164?

15   A.  Yes.

16   Q.  And what is Exhibit 164?

17   A.  A conversation with Dr. Edu and a patient, patients.

18   Q.  Recordings from July 17th, 2018?

19   A.  Correct.

20   Q.  Do -- do you recall approximately how long that recording

21   was in its totality?

22   A.  I would say it was a few hours.  I'm not exactly sure

23   though.

24   Q.  Okay.

25        MR. HELMS:  Your Honor, this time I would move

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4511   Filed 06/13/22   Page 44 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

44

1    Exhibit 164 into evidence.

2         THE COURT:  Okay.  164 is received.  Go right ahead.

3    BY MR. HELMS:

4    Q.  Dr. Patel, did you record any office visits with Dr. Edu

5    on that day?

6    A.  Yes.

7         MR. HELMS:  Ms. Adams, can we play clip 164A-4?

8         (Audio recording being played)

9    BY MR. HELMS:

10   Q.  Dr. Patel, did you have any concerns about this visit?

11   A.  Yeah.  So the only information that we gathered was that

12   there was a pain score and that she had some response to an

13   injection, but there was no other conversation about where her

14   pain was, what the actual response of the injection was or

15   treatment or what's happening with the actual medications that

16   she's taking, and it was a very short visit.

17   Q.  How did this visit compare to other patient visits that

18   you shadowed Dr. Edu on?

19   A.  This is pretty typical.

20   Q.  Approximately how many visits did you shadow Dr. Edu on?

21   A.  I would say around 10.

22   Q.  How often would Dr. Edu do physical examinations?

23   A.  I saw it on one patient.

24   Q.  How often would he discuss opioid risks with -- with

25   patients?

1    A.   None.

2    Q.   How often would he consider nonopioid medication?

3    A.   None.

4    Q.   How -- how often would Dr. Edu recommend injections?

5    A.   With most of the patients that he saw.

6    Q.   Now, moving from that first official week until your time

7    overall at the Pain Center, did you get a sense that the -- the

8    visits that you shadowed Drs. Bothra and Lewis and Edu on were

9    similar to how they continued to practice while you were there?

10   A.   I actually felt like they were shorter as I wasn't

11   shadowing.  I almost felt that there was --

12            MR. COLLINS:  Object, Your Honor, as to foundation.

13            MR. HELMS:  That was going to be my next foundation,

14   Your Honor.  I could do it first if you like.

15            THE COURT:  Yep.

16            MR. HELMS:  Okay.

17            THE COURT:  If you'd clear that up, go ahead.

18   BY MR. HELMS:

19   Q.   Dr. Patel, where in -- on the clinic side, where was your

20   office in comparison to Drs. Bothra Edu and Lewis?

21   A.   We didn't have an office but we had a workspace, and that

22   workspace was in the middle of all the exam rooms that were on

23   both sides of that workspace.

24   Q.   And how close together were those exam rooms?

25   A.   Very close with not much in terms of insulation or sound

1    barrier.

2    Q.  What were you able -- were you able to hear anything in

3    the other exam rooms while exams were going on?

4    A.  Yes.

5    Q.  Okay.  And so based on that, did you get an understanding

6    of how much time Drs. Edu, Bothra and Lewis would spend on the

7    patients?

8    A.  Well, that was one indication.  The other thing was while

9    I'm writing one note, a lot of the other providers would have

10   seen two, three, four at a time during that short time period.

11   Q.  Okay.  So the visits that you continued to overhear, how

12   do they compare to the ones the jury's heard today?

13   A.  The ones that I overheard would -- I -- some of them would

14   be actually a lot more aggressive, more angry, more direct, and

15   then they would just be generally either shorter if it was just

16   for medications and then I would say there -- there was more

17   emotion.

18   Q.  Did you come to have any concerns about the patient volume

19   being seen at the Pain Center?

20   A.  The -- so I think the volume in general, I mean, yes,

21   there's a huge concern for the volume.

22   Q.  Did you try to do anything to address it?

23   A.  Yes.  I -- I requested to cap the amount of procedures

24   that I had to do and the patients that I saw.  I requested -- I

25   told Mimoza who was the manager for the clinical side that I

1    did not want any walk-in patients.

2    Q.  Do you know if Dr. Bothra was informed about your request

3    to cap your procedures?

