```
1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                        SOUTHERN DIVISION

3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5        vs.

6    D-1 DR. RAJENDRA BOTHRA            Case No. 18-20800
     D-3 DR. GANIU EDU                  Hon. Stephen J. Murphy, III
7    D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
8
                         Defendants.
9    _____/

10              JURY TRIAL EXCERPT: VOLUME 15

11       BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                 United States District Judge
12         Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
13              Detroit, Michigan  48226
                 Tuesday, June 7, 2022
14
     APPEARANCES:
15
     For the Plaintiff        BRANDY R. McMILLION
16   United States of America: BRANDON C. HELMS
                               U.S. Attorney's Office
17                             211 W. Fort Street
                               Suite 2001
18                             Detroit, Michigan  48226
                               313-226-9622
19
     For the Defendant        ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra: 30445 Northwestern Highway
                               Suite 225
21                             Farmington Hills, Michigan  48334
                               248-855-5888
22

23                             (Appearances continued next page)

24

25
```

```
 1   APPEARANCES:  Continued

 2   For the Defendant          ALAN T. ROGALSKI
     D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                              2000 Town Center
                                Suite 2700
 4                              Southfield, Michigan  48075
                                248-784-5055
 5
     For the Defendant          ROBERT S. HARRISON
 6   D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                40950 Woodward Avenue
 7                              Suite 100
                                Bloomfield Hills, Michigan  48304
 8                              248-283-1600

 9   For the Defendant          RONALD WILLIAM CHAPMAN, II
     D-4 Dr. Davis Lewis:       Chapman Law Group
10                              1441 West Long Lake Road
                                Suite 310
11                              Troy, Michigan  48098
                                248-644-6326
12
                                JEFFREY G. COLLINS
13                              Collins & Collins, P.C.
                                1323 Broadway
14                              Suite 800
                                Detroit, Michigan  48226
15                              313-963-2303

16   For the Defendant          LAURENCE H. MARGOLIS
     D-5 Dr. Christopher        Margolis Law Firm
17   Russo:                     214 South Main Street
                                Suite 202
18                              Ann Arbor, Michigan  48104
                                734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25              (313) 234-2616 • www.transcriptorders.com
```

USA v Rajendra Bothra, et al • 18-20800

TABLE OF CONTENTS

Government Witnesses:                                      Page

HERSH PATEL

   Cross-Examination by Mr. Margolis                      4

EXHIBITS

Identification                          Offered    Received

NONE

```
 1              Detroit, Michigan
 2              Tuesday, June 7, 2022
 3                       _  _  _
 4              (Proceedings in progress at 11:00 a.m., all parties
 5              present, jury present)
 6              THE COURT:  All right.  Thank you.
 7              Mr. Harrison, did you have questions you wanted to
 8    ask?
 9              MR. HARRISON:  I do, but I think Mr. Margolis wanted
10    to go next.
11              THE COURT:  Mr. Margolis is going to --
12              MR. MARGOLIS:  Mr. Harrison has requested that I go
13    first.
14              THE COURT:  Okay.  That's fine.
15              MR. MARGOLIS:  Is that okay with Your Honor?
16              THE COURT:  It's all right with me.  Maybe it'll save
17    us some time and we won't have to repeat things and that'd be
18    great.  Go right ahead.
19              MR. MARGOLIS:  Thank you, Your Honor.
20              THE COURT:  Thank you.
21                       CROSS-EXAMINATION
22    BY MR. MARGOLIS:
23    Q.  Dr. Patel, my name is Larry Margolis.  I represent Dr.
24    Christopher Russo.
25    A.  Good morning, sir.
```

1    Q.  I'd like to keep our questions at the yes or no format, in

2    the yes or no format as well if that's okay.

3            (Courtroom audio interruption.)

4            MR. MARGOLIS:  We had a little interruption over

5    here.

