Case 2:18-cr-20800-SJM-APP  ECF No. 434, PageID.4617  Filed 06/22/22  Page 1 of 58
Jury Trial Excerpt: Volume  10 • Tuesday, May 31, 2022

1

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,
 4
                         Plaintiff,
 5       vs.

 6   D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7   D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
 8
                         Defendants.
 9   _____/

10                JURY TRIAL EXCERPT: VOLUME 10

11          BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                    United States District Judge
12           Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
13                   Detroit, Michigan  48226
                     Tuesday, May 31, 2022
14
     APPEARANCES:
15
     For the Plaintiff          BRANDY R. McMILLION
16   United States of America:  BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
     For the Defendant          ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                              (Appearances continued next page)

24

25
```

```
 1    APPEARANCES:   Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
            To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                         Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

TABLE OF CONTENTS

Government Witnesses:                                    <u>Page</u>

DENISE SOULIGNEY

   Cross-Examination by Mr. Margolis                     5

<u>EXHIBITS</u>

<u>Identification</u>                          <u>Offered</u>   <u>Received</u>

NONE

| | |
|---|---|
| 1 | Detroit, Michigan |
| 2 | Tuesday, May 31, 2022 |
| 3 | — — — |
| 4 | (Proceedings commenced at 9:01 a.m., all parties |
| 5 | present) |
| 6 | THE LAW CLERK:  All rise for the jury. |
| 7 | (Jury entered the courtroom at 9:01 a.m.) |
| 8 | THE LAW CLERK:  The United States District Court for |
| 9 | the Eastern District of Michigan is now in session, the |
| 10 | Honorable Stephen J. Murphy, III presiding. |
| 11 | THE COURT:  Okay.  Our jury's back and everybody may |
| 12 | be seated. |
| 13 | Want to call the case, Connor? |
| 14 | THE LAW CLERK:  The Court now calls Case No. |
| 15 | 18-20800, the United States versus Rajendra Bothra, et al. |
| 16 | Counsel, please state your appearances for the |
| 17 | record. |
| 18 | MS. McMILLION:  Good morning, Your Honor.  May it |
| 19 | please the Court, Brandy McMillion appearing on behalf of the |
| 20 | United States. |
| 21 | MR. HELMS:  Good morning, Your Honor.  Brandon Helms |
| 22 | on behalf of the United States. |
| 23 | THE COURT:  Morning. |
| 24 | MR. HARRISON:  Good morning, Your Honor, ladies and |
| 25 | gentlemen.  Robert Harrison on behalf of Dr. Edu who stands to |

1       my left.

2                    MR. ROGALSKI:  Good morning, Your Honor.  Alan

3       Rogalski appearing on behalf of Dr. Rajendra Bothra to my left.

4                    MR. WEISS:  Good morning, Your Honor.  May it please

5       the Court, Arthur Weiss as co-counsel for Dr. Bothra.

6                    MR. CHAPMAN:  Good morning, Your Honor.  Ronald

7       Chapman on behalf of Mr. Lewis who is standing to my left.

8                    MR. COLLINS:  And good morning, Your Honor.  Jeffrey

9       Collins on behalf of Dr. David Lewis.

10                   MR. MARGOLIS:  Good morning, Your Honor.  Larry

11      Margolis on behalf of Dr. Russo.

12                   THE COURT:  Okay.  Good morning, one and all.  Please

13      be seated.  Thanks for being on time.  I don't have a lot to

14      say other than welcome back.  You all look like you're dressed

15      pretty cooly here today for the 90-degree weather so that's

16      good to see.  Our lawyers and parties and everybody were here

17      on time, you're here on time.  It's just about 9:00 o'clock, so

18      I think -- as I told my wife, I think we're back in the salt

19      mines and ready to go, right?  Okay.

20                   Another -- did you get the schedule?  Did you get

21      that on your desk, Mr. Lang?  Okay.  We have eight or nine --

22      you remember that schedule I laid out?  We printed that on a

23      block calendar for you, so we gave -- we gave a copy to the

24      parties and I thought we put one in the jury room for you, but

25      we'll get -- we'll get you all individual copies today.  8:30

```
 1    to 2:30 today, tomorrow and we'll go from there, okay?  All
 2    right.  Thank you very much.
 3            You had your young lady here.
 4            MR. HELMS:  Yes, Ms. Souligney.
 5            THE COURT:  Yes.  Welcome back to her as well.
 6            (Brief pause)
 7            THE COURT:  What's up with Linda?
 8            THE COURT REPORTER:  I'm good, Judge.  How are you?
 9            THE COURT:  You all right?
10            THE COURT REPORTER:  Yes.
11            THE COURT:  Good.
12            THE COURT REPORTER:  Ready to be back.
13            THE COURT:  Good Memorial Day?
14            THE COURT REPORTER:  Very.
15            THE COURT:  Good.
16            THE COURT REPORTER:  How about you?
17            THE COURT:  Just fine.
18            Welcome back.
19            THE WITNESS:  Morning.
20            THE COURT:  Soo-lig-nay [phonetic]?
21            THE WITNESS:  Soo-la-nay [phonetic].
22            THE COURT:  Soo-la-nay [phonetic].  Nice to see you.
23    I hope you had a good Memorial Day as well.
24            THE WITNESS:  Lots of rest.
25            THE COURT:  Okay.  You can take your mask down.  You
```

```
 1      got water there for you?
 2              THE WITNESS:  Yep.
 3              THE COURT:  Get comfortable and relax.
 4              Now I remember we're going to hear from Mr. Margolis.
 5              MR. MARGOLIS:  Good morning, Your Honor.
 6              THE COURT:  Morning, sir.  You go right ahead.
 7              MR. MARGOLIS:  Ladies and gentlemen.
 8              THE COURT:  Ms. Souligney's going to speak toward the
 9      mic and we're back in business.
10                      D E N I S E   S O U L I G N E Y
11      was recalled as a witness herein and after being previously
12      first duly sworn to tell the truth and nothing but the truth,
13      resumed the stand and testified on her oath as follows:
14                           CROSS-EXAMINATION
15      BY MR. MARGOLIS:
16      Q.  Good morning, Ms. Souligney.
17      A.  Good morning.
18      Q.  I may be mispronouncing your name so I will say it a
19      lot --
20      A.  Everybody does.  It doesn't matter.
21      Q.  -- before we even get rolling.
22              I'm going to ask you a series of questions.  If
23      possible, I would like you to answer them yes or no.  If you
24      don't know, that's a fine answer too.  If you can't remember,
25      that's also perfectly fine.  Can we do it that way?
```

Case 2:18-cr-20800-SJM-APP   ECF No. 434, PageID.4624   Filed 06/22/22   Page 8 of 58
Jury Trial Excerpt: Volume  10 • Tuesday, May 31, 2022

8

1    A.   Sure.

2    Q.   Thank you.

3    A.   Yes.

4    Q.   I want to start with some of the same questions that Mr.

5    Helms asked last week, and many of them, most of my questions

6    to begin with are going to be about Dr. Kufner.  And I

7    apologize in advance for any repetition, and if you --

8    A.   That's fine.

9    Q.   -- don't understand or want me to clear it up, please

10   don't hesitate to ask, okay?

11   A.   Thank you.

12   Q.   Thank you.

13         And if at any time you want to take a break, just

14   raise your hand.  I'm sure the good judge will permit us to

15   have a --

16         MR. MARGOLIS:  What do you call it, Judge, an

17   in-court --

18         THE COURT:  In-court comfort break.

19         MR. MARGOLIS:  -- comfort break, yes.

20   BY MR. MARGOLIS:

21   Q.   So let's begin.  You first go to the Pain Center in May of

22   2016?

