Case 2:18-cr-20800-SJM-APP  ECF No. 436, PageID.4677  Filed 06/22/22  Page 1 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

1

```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5       vs.

 6   D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7   D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
 8
                          Defendants.
 9   _____/

10            JURY TRIAL EXCERPT: VOLUME 14

11        BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                  United States District Judge
12           Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
13                 Detroit, Michigan  48226
                    Monday, June 6, 2022
14
     APPEARANCES:
15
     For the Plaintiff        BRANDY R. McMILLION
16   United States of America: BRANDON C. HELMS
                               U.S. Attorney's Office
17                             211 W. Fort Street
                               Suite 2001
18                             Detroit, Michigan  48226
                               313-226-9622
19
     For the Defendant        ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra: 30445 Northwestern Highway
                               Suite 225
21                             Farmington Hills, Michigan  48334
                               248-855-5888
22

23                            (Appearances continued next page)

24

25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
           To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

Case 2:18-cr-20800-SJM-APP   ECF No. 436, PageID.4679   Filed 06/22/22   Page 3 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

3

```
 1                        TABLE OF CONTENTS

 2   Government Witnesses:                              Page

 3   HERSH PATEL

 4      Cross-Examination by Mr. Weiss                    4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16                          EXHIBITS

17   Identification                    Offered    Received

18   NONE

19

20

21

22

23

24

25
```

```
 1              Detroit, Michigan
 2              Tuesday, June 21, 2022
 3                        -   -   -
 4              (Proceedings in progress at 2:35 p.m., all parties
 5              present)
 6              (Jury entered the courtroom at 2:35 p.m.)
 7              THE COURT:  Okay.  All jurors are back, 2:35.  We are
 8    ready to go.  Everybody may be seated.  Mr. Weiss is ready to
 9    take the microphone and we'll complete our session.
10              MR. WEISS:  Thank you, Your Honor.
11              THE COURT:  Sure.
12                        CROSS-EXAMINATION
13    BY MR. WEISS:
14    Q.   Good afternoon.
15    A.   Good afternoon.
16    Q.   Did you give the money back?
17    A.   What?
18    Q.   Did you give the money back?
19    A.   No.
20    Q.   You kept it?
21    A.   Can I clarify?
22              MR. HELMS:  Objection as to what money we're talking
23    about.
24              MR. WEISS:  If he doesn't know, then he can ask, but
25    I don't think it's the government's objection.
```

```
1              THE COURT:  Okay.  He doesn't -- he doesn't know.

2   Let's go.  Go ahead, Mr. Weiss.

3   BY MR. WEISS:

4   Q.  Do you know what I'm talking about, sir?

5   A.  No.

6   Q.  You made a little over $116,000 for the couple of months

7   that you were at TPC, correct?

8   A.  Yes, my salary.

9   Q.  Okay.  Did you give it back?

10  A.  No.

11  Q.  So you kept the money?

12  A.  I worked.

13  Q.  Sir, you kept the money?

14  A.  Yes.

15  Q.  So it was horrendous, it was terrifying, it was McDonald's

16  drive-thru, it was all of those adjectives, but you kept the

17  money, correct?

18  A.  Yes.

19  Q.  Okay.  So when Dr. Bothra talks to you about money, the

20  money was important to you, right?

21  A.  No.

22  Q.  But you kept it?

23  A.  Yes.

24  Q.  Even after all those adjectives, you kept the money,

25  correct?
```

1   A.  Yes.

2   Q.  All right.  You decided when you would record, correct?

3   A.  Yes.

4   Q.  Okay.  And at the time you were recording, you were in the

5   State of Michigan, correct?

6   A.  Yes.

7   Q.  You were licensed to practice medicine in the State of

8   Michigan, correct?

9   A.  Yes.

10  Q.  Okay.  And you were aware of the physician/patient

11  privilege that exists in the State of Michigan, correct?

12  A.  Yes.

13  Q.  Okay.  So that privilege indicates that whatever goes on

14  between you and your patient remains privileged, correct?

15  A.  Yes.

16  Q.  Okay.  You didn't tell your patients when you were

17  recording them that they were being recorded, correct?

18  A.  Yes.

19  Q.  Yes, you told them?

20  A.  No, I did not.

21  Q.  Okay.  Do you feel that you violated the physician/patient

22  privilege by recording their intimate conversations with you?

23  A.  No.

24  Q.  Okay.  And did you get legal advice before you did that?

25       MR. HELMS:  Objection if he's asking for

Case 2:18-cr-20800-SJM-APP  ECF No. 436, PageID.4683  Filed 06/22/22  Page 7 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

7

1    attorney/client conversations.

2              MR. WEISS:  No, I'm just asking whether he got

3    advice.  I'm not asking what the advice is.

4              THE COURT:  Objection overruled.  Go ahead and --

5              MR. WEISS:  Thank you.

6              THE COURT:  -- answer, sir, if you can.

7              MR. WEISS:  Thank you, Judge.

8    BY MR. WEISS:

9    Q.  Did you secure legal advice before you recorded those

10   conversations?

11   A.  No.

12   Q.  Okay.  Is that your counsel with you here today?

13   A.  Yes.

14   Q.  Okay.  Do you feel that you need the representation of an

15   attorney for your testimony today, sir?

16   A.  No.

17   Q.  Okay.  Were you aware that --

18             THE COURT REPORTER:  Mr. Weiss, I really need you

19   to --

20             MR. WEISS:  I know.  It's a bad habit.  I apologize.

21             THE COURT REPORTER:  I know.  I know.  Thank you.

22   Q.  Were you aware while you were at the TPC that the

23   government was sending in people pretending to be in need of

24   pain assistance?

25   A.  No.

Case 2:18-cr-20800-SJM-APP   ECF No. 436, PageID.4684   Filed 06/22/22   Page 8 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

8

1    Q.   Okay.  So then I assume you weren't aware of the fact that

2    these individuals were recorded sometimes -- recording

3    sometimes sound, sometimes sound and picture, correct?  Or no,

4    bad question.  You weren't aware that they were recording you

5    at times, were you?

6    A.   No.

7    Q.   Did the government ever tell you that you were recorded

8    with one of their undercovers?

9    A.   No.

10   Q.   All right.

11        MR. WEISS:  Your Honor, I believe it's previously

12   been admitted as Government's 14.  It is a session I believe

13   involving the undercover Henderson Butler.

14        THE COURT:  Yes.

15        MR. WEISS:  And Dr. Patel.

16        THE COURT:  Yes.

17        MR. WEISS:  May I play that to the jury?

18        THE COURT:  Yes.  Yes.

19        MR. WEISS:  Thank you.

20        (Video being played)

21   Q.   Sir, you met with Mr. Butler approximately two and a half

22   minutes, correct?

23   A.   Yes.

24   Q.   Okay.  And you prepared a report or chart on that

25   interview, correct?

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

9

1     A.   Yes.

2     Q.   All right.  Just one moment.

3              (Brief pause)

4              MR. WEISS:  Your Honor, it's my understanding that

5     107C, pages 3, 4 and 5 have previously been admitted, and if my

6     understanding is correct, I'd like them to be -- those pages to

7     be displayed on the screen.

8              THE COURT:  I think you're right but let me just

9     double-check.  Yes, those are all in evidence.  Go right ahead.

10             MR. WEISS:  Thank you.  Put up 105C, page 3 please.

11             MS. McMILLION:  Are we putting it up?

12             MR. WEISS:  I'm sorry.

13    BY MR. WEISS:

14    Q.   Sir, what's on the screen is Government's Exhibit 107C, as

15    in cat, page 3.  Do you see that, sir?

16    A.   Yes.

17    Q.   And is that the first page of the charting that you did as

18    a result of your meeting or assessment of Henderson Butler?

19    A.   Yes.

20    Q.   Okay.

21             MR. WEISS:  And Ms. Adams, could I trouble you to put

22    up next to it 107C, page 1?

23    BY MR. WEISS:

24    Q.   All right.  Sir, bear with me.  On the screen on the left

25    is 107C, page 3, which is the first page of your chart of

1  Henderson Butler on August 2nd, 2018.  You see that, sir?

2  A.  Yes.

3  Q.  And then on the right of the screen is 107C, page 1.  Do

4  you see that?

5  A.  Yes.

6  Q.  Okay.  Now, you did not prepare 107C, page 1, correct?

7  A.  No.

8  Q.  Okay.  In fact, that's from a date of service of

9  6-29-2018, correct?

10  A.  Yes.

11  Q.  Okay.  And if I told you that that chart, 107C, page 1,

12  was prepared by Dr. David Lewis on or about June 29th, 2018,

13  you wouldn't disagree with me, would you?

14  A.  No.

15  Q.  But if you're hesitant --

16       MR. WEISS:  May I approach, Your Honor?

17       THE COURT:  Sure.

18  Q.  Sir, I'm going to hand you, it's copied on both sides,

19  107C-1 and 107C-2, and just ask you if you can take a look at

20  that and if you would agree with me that 107C-1 and 2 were

21  prepared by Dr. Lewis.

22  A.  Yes.

23       MR. WEISS:  Okay.  If I may retrieve the document,

24  Your Honor.

25       THE COURT:  Yes, mm-hmm.

1    MR. WEISS:  All right.  Now, Ms. Adams, if you could

2    under both documents highlight "Chief Complaint," if that's

3    feasible.

4             MR. HELMS:  Highlight or zoom them out?

5             MR. WEISS:  Pardon?

6             MR. HELMS:  Do you want to zoom them out or

7    highlight?

8             MR. WEISS:  Oh, yeah, I'm -- make it so that the jury

9    can read them.  Is it possible to enlarge both of them

10   simultaneously?

11            MS. ADAMS:  Not at the same time.

12            MR. WEISS:  No?  All right.

13   BY MR. WEISS:

14   Q.  Sir, I'll tell you what.  I don't want any issue.  I'm

15   going to --

16            MR. WEISS:  May I approach again, Your Honor?

17            THE COURT:  Yes.

18   Q.  I'm going to hand you those two documents and I'm going to

19   ask you to compare them under "Chief Complaint," okay?

20        (Brief pause)

21        Have you had a chance to read both of -- both of

22   those documents under "Chief Complaint"?

23   A.  Yes.

24   Q.  And they're exact, right?

25   A.  Yes.

1    Q.   Word for word, syntax for syntax, correct?

2    A.   Yes.

3    Q.   "Patient in today for right L5 and S1 selective nerve root

4    block but did not have a drive -- did not have a driver of his,

5    procedure was cancelled," correct?

6    A.   Yes.

7    Q.   So what you did was is you copied on or about August 2nd

8    what had previously been done by Dr. Lewis on June 29th,

9    correct?

10   A.   No.

11   Q.   Okay.  So is it just happenstance that your verbiage is

12   the same as his?

13   A.   No, that's not mine.

14   Q.   Oh, it's not yours.  Okay.

15        Well, we're looking at 107C, page 3, which I believe

16   you indicated was yours, and we're looking at 107C-1, which is

17   Lewis's, and I read the exact same verbiage and syntax in both

18   documents, is that correct?

19   A.   Yes.

20   Q.   Okay.  And it's your testimony under oath that you didn't

21   copy Lewis's June 29th when you did yours on August 2nd?

22   A.   I did not copy it.

23   Q.   Okay.  Thank you.

24        MR. WEISS:  Can I have the...

25   Q.   But you indicated a few moments ago that 107C-3 was the

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

