```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION

 3
     UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5       vs.

 6   D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7   D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
 8
                          Defendants.
 9   _____/

10               JURY TRIAL EXCERPT: VOLUME 2

11        BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                 United States District Judge
12          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
13                Detroit, Michigan  48226
                 Wednesday, May 18, 2022
14
     APPEARANCES:
15
     For the Plaintiff          BRANDY R. McMILLION
16   United States of America:  BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
     For the Defendant          ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                              (Appearances continued next page)

24

25
```

```
 1   APPEARANCES:  Continued

 2   For the Defendant           ALAN T. ROGALSKI
     D-1 Dr. Rajendra Bothra:    Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
     For the Defendant           ROBERT S. HARRISON
 6   D-3 Dr. Ganiu Edu:          Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9   For the Defendant           RONALD WILLIAM CHAPMAN, II
     D-4 Dr. Davis Lewis:        Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16   For the Defendant           LAURENCE H. MARGOLIS
     D-5 Dr. Christopher         Margolis Law Firm
17   Russo:                      214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                         Official Court Reporter
25             (313) 234-2616 • www.transcriptorders.com
```

<pre>
 1                      TABLE OF CONTENTS

 2                                                    Page

 3   OPENING STATEMENT BY MR. MARGOLIS                  4

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15                        EXHIBITS

16   Identification              Offered    Received

17   NONE

18

19

20

21

22

23

24

25
</pre>

1         Detroit, Michigan

2         Wednesday, May 18, 2022

3                    —  —  —

4         (Proceedings in progress at 10:37 a.m., all parties

5         present, jury present)

6         THE COURT:  Mr. Margolis on behalf of Dr. Russo will

7    go next.  Go right ahead.

8         MR. MARGOLIS:  Good morning, ladies and gentlemen.

9    My name's Larry Margolis and it's my privilege to represent Dr.

10   Christopher Ross Russo.

11        I'm a little more old school than Mr. Chapman and Mr.

12   Helms so I'll be speaking from the podium, which I believe

13   Ms. -- Madame Court Reporter's shaking her head, says she

14   appreciates.

15        I want to give you a little background to start about

16   Dr. Russo.  Christopher Russo is 53 years old.  He grew up --

17   he was born on a vacation in Milwaukee, Wisconsin, but he ended

18   up growing up since the age of -- of one pretty much in Ann

19   Arbor, Michigan.

20        His father, his -- his biological father I should

21   say, is a neurosurgeon.  His mother is a registered nurse

22   originally, and then she put herself through dental school and

23   obtained her DDS.  They're in the courtroom today.  That's the

24   stepfather as well is here in support.

25        In 1976, shortly after Chris's bio -- biological

1  father finished his -- his training and -- and fellowship at

2  the University of Michigan in -- in neurology and he was just

3  about to start his -- going to private practice, Chris's dad

4  abruptly left the family.  His departure left Chris, his sister

5  Kathy -- he has a younger sister Kathy, she's a nurse, they're

6  all in health care -- his departure left Chris, Kathy and

7  Bonnie on their to fend for themselves.  Chris was deeply

8  wounded.  He was six or seven at the time.  As a result, the

9  family, like families do when they're that way, they became

10  very close and they remain extremely close to this day.

11        Like many hard-working single mothers, Chris's mom

12  instilled in him a strong work ethic, a determination to

13  succeed, the desire to get the good -- the best education that

14  he could.  And Chris quickly took to science.  He became laser

15  focused on going to medical school, just like his absent

16  father.  Education was paramount in the family household.  So

17  was helping and caring for others.

18        Chris went to the University of Michigan for

19  undergrad.  He graduated and went on to the University of

20  Michigan Medical School where he graduated in 1994.  After

21  medical school, Chris completed a four-year residency in

22  anesthesiology at the University of Michigan.  He later

23  completed a two-year fellowship in pain medicine and then

24  completed post-fellowship training in interventional pain

25  medicine at the distinguished Moffett Cancer Center in South

1    Florida.  He is also ACGME accredited.  He has 16 years of
2    education to practice pain.  He has a passion for treating pain
3    and he is highly trained in advanced interventional pain
4    management.
5            But how does someone like Dr. Russo treat pain?  What
6    even is pain?  Pain can be acute or it can be chronic, right?
7    Acute pain is sudden, sharp pain.  It doesn't last that long.
8    It goes away and hopefully it doesn't come back.  Chronic pain
9    is different.  Chronic pain is longstanding, beyond -- lasting
10   beyond the usual recovery periods, something we often have to
11   try and live with, advanced pain medicine.
12           This case involves chronic pain.  The patients the
13   government will introduce you to either did suffer from chronic
14   pain or claimed to suffer from chronic pain.  They came to the
15   Pain Center for help with their pain, their chronic pain.
16           Diagnosing and treating chronic pain is complicated,
17   as my young but distinguished co-counsel showed you in some of
18   the treatments and words that he spoke.  I guess I'll try to
19   dumb it down for us, for me.
20           Where in the body does the pain originate from?  What
21   causes pain?  How can we best treat it?  Once treated, how long
22   will the pain subside?  Does it go away forever?  When will it
23   come back?  You will see that pain therapy lessens the pain but
24   it doesn't get rid of it entirely.  We all have a different
25   physical etiology, a different biological makeup.  What may

1    work for you may not work for you -- or it may not work for me.

