```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION


 3
     UNITED STATES OF AMERICA,
 4
                         Plaintiff,
 5       vs.

 6   D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7   D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
 8
                         Defendant.
 9   _____/

10              JURY TRIAL EXCERPT: VOLUME 4

11       BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                 United States District Judge
12          Theodore Levin United States Courthouse
                 231 West Lafayette Boulevard
13                Detroit, Michigan  48226
                  Friday, May 20, 2022
14
     APPEARANCES:
15
     For the Plaintiff          BRANDY R. McMILLION
16   United States of America:  BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
     For the Defendant          ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                              (Appearances continued next page)

24

25
```

Case 2:18-cr-20800-SJM-APP   ECF No. 453, PageID.4919   Filed 07/18/22   Page 2 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

2

```
 1   APPEARANCES:  Continued

 2   For the Defendant            ALAN T. ROGALSKI
     D-1 Dr. Rajendra Bothra:     Warner, Norcross & Judd LLP
 3                                2000 Town Center
                                  Suite 2700
 4                                Southfield, Michigan  48075
                                  248-784-5055
 5
     For the Defendant            ROBERT S. HARRISON
 6   D-3 Dr. Ganiu Edu:           Robert Harrison & Associates
                                  40950 Woodward Avenue
 7                                Suite 100
                                  Bloomfield Hills, Michigan  48304
 8                                248-283-1600

 9   For the Defendant            RONALD WILLIAM CHAPMAN, II
     D-4 Dr. Davis Lewis:         Chapman Law Group
10                                1441 West Long Lake Road
                                  Suite 310
11                                Troy, Michigan  48098
                                  248-644-6326
12
                                  JEFFREY G. COLLINS
13                                Collins & Collins, P.C.
                                  1323 Broadway
14                                Suite 800
                                  Detroit, Michigan  48226
15                                313-963-2303

16   For the Defendant            LAURENCE H. MARGOLIS
     D-5 Dr. Christopher          Margolis Law Firm
17   Russo:                       214 South Main Street
                                  Suite 202
18                                Ann Arbor, Michigan  48104
                                  734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25              (313) 234-2616 • www.transcriptorders.com
```

Case 2:18-cr-20800-SJM-APP   ECF No. 453, PageID.4920   Filed 07/18/22   Page 3 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

3

TABLE OF CONTENTS

Government Witnesses:                                              Page

RONALD KUFNER

    Direct Examination by Mr. Helms                             5

EXHIBITS

| Identification | Offered | Received |
|---|---|---|
| Government Exhibit No. 151<br>Dr. Ronald Kufner Employment<br>Contract | 12 | 12 |
| Government Exhibit No. 173,<br>Note of Dr. Bothra re: DME | 43 | 43 |

```
 1              Detroit, Michigan
 2              Friday, May 20, 2022
 3                      -  -  -
 4              (Proceedings in progress at 12:56 p.m., all parties
 5              present, jury present)
 6              THE COURT:  Next from the United States.
 7              MR. HELMS:  Yes, Your Honor.  The government calls
 8     Dr. Ronald Kufner.
 9              THE COURT:  Okay.
10              MR. HELMS:  It will take us a moment to retrieve him.
11              THE COURT:  In-court break if you want to stretch,
12     talk to each other, relax, review your notes.
13              (Brief pause)
14              THE COURT:  Okay.  Here's our witness.  Back to
15     business.  Good afternoon, sir.
16                   R O N A L D   K U F N E R
17     was called as a witness herein, and after being first duly
18     sworn to tell the truth and nothing but the truth, testified on
19     his oath as follows:
20              THE WITNESS:  Yes, I do.
21              THE COURT:  Very good.  Go ahead and have a seat in
22     the chair.  Now, the first thing is for the time you're
23     testifying, I'm just going to ask you to remove your mask.
24              THE WITNESS:  Okay.
25              THE COURT:  And that's so the court reporter can
```

1    understand your answers better.  I will ask you just to be

2    comfortable, speak toward the mic but not too close to it and

3    everything should go just fine.

4          Go right ahead, Mr. Helms.

5                      DIRECT EXAMINATION

6    BY MR. HELMS:

7    Q.   Good afternoon, Dr. Kufner.  Could you please state your

8    full name for the record?

9    A.   Ronald Paul Kufner, spelled K-u-f as in Frank, n as in

10   Nancy, e-r.

11   Q.   And are you a former employee of the Pain Center?

12   A.   I am.

13   Q.   Could you please describe to the jury your educational

14   history?

15   A.   I'm sorry?

16   Q.   Could you please describe to the jury your educational

17   background?

18   A.   I graduated undergrad with a degree in science and

19   psychology; medical school at the Oregon Health Science

20   University; trained a year of medicine and three years in

21   anesthesiology at Mayo Clinic in Rochester, Minnesota; and then

22   a two-year pain fellowship 2010 to 2012 at the University of

23   South Florida.

24   Q.   And do you have any board certifications?

25   A.   I'm board certified in anesthesiology and in pain

1    medicine.

2    Q.   When did you start working in Michigan?

3    A.   When did I start working?

4    Q.   In Michigan, the State of Michigan.

5    A.   I -- the first time was in Traverse City in 2012, and then

6    again I left and worked in Florida for a few months and came

7    back in May of 2014 to the Pain Center.

8    Q.   Okay.  How did it come about that you became employed with

9    the Pain Center?  What -- what did you first do to start

10   looking for a job?

11   A.   Well, I was in a clinic in Bradenton, Florida that wasn't

12   working out at all and started a job search.  And St. John's

13   Hospital has a service for people who are on staff there making

14   connections between would-be employers and physicians looking

15   for positions, and they introduced me to Dr. Bothra.

16   Q.   Okay.  And did you initially interview with Dr. Bothra?

17   A.   I did.

18   Q.   What did Dr. Bothra tell you about the Pain Center when

19   you interviewed?

20   A.   Before I had a chance to say anything, he said, "We treat

21   people who have pain.  We treat people who have pain regardless

22   of their race, religion, background, insurance.  If they have

23   any way that we can help them, we will."  And I will admit at

24   that point he had me hooked.

25           He did say that I would have my own practice and he

Case 2:18-cr-20800-SJM-APP   ECF No. 453, PageID.4924   Filed 07/18/22   Page 7 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

7

1    wouldn't tell me how to do it.  I can't say that that held

2    true.

3    Q.  Did you meet anyone else at your first visit to the Pain

4    Center?

5    A.  I met Drs. Edu and Dr. Bothra -- I'm sorry, Backos.

6    Q.  What did Dr. Edu, if any -- tell you, if anything, at your

7    first meeting?

8    A.  He told me that it was busy.  He told me that the medical

9    assistants were very helpful, especially in the injection room

10   where they would have everything set up for me.  He talked

11   about the money that can be made, and at that time showed me

12   his 1099 that showed the year -- that year prior he had taken

13   home approximately $800,000.

14   Q.  Had you asked about salary payments at the Pain Center or

15   did he provide that information unsolicited?

16   A.  I don't recall asking Dr. Edu.  Dr. Bothra had talked

17   about the package which had a guarantee plus a bonus.

18   Q.  Was that first initial time with Dr. Edu where he talked

19   about money, was that the only time that he talked to you about

20   money?

21   A.  He talked about money he spent on things, his rentals.  He

22   didn't talk much about making money after that.  It was mostly

23   about where it was going, and some of it was rather obvious.

24   Q.  He told you about things he was spending his money on?

25   A.  I'm sorry?

1   Q.   He told you about things he was spending his money on?

2   A.   Well, yeah.  I mean he's -- he's talking about having

3   rentals and taking care of those, and the equipment that he was

4   coming in with, the new jewelry, the watches.  It was fairly

5   obvious that he was spending.  He did also mention that his

6   wife liked to spend a lot of money.

7   Q.   And when you say rentals, are you referring to property

8   that he owned and rented to others?

9   A.   Properties that he owned, yes.

10  Q.   What about Dr. Bothra, did he say anything to you at that

11  initial visit or subsequently about money?

12  A.   Oh, several times.  On the first visit, one of the last

13  things he said to me is that "we're going to show you how to

14  make money."  And he came to that in several other discussions

15  where "if you want to make money, this is what you have to do."

16  And it was impressive to me that when I would say if I can just

17  take good care of the patients, the money will be there and

18  that will be good enough, and it was -- he didn't even argue

19  that; it was like I had said nothing.

20  Q.   What were some of the things he told you you should be

21  doing to make money?

22  A.   See more patients.

23  Q.   Did he give an approximation of how many patients he

24  thought you should see?

25  A.   I'm sorry?

1   Q.   Did he give an approximation as to how many patients he

2   thought you should -- you should see?

3   A.   Well, that came much later, about the third year, and it

4   wasn't even directly to me.  It was to -- to Denisa who was the

5   medical assistant who ran the Interventional Pain Clinic and I

6   believe it was Nicole was a registered nurse.  And they said on

7   separate occasions he was asking about who needed more

8   fluoroscopy -- fluoroscopy time, and they both answered Dr.

9   Kufner does.  And his answer is, "He's not going to get more

10  time till he's seen 80 to a hundred patients a day."

11  Q.   So he wanted you to see 80 to a hundred patients a day?

12  A.   Yes.

13  Q.   Going back to that first day when you met Dr. Backos, Dr.

14  Backos, did you learn anything about Dr. Backos that day?

15  A.   I knew from Dr. Bothra that Dr. Backos was in recovery.  I

16  do not recall if on the first day I heard that from Dr. Backos,

17  but I do know that early on my tenure there he and I had frank

18  discussions about being in recovery.

19  Q.   And so you were in also recovery?

20  A.   I am.

21  Q.   Are you able to explain to the jury what you recovered

22  from?