4    A.  Yes.

5    Q.  And how did he respond?

6    A.  He said it's fine to start with and then I'll learn and

7    I'll work my way up to what everyone else is doing because

8    that's how you make the money.

9    Q.  And so when you say work your way up to what every --

10   everyone else was doing, do you know what that was, what --

11   what Dr. Bothra indicated that was?

12   A.  Seeing 60 to 80 patients a day.

13   Q.  Okay.  Did Dr. Bothra ever say anything to you about the

14   patient -- specifically about the patient population as to why

15   you needed to see a certain number of patients?

16   A.  So the argument was that the demographic -- this is what

17   the -- this is what the population needed and this is how they

18   had to be treated because of their insurance but no other real

19   explanation about why.

20   Q.  I believe you said during your first week you had some

21   concerns about the -- the procedures for the injections and

22   the -- the sterility surrounding those, is that right?

23   A.  Yes.

24   Q.  Do you come to have any other concerns about injections as

25   your time went on at the Pain Center?

1  A.  So I'd say the sterility, the inconsistency in technique

2  and the volume.  I'd say it was also the amount of anesthesia

3  that was being administered, so every patient received

4  anesthesia and they almost seemed overly sedated for the case.

5  And unfortunately the -- the way that we do assessments for

6  these procedures, we're assessing pain, but when a patient is

7  deeply sedated, how do you assess whether or not they got pain

8  relief or if it's just the anesthesia overly sedating them?  So

9  that was a big confounding factor.

10          And then I was also concerned about how much reversal

11  agent we needed to wake these patients back up after going

12  under anesthesia.  So the safety issue there is that if the

13  patient is too sedated and they have some sort of injury from

14  the procedure, more like a nerve injury or something, they're

15  not able to respond.  They're not going to even know that they

16  had that injury until a day or so later once the anesthesia

17  wears off.

18  Q.  You mentioned at the beginning of that answer the

19  inaccuracy involved.  Did any particular doctors that you

20  noticed, were they inaccurate more so than others?

21  A.  When shadowing Dr. Bothra I did feel like he -- he -- he

22  was -- he was missing the target a lot more than the other

23  provides.

24  Q.  Are there any risks associated with injections when

25  they're -- when they're rushed or placed in the wrong place?

1   A.   There's -- there's always a risk of obviously injuring a

2   nerve or having an infection at a site that you really

3   shouldn't have an infection at or might not be so controllable.

4   There's the risk that it'll cause more muscle damage and more

5   long-term pain at the end of the day, especially with ablations

6   when you're burning tissue.  If you're burning the wrong

7   tissue, it could lead to more weakness, more pain, more

8   dysfunction long term.

9   Q.   Moving to facet injections, are those diagnostic or

10  therapeutic or both?

11  A.   So they're generally -- they could be done either as a

12  diagnostic or therapeutic, so both.

13  Q.   Could you explain that to the jury?

14  A.   So with the facet joints, there's two nerves that go into

15  these joints, and when we do these blocks --

16          MR. WEISS:  Excuse me.  I would object.

17          THE WITNESS:  Sorry.

18          MR. WEISS:  This witness has been presented as a fact

19  witness and now he's going into opinion.  Not only did we not

20  get a Rule 16 disclosure, but the Sixth Circuit has frowned

21  upon one witness being both fact and opinion.

22          THE COURT:  Okay.  Well, if a witness is not

23  testifying as an expert, which I don't think this witness is,

24  he can speak about opinions that are rationally related to his

25  perception, things that are helpful to the jury's understanding

Case 2:18-cr-20800-SJM-APP   ECF No. 427, PageID.4517   Filed 06/13/22   Page 50 of 66
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

50

1    of facts that he's testifying to and other things that are not

2    based on science.  So I think he's discussing his perception of

3    his job and explaining to the jury his understanding of -- of

4    what a facet joint injection is and I think that's permissible.

5    So overrule the objection.

6              Go ahead, Mr. Helms.

7              MR. WEISS:  Thank you, Your Honor.

8    BY MR. HELMS:

9    Q.  So you were explaining that they can be for diagnostic and

10   therapeutic, correct?