6            THE COURT:  What was that?

7            MR. CHAPMAN:  It was just evidence on the computer,

8    Your Honor.

9            THE COURT:  Oh, oh, oh, okay.  All right.  Okay.

10   Good.  All right.  Thank you very much.  Sorry about that.

11           Go ahead, Mr. Margolis.

12   BY MR. MARGOLIS:

13   Q.  Are you good with that, sir?

14   A.  Yes.

15   Q.  And if you don't know, you don't know.

16   A.  Yes.

17   Q.  So I'm a bit confused about your testimony from yesterday.

18   On the one hand you agree that the Pain Center served a

19   population, a real population of chronic pain patients, yes?

20   A.  No.

21   Q.  So the population that they served when you went and saw

22   them on the Saturday, that -- those weren't real chronic pain

23   patients?

24   A.  I don't know.

25   Q.  Okay.  Well, that's why you joined in the first instance I

Case 2:18-cr-20800-SJM-APP   ECF No. 428, PageID.4539   Filed 06/13/22   Page 6 of 29
Jury Trial Excerpt: Volume 15 • Tuesday, June 7, 2022

6

1  believe you said.  You wanted to serve a -- in the community, a

2  disadvantaged community, work with real pain patients?

3  A.  No.

4  Q.  Okay.  You are passionate about pain?

5  A.  Yes.

6  Q.  And you didn't want to work in a disadvantaged community?

7  A.  No.

8  Q.  Okay.  I thought you were talking about Detroit and saving

9  the -- the community.  That was not you, I didn't hear that?

10  A.  Can only be yes or no?

11  Q.  Yeah, that's fine.

12  A.  Okay.  Let's just leave it.

13  Q.  Why did you start at the Pain Center?

14  A.  So the reason why I actually addressed that I had the

15  whole idea of Detroit was because my wife lived in Detroit.  I

16  want to help any patient population and that's kind of my goal,

17  right, and specifically in the Detroit population though, I was

18  noticing -- well, we all kind of saw that there weren't access

19  to appropriate care being given to these patients, and, in

20  fact, like there was just a pill -- like a mill of things going

21  on and no one was actually addressing the problems that these

22  patients were having.

23  Q.  So you go in and you want to address these problems, yes?

24  A.  I want to help, yes.

25  Q.  Okay.  And you believe that these people deserve to be

1  treated for their pain?

2  A.  Yes.

3  Q.  And there are millions of people that have chronic pain in

4  the country?

5  A.  Yes.

6  Q.  And many of them are low or mid-income folks?

7  A.  Yes.

8  Q.  Many of them don't have good insurance coverage?

9  A.  Yes.

10  Q.  And they deserve the skills of a double board certified

11  physician like yourself?

12  A.  Yes.

13  Q.  So your lawsuit, your cooperation with the government is

14  not against the -- the -- the patients who step inside the

15  clinic, that's not what that's about, correct?

16  A.  Yes.

17  Q.  Okay.  And so what I thought I was hearing, that by and

18  large, the people you were working with were real pain

19  patients, correct?  I'm not talking about Henderson Butler.

20  A.  No

21  Q.  They weren't, the people you --

22  A.  I don't know.  I don't know.

23  Q.  So you don't know is what you're saying?

24  A.  Right.

25  Q.  Okay.  That's fair.  Even Henderson Butler, he seemed like

1  a real patient to you at the time, is that fair, sir?

2  A.  I don't know.

3  Q.  Okay.  But you're a doctor and it's your job, correct me

4  if I'm wrong, to trust your patients?

5  A.  Yes.

6  Q.  And I know it's easy to look back now and look at the

7  video and look at what happened, but at the time you were

8  acting in good faith, is that fair to say?

9  A.  I don't know.

10  Q.  Okay.  At the time you were not looking to defraud the

11  government when you prescribed Henderson Butler Norco, is that

12  fair?

13  A.  No.

14  Q.  You were looking to defraud the government?

15  A.  I -- I don't understand the question, I'm sorry.  Can you

16  rephrase it?