23   A.   Yes.

24   Q.   And that was May 3rd?

25   A.   I don't recall.

1   Q.   Early May?

2   A.   Yeah.

3   Q.   And you go there because your -- your PCP or your primary

4   care doctor refuses to write you any more prescriptions?

5   A.   My gynecologist, yeah.

6   Q.   He refused to write you any more prescriptions, yes?

7   A.   Yes.

8          THE COURT REPORTER:  Ms. Souligney, I'm going to ask

9   you to please keep your voice up.  If you can move that mic

10  towards you.  No, the mic moves.  If you can just please keep

11  your voice up because you have a soft voice.  Thank you.

12         THE WITNESS:  Sure.

13  Q.   Is it fair to say because of that, he's refusing to help

14  you?

15  A.   It was because of the demands put on him by the

16  government, the amount of paperwork that was required for each

17  patient, he would have had to hire additional staff.

18  Q.   Okay.

19  A.   And that was why.

20  Q.   And I don't want to interrupt you but let's just try to

21  say yes or no --

22  A.   Okay.

23  Q.   -- or -- thank you.

24         So he refused to help you anymore?

25  A.   Yes.

1  Q.  Yes?

2       And that was upsetting to you, yes?

3  A.  Yes.

4  Q.  Because you were in pain?

5  A.  Yes.

6  Q.  And you had a legitimate need for the medication?

7  A.  Yes.

8  Q.  Your longtime doctor says, "Government's cracking down, I

9  can't do it anymore."  That's what I think you just testified

10  to?

11  A.  Mm-hmm, yes.

12  Q.  So you go to the pharmacy.  It was -- what pharmacy was it

13  if you remember?

14  A.  CVS.

15  Q.  CVS.

16       You go to CVS and the pharmacy tech says, "I know

17  somebody."  He or she refers you to Dr. Kufner?

18  A.  Or the Pain Center.

19  Q.  Sorry.  Thank you.

20       So you call and you make an appointment?

21  A.  Yes.

22  Q.  At the Pain Center?

23  A.  (Nods in the affirmative.)

24  Q.  And --

25       THE COURT REPORTER:  Excuse me.  You're nodding.  You

```
 1    have to answer out loud.
 2            THE WITNESS:  Okay.
 3            THE COURT REPORTER:  So what was your answer?  You
 4    were nodding.  Was that a yes?  You just nodded.
 5            THE WITNESS:  Yes.
 6            THE COURT REPORTER:  Okay.  Thank you.
 7    Q.  And you meet with Dr. Kufner that first time?
 8    A.  Yes.
 9    Q.  And he spends a fair amount of time with you that first
10    time?
11    A.  Yes.
12    Q.  He goes over your extensive medical history, yes?
13    A.  Yes.
14    Q.  Gives you a physical exam?
15    A.  (Nods in the affirmative.)
16            THE COURT REPORTER:  I'm sorry, you have to answer
17    out loud.
18            THE WITNESS:  I know.
19    A.  Yes.
20    Q.  I like it when she does that because then I look like I'm
21    not the one yelling at you.
22            MR. MARGOLIS:  And Ms. Cavanagh can yell at anybody
23    in this courtroom she wants, Judge, is that correct?
24            THE COURT:  I prefer if does not yell at me.
25            MR. MARGOLIS:  Other than the judge.
```

```
 1   BY MR. MARGOLIS:

 2   Q.  So he runs your MAPS, yes?

 3   A.  Yes.

 4   Q.  He sees that you're not due for any narcotics that day,

 5   correct, 'cuz you already had a prescription.  You came there

 6   with the prescription still in effect, yes?

 7   A.  No.  No.

 8   Q.  You don't recall that?

 9   A.  No, I didn't.

10   Q.  Okay.

11   A.  I hadn't had any in two months.

12   Q.  Okay.  But you don't get a prescription that day?

13   A.  Okay.

14   Q.  But even so, you like Dr. Kufner a lot, he spends a lot of

15   time with you, you're feeling good about this doctor?

16   A.  Mm-hmm.

17            THE COURT REPORTER:  Okay.  And that's the other

18   thing.

19            THE WITNESS:  Yes.

20            THE COURT REPORTER:  You can't say mm-hmm.  I'm

21   sorry, so many instructions.  Thank you.

22            THE WITNESS:  That's all right.  I've never been in

23   one of these things before.

24            THE COURT REPORTER:  I understand.  Thank you.

25   Q.  And you're truthful to Dr. Kufner that day?
```

Jury Trial Excerpt: Volume 10 • Tuesday, May 31, 2022

```
 1   A.   Yes.
 2   Q.   You're truthful about the -- the intensity of the pain
 3   that you're experiencing?
 4   A.   Yes.
 5   Q.   About all your prior injuries and surgeries?
 6   A.   Yes.
 7   Q.   On the first day -- and I'm going to go over the list if
 8   that's okay, and just yes or no or I don't remember.  On the
 9   first day you tell Dr. Kufner you have pain in the following
10   areas: your left shoulder?
11   A.   Yes.
12   Q.   Left elbow?
13   A.   No.
14   Q.   Mid-back?
15   A.   Yes.
16   Q.   Lower back?
17   A.   Yes.
18   Q.   Both left and right hip?
19   A.   Yes.
20   Q.   Right leg?
21   A.   Right knee.
22   Q.   And right knee pain?
23   A.   Yeah.
24   Q.   You are truthful to Dr. Kufner about all of your past
25   surgeries that day?
```

1   A.   Yes.

2   Q.   And I want to go over those too.  I don't know if you

3   remember them all but --

4   A.   I remember.

5   Q.   I bet you do.

6         Cervical laminectomy in 1985?

7   A.   Mm-hmm.

8   Q.   Right hip surgery in 2001?

9   A.   Mm-hmm.

10  Q.   Another right hip surgery in 2001?

11  A.   Mm-hmm.

12  Q.   Was that to fix something or was it --

13  A.   The cuff --

14        (Coughing in the courtroom.)

15        THE COURT REPORTER:  I'm sorry.

16  A.   The cuff was not adequate so it -- my hip dislocated.

17  They couldn't get it back in so they had to repeat the surgery.

18  Q.   Thank you.

19        You had right knee surgery in '03, 2003?

20  A.   Mm-hmm, yes.

21  Q.   Left shoulder surgery in 2003?

22  A.   Yes.

23  Q.   Lumbar fusion L3 through L5 in 2005?

24  A.   Yes.

25  Q.   Right shoulder in 2008?

1    A.   Yes.

2    Q.   Left elbow in 2015?

3    A.   Elbow has never been operated on.

4    Q.   Oh, maybe I saw that wrong.

5             Right knee in 2016?

6    A.   Yes.

7    Q.   And if you don't recall, feel free to say it.  But Dr.

8    Kufner's initial assessment that day was lumbar radiculopathy?

9    A.   Mm-hmm, yes.

10   Q.   Osteoarthritis?

11   A.   Rheumatoid arthritis.

12   Q.   Spondylosis of lumbar spine and cervical spine?

13   A.   Yes.

14   Q.   And you're saying you were not already on Norco four times

15   a day 10 milligrams when you arrived?

16   A.   Oh, yeah, I've been on pain pills for a number of years.

17   I was on Darvocet till they took that off the market and the

18   doctors were prescribing Norco.

19   Q.   Okay.  So clearly you have an extensive medical history?

20   A.   Yes.

21   Q.   Large surgical hardware in your lower back?

22   A.   Yes, lower back, cervical spine.  Lower back is the worst.

23   Q.   Rods, plates and screws there?

24   A.   Yeah.

25   Q.   A metal hip?

1    A.   Yep, three.

2    Q.   Three metal hips?

3    A.   Yeah.

4    Q.   Hmm.

5    A.   Two on the right and one on the left.

6    Q.   Prosthetic joints in your hips, elbows and knees?

7    A.   Never had elbow surgery.

8    Q.   Why do I keep saying that?

9         Degenerative changes throughout your spine?

10   A.   Yes.

11   Q.   Your lower -- your lumbar spine has surgical changes as

12   well as degenerative changes?