```
1    first page of your charting, correct?
2    A.  Yes.
3    Q.  Okay.  So if you didn't do it -- it's your testimony you
4    didn't do it, right?
5    A.  Yes.
6    Q.  Okay.  Now, was Henderson Butler scheduled for a L5-S1
7    selective nerve root block on August 2nd?
8    A.  No.
9    Q.  Okay.  But nonetheless you put that down, correct?
10   A.  No.
11   Q.  Oh, you didn't put it down?
12   A.  No.
13   Q.  But it appears in your report?
14   A.  Yes.
15   Q.  Okay.  All right.  You indicate in your report that he is
16   there for a -- he's a 63-year-old male, followup on chronic
17   lower back pain, correct?
18   A.  Yes.
19   Q.  Okay.  Stopped taking benzos, amphetamines?
20   A.  Yes.
21   Q.  And you got that in the two and a half minutes that he was
22   on the screen?
23   A.  Yes.
24   Q.  All right.  Finished his master's degree, right?
25   A.  Yes.
```

1    Q.  Agrees that narcotics are not necessary for lower back
2    pain?
3    A.  Yes.
4    Q.  Did he actually agree to that?
5    A.  Yes.
6    Q.  Okay.  And you still wrote him a prescription for Norcos,
7    correct?
8    A.  Yes.
9    Q.  And this was after you told him that Norcos are not
10   indicated for lower back pain, right?
11   A.  Yes.
12   Q.  So you still wrote him a script, right?
13   A.  Yes.
14   Q.  And in your belief, that was in good faith in the ordinary
15   course of your business, correct?
16   A.  No.
17   Q.  Oh, so you did it outside the ordinary course of being a
18   physician, correct?
19   A.  No.
20   Q.  Okay.  Did you feel you wrote it in bad faith?
21   A.  No.
22   Q.  Okay.  But you nonetheless wrote it, correct?
23   A.  Yes.
24   Q.  Okay.  And you indicated that Norco is not indicated for
25   lower back pain, correct?

1    A.  Yes.

2    Q.  Okay.  And you told that to -- to Mr. Butler?

3    A.  Yes.

4    Q.  Okay.  And throughout the course of your recordings you

5    told a number of patients that the literature did not support

6    Norco for lower back pain, correct?

7    A.  Yes.

8    Q.  Okay.  But in reality, the studies do support Norco for

9    lower back pain, correct?

10   A.  It's yes and no.  Yes.

11   Q.  Okay.  Thank you.  All right.

12        Now, you indicated that he had no allergies.  How did

13   you determine that?

14   A.  I didn't write that.

15   Q.  Okay.  Again you didn't write it.

16        Then it indicates, "Review of systems, ROS, negative

17   other than HPI," correct?

18   A.  Yes.

19   Q.  For the uninitiated, what is ROS negative other than HPI?

20   A.  That's a prepopulated statement that comes up that states

21   review of systems negative other than history of present

22   illness.

23   Q.  But you didn't review his systems in those two and a half

24   minutes, did you?

25   A.  Yes.

1    Q.  Oh, you did.

2        All right.  And what physical examination did you

3    perform on Mr. Butler in those two and a half minutes on

4    August 2nd, 2018?

5    A.  That's -- that's not a physical exam.

6    Q.  Well, my question is what physical examination did you do

7    of Henderson Butler on August 2nd, 2018?

8    A.  I did not do a physical exam.

9    Q.  You didn't touch him at all, right?

10   A.  No.

11   Q.  And you've told this jury time and time again today about

12   the appropriateness, in fact the necessity, of conducting a

13   physical examination before you issue a prescription for

14   opiates, right?

15   A.  Yes.

16   Q.  And you didn't follow your own advice and your own

17   testimony, correct, as it relates to August 2nd of Mr. Butler?

18   A.  I was doing what everyone else does.

19   Q.  Oh, so --

20       (Courtroom interruption)

21       THE COURT:  Hey, I don't want any commentary from

22   anyone except a lawyer and a witness, and if I hear more

23   commentary, you're going to be escorted out of here.

24       Please proceed, Mr. Weiss.

25       MR. WEISS:  Thank you, Your Honor.