2    We all have different thresholds for pain.

3           Most importantly, pain is subjective.  Pain is

4    personal to the one feeling it.  There is no pain meter, no

5    blood pressure valve we can put on to measure our pain.  We

6    only know because we're told about it.  We have to rely on

7    another person's report of their pain to understand what state

8    of pain they're actually in.  Pain is hidden.  We can see

9    people limp, we see them on crutches or -- or -- or with a

10   cane, but we still don't know how they're feeling, right?  We

11   can't.  We have to take their word for it.  We have to trust

12   them.

13          Advanced pain doctors like Dr. Russo are no

14   different; they have to trust too.  There is nothing wrong with

15   a doctor trusting their patient.  They have to, that's what

16   they do, but we'll talk more about that in a little bit.

17          Now, the government has shown you some photographs.

18   They may offer you some videos too.  You will hear about a busy

19   waiting room or a parking lot that was full.  First, I want to

20   say this about that.  The parking lot was small and Dr. Bothra

21   had over 60 people working for him at the Pain Center.  The

22   Pain Center itself was rather small, and I believe one of my

23   distinguished co-counsels will show you the layout of the

24   place.  There were other businesses there too.

25          Most importantly, more importantly, I want you to

1    remember this point: pain doesn't discriminate.  Millions and

2    millions of Americans from all walks of life suffer chronic

3    pain, all races, all ethnicities, all genders.  Many are lower

4    income.

5         It is a sad but true fact of our health care system

6    that millions and millions of Americans don't have health care

7    insurance or underinsured.  This group, especially in our most

8    disadvantages -- disadvantaged communities, are often low

9    income.  Medicaid is intended to cover these individuals.  This

10   group deserves access to pain specialists, just like everybody

11   else, just like people with quality coverage.  Many medical

12   practices refuse to take Medicaid, they refuse to serve them at

13   all.  Those without private insurance, the uninsured folks,

14   there are millions of them.  They are relegated to providers

15   that serve low or lower income populations that take Medicaid.

16   Of course a specialized pain practice in a busy urban area is

17   going to be busy, of course, in a building that size, in a

18   parking lot like that, of course.

19        The government will try to use that fact that the

20   Pain Center was crowded or busy against us.  Don't let them.

21   These are real people who came to the pain clinic with real

22   pain and real reports of pain were made.  Most were already

23   receiving pain medication.  Most were already on long-term

24   opioid therapy.

25        It is also true that chronic pain patients are often

Case 2:18-cr-20800-SJM-APP   ECF No. 452, PageID.4890   Filed 07/18/22   Page 9 of 36
Jury Trial Excerpt: Volume 2 • Wednesday, May 18, 2022

9

1    higher risks and have preexisting problems, are

2    multisymptomatic, present with psychosocial issues.  They still

3    deserve care.

4            There is an unconscious or implicit bias toward

5    chronic pain patients, especially toward those in our most

6    disadvantaged communities.  Please take note of this implicit

7    bias as you hear the testimony when you judge the facts of this

8    case.  Resist stereotypes of the chronic pain patient.  A pain

9    doctor has to, Dr. Russo has to, so should you.

10           A trust relationship.  The doctor/patient

11   relationship begins with trust.  Pain specialists too begin

12   their relationships by trusting the patient; they have to.

13   Doctors trust us when they tell them our problems.  Strike

14   that.  Doctors trust us when we tell them our pain symptoms.

15   We in turn trust doctors when it comes to medical advice.  They

16   went to med school.  In Dr. Russo's case, fellowship and

17   post-fellowship training in diagnostic and pain procedures.

18           But doctors don't know everything.  They can be

19   wrong.  If we're not happy with the advice or treatment, we can

20   always get a second opinion, ask another doctor, reject the

21   advice, go back to our primary care provider who referred us to

22   the specialist in the first instance, or we can try and see if

23   it helps, stay and give it a chance.

24           The Pain Center provided elective treatment and

25   elective pain therapies.  This was not an emergency room, not

1    an ER.  They offered treatment options.  That's what the Pain

2    Center did.  Not every doctor is a good fit.  There's usually

3    another doctor we can go to.  If we're not happy with our

4    present doctor, what they're doing or saying, find another one.

5    There are even doctors that take Medicare and Medicaid.  Yeah,

6    the line, the wait might be long.  That's our health care

7    system.

8         The other piece to this trust relationship is the

9    doctor's trust of the patient.  If a -- if a doctor no longer

10   trusts a patient, the doctor is entitled to end the

11   relationship, time to end it, time to go, the trust is gone,

12   the relationship is broken.

13        But remember as you hear the government's case, no

14   grown person is forced to remain in a professional

15   relationship.  No adult person is forced to keep going, keep

16   seeing a doctor again and again for years if especially they

17   aren't getting relief for their pain.

18        Be highly skeptical of the government's narrative

19   here.  The majority, the vast majority of Dr. Russo's pain

20   patients did get relief from their pain.  These are adults who

21   made their own health care decisions.  The evidence will show

22   that Dr. Russo never forced any patient to receive any

23   medication or undergo any procedures.  He never performed, the

24   evidence will show, any procedure unnecessarily.  It was all

25   part of a treatment plan, fully legal, completely within the

1   standard of care.  Now, places like the Pain Center may not be

2   the types of places or the doctors that we or you are used to

3   seeing, but that doesn't make it illegal and it's not illegal.

4        Follow the science.  That's what my learned

5   co-counsel said or brother counsel said here today.  Scrutinize

6   the government's evidence.  Don't be distracted by big dollar

7   figures or -- or high pill counts as they will say or catch

8   phrases that they present to you in a vacuum without context.

9        The evidence will show that Dr. Russo sought to

10  diagnose and provide relief for pain.  It was his passion, it

11  was his education, and it was his specific intent when treating

12  these folks.  That is the only reason he sits here today,

13  because of doing his job.  He had a valid medical reason for

14  everything he did and the records will support that.