23  A.   Well, addiction is a disease and I have it.  And when

24  you're active in your disease, you really don't understand how

25  crazy you're behaving, and this explains a lot of things that

1   people see.  And if you're not an addict, there's really no

2   explaining it.  You have to have an -- I guess you have to be

3   there.  But it is a disease of the mind.  And recovery is when,

4   by God's grace, you have learned that this is not the best

5   life, that there's some reason that you want to have a better

6   life, and the way to do it to find ways to avoid the drugs,

7   avoid the alcohol.  And it takes time, it takes effort, and

8   sometimes there are failures, but life gets a whole lot better

9   without it, and there comes a time where that becomes your new

10  identity.  But recovery does not mean cured.  Anyone who is in

11  recovery has the capacity to relapse and get active in the

12  disease again.

13  Q.  And when you were first hired by Dr. Bothra, did you

14  inform him about the fact that you were recovered, in recovery?

15  A.  When he was through telling me about the practice, that

16  was one of the first things I told him.

17  Q.  And what was his response?

18  A.  I'm sorry?

19  Q.  What was Dr. Bothra's response to you?

20  A.  His response was that he believes in second chances, that

21  there were other people, I believe that's about the time he

22  mentioned Dr. Backos, and he went clear back to his time as the

23  Medical Director or Chief of Medicine at Holy Cross when he

24  gave other physicians second chances and how some failed, some

25  succeeded, but he always believed in second chances, so that

1   was a win over too.

2   Q.   So after this interview did you -- were you hired by Dr.

3   Bothra?

4   A.   Yes, I was.

5   Q.   When did you first officially start working at the Pain

6   Center?

7   A.   It was May 1st, 2014.

8   Q.   And what was your title?

9   A.   My title?

10  Q.   Yes.

11  A.   I guess you'd call me staff physician.  They really didn't

12  talk about titles.  I -- I wasn't an officer of any kind.

13  Q.   Did you sign a con -- a contract with the Pain Center?

14  A.   I signed an employment agreement, yes.

15  Q.   Dr. Kufner, there should be a binder near you, and I can

16  come help you if you'd like, that has Exhibit 151 in it.  Do

17  you want me to come help you?

18  A.   Is -- oh, here?

19       (Brief pause)

20  Q.   Dr. Kufner, have you had a chance to review what

21  Exhibit 151 is?  And if not, let me know when you have.

22  A.   I've seen this many, many, many times.  I'm sure that if

23  you ask me something that's not at the top of my head, I can

24  find it rather quickly.

25  Q.   But do -- do you know what this document is?

1    A.   Do I -- I'm sorry?

2    Q.   What is Exhibit 151, the document in front of you?

3    A.   What I see is Government Exhibit 151, Independent

4    Contractor Agreement dated May 1st, 2014 between the Pain

5    Center USA, PLCC and Ronald Kufner, Michigan Licensed

6    Physician.

7    Q.   So is that the contract that you signed with the Pain

8    Center when you started?

9    A.   Yes, it is.

10            MR. HELMS:  Your Honor, at this time I would move

11   Exhibit 151 into evidence.

12            THE COURT:  Okay.  Without objection, that's

13   received.  Go right ahead.

14            MR. HELMS:  Ms. Adams, could you pull up 151?

15   BY MR. HELMS:

16   Q.   So Dr. Kufner, with whom did you negotiate this contract?

17   A.   With Dr. Bothra.

18   Q.   Okay.

19   A.   I would not say it was much of a negotiation.  He pretty

20   much said, "This is what I have, this is what I'll do for you,"

21   and it wasn't a stern take it or leave it but there wasn't a

22   lot of room for negotiations.

23            MR. HELMS:  And Ms. Adams, could we turn to page 3?

24   A.   Okay.

25            MR. HELMS:  And then if you could highlight the

1   portion 6, "Compensation."

2   BY MR. HELMS:

3   Q.   Now, Dr. Kufner, I don't want you to have to read this

4   word for word, but in general, first, did you have a minimum

5   salary that you were guaranteed during your time?  And if --

6   Dr. Kufner, if you can't see in -- in this document --

7   A.   No, actually I just needed to find -- find the right page

8   here, but I have it, I'm -- I'm good.

9   Q.   Okay.  Did you have a minimum salary that you were going

10  to receive?

11  A.   Yes.  In fact, the way he stated it was "I'll guarantee

12  you a million dollars over four years," I believe, or

13  $1.2 million over four years.

14  Q.   So about $300,000 per year?

15  A.   Yes.

16  Q.   Okay.  And then if you move to Section (b) of Section 6.

17  A.   B as in Beta?

18  Q.   Yes.

19  A.   Okay.

20  Q.   Does that cover bonuses that you can receive?

21  A.   Yes.  It -- it was talking about a 30 percent of -- I

22  would receive 30 percent of the collections amount.

23  Q.   Okay.  And then down in Section (c)(i) is there additional

24  sections about bonuses there?

25  A.   Yes.  There's office space practice.  If the office space

1   practice is converted to a surgical center, then the amount
2   that I would receive for professional services would change.
3   Q.   Okay.  And so an ambulatory surgery -- surgery center
4   referenced in Section (c), could you explain to the jury what
5   that is?
6   A.   Okay.  Initially it was when I was there we did the
7   injections as it was in a medical clinic, just like if you go
8   into a doctor's office and get a flu shot but a bit more
9   complicated.  We had the equipment, we had the supplies, but
10  the payment was based on a fee scale set by Medicare for
11  office-based procedures.  When you convert to an ambulatory
12  surgery center, there's an expectation that you will meet the
13  rules, regulations and procedures that are no different than if
14  you had the same work done in a hospital with hospital staff.
15  There's a higher level of expectation on the part of the
16  players in order to protect the patients and ensure that
17  they're getting proper care with all due attention to infection
18  control and proper medical reviews and the like.
19          For that, the compensation is then spit -- split into
20  two forms.  There's a separate form where the surgical center
21  gets paid just as when you go have an operation the hospital
22  gets paid, and then there's the professional fee where the
23  operator or the surgeon, the anesthesiologist doing the
24  injection gets a professional fee.  Just as when you have
25  surgery you find out, no, the surgeon sends you a bill, the

Case 2:18-cr-20800-SJM-APP ECF No. 453, PageID.4932 Filed 07/18/22 Page 15 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

15

1    anesthesiologist sends you a bill, those are the professional

2    fees.

3             And his offer was that I would get 90 percent of the

4    professional fee. He would still keep back ten percent. And

5    for all other work it would still be at 36 percent and that

6    there would be no -- no part of the -- of the facility fee

7    would come to me 'cuz I had no financial interest in the

8    facility.

9    Q.  Okay. So under the terms of your contract, whether you

10   performed a service under a normal professional fee or under

11   the ambulatory surgical center, would you receive a portion of

12   whatever was paid to the Pain Center for that procedure?

13   A.  Based on my work, yes.

14   Q.  Okay. So is it fair to say that you had an incentive to

15   perform procedures?

16   A.  Yes, I did.

17   Q.  A monetary incentive?

18   A.  Yes.

19   Q.  Do you know if any of -- do you know if Dr. Russo, Dr.

20   Lewis, Dr. Edu or Dr. Bothra had similar contracts?

21   A.  Well, since Bothra, Dr. Bothra owned it, he had his own

22   interest. As far as the rest of us, everybody had contracts

23   that were similar to mine. In fact, when Dr. Bothra handed me

24   the contract, he told me that it was the -- exactly the same as

25   Dr. Edu's except the percentages for him were different.

1          MR. CHAPMAN:  Objection, Your Honor.  Calls for

2    speculation related to the other defendants' contracts.

3          THE COURT:  I'm going to -- I'm going to sustain that

4    objection on a different ground because I -- I think -- I think

5    that holding this witness's understanding of what Dr. Bothra

6    said about the others is speculative and may raise some

7    cross-examination issues.  So I think the question was fine,

8    the answer was fine, but I'm directing the jury not to consider

9    what this witness heard from Dr. Bothra about the other

10   contracts of the other defendants.

11         Go ahead, Mr. Helms.

12         MR. HELMS:  Your Honor, just for the sake of making a

13   record, I would --

14         THE COURT:  Yeah.

15         MR. HELMS:  -- I would suggest that any comment that

16   Dr. Bothra has made to this witness is a party admission and

17   the statement of a co-conspirator.

18         THE COURT:  I -- I agree.  I agree.  I agree.  It's

19   the substance that I'm concerned about, and that's what my

20   instruction to the jury went to, but I agree with you.

21         Go right ahead.

22   BY MR. HELMS:

23   Q.  So you don't personally -- your contract had an incentive

24   to perform injections or procedures, is that correct?

25   A.  Yes.  Forgive me if I'm out of line, but I did see a

 1    contract offer that had different percentages than mine and I

 2    had discussions with other defendants about their percentages,

 3    so it didn't just come from Dr. Bothra.

 4            MR. HELMS:  And Your Honor, is it -- is it the

 5    Court's ruling that I cannot go into those discussions?

 6            THE COURT:  Well, if you have a discussion between

 7    this doctor and a defendant that impacts something between that

 8    defendant and this doctor, that's perfectly fine.  My ruling

 9    was in terms of cross-examination and attenuation, a

10    conversation between this doctor and a defendant who's

11    testifying or made a statement out of court about another

12    defendant's arrangement is -- is substantively troubling for a

13    number of reasons it's not worth going into, but that's my

14    ruling.

15            Go ahead.

16            MR. HELMS:  Thank you, Your Honor.

17            THE WITNESS:  If I was out of line, I apologize.

18            THE COURT:  You're fine, Doctor.  Just keep answering

19    what's asked and we'll be fine.

20            Go ahead, Mr. Helms.

21    BY MR. HELMS:

22    Q.  Dr. Kufner, did you have specific conversations with Dr.

23    Edu about the terms of his contract?

24    A.  About the terms of his contract?  No, I can't say that I

25    did.