11   A.  Yes.  So there's two nerves that go into these joints.

12   When we're doing a diagnostic block, we're putting local

13   anesthetic there to see how much relief the patient actually

14   gets, with the intent that we're going to burn those nerves

15   with the radio frequency ablation down the line if it's

16   successful, if it provides at least an X amount of -- a certain

17   percentage of relief of the pain.  In a therapeutic block we're

18   providing the injection with the intention that it'll give at

19   least three months of relief with that one injection.  And

20   that's kind of how we break up those two, so either/or can be

21   done.

22   Q.  So with respect to the doctors that you observed or

23   overhear, Drs. Bothra Edu and Lewis, what did they do to

24   evaluate the effectiveness of the first injection?

25   A.  So there generally wasn't any evaluation.  The -- the

1    notes were generally filled out before the procedure was done.

2    So it was actually the -- the medical assistant would be doing

3    the workup, have -- bring the patient in, the procedure would

4    be done by the provider and then back to the MA, so there

5    really actually wasn't any assessment being done.

6    Q.  Did you ever hear Dr. Bothra tell patients that they had

7    to get injections in order to get pain medication?

8    A.  Yes.

9    Q.  How would you hear that?

10   A.  Generally from the -- the angry conversations he would

11   have leaving the rooms right next to where we were -- where our

12   work stations were.

13   Q.  During your time at the Pain Center would you see patients

14   that had previously been seen by the defendants?

15   A.  Yes.  So one of the -- sorry.

16   Q.  That's okay.  So with respect to those patients, did you

17   ever ask them if the injections they were receiving were

18   helping?

19   A.  I -- I did, yes.

20   Q.  Okay.  To some patients, every patient, how many patients

21   would you ask that to?

22   A.  I would ask it to all the patients.

23   Q.  And what would they say?

24   A.  So for the most part, they would say that the injections

25   weren't working and that they needed to get the injections done

1   for their medication.

2   Q.  Are you able to estimate how many people told you the

3   injections weren't helping?

4   A.  I would say close to 75 percent, 80 percent.

5   Q.  Did you record any -- any of your -- your visits with

6   patients during your four months at the Pain Center?

7   A.  Yes.

8   Q.  And why did you record those visits?

9   A.  I was actually just recording it to -- because I felt like

10  I needed to have my -- protect kind of my work being done as

11  well, like to come -- if anything came about, I just wanted to

12  have some sort of record there available.

13  Q.  And in those -- in the two office visits you recorded, did

14  the patients make any statements about why they were receiving

15  injections?

16  A.  Yes.

17  Q.  And if you look at Exhibit 165 in your binder, do you see

18  what's listed there?

19  A.  Yes.

20  Q.  Okay.  What's listed?

21  A.  It's 165A, document for Jones Rena.

22  Q.  Says for patient Rena Jones?

23  A.  Yes.

24  Q.  And that was -- that was a recording that you made?

25  A.  Yes.

1  Q.  And if you look at Exhibit 166, can you tell the jury what

2  that is?

3  A.  166 is an audio recording of a patient, Marisca Pendarvis.

4  It was an office visit.

5  Q.  And that was a recording you made?

6  A.  Yes.

7         MR. HELMS:  Your Honor, at this time I would move 165

8  and 166 into evidence.

9         THE COURT:  Okay.  165 and 66 are received, and we've

10  got the transcripts published at the bottom?

11         MR. HELMS:  Yes, Your Honor.

12         THE COURT:  All right.  I'll receive 165A and 166A.

13  I want the jurors to know once again that the evidence in the

14  case are the voices on the recordings that you'll hear

15  presumably.  The transcripts at the bottom are visual aids to

16  help you but they're not evidence, okay?  All right.

17         Go ahead, Mr. Helms.

18         MR. HELMS:  Ms. Adams, could you play clip 165-A?

19         (Audio recording being played)

20         You can stop it there, Ms. Adams.

21  BY MR. HELMS:

22  Q.  So how often would you hear patients make comments like

23  this?