17  Q.  When you prescribed -- you saw the video of Mr. Butler?

18  A.  Yes.

19  Q.  And you met with him for under five minutes, right?

20  A.  Yes.

21  Q.  And you measured his pain.  It wasn't the highest pain

22  score.  It was a low to moderate or moderate pain, right?

23  A.  Yes.

24  Q.  And I believe you prescribed him Norco 10.  Was it 10 or

25  7.5?

1    A.   I decreased the dose to twice a day, 7.5 milligrams.

2    Q.   Okay.  And all I'm asking is at the time you did that, you

3    were acting in good faith, you weren't trying to defraud

4    anybody, yes?

5    A.   Yes.

6    Q.   That's all I'm asking, sir.

7         And you were not intending to drug him up

8    unnecessarily, right?

9    A.   Correct.

10   Q.   You had no idea he was smoking crack at the time?

11   A.   No.

12   Q.   You had no idea he was videotaping you and also working

13   for the government like you were, right?

14        MR. HELMS:  Objection.  There's been no establishment

15   that he was working for the government.

16   BY MR. MARGOLIS:

17   Q.   Fine.  You have no idea he's videotaping you?

18   A.   Correct.

19   Q.   And you had no idea that Mr. Henderson was working for the

20   government at the time, correct?

21   A.   Yes.

22   Q.   Your job is to help him?

23   A.   Yes.

24   Q.   Believe him, right?

25   A.   Yes.

1  Q.  To use your training and skill the best you can to help

2  Mr. Butler?

3  A.  Yes.

4  Q.  On what was probably I think you said a very busy day of

5  patients.

6  A.  Yes.

7  Q.  But we can't -- we can talk to you now about it now, but

8  we can't go back and look in your head and your heart at that

9  time, is that a fair thing to say?

10  A.  I don't know.

11  Q.  We can go back and look in your heart and head?

12  A.  I don't know.

13  Q.  Okay.  But I believe you've said if we could, we would see

14  that you treated him in good faith, fair?

15  A.  Yes.

16  Q.  Because you've said you're passionate about helping the

17  masses of the chronic pain population, whether they be in the

18  bougie or whether they be in the disadvantaged communities,

19  fair?

20  A.  Yes.

21  Q.  That's why you became the type of doctor that you are,

22  yes?

23  A.  Yes and no, yep.  I -- so I don't know.

24  Q.  Okay.  And I guess what I'm trying to say is, is that as

25  we can see, the day to day of our jobs, and I'm talking

1    generally now --

2    A.  Mm-hmm.

3    Q.  -- never exactly matches how we're trained to do it, is

4    that fair?

5    A.  No.

6    Q.  It matches exactly like your fellowship and your -- your

7    med school training, the day to day in the urban private

8    clinic?  That is different I would suggest.

9    A.  I don't know.

10   Q.  Okay.  Well, in fact, in the real world when you're out on

11   the ground dealing with your Henderson Butlers, you adapt to

12   deal with the reality on the ground?

13   A.  No.

14   Q.  You don't?

15   A.  You individual -- sorry.

16   Q.  No, no.  You individualize your treatment plan as much as

17   you can of course, yes?  Yes or no?  You can say yes or no.