13   A.   Yes.

14   Q.   A lifetime of significant and debilitating pain you must

15   suffer?

16   A.   It started at about -- it was diagnosed at 30 years old.

17   Q.   Your pain is constant and impactful every day?

18   A.   Yes.

19   Q.   It greatly diminishes your quality of life?

20   A.   Yes.  I've had to give up driving, live on ice packs.

21   Q.   It's painful to sit for long periods?

22   A.   If it's cushioned like this is fine.  Metal bench or wood

23   benches are tough.

24   Q.   It's painful trying to stand up and rise sometimes?

25   A.   Yes.

1  Q.  You and Dr. Kufner discuss these problems?

2  A.  Yes.

3  Q.  You talk with him about your chronic pain?

4  A.  Yes.

5  Q.  And you feel good about Dr. Kufner, you -- you --

6  A.  Yes.  He spent a lot of time with me each visit and

7  assessing the impact of the previous injections and sent me on

8  for more.

9  Q.  And you have a good rapport with him is what I'm hearing?

10  A.  Yes.

11  Q.  You trust his medical judgment?

12  A.  Yes.

13  Q.  Trust his opinion about how best to treat all that stuff,

14  all the pain?

15  A.  Just the back.

16  Q.  Okay.

17  A.  He was just focused on the back.

18  Q.  Okay.  And you briefly mentioned it but he creates a care

19  plan for you, yes?

20  A.  Yes.

21  Q.  And you said he discusses it with you, the injections, he

22  went over that?

23  A.  Mm-hmm.

24  Q.  And you agree to that, let's try it out?

25  A.  Yes.  Yes.  Well, I wasn't given that option.

```
1   Q.   Okay.

2   A.   It was told to me that that would -- that's what would

3   happen.

4   Q.   Okay.  We'll get there.

5            So you agree to -- and you can say yes or no to this,

6   but you agree to multiple series of injection treatments by Dr.

7   Kufner?

8   A.   Yes.

9   Q.   Over the next year and a half Dr. Kufner performs 18

10  different injections on you?

11  A.   Mm-hmm.

12  Q.   Focusing primarily on your lumbar facets and your

13  sacroiliac joints?

14  A.   Yes.

15  Q.   Your facets are in the back, the joints come around there?

16  A.   Yes.

17  Q.   And this is to deal with that debilitating lower back pain

18  you've described?

19  A.   Mm-hmm, yes.

20  Q.   And this is Kufner, not Dr. Russo, correct?

21  A.   No.

22  Q.   And throughout that you continue to have a really good

23  relationship with Kufner?

24  A.   Yes.

25  Q.   And he said the same thing about you last week when he
```

1  testified.

2  A.  Oh.

3  Q.  On each of these procedures you travel down to the Pain

4  Center?

5  A.  Yes.

6  Q.  You don't drive yourself?

7  A.  No.

8  Q.  Because you know you can't drive on your own after the

9  injections?

10  A.  Yes.

11  Q.  There's sedation, you're -- they hook you up with an IV,

12  you're very groggy, you -- you --

13  A.  My husband would take me.

14  Q.  Okay.  And the PC staff, the Pain Center staff tells you

15  that well in advance, right?  I mean they give you the -- the

16  notice, the --

17  A.  Yes.

18  Q.  -- sedation instructions?

19       And you do these because -- and a lot of this is

20  going to be repetitive and I apologize for that, but you do

21  these continual procedures, sedation, instructions, go down,

22  have your husband down there taking you, because you still

23  trust Dr. Kufner?

24  A.  Yes.

25  Q.  But your pain does not go away?

1    A.   No.

2    Q.   You have to live with it still you say?

3    A.   Yes.  The pain pills helped significantly.

4    Q.   Even today --

5    A.   The lumbar injections didn't.

6    Q.   Even today you're still in pain?

7    A.   Oh, yeah.  And I get over-the-counter medication.

8    Q.   What would you rate your pain as you sit here right now?

9    A.   Seven.

10   Q.   You're not taking Norco for the heck of it, right?

11   A.   Oh, no, I haven't in years.  I rely on Aleve.

12   Q.   I'm talking now let's go back to --

13   A.   Oh.

14   Q.   Yeah.  You weren't taking it -- you took it because you

15   needed it for your pain?

16   A.   Yes.

17   Q.   Even after the injections, I believe you said you were

18   still in pain?

19   A.   Yes.

20   Q.   The injections Dr. Russo did, they caused you pain I

21   believe you said.

22   A.   Mm-hmm.

23   Q.   On top of the pain you had before you came in?

24   A.   Mm-hmm, yes.

25   Q.   Including the one he did in March, is that what you're

1    saying too?

2    A.   I'm sorry, I don't understand the question.

3    Q.   Including the last injection he did, that also caused you

4    pain, is that --

5    A.   Yes.

6    Q.   And it doesn't go away.  Does it go away or it doesn't go

7    away right away from the injections?

8    A.   I -- yeah, it goes away fairly quickly.

9    Q.   Days?

10   A.   Yeah.

11   Q.   So the prescription you receive after your March 2018

12   procedure is a necessary prescription for your pain, is that

13   fair?

14   A.   Yes.

15   Q.   You're not pill seeking?

16   A.   Excuse me?

17   Q.   You weren't pill seeking.  You needed --

18   A.   Oh, God no.  I was not getting high off of them.  They

19   relieved the pain.

20   Q.   Understood.  It's a legitimate prescription?

21   A.   Yes.

22   Q.   They're all legitimate prescriptions, yes, ma'am?

23   A.   Yes.

24   Q.   Helps you to cope?

25   A.   Oh, yes.  I could do a lot more then.

1    Q.  Let's talk briefly about the procedures you agreed to over

2    the years.  In your testimony last week you say that Dr. Kufner

3    never specifically requires you to undergo any procedure, is

4    that correct?

5    A.  No, that's not correct.  He laid it out as part of the

6    procedure.  Didn't ask me if I wanted injections.  You come in,

7    you get your injections, you go out, you have a -- you have

8    your prescription.  I was never given the option.

9    Q.  Okay.  But he never makes it a specific requirement I

10   believe you've said before, yes or no?

11   A.  Yes.

12   Q.  He does?

13   A.  Yes.

14   Q.  Okay.  And that's what you told the police officers, the

15   FBI when you spoke to them?

16   A.  I --

17   Q.  Is it possible you didn't tell them that?

18   A.  I -- if I was not asked that.  I was never given an option

19   to come in and just get a prescription.  I had to have the

20   injections to get the prescription.

21   Q.  Is it possible you told the agents that Dr. Kufner never

22   specifically made it a requirement, he never specifically said

23   you had to do it, isn't that possible?

24   A.  He never said anything.  He laid out what the procedure

25   was going to be: the injections, then the prescription.

1   Q.  So he never said it specifically you had to do this to get

2   this, that's all I'm saying.

3   A.  No, he did.

4   Q.  Thank you.

5           No one at the Pain Center ever did, correct?

6   A.  Excuse me?

7   Q.  No one at the Pain Center ever made that specific quid pro

8   quo statement to you, correct?

9   A.  No.  I mean yes, that's correct.

10  Q.  Thank you.

11          And I -- and I don't mean to belabor this point but

12  this is the important -- this is an important point because

13  you're saying that Dr. Kufner implies it I think was the word

14  you used, it was implied in his care plan.  That's how I --

15  A.  It -- it was told outright, it wasn't implied.  I would

16  get the injections every month.

17  Q.  Well, just a yes or no, I'm so sorry, but I'm asking you

18  was it implied?  It wasn't specific you said so it had to have

19  been implied, yes?