```
1    BY MR. WEISS:
2    Q.  Sir, have you ever heard the old kid's adage about do as I
3    say, not as I do?
4    A.  Yes.
5    Q.  Okay.  All right.  Then it indicates patient has a history
6    of none.  You didn't ascertain that on August 2nd, correct?
7    A.  No.
8    Q.  Okay.  "Surgical history: Patient's surgical Hx none."
9    You didn't ascertain that on August 2nd, did you?
10   A.  No.
11   Q.  Okay.  Did you ascertain that Henderson is divorced?
12   A.  No.
13   Q.  Did you ascertain patient does not drink alcohol?
14   A.  No.
15   Q.  Did you ascertain patient's smoking status is current
16   everyday smoker?
17   A.  No.
18   Q.  Did you ascertain patient does not use illegal drugs?
19   A.  No.
20   Q.  Did you ascertain patient has never been treated for
21   substance abuse in the past?
22   A.  No.
23   Q.  Would it surprise you that he had been a crack addict for
24   about ten years?
25   A.  No.
```

1  Q.  "Family history: Patient has a history of none."  You

2  didn't ascertain that on August 2nd either, did you?

3  A.  No.

4  Q.  Under vitals: Height, six foot.  Did you ascer -- you

5  didn't ascertain that on August 2nd, correct?

6  A.  No.

7  Q.  Weight, 220 pounds.  You didn't ascertain that on

8  August 2nd, correct?

9  A.  No.

10  Q.  Physical exam findings, that's the bottom entry, right?

11  A.  Yes.

12  Q.  Okay.  You didn't do a physical exam of him, did you?

13  A.  No.

14  Q.  Okay.  So let's -- I turned it over on mine.

15          MR. WEISS:  Ms. Adams, you can take down right now

16  page 1 and if you could go to -- under 107C, page 4 please.

17  BY MR. WEISS:

18  Q.  All right.  You see it, can you see that, sir?

19  A.  Yes.

20  Q.  Okay.  General appearance.  This is I assume under

21  findings from the previous page.  "General appearance: Alert

22  and oriented x3, no acute distress, no signs of intoxication."

23  Did you put that down?

24  A.  Yes.

25  Q.  And did you ascertain that as a result of your August 2nd

1    contact with him?

2    A.   Yes.

3    Q.   What does x3 stand for?

4    A.   To person, place and time.

5    Q.   Pardon?

6    A.   To person, place and time.

7    Q.   Okay.  And then underneath that is HEENT.

8    A.   Yes.

9    Q.   What does that stand for?

10   A.   It's head, ears, neck, throat.

11   Q.   Okay.  And then you've got two words after that.

12   A.   So it means the head looks normal, it looks like there's

13   no head injury.

14   Q.   Okay.  And -- but it was more than head.  It was H is

15   head, E, the first E is?

16   A.   Ear.

17   Q.   Ear.  You didn't look at his ears, did you?

18   A.   This is --

19   Q.   Sir, my question is you didn't look at his ears?

20   A.   No.

21   Q.   Okay.  And the second E is?

22   A.   Esophagus.

23   Q.   You didn't look at that either?

24   A.   No.

25   Q.   And the N?

1    A.  Nose.

2    Q.  You didn't look at his nose either?

3    A.  Oh, sorry, that was eyes, nose, throat.

4    Q.  And you didn't look at either one of those, correct?

5    A.  No.

6    Q.  Okay.  "Extremities: 5/5 muscle strength LE and 5/5 muscle

7    strength UE."  You didn't touch him, did you?

8    A.  No.

9    Q.  You didn't perform any examination as to muscle strength

10   LE or muscle strength UE, did you?

11   A.  I did.

12   Q.  Oh, you did?  Without touching him?  Okay.

13          And skin, no rash, no lesions or ulcers.  You didn't

14   do a physical examination of him, did you?

15   A.  No.

16   Q.  And he was dressed, wasn't he?

17   A.  Yes.

18   Q.  Okay.  Musculoskeleton, did you do an examination of that?

19   A.  No.

20   Q.  Okay.  But there is, and would you read it to the jury

21   please?

22   A.  "Positive paraspinal muscle tenderness and tenderness in

23   the lumbar spine."

24   Q.  Okay.  Then you have cranial nerves.  What does that make

25   reference to?

1    A.  It makes reference to the nerves that go into the face and

2    other areas, your sense of taste, touch -- I'm sorry, taste,

3    smell, things like that.

4    Q.  You didn't ask him any questions about that, did you?

5    A.  No.

6    Q.  Okay.  All right.  Assessment: M54.5, which stands for?

7    A.  Lower back pain.

8    Q.  Okay.  And you did that simply on the basis of what he

9    told you?

10   A.  Yes.

11   Q.  Okay.  And the conversation regarding his pain lasted

12   about 30 seconds?

13   A.  I'm not sure.

14   Q.  Okay.  Relatively short, right?

15   A.  No.

16   Q.  Okay.  You -- you felt it was long but sufficient enough?

17   A.  Yes.

18   Q.  Okay.  All right.  "Plan: Decrease Norco," correct?

19   A.  Yes.

20   Q.  "To 5/325 MG BID," correct?

21   A.  Correct.

22   Q.  Which stands for?

23   A.  Two times a day.

24   Q.  Okay.  "Baclofen, 10 milligrams TID.  Mobic, 15 milligrams

25   daily."  Correct?

Case 2:18-cr-20800-SJM-APP   ECF No. 436, PageID.4698   Filed 06/22/22   Page 22 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

22

1   A.   Yes.

2   Q.   Okay.  "Continue home PT exercises, RTC in one month,"

3   right?

4   A.   Yes.

5   Q.   And then you have a section on pain -- patient education,

6   and you discussed with him the importance of medication

7   compliance, right?

8   A.   Yes.

9   Q.   Okay.  "Strongly encourage not to drive or operate

10  machinery while taking pain medications or other controlled

11  substances."

12  A.   No.

13  Q.   You didn't discuss that with him, did you?

14  A.   No.

15  Q.   Okay.  Did you advise him against smoking?

16  A.   No.

17  Q.   Okay.  Mixing opioids with benzodiazepine, did you discuss

18  that with him?

19  A.   Yes.

20  Q.   Okay.  "Alcohol, muscle relaxers or any other drug that

21  may depress the central nervous system can cause serious health

22  risks including death or disability."  Did you discuss that

23  with him?

24  A.   Yes.

25  Q.   Okay.  And Baclofen, what is Baclofen?

1  A.  It's a muscle relaxer.

2  Q.  Okay.  So you specifically talked to him about taking a

3  muscle relaxer while he was taking an opiate?

4  A.  He was on -- I'm sorry.  Yes.  Yes.

5  Q.  Sir, my question is did you discuss with him the concerns

6  about taking a muscle relaxer at the same time you are taking

7  an opiate?

8  A.  Yes.

9  Q.  Okay.  And that's on the tape?

10  A.  Yes.

11  Q.  Okay.  All right.  And you discussed safe disposal of

12  opioids?

13  A.  Not disposal.

14  Q.  Okay.  You talked about proper disposal of expired, unused

15  or unwanted controlled substances?

16  A.  No.

17  Q.  Okay.  Did you -- did you discuss with him the risks of

18  substance abuse disorder and overdose associated with

19  controlled substance containing an opioid?

20  A.  Yes.

21  Q.  All right.

22      MR. WEISS:  And Ms. Adams, if I could trouble you to

23  go to page 5.

24  BY MR. WEISS:

25  Q.  All right.  And on page 5 is -- that's your signature,

1   correct?

2   A.  Yes.

3   Q.  Okay.  So you reviewed this five-page document and then

4   you signed it, correct?

5   A.  Yes.

6   Q.  And at no time in your signature did you indicate any of

7   it's in error, correct?

8   A.  Correct.

9   Q.  You didn't indicate, "I didn't author any of this, I don't

10  know what it is," correct?

11  A.  Correct.

12  Q.  But you read over all five pages and you signed it as

13  though it was true and accurate, correct?

14  A.  No.

15  Q.  Okay.  So you signed it as though it was false and

16  misleading?  That's a yes or no.

17  A.  Yes.

18  Q.  Okay.  Now, in terms of -- strike that.

19          In the summer of 2018 you were familiar, were you

20  not, with the CDC guidelines that were published in 2016?

21  A.  Yes.

22  Q.  Okay.  And in those guidelines do they -- first of all,

23  those guidelines pertain to primary care physicians, correct?

24  A.  Yes.

25  Q.  Okay.  Not necessarily physician -- excuse me, pain

Case 2:18-cr-20800-SJM-APP ECF No. 436, PageID.4701 Filed 06/22/22 Page 25 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

25

1    management clinicians, correct?

2    A.   Yes.

3    Q.   Okay.  But nonetheless, they can be utilized by the pain

4    management clinician in his or her discretion, correct?

5    A.   Yes.

6    Q.   Okay.  And do those guidelines mention anything at all

7    about telling patients that they can go to jail?

8    A.   No.

9    Q.   Okay.  Does it recommend that the clinician tell the

10   patient what the government wants?

11   A.   No.

12   Q.   Okay.  But nonetheless, when you decided to record

13   surreptitiously your patients, you repeatedly warned them about

14   going to jail and what the government wanted, correct?

15   A.   Yes.

16   Q.   Okay.  I believe...

17           (Brief pause)

18           MR. WEISS:  Your Honor, may I inquire of the Court --

19           THE COURT:  Yes.

20           MR. WEISS:  -- does the Court have down that

21   Government's 169A has been admitted?

22           THE COURT:  I believe it has.  Let me double-check.

23   Yes, 169 and 169A are received.  A is the transcript and I gave

24   the instruction about that.

25           MR. WEISS:  Your Honor, I guess I'm going to ask for

1    some guidance from the Court.  I would like to be able to

2    display some portions of 169 on the screen to ask the witness

3    some questions.  Is the Court okay with that?  I'm not going to

4    play the tape again.

5               THE COURT:  Sure.

6               MR. WEISS:  But I'd just like to display some

7    portions.

8               THE COURT:  Yeah.

9               MR. HELMS:  Your Honor, I'm sorry, just to clarify, I

10   think I admitted 165 and 166 but I wouldn't have an objection

11   to 169.

12              THE COURT:  Well, 169's in.

13              MR. HELMS:  It is in?

14              THE COURT:  I received that.

15              MR. HELMS:  Okay.  I apologize, Your Honor.

16              THE COURT:  And Mr. Weiss's reasonable request is to

17   display the transcript as a visual aid to move along the

18   questioning, and I don't have any problem with that.

19              MR. WEISS:  Your Honor, just so the record's clear,

20   the transcript itself is in excess of 300 pages.

21              THE COURT:  Okay.

22              MR. WEISS:  I don't intend to go through all 300.

23   I'm just going to pick out some areas that I think perhaps

24   would be a focal point.

25              THE COURT:  Yeah.  Well, that's good, very good.

1   Thank you, sir.

2           MR. WEISS:  Thank you, Your Honor.  Is it okay if I

3   take a sip of water periodically?

4           THE COURT:  Nobody's going to yell at you about that,

5   Mr. Weiss.  Okay.  Go ahead.

6           MR. WEISS:  Could you go to page 20 please?

7   BY MR. WEISS:

8   Q.  Now, we don't know who the patient is during this

9   conversation, do we, sir?

10  A.  No.

11  Q.  Did you keep a log of the patients who you recorded?

12  A.  No.

13  Q.  Okay.  So we don't know and probably will never know who

14  UP1 was, correct?

15  A.  Correct.

16  Q.  Pardon?

17  A.  Correct.

18  Q.  Okay.  And just so I'm clear, this transcript of 169A was

19  prepared in relation to your lawsuit that you've mentioned,

20  correct?

21  A.  No.

22          MR. WEISS:  I'm sorry, can we...

23           (Brief pause)

24          Your Honor, may I approach?

25          THE COURT:  Yes, sir.

1   Q.  Sir, I'm going to hand you what is 169A, page 1 and ask

2   you to take a look as to what is in the upper right-hand

3   corner, okay?

4   A.  Mm-hmm.

5   Q.  The designation indicates your civil lawsuit, does it not?

6   A.  I don't know.

7   Q.  Okay.  Do you know yourself as a relator?  Do you know

8   what that means?

9   A.  No.

10  Q.  Okay.  Do you know who Thacker Anderson is?

11  A.  A patient.

12  Q.  A patient?  Are you -- if you're not -- if you don't --

13  A.  I don't know.

14  Q.  Don't guess if you're not certain.

15  A.  I'm not sure.

16  Q.  Okay.  All right.  Okay.  So on page 20 you indicate, "You

17  realize it is a controlled substance with high risk."

18          "Yeah."

19          "And a lot of potential to go to jail if they catch

20  you doing anything illegal with it."

21          "Yeah."

22          Correct?

23  A.  Yes.

24  Q.  And so --

25          MR. HELMS:  Sorry, Your Honor.  I don't -- I'm not

```
1    sure if the witness can see on his screen 'cuz it's not on any
2    of our screens.
3              MS. McMILLION:  We don't have it.
4              MR. COLLINS:  We need a little help over here.
5              MR. HELMS:  It's not on any of the counsels' screens.
6              MR. WEISS:  When it comes to technology --
7              MR. HELMS:  I know you didn't do it.
8              THE COURT:  Whose -- whose -- whose computer is
9    generating the -- okay.  Well, I've got it and --
10             MR. HELMS:  We have it now, Your Honor.
11             THE COURT:  All right.  Okay.  Go ahead.
12             MR. WEISS:  Thank you, Judge.
13             THE COURT:  Mm-hmm.
14   BY MR. WEISS:
15   Q.  So you felt it necessary to advise the patient about not
16   doing anything illegal with the controlled substances, correct?
17   A.  Yes.
18   Q.  Now, you lived this recording because you were there and
19   recorded the patient.  At any point in time during your
20   conversation with the patient did the patient indicate to you a
21   proclivity to violating the law?
22   A.  I don't know.
23   Q.  Okay.  So nonetheless, just for the heck of it, you
24   threatened a patient with the potentiality of going to jail,
25   right?
```

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

1   A.  No.

2   Q.  Oh, you didn't do that.  Okay.

3        So you feel that sort of being a pseudo law

4   enforcement officer is part of being a good physician?

5   A.  No.

6   Q.  Okay.

7        MR. WEISS:  Can we go to page 45 please?

8   BY MR. WEISS:

9   Q.  Do you see the passage, "And we've got to keep the

10  community safe, right?  These medications are controlled.  They

11  can get in the wrong hands.  You could go to jail.  You don't

12  want to go to jail when you're 73."

13       Patient: "No."

14       Right?

15  A.  Yes.

16  Q.  Okay.  Do you recall that interaction between a patient?

17  A.  No.

18  Q.  Okay.  But in any event, was there anything in your

19  conversation with your patient leading up to that passage that

20  would demonstrate to you that that particular patient had a

21  proclivity to violating the law and doing something

22  impermissible with his or her medications?

23  A.  I don't know.

24  Q.  Okay.  But nonetheless you felt compelled to threaten that

25  patient with the potentiality of going to jail?