15       How, in fact, does a pain specialist like Dr. Russo

16  act on that specific intent of his to treat and manage chronic

17  pain?  I'll try to not redo what my brother counsel has already

18  done here, but I think it's important to emphasize because this

19  is -- this is complicated stuff.

20       First, the doctor diagnoses the pain, try and find

21  out where the pain comes from, what is the underlying

22  condition, the cause of the pain that's shooting down my leg

23  or -- or hurting my back.

24       To do this, and -- and it's how he is charged in some

25  of these counts, is that the government claims Dr. Russo

 1   performed unnecessary facet joint injections.  I think the term

 2   they're going to be spread about is facets, they call them

 3   facets.  The facets is actually on the body, but the -- the --

 4   the colloquial term in the business is facets, but we'll call

 5   them facet joint injection so we don't confuse.

 6        That is going to be shown to be completely untrue.

 7   He never performed any unnecessary injections.  The science

 8   will support that, the records will support that.  Facets were

 9   done to verify -- to seek, to verify the origin of the pain.

10   That's what a facet injection is all about, verification.  We

11   trust what the patient says, we go verify it with the

12   injection.  It's the standard of practice.  It's a standard of

13   care.  It's going on all over the country.  It's legal and

14   Medicare/Medicaid approved as well, reimbursed by all insurance

15   companies.

16        If the pain subsides, then the doctor has diagnosed

17   where the pain came from.  If not, the doctor should try a

18   different methodology.  That's the standard of practice.

19   That's why these folks came to the pain clinic in the first

20   instance.  They were in pain.  They were in chronic pain.  They

21   all had records and objective evidence of their chronic pain.

22   What is a pain doctor supposed to do in that situation?  What

23   is a 16-year specialist supposed to do?  Pain is subjective.

24        I don't know if my brother counsel mentioned this,

25   but there are 48 different types of possible facet joint

1    injections that could be made in the body, and that's because

2    there are 48 different types of facets: 14 facets in the neck,

3    24 in the -- facet joints in the thoracic spine, ten facet

4    joints in the lumbar spine.  Dr. Russo has done them all.  The

5    government is calling Dr. Russo a criminal for literally doing

6    his job.

7            While facet joint injections are diagnostic, done to

8    determine the origin of pain, some interventional pain

9    procedures treat the pain.  Mr. Chapman talked about

10   radiofrequency ablation or RFA.  That's done after a successful

11   facet diagnosed the origin of the pain.  RFA disables, it

12   doesn't destroy.  RFA, radiofrequency ablation, disables the

13   nerve endings that transmit the pain signals.  It lasts about

14   six months to a year depending on the person, but the pain

15   comes back.  RFAs work and are done because they give extended

16   relief to the area causing the pain.  RFA is completely legal,

17   a completely approved procedure like a facet joint injection,

18   reimbursed by Medicare and Medicaid.  It's what a pain

19   specialist does.  Dr. Russo is being charged for doing an RFA.

20   They say it's unnecessary.  Their records are going to debunk

21   that.  It's what a pain specialist does.  Facet joint

22   injections diagnose, RFAs treat.

23           But an RFA won't lessen pain in the other areas of

24   the body.  It only treats the particular area that the facet

25   diagnosed, the -- the facet injection diagnosed.  Often these

1  patients are multisymptomatic: they have neck pain, they have

2  back pain, they have leg pain, they have ankle pain.

3          The RFA Dr. Russo is charged for doing was warranted

4  by the workup, the history and physical of the patient and the

5  symptoms.  You can follow the science; Dr. Russo always did.

6          There's a host of other specialized pain procedures

7  that Dr. Russo performed.  He's well versed in them all and

8  regularly did them while at the Pain Center.

9          Government claims that every patient had the same

10  treatment plan, the same treatment protocol.  That's part of

11  their -- their narrative here, their -- their false narrative.

12  The evidence will show that is false.  Treatment plans varied

13  from patient to patient.  Mr. Chapman spoke about it with Dr.

14  Lewis.  It's the same thing with Dr. Russo.  They were

15  particularized to that patient's needs.

16          Yes, some treatment plans may look similar.  Lower

17  back pain is quite common, the most common reason people

18  present to a pain clinic such as the Pain Center.  A similar

19  treatment plan for a similarly situated patient does not show

20  fraud, does not show fraud.  It shows consistent and sound

21  practices to treat a common chronic pain condition.

22          Government has mentioned the Pain Center prescribed

23  back braces or durable medical equipment.  Back braces are

24  simply another option in the pain specialist's treatment

25  arsenal to treat back pain.  Occasionally Dr. Russo provided

1    back braces.  There's nothing criminal there.  Dr. Russo always

2    gave his patients a choice and the patient was always able to

3    refuse.  Pain is complicated.  The relief of pain is

4    complicated.  A back brace may help you but not me.  Why should

5    a pain doctor not offer someone with back pain a back brace?

6    One of the lawyers in the courtroom is wearing a back brace.

7    There is absolutely nothing wrong with a pain doctor offering a

8    patient a back brace for back pain.

9            Importantly, Dr. Russo had no financial incentive to

10   order back braces.  He received no bonus, no extra pay.  He

11   didn't really have any financial incentive to order any of the

12   ancillary services in this matter: back braces, physical

13   therapy, drug testing.  He didn't get extra money for that.