1  Q.   Did you have any discussion with Dr. Lewis about the terms
2  of his contract?
3  A.   Yes, but they were brief and short.  But I acknowledged
4  that I knew he was getting what I thought was a low rate and he
5  kept saying things will work out.
6  Q.   Did he -- did that conversation, if at all, entail whether
7  or not he would receive bonuses based on procedures performed
8  by him?  Just yes or no.
9  A.   No, it didn't say that.
10 Q.   Okay.  And then with respect to Dr. Russo, did you have
11 any conversations with him about the terms of his contract?
12 A.   Yes, we did.
13 Q.   And what did he tell you about his contract?
14 A.   That his rates were lower but similar to mine in that we
15 were paid by what we did.
16 Q.   So Dr. Russo indicated that he was paid based on
17 procedures?
18 A.   Oh, I can't say that that was the only -- we were paid for
19 what we did which included procedures.  The procedures were the
20 most lucrative part of what we did.
21 Q.   Yeah.  But the more -- the more services you provide --
22 you provided, the more money you could make?
23 A.   Yes.
24 Q.   Which Pain Center location did you primarily work at?
25 A.   I worked -- my clinic was in Eastpointe, and I worked at

1    Warren for the sole purpose of doing injections and providing

2    sedation.

3    Q.   So when you saw patients for clinical visits, that was

4    solely in the Eastpointe location?

5    A.   Well, there were rare exceptions.  Maybe one or two dozen

6    times in an entire year I might see a patient in -- excuse

7    me -- in Warren at the -- to be helping out.

8    Q.   Okay.  But the vast majority of your clinical visits would

9    be at Eastpointe?

10   A.   Absolutely.

11   Q.   And then when you would do any injection or when you would

12   assist another doctor with an injection, that would be at the

13   Warren location?

14   A.   Well, it was either doings injections or doing sedation.

15   I wasn't assisting anyone with any injections.

16   Q.   I apologize for the wording.

17           So when you were -- when you were doing injections or

18   if you were doing sedation for another doctor, that was all in

19   Warren?

20   A.   Fluoroscopic injections, yes.  I did other injections in

21   the clinic but that had nothing with the ASC or fluoroscopy.

22   Q.   Okay.  Was there a reason why you primarily did all of

23   your clinical work in Eastpointe if you're aware?

24   A.   That was pretty much what I was hired for.  Dr. Bothra

25   made that clear that he was -- wanted to staff that clinic and

1    make it full time 'cuz he had been covering it one or two half

2    days a week for some time.

3    Q.  Okay.  Did he ever give you any other -- any other

4    indication about why he wanted you to do clinical visits

5    primarily in the Eastpointe location?

6    A.  I'm sorry, could you...

7    Q.  Did Dr. Bothra ever give you any other indication as to

8    why he wanted you doing clinical visits in Eastpointe as

9    opposed to Warren?

10   A.  Well -- well, are you asking why I didn't see patients in

11   Warren or why I did see patients in East -- Eastpointe?

12   Q.  I'm asking if you were ever given a reason for why you

13   weren't seeing patients in Warren.

14   A.  Well, Dr. Bothra told me that Dr. Edu didn't want me

15   there.  I'm not sure that I believe that.

16   Q.  Okay.

17         MR. WEISS:  Your Honor, I'm going to object as to the

18   editorial.

19         THE COURT REPORTER:  Wait.

20         THE COURT:  That -- that --

21         THE COURT REPORTER:  Speak through microphone please.

22         MR. WEISS:  I'm going to object as to the editorial.

23   That wasn't --

24         THE COURT:  That's -- that's sustained.  Okay.

25         MR. WEISS:  Ask that it be stricken from the record.

```
 1              THE COURT:  That's stricken from the record.  We're
 2   not -- we're not here to have the jury construe the beliefs as
 3   to the truthfulness or non-truthfulness of other defendants.
 4              Go ahead --
 5              MR. WEISS:  Thank you, Your Honor.
 6              THE COURT:  Yes, you're welcome.
 7              Go ahead, Mr. Helms.
 8   BY MR. HELMS:
 9   Q.  Let's turn to a different subject, Dr. Kufner.  You had
10   mentioned an ambulatory surgical center, correct?
11   A.  Yes.
12   Q.  Do you know when the Pain Center opened an ASC?
13   A.  I can't tell you the exact date, no.  It was
14   approximately -- I was in my third year there I think.
15   Q.  So sometime in 2016 or 2017?
16   A.  Well, it was a process where we started doing cases in the
17   physical area, but it later became certified as an ASC.  Even
18   though the physical environment was there, we had to go through
19   a certification process, and those dates are -- are lost to my
20   memory.
21   Q.  Okay.  And in terms of the requirements for an ambulatory
22   surgical center, what are -- what are the general requirements
23   that need to be met to operate an ASC?
24   A.  Well, there's a minimum number of beds that are supposed
25   to be there in the pre-operative area and the post-operative
```

```
 1    area for each individual certified room.
 2           There is supposed to be certain pieces of equipment,
 3    suction, oxygen availability in the certified rooms as well as
 4    in those waiting areas.  Those are safety precautions.
 5           There are clear expectations about how medications
 6    are handled including narcotics: being counted at the beginning
 7    and ending of every day and every dose administered being
 8    signed out and waste being documented.  And there is very clear
 9    guidelines and -- and expectations I think that rises to the
10    level of policy that medications have to be used for one
11    patient and one patient only and that vial cannot be reused.
12    Multi-dose vials are not to be used in --
13           MR. WEISS:  Your Honor --
14    A.   -- a certified surgical center.
15           MR. WEISS:  Your Honor, excuse me.
16           THE COURT:  Yes.
17           MR. WEISS:  I would object.  Number one, we're
18    getting into --
19           THE COURT REPORTER:  Excuse me.  Mr. Weiss, I need
20    you to speak into a microphone.
21           THE COURT:  All right.  Number one?
22           MR. WEISS:  Number one, we're getting into a
23    narrative.  Number two, there's no demonstration that this
24    doctor has the expertise and experience to proffer an opinion
25    as to what an ambulatory surgical center is required.
```

Case 2:18-cr-20800-SJM-APP ECF No. 453, PageID.4940 Filed 07/18/22 Page 23 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

23

1        THE COURT:  I will sustain the objection on the

2   ground of the narrative answer because I think -- I think it's

3   going beyond the question that was asked.  I -- I do find that

4   it's well within the witness's presumed knowledge as a pain

5   specialist doctor to describe to the jury how a room or certain

6   portions of a medical facility should be set up, but that's

7   been done.

8        So go ahead, Mr. Helms.

9   BY MR. HELMS:

10  Q.   Dr. Kufner, in the past you have worked in hospitals,

11  correct?

12  A.   Yes, I have.

13  Q.   And is it fair to say that the standard of care and -- and

14  cleanliness standards of an ASC should meet those of a

15  hospital?

16  A.   That is the purpose.  An ASC should meet the same

17  standards as a hospital.

18  Q.   And was the ASC at the Pain Center meeting those

19  standards?

20  A.   Woefully, no.

21  Q.   Can you describe to the jury a few of the most egregious

22  reasons why you believe those standards were not being met?

23  A.   Well, I have grave concern --

24        MR. CHAPMAN:  Your Honor, objection.

25        THE COURT:  Hold on a minute.  What's your objection?

1    MR. CHAPMAN:  First, this is calling for opinion

2    testimony of somebody who hasn't been established as an ASC

3    expert as Mr. Weiss said.

4        Second of all, no defendants, specifically Dr. Lewis,

5    have been charged with improperly running an ASC in this case,

6    and there's been no prior bad acts notice that this would be

7    part of the government's case in chief against Dr. Lewis or any

8    other defendant.

9        THE COURT:  Okay.  As to the 404(b) issue, what's

10   your response to that, Mr. Helms?

11       MR. HELMS:  Your Honor, the -- the -- the first

12   charge in this case is a health care fraud conspiracy count

13   that spans January of 2013 through 2018, and the defendants are

14   alleged to have engaged in a number of different frauds.  Even

15   if it's not specifically named in the indictment, they are part

16   and parcel.  Any --

17       THE COURT:  Wait a minute.  He's talking about the

18   cleanliness or non-cleanliness of the facility, ASC, ambulatory

19   surgical center, and the objection is that this is other acts

20   evidence not noticed and overly prejudicial beyond its

21   probative value.  Answer?

22       MR. HELMS:  These are not other -- the government

23   does not believe they are other acts; they are res gestae.  And

24   it's not just cleanliness; it's billing at -- for an ASC

25   which -- which comes with a higher reimbursement rate.  When an

1    ASC's standards aren't being met --

2          THE COURT:  Stop right there.  That's not necessary.

3    I'll overrule the objection.  I'll allow the witness to testify

4    based on his experience in evaluation of the conditions in

5    which he was working, and -- and I think based on that, you can

6    make the points you wanted to make with regard to Count 1.

7          Go ahead, Mr. Helms.

8    BY MR. HELMS:

9    Q.   Dr. Kufner, just provide the jury with some of the

10   examples that you noticed that were why the Pain Center's ASC

11   was not meeting the requirements that were necessary.

12   A.   Well, I'll try to be very narrow.  We are not allowed in a

13   surgical center to use multi-dose vials, and vials are to be

14   used for a single patient only, and if there's anything left

15   over, the remainder was to be discarded and a fresh vial for

16   each patient.  This was not done.  First of all, multi-dose

17   vials were used between patients, and even single use vials

18   that were intended to be used only once would be held over even

19   overnight and used on other patients.  And I can say that with

20   confidence because on my injections day I would go to the

21   cabinets before the assistants got there and throw away

22   everything that had been opened the day before and kept over so

23   that we were at least starting with fresh medications in the

24   morning.

25          If you want other examples, that was -- there are a

Case 2:18-cr-20800-SJM-APP   ECF No. 453, PageID.4943   Filed 07/18/22   Page 26 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

26

1    number of checks that are supposed to be done: room

2    temperature, refrigerator temperature where drugs are, and

3    that's supposed to be documented on a daily basis.  I watched a

4    registered nurse fill in months' worth of records that had not

5    been attended to at all and then refuse to sign off because she

6    was willing to put numbers down but not say that they were

7    real, only to have somebody else sign those pages.

8    Q.   Okay.

9    A.   Narcotic count, narcotic control.  Narcotics are supposed

10   to be counted by two different people, a nurse and a doctor,

11   two nurses or two doctors at the beginning and end of every

12   shift.  This was not done most of the time.  A nurse would do

13   the count and somebody else would come out the next day or --

14   or hours later at least and just sign it.