24  A.  So anytime I would inquire about it, it would come up.

25  And the inquiry was mostly around when I felt like the patient

```
1    was having some sort of social struggle, and that's a big part
2    of chronic pain, being able to address or identify when the
3    patient's having problems at home, financially, socially,
4    mentally, all those kinds of things.
5            MR. HELMS:  And can we play clip 166A, Ms. Adams?
6            (Audio recording being played)
7            You can stop it there, Ms. Adams.
8    BY MR. HELMS:
9    Q.  So Dr. Patel, during that clip when you -- I think you
10   asked -- she said the white doctor with glasses.  Do you recall
11   that?
12   A.  Yes.
13   Q.  And then what did you ask?
14   A.  Was it Dr. Russo?
15   Q.  And I don't think her answer was verbal.  Do you know what
16   she -- how was -- what was her reaction?
17   A.  I don't remember if she nodded or anything.
18   Q.  Okay.  Did any of the patients you talked to mention
19   whether Dr. Lewis required injections for pain medication?
20   A.  Yes.
21   Q.  How often would that happen?
22   A.  That was pretty frequently as well.
23   Q.  Okay.  Did Dr. Bothra ever give you specific advice
24   regarding caudal epidural injections?
25   A.  Yes.  So the advice was that it is a simple procedure
```

1  that's a little less painful, and so it helps ease the patient

2  into accepting other procedures like the facet joint blocks

3  which may be a lot more painful for the patient.

4  Q.  Did you have a choice in what steroid to use for your

5  injections?

6  A.  No.

7  Q.  Why not?

8  A.  It was based off of cost.  So I remember even with the

9  epidurals when I wanted something that had -- so there's

10  different types of steroids, but the -- the one that they used

11  was one of the cheaper ones like the Triamcinolone which has a

12  black box warning against it for use as an epidural since 2011.

13  Q.  And can you tell the jury what a black box warning means?

14  A.  That means there's a major safety concern about its use

15  and so it's -- it's a warning label that's placed on that

16  medication.

17  Q.  You mentioned earlier sedation concerns and about patients

18  being oversedated, correct?

19  A.  Yes.

20  Q.  Were there any doctors who were known to be prone to

21  oversedating patients?

22  A.  Patients would mention Dr. Lewis and Dr. Russo.

23  Q.  Moving to medications, what prescription was the most

24  common at the Pain Center?

25  A.  Probably Norco.

1   Q.  Do you know what kind of -- was it high or low in terms of
2   dose?
3   A.  So it was pretty set.  I mean it was below the 90 morphine
4   equivalents.  I would say it's considered median, medium to
5   moderate dosing.
6   Q.  Did the -- did any of the defendants ever have a
7   discussion with you about what opioids to prescribe or not
8   prescribe?
9   A.  Yes.
10  Q.  Who would have discussions with you about that?
11  A.  Dr. Bothra and I've had the discussion with Dr. Lewis.
12  Q.  Let's talk about Dr. Bothra first.  What did he tell you?
13  A.  He said they stopped prescribing oxycodone 30 milligrams
14  as soon as there were some cases, and basically it would -- if
15  we -- they -- if we were prescribing high dose opioids, we
16  would be under the radar.
17  Q.  And what did Dr. Lewis tell you?
18  A.  Same thing.
19  Q.  Moving to the back braces, were they sized for each
20  person?
21  A.  No.
22  Q.  Where were they kept?
23  A.  They were kept in a locker in the clinic.
24  Q.  And how many would be in the clinic at one time?
25  A.  There were hundreds in the supply closet at all times.

```
1    Q.  Were the doctors overseeing the issuance of the back
2    braces?
3    A.  No.
4    Q.  So how would a patient receive a back brace when they came
5    to the Pain Center?
6    A.  It was generally given by a medical assistant.  There was
7    a system in place where they -- if the patient had specific
8    insurance and it was covered, the patient automatically
9    received a back brace and the -- there was no fitting, there
10   was no followup, there was no instructions about the back brace
11   given.
12   Q.  Are there any problems that could be caused by back
13   braces?
14   A.  Yeah.  So using a back brace long term can actually cause
15   weakness of the muscles and so you actually get worsening pain
16   and more dysfunction long term if you continue to use it and it
17   has to be used appropriately and for short periods of time.
18   Q.  Okay.  I want to talk briefly now about the pharmacy that
19   was next to the Pain Center in Warren.  Do you recall that
20   pharmacy?
21   A.  Yes.
22   Q.  Okay.  Did you know any -- notice anything in particular
23   about that pharmacy?
24   A.  Well, one thing that I found a little strange was that it
25   only -- it had -- it -- it mostly kept the med -- the pain
```

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

1    medications that were being prescribed by the Pain Center in

2    inventory.  There really wasn't much else there at the time

3    and -- yeah.

4    Q.  Do you know who owned the pharmacy or the building that it

5    was located in?