18   A.  Patient is a patient at the end of the day.

19   Q.  Fair enough.

20   A.  Right.

21   Q.  Mm-hmm.

22   A.  Okay.

23   Q.  Thank you.

24   A.  Yeah.

25   Q.  But your intent, even with Henderson Butler, is pure,

```
1    fair?

2    A.  Yes.

3    Q.  Thank you.

4         I want to talk about prescriptions for opioids,

5    opium.  Are you aware that humans have been using opium for

6    pain for thousands of years?

7              MR. HELMS:  Objection.  Relevance.

8              THE COURT:  I'll -- I'll -- he can answer that.  Go

9    ahead, Doctor, if you can answer that.

10             THE WITNESS:  Yes.

11   BY MR. MARGOLIS:

12   Q.  Even back in one of the earliest civilizations, ancient

13   Samaria, they found 8000-year-old clay tablets that were

14   prescriptions.  Did you know that?

15             THE COURT:  That -- that might be getting into the --

16             MR. MARGOLIS:  I'm just asking if he knows the

17   history.

18             THE COURT:  -- irrelevant, be irrelevant, Mr. --

19             MR. MARGOLIS:  It was something I said in opening and

20   I'm seeing if --

21             THE COURT:  Go ahead.

22             MR. MARGOLIS:  -- the man knows the history.  He's

23   obviously well educated.

24             THE COURT:  Go ahead, Mr. Margolis.

25             MR. MARGOLIS:  Thank you.
```

```
 1   BY MR. MARGOLIS:
 2   Q.  And we saw some of your prescription habits from yesterday
 3   or -- or today and yesterday.  You prescribed opioids on
 4   occasion?
 5   A.  Yes.
 6   Q.  And on other occasions you try to talk to people down and
 7   get them off or -- opioids, is that fair?
 8   A.  Yes.
 9   Q.  You had that freedom even when you were with Dr. Bothra
10   I've seen and heard today, is that fair?
11   A.  No.
12   Q.  Because --
13   A.  Because of the time constraints.
14   Q.  Okay.  But you do in many of the tapes we see talk to your
15   patients about not taking narcotics?
16   A.  Correct.
17   Q.  And I believe we did see also that Dr. Bothra indicated
18   that if you didn't like something, you can change it, fair?
19   A.  Yes.
20   Q.  So you were able to have that freedom is all I'm asking.
21   I know it was busy, but if you didn't want to write a script,
22   you didn't have to, yes?
23   A.  Yes.
24   Q.  And this was especially true I think you said with young
25   people, you don't want the young people getting hooked.  Nobody
```

1    does, right?

2    A.  Yes.

3    Q.  And I -- is that why you were trying to scare them with

4    arrest and criminal prosecution because that was your --

5    your -- your goal was not to put them in fear of arrest; your

6    goal was to reduce them and get them off opioids?

7    A.  I don't know.

8    Q.  Well, you did threaten people with arrests on several

9    occasions, yes?

10   A.  It was not a threat, no.

11   Q.  Well, I know you're not a police officer, but when a

12   doctor in a -- in a position of authority says, "You might be

13   arrested, you can be arrested for this," you wouldn't take --

14   you wouldn't think that was a threat to some -- one of your

15   patients?

16   A.  I don't know.

17   Q.  Okay.  But you said it to some -- even some of the older

18   folks too, right?  There was a lady I think that was in her 70s

19   that you -- you did the whole arrest spiel with her, right?

20   A.  I'm not sure.

21   Q.  You remember that?

22        But you were just starting off then, right?

23   A.  Yes.

24   Q.  Your career was still in its infancy?

25   A.  Right.

1    Q.   You probably don't do that anymore --

2    A.   No.

3    Q.   -- at Christiana.  You've matured as a pain doctor, is

4    that fair?

5    A.   Practicing the way I want to, yes.

6    Q.   Okay.  And then your practices are much different now,

7    right?

8    A.   Yes.

9    Q.   But you still prescribe low dose opioids on occasion?

10   A.   Yes.

11   Q.   Similar to how you did back then to many of your patients

12   too, yes?

13   A.   For the right indication, yes.

14   Q.   Fair enough.  That's what I'm getting at.

15        If they had -- most all the patients you do prescribe

16   Norco to, I think you just said it, they need it.  They had --

17   they presented with a fair indication you just said.  That's

18   why you prescribed them the Norco, correct?

19   A.   No.

20   Q.   Okay.  You didn't just say presented to a fair indication,

21   that's when you would prescribe Norco?