20          MR. HELMS:  Objection.

21  A.  No.

22          MR. HELMS:  I think this question's been answered

23  several times now.

24          MR. MARGOLIS:  I don't know that she has.

25          THE COURT:  I think you can go -- keep moving, Mr.

```
 1    Margolis.  Go right ahead.
 2            MR. MARGOLIS:  All right.
 3    BY MR. MARGOLIS:
 4    Q.  Dr. Kufner has a care plan and you follow it, yes?
 5    A.  Yes.  Yes.
 6    Q.  And the injections you say don't do anything to reduce
 7    your pain?
 8    A.  No.
 9    Q.  They actually make it worse?
10    A.  Well, after the first injection I lost the use of my right
11    leg for two days.  The second injection I lost the use of my
12    right leg but only for a day.
13    Q.  Okay.
14    A.  And --
15    Q.  I'm sorry.  Those were the injections you're saying that
16    Dr. Kufner did way back?
17    A.  The first.
18    Q.  Okay.  But do they reduce your pain after that, yes or no?
19    A.  Well, I don't know.
20    Q.  Yes or no, ma'am?  I'm so sorry.
21    A.  Oh, sorry.
22    Q.  Yes or no?
23    A.  It's not a yes or no because I was also getting --
24    Q.  Then I don't know is fine.
25    A.  -- the anesthesia.
```

1    Q.  I don't know is fine.

2         THE COURT:  Well, you can also say, "I can't answer

3    that yes or no."

4    A.  Okay.  I can't answer that yes or no.

5    Q.  Okay.  You never actually tell Kufner that his care plan

6    isn't working, do you?

7    A.  Yes.  And he moves it -- he would feel my back and

8    determine another point of entry.

9    Q.  So that may be reflected in the records, the medical

10   records, yes?

11   A.  I would assume so, yes.

12   Q.  And the records may reflect that -- your many complaints,

13   that you have no reduction in pain, yes?

14   A.  Yes.

15   Q.  Have you seen your medical records?

16   A.  Briefly.

17   Q.  They're quite extensive.

18   A.  Mm-hmm.

19   Q.  Over 900 pages.

20        When you say briefly, was that recently since you

21   stopped treating or with Dr. Kufner?

22   A.  That was recently --

23   Q.  Okay.

24   A.  -- when I came to the courthouse for the first or for the

25   second time.

1    Q.   When you met with the agents and the prosecutors?

2    A.   Mm-hmm.

3    Q.   Mr. Helms, did he go over your medical records with you?

4    A.   I don't know.  I don't remember.

5    Q.   Did Agents Tolan, Link or Kroger go over your medical

6    records with you?

7    A.   I don't recall.

8    Q.   Well, what do you recall about briefly seeing your

9    records, if I may?

10   A.   Names I didn't recognize, treatments I didn't recognize.

11   A back brace was suggested.  Physical therapy, according to

12   these records, was suggested.  Never ever --

13   Q.   And you pointed all that out to the agents?

14   A.   Yes.  Yes.

15   Q.   Okay.  But this was recently or was this back in '18 or

16   2021?

17   A.   This was recently.

18   Q.   Okay.  During the time you were at the Pain Center you

19   never reviewed your records, is that fair?

20   A.   Yes.

21   Q.   Okay.  Because you trusted Dr. Kufner?

22   A.   Yes.

23   Q.   You trusted him to accurately report your records, your --

24   your complaints?

25   A.   Yes.

1   Q.  And at the time you had no reason to believe that Dr.

2   Kufner wasn't accurately reporting, correct?

3   A.  Correct.

4   Q.  Or charting I should say.

5           Dr. Russo takes over after Dr. Kufner leaves, right?

6   A.  Yes.

7   Q.  He inherits you, your plan of care from Dr. Kufner?

8   A.  Yeah.

9   Q.  You say Dr. Russo's injections don't help either?

10  A.  No, same old same old.

11  Q.  No reduction in pain?

12  A.  No.

13  Q.  You're actually in more pain I think you said at one time,

14  either --

15  A.  Well, they changed -- they changed positions around and

16  they changed procedure so sometimes it was quite a bit more

17  painful.

18  Q.  But again, Mr. Helms doesn't go over this even with you of

19  Dr. Russo's care, correct?

20  A.  No.

21  Q.  You don't ask him to, right?

22  A.  Who are you referring to?  Excuse me.

23  Q.  This good looking, younger gentleman over here, Mr. Helms.

24  You don't ask him to go over your charts with you, correct?

25  A.  Well, he -- he --

28

```
 1    Q.  Yes or no, ma'am?

 2    A.  Yes, he asked me to go over my charts.

 3    Q.  Well, actually the question was is whether you asked him

 4    to, but that's fine.

 5           So you've seen your medical records briefly?

 6    A.  Briefly.

 7    Q.  Okay.  I'd like to go over them a little bit with you

 8    today if we may.

 9    A.  Okay.

10    Q.  Thank you.

11           MR. MARGOLIS:  Judge, if I may have a second.

12           THE COURT:  Yes.  Yes.

13           MR. MARGOLIS:  Let's just see how this works.  And

14    please bear with me, Your Honor.  I had partner but he wasn't

15    able to make it today.

16           THE COURT:  Okay.

17    BY MR. MARGOLIS:

18    Q.  This is your initial history and physical.  Do you -- are

19    you able to see that, Ms. --

20    A.  Yes.

21    Q.  -- Souligney?

22    A.  Yes.

23    Q.  You see the history of your present -- that's the present

24    illness up at the top there.  That's what you presented with?

25    A.  Yes.
```

1    Q.  And it does mention your left elbow, doesn't it?

2    A.  Yeah, it does but not from me.

3    Q.  Says your pain quality is throbbing, severe at 9 out of

4    10.  Do you see that there?  Sorry, I can point.

5    A.  Yes.

6           THE COURT REPORTER:  Mr. Margolis, is it possible --

7    no, you cay stay there but can you lean --

8           MR. MARGOLIS:  Yeah, I can.  Let me try to do this

9    for you.

10          THE COURT REPORTER:  Thank you.

11   Q.  So that's -- it also says that you're taking current pain

12   meds, Norco 10 QID, four times a day.  Do you see that?

13   A.  IV?

14   Q.  Well, do you see the -- what I'm pointing to here?

15   A.  Yeah, Norco.

16   Q.  Well, you had mentioned that you weren't on any

17   medication, but it seems that back in '16 it -- it was

18   documented that you were is all I'm pointing out.

19          He also did a physical examination of you, right?

20   A.  Let me see.

21   Q.  Checked your heart rate, neurologic cranial nerves

22   examination?

23   A.  Mm-hmm.

24   Q.  And there's his assessment, just like we went over today.

25   Is that consistent with what we spoke about this morning

1    already?

2    A.   I can't really make out his handwriting.

3    Q.   "Lumbar radicul -- radic -- radiculopathy."

4    A.   Okay.

5    Q.   "Osteoarthritis."  And I'll tell you the other one,

6    "Spondy -- spondylosis --

7    A.   Yes.

8    Q.   -- of the lumbar spine and cervical spine."

9    A.   Yes.

10   Q.   You see that?

11   A.   Yes.

12   Q.   Okay.  I want to get to your chart on 5-3.  So here is

13   your first chart from the first day of seeing Dr. Kufner.

14   A.   Yes.

15   Q.   And I have a -- I can read that to you as well.

16   "61-year-old female, long history of chronic pain presents for

17   treatment."  It refers to the new patient intake sheet for the

18   extended history and physical.  This is the important part:

19   "Has positive SI pain, positive buttocks increased pain while

20   sitting."  Do you see that part, the highlighted part?