```
 1   A.  No.
 2   Q.  Okay.  All right.
 3           MR. WEISS:  Go to 76, 77 please.
 4   BY MR. WEISS:
 5   Q.  Do you see at the bottom of 76, sir, "And make sure these
 6   drugs are in a safe place."
 7           "Oh, ya, I do."
 8           (Unintelligible).
 9           "Absolutely, absolutely."
10           Next page.  "There's a crackdown on them now, so if
11   they..."
12           Patient: "I understand."
13           You: "The federal governments finds them in anyone
14   else's hands, you're going to jail."
15           We lost it.
16           "You're going to jail."
17           Patient: "Ya, ya, trust me, I'm not doing it."
18           You: "Um and."
19           Patient: "I'm sixty-three.  I haven't been to jail in
20   my life, man.  I'm not doing that."
21           You: "Gotcha."
22           Okay.  That's an accurate recitation of that passage
23   of your leading with that particular patient, correct?
24   A.  Yes.
25   Q.  Okay.  And again, no prior indication at all that this
```

1    particular patient was doing anything else inappropriate with

2    his or her medication, and you felt it incumbent not only to

3    warn them about going to jail, but you threw in the federal

4    government fines them.  And again, we've already indicated that

5    there's nothing in the CDC guidelines that even remotely

6    advises the clinician to threaten the patient about what the

7    federal government may or may not do with them and that they're

8    going to jail simply because they're getting a controlled

9    substance.

10   A.   No.

11   Q.   Thank you.

12          MR. WEISS:  83 please.

13   BY MR. WEISS:

14   Q.   Now, on 83, about two-thirds of the way down, you start a

15   passage about asking about the person's pain, correct?

16   A.   Yes.

17   Q.   Okay.  And then it continues on to the next page and they

18   talk about Percocet or, excuse me, the patient talks about

19   Percocet and you tell the patient, "No, no, no, it's not, so,

20   we can't do narcotics and, so, do you take Baclofen?"  Correct?

21   A.   Yes.

22   Q.   Okay.  So what was it about that particular patient that

23   when he or she mentions Percocets, you say, "No, no, no, it's

24   not, so, we can't do narcotics"?

25   A.   I have no idea.

1    Q.  Okay.  And then you continue down on the page and the

2    patient indicates about being in a bad car accident and he's

3    been shot again and you ask where the pain is.  "It'll be all

4    over, but it helps, cause I take my medicine like I should."

5             You respond, "Ya."

6             And then on the next page, "It's doing its job."

7             "Gotcha.  So it's mostly in the left arm, right

8    foot?"

9             "No, it's all over my body, I feel it."

10            THE COURT REPORTER:  Mr. Weiss?

11            MR. WEISS:  I apologize.  I'm going too fast.

12            THE COURT REPORTER:  You are.

13            MR. WEISS:  Okay.

14            THE COURT REPORTER: So it's mostly in the left arm,

15   right foot?"

16   Q.  Doctor responds, "Gotcha.  So it's mostly in the left arm

17   and the right foot then?"

18            Patient: "No, it's all over my body, I feel it."

19            Doctor: "All over?"

20            Patient: "Cause that tingling and numbing coming

21   through my spine and my back."

22            Doctor: "Gotcha."

23            Patient: "So as long as I take my medicine like I

24   should, it's helping so that's what I'm doing."

25            Doctor: "Gotcha."

1          That is an accurate recitation of your conversation

2   with that patient on that particular day, correct?

3   A.   Yes.

4   Q.   Okay.

5          MR. WEISS:  And if we could go to 265 please.

6   BY MR. WEISS:

7   Q.   All right.  So the patient is telling you that he or she

8   would like a good neurologist that will diagnose him or her

9   properly, correct?

10  A.   Yes.

11  Q.   And then makes reference to another physician that's not

12  part of TPC and diagnosed with a particular ailment.

13  A.   Yes.

14  Q.   And you ask the patient about medications and you

15  indicate, "Tylenol Four is not the answer to this."

16         And the patient indicates, "Well, Tylenol four is the

17  answer to my knees and my back and my, my uh, you know, neck."

18         And you answer, "Narcotics are never the answer."

19         Correct?

20  A.   Yes.

21  Q.   Okay.  And that seems to be a theme of yours about

22  narcotics are never the answer, right?

23  A.   No.

24  Q.   It's not a theme.  Okay.

25         MR. WEISS:  Let's go to the top of 266 please.

Case 2:18-cr-20800-SJM-APP   ECF No. 436, PageID.4711   Filed 06/22/22   Page 35 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

35

1  BY MR. WEISS:

2  Q.  And the patient goes, "Well, if you're gonna do away with

3  that then I'll go elsewhere because I cannot tolerate the pain

4  and Ibuprofen is not good for my heart nor my blood pressure."

5  Correct?

6  A.  Correct.

7  Q.  So the patient is telling the doctor what the patient

8  needs and the patient will go elsewhere, correct?

9  A.  Yes.

10  Q.  And even after the patient tells you how bad the pain is

11  and that what you may be recommending is not good for his or

12  her heart or blood pressure, your response is, "Well, neither

13  are narcotics."  Rather cavalier response, correct, to someone

14  that's in a lot of pain, yes?

15  A.  Yes.

16  Q.  Thank you.

17        The CDC guidelines talk about discharging the

18  patient, correct?

19  A.  No.

20  Q.  Okay.  That's fine.  And they never reference about the

21  concerns about a patient being discharged and perhaps having to

22  go cold turkey and withdrawal from the pain medication that the

23  patient's been on for a varying period of time?

24  A.  They do.

25  Q.  Okay.  All right.  So let's go to page 22 please.  All

```
1    right.  So you tell the patient, "Alright.  My main goal for
2    you is you're thirty-four years old, you're old."  I hope 34
3    isn't old, that's me.  "You're one year older than me and
4    you're on medications that can take you down the wrong path
5    pretty quickly, and I'm trying to take you off of it.  You can
6    agree with me and stick to my plan or you can go elsewhere and
7    you'll get, you'll get the medications and I'm telling you,
8    you're going down the wrong path, right?"
9         So you're essentially telling the patient, "It's my
10   way or the highway," correct?
11   A.  No.
12   Q.  Okay.
13       MR. WEISS:  40 -- or excuse me, 166.
14   BY MR. WEISS:
15   Q.  Now, I know it says RB but I think you'd agree with me
16   that it should be HP.  Do you see that, sir?
17   A.  Yes.
18   Q.  Okay.  "I come from New York, where I've seen twelve kids
19   die, your age, just from these medications.  So I'm telling you
20   right now, it's not gonna happen.  But you can go elsewhere.
21   Once you leave this clinic you're discharged if you don't
22   follow my instructions."  You see that, sir?
23   A.  Yes.
24   Q.  And you told that to a patient, correct?
25   A.  Yes.
```

1   Q.  Okay.

2           MR. WEISS:  269 please.

3   BY MR. WEISS:

4   Q.  Now, on 269 -- let me -- let me back up a little bit.

5   Prior to this passage, the patient is telling you about his or

6   her ailments and the excruciating pain that the patient is

7   suffering.  Do you recall that?

8   A.  Yes.

9   Q.  And the patient is wanting some pain killers, correct?

10  A.  I'm not sure.

11  Q.  Okay.  And you're reticent to giving that patient pain

12  killers, correct?

13  A.  Yes.

14  Q.  Okay.  And so the patient gets a little bit frustrated and

15  the patient goes, "Let's put some rides -- rods in your back

16  and see if you'll get off the medication, blank, yeah.  Truth,

17  sorry."

18          You respond, "You can go somewhere else if you're

19  gonna act, behave that way.  That was very inappropriate."

20          Patient: "Well, you know..."

21          You: "Good luck."

22          Patient: "...it's the truth I'm sorry.

23          (Unintelligible).

24          (Overlapping)"

25          Patient -- or excuse me, You: "He'll be discharged

1    from here."

2            So that's an accurate passage of what you and the

3    patient discussed on that particular day, right?

4    A.  Yes.

5    Q.  Okay.  So the patient is trying to have you think the way

6    he or she is.  They've got rods in the back and they can be

7    painful, correct?

8    A.  Yes.

9    Q.  And generally when rods end up in someone's back, it's

10   after a surgery, correct?

11   A.  Yes.

12   Q.  Maybe multiple surgeries?

13   A.  Yes.

14   Q.  And you've already described this morning or earlier today

15   about -- I think you described it as the failed back surgery

16   syndrome?

17   A.  I did not.

18   Q.  Okay.  And so the patient is trying to get you to think

19   the way he or she is or to feel the way he or she is and says,

20   "Let's put some rods in your back."  And you are so offended by

21   that that you're discharging the patient from here, correct?

22   A.  No.

23   Q.  "He'll be discharged from here."  Those are your words,

24   right?

25   A.  Yes.

1    Q.  Thank you.

2          Now, are there anywhere in the CDC guidelines that

3    recommend that the clinician should tell the patient how bad

4    the particular office is that the patient is in?

5    A.  Is this a yes or no?

6    Q.  Sure.  Does the CDC recommend to the physician that the

7    physician tell the patient that they're in a bad place, meaning

8    a bad office?

9    A.  No.

10   Q.  Okay.

11         MR. WEISS:  Let us go to page 21 please.  You can

12   blow that up please, Chris.

13   BY MR. WEISS:

14   Q.  So this is you.  "So, I don't prescribe opioids for

15   unnecessary reasons and I'll tell you that much.  I think this

16   clinic is ridden with people that take opioids for the wrong

17   reasons."  You told that to a patient, right?

18   A.  Yes.

19   Q.  Okay.

20         MR. WEISS:  Let's go to page 40 and 41 please.

21   BY MR. WEISS:

22   Q.  You're telling a patient, "I like Detroit a lot and

23   honestly, I care about the city a lot.  And that's -- and

24   that's kind of why I joined this clinic.  Because I knew there

25   were a lot of prescribing habits that aren't the best."