14   There was no reason that he would say, "Oh, just hand them out,

15   I'm gonna get -- gonna get rich from this."  No.  The pay was

16   the same for him.  He did it because there was a medical reason

17   to do it or he didn't do it at all.  That's what's going on

18   with Dr. Russo in his care.  Prescribing a back brace is

19   100 percent within the standard of care for treating back pain.

20           We've talked a bit about procedures that Dr. Russo

21   would perform.  Some are diagnostics, the facets; some are

22   therapeutic, RFA, radiofrequency ablation.  Now let's talk a

23   little bit about prescriptions.  The government makes great hay

24   with the fact that pain specialists working at a busy pain

25   clinic prescribed a large number of controlled substances over

1    the years.

2         First a bit of history on the treatment of pain and

3    other ailments by opioids and opioid derivatives.  Much of this

4    you guys like -- probably likely know but I think it's worth

5    stating for context.  Opium and opium derivatives have been

6    used for thousands of years.  8000-year-old archeologists --

7    8000-year-old clay tablets were found by archeologists that had

8    prescriptions for opium written on them.  Inscribed in the clay

9    in 8000-year-old tablets was a prescription for opium.  Opium

10   was used by the ancient Greeks, Romans, Egyptians, people in

11   the Middle Ages, all through Renaissance time in -- in Europe.

12        In the early U.S. opium was approved medication for

13   all sorts of maladies.  Doctors prescribed low doses for

14   children.  It was a panacea for all sorts of ailments.  One of

15   our Founding Fathers, Thomas Jefferson, who was skeptical of

16   medical treatments of his day, took opium for his chronic

17   dysentery, and made him feel so much better he ended up growing

18   poppies on his Monticello estate.

19        Morphine was sold over the counter in soothing syrups

20   for fussy children.

21        THE COURT:  Let's stick with the --

22        MR. MARGOLIS:  Thank you, Judge.

23        THE COURT:  -- facts -- facts of the case there, Mr.

24   Margolis.  Go right ahead.

25        MR. MARGOLIS:  Thank you.

```
 1              Today we don't treat cholera, dysentery, smallpox
 2    with opium.  It does, however, remain an important and approved
 3    treatment protocol, treatment therapy for chronic pain.  Opioid
 4    therapy, long-term opioid therapy is an effective tool to
 5    lessen pain.  It is within the standard of care for doctors to
 6    prescribe, including chronic pain patients.
 7              But treatment by opioids doesn't cure the problem.
 8    The effects wear off, the pain comes back.  Controlled
 9    substances treat, they don't cure.  The goal, as Mr. Chapman
10    said, of interventional pain medicine is to intervene, where's
11    the pain come from, to use every available tool in the modern
12    medical arsenal to find the pain, relieve the pain, to attempt
13    a myriad of treatments, to manage the pain.  That's the goal,
14    that's the intent here.
15              It should not -- should not surprise us that a pain
16    specialist prescribes medication that has been used for
17    thousands of years.  That's why the primary care provider and
18    other doctors refer their chronic pain patients to places like
19    the Pain Center: to manage pain in a multidisciplinary fashion;
20    to reduce dependence on opioid therapy with interventional pain
21    procedures; to lower the doses; to provide other treatment
22    options: physical therapy, back braces, facets, RFA, Rhizotomy,
23    nerve blocks, trigger -- trigger point injections.  Find the
24    cause of the pain, treat the source, manage the symptoms of
25    pain.
```

1      There is no one perfect option.  There is no

2   one-size-fits-all.  Pain specialists don't just do opioid

3   therapy.  That's not why they're coming.  That's not why

4   they're sent there.  They don't just do injections.  Trying a

5   course of both is not illegal.  It is not outside the standard

6   of care.  It is sound medical practice.

7      That's why it's the government's theory that these

8   patients were forced or somehow unlawfully induced to -- to --

9   to do this to get that.  The government will never admit to you

10  that it's perfectly legal to do both, it's perfectly legal to

11  do both.  It's called following a care plan or a plan of care.

12  I'll say it both ways.  It's perfectly legal, wholly in the

13  standard of practice, accepted and undertaken every day in

14  every state in our country.  It's going on right now.  Be

15  highly skeptical of the government's narrative.  Follow the

16  science.  Don't be fooled by big numbers of controlled

17  substances prescribed over the course of years or high dollar

18  figures.

19      The Pain Center was a multidisciplinary practice with

20  over 60 employees.  It had six doctors, a psychiatrist, a

21  chiropractor, addictionologist, physical therapist, RNs, MAs,

22  PAs and a large administrative staff.  That's a lot of

23  overhead.  It was situated in an urban community filled with a

24  large number of disadvantaged and uninsured citizens, all who

25  claimed to suffer from chronic pain, all who had their chronic

1    pain verified.

2           The government wants you to disregard all that, all

3    those people working there, working for the pain patients, and

4    they'll say, "Look at this, look at the prescriptions, look at

5    all the money made."  I'm asking you all to follow the science,

6    look at the records, look at the charge, listen to the witness

7    describe the pain they feel, the pain they've had.  That's what

8    Dr. Russo did.  He treated his patients in good faith, exactly

9    as he was educated and trained to do, every one of them.

10          Speaking of science, I want another -- make -- I want

11   to make another point that may come up during this trial.  It

12   is true that the Pain Center didn't practice holistic medicine.

13   Nothing in the law you will hear, the CDC guidelines or any

14   local coverage determinations from any of the insurance

15   regulators, nothing requires doctors, pain doctors or any

16   doctor for that matter to practice holistic or spiritual

17   healing to heal pain.  Holistic and spiritual healing is one

18   way that people treat a variety of ailments.  Dr. Russo didn't

19   practice holistic medicine.  He was not a spiritual healer.  He

20   practiced the way he was taught at the University of Michigan

21   Medical School, during his residencies, his fellowship, his

22   post-fellowship accreditation.  New Age medicine has its place,

23   has its place in treating pain, but it is unlikely to relieve

24   the chronic pain caused from metal screws in your back or neck.