15            THE COURT:  Okay.  All right.  Next question.  Go

16   ahead.

17   BY MR. HELMS:

18   Q.   Dr. Kufner, do you know, is there a difference in billings

19   for procedures performed not in an ASC versus procedure --

20   procedures billed in an ASC?

21   A.   A huge difference.

22   Q.   What is the huge difference?

23   A.   I've been quoted as saying I think three to four times.

24   That was speculative on my part.  What I do know is that when

25   you are billing from an ASC, between the facility charge and

1    the professional charge, it is considerably more than what you

2    get one payment for doing the same procedure in a clinic.  But

3    I want to be careful about what I said in the past was taken as

4    gospel.  I do know that there's a huge difference, but the

5    exact numbers I would have to defer to somebody who is -- has

6    billing expertise.

7    Q.   So in general, it's fair to say that you can bill more for

8    procedures performed in an ASC?

9    A.   Oh, clearly.

10   Q.   Which doctors at the Pain Center worked in the ASC?

11   A.   I did, Dr. Edu, Dr. Bothra, Dr. Russo and Dr. Lewis.

12   Q.   Let's turn our attention now to the pharmacy that was

13   located next to the Pain Center in Warren.

14   A.   Okay.

15   Q.   Are you familiar with that?

16   A.   Vaguely.  I -- I only was under the understanding that Dr.

17   Bothra owned it.

18   Q.   Okay.  Is it fair to say that during your course

19   of employment --

20        MR. WEISS:  Your Honor, I'm -- I'm going to object as

21   to that, his understanding.  We have no foundation as to where

22   that understanding came from.  I'm going to object on the basis

23   of hearsay and confrontation.

24        THE COURT:  Okay.  Well, you'll be able to cross-exam

25   him, but he said he understand -- understood that Dr. Bothra

1    owned the -- the business and we can probe that later.  It

2    seems to me that his understanding is his knowledge and that's

3    the foundation for the answer.

4                Go ahead, Mr. Helms.

5    BY MR. HELMS:

6    Q.   So different subject, Dr. Kufner.  During the course of

7    your employment with the Pain Center, I take it you had

8    conversations from time to time with Dr. Bothra, is that fair?

9    A.   Yes, I did.

10   Q.   From those conversations, did you get a sense as to what

11   his primary sense of focus was?

12   A.   Probably the -- well, not probably.  Clearly, the one

13   thing he said directly to me was he wanted to see me sending

14   more durable medical equipment home with patients.

15   Q.   Did he tell you why he wanted you to do that?

16   A.   I'm sorry?

17   Q.   Did he tell you why he wanted you to send home more

18   durable medical equipment?

19   A.   Well, he actually told me that's the way he only made any

20   money in that clinic.  That everything else that we did, well,

21   his share just barely covered the expenses, and if I wasn't

22   sending people home with durable medical equipment from his

23   clinic, that he wasn't really making any money.

24   Q.   During your time at the Pain Center did you ever have

25   conversations with Dr. Bothra where he indicated that the

Case 2:18-cr-20800-SJM-APP  ECF No. 453, PageID.4946  Filed 07/18/22  Page 29 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

29

1    doctors really needed to focus on the quality of patient care?

2    A.   No.

3    Q.   Not one time?

4    A.   No.  In fact, I -- I complained about the conditions.

5    Sometimes essentially I told him myself that there were

6    procedures I wanted to do but the place was too dirty to do

7    them.  I said that to his face, and he said, "Well, we do what

8    we can do."  There was even a day where there was so much filth

9    and garbage underneath the fluoro table, I was providing

10   sedation, I couldn't stand to look at it, so I got a broom and

11   swept it out and I was sweeping it.  This was before it was an

12   ASC.  But it had Band-Aid -- Band-Aid wrappers, caps from --

13   from needle hubs, just filth.  And as I was sweeping it out, I

14   almost walked into Dr. Bothra and Dr. Edu and they saw me doing

15   the sweeping and they both had a good laugh over it.  So he --

16   he brushed me off anytime I talked about cleanliness.

17            THE COURT:  Okay.  Next question.

18   Q.   I'd like to ask you some questions about the standard

19   practices of the Pain Center.  In general, how many patients

20   per day were seen, do you know?

21   A.   I -- who are we talking about again?  I'm...

22   Q.   At the Warren location.  Do you know how many patients

23   were seen?

24   A.   At the Warren?  Oh, I -- I would see the -- I should

25   explain.  I had to bring my billings over at the end of the day

1  when I was in Eastpointe, and most often the schedule was still

2  up and I would see anywhere from a hundred to a 120 patients on

3  the list marked off, not marked as no shows but marked off, so

4  I had to assume those patients were seen.

5  Q.  And you yourself at the Eastpointe location, how many

6  patients a day would you see?

7  A.  In the first year, 20 to 30 in a day.  Second year, it

8  started getting busier.  My last year I would see maybe 50, on

9  a really bad day 60.  Those were tough days.

10  Q.  For you for a new patient visit, typically how long would

11  that last?

12  A.  Minimum of 30 minutes, often more.

13  Q.  And what types of things would you do during a new patient

14  visit?

15  A.  I would review any of the material I had to begin with, if

16  there were MRI or CT scans, X-rays.  Very seldom did I have the

17  luxury of medical records from the outside.  But the medical

18  assistants would take a cursory history for me, and then I

19  would go in and go over the -- excuse me, the patient's

20  history, do a physical examination, looking at -- you know,

21  focusing on where their pain issues were.  I would talk with

22  them about the plan and then document things.

23  Q.  Now, you mentioned that medical assistants would have

24  asked questions of the patients before you saw the patient, is

25  that right?

1  A.   Yeah.  Things like, "What's your main complaint?  Do you

2  have allergies?  What medication do you take?"

3  Q.   Now, even though the medical assistants asked those

4  questions, would then -- would you then ask -- also ask similar

5  questions to the patient?

6  A.   I would go over those and -- and spot-check about --

7  especially about the pain, but I'd look at the allergies and

8  the medications and I might have questions.

9  Q.   With respect to established patients, so a patient who had

10 already come once and -- and was now there for the second or

11 third or fourth time, what was your typical visit like with

12 them?

13 A.   Depending on the patient and the problem, five to

14 15 minutes.

15 Q.   Would there be -- would there still be -- excuse me.

16 Would there still involve a physical exam with an established

17 patient visit?

18 A.   If they were returning patients and just there for

19 medication refills, it would be brief and the exam would amount

20 to what I could see and just a normal -- normal conversation:

21 were they walking steady, did they seem at ease, were they

22 breathing normally, were they content with how things were

23 going.  If they had a pain complaint, then I would do a more

24 focused exam.

25 Q.   So you would ask questions about how they were doing?

1   A.   Yes.

2   Q.   And if they indicated a problem, you would ask more

3   questions?

4   A.   Yes.

5   Q.   Like to move to injections now.  Did you have an

6   understanding as to how many injections were performed at the

7   Pain Center on any given day?

8   A.   On any given day?

9   Q.   Or how many patients received injections on any given day?

10  A.   Well, that too increased.  There were -- when I first

11  started there, it seemed like it was around 30, maybe more.

12  That number gradually grew to 40, became a routine number, and

13  by the time I left, 50 to 60.

14  Q.   And when did you leave?

15  A.   Pardon me?

16  Q.   When did you leave the Pain Center?

17  A.   I left, it was October of 2017.

18  Q.   Okay.  And when you -- so when you say in October of 2017

19  that it grew to I think you said 50 or 60, is that right,

20  injections or patients with injections?

21  A.   That was variable, but on -- on an average, I'd say 50 was

22  a fair number 'cuz there were days -- not many days were

23  slower.  There were days that were more than that, but I -- I

24  like to keep with numbers I can say with certitude, which we

25  averaged about 50, and that was just in the one room.  What was

1    going on in the second room I don't know.

2    Q.   That's what I was going to ask you.  The -- the number

3    of -- they say 50 to 60, is that the ones that you were

4    personally involved with either giving the injection or

5    providing the sedation?

6    A.   Yes.

7    Q.   Was it also another room during the day was anesthesia

8    and -- and injections were happening?

9    A.   Yes, there was.

10   Q.   So there could be tens or dozens more of injections

11   happening in that other room on the same day?

12   A.   Yes.  As far as the numbers, I -- I can't say, but there

13   was a second room running.

14   Q.   How many of the patients at the Pain Center received

15   sedation before receiving a back injection, ballpark term?

16   A.   Oh, the -- the vast majority, at least 90 percent.

17   Q.   And is the sedation billed separately from the injection?

18   A.   Excuse me.  Yes, it is.

19   Q.   Was there anyone at the Pain Center who encouraged you to

20   encourage patients to get injections?

21   A.   To get injections?  I can't say that.  I can say that we

22   were encouraged to have more modalities than just medication.

23   Now, I can't say what happened in Warren.  I can only say what

24   happened in my clinic, which was patients had the option of

25   seeing a chiropractor, physical therapy, injections.  I even

1    approved one patient who said she used aquatic therapy and it

2    helped.  But one of our early -- my first conversations with

3    Dr. Backos, "We're not a pill mill and this is how we express

4    that, that we want to see people doing something besides just

5    getting pain pills and going home."  So that was the standard

6    to which I -- I followed.

7    Q.   So when you say modalities, that could be -- that could be

8    injections but it could be physical therapy?

9    A.   Yes.

10   Q.   Or chiropractic services, things like that?

11   A.   Yes.

12   Q.   In terms of the procedure or progression of injections,

13   did Dr. Bothra indicate to you or did you come to learn through

14   your time there that there was a certain sequence that the Pain

15   Center used for doing injections?

16   A.   On the case about Dr. Bothra, I was joking towards the end

17   how predictable it was that a patient comes in with back pain,

18   they'll get a caudal, then they'll get facet injections, then

19   get facet injections, then they get Rhizotomy, and that was not

20   a hundred percent of the time but it was a very recognizable

21   pattern.

22   Q.   Okay.  So I -- I'm not sure the jury caught that.  You

23   said that you told Dr. Bothra that it -- it was clear to you

24   that a patient got a caudal injection first?