6    A.  I'm not exactly sure who owned it.  It -- the same --

7    Q.  I don't want you to speculate.

8    A.  Sorry.  Okay.

9    Q.  Did you ever see patients doing anything noteworthy

10   outside of the pharmacy?

11   A.  So I've -- I've seen on a couple of occasions where

12   medications would exchange hands outside of the pharmacy.  I

13   did see on one occasion a -- a vehicle pull up in the front and

14   where the medication was exchanged there as well.

15   Q.  I'd like to move now to Dr. Russo.  Did you ever develop

16   any concerns specific to Dr. Russo?

17   A.  The main concern I had was --

18   Q.  Just yes or no.

19   A.  Oh, sorry.  Yes.

20   Q.  Okay.  What observations did you have that led you to have

21   concerns about Dr. Russo?

22   A.  When Dr. Russo was giving anesthesia for my cases, a lot

23   of times the -- I would -- I would notice that Dr. Russo was

24   kind of dozing off during a procedure.  I mean I felt like it

25   was very dangerous, especially when a patient's under

1    anesthesia and not being monitored appropriately.

2    Q.  Did you bring this behavior to anyone's attention?

3    A.  Yes.

4    Q.  To who?

5    A.  The clinic manager at that time, I think it was Denisa.

6    Q.  And do you know if she did anything with what you told

7    her?

8    A.  I was told it was brought up to Dr. Bothra.

9    Q.  Okay.  But you don't have any firsthand knowledge?

10   A.  No.

11   Q.  Did anything change while you were there with respect to

12   Dr. Russo and whether or not he was dozing off?

13   A.  Not the dozing off, no.

14   Q.  Based on your patient visits, do you know if any of the

15   patients were addicted to pain medication?

16   A.  Yes.

17   Q.  Are you able to estimate approximately how many Pain

18   Center patients were addicted to pain medication?

19          MR. COLLINS:  Objection as to foundation, Your Honor.

20          THE COURT:  I'd agree.  We should establish a better

21   foundation for that question.

22          Mr. Helms, go ahead.

23   BY MR. HELMS:

24   Q.  Dr. Patel, in all of your years of training, fellowships

25   and residency, were you trained on how to look for substance

1   abuse?

2   A.  Yes.

3   Q.  And what kind of things were you trained on what to look

4   for?

5   A.  Specifically there was mostly through the XDA licensing

6   program.  They teach you about like what to look out for in

7   terms of patient dependency and addiction, so different shading

8   between the two, and addiction is usually when you're not

9   using -- when you're going out of your way to get the

10  medications, either illegally or by other means.

11          And so the -- to answer the first question, I would

12  say, you know, 30 to 40 percent of the patients had some signs

13  showing -- some signs of addiction.

14  Q.  Okay.  What effect did all of the concerns that you had

15  about the Pain Center have on you while you were working there?

16  A.  Sorry, what effect?

17  Q.  Yeah, did it have on you?

18          MR. COLLINS:  Your Honor, objection as to relevancy.

19          THE COURT:  I tend to agree.  I think he -- you can

20  answer what he did or...

21          MR. HELMS:  I'll -- I'll move on, Your Honor.

22          THE COURT:  Yeah.

23  BY MR. HELMS:

24  Q.  Before you resigned from the Pain Center, did you talk to

25  anyone else outside of the Pain Center about what was

1    happening?

2    A.   Yes.

3    Q.   Okay.  And who -- what did you do to -- to talk to

4    somebody?

5    A.   So I reached out to some previous employees of the center.

6    I reached out to some colleagues, mentors.

7    Q.   Okay.

8    A.   Things like that.

9    Q.   And at some point you filed a civil lawsuit, right?

10   A.   Oh, right, yeah.

11   Q.   Okay.  A qui tam?

12   A.   Yes.

13   Q.   When did you start looking for an attorney for that?

14   A.   That was the -- close to the third week of -- third or

15   fourth week of being employed there.

16   Q.   Okay.  And why were you looking for a civil attorney?

17   A.   The biggest reason was because I thought this was the end

18   of my career.  I thought I'm giving in my 90-day notice as

19   a first -- after -- during my first employment.  From here on

20   out these guys decide whether I'm going to be able to get

21   credentialing at my next hospital or if I'm going to get a

22   medical license at another state because all that comes from

23   them.  And so I -- I -- I wanted something to support my family

24   and I -- I didn't know what else to do at that point.