22   A.   There's more to it.

23   Q.   Okay.  But you would only prescribe it if in your

24   hearts -- heart and head you felt it was medically necessary?

25   A.   No.

1  Q.  Okay.  So you were breaking the law just by handing them

2  out back then, yes or no, sir, yes or no?

3  A.  I don't know.

4  Q.  Okay.  You were prescribing medication to pain patients

5  who came in describing subjective complaints of pain, correct?

6      MR. HELMS:  Just to be clear, are we talking about at

7  the Pain Center now?

8      MR. MARGOLIS:  Yes, I'm sorry, back to the Pain

9  Center.

10      MR. HELMS:  Okay.

11      MR. MARGOLIS:  Sorry about that.

12  BY MR. MARGOLIS:

13  Q.  And if you have that type of question, you can say --

14  A.  Got it.  Thank you.

15      Um, at the Pain Center, yes.

16  Q.  Okay.  And in that sense, they were legitimate

17  prescriptions based upon subjective complaints from a patient,

18  yes?

19  A.  No.

20  Q.  So you repeatedly wrote prescriptions that you are telling

21  us under oath that were criminal?

22  A.  Yes.

23  Q.  Okay.  So you didn't trust your patients?

24      MR. HELMS:  Your Honor, I object to the last

25  question.  It's not for this witness to determine what's

1      criminal and what's not criminal.  That's up to the jury.

2              THE COURT:  Well, that's a true --

3              MR. MARGOLIS:  He can say --

4              THE COURT:  -- statement.  However, his -- is his

5      perception -- whether or not his perception was that he was

6      writing prescriptions that were, quote-unquote, criminal or

7      violative of the law I think is relevant and appropriate.

8              Go -- go ahead, Mr. Margolis.

9      BY MR. MARGOLIS:

10     Q.  You've said that you trust your patients, you -- at the

11     Pain Center, any patient of yours.  You're a doctor, you have a

12     Hypocratic Oath.  Your job is to listen, take the information

13     in, trust your patient.  I believe I heard that, right?

14     A.  No.

15     Q.  Okay.  That's not your job to trust your patients, no?

16     A.  It's a part of it, yes.

17     Q.  Okay.  And then work to verify their complaints of pain.

18     You trust and then verify, isn't that part of your role as a

19     physician?

20     A.  Yes.

21     Q.  Thank you.

22             Do you remember an Eastpointe patient of yours named

23     Denise Souligney?

24     A.  No.

25     Q.  She was a 63-year-old woman, you treated her for chronic

```
 1   back pain.  She had failed back surgery.  You saw her first on
 2   September 11th, a memorable date, 2018.
 3           MR. MARGOLIS:  Ms. Adams, can we pull up Exhibit 122,
 4   page 4?
 5   BY MR. MARGOLIS:
 6   Q.  Can you see that, Doctor?
 7   A.  Yes.
 8           MR. MARGOLIS:  Ms. Adams, can we scroll to his
 9   signature first just to confirm that it is his?
10   BY MR. MARGOLIS:
11   Q.  Is that your signature, Doctor?
12   A.  Yes.
13   Q.  So it's fair to say this is your patient?
14   A.  Yes.
15   Q.  Okay.
16           MR. MARGOLIS:  Can you go back, Ms. Adams, and
17   highlight the prescription?
18   A.  Sorry.
19           MR. MARGOLIS:  Prescription he wrote that day?  It
20   would be in the middle.  Maybe it's on page 2.  Yeah, it would
21   be in the middle of the page 2, if you could highlight that,
22   under the plan, the word "plan."
23           Well, first let's look at her assessment, assessment
24   through followup.  So sorry.
25           MS. ADAMS:  Should I blow it up?
```

Jury Trial Excerpt: Volume 15 • Tuesday, June 7, 2022

1    MR. MARGOLIS:  Yep.  If you want to bring it down.

2    Okay.

3    BY MR. MARGOLIS:

4    Q.  So she's cervical neck pain, post-laminectomy syndrome.

5    What is a post-laminectomy syndrome?

6    A.  She had some sort of back surgery and she continues to

7    have some sort of pain, neuropathic or somatic, we don't know.