21             THE COURT REPORTER:  Wait, what was that last word,

22   I'm sorry, after "increased pain"?

23             MR. MARGOLIS:  "While sitting."

24             THE COURT REPORTER:  Oh, okay.  Thank you.

25   Q.   Do you see that highlighted part, ma'am?

Case 2:18-cr-20800-SJM-APP   ECF No. 434, PageID.4647   Filed 06/22/22   Page 31 of 58
Jury Trial Excerpt: Volume 10 • Tuesday, May 31, 2022

31

1    A.   Yes, there's three.

2    Q.   "Patient declines physical therapy.  Benefit is used up

3    for 2016.  Not due for narcotics today."

4    A.   I was never offered PT.  In fact, part of the time that I

5    was going to the clinic I was receiving PT because I had just

6    had another joint replacement.

7    Q.   Okay.  So if it was in your chart, it was something that

8    was there for years and it just wasn't accurate is what you're

9    telling us?

10   A.   It's not accurate.

11   Q.   Okay.  The next day, this is -- we're at 5-25, May 25th,

12   you present again, states that you failed conservative

13   treatment.  The plan today, "Bilateral sacroiliac injections.

14   Return in two weeks."  You see that?

15   A.   Okay.

16   Q.   Let's take you to June 9th.  This is after those

17   injections.  The top highlighted part, "One week of 80 percent

18   reduction with SI.  Looks forward to continuing interventional

19   treatment."  Do you see that?

20   A.   Mm-hmm.

21   Q.   He prescribes Norco 10 four times a day?

22   A.   Yes.

23   Q.   There's a note at the bottom there, "If patient breaks

24   narcotic agreement again to stop -- stop prescribing patient

25   any narcotics from our office per Dr. Kufner."  Do you see

Case 2:18-cr-20800-SJM-APP   ECF No. 434, PageID.4648   Filed 06/22/22   Page 32 of 58
Jury Trial Excerpt: Volume 10 • Tuesday, May 31, 2022

32

1   that?

2   A.  Yes.

3   Q.  Continuing to June 15th, in the yellow, "One positive SI

4   injection.  Presents for a second diagnostic sacroiliac joint

5   injection."  And then the plan on the -- on the right side

6   there, "Bilateral SI joint injections, return to clinic in two

7   weeks, NPO driver."  Do you remember what NPO driver means?

8   A.  No.

9   Q.  Not by mouth, not to eat anything.

10  A.  Oh, okay.

11  Q.  I get confused on that every time.

12          I am going to jump to October 28th.  This is an

13  important one for the note I believe.  Right here where it

14  says, "Off oxycodone.  Will restart Norco.  Has been taking my

15  prescription.  Wishes to proceed with facet blocks."  Do you

16  see that?

17  A.  It -- I can't read it but --

18  Q.  It's not --

19  A.  -- I believe you.

20  Q.  -- easy to read.  Let me try to highlight it for you.  So

21  that says you wish to proceed with the facet blocks on

22  October 28th of '16.  Do you see that?

23  A.  Yes.

24  Q.  Thank you.

25          I guess I should have stayed on that.  This is --

1   when you present on December 7th of '16 it's reported, "Two

2   days of greater than 90 percent relief or was reduced by the

3   first facet injection."  Did you see that?

4   A.  Yeah, I see it.

5   Q.  Proceeding to December 20th, "Two days of greater than

6   90 percent pain reduction with second facet block."  Do you see

7   that?

8   A.  Yes.

9   Q.  December [sic] 24th, "Positive left SI stressing

10  exacerbates pain.  Schedule left SI joint injection."  That's

11  the plan on the right?

12  A.  Yes.

13  Q.  Sorry, I shouldn't have taken that away.  March 15th --

14  what am I doing here?  "After the injections, three days of

15  greater than 80 percent reduction with a sacroiliac joint

16  block."  Do you see that?

17  A.  I see that.  Those aren't my words but I see it.

18  Q.  Understood.  Now we're getting into '17 again or April of

19  17.  "SI pain quieting down.  Has left knee pain.

20  Contemplating total knee arthroplasty but would like to

21  consider injections first."  Do you see that?

22  A.  Yes.

23  Q.  Do you have a knee problem?

24  A.  Yes, I believe I had -- while I was under his care I had a

25  knee re -- another knee replacement.

1    Q.  Okay.

2    A.  And I was prescribed Norco.

3    Q.  Okay.

4    A.  So I put Dr. Kufner's Norco in the cabinet as I was

5    instructed to.

6    Q.  Okay.

7         MR. MARGOLIS:  I misplaced one.  Give me a second,

8    Your Honor.  I apologize.

9         (Brief pause)

10   Q.  August 2nd now, we're still in '17, "Two days greater than

11   90 percent pain reduction.  Five days of additional

12   improvement."  Oops, I'm reading the wrong one.

13        August 2nd says, "Lumbar axial pain with facet

14   loading."  It was August 16th that I meant to read.  I

15   apologize, Your Honor.  I apologize, ma'am.

16   A.  Mm-hmm.

17   Q.  August 16th, "Two days greater than pain reduction.  Five

18   days of additional improvement."  Do you see that?

19   A.  Yes, but that also did not come out of my mouth.

20   Q.  Okay.  Let's go to October '17.  This is Dr. Kufner still,

21   right?

22   A.  I assume so, yes.

23   Q.  "Has pain with sitting and rising to a stand."  Do you see

24   that?

25   A.  Yes.

1  Q.  Kind of like you told us today too, right?

2  A.  Yes.

3  Q.  "Last had RFA 3/27 -- March 20 -- 2017," sorry.  Do you

4  see that?

5  A.  Yes.

6  Q.  So that was six months, more than six months before that

7  10-17 date, is that correct?

8  A.  Yes.

9  Q.  Now we are switching to November, November 16, 2017.  We

10  have new handwriting, you have a new doctor, correct?

11  A.  Yes.

12  Q.  "Decrease Norco 10 milligrams, TID."  Do you know what

13  that means?

14  A.  Three times a day.

15  Q.  So Dr. Russo was the one who reduced your Norco that day,

16  correct?

17  A.  Yes.

18  Q.  The plan was the bilateral sacroiliacs that Dr. Kufner had

19  scheduled in October?

20  A.  Yes.

21         MR. MARGOLIS:  I apologize, Your Honor.  Just seem to

22  have misplaced one of my...

23         THE COURT:  Should I order a comfort break, in-court

24  comfort break?

25         MR. MARGOLIS:  That would be up to Ms. Souligney.

```
 1              THE COURT:  Kidding, just kidding.
 2              MR. MARGOLIS:  Oh, it's on the same page.  That's why
 3    I'm -- I apologize, excuse me.  They're such small chart notes,
 4    I don't know that they're still there.
 5    BY MR. MARGOLIS:
 6    Q.  So that was what happened in November.
 7              In December you go back and meet with folks at the
 8    Pain Center, correct?
 9    A.  Yes.
10    Q.  You met with Sarah Pursifull.
11    A.  Yes.
12    Q.  Remember Ms. Pursifull?
13    A.  Yes, most of my contact was through her, not Dr. Russo.
14    Q.  Okay.
15              THE COURT REPORTER:  I'm sorry, did you say not Dr.
16    Russo?
17              THE WITNESS:  I saw --
18              THE COURT REPORTER:  You said, "Most of my contact
19    was through her," then did you say "not Dr. Russo"?
20              THE WITNESS:  Yes, not Dr. Russo.
21              THE COURT REPORTER:  Okay.  I didn't know if you said
22    "not" or "and."
23              THE WITNESS:  Yes.
24              THE COURT REPORTER:  Okay.
25    Q.  Okay.  On this date you state that you are in more pain
```

```
 1    because your Norco was lowered last time, right?
 2    A.  Yes.
 3    Q.  Do you remember saying that or you -- that's -- is that
 4    accurate, yes or no?
 5    A.  Yes.
 6    Q.  Thank you.
 7              On -- you come back in December?
 8    A.  Mm-hmm.
 9    Q.  December 22nd, 2017, right?
10    A.  Yes.
11    Q.  Sorry, I'm trying to -- I already did that one.  I want to
12    do this.
13              MR. MARGOLIS:  See, Ron, I told you I needed help.
14    BY MR. MARGOLIS:
15    Q.  This is your appointment from January.  You next came in
16    January to the Pain Center, correct?
17    A.  Yes.
18    Q.  And you met with Dr. Lewis, correct?
19    A.  I don't recognize -- no, I didn't see Dr. -- Dr. Lewis?
20    Q.  This individual right here.
21    A.  No.
22    Q.  You don't recall?
23    A.  I never saw him.
24    Q.  You never saw him?
25    A.  I only saw two doctors.
```

1   Q.   Okay.  Was -- we're going on over four years now.  Well,

2   yeah.