```
1            So you were telling the patient that you joined the
2    clinic knowing that the prescribing habits aren't the best,
3    right?
4    A.  In the area, yes.
5    Q.  Okay.  So I read -- I -- that passage is telling that you
6    knew before you joined the clinic that the prescribing habits
7    aren't the best, right?
8    A.  In that area, yes.
9    Q.  Okay.  Patient answers, "Yeah".
10           You: "So, I wanna keep the city safe."
11           Patient: "Sure."
12           "And I'm gonna have every patient play their role in
13   that too."
14           Correct?
15   A.  Yes.
16   Q.  All right.
17           MR. WEISS:  And on the top of the next page please.
18   BY MR. WEISS:
19   Q.  You asked the patient, "So I understand the Norco's
20   helping you?"
21           The patient answers, "Yes."
22           And you say, "Right," correct?
23   A.  Mm-hmm.
24   Q.  But you're telling the patient, the patient can try
25   other -- other medications, correct?
```

1    A.  Yes.

2    Q.  Okay.  But then after telling the patient about the bad

3    prescribing habits of the clinic and that there are other

4    medications, you relent and you tell the patient, "I'm not

5    going to change your narcotics," right?  Right?

6    A.  Yes.

7    Q.  Okay.  And then you say something, "Because narcotics are

8    never the answer for pain."

9            MR. WEISS:  Are we on 41?

10           MR. ANTONE:  Correct.

11           MR. WEISS:  Okay.

12   BY MR. WEISS:

13   Q.  So you acknowledge that on that day you did continue with

14   the narcotics prescriptions that had previously been prescribed

15   for this patient, correct?

16   A.  Yes.

17   Q.  Okay.  Even though you say narcotics are never the answer

18   for pain?

19   A.  Yes.

20   Q.  Okay.  Now, you indicated earlier in your direct

21   examination about back braces, correct?

22   A.  Yes.

23   Q.  Okay.  But you also would inquire about braces from the

24   patients that you saw, correct?

25   A.  Yes.

```
1    Q.  Okay.
2         MR. WEISS:  104 please.
3    BY MR. WEISS:
4    Q.  All right.  So you acquire of the patient -- inquire of
5    the patient, "Do you need a back brace or anything?"
6         "Have a back brace, new brace, and all that and this
7    guy."
8         You respond, "Yep, perfect."
9         All right?
10   A.  Yes.
11   Q.  So you inquired and he already had one.
12        And is there anything in the conversation between you
13   and your patient on that date leading up to the passage that
14   would indicate the necessity for this individual having a back
15   brace?
16   A.  I don't know.
17   Q.  Okay.  And I think you testified about a spinal cord
18   stimulator?
19   A.  Today?
20   Q.  Yes.
21   A.  No.
22   Q.  Okay.  Do you know what a spinal cord stimulator is?
23   A.  Yes.
24   Q.  Okay.  Would you relate to the jury what it is?
25   A.  So a spinal cord stimulator is pretty much like a
```

1    pacemaker for the spine.  It helps block any sort of pain

2    signals from going upwards, and it's a -- a device that you

3    implant into the spinal -- into that space.

4    Q.  So it necessitates some surgery?

5    A.  The -- not the trial.

6    Q.  No, but to implant it?

7    A.  For the implant, yes.

8    Q.  And it is an alternative to narcotics, correct?

9    A.  Yes.

10   Q.  Okay.  And it's something that at times even yourself

11   advocated to the patients, correct?

12   A.  Yes.

13           MR. WEISS:  Okay.  196 please.

14   BY MR. WEISS:

15   Q.  All right.  And here's where you're telling the patient

16   about perhaps considering a spinal cord stimulator, correct?

17   A.  Yes.

18   Q.  And you're telling the patient, "Basically all it does

19   it's one electrode that will be put in the back and it makes

20   your body think that anything that's going down here that feels

21   like pain is just a bit of pressure."  Correct?

22   A.  Yes.

23   Q.  And you're recommending it perhaps down the line, correct?

24   A.  Yes.

25   Q.  Okay.  But you first want to get the back into a

1    comfortable place, right?

2    A.  Yes.

3    Q.  Okay.  "But, ultimately, I think that's what's going to

4    get you off all the medications, off the therapy, whatever else

5    you need.  Alright?  So, we'll definitely talk about that in

6    the future." Correct?

7    A.  Yes.

8    Q.  Okay.  And that's something that the TPC did.  The

9    physicians there did occasionally mention to their patients

10   about taking a look at a spinal cord stimulator, correct?

11   A.  Yes.

12   Q.  All right.

13          MR. WEISS:  Let's go back to page 41 please, just the

14   one in the center, "So, unfortunately."

15   BY MR. WEISS:

16   Q.  So you're telling a patient, "So, unfortunately the only

17   thing that really helps and is proven in literature is physical

18   therapy and exercise."

19          Is it your testimony that the literature and studies

20   do not demonstrate the efficacy and propriety of pain -- of

21   Schedule II pain killers for lower back pain?

22   A.  No.

23   Q.  Okay.

24          MR. WEISS:  All right.  Let's go to page 8 -- excuse

25   me, 182.

```
 1   BY MR. WEISS:
 2   Q.  So you're telling patients, "So, I mean, so you also gotta
 3   understand that these are controlled substances..."
 4            Patient: "Oh, I know.  I realize that, yeah."
 5            "There's really actually no indication for lower back
 6   pain for prescribing, like, these medications."
 7            That's what you told the patient, correct?
 8   A.  Yes.
 9   Q.  But the literature does indicate and there is an
10   indication for Schedule II pain killers for lower back pain, is
11   there not?
12   A.  Yes, there is.
13   Q.  Thank you.
14            At times you would advocate for injections, correct?
15   A.  Yes.
16   Q.  All right.
17            MR. WEISS:  Page 1 please.
18   BY MR. WEISS:
19   Q.  "So the way that these injection work, um, the ones that
20   you're putting -- that you're getting today the burns.  You
21   only do one set at a time.  So if we only do it today and you
22   don't come back in the next month honestly you're gonna feel
23   really imbalanced..."  Correct?
24   A.  Yes.
25   Q.  Okay.  So you're advocating a certain injection today and
```

Case 2:18-cr-20800-SJM-APP  ECF No. 436, PageID.4722  Filed 06/22/22  Page 46 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

46

1   maybe the other side in about a month, correct?

2   A.  Yes.

3   Q.  Okay.

4       MR. WEISS:  Page 6 please.  103, I'm sorry.

5   BY MR. WEISS:

6   Q.  Okay.  So the patient is describing or advising that

7   they've never prescribed injections for his or her back, and

8   you indicate, "That's unfortunate.  So, I'll tell you right

9   now.  I think the first injection we should try just for your

10  lower back pain..."

11      Patient: "Mm hmm."

12      "Covers most of the spine, most of your lower back.

13  It's called a cau', it's called a caudal epidural steroid

14  injection.  It's just one needle.  We're not even going to go

15  through the back here.  We're just going right to the bottom

16  and we're gonna fill up the spine..."

17      Patient: "No problem."

18      "with steroids and a little bit of anesthetic.  It'll

19  numb out, it'll calm all of these nerves down better that are

20  kind of irritated.  And, I think that's gonna be the first

21  step.  We're gonna see how you respond to that.  You're gonna

22  start physical therapy again, do all the normal things that you

23  need to do to get, you know, back into shape as well."

24      Correct?

25  A.  Yes.

```
1    Q.  So you're telling the patient about the positives of the
2    injection, correct?
3    A.  Yes.
4    Q.  But you didn't tell the patient any of the negatives?
5    A.  I did.
6    Q.  You did.  Okay.
7            MR. WEISS:  107 please.
8    BY MR. WEISS:
9    Q.  All right.  You introduce yourself: "Dr. Patel.  It's nice
10   to meet you."
11           Patient: "Same here."
12           "Well, how's your pain?"
13           "Nine.  Can I get my shots back?"
14           You respond, "What shot?"
15           Patient: "Uh, I get my back injection in my back."
16           "What shot do you get?  It's in your neck?"
17           "No, it's in my lower back."
18           Now, when you came into the room, had you reviewed
19   this patient's chart at all?
20   A.  I had no time.
21   Q.  You had no time.  Okay.
22           And you didn't feel it was appropriate to maybe take
23   some time so you could talk intelligently with the patient?
24   A.  I did.
25   Q.  You did.  Okay.
```

Case 2:18-cr-20800-SJM-APP ECF No. 436, PageID.4724 Filed 06/22/22 Page 48 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

48

1          Next page.  "Lower back?  Where is your pain right
2    now?"
3          "In my lower back."
4          "And, does it go down your legs at all?"
5          "Yes, it's down my legs now and on my back."
6          "Down your arms as well?"
7          "And my arms.  (Unintelligible)."
8          You: "Gotcha.  What's bothering you more, your upper
9    neck or your lower back?"
10          "Uh, my lower back and my arms and legs are numb."
11          Let's just stop right there for a minute.  So you're
12   inquiring about what bothers this patient more, either upper
13   neck problem or a lower back problem, correct?
14   A.  Yes.
15   Q.  So some patients present with multiple pain generators,
16   correct?
17   A.  Yes.
18   Q.  In different parts of the body, correct?
19   A.  Yes.
20   Q.  And sometimes you can't deal with all of it at one time
21   for whatever reason, and so you do what you can and then you --
22   you have to revisit the other area or go to the other area,
23   correct?
24   A.  Yes.
25   Q.  Okay.  All right.  Your response, "Ya?"