25          I want to talk a little bit about how Dr. Russo came

1   to be working at the Pain Center with the other folks here.

2   One answer: Dr. Ron Kufner.  Government spoke briefly about Dr.

3   Kufner.  Dr. Russo and Dr. Kufner trained together years ago at

4   the Moffett Cancer Center in South Florida.  They were there

5   working on treating cancer pain patients.  They became friends,

6   stayed close over the ensuing years, kept in touch, how you

7   doing, where you working, that kind of thing.

8         In May of 2014 Dr. Kufner started working with Dr.

9   Bothra at the Pain Center.  At this time Chris was at a private

10  clinic in Grand Rapids.  Chris thought highly of Dr. Kufner's

11  skills.  He trusted him as a doctor to inject people.  Shortly

12  after Kufner joined Dr. Bothra, he tried to get his friend

13  Chris, "Come on over, join me, I have a new job.  Dr. Bothra's

14  trying to enlarge his practice.  We -- we could use someone

15  with your skill set."  Kufner made a real hard sell.  This is

16  2014.  Kufner made a real hard sell, and Chris agreed to go out

17  and visit, check the place out.

18        Chris traveled from Grand Rapids to Detroit to -- to

19  see and check out the practice and meet Dr. Bothra.  This was

20  the first time Dr. Russo had met Dr. Bothra, and Dr. Bothra

21  made quite an impression on him.  He had a large staff.  He had

22  photographs of himself with Mother Teresa shaking hands, some

23  high-level figures in the country and outside the country.  It

24  was -- it was a very impressive place.  Dr. Bothra was an

25  impressive man to Dr. Russo.

1       And Dr. Bothra spoke about at this time that he

2 wanted to expand. He -- he planned on expanding the place

3 and -- and adding a surgical center, and that was one of the

4 reasons he was so interested in -- in bringing Dr. Russo over,

5 and Dr. Kufner knew this and they talked about it. Again, he

6 liked the fact of -- of -- of Dr. Russo's training, his

7 accreditation.

8       A job was offered to him on the spot, 2014.

9 Government's indictment is 2013. Christopher was in Grand

10 Rapids still in 2013. He was in Grand Rapids in 2014. He was

11 in Grand Rapids in 2015. He was in Grand Rapids up until June

12 of 2016.

13       So anyway, back to Kufner. Chris didn't take the

14 job. He didn't love where he was working in Grand Rapids but

15 he wasn't ready to leave either. He had just bought his first

16 condominium, his first property at the age of 46. He had a

17 girlfriend, he had a bunch of friends there. He -- he -- he

18 liked being by the lake. Yeah, his family was in -- in this

19 part of the state in Southeastern Michigan. He's a huge Lions

20 fan, Tigers fan. And he spent a year doing his -- his rounds

21 during his residency or rotation in downtown Detroit and he

22 liked that too. So he was a little torn but he just wasn't

23 ready. So he said to -- to his buddy Ron, he said, "Ron,

24 thanks but no thanks. I think I'm going to stay put. I'll see

25 if this works out at my place in Grand Rapids."

Case 2:18-cr-20800-SJM-APP ECF No. 452, PageID.4903 Filed 07/18/22 Page 22 of 36
Jury Trial Excerpt: Volume 2 • Wednesday, May 18, 2022

22

1          Ron Kufner was persistent.  He continued to recruit

2    Chris, tried to get him to come on over.  Two years later,

3    we're in 2016 now, Kufner contacted Dr. Russo and -- and --

4    and -- and I don't want to say begged, but he urged him to meet

5    with Dr. Bothra's business manager, a man named James Jayakar.

6    Now, Russo, Dr. Russo didn't know Mr. Jayakar but Dr. Kufner

7    did well and Dr. Kufner vouched for him and he -- he said,

8    "Just meet him, he -- he wants to -- he wants to talk with you

9    and -- and -- and really, really put a hard sale on you."

10          And Dr. Russo said, "Okay.  But, you know, I -- I --

11    I drove down there and I -- I've seen the place and I'm -- you

12    know, I -- I -- I don't want to do that again."  And Dr. Kufner

13    said, "Don't worry, he wants to take you out to dinner.  He's

14    going to drive out to Grand Rapids from Detroit or -- or

15    where -- in the metro area to see you and talk to you about

16    this."

17          So that's what happened.  Dr. or Mr. Jayakar drove

18    across the state, took Dr. Russo out for a fancy dinner.  At

19    the dinner Dr. Russo accepted Dr. Bothra's offer.  This was in

20    late May or maybe the first part of June.  He started working

21    that next week, June 6th of 2016.  That's the date Dr. Russo

22    joined Dr. Bothra's practice at the Pain Center.

23          And for the next year and a half Dr. Russo and Dr.

24    Kufner both worked at the Pain Center together.  Dr. Russo

25    signed on as an independent contractor, and as promised by Dr.

 1    Kufner, Jayakar and Bothra when he had spoken to him before,

 2    Dr. Russo was allowed to practice in his own way, under the

 3    Pain Center umbrella, of course, but his own way to practice.

 4         Transition was not always easy.  It was a new

 5    environment.  It was much busier, more crowded than the place

 6    he had worked at in Grand Rapids, very fast paced.  Took him a

 7    minute to get up to speed.  And some of the patients could be

 8    challenging, of course.  And Dr. Bothra was a very hard worker,

 9    he could be demanding.  But Dr. Russo was able to practice

10    medicine the way he was trained, his own way.  Dr. Bothra

11    permitted his doctors to do that.  He actually encouraged his

12    doctors to do that.