25   A.   Which is a form of an epidural.

1   Q.   And then they would receive a facet injection?

2   A.   Yes.

3   Q.   And then they would receive another facet injection?

4   A.   Yeah, two tests goes to -- to lead into Rhizotomy.

5   Q.   And Rhizotomy is -- is another name for an RFA?

6   A.   Yes, RFA, they're both proper names.

7   Q.   Destruction of a nerve ending?

8   A.   Destructure [sic] -- destructure [sic] of -- destruction

9   of the nerve, yes.

10  Q.   When you joked with Dr. Bothra that treatment was

11  predictable, did he say anything in response to you?

12  A.   Oh, I joked about it, not to him, no.

13  Q.   How did you come to notice this somewhat --

14  A.   Oh, I sedated --

15  Q.   -- standard practice?

16  A.   -- I sedated so many of his patients.  I saw what was

17  going on.  I would see the charts, I would see what was -- what

18  was happening.

19  Q.   Would you provide sedation for patients that Dr. Bothra

20  was providing injections to?

21  A.   Yes.  Not always but I -- I did -- I worked with him quite

22  a bit.

23  Q.   On the times that you sedate patients for Dr. Bothra, did

24  Dr. Bothra come into the -- in to the room and -- explain

25  anything to the patient before he performed the injection?

1    A.   Hardly ever, and then only if asked.

2    Q.   Okay.

3    A.   Patients would come in sometimes and ask me what they were

4    going to have done and I'd say, "Well, you need to talk with

5    Dr. Bothra," 'cuz I was there for the sedation, and even if I

6    knew the answer, I wouldn't -- would not provide it.

7    Q.   And during the times that you were providing sedation for

8    patients that Dr. Bothra was giving injections, did you ever

9    witness any patients complain to Dr. Bothra?

10   A.   Oh, yes.

11   Q.   What were they explaining about?

12   A.   Well, a lot of times, "Well, you're injecting my back but

13   my neck hurts.  Why can't we have the -- you work on that?"

14   And he would say, "We have to complete this before we can

15   do work on your neck," because he had to -- it seemed to me --

16   in fact, he criticized me for not doing the same.  He wanted

17   one area done to completion before you move on to the next,

18   where I would deal with the problem the patient saw most

19   pressing.

20   Q.   Okay.  So your practice was if a patient had, say, both

21   neck pain and lower back pain --

22   A.   Mm-hmm.

23   Q.   -- you wanted to treat those at the same time?

24   A.   Yeah.  If -- if the patient's back injections were helping

25   to the point where the neck now bothered them more, I felt that

1  that was what I would -- should be doing is moving up and

2  taking care of the neck, and if the back still bothered you

3  later, we can come back to that.  It was actually a specific

4  instance where I did that, and he followed up covering when I

5  wasn't there and he felt that that was too confusing and told

6  me in a meeting with other physicians, it was Dr. Backos and

7  Dr. Edu were there, that he didn't like that, that he didn't

8  think I should be doing it that way.

9  Q.  And did he say why you shouldn't be doing it that way?

10 A.  'Cuz he felt it was confusing.

11 Q.  Can -- can you elaborate on that, is that -- or is that

12 the best you can do?

13 A.  That starting on the back and then jumping and taking care

14 of the neck and then when that got better coming back to the

15 back to him seemed confusing.  That was the explanation he

16 provided.

17 Q.  Okay.  I'd like to talk to you next about informed consent

18 forms, or actually I'm -- hold on with that.

19 A.  I'm sorry?

20 Q.  Strike that.  I'm going to --

21 A.  Oh.

22 Q.  I'm not going to ask that.

23 A.  I -- I'm just -- my hearing aids are loud enough to where

24 I -- I am hearing too much, so I'm sorry but --

25 Q.  No, don't apologize.  I'll try to -- I try to be clear.

1    I'll try to be even clearer.

2              With respect to durable medical equipment --

3    A.   With respect to?

4    Q.   Durable medical equipment.

5    A.   Durable medical equipment, yes.

6    Q.   The doctors at the Pain Center would prescribe back

7    braces, is that correct?

8    A.   Yes.

9    Q.   When a patient is -- is prescribed a back brace, what

10   procedure or general procedures should be followed?

11   A.   To -- for them to have a back brace?

12   Q.   Yes.

13   A.   Well, the patient deserves an explanation, preferably from

14   the physician, that this is what I would like you to do, and

15   then there should be either the physician or representative who

16   is skilled in fitting it on the patient, explaining the best

17   way to handle it.  I personally would tell patients don't wear

18   it all the time if it makes you feel good.  I don't want your

19   back getting weak.  It's there for your worst days.  In fact, I

20   would try to -- to say don't carry -- keep it on more than four

21   hours at a time.  And then we should be following up in

22   subsequent visits and ask did you -- is it helping.

23   Q.   Based on your time at the Pain Center, including your

24   review of patient files who were treated by doctors other than

25   you, were other -- were the other doctors at the Pain Center

1  following those protocols?

2  A.   That's a -- that's a question that's hard to answer in a

3  short answer.  I don't believe they were, no.

4  Q.   And what -- what basis gives you the -- the ability to say

5  that they were not?

6  A.   Well, I was assured by Dr. Bothra that the medical

7  assistants had been trained and would fit the braces and

8  explain everything to the patient, and I relied on that 'cuz I

9  was quite busy.  There was a day when a patient had a bag in

10  his hand and I said, "Oh, you like the brace?"  He said, "Oh,

11  is that what's in there?"  And I put a stop to everything,

12  found the medical assistant who had just handed it to him -- he

13  didn't even know what was in the bag -- made her go back in,

14  put it on and let him try it out.

15        And then in different discussions, I can describe one

16  was Ramona who was a medical assistant, later became an RN, and

17  two of the MAs that I can describe, I can't tell you their

18  names, they're lost to my memory, but all three would say, "Oh,

19  over at the Warren clinic we just hand them the bag, send them

20  out the door."  And they -- they weren't even the least bit shy

21  about saying so, that, "No, we -- we just hand them --

22  they're -- we're too busy.  We just hand it to them and they'll

23  take it home."

24        MR. HARRISON:  Your Honor, I'm going to object to

25  the --

Case 2:18-cr-20800-SJM-APP ECF No. 453, PageID.4957 Filed 07/18/22 Page 40 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

40

```
 1              THE COURT REPORTER:  Mr. Harrison, can you please
 2   take your mask off?
 3              THE COURT:  Go ahead.
 4              MR. HARRISON:  I'm going to object to these long
 5   rambling, volunteered answers that go far beyond the question
 6   asked.
 7              THE COURT:  I'd ask Mr. Helms to tighten it up a
 8   little bit please.  The witness does have a -- a -- a tendency
 9   to sometime give narrative answers, and if you can keep -- keep
10   things tightened up a little bit better, that would be most
11   appreciated.  Go right ahead.
12              MR. HELMS:  Yes, Your Honor.
13   BY MR. HELMS:
14   Q.  Dr. Kufner, just yes or no, did you ever receive pressure
15   from Dr. Bothra to prescribe more durable medical equipment
16   like back braces?
17   A.  Oh, yes.
18   Q.  Can you tell me how and what forms he pressured you to do
19   that?
20   A.  The sticky notes.  Any patient that had insurance that
21   would cover a back brace and didn't get a back brace, there
22   would be a sticky note on the chart as a reminder.
23   Q.  And when you say sticky note, are we talking about a
24   little Post-it Note or are we talking about --
25   A.  A Post-it Note, a yellow Post-it Note.
```

1   Q.   So like something smaller than this but --

2   A.   Oh, yeah, but -- but clearly around the inside of the

3   chart where it couldn't be missed.

4   Q.   Okay.  So on -- on patient charts of yours there would be

5   a note saying give --

6   A.   Back brace or may need back brace.

7   Q.   And did Dr. Bothra ever have any specific conversations

8   with you that you needed to prescribe more durable medical

9   equipment?

10  A.   I came to him about it and asked him why he was doing

11  this.

12  Q.   Sorry?

13  A.   I said I went to him and ask why he was doing it.

14  Q.   And what did he say?

15  A.   At that -- the first conversation he said, "Oh, it's just

16  my habit.  I just want to make sure you're covering all the

17  bases," and I assured him that I did; that if I felt they

18  needed a back brace, I would order it and they would know that

19  it was coming and I would want them to use it.  If I didn't

20  think it was indicated, I wouldn't do it.

21  Q.   Did Dr. Bothra give you any justification for why he was

22  telling you to prescribe more back braces?

23  A.   He just felt that it was a necessary thing to do, and

24  that in a different conversation he even suggested that if a

25  patient didn't think they wanted one, I should send it home

1    with them anyway 'cuz they might start to use it, and I

2    disagreed.

3    Q.  Were there any signs in the work -- worker areas at the

4    Pain Center about what -- what insurance companies would pay

5    for back braces and physical therapy and lab services?

6    A.  Yes.  That -- that came later but it did happen.

7    Q.  Okay.  Dr. Kufner, if you could look in your binder,

8    there's Exhibit 173, and I can come assist you with finding it.

9    A.  173?  Okay.

10            MR. COLLINS:  Your Honor?

11            THE COURT:  Yes.

12            MR. COLLINS:  I hate to interrupt.  I noticed your

13   clerk earlier about a scheduling issue at --

14            THE COURT:  You need to excuse...

15            MR. COLLINS:  (Nods in the affirmative.)

16            THE COURT:  Yeah, I understand completely.

17            MR. COLLINS:  Thank you.

18            THE COURT:  That's no problem at all.  If you want to

19   leave right now, go ahead.

20            MR. COLLINS:  Thank you, Judge.

21            THE COURT:  My pleasure.  Mr. Collins has an

22   important professional obligation in about 12 minutes

23   downstairs, so if -- if you need to leave, I encourage you to

24   go, okay?

25            (Mr. Collins excused at 1:48 p.m.)

1          Go ahead, Mr. Helms.

2               MR. HELMS:  Thank you, Your Honor.

3               THE COURT:  Thank you for your patience.  Go right

4     ahead.