25   Q.   Do you recall approximately when your qui tam lawsuit was

1   filed?

2   A.   Somewhere toward the end of August of 2018.

3   Q.   Do you recall when you submitted your resignation to Dr.

4   Bothra?

5   A.   Yeah, August 3rd, 2018.

6   Q.   So you started July 16th.  Why did you wait until

7   August 3rd to resign?

8   A.   Well, the number one factor was me, how this being my

9   first job and coming straight out of fellowship, I -- I -- I --

10  I didn't know if this was going to literally be the end of my

11  career, and so that -- that fear really drove me.  But the

12  reason why I ended up doing the resignation was specifically

13  because I saw what harm it was doing to the community and I

14  couldn't stand it.

15  Q.   And when was your last day at the Pain Center,

16  approximately?

17  A.   November 3rd.

18  Q.   2018?

19  A.   2018.

20  Q.   And why did you -- why -- why'd you stay until November?

21  A.   Again, because it was part of our contract to have -- give

22  a 90-day notice.  And I mean I brought up my concerns with Dr.

23  Bothra multiple times, but it seemed like it -- it -- there

24  was -- there was no response to it.

25  Q.   Did Drs. Edu and Lewis have any response to your

1   resignation?

2   A.   Their only response was that, you know, the way I practice

3   is more for the academics and it doesn't fit the demographic

4   that they deal with.

5   Q.   Okay.  When you submitted your resignation on August 3rd,

6   did you talk to anyone?

7   A.   Dr. Bothra.

8   Q.   Okay.  Did you record your conversations that day with

9   him?

10  A.   Yes.

11  Q.   Can you take a look at Exhibit 169?

12  A.   Yes.

13  Q.   Is that the recording from August 3rd, 2018?

14  A.   Yes.

15  Q.   It's your recording?

16  A.   Yes.

17  Q.   Had you reviewed that recording prior to today?

18  A.   Yes.

19        MR. HELMS:  Your Honor, I would move Exhibit 169 in

20  evidence.

21        THE COURT:  Okay.  Received.  Go ahead.

22  BY MR. HELMS:

23  Q.   Did you also review some clips from that exhibit prior to

24  today?

25  A.   Yes.

1           MR. HELMS:  Ms. Adams, can we play 169A-1?

2           (Audio recording being played)

3    BY MR. HELMS:

4    Q.  So Dr. Patel, in this clip you'd -- you had already told

5    Dr. Bothra you were resigning?

6    A.  Yes.

7    Q.  Okay.  And how did he respond?

8    A.  So he said -- he basically was explaining that he was

9    hoping that I would take over or he would kind of have me take

10   on the reins of the practice at some point and that I'm losing

11   out on a lot of money, making millions of dollars a year.

12          MR. HELMS:  And Ms. Adams, can we play clip 169A-2?

13          (Audio recording being played)

14   BY MR. HELMS:

15   Q.  This is pretty similar to the last clip we heard, right?

16   A.  Yeah, same type.

17   Q.  Okay.

18          MR. HELMS:  Can we play clip 169A-6?

19          (Audio recording being played)

20   BY MR. HELMS:

21   Q.  Dr. Patel, how did you react to these comments at the

22   time?

23   A.  I think the biggest thing that I was feeling then and even

24   before with the prior comments was that, well, where's the

25   patient in all of this?  We became healthcare providers to help

1   people, not to make a ton of money, and no matter how much
2   money you make, it doesn't take away the harm that you're
3   creating.  And so every time he said that, that was a reminder
4   of that emotion.
5           MR. HELMS:  No further questions, Your Honor.
6           (Excerpt concluded at 2:19 p.m.)
7                          —   —   —

```
1                    C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3     United States District Court, Eastern District of Michigan,

4     appointed pursuant to the provisions of Title 28, United States

5     Code, Section 753, do hereby certify that the foregoing pages 1

6     through 65 comprise a full, true and correct transcript of the

7     excerpt of proceedings taken in the matter of United States of

8     America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis

9     and D-5 Christopher Russo, Case No. 18-20800, on Monday, June

10    6, 2022.

11

12                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                         Federal Official Court Reporter
                           United States District Court
14                         Eastern District of Michigan

15

16

17

18

19    Date: June 12, 2022
      Detroit, Michigan
20

21

22

23

24

25
```