8    Q.  Is that what we in the lay people who don't know this call

9    failed back surgery?

10   A.  It's similar.

11   Q.  Okay.  And it indicates as well low back pain?

12   A.  Yes.

13   Q.  Okay.

14    MR. MARGOLIS:  And can you scroll down to the --

15   there.

16   BY MR. MARGOLIS:

17   Q.  So you wrote this prescription for her that day, Norco 10,

18   325, PO TID PRN.  So what -- that means three times a day?

19   A.  Correct.

20   Q.  And she's a 63-year-old woman with failed back surgery and

21   low -- and that's a relatively low dosage, would you agree?  I

22   mean --

23   A.  It depends.

24   Q.  -- you wrote Norco 10.  It's -- it's 30 percent of the --

25   the 90 MME that the CDC guidelines...

1    A.   It's very patient specific.

2    Q.   Understood.

3    A.   So I don't know.

4    Q.   Okay.  But you wrote this?

5    A.   Yes.

6    Q.   And she had indications for that, right?

7    A.   I'm not sure.

8    Q.   Well, why would you write it if -- if -- if you're not

9    sure?

10   A.   Because the way the system was created, I -- I had no

11   choice about who my patient was.  It could be a patient --

12   someone else's patient and I was asked to write the

13   prescriptions.

14   Q.   Okay.

15   A.   And even in this situation I'm not sure if this was

16   actually my patient, and a lot of times this was just the cycle

17   of things.

18   Q.   So you -- so you would sign your name?  I mean that is

19   your signature, sir, right, yes?

20   A.   The signature autopopulates on those notes --

21   Q.   Oh, so it autopopulates.

22   A.   -- at the end.  You just go in and click a button.

23   Q.   Okay.  So you saw her again the next month though.  You

24   wrote her the exact same prescription.

25        MR. MARGOLIS:  Can we go to the next -- that would be

1   122C-7 when you scroll down to his signature.

2   BY MR. MARGOLIS:

3   Q.  That's your signature again, right?

4   A.  Same template, yes.

5   Q.  And you were working at the Eastpointe clinic in September

6   and October, correct?

7   A.  Certain days, yes.

8   Q.  Okay.

9          MR. MARGOLIS:  And so can we go back to the middle of

10  the second page, the prescription there?  Yeah, if you can

11  highlight the Norco 10 under the plan.  It was right at the

12  plan.  Sorry, Ms. Adams.

13  BY MR. MARGOLIS:

14  Q.  I just want to confirm that's the same prescription that

15  was given to her the month before?

16  A.  It's a lower dose.

17  Q.  7.5.  Okay.

18          So you do have some recollection or no?

19  A.  No, I'm just looking at it.  It's 7.5 instead of 10.

20  Q.  Okay.  And you said taper her Norco, advised patient to

21  wean off Xanax, will reevaluate MAPS next visit, but you have

22  no recollection of this particular patient?

23  A.  No.

24  Q.  Okay.  Would you agree that the indications now that were

25  presented by her, failed back surgery, low back pain,

```
 1   63-year-old patient, that the prescription was not an

 2   illegitimate one, it was a reasonable prescription you wrote

 3   for her on that day?

 4   A.  I'm not sure.

 5   Q.  Okay.  But if you did, would it have been reasonable?

 6   A.  I'm not sure.  I need more history.

 7   Q.  Okay.  Well, she was there for you so I assume you got

 8   that history, yes?

 9   A.  Yes.

10   Q.  Okay.  So you wouldn't have written that without getting

11   the history?

12   A.  I'm not sure.

13   Q.  Okay.  You were able to see her procedure charts if you

14   wanted to at the time you were visiting with her?

15   A.  Yes.

16   Q.  Okay.  So that may have been something you did before you

17   wrote the prescription to her?

18   A.  I'm not sure.

19   Q.  It's possible, right, sir?

20   A.  Yes, it's possible.

21   Q.  Okay.  And if you did and that was her presentation, the

22   Norco 10, the first one in September would have been a

23   reasonable prescription, a legitimate one, no?

24   A.  I'm not sure.

25   Q.  Okay.   Do you know Dr. Russo is being charged in this
```

1    case for writing the same prescription you did to the same

2    woman?