3   A.   Well, whatever.

4   Q.   That's fine.

5        Regardless, the chart says that you "present for

6   followup status post-SI joint injection with good relief."  Do

7   you see that?

8   A.   Mm-hmm.

9   Q.   And then it says, "Now needs to complete the series."  Do

10  you see that?

11  A.   Yes.

12  Q.   Dr. Lewis increases your Gabapentin, your Gabapentin that

13  day, correct?  You see that?

14  A.   I don't know what Gabapentin is.

15  Q.   You've never taken Gabapentin?

16  A.   I've never heard of it.

17  Q.   A nerve pill?

18  A.   Maybe a generic -- a generic --

19  Q.   Relaxant?

20       Sorry, it's Neurontin.  Have you heard that name?

21  A.   No.

22  Q.   Okay.  In February you appear again?

23  A.   It's out of focus.  I can't read it.  There we go.

24  Q.   Thank you.

25       February 21st you see Dr. Russo.  "Status,

1    post-positive diagnostic -- diagnostic block.  Plan, RF right

2    SI joint today."  Do you see that?

3    A.  Yes.

4    Q.  "MAPS okay."

5         March 14th you see Dr. Russo again?

6    A.  Mm-hmm, yes.

7    Q.  "Plan, RFA left SI joint today."  Do you see that?

8    A.  Yes.

9    Q.  He prescribes you Norco 10?

10   A.  Mm-hmm.

11   Q.  But he circles 4 days, 5 days after.  Do you see that,

12   meaning okay to fill after March 19?

13   A.  Yes.

14   Q.  Because you -- it was less than 30 days and you already

15   had your -- your allotted amount, right?

16   A.  Yes.

17   Q.  That's what they do.  Thank you.

18        So there's a -- the charts when I receive them were a

19   little off so I'm going to -- this says May but there was

20   actually another appointment in April where you followed up,

21   and this is with Tatyana Bezpalko.  Do you remember Ms.

22   Bezpalko, the stern Ukrainian woman?

23   A.  No.

24   Q.  Okay.  She says, "A 63-year-old female with low back

25   pain."  She rates it 7 out of 10.  Was that the same you rated

1    it today?  I can't remember.

2    A.  I don't remember.

3    Q.  "Status, post-SI RFA that decreased her pain about

4    50 percent.  Still reports some tightness.  Refill Norco,

5    Gabapentin.  Discussed with primary care physician benzo dose

6    to be decreased."  So she was -- she wanted you to talk to your

7    other doctor to reduce your Xanax, is that what that's about?

8    A.  I guess.

9    Q.  This is April, so now we go to May.  This is Ms.

10   Pursifull.

11   A.  Yes.

12   Q.  "Pain, 7 out of 10.  See psychiatrist next month.

13   Discussed coming down on benzodiazepine dose to either twice a

14   day dosing or .5 milligram strength."  Do you remember that

15   conversation?

16   A.  No.  And I still don't know what benzo, whatever it is,

17   diazepine is.

18   Q.  Well, you had a psychiatrist at the time, right, for

19   anxiety or whatever?

20   A.  No.

21   Q.  You did not?

22   A.  No.

23   Q.  You weren't taking Xanax?

24   A.  I was taking Xanax.  My primary care physician prescribed

25   it.  She said it would help me cope for the pain.

1    Q.   Okay.  But not a psychiatrist for --

2    A.   No.

3    Q.   Okay.  That was May.

4         Now we are in June, is that correct?

5    A.   Yes.

6    Q.   That's '17 or is it -- oh, no, it just says -- it's wrong

7    up there but it's correct down here.  So June of '18, this is

8    with Ms. Pursifull?

9    A.   Mm-hmm.

10   Q.   "63-year-old female, neck and back."  I'm going to skip.

11   "She had an appointment with psychiatrist regarding Xanax dose

12   and her psychiatrist, quote, 'sees absolutely no problem with

13   the dose she is on.'  Informed patient, spoke at length about

14   risks of combining opioid, benzos and risks of dependency.

15   Patient stated she will self-taper to twice a day dosing and

16   ask psychiatrists to lower prescription to twice a day.

17   Informed patient this is not -- if this is not done, we will

18   decrease opioids at next visit.  She verbalized understanding.

19   Alert and oriented.  Positive lumbar facet loading."  And then

20   at the end or -- and the plan on the top right there says

21   "decrease Xanax" with an exclamation point.  Do you see that?

22   A.   Yes, I do.  But I never saw a psychiatrist.

23   Q.   Now we're in July of 2018.

24        THE COURT:  Let me -- let me ask this, Mr. Margolis.

25   For instance, in -- in the last question you read the contents

1    of the exhibit into the record and asked her if she saw it and

2    she said yes.  I'm wondering, rather than just having her

3    acknowledge what's in the records, what -- what it is you want

4    to know.  Did that -- I -- I don't know what you're trying to

5    do with that question.

6              MR. MARGOLIS:  Well, I'm just going over her medical

7    history.

8              THE COURT:  Well, the jury can take the medical

9    history into the jury room and read all this stuff.

10             MR. MARGOLIS:  Fair enough, Judge.  I understand.

11             THE COURT:  What do you want to know from her?  I

12   mean do you want to know that this happened, that it didn't

13   happen?  I -- I don't -- I don't see the point of just reading

14   documents into the record.

15             MR. MARGOLIS:  I -- I understand the Court's concern

16   and I will move on from that.

17             THE COURT:  Okay.

18             MR. MARGOLIS:  And I will note for the record this is

19   Exhibit 122.

20             MR. HELMS:  If you took it from 122D, that's what it

21   probably is.

22             MR. MARGOLIS:  Okay.  Just for the record, these are

23   all for the jury's consideration in Exhibit 122, most likely

24   122D.

25             THE COURT:  Okay.

1   BY MR. MARGOLIS:

2   Q.  I want to try and summarize some of that, distill it, the

3   medical records, at least as they pertain to Dr. Russo taking

4   over your care.

5   A.  Mm-hmm.

6        MR. MARGOLIS:  And I thank the Court for getting me

7   to this point.

8        THE COURT:  Thank you, sir.

9   BY MR. MARGOLIS:

10  Q.  On October 17, 2017, that was the last visit with Dr.

11  Kufner, yes?

12  A.  Yes.

13  Q.  And at that time, that's when he noted that you had pain

14  still sitting and rising to stand?

15  A.  Yes.

16  Q.  Your last ablation, your last RFA to your sacroiliac

17  joints was in March of that year, which was more than six

18  months before, fair?

19  A.  Yes.

20  Q.  On that day Kufner, Dr. Kufner schedules you for a series

21  of injections for your SI joints?

22  A.  Yes.

23  Q.  He leaves the practice three days later, yes?

24  A.  Yes.

25  Q.  On 11-16, on November 16 of that same year Dr. Russo

1    performs the injections that Dr. Kufner had scheduled?