```
1              Patient: "Ya."
2              "Awright."
3              "I haven't been here in six months."
4              "Gotcha."
5              "That's -- that's why it's probably hurting as bad as
6      it is."
7              "Where you been?"
8              Please keep going.
9              "Home."
10             "Home."
11             "Stressed out."
12             "Why?"
13             "Woman."
14             "Huh."
15             "A woman."
16             "Women.  All right."
17             "A woman's (unintelligible) me.  Look at my lips.
18     Woman."
19             "Women?"
20             THE COURT REPORTER:  Wait, Mr. Weiss.  When you're
21     reading it like this into the record and if I'm to do a
22     transcript, it's -- it's --
23             MR. WEISS:  I apologize.
24             THE COURT REPORTER:  Can you please indicate the
25     patient, the doctor?  I mean it's going to be all over the
```

1    place for a transcript.

2              MR. WEISS:  Too many women.

3    Q.  Patient goes, "A woman."

4              Dr. Patel goes, "Woman.  All right."

5              Patient: "A woman's (unintelligible) me.  Look at my

6    lips.  Woman."

7              Dr. Patel: "Womens."

8              Patient: "Woman.  Not womens.  A woman.  I wish it

9    was women.  We'd be smiling together."

10             Patel: "That's life."

11             "No, I've been uh, got a lot of family issues, man."

12             Patel: "Gotcha."

13             Next page.  Patel: "Ya.  Um, all right.  So, let me

14   check it out.  I think what we could do is we'll, we'll do the

15   back injection and we'll see how you do with that.  All right?"

16             "Right now, right?"

17             "No.  We gotta schedule that."

18             Okay.  So you're telling the patient that you're

19   going to schedule -- I assume it's a male but I guess I

20   shouldn't make that assumption -- you're -- you're advising the

21   patient that you're going to schedule a back injection for that

22   particular patient, correct?

23   A.  Yes.

24   Q.  Okay.

25             MR. WEISS:  Go to 192 please.

```
 1   BY MR. WEISS:
 2   Q.  All right.  So you're discussing with the patient that the
 3   patient had previously received injections, correct?
 4   A.  Yes.
 5   Q.  Okay.  And you're asking the patient, "I understand, yeah.
 6   Alright, so, basically what kind of injections and stuff did he
 7   do for you?"
 8           Patient: "He did the back injections."
 9           Patient: "How many times a month did you get them?"
10   Or excuse me, that's you.  "How many times a month did you get
11   them?"
12           Patient: "(mumbling, unintelligible) About once a
13   month."
14           You: "What kind of injections were they?"
15           Patient: "I didn't know the name of them."
16           You: "Did you have pain?"
17           Patient: "They did make my back feel better."
18           You: "They did?"
19           Patient: "You know, not a hundred percent better,
20   like, um, back to normal, but it made them feel a lot better
21   than what it was."  Okay?
22           So the patient is describing the fact that he or she
23   has had injections and they've made the patient feel better,
24   correct?
25   A.  Yes.
```

Case 2:18-cr-20800-SJM-APP ECF No. 436, PageID.4728 Filed 06/22/22 Page 52 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

52

```
1    Q.  So sometimes they do work, correct?
2    A.  Yes.
3    Q.  Okay.
4         MR. WEISS:  202 please.
5    BY MR. WEISS:
6    Q.  All right.  And you inquire, "Alright, how's your pain?"
7         Patient: "My pain is worsened and it's getting..."
8         Let's go to the next page.
9         You indicate, "It's worse?"
10        Patient: "I'm on, I have to take like one and a half
11   now."
12        You: "Mmhmm."
13        Patient: "Sometimes two depending on how bad it is."
14        You: "Where is your pain?"
15        Patient, "It's here."
16        You: "Mhhmm."
17        Patient: "...on my low- Let me show you.
18   (Unintelligible) on my back it goes all the way across.  It's
19   like down there."
20        You: "Across like that?"
21        "My" -- Patient: "My left side has pain, but there,
22   in the center to the right, and when they, when it starts.  And
23   then my knees."
24        You: "Both your knees?"
25        Patient: "...and legs.  Yes."
```

1    You: "Alright.  Um, so what you want to get treated
2    for first?  Do you want to get the knee injections today?"
3         "Mmm mmm."
4         You: "No?  Do you want to get the neck pain treated?"
5         Patient: "What's the, um, what's, what's going to
6    happen?"
7         You: "So that's just a cervical epidural.  So it's
8    one injection.  It basically calms the nerves down that are
9    going down your arm from the neck."
10        Patient: "Mmm."
11        You: "Um, it usually causes pretty good pain relief
12   for a couple of months at a time, but you could, it would,
13   sometimes you need more than one to get good effect.  Um, the
14   main thing, you know at the end of the day, none of these
15   things help with pain in the long term..."
16        "Mmhmm."
17        You: "...as much as physical therapy, exercise..."
18        The patient indicates, "I'm in physical therapy."
19        Next page.  You respond, "...weight loss.  How many
20   sessions have you done so far?"
21        Patient: "I done about eight?  Seven or eight.  And I
22   have one today as well."
23        You: "And what?  Sorry, I missed that."
24        Patient: "Look, I have a whole (unintelligible) one
25   therapy..."

Case 2:18-cr-20800-SJM-APP  ECF No. 436, PageID.4730  Filed 06/22/22  Page 54 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

54

1        You: "Uh huh."

2        Patient: "...and physical therapy.  Um, as soon as we

3   get -- as soon as we did those things."

4        You: "Gotcha.  Alright.  So I really need you to

5   continue doing the physical therapy.  All we can do is help you

6   get through the physical therapy and interventions.  Right?

7   This is a interventional pain clinic."

8        Correct?

9   A.  Yes.

10  Q.  Okay.  So let's break that down a little bit.  The patient

11  is presenting with multiple pain generation -- generators in

12  different parts of the body, correct?

13  A.  Yes.

14  Q.  And you're advising, "Well, we can't do it all today and

15  let's break it down.  So what's hurting more, the neck or the

16  knee?"  Correct?

17  A.  Yes.

18  Q.  Okay.  And then you're advising that you are an

19  interventional plain -- pain clinic, correct?  Correct?

20  A.  They are at an interventional pain clinic.

21  Q.  Pardon?

22  A.  They are at an interventional pain clinic, yes.

23  Q.  This is a interventional pain clinic are your words?

24  A.  Yes.

25  Q.  And an interventional pain clinic performs interventions,

1    correct?

2    A.   Correct.

3    Q.   Okay.  And interventions can be injections, correct?

4    A.   Yes.

5    Q.   Okay.

6            MR. WEISS:  205 please.

7    BY MR. WEISS:

8    Q.   All right.  Now, this is continuing on with the same

9    patient a little bit later on during the conversation.

10           You: "As far as the medication goes, besides the

11   Norco," I assume the (PH) means spelling, I don't know, "or, is

12   any of the other medications actually helping you?  You're on

13   Gabapentin as well."

14           Patient: "I take Gabapentin because it does help

15   sometimes."

16           Next page, it's 206.  "Good.  So what, you're at a

17   very low dose.  So I'm actually going to go up on it.  It

18   should help a little bit more.  Alright."

19           Patient: "How high?"

20           You: "You're at the one-hundred."

21           Patient: "Mmhmm."

22           You: "So we could move up to three-hundred now."

23           Patient -- Patient: "They give, they put me on

24   three-hundreds and I start hallucinating from it.  So that's

25   why they lowered it to..."

1          You -- so you respond, "So what we could do is slowly

2    go up.  We could go up to two-hundred and do it three times a

3    day.  You should be fine with that.  Because..."

4          Patient: "Oh, okay."

5          You: "Do you want an injection in your shoulder?"

6          Patient: "I don't know where I want it.  All I know

7    it's hurting.  Mmhmm."

8          You: "That hurts?"

9          Patient: "Yes it does."

10         You: "What about on this side?"

11         Patient: "This side hurts too, but this is the one,

12   this whole side."

13         You: "That's fine.  I can get the injection done

14   today if you want."

15         Patient: "In my shoulder?"

16         You: "We can put some (unintelligible) in it.  Yea."

17         Patient: "Mmm mmm."

18         You: "No?"

19         Patient: "Mmm."

20         MR. CHAPMAN:  Art.

21         MR. WEISS:  Excuse me, Your Honor.

22         (Brief pause)

23   Q.  I think I left off with Patient: "Mmm mmm"

24         You responding, "No?"

25         Patient: "Mmm, no in here and my, not in my neck."

1          You: "No, I think the neck injection's going to help

2     the most because you have some ridiculer (PH) symptoms.  But

3     the shoulder injection I could do today because it does seem

4     arthritic."

5          Patient: "Mmhmm."

6          So here the patient again is presenting with

7     normal -- multiple pain generators, correct?

8     A.  Yes.

9     Q.  And you're recommending injections, correct?

10    A.  Yes.

11    Q.  And it's just a matter of which is the worst and which is

12    the one you're going to do today, and because of the nature of

13    the injections, you're just going to have to wait for another

14    day to do the others, correct?

15    A.  Yes.

16    Q.  Okay.  Which means since you're waiting, the patient has

17    to come back, correct?

18    A.  No.

19    Q.  Patient doesn't have to come back?

20    A.  No.

21    Q.  So the patient doesn't come back, foregoes the additional

22    injections and just continues to suffer?

23    A.  That's their choice, yes.

24    Q.  Okay.  And so you're good with just doing one and then

25    leaving the patient off?  You're not going to schedule the

Case 2:18-cr-20800-SJM-APP   ECF No. 436, PageID.4734   Filed 06/22/22   Page 58 of 76
Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

58

1   patient for a followup?

2   A.  If they want to, yes.

3   Q.  So you're going to broach that with the patient, correct?

4   A.  Yes.

5   Q.  And if the patient wants to come back in a couple of weeks

6   or a month, he or she will?

7   A.  Yes.

8   Q.  And there's nothing sinister or improper with asking the

9   patient if you want to come back for additional injections for

10  the other pain generators, correct?

11  A.  For the right indication, yes.

12  Q.  Yeah, okay.  Injections, we're talking about injections,

13  sir, right?

14  A.  For the right indication.

15  Q.  Yeah.  Okay.

16  A.  Yeah.

17          MR. WEISS:  Could we go to 211 please?

18          THE COURT:  Maybe we can get more done if we simply

19  ask him those types of questions that you wrapped up with, and

20  if there's some disagreement, then refer to the transcript

21  rather than reading these verbatim over and over again into the

22  record.

23  BY MR. WEISS:

24  Q.  Okay.  Following the Court's suggestion, there are

25  about -- about another six or seven similar passages with other

1    patients where injections are recommended by yourself, correct?

2    A.  Yes.

3    Q.  In fact, there's one patient who is getting his or her

4    injections at Beaumont, correct?

5            MR. WEISS:  You can take that down.

6    BY MR. WEISS:

7    Q.  And you counsel the patient about, "We're an

8    interventional Pain Center, we can do your injections, there's

9    no reason to go to Beaumont."  Do you recall that, sir?

10   A.  No.

11   Q.  Okay.

12           MR. WEISS:  Would you give me a moment, Your Honor,

13   'cuz that one I have to look up.

14           (Brief pause)

15   BY MR. WEISS:

16   Q.  All right.  Let us go to -- let's just go to 220, and just

17   in the -- in the area of speeding things up, the last

18   highlighted passage by you: "So that's fine.  I mean honestly

19   we could do the epidural too.  You don't need to go to Beaumont

20   for that.  We'll take care of all your pain management."

21           Now do you recall advising the patient about coming

22   back to you and not going to Beaumont?

23   A.  Yes.

24   Q.  Okay.  Thank you.

25           You also recorded a series of conversations between

1    yourself and Dr. Bothra, correct?

2    A.  Yes.

3    Q.  Okay.  And Dr. Bothra indicated to you that he was

4    considering leaving the practice to you, correct?

5    A.  Yes.

6    Q.  Okay.  He was getting -- he was going up in years, he was

7    thinking of cutting back, and someone like yourself was someone

8    that he envisioned taking over the practice, correct?

9    A.  Yes.

10   Q.  Now, at this point in time you're already talking to the

11   government, correct?

12   A.  Yes.

13   Q.  Okay.  You've already got your civil lawsuit lawyer,

14   correct?

15   A.  No.

16   Q.  You don't have him yet.  Okay.

17         But you're contemplating that lawsuit, correct?

18   A.  No.

19   Q.  You're not even contemplating it then.  Okay.

20         And so you're telling him about, you know, "I got my

21   family back East and they're not doing too well," and you're

22   going to go back East, correct?

23   A.  Yes.

24   Q.  Okay.  All right.  In fact, you're even telling Bothra,

25   you know, "I may get out of medicine altogether and just deal

1    with my family's businesses," correct?

2    A.  Yes.

3    Q.  Okay.  And you've got to leave and go back East, correct?

4    A.  Yes.

5    Q.  Okay.  And you look Dr. Bothra in the eye, you guys are

6    face to face, and you're telling him that you've got to go back

7    East to handle family matters, you've got to leave the Detroit

8    metropolitan area, correct?

9    A.  Yes.

10   Q.  But in reality you're already negotiating for a job in

11   Southfield, Michigan, correct?

12   A.  I'm not sure of the timeline.

13   Q.  But you do take a job in August of 2018 with Northland --

14   what is it, Northland Associates, Northland Radiology?

15   A.  Not in August.

16   Q.  Not in August?  Okay.

17          But you do have some -- well, let's back up for a

18   second.  You do go to Northland, correct?

19   A.  Yes.

20   Q.  Okay.  So you don't go back East, right?

21   A.  I do go back East.

22   Q.  But you've got this new job in Southfield, correct?

23   A.  It is a contract that was temporary.

24   Q.  Sir, my question was you've got this job in Southfield,

25   correct?