13         But unlike in Grand Rapids, Dr. Russo had

14    independence here now.  He liked being considered an

15    independent contractor.  He had never been a 1099 contract

16    employee before, his own boss.  Yeah, he was responsible for

17    paying his own taxes and he didn't like that very much, and he

18    had to provide for his own health insurance and he didn't get a

19    4041k or any retirement plan from Dr. Bothra.  But being a 1099

20    employee internally -- internalized.  It -- it -- it gave him a

21    sense of separation, independence, the freedom to do things his

22    own way.

23         He created his first LLC, his own private independent

24    company separate from Dr. Bothra and the others.  Dr. Bothra's

25    staff, large staff that he had, did all -- handled all the

Case 2:18-cr-20800-SJM-APP  ECF No. 452, PageID.4905  Filed 07/18/22  Page 24 of 36
Jury Trial Excerpt: Volume 2 • Wednesday, May 18, 2022

24

1    billings, all the business matters, licensing, credentialing,

2    took care of his malpractice insurance, all the red tape that

3    goes along with being in the practice of medicine.

4            THE COURT:  I think it's better if the jurors saw the

5    evidence of this rather than hearing your --

6            MR. MARGOLIS:  Okay.

7            THE COURT:  -- testimony about it, Mr. Margolis, so

8    if we could kind of maybe talk about what the overall evidence

9    is going to show in terms of relevant --

10           MR. MARGOLIS:  That's fine.

11           THE COURT:  Go ahead.

12           MR. MARGOLIS:  Thank you, Judge.

13           The evidence is going to show that Dr. Russo's good

14   friend, Ron Kufner, started to have problems with Dr. Bothra,

15   and Chris was aware of this.  This is -- I think, I believe the

16   government will show or we will show, it'll be part of this

17   case, that it was in 2017 that Dr. Kufner started talking about

18   leaving Dr. Bothra, and Chris knew this.  He had spoken to --

19   to Dr. Kufner.  They were -- they were good friends.  Dr.

20   Kufner was the one who got him there, remember.  And he never

21   told him why.  Chris is like, "What's going on?  Why -- what's

22   going on with you and -- and -- and Dr. Bothra?"  And Dr.

23   Kufner would tell Chris, "Well, it's just between him and I.

24   It's a business matter.  It's about money that's owed.  It

25   doesn't concern you.  It doesn't concern you.  It's about me

1   and Dr. Bothra."

2          So Chris knew Kufner may be leaving.  What Dr. Russo

3   didn't know is that Dr. Kufner's leaving could impact him.  And

4   Dr. Russo didn't know why Kufner was specifically leaving.  Dr.

5   Kufner never told Chris.  Dr. Kufner never told Chris that he

6   was making secret recordings and working with the federal

7   government to take down the whole practice and Chris too.  He

8   failed to mention that fact when he was speaking to his old

9   friend.  Dr. Kufner had convinced Chris to uproot his life,

10  change his career and move from the other side of the state,

11  and he secretly plotted to take down the practice.

12         Dr. Kufner will come before you soon to testify in

13  this case against his old friend, Dr. Russo.  When Mr. Kufner

14  now does, please remember his secret lawsuit that he prepared

15  and didn't tell Dr. Russo or anybody at the practice about

16  while he was working there.  Please remember his deception to

17  his old friend, his self-interest, and most importantly, please

18  remember the future sentencing he will be facing in this very

19  courtroom for the crimes he committed.

20         Dr. Kufner's betrayal of Dr. Russo is the saddest

21  aspect of this case.  His testimony against his old friend will

22  be a shameful --

23         THE COURT:  Argumentative --

24         MR. MARGOLIS:  Sorry, Judge.

25         THE COURT:  -- Mr. Margolis.  Go ahead please.

1          MR. MARGOLIS:  The other Pain Center doctor who will

2    testify for the government is Dr. Backos.  We don't have much

3    to say about Dr. Backos because his practice was entirely

4    separate from Chris's, from Dr. Russo's.

5          And I -- I should mention I -- I -- I skipped ahead

6    about Dr. Kufner.  Dr. Kufner worked on his own too.  He was at

7    Eastpointe.  That was five miles from where Dr. Russo worked.

8    They had separate practices.  Kufner was his own man, just like

9    Dr. Russo, but Kufner was able to do it out of view.  That's

10   what was going on at Eastpointe with Dr. Kufner.  That's why

11   you will see, you will hear that he took the plea of guilty

12   that he did.

13         Back to Dr. Backos.  Dr. Backos, like Kufner, saw his

14   own patients.  Unlike Dr. Russo, Dr. Backos was not a pain

15   specialist.  He was an addictionologist.

16         One important point that I want you to remember about

17   Backos, Backos was with Dr. Bothra since 2012.  Dr. Russo

18   arrived in 2016.  Dr. Backos when he testifies you will hear

19   pled guilty to crime, a crime, not crimes he committed, but a

20   independent crime he committed in 2014, two years before, over

21   two years before Dr. Russo arrived.  Dr. Backos pled to

22   unlawfully prescribing one individual count, not conspiracy,

23   one individual count of unlawfully prescribing narcotics or

24   controlled substances.

25         Backos, the evidence will show, was also known to

1    prescribe in high doses like Dr. Kufner.  It is not surprising

2    he pleaded guilty to doing so too.  We don't expect Dr. Backos

3    to offer much evidence relevant to Dr. Russo notwithstanding

4    his incentive to avoid a lengthy prison sentence.