5     BY MR. HELMS:

6     Q.   Dr. Kufner, do you recognize what Exhibit 173 is?

7     A.   Yes, I do.

8     Q.   And what is it?

9     A.   This is a list of the -- the insurances that we accepted

10    and what modalities that they would cover between -- this

11    includes --

12    Q.   Well, just stop there for a second.

13    A.   Okay.

14    Q.   So did you personally obtain this document?

15    A.   Yes, I took it off of the wall.  It had to have been hung

16    in my clinic.

17    Q.   Okay.

18               MR. HELMS:  Your Honor, based on that, I would like

19    to move Exhibit 173 into evidence.

20               THE COURT:  Okay.

21               MR. WEISS:  No objection, Your Honor.

22               THE COURT:  Thank you very much.  Go ahead.  173 is

23    received.

24               MR. HELMS:  Would you pull that up?

25    BY MR. HELMS:

1    Q.   So I'm -- I'm sorry, Dr. Kufner.  Now, you were saying

2    that -- what does this document describe?

3    A.   I'm sorry?

4    Q.   What does this document describe in general?

5    A.   Well, it describes each insurance company and what they

6    will cover.  The DME stands for durable medical equipment.  UDT

7    is urine testing for drugs.  PT, of course physical therapy and

8    procedures.  Everybody allowed procedures but some required

9    prior authorization.

10   Q.   And I think you testified that this was hanging up in your

11   office or in the -- in the Eastpointe location?

12   A.   In the Eastpointe location, yes.

13   Q.   Were there similar signs in the worker areas in the Warren

14   location?

15   A.   Well, it's been a while, but memory serves me, I think

16   there were.

17   Q.   Okay.  And what's the significance, if anything, of these

18   being listed in the worker areas?

19   A.   Well, it could be seen as an attempt to be helpful except

20   that if the --

21          MR. WEISS:  Your Honor, I -- excuse me, I'm sorry.

22   I'm going to object --

23          THE COURT:  Speak to the mic.

24          MR. WEISS:  I don't -- I don't have a problem with it

25   being introduced, but now he's trying to testify as to

1   subjective intent of other individuals as to why it may or may

2   not have been there.  I mean unless he's clairvoyant, I'm going

3   to object to what it was in someone else's mind that was not

4   articulated to him.

5          THE COURT:  Okay.  I -- I think that's fair and I'll

6   sustain that objection to the answer.

7          MR. WEISS:  Thank you.

8          THE COURT:  I think that the witness can testify as

9   to his understanding of why it was there but not why somebody

10  else decided to put it there.

11         Go ahead, Mr. Helms.

12         MR. HELMS:  That's fine, Your Honor.  We can take

13  this down then.

14  BY MR. HELMS:

15  Q.  Dr. Kufner, I'm next going to direct you --

16         THE COURT:  I mean in some ways it speaks for itself

17  and it's arguable between counsel as to what it shows and why.

18  But -- but anyway, the objection is sustained as to the latter

19  part of the answer, and Mr. Helms, it's in evidence and you can

20  go right ahead.

21         MR. HELMS:  Thank you, Your Honor.

22  BY MR. HELMS:

23  Q.  Dr. Kufner, I would like to take you next to Exhibit 180

24  which is already in evidence.

25         MR. HELMS:  So Ms. Adams, could you pull up 180?

1   BY MR. HELMS:

2   Q.   And Dr. Kufner, do you need help finding it?

3          THE COURT:   That's in evidence, 180.

4          MR. HELMS:   Yes.

5          THE COURT:   Yeah.   Okay.   Go ahead.

6   Q.   Can you see it, Dr. Kufner?   It's also on the screen in

7   front of you.

8   A.   Okay.

9   Q.   Let me know -- let me know when you're done reviewing.

10  A.   Well, I'm not trying to be funny, but Dr. Bothra's

11  handwriting is hard -- as hard to read as my own, and I say

12  that kindly 'cuz I know my penmanship is lousy, but --

13  Q.   I understand.   Why don't I walk you through some of the

14  three questions regarding this document, okay?

15  A.   Okay.   Sure.

16  Q.   Okay.   First, do you see your name at the top there?   It

17  says Dr. Edu and Dr. Kufner and Dr. Backos.   Do you see that?

18  A.   Yes.

19  Q.   Okay.   This document here, these -- is this the type of

20  note that you would -- you would find on either a patient file

21  or handed to you?

22  A.   It certainly would not be in a patient chart.   It would be

23  somewhere for me to see hanging on a wall or might have been

24  handed to me to review, but it wouldn't be on a patient chart.

25  Q.   Okay.   And, in fact, at the bottom it's signed by Dr.

1   Bothra, is that right?

2   A.  Yes, it is.

3   Q.  Do you recall receiving this specific note?

4   A.  Do I recall?

5   Q.  Receiving this note?

6   A.  It -- it's familiar now that I see it and I see my name is

7   on it, but I would not have probably been able to bring it up

8   otherwise.

9   Q.  When you -- do you recall when you received this note what

10  you thought of it?

11  A.  Well, I wrote at the last line, "We're not being -- we are

12  not using much of neck or ankle brace!" with an exclamation

13  mark.  "Is there more need of it!" with an exclamation mark,

14  not a question.  The rest of it, it looks like it's rather

15  instructionary, what one needs to -- to -- of provide these

16  braces.

17  Q.  So is it fair to say this is an example of -- of the --

18  the pressure Dr. Bothra put on you to prescribe more durable

19  medical equipment?

20  A.  Well, when you look at Item 3, I take that definitely

21  as -- as a urging me to do more of the -- of the ankle and neck

22  braces.

23  Q.  Let's turn now, Dr. Kufner, to controlled substances.  Did

24  you come to have an understanding that Dr. Bothra had a

25  standard of practice with regard to prescribing controlled

1    substances?

2    A.   His own standard, yes.

3    Q.   And how --

4    A.   He -- he wanted to see minimal narcotics, that they would

5    be used and explained to the patient that they were an adjunct.

6    That he wanted to keep -- he did not want to see high dose

7    narcotics.  This is as he explained to me, high dose narcotics.

8    And for things he considered low dose such as Norco and

9    Percodan, he wanted to see those small numbers, three or four a

10   day.

11   Q.   And did he tell you why he wanted to see only small

12   numbers?

13   A.   Because he felt that that kept him under the radars for

14   scrutiny.

15   Q.   Scrutiny from law enforcement?

16   A.   Or payors or whoever might be looking.

17   Q.   Whoever might be looking into the -- the billing data of

18   the Pain Center?

19   A.   Yeah.  He was never -- I mean he never said law

20   enforcement.  If he -- if he had, I would have had a --

21   a problem.  But he just felt that this calls less attention

22   when you're not passing out a lot of medication.

23   Q.   And -- and do you know, was there a point when the doctors

24   at the Warren location were encouraged to lower the number of

25   dosages to three times a day or less?

```
 1   A.   I was advised that that had happened after I left, that

 2   there was a mutual agreement made.

 3            MR. CHAPMAN:  Objection, Your Honor.  It's hearsay.

 4            THE COURT:  That's sustained.  Go ahead.

 5            MR. CHAPMAN:  Move to strike.

 6            MR. HELMS:  Well, Your -- Your Honor, if I could ask

 7   one more question, I think it would come from a co-conspirator

 8   statement if I'm allowed to ask the basis for it.

 9            THE COURT:  Let's review this for a minute.

10            (Brief pause)

11            Well, yeah, if you want to approach it from

12   establishing a foundation for the, quote-unquote, mutual

13   agreement, I'll let you do that.  Go ahead.

14   BY MR. HELMS:

15   Q.   Dr. Kufner, did one of these four defendants on trial

16   today tell you that there had been a decision to lower

17   medication to three times a day or less?

18   A.   Dr. Russo told me that in a phone conversation.

19   Q.   Okay.  I would now like to turn --

20            MR. HELMS:  Oh, I apologize, Your Honor.  I see

21   it's --  it's 2:00 o'clock.  Do you know how --

22            THE COURT:  Let's keep going a little longer.  How

23   much -- how much do you have left with this witness?

24            MR. HELMS:  I would say 15 to 20 minutes.

25            THE COURT:  Okay.  Why don't you go through, you
```

1   know, another large -- I don't know, you said you were on to

2   narcotics or medications at this point?

3           MR. HELMS:  I was moving to laboratory services next.

4           THE COURT:  Yeah, let's go through laboratory

5   services and see where we are after that.

6           MR. HELMS:  Okay.

7   BY MR. HELMS:

8   Q.   Dr. Kufner, when you first started at the Pain Center in

9   2014, did the Pain Center have a general practice of using

10  urine drug screens?

11  A.   No.

12  Q.   Did any of the doctors have a general practice of using

13  urine drug screens?

14  A.   Well, Dr. Backos's practice was separate from ours and he

15  routine -- routinely did.  And when I found out that Dr. Bothra

16  and Dr. Edu were not routinely checking urine, I insisted that

17  I would be doing it at Eastpointe, and I did.

18  Q.   Okay.  Did you ever have any discussions with Dr. Bothra

19  about why he was not doing urine drug screens in 2014?

20  A.   He felt with the low level of prescribing, that it wasn't

21  necessary.

22  Q.   At some point did the Pain Center begin to use urine drug

23  screens more often?

24  A.   Yes.

25  Q.   Okay.  Do you know, can you recall precisely -- not

1  precisely but generally when that happened?

2  A.  Well, we had a -- a meeting, Dr. Bothra, Dr. Edu, Dr.

3  Backos and me, and he was saying does anyone have any ideas,

4  and I brought it up as, well, this is something we should be

5  doing anyway and it -- it probably is a profit center.  And

6  later he thanked me for bringing it up when he had tried with

7  Great Lakes Lab and had figured out that, yes, there is profit

8  in this, and he credited me for giving him the idea to start

9  his own lab.

10  Q.  So -- so at some point Dr. Bothra learned -- well, it was

11  brought to his attention that we should be doing urine drug

12  screens?