3    A.  No.

4    Q.  Okay.  You were working for the federal government by --

5    with -- with -- you were making -- making audios and you had

6    filed your lawsuit by September 11th?

7            MR. HELMS:  Your Honor, I would just object to the

8    preface of that question that he's been working --

9            MR. MARGOLIS:  It was a badly worded question.

10           MR. HELMS:  -- for the government.

11           THE COURT REPORTER:  Wait, wait.  Don't talk -- I

12   can't take two at a time.

13           THE COURT:  Okay.  Withdraw the question and start

14   again.  Go ahead.

15           MR. MARGOLIS:  Thank you, Judge.

16           THE COURT:  Yep.

17   BY MR. MARGOLIS:

18   Q.  You don't recall giving the agents Ms. Souligney's name?

19   A.  No.

20   Q.  Did you give them some names?

21   A.  Yes.

22   Q.  Gave them some evidence or some -- some copies or her,

23   what am I trying to say, documents, medical records?

24   A.  Yes.

25   Q.  Okay.  And your lawyer as well, you provided that

Case 2:18-cr-20800-SJM-APP ECF No. 428, PageID.4557 Filed 06/13/22 Page 24 of 29
Jury Trial Excerpt: Volume 15 • Tuesday, June 7, 2022

24

1    information to him as well?

2    A.  Yes.

3    Q.  And there were like lots of patients, right?

4    A.  I don't remember.

5    Q.  Well, you filed a lawsuit, it's your lawsuit, right?

6    A.  Yes.

7    Q.  And they are like hundreds of names and patient files in

8    that lawsuit, yes?

9    A.  I guess so, yes.

10   Q.  Well, you got them for them, it's all because of you, sir.

11   A.  I -- I don't remember.

12   Q.  Okay.

13   A.  Yeah.

14   Q.  I know you don't remember stealing patient records and

15   providing your lawyer discovery.

16          THE COURT:  Hey, hey, hey, that's improper.

17          MR. MARGOLIS:  Sorry.

18          THE COURT:  That's okay.

19   BY MR. MARGOLIS:

20   Q.  You don't remember?

21   A.  No.

22   Q.  Ms. Souligney is not one of the patients you use in your

23   lawsuit though, is she?

24   A.  I'm not sure.

25   Q.  That's a false claims lawsuit, right?

Case 2:18-cr-20800-SJM-APP ECF No. 428, PageID.4558 Filed 06/13/22 Page 25 of 29
Jury Trial Excerpt: Volume 15 • Tuesday, June 7, 2022

25

1    A.   I -- I have no idea.

2    Q.   So you just file lawsuits with no idea, that's your thing?

3    A.   I'm not sure.

4    Q.   Yes or no.  Yes I think is your answer.

5    A.   I'm not sure.

6    Q.   Okay.  You're not sure.

7         You personally know a government witness in this

8    case, don't you?

9    A.   I --

10   Q.   You personally know Dr. Neel Mehta, correct?

11   A.   As a colleague?

12   Q.   It's a yes or no question.  You personally know him?

13   A.   No.

14   Q.   You don't personally know him, you've never met him?

15   A.   I've met him at a -- at one speaker engagement, yes.

16   Q.   Okay.  You don't call him a friend of yours?

17   A.   No.

18   Q.   Don't have his cell number?

19   A.   I do not have his cell phone number.

20   Q.   Took you a minute there.

21        You speak to him at all lately?

22        MR. HELMS:  I'm sorry, did you say it took him a

23   minute there?  I just object to -- to the attorney making

24   comments and just asking questions.