2    A.  Yes.

3    Q.  You see Ms. Pursifull next and you complain about the pain

4    meds being reduced?

5    A.  Mm-hmm.

6    Q.  You see Dr. Lewis next on January -- according to your

7    records now --

8    A.  Well, I don't know a Dr. Lewis.

9    Q.  Understood.  But according to your records, you received

10   good relief from the November injections, yes?

11   A.  According to the records, yes.

12   Q.  Thank you.

13          And based on that report, Dr. Lewis schedules you for

14   the ablations?

15   A.  For what?  Excuse me.

16   Q.  The RFA, the -- the next procedure.

17   A.  Oh, of the radiofrequency.

18   Q.  Correct.  The injections were the diagnostics, right?

19   A.  Mm-hmm.

20   Q.  And the ablation is the one that gives you the extended

21   relief or is supposed to, correct?

22   A.  Mm-hmm.

23   Q.  Dr. Russo does the first right facet of the RFA on -- in

24   February of the next year?

25   A.  Yes.

```
 1   Q.  And that same day, based on the positive block we -- we --
 2   we -- we talked about, he schedules you for the left side,
 3   the -- to complete the series?
 4   A.  Yes.
 5   Q.  And he does on March 14 of '18?
 6   A.  I don't recall but that's what it says.
 7   Q.  Sounds reasonable, right --
 8   A.  Yeah.
 9   Q.  -- according to the record?
10           According to the records, you follow up with Ms.
11   Bezpalko, Tatyana, the Ukrainian I discussed, in April, yes?
12   A.  I -- I don't recall her.  If I did --
13   Q.  That's fair.
14   A.  -- I didn't know she was a psychiatrist.
15   Q.  The nurse notes in the record we showed you from April
16   that you present status, post-SI joint RFA that decreased your
17   pain about 50 percent, correct?
18           MR. HELMS:  Your Honor, I -- I would object to asked
19   and answered.  This is not exactly a summary.
20           MR. MARGOLIS:  I'm just trying to summarize it,
21   Judge.  I'm almost -- I'm almost done.
22           THE COURT:  You can summarize and see if she can
23   answer it.  Go ahead.
24           MR. MARGOLIS:  Yeah.
25   BY MR. MARGOLIS:
```

1   Q.   Yes?

2   A.   Not my words.  According to the percentages, according to

3   the records.

4   Q.   Thank you.

5   A.   Yeah.  You can say anything in a record.

6   Q.   Hopefully the Court and Mr. Helms won't be upset with me,

7   but I want to briefly backtrack to your visit with Kufner in

8   October.

9   A.   Okay.

10   Q.   And you remember the last time you saw him?

11   A.   Oh, yes.

12   Q.   Because at the time he's -- he's still your doctor, he's

13   the one?

14   A.   Yes.  And then he informed me that he was going to Grand

15   Rapids and he would turn me over to Dr. Russo.

16   Q.   And he introduced you to him.  You may not recall but he

17   said -- he testified to it.

18   A.   Okay.  Well, then I'm sure it's correct.

19   Q.   So you -- at the time you're going along, you continue to

20   go along with his plan for treatments, yes?

21   A.   Yes.

22   Q.   Okay.  Because you want your Norco pills to keep coming?

23   A.   Yes.

24   Q.   That's what you have come to believe in your mind?

25   A.   Yes.  And anybody else --

```
1    Q.  If you consent to the procedure --
2    A.  -- in the waiting room.
3         THE COURT REPORTER:  Wait, wait.  You can't talk on
4    top of one another.
5    Q.  Yes.  Yes is fine.  You can clear that up later.
6         If you consent to the procedures, you get your Norco?
7    A.  Yes.
8    Q.  So you do consent to all the procedures, yes?
9    A.  I wasn't given a choice.
10   Q.  Yes or no, ma'am, yes or no?
11   A.  No.
12   Q.  Okay.  You need your pain medicine so, "Yeah, Dr. K, go
13   ahead and schedule me," fair?
14   A.  Yes.
15   Q.  Because you honestly believe you need to undergo the
16   procedures to get your hydrocodone?
17   A.  Yes.
18   Q.  Here's the thing.  The injections stop after Dr. Russo
19   completes the procedure, Kufner's scheduled procedure?
20   A.  Mm-hmm, yes.
21   Q.  However, you still get your prescription for Norco, don't
22   you?
23   A.  Yes.
24   Q.  The March 18 ablation Dr. Russo does is the last procedure
25   you ever undergo at the Pain Center, true?
```

Case 2:18-cr-20800-SJM-APP   ECF No. 434, PageID.4664   Filed 06/22/22   Page 48 of 58
Jury Trial Excerpt: Volume 10 • Tuesday, May 31, 2022

48

1   A.  I don't recall.

2   Q.  After the March 14th ablation, you are not scheduled for

3   any more procedures at the Pain Center, true?

4   A.  True.

5   Q.  You even told it to Agent Link.  You said, "I abruptly

6   stopped receiving back injections."  Do you remember saying

7   that?

8   A.  Yes.

9   Q.  Yet you keep going to the Pain Center?

10  A.  For my prescription.

11  Q.  And you continued to get them?

12  A.  For a very short time.

13  Q.  Refills every time you go, correct?

14  A.  But I didn't stay with Russo.

15  Q.  Yes or no, ma'am, is fine.

16  A.  Yes.

17  Q.  From March through November, correct, yes or no?

18  A.  I don't recall.

19  Q.  Well, you recall that you had no more procedures, correct?

20  A.  Yes.

21  Q.  Yes?

22  A.  Yes.

23  Q.  So you agree to 18 different procedures over a year and a

24  half with Dr. Kufner, right?

25  A.  Mm-hmm.

1    Q.  Dr. Russo comes in, completes Kufner's care plan in less

2    than four months, right?

3    A.  Yes.

4    Q.  That's it, the procedures are done, right?

5    A.  Yes.

6    Q.  They end with Dr. Russo?

7    A.  Mm-hmm.

8    Q.  Yes?

9    A.  Yes.

10   Q.  And you keep going getting your refills for the next eight

11   months, yes?

12   A.  I don't recall.

13   Q.  But you don't recall it not happening either?

14   A.  I don't know the span of time.

15   Q.  Well, if I told you that your electronic medical records

16   have you treating through November, would you disagree with

17   that?

18   A.  No.

19   Q.  Thank you.

20         I discussed this briefly.  I'll go into it briefly.

21   When Dr. Russo inherits your care from Dr. Kufner, he also

22   reduces your pain medication?

23   A.  Mm-hmm, yes.

24   Q.  Kufner had you at four times, Russo takes you to three

25   times?

1    A.  Yes.

2    Q.  And that's a 25 percent reduction?

3    A.  Yes.

4    Q.  And that upsets you at the time?

5    A.  Yeah.  The pain increased.

6    Q.  And except for the specific and limited period of time

7    when you either broke your wrist or something happened where

8    you had surgery, it went up four -- to four times for two

9    weeks, but other than that particular time, it was -- it stayed

10   at three times a day?

11   A.  Yes.

12   Q.  Everyone at the Pain Center keeps you at Dr. Russo's

13   reduced pill count, correct?

14   A.  Yes.

15   Q.  That August Sarah Pursifull destroyed 29 pills of Xanax of

16   yours?

17   A.  Mm-hmm, yes.

18   Q.  Because you -- according to her, you had violated your

19   opioid agreement.  Do you remember that?

20   A.  I remember -- I remember discussions about it.  My primary

21   care physician disagreed, kept me on the Xanax.

22   Q.  So it was a battle of the physicians?

23   A.  Well, no, not -- a PA and a physician.

24   Q.  Got it.  And she -- she took them and she put them in

25   water and had to dump them in the toilet, is that what

Case 2:18-cr-20800-SJM-APP   ECF No. 434, PageID.4667   Filed 06/22/22   Page 51 of 58
Jury Trial Excerpt: Volume 10 • Tuesday, May 31, 2022

51

1   happened?