```
 1    A.   Yes.

 2    Q.   Northland, was it Radiology?

 3    A.   Yes.

 4    Q.   Was it Associates?

 5              And were you aware of the fact that when you took

 6    this job in late summer of 2018, that the owner of Northland

 7    had already been convicted of fraud in this building?

 8              MR. HELMS:  Objection.  It assumes facts not in

 9    evidence and also the witness has testified he didn't start in

10    the summer of 2018.

11              THE COURT:  Well, I -- I think it -- did you know

12    that, Doctor?

13              THE WITNESS:  No.

14              THE COURT:  Okay.  Go ahead.

15              MR. WEISS:  Thank you, Judge.

16              THE COURT:  The questions aren't evidence, ladies and

17    gentlemen, the answers are, okay?  All right.

18              Go ahead, Mr. Weiss.

19    BY MR. WEISS:

20    Q.   Sir, do you have a presence -- I'm sorry, I've got to go

21    to the microphone.  Sir, do you have a presence on the

22    Internet?

23    A.   Yes.

24    Q.   Okay.

25              MR. WEISS:  May I approach the witness, Your Honor?
```

1          THE COURT:  Yes.

2    Q.  I'm going to ask you if you can identify this.  It's three

3    pages.

4    A.  Yes.

5    Q.  Okay.

6          MR. WEISS:  May I retrieve it, Your Honor?

7          THE COURT:  Yes, mm-hmm.

8          MR. WEISS:  Thank you.

9    Q.  Are you able to identify those three pages, sir?

10   A.  Yes.

11   Q.  And would you tell the jury what they are?

12   A.  It's my LinkedIn profile.

13   Q.  LinkedIn?

14   A.  Yes.

15   Q.  Okay.  And that's social media on the Internet?

16   A.  It's networking for professionals.

17   Q.  Okay.  And part of it indicates what you're currently

18   doing, correct?

19   A.  Yes.

20   Q.  And part of it indicates what you've done?

21   A.  Yes.

22   Q.  Correct?  Okay.  And you indicate on your LinkedIn profile

23   Interventional Pain Physician, correct?

24   A.  Yes.

25   Q.  Okay.  And you indicate Northland Radiology, Inc.,

1    correct?

2    A.   Yes.

3    Q.   And you indicate August 2018 through June 2019, 11 months,

4    Southfield, Michigan, correct?

5    A.   Yes.

6    Q.   Okay.  So in July or August of 2018 when you were looking

7    Dr. Bothra right in the eye and telling him, "I've got this

8    family emergency in New Jersey, I got to rush back, I'm sorry,

9    Doctor, thank you for the opportunities that you've given me,

10   no one else would give me those opportunities but I've got to

11   go back to New Jersey," you're negotiating for a job in

12   Southfield, correct?

13   A.   No.

14   Q.   Okay.  But you told the jury earlier that you didn't leave

15   the TPC until November of 2018, right?

16   A.   Correct.

17   Q.   So between August, September, October and November, four

18   months, there's an overlap between TPC and Northland Radiology

19   Inc., correct?

20   A.   That date is just wrong.

21   Q.   This is off your site, correct?

22   A.   Yes.

23   Q.   You're familiar with the Hypocratic Oath?

24   A.   Yes.

25   Q.   All physicians take it?

Jury Trial Excerpt: Volume 14 • Monday, June 6, 2022

65

1   A.   Yes.

2   Q.   Before they become physicians?

3   A.   Yes.

4   Q.   Correct?

5        Part of it says that you're to do no harm to your

6   patients, correct?

7   A.   Yes.

8   Q.   Okay.  Part of it is to -- that whatever goes on between

9   you and your patient remains confidential, correct?

10   A.   Yes.

11   Q.   Okay.  So is it your testimony here that all of the

12   procedures that you did at the TPC did not harm your patients?

13   A.   No.

14   Q.   So you violated your oath, correct?

15   A.   No.

16   Q.   You -- okay.  Well, you either violated it or you didn't

17   cause harm, so which is it, sir?

18   A.   I don't know.

19   Q.   Okay.  And you definitely didn't keep what went on between

20   you and your patients confidential, did you?

21   A.   I did.

22   Q.   You did.  Okay.

23        But you recorded it, correct?

24   A.   Yes.

25   Q.   You gave the recordings to the government, correct?

1    A.   Yes.

2    Q.   You gave the recordings to your attorneys, correct?

3    A.   Yes.

4    Q.   They weren't all in that room with you and your patient,

5    were they?

6    A.   No.

7    Q.   And so you think recording them and disseminating them to

8    all these entities and individuals is still keeping that

9    communication confidential?

10   A.   I don't know.

11   Q.   You filed your lawsuit almost four years ago, correct?

12   A.   Yes.

13   Q.   The government still has not made a determination whether

14   or not to intervene, correct?

15          MR. HELMS:  Objection.  Calls for -- calls for

16   speculation.

17          MR. WEISS:  If he knows.

18          THE COURT:  You can answer if you know.

19          THE WITNESS:  I don't know.

20   BY MR. WEISS:

21   Q.   You don't know.  Okay.

22          How much money do you intend to realize as a result

23   of that lawsuit?

24   A.   None.

25   Q.   None?  Okay.