5            Dr. Kufner and Dr. Backos are not the only doctors

6    the government will use to try and meet its heavy burden in

7    this case.  There will be two others, and I won't spend much

8    time on them.  First is Dr. Patel.  I believe they mentioned

9    Dr. Patel in their opening statement.  Fresh out of -- fresh

10   out of his residency when he joined the Pain Center, he signed

11   on at a higher pay than Dr. Russo and I believe most of the

12   others.  Most importantly, he had never worked -- and they

13   admitted this or they said it as well I believe -- Patel had

14   never worked in a private practice before.

15           What they didn't mention and I believe the evidence

16   will show is that Patel favors a holistic or New Age approach

17   to the treatment of chronic pain.  Nothing's wrong with that,

18   nothing is wrong with that, but I think it's important to note

19   that his philosophy is vastly different than most others when

20   it comes to treatment of chronic pain.

21           Some similarities Patel has with Kufner.  Patel, like

22   Kufner, the evidence will show, filed a secret lawsuit against

23   Dr. Bothra, the Pain Center and others.  Dr. Kufner's secret

24   lawsuit, and I -- I skipped over this by accident, didn't --

25   wasn't brought against Dr. Russo.  He only sued Dr. Bothra and

1    the Pain Center.  Dr. Patel brought his lawsuit against

2    everybody, which is very strange because he didn't even really

3    know Dr. Russo.  Patel never -- the evidence will show Patel

4    never shadowed Dr. Russo.  Patel was never trained by Dr.

5    Russo.  Dr. Patel never sat in on any meeting or patient

6    consult with Dr. Russo.  The evidence will show Dr. Patel was

7    at the Pain Center for a very short time and he immediately

8    started capitalizing on it.

9         But Patel, the evidence will show, and all his

10   contriving also provides an important truth, an important fact

11   for your jury's consideration, for your all's consideration of

12   the evidence, he provides a telling admission.  First a little

13   background that the evidence will show.  Patel called the

14   government, I believe Mr. Helms said, on his first day of work

15   or in the first week of work he called the government to -- to

16   say, "What's -- this is weird.  What's going on here?"

17        Soon after, he starts recording his interactions with

18   staff and the doctors.  He starts recording his interactions

19   with patients, confidential communications, mind you.  He stays

20   in contact with the government over the next days and weeks.

21   The evidence will show he communicates with the FBI via phone,

22   via -- via text, phone, and plans a meeting.

23        But then Dr. Patel has a change of heart.  He cancels

24   an upcoming meeting with the FBI.  "I was wrong.  The doctors

25   at the Pain Center can practice independently, can practice in

1    their own fashion.  Bothra allows for it."

2           MR. HELMS:  Your Honor, I'm -- I'm sorry.  I have to

3    object.  This is -- this is misstating any evidence that will

4    come in in this case.

5           THE COURT:  Well, I don't know, I don't know.  He

6    says that it's going to be the evidence in the case, and he's

7    leading the jury through the evidence that he expects it to

8    show.  If it doesn't, the jury will note that and act

9    accordingly.  So that's overruled.

10          Let's continue.

11          MR. MARGOLIS:  Thank you, Judge.

12          That's what we expect the evidence to show and it's

13   what was fact: the doctors at the clinic were independent, able

14   to use their own judgment.  This is what their star witness

15   advised we believe the evidence will show.

16          He made this call to the FBI, the evidence will show,

17   while he was working with them.  This fact creates a gaping

18   hole in the government's narrative.  Independent judgment in

19   the treatment of patients is the opposite of a conspiracy, and

20   it was said, if it was said, while the man was working for the

21   government, so he had no reason to lie.  Remember that

22   admission when he testifies.

23          The last doctor to testify for the government will be

24   Dr. Mehta.  Dr. Mehta was hired by the prosecutor years after

25   all the facts in this case took place.  The government is

1  paying to fly him in from New York City and has a specially

2  date set for him.  Mehta, like Patel -- Dr. Mehta works in a

3  large hospital.  He has no experience, no great experience in

4  private practice I don't believe, let alone one in a community

5  like the Pain Center served.

6         Dr. Mehta will offer his opinion about Dr.'s Russo --

7  Dr. Russo's treatment of two patients named in the indictment,

8  MM and -- and DS.  Those counts involving two patients are the

9  only specific allegations the government makes against Chris in

10 the entire 38-page, 57-count indictment.  Dr. Mehta will not

11 offer any competent or convincing evidence relative to Dr.

12 Russo's care of those two patients.  Nothing Mehta says

13 specific to Dr. Russo will show any crime.

14        We didn't have to travel to New York City to find our

15 expert.  Ours is local, a man named Anthony Chiodo.  Dr.

16 Anthony Chiodo will come and testify to his opinions about Dr.

17 Russo's care of those two patients.  Dr. Chiodo has extensive

18 experience and impeccable qualifications, U of M professor

19 who's going to put his hard-earned reputation on the line in

20 front of you all.  He will tell you Dr. Russo's care and those

21 only two specific patients in the charging document was sound,

22 was reasonable within the standard of practice.

23        Importantly, Dr. Chiodo will emphasize the role of

24 the advanced pain practitioner relative to utilizing as many

25 effective pain strategies as possible to mitigate the high --

Case 2:18-cr-20800-SJM-APP  ECF No. 452, PageID.4912  Filed 07/18/22  Page 31 of 36
Jury Trial Excerpt: Volume 2 • Wednesday, May 18, 2022

31

 1    the need for high doses of pain medication.  That's the reason

 2    you do the various strategies.  You try the different

 3    treatments.  The government is attacking these folks, Dr.