13  A.  That -- that it was what, doing urine drug screens?

14  Q.  At some point you and others brought it to his attention

15  that the Pain Center should be doing urine drug screens, is

16  that fair?

17  A.  Well, yes, he finally agreed it was a good idea.

18  Q.  And then you had mentioned Great Lakes, First Great Lakes

19  Medical.  Is that where he first was using --

20  A.  That was just a name to me.  It was a lab where urine

21  samples, and then even after we had our own lab if I wanted to

22  do saliva sample, that's where they would go.

23  Q.  And then did you say that Dr. Bothra then opened his own

24  laboratory?

25  A.  Yes.

Case 2:18-cr-20800-SJM-APP    ECF No. 453, PageID.4969    Filed 07/18/22    Page 52 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

52

1    Q.    Okay.  And when Dr. Bothra opened his own laboratory, did

2    the frequency of urine drug screening change?

3    A.    In my practice, no.

4    Q.    With respect to the doctors in the Warren location, did it

5    change?

6    A.    We had discussions and we had agreements what were

7    reasonable guidelines, and I insisted that less than four times

8    a year was not enough, but I can't say what everyone else did.

9    Q.    Okay.  Was there a general policy about what would happen

10   if a patient failed a -- had an abnormal urine drug screen?

11   A.    Yes.  There was a consensus that we would not punish

12   people, and if there was a dirty urine and that it was a

13   prescribed drug, an explanation, they got it from a sister,

14   whatever, that they'd get a second chance.  If it was something

15   off the street like heroin or cocaine, there would be clinician

16   judgment whether they got a second chance, but a second one

17   would be a cutoff.  And it was also considered a dirty urine if

18   the drugs weren't there unless they had pills to show that they

19   hadn't needed them for a few days and didn't take them.

20   Q.    And that -- that policy, was it a firm policy or was it a

21   flexible --

22   A.    Nothing was written.  It was a consensus amongst us in

23   discussions.

24   Q.    Okay.  So there may have been some patients who had

25   abnormal urine screens more than twice but they weren't cut off

1    from treatment?

2         MR. HARRISON:  Your Honor, I'm going --

3         MR. WEISS:  Your Honor, that calls for speculation.

4    I'm going to respectfully object.

5         THE COURT:  Sustained.

6         MR. WEISS:  Thank you.

7    BY MR. HELMS:

8    Q.  Do you know if there were patients who had more than two

9    abnormal urine drug screens and were not cut off from

10   treatment?

11   A.  I -- I -- I can't say that I can answer that.  I believe

12   so, but I can't say that I know that with such certainty.

13   Q.  Okay.  Now, I'm going to change now to walk-in services.

14   When you first started the Pain Center, was there a walk-in

15   portion of the clinic?

16   A.  No.

17   Q.  Okay.  Do you recall generally when that began?

18   A.  It was I think around the end of 2016.  I may not be

19   totally accurate on that.  I was not part of it.

20   Q.  Do you recall how you and other employees at the Pain

21   Center were informed that a walk-in clinic was going to be

22   started?

23   A.  Oh, it was just an announcement that we're going to do --

24   do this, and it started with sign -- a sandwich sign on the

25   sidewalk, and after a few months it was painted on the

1   building.

2   Q.   Okay.  Was -- was there ever a meeting where someone said,

3   "We're about to start a walk-in clinic"?

4   A.   Not that I was part of.

5   Q.   What did you -- how did you feel about it when you heard

6   that this was going to become a walk-in clinic?

7   A.   I thought it was the worst idea I had ever heard.

8   Q.   And why is that?

9   A.   Because it was going to be a Saturday walk-in clinic for

10  pain, and I was -- made no secret that I felt that that was an

11  invitation for drug users to come try to get pills and that we

12  would have a very low yield, if any, of legitimate patients.

13  Q.   Did any of the defendants on trial today have

14  conversations with you about starting a walk-in clinic?

15  A.   I asked Dr. Russo what it was like to work in the walk-in

16  clinic after it'd been going for a while.

17  Q.   And what did he say?

18  A.   He hated it.  He said, almost to the man, people are

19  coming in just looking for drugs and wanted very big numbers of

20  strong drugs, and they would walk out with a small prescription

21  of Norco and a back brace.

22  Q.   Okay.

23  A.   And they never came back.

24  Q.   Dr. Kufner, I'd like to move now to the fact that you were

25  a defendant in this case, correct?

1   A.   Yes, I am or was.

2   Q.   You were -- you were a named defendant in the indictment,

3   correct?

4   A.   I was.

5   Q.   But you are not going to trial?

6   A.   No.

7   Q.   And that's because you pled guilty?

8   A.   Yes, I did.

9   Q.   To one count of health care fraud conspiracy?

10  A.   Yes.

11  Q.   Why did you plead guilty?

12  A.   Because I did those things that I said I did in the plea.

13       MR. HELMS:   Your Honor, may I have one moment?

14       THE COURT:   Yes.

15       (Brief pause)

16  Q.   Dr. Kufner, with respect to you pleading guilty, did

17  the -- did the government promise you anything in return for

18  pleading guilty?

19  A.   Promise me?   No.

20  Q.   Did the government say they would dismiss the other counts

21  in the indictment against you other than Count 1?

22  A.   Oh, yes, they did dismiss other counts, yes.

23  Q.   Okay.   And did the government say it would recommend a

24  sentence not to exceed the midpoint of your guideline range?

25  A.   I believe that that was what was -- was said.

1  Q.  As part of your Rule 11 agreement?

2  A.  As part of it.  I know -- I know there were conversations,

3  and I'm going to be the first to admit I'm not a lawyer, but

4  that is my understanding, that the government has offered to

5  make recommendations, but Judge Murphy will be the one who

6  makes the decision what happens to me.

7  Q.  Okay.  And Dr. Kufner, you are now cooperating in this

8  case, correct?

9  A.  Yes, I am.

10 Q.  In fact, you have met with -- with me and with government

11 agents prior to this --

12 A.  Yes, I have.

13 Q.  -- trial?

14        And are you hoping that by cooperating and by

15 testifying today, that the government will file a motion to

16 lower your guidelines range?

17 A.  Well, I'm hoping for that, yes.

18 Q.  And has anyone promised you that's going to happen?

19 A.  No.  I would say Dr. -- or I'm sorry, my bad -- Judge

20 Murphy has made it clear that the decision is his and that I am

21 abiding by that.

22 Q.  Okay.  And are you hopeful that Judge Murphy will grant

23 you leniency?

24 A.  I'm hopeful.

25 Q.  But again, you've received no guarantees?

1    A.   None at all.

2    Q.   Okay.  Dr. Kufner, you have also filed what's known as a

3    qui tam complaint?

4    A.   I did.

5    Q.   Okay.  Are you able to explain to the jury in just broad

6    strokes what a qui tam is?

7    A.   It turns out that that is a civil action where somebody

8    witnesses what they believe is fraud and takes it to the courts

9    as a -- a whistleblower.

10   Q.   So it's someone who files a complaint on behalf of the --

11   of the United States saying fraud is happening against you?

12   A.   Yes.

13   Q.   In -- in summary, you have alleged that the Pain Center

14   and Dr. Bothra were defrauding the United States, is that fair?

15        MR. WEISS:  Leading question, Your Honor.  I'm going

16   to object.

17        THE COURT:  Sustained.

18        MR. WEISS:  Thank you.

19   BY MR. HELMS:

20   Q.   What is -- what is the general nature of the qui tam

21   complaint that you filed?

22   A.   It is Dr. Kufner and one other co-relator and the U.S.

23   government against Dr. Bothra and the Pain Center.

24   Q.   And what are the general allegations in your complaint?

25   A.   Medicare fraud and -- and --

| | |
|---|---|
| 1 | MR. CHAPMAN:  Your Honor, I have to object. |
| 2 | THE COURT:  Okay. |
| 3 | MR. CHAPMAN:  This completely mischaracterizes the |
| 4 | nature of the qui tam complaint.  Those are filed under the |
| 5 | False Claims Act and are essentially -- |
| 6 | THE COURT:  All right. |
| 7 | MR. CHAPMAN:  -- civil claims which do not require a |
| 8 | finding of fraud. |
| 9 | THE COURT:  All right.  Well, I'm going to overrule |
| 10 | the objection because he is stating his understanding of the |
| 11 | qui tam complaint, and I bet you will cross-examine him and |
| 12 | correct those issues that you just mentioned when you do it. |
| 13 | Go ahead, Mr. Helms. |
| 14 | BY MR. HELMS: |
| 15 | Q.  Well, and -- and for the record, Dr. Kufner, you have |
| 16 | alleged civil fraud claims in your complaint, correct? |
| 17 | A.  Yes. |
| 18 | Q.  Okay.  Through that -- through that complaint, if there's |
| 19 | a monetary recovery, are you hoping to get a portion of that |
| 20 | recovery? |
| 21 | A.  When I -- when it was filed, yes.  At this point I'm not |
| 22 | so sure. |
| 23 | Q.  What would you say the general allegations in your -- your |
| 24 | complaint are? |
| 25 | MR. WEISS:  Asked and answered, Your Honor.  He's |

1    already gone through it.

2          MR. HELMS:  But Your Honor, the -- the broad answer

3    was fraud and then there was an objection, and I don't think

4    he's actually mentioned what the actual final allegation --

5          THE COURT:  I'll -- I'll -- I'll allow -- allow the

6    answer if the doctor wants to --

7          MR. WEISS:  Thank you, Your Honor.

8          THE COURT:  -- convey his understanding of what the

9    complaint alleges in the qui tam action.  Go ahead.

10   A.  Well, the first thing that came to mind outside of issues

11   with the surgery center which we've already discussed, there

12   are others, but the first thing that compelled -- felt -- left

13   me feeling compelled to do something was when I saw over 1,500

14   billings of services that had been performed by Dr. Russo but

15   had been billed by Dr. -- for Dr. Bothra 'cuz Dr. Russo was not

16   yes -- yet credited with that insurance company.  So there were

17   a multitude of claims for work Dr. -- Dr. Bothra claimed he had

18   done but had been done by somebody else.