25        MR. MARGOLIS:  I could have put it in the form of a

```
 1   question.  Sorry.
 2   BY MR. MARGOLIS:
 3   Q.  Have you emailed or texted with him lately?
 4   A.  No.
 5   Q.  Have you socially interacted with him?
 6   A.  No.
 7           THE COURT:  If you're objecting, Mr. Helms, you've
 8   got to stand up.
 9           MR. HELMS:  I -- I did, Your Honor.  You just
10   couldn't see me.
11           THE COURT:  All right.
12   BY MR. MARGOLIS:
13   Q.  You also own an alternative medical practice, right?
14   A.  No.
15   Q.  You're not part of a alternative medicine practice,
16   Scripps holistic medicine, alt -- holistic?
17   A.  No.
18   Q.  You don't work with your wife in a -- in a holistic
19   medical business practice?
20   A.  That's just pain and psychiatry.
21   Q.  Okay.  But you have a big website, it says it's a
22   business, it's incorporated.
23   A.  I don't work there.  That's my wife's.
24   Q.  Okay.  But you're on the website too?
25   A.  Right.
```

1   Q.  As one of like the chief, I forget the name, faith leader

2   or let me see if I can find it.  You're part of that business

3   in the advertisements, you -- you post to it all the time?

4   A.  Yes.

5   Q.  Okay.  And it's a for profit business?

6   A.  Yes.

7   Q.  You seek to make money, you want to be successful for your

8   family, for your wife, fair?

9   A.  It's her business, yes.

10  Q.  Okay.  And I doubt -- I doubt that business follows the

11  CDC guidelines, right?  It's not that type of practice, fair?

12         MR. HELMS:  I object to the relevance of these

13  questions, Your Honor, his wife's business.

14         MR. MARGOLIS:  I'll ask another question.

15         THE COURT:  Okay.

16         MR. MARGOLIS:  Well, it's his -- he said it's not

17  just his wife's business.  He's involved with the business,

18  he's on the website.

19         THE COURT:  Why don't you lead up to your point

20  and...

21  BY MR. MARGOLIS:

22  Q.  You do follow the CDC guidelines at ChristianaCare and

23  your practice there?

24  A.  Yes.

25  Q.  Holistic or spiritual practices are not typically

1  reimbursed by Medicare or Medicaid, is that fair to say?

2  A.  I'm not sure.

3  Q.  Okay.  Most insurance companies don't reimburse for

4  holistic practices?

5  A.  I don't know anything about what you're -- holistic --

6  Q.  Okay.

7  A.  -- practice you're talking about.

8  Q.  Well, I just assumed because you were on the website too

9  as part of it, that you were involved with it, but I'm hearing

10  that maybe you're not as involved as I thought.

11  A.  Holistic means whole person.

12  Q.  Okay.  Are you -- is that the type of physician that you

13  are too?

14  A.  I hope all physicians are.

15  Q.  Okay.  So you do subscribe to holistic practices?

16  A.  No, I treat the patient holistically.

17  Q.  Okay.

18  A.  As a whole.

19  Q.  Got it.  Thank you, Doctor.

20  A.  Sorry about that.  Thank you.

21  Q.  No apology necessary.  Thank you.

22       MR. MARGOLIS:  That's all I have.

23       THE COURT:  All right.  Thank you very much.

24       (Excerpt concluded at 11:25 a.m.)

25                          —  —  —

```
1                    C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 28 comprise a full, true and correct transcript of the

7    excerpt proceedings taken in the matter of United States of

8    America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis

9    and D-5 Christopher Russo, Case No. 18-20800, on Tuesday, June

10   7, 2022.

11

12                              s/Linda M. Cavanagh
                                Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17

18

19   Date: June 11, 2022
     Detroit, Michigan
20

21

22

23

24

25
```