2   A.  Yes.

3   Q.  And that was upsetting to you at the time?

4   A.  Of course.

5   Q.  Ms. Pursifull said you can't take both?

6   A.  Yes.

7   Q.  The PC won't keep giving you Norco if you continue to take

8   your Xanax?

9   A.  Yes.

10   Q.  In your interview with Agent Link you call Ms. Pursifull a

11   witch.

12   A.  I don't recall that.

13   Q.  Do you recall her filling out the written pain

14   destruction -- medication destruction report?

15   A.  No.

16   Q.  I want to try to summarize what we -- I believe we've

17   established so far this morning.

18   A.  Okay.

19   Q.  We've established every time you receive pain meds from

20   any doctor, it is needed?

21   A.  Yes.

22   Q.  To treat real pain you suffer?

23   A.  Yes.

24   Q.  Real pain you suffer that you consistently report to the

25   Pain Center?

1    A.   Yes.

2    Q.   Over a period of more than two years?

3    A.   Yes.

4    Q.   You are not a pill seeker but treating at the Pain Center

5    to have professionals try to help manage your care, your pain,

6    your chronic pain?

7    A.   Yes.

8    Q.   We've established that you always trust -- trusted Dr.

9    Kufner?

10   A.   Yes.

11   Q.   That you agreed to Dr. Kufner's years-long plan of care to

12   treat your pain from your lumbar facets and your SI joints?

13   A.   Yes.

14   Q.   We've established that the quid pro quo you claim is only

15   a belief of yours, yes?

16   A.   I didn't understand the question.

17   Q.   We've established that once Dr. Russo completes Dr.

18   Kufner's plan to treat your SI joints, there are no more

19   procedures for you at the IPC?

20   A.   Mm-hmm.

21   Q.   Correct?

22   A.   Yes.

23   Q.   No more injections?

24   A.   No.

25   Q.   We've established that after the last procedure in March

1    of '18 and for the next nine months thereafter, you continue to

2    go to the Pain Center's Eastpointe clinic, yes?

3    A.  Yes.

4    Q.  We've established that you continue to receive pain

5    medication from the providers you see in Eastpointe?

6    A.  Yes.

7    Q.  And that's what I mean, that we've established there's no

8    quid pro quo because you were getting your meds and you had no

9    more injections, right?

10             MR. HELMS:  Objection, Your Honor.  Argumentative.

11             THE COURT:  What's your objection?

12             MR. HELMS:  Argumentative and asked and answered many

13   times.

14             THE COURT:  I think that's overruled.

15             Go ahead and answer if you can please, witness.

16   BY MR. MARGOLIS:

17   Q.  Want me to repeat it?  Are you able to answer?

18             THE COURT:  Don't use an argumentative tone but the

19   words look fine.  Go ahead.

20             MR. MARGOLIS:  Thank you.

21             THE COURT:  Yep.

22   BY MR. MARGOLIS:

23   Q.  We've established that you were able to get your

24   medication?

25   A.  Yes.

1    Q.  Without any injections?

2    A.  Yes.

3    Q.  So there's no quid pro quo, no con -- it wasn't -- the

4    inject -- the medication wasn't contingent upon your receipt of

5    injections, correct?

6    A.  I don't know.  I -- I -- I -- nobody explained to me why

7    the injections were going to stop.  I don't know.

8    Q.  Okay.  But they did stop and you still got your medicine?

9    A.  Yes, which is the whole reason I was there.

10   Q.  Thank you.

11        I want to go over briefly what I thought I heard from

12   Friday, so correct me if I'm wrong, I apologize.  I think you

13   testified that you had never met Dr. Hersh Patel?

14   A.  No.

15   Q.  So have you met Dr. Hersh Patel?

16   A.  No.  Don't even recognize the name.

17   Q.  Okay.  You don't recall a young doctor at the -- the Pain

18   Center toward the end of your treatment there in August or in

19   September, October?

20   A.  No, I don't.

21   Q.  In one of your interviews with Agent Kroger you talk about

22   past injections that you've had before.

23   A.  Mm-hmm.

24   Q.  Other doctors not at the PC.

25   A.  Yes.

1   Q.  You mentioned that you've received caudal epidurals?

2   A.  Yes.

3   Q.  You tell Agent Kroger that the caudal epidurals provide

4   you weeks of pain relief?

5   A.  I don't remember, but if that's what he said, then I trust

6   him.

7   Q.  For your low back pain?

8   A.  Yeah.

9   Q.  According to Agent -- according to the report that I have,

10  in the past you have had caudal epidurals provide you weeks of

11  pain relief.  Do you agree that that's what you could have

12  said?

13  A.  Possible.

14  Q.  So even though they weren't done at the Pain Center --

15  A.  Yes.

16  Q.  -- you did have injections before?

17  A.  Yes, cortisone.

18  Q.  Okay.  And they helped treat your -- your back pain?

19  A.  No.

20  Q.  No?

21  A.  A few days.

22  Q.  Okay.  But for your -- for your back pain is what I'm

23  saying.

24  A.  Oh, well, it's hard to -- you know, the pain is all over.

25  Q.  Sure.  Sure.

```
1    A.   It's kind of hard to determine an 80 percent relief in my

2    back but no relief anyplace else.

3    Q.   Okay.

4    A.   It just doesn't make sense.

5    Q.   So one -- the -- the caudals were just a quick shot to

6    your lower coccyx area, right?

7    A.   Yes.

8    Q.   Weeks of relief according to what you told the agent?

9    A.   Mm-hmm.

10   Q.   Easy, safe and effective?

11   A.   Yes.

12   Q.   I'll end on this point, Your Honor.  You have had other

13   doctors before you showed up at the Pain Center in May of '16,

14   right?

15   A.   Yes.

16   Q.   Of course.

17        And you have another doctor now I presume?

18   A.   Yes, the same one that I had back then.

19   Q.   So during your over two and a half years at the PC, at the

20   Pain Center, you could have always gone to see another doctor,

21   right?

22   A.   They wouldn't prescribe any pain pills.

23   Q.   There was nothing preventing you from finding another

24   doctor, yes or no?

25   A.   I tried.
```

Case 2:18-cr-20800-SJM-APP ECF No. 434, PageID.4673 Filed 06/22/22 Page 57 of 58
Jury Trial Excerpt: Volume 10 • Tuesday, May 31, 2022

57

1    Q.  But you chose to stay at the Pain Center, yes?

2    A.  I couldn't find anybody, yes.

3    Q.  Thank you.

4    A.  I went to pain centers but they --

5    Q.  Thank you.  That's all I have for you, ma'am.

6    A.  -- wouldn't prescribe pills.

7           THE COURT:  Okay.  All finished, Mr. Margolis?

8           MR. MARGOLIS:  I believe so.

9           THE COURT:  Okay.  Very good.

10          (Excerpt concluded at 10:11 a.m.)

11                          —  —  —

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T I O N

2           I, Linda M. Cavanagh, Official Court Reporter of the

3     United States District Court, Eastern District of Michigan,

4     appointed pursuant to the provisions of Title 28, United States

5     Code, Section 753, do hereby certify that the foregoing pages 1

6     through 57 comprise a full, true and correct transcript of the

7     excerpt of proceedings taken in the matter of United States of

8     America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis

9     and D-5 Christopher Russo, Case No. 18-20800, on Tuesday, May

10    31, 2022.

11

12                             s/Linda M. Cavanagh
                               Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                             Federal Official Court Reporter
                               United States District Court
14                             Eastern District of Michigan

15

16

17

18

19    Date: June 17, 2022
      Detroit, Michigan
20

21

22

23

24

25