```
 1              But you filed it because you were concerned about
 2    supporting your family, right?
 3    A.   Yes.
 4    Q.   And now almost four years later you cavalierly say, "I
 5    don't expect to get anything"?
 6    A.   No.
 7    Q.   Okay.  By the way, in preparing your complaint, you took
 8    documentation from the TPC, correct?
 9    A.   Not physically.
10    Q.   Not physically.  Okay.
11              Do you know how various charts ended up as being
12    exhibits to your civil lawsuit?
13    A.   Pictures, yes.
14    Q.   Pardon?
15    A.   Pictures.
16    Q.   Pictures.  Okay.
17              So you felt it was okay to take a picture of a
18    confidential document and give it to someone else, correct?
19    A.   I don't know.
20    Q.   You don't know.  Okay.
21              The government had you identify your agreement
22    between yourself and the TPC, correct?
23    A.   Yes.
24    Q.   Okay.  And you indicated that you signed it on or about
25    February 14 of 2018, correct?
```

1   A.   Yes.

2   Q.   And at that point in time had you already been out to see

3   the TPC?

4   A.   Yes.

5   Q.   Okay.  So you saw what they were doing, correct?

6   A.   On a Saturday.

7   Q.   On a Saturday.

8        But you still saw what they were doing?

9   A.   Yes.

10  Q.   And you saw how they were doing it?

11  A.   No.

12  Q.   You didn't see how they were doing it?

13  A.   No.

14  Q.   So let's -- let's break that down a little bit.  You

15  physically went into the facility, correct?

16  A.   Yes.

17  Q.   There were patients there, correct?

18  A.   Yes.

19  Q.   Okay.  Patients were getting prescriptions, correct?

20  A.   No.

21  Q.   No prescriptions at all were issued that day?

22  A.   No.

23  Q.   Okay.  And were they getting procedures?

24  A.   Yes.

25  Q.   Okay.  And so you saw that?

1   A.  Yes.

2   Q.  All right.  And in the entirety of that day, you didn't

3   see one prescription being written, correct?

4   A.  I did not see any prescriptions written that day.

5   Q.  Okay.  And nor were prescriptions or medications discussed

6   with the patients?

7   A.  I'm not sure.

8   Q.  Okay.  Now, you've indicated that you have to stick around

9   because the contract talked about 90 days or three months

10  notice, correct?

11  A.  Yes.

12  Q.  Okay.  But that wasn't the only provision in that

13  agreement, was it?

14  A.  I'm not sure.

15  Q.  Well, the agreement encompassed seven pages, correct?

16  A.  Yes.

17  Q.  So I imagine in seven pages there was something more about

18  you've got to give three months notice if you're leaving,

19  correct?

20  A.  I'm not sure.

21  Q.  Okay.  All right.  Did you promise that you would

22  recognize and adhere to all professional ethics and customs?

23  A.  In the contract?

24  Q.  Yeah.

25  A.  Yes.

1    Q.   Okay.  Did you indicate that you would adhere to practice

2    in accordance with applicable standards of care?

3    A.   Yes.

4    Q.   Did you indicate that you would adhere to avoid all acts,

5    habits and use -- usages that might injure in any way directly

6    or indirectly the professional reputation and standing of TPC,

7    IPC or any or its employees, affiliates?  Did you do that?

8    A.   That would have been nice if the clinic did.  Yes.

9    Q.   I'm sorry what was the -- the little remark before you

10   responded yes?

11   A.   It would have been nice if the rest of the clinic upheld

12   those.

13   Q.   I see.  But we're talking about you now, sir, right?

14   A.   Yes.

15   Q.   You're the one that signed this document, right?

16   A.   Yes.

17   Q.   You're the one that is testifying under oath in front of

18   this jury?

19   A.   Yes.

20   Q.   So with all due respect, we're going to deal with you

21   today, okay?

22   A.   Yes.

23   Q.   All right.  You would adhere to all applicable federal,

24   state and local government laws, rules and regulations as well

25   as all licensure requirements, correct?

1   A.   Yes.

2   Q.   Okay.  You also indicated that you would maintain patient

3   records and confidentiality, correct?

4   A.   Yes.

5   Q.   But you didn't do that, did you, sir?

6   A.   I don't know.

7   Q.   You don't know?  Really?  Okay.  All right.

8         Now, you also promised in writing that you would not

9   compete.  Do you recall that, sir?

10   A.   Compete with...

11   Q.   Do you recall in the document, paragraph 9, entitled

12   "Covenant Not to Compete"?

13   A.   Yes.

14   Q.   Okay.  Do you know what a covenant not to compete is?

15   A.   Not entirely.

16   Q.   Okay.

17         (Brief pause)

18   Q.   Do you see paragraph 9 there, sir?

19   A.   Yes.

20   Q.   Okay.  "9(a) Independent Contractor Covenants."  You're

21   the independent contractor, right?

22   A.   Yes.

23   Q.   Okay.  So you "covenant, agree and warrant that during the

24   term of this agreement and for the two-year period thereafter,

25   independent contractor shall not directly or indirectly assist

1    or become involved in any activities in any capacity which are

2    competitive with any activity of TPC/IPC within 20-mile radius

3    of the Pain Center USA PLLC and Interventional Pain Center PLLC

4    located in the Tri-County area, paren, (Wayne, Oakland or

5    Macomb Counties of Michigan), close paren, existing as of the

6    date of termination of independent contractor as a physician or

7    in any other capacity without the prior written consent of

8    TPC/IPC."  Correct?

9    A.  Yes.

10   Q.  Okay.  You never obtained, consistent with paragraph 9, a

11   prior written consent of TPC/IPC to go work for Northland,

12   correct?

13   A.  It's not enforceable.

14   Q.  Oh, it's not enforceable.  Who told you that, sir?

15   A.  As an independent contractor.

16   Q.  Pardon?

17   A.  As an independent contractor.

18   Q.  Okay.  And did you go into a court of law and have a

19   judge --

20   A.  No.

21   Q.  -- tell you that this particular paragraph is not

22   enforceable?

23   A.  No.

24   Q.  Okay.  So you've now become a lawyer?

25   A.  No.

1   Q.  Okay.  But you believe that it's not enforceable, correct?

2   A.  Yes.

3   Q.  Okay.  Well, if that provision is not enforceable, then

4   what about the three-month notice?  Why did you stick around?

5   A.  Because it was a part of the contract.

6   Q.  I see.  But since you have some what you believe to be

7   legal understanding, did you research the fact that a contract

8   that asks for someone to perform something illegal is not a

9   valid contract?

10  A.  I didn't know that.

11  Q.  Okay.  So the cold, hard reality is you followed what you

12  want when it suited you and your interests and you ignore what

13  you want when it suited your interests, correct?

14          MR. HELMS:  Objection.  Argumentative.

15          MR. WEISS:  I'm just asking, Your Honor.

16          THE COURT:  It is a bit argumentative, Mr. Weiss.  Go

17  ahead.

18          MR. WEISS:  Okay.  Thank you.

19          THE COURT:  Sure.

20          MR. WEISS:  Your Honor, may I inquire -- I've got a

21  little bit more, I'm not sure how much, maybe a half hour or

22  so, and it's 4:16 right now.  I can continue on if the Court

23  wants but I'm not sure I'll be able to --

24          THE COURT:  Half hour would probably take us beyond

25  what I -- I was thinking we could break for the day, so why

1    don't we just call it a day right now, okay?

2              MR. WEISS:  Thank you, Your Honor.

3              THE COURT:  Yep.  All right, ladies and gentlemen,

4    4:16 p.m.  I think it's been a pretty good day, pretty

5    productive.  We'll go full days or continue to go full days and

6    try to make a little more progress.

7              I -- I assume this came from the jury, but a -- one

8    of the members of the staff received a request about difficulty

9    discussing -- not discussing the case and being emotionally

10   invested in the facts and all that sort of thing or that sort

11   of thing.  I understand that sort of question and we've had

12   those types of discussions with jurors in the past, especially

13   after their service.

14             I'm going to continue to tell you not to discuss the

15   case or the facts with -- with other people.  I think it's

16   certainly fine if you have a loved one or a friend or someone

17   in your family that you want to discuss the nature, the

18   demanding nature frankly of federal jury service with.  It's

19   just inappropriate to discuss the evidence and the issues in

20   the case.  We want you to keep an open mind as to the facts

21   that you're going to be deliberating on.

22             But if you feel, you know, pressure or if you feel

23   frustration about serving or any of those sorts of things, I --

24   I -- I think that that's all fair game to talk about with --

25   with loved ones.  I just urge you not to do any experimentation

1    about the facts, not to reveal evidence that's come to you in

2    court.  Those are things that you should keep to yourself until

3    you start deliberating with your fellow jurors.  And I will

4    assure you that once you do start deliberating, you'll probably

5    feel pressure from discussing the facts of the case too much.

6    So there will be a shift in your -- in -- in your mindset.

7         But I -- I have found in my limited contacts with you

8    and -- and from the reports I've received from the staff that

9    you are a -- a very good, well-intended group, and I want you

10   to continue those -- those efforts.  Be -- be aware we're

11   not -- we're not looking for, you know, a complete lockdown on

12   jury service.  We're asking you not to talk about the facts of

13   the case and the evidence, okay?  So if you'll bear that in

14   mind, I think that might help you.

15        Let us ask you to be back here -- I -- I -- I think

16   8:30 tomorrow will be good.  We may have a lengthy break or two

17   where we have to deal with some legal matters tomorrow.  I just

18   want you to be on guard for that.  But 8:30 and we'll continue

19   to make progress.  We'll go 8:30 to 4:30 roughly or 4:00

20   o'clock with a shorter lunch.

21        And I would like to conclude once again by giving you

22   my great thanks for your patience and hanging in there for such

23   a long time today, all right?

24        Let's all rise for our jurors now.

25        (Jury excused at 4:20 p.m.)

```
 1              (Non-testimonial proceedings continued on the record,
 2         jury not present)
 3              (Proceedings in the above-entitled matter adjourned
 4         to Tuesday, June 7, 2022)
 5                             -  -  -
 6                    C E R T I F I C A T I O N
 7              I, Linda M. Cavanagh, Official Court Reporter of the
 8    United States District Court, Eastern District of Michigan,
 9    appointed pursuant to the provisions of Title 28, United States
10    Code, Section 753, do hereby certify that the foregoing pages 1
11    through 76 comprise a full, true and correct transcript of the
12    excerpt of proceedings taken in the matter of United States of
13    America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis
14    and D-5 Christopher Russo, Case No. 18-20800, on Monday, June
15    6, 2022.
16
17                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
18                         Federal Official Court Reporter
                           United States District Court
19                         Eastern District of Michigan
20
21
22
23
24    Date: June 22, 2022
      Detroit, Michigan
25
```