 4    Russo, this clinic, for trying different treatment, trying

 5    different strategies.  Dr. Chiodo will debunk that false

 6    narrative.

 7            I've spoken too long.  I will not discuss much more

 8    about what we expect the other patients of the pain clinic to

 9    testify to.  I will offer this fact about the patient

10    witnesses, and I believe Mr. Chapman also did, so we're just

11    reemphasizing.  Every one of them came to the Pain Center --

12    every one of them that came to the Pain Center had chronic

13    pain.

14            Every patient witness Dr. Russo saw had their chronic

15    pain verified.

16            Every patient who received controlled substances from

17    Dr. Russo was in pain and claimed to be in pain.

18            Every patient signed an opioid agreement.  Mr.

19    Chapman put that up on the screen.  That's the procedure,

20    that's the practice.

21            Most every patient already had a long history of

22    opioid therapy.

23            Every patient had their MAPS run.  I don't believe

24    that has been mentioned yet, but MAPS is the Michigan program

25    to see what else this person might be taking.  It's an instant

1    program where a doctor can ask a nurse or press a button and

2    see a breakdown of everything this person's been prescribed in

3    the last two years I believe.

4         So they didn't get their pain medication handed out

5    to them.  They had to have their MAPS run.  They had an exam.

6    They had problems that the doctor was trying to treat, every

7    one of them, before they got their prescription.

8         You know who you won't see as patient witnesses?

9    Young people like some of you here today.  It's interesting.

10   You won't see known drug dealers.  You won't see people who

11   obtained drugs from any other doctor or employee outside of the

12   Pain Center or outside of the Eastpointe clinic.  They went in,

13   saw the doctor, expressed their pain, had their MAPS run, low

14   dose opioid therapy, drug testing to ensure compliance, verify

15   through imaging and procedures.  That's the science, that's

16   what pain specialists do.  I'm just dumbing it down, they're

17   much smarter than I am, but that's what they do.  If you follow

18   the science, the records of every patient will demonstrate Dr.

19   Russo provided good care, sound medicine.

20        I will conclude -- fortunately, right? -- with a bit

21   about your role in this trial.  Now, the Court is going to

22   instruct you on the law and it's vitally important that we

23   follow it.  As the good judge has indicated, your role

24   pertaining to Dr. Russo is to judge him, the evidence against

25   him individually, his case, his care of his patients, of his

1   care patients, independent from the others.  What, if anything,

2   will the actual evidence show which specifically pertains to

3   Dr. Russo?  What do the records show of his care?  That is all

4   that matters here for us.  I represent Christopher Russo.  That

5   is all you should focus on as you think about Chris.

6           This is a complicated case.  There are four

7   defendants.  We're dealing with unusual and arcane subject

8   matter.  Your task is enormous.  My job, in part, if you can't

9   tell, is to try to simplify it for you.  So I will finish not

10  by telling you what the vast and often I believe misleading

11  evidence the government will present to you shows.  I will

12  conclude by telling you what it will not show.

13          The government will present video evidence, they --

14  they spoke about it in their opening, to try and meet their

15  heavy burden in this case.  There will be --

16          THE COURT:  Mr. -- Mr. Margolis, this is like --

17  you're -- you're on to like 50 minutes here.

18          MR. MARGOLIS:  I'm --

19          THE COURT:  Let's wrap it up please.

20          MR. MARGOLIS:  I'm wrapping it up, Your Honor.

21          THE COURT:  Come on now.

22          MR. MARGOLIS:  I'm really almost done.

23          THE COURT:  Yeah.  Come on now.

24          MR. MARGOLIS:  There will be no video evidence of Dr.

25  Russo in this case.

1      The government spoke about audio recordings that it

2  wants to present, that it will present to try to meet their

3  high burden.  There will be no audio recordings of Dr. Russo in

4  this case.

5      The government will call dozens of witnesses in an

6  attempt to meet their high burden.  Many of them he never

7  treated, never saw.

8      Your role here is to judge Dr. Russo by what they can

9  actually prove to you that he did and prove to your

10  satisfaction beyond a reasonable doubt.  This case is going to

11  be littered with doubt, holes gaping.

12      He can't be found guilty of these horrendous crimes

13  simply because of his working at the Pain Center.  They can

14  prove he's a short-term employee, contract employee in a

15  high-volume pain clinic who treated difficult chronic pain

16  patients in a struggling community.  That is all they'll be

17  able to prove against Dr. Russo, and we will stipulate to those

18  facts.

19      In a case of this magnitude with these horrendous

20  crimes charged against him, you should expect your government

21  to come with overwhelming evidence of Dr. Russo's individual

22  criminality.  They won't come close, they can't.  It just

23  didn't happen.  We are here fighting for Dr. Russo 's life.  He

24  is an innocent man.  Your role is to ensure justice is done by

25  him, justice for Dr. Russo.  Thank you.

1              THE COURT:  All right.  Thank you very much, Mr.

2    Margolis.

3              (Excerpt concluded at 11:33 a.m.)

4                        —   —   —

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 35 comprise a full, true and correct transcript of the

7    proceedings taken in the matter of United States of America vs.

8    D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5

9    Christopher Russo, Case No. 18-20800, on Wednesday, May 18,

10   2022.

11

12                          s/Linda M. Cavanagh
                            Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                          Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15

16

17

18

19   Date: July 14, 2022
     Detroit, Michigan
20

21

22

23

24

25