19   BY MR. HELMS:

20   Q.  Were there also claims in your complaint about the

21   overbilling of back braces?

22   A.  That was in there I believe.

23   Q.  Now, I -- you didn't mention -- strike that.

24         THE COURT:  How much longer now?

25         MR. HELMS:  10 to 15.  I think I said that last time

 1    too.

 2            THE COURT:  You said 15 or 20.  I think that's a

 3    good -- good -- good point -- the -- the jurors want you to

 4    finish, but I -- I think we'll let it go at that because it's

 5    warming up in here and it's 2:10.  Okay.  Why don't we take a

 6    break for the weekend at that point.

 7            MR. HELMS:  Thank you, Your Honor.

 8            THE COURT:  Thank you, Mr. Helms.

 9            Okay.  You may step down if you'd like, Doctor.

10            THE WITNESS:  Thank you.

11            (Witness excused at 2:10 p.m.)

12            THE COURT:  Okay.  So, ladies and gentlemen, we've

13    had a splendid week with a lot of trial practice and a great

14    deal of concentration and attention paid by our jurors and I

15    know you've -- you've worked hard.

16            The first thing I want to say is -- is that we're

17    going to start 10:00 o'clock on Monday.  So enjoy your weekend.

18    Relax.  I would strongly urge you to put this trial and any of

19    its facts completely out of your mind.  I would continue to

20    admonish you not to talk about the case with anybody for all

21    the reasons that I've said and to let us know if anyone wants

22    to talk about the case with you.

23            If you can be here anytime between 10:00 a.m. or,

24    excuse me, anytime before 10:00 a.m. on Monday, we'll get

25    started and go till about 3:00.  I anticipate we're going to

Case 2:18-cr-20800-SJM-APP  ECF No. 453, PageID.4978  Filed 07/18/22  Page 61 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

61

1    complete the testimony of -- of Dr. Kufner, but I do know we

2    have witnesses like the one earlier today who come from out of

3    town, and sometimes because of travel and all that, we -- we

4    sometimes let people get out of order a little bit just for the

5    convenience of -- of the witnesses who are not from Southeast

6    Michigan.  I don't know if we're going to have to do that on

7    Monday or not.  But otherwise, we'll be back at it and we'll go

8    for the remainder of next week and we'll -- we'll see where

9    we're at.  But I think we're making very good progress.  We're

10   up to our fourth witness.  We've had all the preliminaries and

11   we just have to hang in there together, okay?  All right.

12          Have a great weekend.  Let's all rise for our jury

13   and we'll take our weekend recess shortly.

14          (Jury excused at 2:12 p.m.)

15          THE COURT:  Okay.  Everybody may be seated.

16          I -- I want to talk just really, really quickly about

17   a couple of things.  I think the U.S. Attorney's being sworn in

18   downstairs and I'm sure some of you want to attend that and I

19   want you to attend that as well.

20          I -- I just have a question on the -- on the United

21   States' witness list, and I appreciate -- I got your, excuse

22   me, exhibit list as I requested that was marked.  1A, 2A, 3A,

23   et cetera are the transcripts of 1, 2, 3, et cetera, which are

24   recordings.

25          My question is, having seen the transcripts at the

1   bottom of the screen during the -- during the playing of the

2   videos and having you identify them, should we not just admit

3   1A through 16A inclusive and instruct the jury that the --

4   the -- the tapes are the evidence and the transcripts are

5   demonstrative aids?

6           MS. McMILLION:  Your Honor, with respect to that, it

7   has been the practice, and I have not had a discussion with

8   defense counsel, but just that we admit the actual exhibit.

9   And I understand that the Court has recognized that the video

10  or audio recording itself is the actual exhibit.

11          THE COURT:  Right.

12          MS. McMILLION:  We did have the agent on the stand at

13  least verify that he had reviewed them.

14          THE COURT:  Right.

15          MS. McMILLION:  They were provided to counsel so that

16  they could review them in advance so that we would need to make

17  any adjustments, but it literally is just an aid to a jury and

18  I don't think it's evidence in the case.

19          THE COURT:  Right, exactly.  So any objection to

20  admitting as demonstrative aids 1A through 16A inclusive?  No

21  one has an objection so I'm going to admit those and record

22  those on here.  So thank you to the lawyers on this.

23          Now, I do -- this was touchy.  When Mr. Helms had Dr.

24  Kufner on the stand, Mr. Chapman made a -- made a -- an

25  objection as to speculation regarding the witness's

1  understanding of what Bothra was saying about Edu's statement.

2  Mr. Helms responded that those were co-conspirator statements

3  and I agreed.

4       Now, *Bourjaily* from 1997 is black letter law that

5  admission of co-conspirator statements in a case like this,

6  notwithstanding the hearsay rule, does not violate the

7  confrontation clause.  I was trying to be extra careful about

8  the fact of this.  As -- as I was thinking this through, I

9  don't know, maybe you want to write a brief on this, maybe you

10  don't need to, but my concern was that Kufner asserted what

11  Bothra told him, and then probably pursuant to the conspiracy,

12  Edu said to Bothra, not to -- not to Kufner but to Bothra

13  that -- that he didn't like Kufner.  Now, is that a

14  co-conspirator's statement?  Yes.  But what was troubling me

15  was that Edu has no way to impeach Kufner on the basis of

16  Bothra not saying that or not being accurate because Edu can't

17  call Bothra to the stand.

18       So that was my -- that was my issue there.  You

19  probably didn't know that or -- or consider it, but that's why

20  I sustained the objection.  And if I'm wrong about that, I'd

21  like to know.  But -- but obviously *Bruton* and confessions

22  would have prohibited the introduction of a confession by Edu

23  against Bothra through Kufner or any other witness.  That's

24  black letter law, *Bruton vs. United States*, we all know that,

25  the co-conspirator -- conspiracy and confrontation issue.  But

1    that -- that's what was going on in my mind, and I just -- I

2    just wanted to -- I just wanted to explain that for you.

3            The Monday schedule's been set forth.  We're going to

4    go all week next week, 8:30 to 2:30 otherwise.

5            And Mr. Weiss, you -- your client hasn't had his

6    materials sent over to Livingston yet, is that what I'm told?

7            MR. WEISS:  Yes, Your Honor, that is my

8    understanding.  And what is exacerbating the situation is

9    there's no visitation for attorneys at the Livingston County

10   Jail over the weekend.

11           THE COURT:  Okay.

12           MR. WEISS:  And now that we're getting into some of

13   the scientific and medical aspects of the trial, the inability

14   for myself and Mr. Rogalski to discuss these matters in depth

15   with our client is impacting adversely our ability to

16   effectively represent him as he's entitled under the Sixth

17   Amendment.

18           And so I don't have the ability to countermand

19   Livingston County.  I don't have the ability to send him back

20   to Milan.  And I know we've gone through it with the Court and

21   I don't mean to be difficult, but I think I'd be remiss if I

22   didn't at least place on the record that what the marshals have

23   done by removing him from Milan is now really seriously

24   impacting my ability as well as Mr. Rogalski's ability to

25   represent our client.

1    THE COURT:  Okay.  All right.  Well, you -- the

2   record's crystal clear on that and I respect the -- the

3   objection.  You know, I don't want to have a mini trial on that

4   issue and, you know, there's some -- or I hesitate to say this.

5   There is some grounds for, you know, civil -- civil litigation

6   should -- should -- should all those things be true.

7        But in -- in terms of -- in terms of defendant

8   placement, administrative decisions of the -- of the marshal

9   and housing during trial, I have spoken with the Marshal

10  Service about this, I know Mr. Weiss has.  I've concerned --

11  I've conveyed my concerns, and I -- I -- I -- I'm at a loss to

12  overrule the marshal on -- on his decision.  I will consult

13  with Deputy Hughes who manages -- manages these things in our

14  district and I'll -- I'll discuss with him the essential nature

15  of the documentation and the fact that as of this morning

16  it's -- it still wasn't there 'cuz I think that is something I

17  should be able to do something about.

18        But otherwise, we -- we proceed apace, and if there's

19  a showing that -- that Dr. Bothra's not getting effective Sixth

20  Amendment counsel as a result of this issue, then we'll

21  consider that showing and see if we can do anything about it,

22  or maybe the Court of Appeals if there's a conviction will, but

23  I've gone as far as I can on this thing right now.  And I do --

24  I do respect the objection and -- and want to reassure

25  everybody on the defense side, Mr. -- Dr. Bothra, Mr. Rogalski

1  and Mr. Weiss, that I'm aware and proceeding as I can, okay.

2          MR. WEISS:  Thank you very much for allowing me to

3  make a record, Your Honor.

4          THE COURT:  Yeah, of course, of course.  All right.

5  I hope you all have a good weekend.  It's 2:20.  The U.S.

6  Attorney is being sworn in downstairs, and I don't think it

7  would be seemly for me to go striding up on the bench so I

8  probably won't be there.  I encourage you to go, and I believe

9  they'll probably have free food afterwards which you all

10  deserve, okay?

11          So with that, we'll call it a week and be in recess

12  till Monday morning at 10:00 a.m.

13          (Court in recess at 2:20 p.m.)

14          (Proceedings in the above-entitled matter continued

15          to Monday, May 23, 2022)

16                          —  —  —

17

18

19

20

21

22

23

24

25

Case 2:18-cr-20800-SJM-APP   ECF No. 453, PageID.4984   Filed 07/18/22   Page 67 of 67
Jury Trial Excerpt: Volume 4 • Friday, May 20, 2022

67

1                C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 66 comprise a full, true and correct excerpt of

7    proceedings taken in the matter of United States of America vs.

8    D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5

9    Christopher Russo, Case No. 18-20800, on Friday, May 20, 2022.

10

11                              s/Linda M. Cavanagh
                                _____
                                Linda M. Cavanagh, RDR, RMR, CRR, CRC
12                              Federal Official Court Reporter
                                United States District Court
13                              Eastern District of Michigan

14

15

16

17

18   Date: July 18, 2022
     Detroit, Michigan
19

20

21

22

23

24

25