```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
      UNITED STATES OF AMERICA,
 4
                          Plaintiff,
 5        vs.

 6    D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
      D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7    D-4 DR. DAVID LEWIS
      D-5 DR. CHRISTOPHER RUSSO,
 8
                          Defendant.
 9    _____/

10                 JURY TRIAL EXCERPT: VOLUME 7

11        BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                   United States District Judge
12          Theodore Levin United States Courthouse
                  231 West Lafayette Boulevard
13                  Detroit, Michigan  48226
                   Wednesday, May 25, 2022
14
      APPEARANCES:
15
      For the Plaintiff        BRANDY R. McMILLION
16    United States of America: BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
      For the Defendant        ARTHUR J. WEISS
20    D-1 Dr. Rajendra Bothra: 30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                             (Appearances continued next page)

24

25
```

```
 1    APPEARANCES:  Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
           To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                         Official Court Reporter
25            (313) 234-2616 • www.transcriptorders.com
```

```
 1                        TABLE OF CONTENTS

 2   Government Witnesses:                              Page

 3   RONALD KUFNER
```

```
 4       Direct Examination Continued by Mr. Helms..........6
         Cross-Examination by Mr. Weiss....................35
 5       Cross-Examination by Mr. Collins..................63
         Cross-Examination by Mr. Harrison.................92
 6       Cross-Examination by Mr. Margolis................114
         Redirect Examination by Mr. Helms................168
```

```
 7

 8

 9

10

11

12

13

14

15

16                           EXHIBITS

17   Identification                    Offered    Received

18   Government Exhibit No. 174,          21         22
     Consent Forms
19

20

21

22

23

24

25
```

```
1              Detroit, Michigan
2              Wednesday, May 25, 2022
3                        _   _   _
4              (Proceedings commenced at 8:53 a.m., all parties
5              present)
6              THE LAW CLERK:  All rise for the jury.
7              (Jury entered the courtroom at 8:53 a.m.)
8              THE LAW CLERK:  The United States District Court for
9    the Eastern District of Michigan is now in session, the
10   Honorable Stephen J. Murphy, III presiding.
11             THE COURT:  Okay.  Everybody may be seated.
12             THE LAW CLERK:  The Court now calls Case No.
13   18-20800, United States versus Rajendra Bothra, et al.
14             Counsel, please state your appearances for the
15   record.
16             MS. McMILLION:  Good morning, Your Honor.  May it
17   please the Court, Brandy McMillion appearing on behalf of the
18   United States.
19             MR. HELMS:  Good morning, Your Honor.  Brandon Helms
20   on behalf of the United States.
21             THE COURT:  Good morning.
22             MR. HARRISON:  Good morning, Your Honor.  Robert
23   Harrison appearing on behalf of Dr. Edu who is to my left.
24             THE COURT:  Welcome.
25             MR. WEISS:  Good morning, Your Honor.  May it please
```

1  the Court, Arthur Weiss, co-counsel for Dr. Bothra.

2      MR. ROGALSKI:  Good morning, Your Honor.  Alan

3  Rogalski appearing on behalf of Dr. Bothra.

4      THE COURT:  Welcome.

5      MR. CHAPMAN:  Good morning, Your Honor.  Ronald

6  Chapman on behalf of Dr. Lewis who is to my left.

7      MR. COLLINS:  And good morning, Your Honor.  Jeffrey

8  Collins on behalf of Dr. David Lewis.

9      THE COURT:  Okay.

10      MR. MARGOLIS:  Good morning, Judge.  Laurence

11  Margolis on behalf of Dr. Russo.

12      THE COURT:  Okay.  Good morning to all of our

13  lawyers.  Thank you for being here on time and ready to go as

14  always.  Welcome back to our jurors.  It's 8:54 and timewise

15  we're in very good shape.

16      I believe our next move in the trial is to return to

17  the testimony of Dr. Kufner.  You recall he was on the stand

18  last week and then we went out of turn to get the -- the doctor

19  from New York here.  So we're going to go back to Dr. Kufner

20  now.  Frankly, I don't remember where we were.  Were we doing

21  direct examination?

22      MR. HELMS:  We were still on direct, Your Honor.

23      THE COURT:  Okay.  So we'll start out there.  And

24  there's no magic or need for instruction, you know.  You

25  remember the evidence as it comes in.  We took a hiatus on Dr.

1    Kufner to get some other things done and now we're going back

2    to his direct exam, okay?  All right.  Thanks again, ladies and

3    gentlemen, for your attention and we're ready to go.

4              MR. HELMS:  Dr. Kufner, you can go up to the witness

5    stand.

6              THE COURT:  Good morning, Doctor.  You can have a

7    seat and relax and take your mask off like last time, and we

8    don't have to give you another oath 'cuz we did that last week.

9              And when you're ready, Mr. Helms, you go right ahead.

10             MR. HELMS:  Thank you, Your Honor.

11                      R O N A L D   K U F N E R

12   was recalled as a witness herein, and after previously being

13   first duly sworn to tell the truth and nothing but the truth,

14   resumed the stand testified on his oath as follows:

15                   DIRECT EXAMINATION CONTINUED

16   BY MR. HELMS:

17   Q.  Good morning, Dr. Kufner.

18   A.  Good morning.

19   Q.  Welcome back.

20             Dr. Kufner, is it fair to say that you performed

21   sedation for a number of patients for which Dr. Bothra

22   performed injection procedures?

23   A.  Yes, it is.

24   Q.  So when Dr. Bothra would do injection procedures, would

25   you be in the room for the entire procedure?

1    A.   I had to be, yeah.

2    Q.   That's part of what an anesthesiologist does?

3    A.   Yes.  I have to be there before and after Dr. Bothra.

4    Q.   And would you perform sedation on particular patients for

5    each of their injection sessions?

6    A.   I'm sorry?

7    Q.   For some patients would you be there for more than one

8    particular injection section -- session, so one week that

9    patient, then maybe a few weeks later the same patient?

10   A.   Oh, yes, that happened.

11           THE COURT REPORTER:  Doctor, can you keep your voice

12   up please?

13           THE WITNESS:  Okay.  Is that better?

14           THE COURT REPORTER:  Yes.

15   Q.   And for each procedure where you performed sedation would

16   you review the patient file ahead of time?

17   A.   Yes, I would.

18   Q.   So based on that experience with Dr. Bothra -- Dr.

19   Bothra's injections, did you -- did you happen to notice any

20   type of progression or pattern with those injections?

21   A.   Well, yes.  It was not all the time but it was certainly

22   noticeable.  In fact, there were conversations at meetings with

23   Dr. Bothra and other doctors about progression of treatment --

24   Q.   And before --

25   A.   -- as suggestions.

1    Q.  Before we get to those progressions -- those suggestions,

2    let's start first with what was the -- the typical progression

3    that you saw?

4    A.  Well, somebody who had back pain, it'd be a caudal

5    epidural and then followed by facet injections, which were test

6    injections, followed by Rhizotomy.

7    Q.  So that first round would be caudal epidural injections?

8    A.  Usually, yes.

9    Q.  And would it be one session or two typically?

10   A.  One, maybe two.

11   Q.  And then the second round would be facet injections?

12   A.  Yes.

13   Q.  And would that be one or two rounds?

14   A.  Well, if they had never had injections before, they were

15   required to have two test injections.

16   Q.  And then the third step in that progression was I believe

17   you said Rhizotomy?

18   A.  Rhizotomy on one side.

19   Q.  And is that also known as radiofrequency ablation?

20   A.  It is.

21   Q.  Were there times when Dr. Bothra would do both facet

22   injections and caudal epidurals regardless of the medical of

23   the patient in your opinion?

24   A.  I'm sorry, I'm having a hard time catching --

25          MR. WEISS:  I'm going to object.  We never got a Rule

Case 2:18-cr-20800-SJM-APP ECF No. 454, PageID.4993 Filed 07/18/22 Page 9 of 178
Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

9

1    16 disclosure that Dr. Kufner was going to be a government

2    expert.

3            THE COURT:  I tend to agree with the phrasing of --

4    of -- of the question.  He wouldn't be able to offer an opinion

5    unless you qualified him or put some foundation down.

6            Go ahead, Mr. Helms.

7    BY MR. HELMS:

8    Q.  Dr. Kufner, how long did you work at the Pain Center?

9    A.  I was there over three years.

10   Q.  And during your time there did you perform anesthesia for

11   patients receiving injections?

12   A.  Yes, I did.

13   Q.  Did you also perform your own injections?

14   A.  Yes, I did.

15   Q.  And are -- were you trained in performing anesthesia?

16   A.  Yes, I am.

17   Q.  And were you trained in performing injections?

18   A.  Yes, I am.

19   Q.  And during the course of -- since when you pled guilty in

20   this case, have you met with the government on various

21   occasions?

22   A.  I'm sorry, could you say again?

23   Q.  Since the time that you pled guilty in this case, have you

24   met with the government on various occasions?

25   A.  Have I met with?

1    Q.  Myself and other government agents.

2    A.  Oh.  Yes, I'm sorry.  My hearing aids are turned up and

3    sometimes that works against me.  I apologize.

4    Q.  That's -- that's fine.  Whenever you can't understand me,

5    just let me know, Dr. Kufner.

6             During those meetings do you know if interview

7    reports were written up for those meetings?

8    A.  Interview reports?

9    Q.  Yes, of what you would tell us.  You may or may not know

10   that.

11   A.  No, I don't know that.  I -- I know that there were -- I

12   had an idea what questions would come my way.

13   Q.  Okay.

14            MR. HELMS:  I rep -- I would represent to the Court

15   that those reports have been provided to defense counsel.

16   With -- with that background, Your Honor, may I proceed?

17            THE COURT:  No.  No.

18            MR. WEISS:  Your Honor?

19            THE COURT:  You have to show that he has the

20   capability to offer an opinion.  The issue is not what the

21   defense got.  It's the offer of what he's able to -- it's the

22   issue of what he's able to tell the jury under 702.  I don't

23   think he's able to offer opinions unless he's qualified to do

24   so.  He worked at the Pain Center and he can testify about what

25   he saw and did there.

```
 1          MR. HELMS:  So I can be clear, Your Honor, are you
 2   looking for me to provide further information as to why he
 3   would be qualified or should I --
 4          THE COURT:  I'm not looking for a thing.  It's your
 5   witness, it's your questioning, you proceed as you want.  I
 6   sustained the objection on the grounds of a 702 issue raised by
 7   Mr. Weiss.
 8          Go right ahead.
 9          MR. WEISS:  Thank you, Your Honor.
10   BY MR. HELMS:
11   Q.  Dr. Kufner, during the course of your time at the Pain
12   Center was it your job to evaluate whether or not injection
13   procedures were medically necessary for patients?
14   A.  On my own patients, yes.
15   Q.  Okay.  And how often would you do that?
16   A.  On every patient.
17   Q.  So do you have an idea of ballpark how many patients you
18   determined the medical necessity of injections?
19   A.  It's a big number.  I was there for a long time.  I saw a
20   lot of patients.
21   Q.  Okay.  And so with regard to caudal injections and --
22   caudal -- caudal epidurals and facet injections that Dr. Bothra
23   would perform, were there on occasion times when you felt that
24   you would not have provided those injections?
25          MR. WEISS:  Well, Your Honor, number one, I'm still
```

1   going to renew my objection, respectfully.

2         Secondly, the issue's not whether he would do it or

3   anyone else would do it. That's not the standard that we're

4   faced with in this case.

5         THE COURT: Okay. All right. I -- I think he can

6   answer that question from the perspective of an individual

7   doctor with his background and work experience making a

8   decision personally not to have provided an injection or a

9   procedure that was different from someone else's at -- at the

10   clinic, so I'll allow that.

11         Go ahead, Dr. Kufner.

12   A. Specifically in Dr. Bothra's case, there were times that I

13   recall clearly where patients were saying that they had other

14   areas that were more painful and asked why we couldn't have

15   attention on that, done on that, and Dr. Bothra's answer every

16   time was, "We have to complete what we're doing and then we can

17   talk about the other pain." I personally would have dealt with

18   the problem that the patient felt was most urgent.

19   BY MR. HELMS:

20   Q. After Dr. Bothra performed injection procedures, can you

21   tell the jury whether he would follow up with those patients to

22   evaluate the effectiveness of the procedures?

23   A. No, I can't say that. I was not allowed in the clinic in

24   Warren, and his conversations with the patients were usually in

25   realtime in the operating room about what was happening at that

 1   moment.

 2   Q.  Did you review medical files, the patient charts for the

 3   patients that Dr. Bothra performed procedures on?

 4   A.  Yes, I did.

 5   Q.  Did you notice in these medical charts instances where Dr.

 6   Bothra had assessed the effectiveness and documented that?

 7   A.  Well, as far as looking at the patient notes, I never saw

 8   any followup about effect of the injections.

 9   Q.  Were injection procedures typically given at the Pain

10   Center unilaterally or bilaterally?

11   A.  Oftentimes they're done bilaterally, but in the case of

12   Rhizotomy, those were always done unilaterally, coming back

13   later and doing the second site.

14   Q.  Did you ever hear a patient ask Dr. Edu why he was giving

15   an injection on -- on a side of the body where that patient had

16   no pain?

17   A.  Yes, I did on two occasions.

18   Q.  And how did Dr. Edu respond to that patient, those

19   patients?

20   A.  He told the patient that we needed to do that side because

21   pain can jump from one side to the other.

22   Q.  And in your experience can pain jump from one side to the

23   other?

24   A.  No, it does not.

25   Q.  Did you also witness a patient ask Dr. Bothra why he was

```
 1   getting a back injection in his back when his neck was hurting
 2   him more than his back?
 3   A.  I heard those kind of questions, yes.
 4   Q.  And how did Dr. Bothra respond to those types of
 5   questions?
 6   A.  As I said before, he said, "We have to complete what we're
 7   doing and we'll deal with this other issue later."
 8   Q.  And in your experience is that what you would have done?
 9   A.  Absolutely not.
10   Q.  Why not?
11   A.  Because I feel that the patient tells me where their needs
12   are, and my job as a physician was to attend to those needs
13   even if it didn't follow some predetermined sequence.  This is
14   not an issue of life or death; it's an issue of comfort.
15   Q.  Did Dr. Bothra ever get upset at you for not following the
16   typical -- the typical progression of injections that he would
17   follow?
18   A.  Oh, yes.  I recall that it actually came out in a meeting
19   with other physicians.
20   Q.  Do you recall who else was at that meeting?
21   A.  Well, I had a patient I believe started with back pain and
22   we were working on that, and his back pain was still there but
23   got better.  And then he said, "But, you know, my neck really
24   hurts a loss worse," and I said, "Let's do the neck," which we
25   did.  And I don't recall whether it was an epidural or facet
```

1   injection; it was just attending to that area of the body.

2        And then either for the patient's needs or I was out

3   of town, whatever, that patient was seen by Dr. Bothra for one

4   of those injections.  And later in the meeting and -- well, I

5   should go back and say that I took back over care of the

6   patient.

7        MR. WEISS:  Your Honor, we're getting into a

8   narrative right now.  I'm going to object.  It should be by

9   question and answer.

10       THE COURT:  Okay.  Why don't you finish up what

11  happened in that instance, Doctor, and then we'll go back to

12  the next question, Mr. Helms.  Go right ahead.

13  A.  Yeah.  So the short answer is that in the meeting Dr.

14  Bothra complained that I didn't finish what I had started and

15  it was confusing to him.

16  BY MR. HELMS:

17  Q.  And do you recall who else was at that meeting?

18  A.  I know that Dr. Edu was there.  I don't recall whether --

19  I don't think Dr. Russo had joined the practice by then.

20  Q.  Did Dr. Bothra ever tell you to keep injections under the

21  radar?

22  A.  Oh, yes, yes.

23  Q.  And can you explain to the jury what he meant by that or

24  what you interpreted that as?

25  A.  Well, when I first started there he wanted us to keep the

1   fluoroscopically guided injections down to eight to ten per

2   patient per year, and that later became six to eight per

3   patient per year, and the purpose being that if we did more

4   injections, it was more likely it would trigger a review and

5   have people looking at what we were doing.

6   Q.  So if a particular patient was getting too many

7   injections, that might trigger a review?

8   A.  It might.

9   Q.  So did Dr. Bothra say what to do to make up for that lack

10  of injections for a particular patients?

11  A.  I'm sorry, did Dr. Bothra say what?

12  Q.  Did Dr. Bothra offer any suggestion how to make up for the

13  fact that he was reducing injections for individual patients?

14  A.  Well, not directly, but he wanted a lot of injections

15  done, which if you're doing fewer injection per patients, it

16  obviously means you need to involve more patients.

17          MR. WEISS:  Your Honor, I'm going to object as to

18  what obvious is.  He doesn't know what was in Dr. Bothra's

19  mind.  He's making an assumption here.

20          THE COURT:  Okay.  I'll -- I'll strike the word

21  obvious.  It may be obvious to the witness, that's fine.  But

22  he's testifying as to his understanding from the discussions he

23  had about how they were going to -- he and Dr. Bothra were

24  going to pursue this issue.

25          Go ahead, Mr. Helms.

Case 2:18-cr-20800-SJM-APP   ECF No. 454, PageID.5001   Filed 07/18/22   Page 17 of 178
Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

17

```
 1              MR. WEISS:  Thank you, Your Honor.
 2              THE COURT:  Yes, sir.
 3              MR. HELMS:  Your Honor, Mr. Weiss interrupted while
 4    the doctor was still speaking.  Could I have the court reporter
 5    read back the answer without the word obvious in it?
 6              THE COURT:  Well, I don't think the court reporter
 7    reads back answers, so...
 8              MR. HELMS:  Could I reask the question then, Your
 9    Honor?
10              THE COURT:  I think I heard everything he said, and
11    you can follow up with a next -- a new question if you want.
12    Go right ahead.
13    BY MR. HELMS:
14    Q.  Dr. Kufner, let's turn to a different topic.  I want to
15    talk to you about informed consent, okay?
16    A.  Yes, sir.
17    Q.  Can you explain to the jury what informed consent is?
18    A.  Informed consent essentially means that the patient has
19    been given enough information to have an understanding of the
20    procedure, the risks and complic -- possible complications and
21    has agreed to do so.
22    Q.  And is informed consent important in the medical practice?
23    A.  Absolutely.
24    Q.  At the Warren location who presented informed consent
25    forms to the patients?
```

1           MR. WEISS:  His testimony was Dr. Bothra didn't allow

2    him to go to Warren so how would he know?

3           MR. HELMS:  Your Honor, I think that misstates his

4    testimony, but I can ask a couple of questions to set a

5    foundation.

6           THE COURT:  Okay.  Please do.  Go right ahead.

7    BY MR. HELMS:

8    Q.  Dr. Kufner, you -- on the clinic side you practiced in

9    Eastpointe, correct?

10    A.  In the clinic, but I was still in Warren for injections

11    and sedation.

12    Q.  Okay.  So you would go to the Warren location frequently

13    to do anesthesia?

14    A.  Correct.

15    Q.  For Dr. Bothra's patients?

16    A.  Yes.

17    Q.  And you would also perform your own injections at the

18    Warren location?

19    A.  Yes.

20    Q.  Okay.  So based on your time in the Warren location, who

21    presented the informed consent forms to the patients?

22    A.  Most of the time it was the medical assistants would take

23    it to the patient and have it signed.

24    Q.  And if a medical assistant had the patient sign that form

25    rather than the doctor, is there a concern there?

1    A.   If the medical assistant had that signed instead of the

2    doctor, what was the rest?

3    Q.   Is there a concern about that?

4         MR. WEISS:  Your Honor, I'm going to object.  My

5    impression is, is that he didn't see this.  He's assuming that

6    the medical assistant took it.  We have to have firsthand

7    knowledge and with some specificity rather than just a belief.

8         THE COURT:  Well, that's true.  Let me review the

9    transcript to see whether or not he's offering testimony on the

10   basis of assumptions.

11        (Brief pause)

12        Well, you -- you should -- you should try to avoid --

13   I think, Mr. Helms, if you can avoid the hypos, if a medical

14   assistant, then this, and just ask more open-ended questions

15   along the lines of what did the medical assistant do with the

16   form, if you know, and that should cure the objection and the

17   response.  Go right ahead.

18        MR. WEISS:  Thank you, Your Honor.

19   BY MR. HELMS:

20   Q.   Dr. Kufner, if you know, what did medical assistants at

21   the Warren location do with the informed consent forms?

22   A.   They would set them on the counter with other forms that

23   belonged with that particular patient, and then the physician

24   would sign those forms, the consents, and in many cases even

25   after the procedure was done, and that I saw firsthand.

1   Q.   You saw firsthand doctors signing the informed consent

2   forms after the procedure had been done?

3   A.   I'll go even a step farther.  I tried to control it, but

4   still if the MAs forgot my rule and had the patient sign it

5   before I saw the patient, rather than make them do it over

6   again, I would go ahead and sign it when I saw the patient.

7   Q.   So there were particular instances where medical

8   assistants for your patients had the informed consent form

9   signed before you saw the patient?

10   A.   Yes, but it was against my instructions.

11   Q.   And so then you would go over the informed consent with

12   the patient?

13   A.   Yes.

14   Q.   Now, on the occasions when you noticed that a medical

15   assistant had the patient sign the form rather than a doctor,

16   why isn't that your -- why is that not your practice?

17   A.   It is the doctor's responsibility before the procedure to

18   see the patient, review the procedure in realtime, answer any

19   questions that are being made, and then sign the consent before

20   the patient signs the consent.

21   Q.   Because it's important for the patient to understand what

22   they're having done that day?

23   A.   Yes, it is.

24   Q.   Dr. Kufner, you should have in your binder there an

25   Exhibit 174, and I can approach and help you if you need it.

 1    A.   Which one are you looking at?

 2         (Brief pause)

 3    Q.   Dr. Kufner, do you recognize what Exhibit 174 is?

 4    A.   It is a consent.  It's redacted but appears to have a

 5    patient's signature, and it's for radiofrequency ablation of

 6    the left facet.

 7    Q.   And is there more than one consent form contained within

 8    Exhibit 174?

 9    A.   I'm sorry, is there more one consent form?

10    Q.   Contained within that exhibit.  So is there multiple --

11    multiple pages of consent forms?

12    A.   Oh, yes, there's quite a few, yes.

13    Q.   How did you obtain copies of these consent forms?

14    A.   This was at a time when I had already decided that it was

15    in my best interests to have some documentation of what was

16    going on, and when I would see these I would take these off of

17    the counter and take them into another room, and these are

18    actually prints of pictures that I took, and then I would

19    return these back to be signed and -- and dealt with.

20    Q.   Okay.  And do you recall approximately when you obtained

21    the pictures of these forms?

22    A.   Yes.  I remember it started after I had found other

23    evidence and had decided it was time for me to go.

24         MR. HELMS:  Your Honor, at this point I would move

25    Exhibit 174 into evidence.

1          THE COURT:  Okay.  No objection and received.  Go

2      ahead.

3          MR. HELMS:  Ms. Adams, could you pull up 174?

4      BY MR. HELMS:

5      Q.  So Dr. Kufner, this -- this first form here is dated I

6      think it's February 25th, 2017.

7      A.  Yes, it is.

8          MR. CHAPMAN:  Your Honor, we don't have this on our

9      screen.

10          THE COURT:  Okay.  Well, here we go again, huh?

11          (Brief pause)

12          I think we should get an IT audit every morning at

13      8:00 a.m., seriously, Linda.

14          THE COURT REPORTER:  I will, Judge.

15          THE COURT:  I think we ought to get an IT audit every

16      morning at 8:00 a.m. 'cuz this is not -- not in my interests to

17      be sitting through this kind of stuff or the jurors.  Okay.

18          Go -- go ahead, Mr. Helms.

19      BY MR. HELMS:

20      Q.  Dr. Kufner, at the top of that first page do you see a

21      date of February 25th, 2017?

22      A.  Yes, I do.

23          MR. HELMS:  And Ms. Adams, if we could scroll to the

24      bottom of that page.

25      BY MR. HELMS:

```
 1   Q.  The -- the physician's signature line at the bottom there,
 2   is it signed?
 3   A.  It is not signed.
 4   Q.  So is this an example of what you've been talking about?
 5   A.  Yes, it is.
 6            MR. HELMS:  If we go to page 2, Ms. Adams.
 7   BY MR. HELMS:
 8   Q.  Again, is this another example of an informed consent form
 9   where the patient has signed but the physician has not?
10   A.  That's correct.
11   Q.  Okay.  And we don't need to go through every form in this
12   exhibit, but can you tell the jury approximately how many forms
13   you have in Exhibit 174?  And there's page numbers at the
14   bottom that should help you.
15   A.  They don't seem to be numbered so it looks like 55.
16   Q.  Fifty-five incent [sic] -- informed consent forms?
17   A.  Yes.  If that represents the number in this stack,
18   that's -- that would be correct.
19   Q.  In fact, on this particular page 2 is the procedure even
20   listed on this form?
21   A.  No, it is not.
22   Q.  So aside from the fact that a physician didn't go over
23   this form with a patient --
24            MR. WEISS:  Objection, Your Honor.  Assumes facts not
25   in evidence that the physician didn't go over it simply because
```

1    there's no signature.  We don't know what happened unless he

2    was present when the patient executed it and under the

3    conditions that the patient signed it.

4            THE COURT:  Okay.  I don't know if that's true or not

5    so I can't rule on the objection.  I think you can

6    cross-examine the witness on that, but, Mr. Helms, you may want

7    to clear that up with Dr. Kufner.  Go right ahead.

8            MR. WEISS:  Thank you, Your Honor.

9    BY MR. HELMS:

10   Q.  Dr. Kufner, is this an example of where you were concerned

11   that perhaps a patient had not received the information from

12   the physician about the procedure?

13   A.  It is.

14   Q.  And on this particular page is the procedure even listed

15   on the form?

16   A.  No, it is not.

17   Q.  But the patient has signed?

18   A.  That the patient has signed.

19   Q.  And within Exhibit 174 are there other examples where the

20   procedure line is also blank?

21   A.  The first six or eight that I see are exactly the same.

22   As I keep going, that is -- yes, that is the issue.

23   Q.  And you don't need to review every page, Doctor.  You can

24   stop there.

25   A.  Yeah, okay.

1   Q.  Now, again, besides yourself, who was performing the

2   injection procedures at the Warren location?

3   A.  Drs. Edu, Russo and Lewis.

4   Q.  As well as Dr. Bothra?

5   A.  Dr. Bothra.

6   Q.  Now, I'd also like to direct your attention to

7   Exhibit 116E which is the patient file for Victoria Loose

8   already in evidence.

9           MR. HELMS:  And Ms. Adams, if you could pull up page

10  164.

11  A.  You said 168?

12  BY MR. HELMS:

13  Q.  164.  Can you see it on your screen there, Doctor?

14  A.  Oh, yes.

15  Q.  Is this an example of a form where the physician's

16  signature is not there?

17  A.  Yes, it is.

18  Q.  And if you look at the top, can you tell what the date is

19  for that form?

20  A.  It is October 27th, 2017.

21  Q.  And who is the patient?

22  A.  Is Victoria Loose.

23          MR. HELMS:  And Ms. Adams, if you could go to one

24  page prior, 163.

25  A.  Was there a question there?

1    BY MR. HELMS:

2    Q.  Yes.  So Dr. Kufner, if you look at the top of that page,

3    is that for Victoria Loose?

4    A.  That's Victoria Loose.

5    Q.  Same date, October 27th, 2017?

6    A.  Yes, it is.

7    Q.  And there's a doctor's signature at the bottom of that

8    page.  Do you see that?

9    A.  Yes, there is.

10   Q.  Who is it for?

11   A.  Dr. Lewis.

12   Q.  So the informed consent form on 164 should have been

13   signed by Dr. Lewis?

14   A.  That would be my understanding, yes.

15   Q.  I'd like to move now to time spent with patients at the

16   Pain Center.  Is that okay, Dr. Kufner?

17   A.  Time...

18   Q.  Time spent with the patient in the exam room.

19   A.  Yes.

20   Q.  What is a 2 -- 99214 code used for, can you explain that

21   to the jury?

22   A.  Those are for visits which involve complex history,

23   physical discussion with the patient, examination.  It's one of

24   the higher codes.

25   Q.  Can you move the microphone a little closer?

1   A.  Oh, sorry.  It's -- it's one of the higher codes.

2   Q.  When you say higher codes, does that apply to an extended

3   visit?

4   A.  It would imply 15 to 20 minutes with the patient.  In

5   fact, in the guidelines for Medicare, that is one of the

6   criteria that can be met.  There are several criteria.

7   Q.  In your practice, how many patients a day would you see?

8   A.  Early on, 20 to 40.  By the time I was leaving, 40 to 60.

9   Q.  And do you -- do you know -- before you give me the

10  answer, do you know if the defendants on trial, how many

11  patients a day they would see?

12  A.  He had schedules posted that were still up when I came by

13  after my clinic closed and when I came over after my days in

14  the injection room, and I would see over a hundred, sometimes

15  120 returning patients and as many as 10 to 20 new patients in

16  a day.

17  Q.  So based on the patient schedules and the time spent with

18  each patient, do you think it was appropriate for -- let's say

19  for you to bill for 99214?

20  A.  It'd be impossible.

21  Q.  And if the other doctors were seeing similar number of

22  patients, would it have been possible for them to bill for a

23  99214?

24          MR. WEISS:  Your Honor, this is speculative because

25  we don't know what the other physicians did.  Simply because he

 1   did it, that's his concern.

 2         MR. HELMS:  Your Honor, the witness has testified

 3   that he saw patients' schedules that were greater than his own

 4   schedule, and it's impossible --

 5         THE COURT:  Again -- again, I might -- I might

 6   recommend -- I might -- I might recommend what -- what is your

 7   conclusion with regard to other doctors seeing similar number

 8   of patients, because I agree when you ask the if/then, that's

 9   a -- that's a question that's going to draw an objection.  Go

10   right ahead.

11         MR. WEISS:  Thank you, Your Honor.

12   BY MR. HELMS:

13   Q.  Dr. Kufner, what is your conclusion, based on how long you

14   know it takes to meet with a patient and how many patients were

15   being seen, as to whether or not the other doctors could have

16   billed for 99214?

17   A.  Well, my conclusion is --

18         MR. COLLINS:  Your Honor, we would object to that.

19   That's giving his opinion.

20         THE COURT:  Well, I think he can testify as to his

21   firsthand knowledge and give his conclusion about what those

22   types of documents would show based on his work and presence.

23   I think we're talking about Warren at this point.  So I'll

24   overrule the objection and just instruct the witness to stay

25   close to what you know based on your work at the Pain Center.

1    Go ahead, Doctor.

2    A.   Well, I would say that taking into account my training

3    with board certification in pain management by the American

4    Board of Anesthesiology and having been schooled on what is

5    expected by professors in pain management and anesthesia, what

6    it would be expected for 99214, I can say with certitude it

7    would be impossible for a single person to see a hundred

8    patients and bill at that level.

9    BY MR. HELMS:

10   Q.   Now, I'd like to turn to a different topic, Dr. Kufner,

11   involving the parking lot at the Pain Center, okay?

12   A.   Yes, sir.

13   Q.   Do you recall a meeting involving the doctors and the PAs

14   at the Pain Center regarding the parking lot?

15   A.   I do.  I wasn't invited but went there anyway.  I had

16   already given resignation.

17   Q.   So you were present at this meeting?

18   A.   I was.

19   Q.   Do you recall who else was present?

20   A.   Drs. Edu, Russo, Bothra.  There were -- I recognized one

21   PA, I can't remember his name, and I think there was a nurse

22   practitioner there.  Did I mention Dr. Lewis was there?

23   Q.   I believe you did.

24   A.   Essentially the whole staff including the medical

25   assistants and secretaries were there.

1  Q.  And what was being discussed at that meeting?

2  A.  A number of items.  I came into the middle of it.

3  Q.  Was there a discussion about armed guards?

4  A.  Yes.

5  Q.  Can you tell the jury about that?

6  A.  Dr. Lewis late in the meeting suggested that we needed

7  armed guards in the clinic.

8  Q.  And did he say why he believed that the clinic needed

9  armed guards?

10  A.  Because there had been some serious problems with

11  disruptive patient -- disruptive behavior with patients and

12  that there had been activity in the parking lot that caused

13  great concern.

14  Q.  Did he say what that activity in the parking lot that

15  caused concern was?

16  A.  Yes.  He said drinking, drug use and drug sale.

17  Q.  People selling drugs in the parking lot?

18  A.  Yes.

19  Q.  How did Dr. Bothra respond?

20  A.  With a very common response when he didn't like what he

21  heard.  He would say, "We know this goes on, it's not all that

22  bad, we're doing as much as we can do, we can't control

23  everything," comments like that, and he used those all at that

24  time.

25  Q.  So did anything happen after that meeting?

1    A.  Well -- actually Dr. Lewis persisted and Dr. Bothra never

2    committed, he said he would think about it, but then armed

3    guards did appear sometime later.

4    Q.  Did any of the doctors at that meeting suggest calling the

5    police about what was going on?

6    A.  No.

7    Q.  Did any of the doctors suggest taking a harder look at

8    their patients to see which ones might be dealing drugs?

9    A.  At that time, no.

10   Q.  Now, Dr. Kufner, as we've already established, you've pled

11   guilty in this case?

12   A.  Yes, I have.

13   Q.  Can you walk the jury through some of the things that you

14   think you did that were illegal?

15   A.  Well, most easily I identify is for the first year I was

16   billing for injections that didn't even happen but it was in

17   good faith, but it was still billing for procedures I had not

18   done.  That could be confusing, but it's the number of needles

19   required for facet injection versus an injection that goes on

20   the nerves that go to those joints.

21        And in my initial training there Dr. Bothra showed me

22   how he circled on the billing sheet for the -- for the work he

23   did, and the technique he was using would have required four

24   needles for three joints.  He was circling for three joints and

25   in later conversations said, "No, this is the way it is now and

1    the billers know what to do and they're doing everything

2    correctly," and I accepted that for fact only to find out about

3    a year later that was not true.

4    Q.  So to clarify that, you felt you were billing for more

5    injections than what should have been billed for?

6    A.  At the time I was billing I thought I was handling it

7    properly even though I had reservations and questions I let go

8    unanswered for far too long, but it became clear later that no,

9    I was billing, overbilling and saying -- and was getting paid

10   for injections I had not done.

11   Q.  And when you were overbilling, why were you doing that?

12   A.  Because I'd been assured by Dr. Bothra that this was as

13   the rules were.  When I confronted him about it early on, he

14   talked about his conversations with Dr. Manicotti who's a

15   national figure, with other pain clinics and even with the

16   insurances.  I asked him specifically if he discussed what we

17   were doing with the insurance companies and that he -- and that

18   we know from them that they're okay with what we're doing.  He

19   looked me straight in the face and said yes.

20   Q.  Was there anything else during your time at the Pain

21   Center that you felt you were doing was illegal?

22   A.  With the needles?

23   Q.  With anything else, or is that the -- the bulk of it?

24   A.  Oh, no, there was -- there was more.  I mean at -- at

25   times, anesthesia time, my first day Dr. Edu told me that what

1    he did was take 15 minutes for these procedures, ten minutes

2    for those procedures.  And Dr. Bothra could be very quick.  He

3    could have a procedure done in three or four minutes sometimes.

4    And Dr. Edu went so far as to say that he would start

5    documenting his first case at 7:00 in the morning so that he

6    would not be documenting past 6:00 o'clock in the evening

7    because the realtime did not coincide; the time claimed went

8    beyond that.  Dr. Bothra assured me that this is only sedation,

9    it doesn't really matter, which is less of an issue, but then I

10   found out that they were billing anesthesia minutes, which

11   makes a huge difference.

12   Q.  So Dr. Edu told you that he was billing for more minutes

13   than he was actually providing for sedation?

14   A.  Yes.  And after Dr. Bothra's assurance that it was

15   sedation and the time was less of an issue, I got lazy and

16   started doing the same because it would not have made a

17   difference in the payment, but when you're talking about

18   anesthesia units, it makes a huge difference.

19   Q.  Was there pressure at the Pain Center to provide -- to --

20   as many injections as possible?

21   A.  Well, there was pressure to do a lot of injections.  I

22   don't know if I want to say as many as possible, but the number

23   50 in a day in a room came up repeatedly and we met that many

24   times.

25   Q.  And where did that pressure come from?

1   A.  It was just in the air.  I can't say that I heard Dr.

2   Bothra ever say it, but it was common that the MAs would talk

3   about it, that this is what he wants to do.

4   Q.  When you met with the government, did you -- you used the

5   phrase conveyor belt society?

6   A.  Yeah.

7   Q.  Could you tell the jury what you meant by that?

8   A.  Well, when you see a hundred patients in a day in a

9   clinic, there is just no way that you can spend the kind of

10  time I believe should be spent and what I know that I wanted to

11  spend, and I was seeing far less than that and I was working

12  later than the Warren clinic.  I would -- it was a rare day

13  when I finished before 6:00 o'clock.  And I just don't believe

14  with that many patients in that short of time that you can give

15  patients proper attention.  Even returning patients need more

16  than just two or three minutes of your time face to face.  And

17  in the -- interventional side, when we got up to 40 and 50

18  patients, it was -- things had to move just as fast.

19  Q.  And Dr. Kufner, moving to our final topic, how long did

20  you work at the Pain Center?

21  A.  I was there from May 1st, 2014 to October 20th, 2017.

22  Q.  And why did you leave the Pain Center?

23  A.  Because at one point I realized that what I was doing was

24  breaking the law and so were the people around me and I was --

25  I didn't want to stay there.

1  Q.  Why did you stay as long as you did?

2  A.  Well, there's a number of reasons.  First of all, I was at

3  an age where -- and with my history of having addiction and it

4  coming out and having cost me in consequences regarding my

5  profession, that it would be very difficult, if not impossible,

6  to go somewhere else.  I was deluding myself that we were

7  really doing okay and things would get better.  And at -- at

8  one point there was a turning point where I had a desire to

9  leave where I suddenly had the fear of staying, and that was

10 when I found a box that was in plain sight that had a box that

11 said cases -- or Dr. Russo cases billed by Dr. Bothra, and that

12 constitutes a fraudulent billing, and I became afraid and was

13 looking for ways to protect myself.

14          MR. HELMS:  No further questions, Your Honor.

15          THE COURT:  Okay.  Thank you, sir.

16          Mr. Weiss is rising and we'll get started.

17          MR. WEISS:  Thank you, Judge.

18          THE COURT:  Thank you, sir.

19                    CROSS-EXAMINATION

20 BY MR. WEISS:

21 Q.  Good morning.

22 A.  Good morning.

23 Q.  Let me know when you're ready.

24 A.  I'm sorry?

25 Q.  Just let me know when you're ready, sir.

1    A.   Yeah, I'm ready.

2    Q.   Okay.  As I understand your testimony, Dr. Bothra gave you

3    a second chance, correct?

4    A.   I guess you could see it that way.

5    Q.   Well, I'm just trying to remember your testimony from

6    Friday.  Didn't you tell us that Dr. Bothra, in fact, hired you

7    and gave you a second chance?

8    A.   That was not --

9    Q.   Just a yes or no.

10   A.   I -- I did not see it as a second chance.  Okay.

11   Q.   Okay.  Do you dispute that on Friday you testified that he

12   gave you a second chance, yes or no?

13   A.   I don't remember using those words.  I know that he prided

14   himself in his words of giving people second chances.

15   Q.   But you didn't feel that?

16   A.   I felt that I was a tough sell and that he found interest

17   in me and wanted to take me on as a staff physician.

18   Q.   And because you were a tough sell --

19            THE COURT REPORTER:  Please use the mic.

20   Q.   Because you were a tough sell and he hired you, you repaid

21   him by suing him and testifying against him, correct?

22   A.   Yes.

23   Q.   Thank you.

24            Now, let's talk a little bit about you being a tough

25   sell for someone to hire you.  Back in around, what was it,

1    2005, 2006 you worked at Spectrum Health in Grand Rapids?

2    A.   Yes.

3    Q.   And you were addicted to pain killers, correct?

4    A.   I was.

5    Q.   And --

6    A.   And that was 2004.

7    Q.   Okay.  And you showed up at the hospital under the

8    influence of those pain killers, correct?

9    A.   Yes, I did.

10   Q.   Okay.  And other staff members became concerned about how

11   you were acting?

12   A.   Yes, they did.

13   Q.   They described it as bizarre, erratic?

14   A.   Yes, they did.

15   Q.   They turned you in to their superiors, correct?

16   A.   Correctly so.

17   Q.   And you were suspended?

18   A.   No.  At that time I turned myself into the Michigan --

19   Q.   You were suspended, were you not, from Spectrum?

20   A.   No, I was not.  At 2004 I was not suspended.

21   Q.   When were you suspended from Spectrum?

22   A.   And it was in 2008 when I had a relapse after four years

23   of sobriety.

24   Q.   Okay.  And again, that relapse affected your ability to

25   treat patients at the hospital, correct?

1    A.  Yes, it did.

2    Q.  Okay.  So -- so you've complained to us about dirty

3    floors, but you're okay with showing up at a hospital and

4    treating patients with anesthesia while you were under the

5    influence of Schedule II pain killers, is that correct, sir?

6          MR. HELMS:  Objection, Your Honor.  Argumentative,

7    and also I allowed some of this testimony to -- these questions

8    to happen, but based under the rules involving witnesses, the

9    612 series, I don't believe it's proper impeachment for

10   something that happened back in 2004 and 2008.

11         MR. WEISS:  This --

12         THE COURT:  Okay.

13         MR. WEISS:  It was gone into briefly on direct.

14         THE COURT:  Okay.  Okay.  It is argumentative.  Let's

15   slow down, ask one question at a time so the jury can

16   understand the evidence and the answer of the witness.

17   However, I do find that the impeachment is proper and I'll

18   permit inquiry into the topic area, with some limits of course.

19         Go right ahead, Mr. Weiss.

20         MR. WEISS:  Thank you, Your Honor.

21   BY MR. WEISS:

22   Q.  You were suspended at Spectrum?

23   A.  I was.

24   Q.  And you went elsewhere, correct?  That's a yes or no.

25   A.  I didn't work for a year after that.

```
1    Q.   Okay.  And when was your next job?

2    A.   I worked at the Veterans Home for -- in Grand Rapids, the

3    Home for Veterans; it's a state facility.

4    Q.   Did you do anesthesia there?

5    A.   No, it was primary care.

6    Q.   Okay.  And how long did you stay there?

7    A.   Approximately a year.

8    Q.   And what was your next job?

9    A.   I went to training at the University of South Florida.

10   Q.   And what did you do there, sir?

11   A.   Pain medicine.

12   Q.   Anesthesia?

13   A.   Pain medicine I did.

14   Q.   Okay.  No anesthesia?

15   A.   No.

16   Q.   Okay.  And how long did you stay there?

17   A.   That was a two-year.

18   Q.   Okay.  And where did you go afterwards by way of

19   employment?

20   A.   To Traverse City.

21   Q.   And where in Traverse City, sir?

22   A.   At Jones Center for Pain Management.

23   Q.   And what did you do there, sir?

24   A.   Provided pain medicine services.

25   Q.   Any anesthesia?
```

1    A.   No.

2    Q.   Okay.  And where did you go after that?

3    A.   I went to -- that was -- next was Bradenton, Florida.

4    Q.   And what did you do there, sir?

5    A.   That was pain medicine.

6    Q.   Did you do any anesthesia there?

7    A.   No.

8    Q.   Okay.  And how long did you stay there?

9    A.   That was short.  That was only about six months.

10   Q.   Okay.  And where did you go after that?

11   A.   To the Pain Center.

12   Q.   Okay.  So in that period of time you had about five

13   different jobs?

14   A.   Yes.

15   Q.   Okay.  And how long had you before you went to the Pain

16   Center been providing pain medicine and anesthesia services?

17   A.   Could you repeat that?

18   Q.   Sure.  Before going to the Pain Center, how many years had

19   you been providing pain management services as well as

20   anesthesia?

21   A.   Until -- from 2012 until when I started -- when I finished

22   residency until I came to the Pain Center, I did pain medicine

23   only.

24   Q.   Okay.  But when you related to us on Friday your

25   professional history, I believe you indicated some obtainment

```
1   in the area of anesthesia, did you not?
2   A.  I'm board certified in anesthesia.
3   Q.  Okay.  And when did you obtain that board certification?
4   A.  1990 something.  It's been a long time.
5   Q.  Okay.  So you knew about -- excuse me.  You knew how to
6   practice anesthesia long before you came to the Pain Center,
7   correct?
8   A.  That's true.  I might add though --
9   Q.  Thank you.  You've answered the question, sir.
10  A.  Okay.
11  Q.  Now, you advised the jury about that you pled guilty,
12  correct?
13  A.  I did.
14  Q.  Okay.  And you advised the jury about your plea or at
15  least some of your plea, is that correct?
16  A.  Yes.
17  Q.  Okay.  How many charges were you originally charged with
18  in this case?
19  A.  I believe it was four.  I may be incorrect.
20  Q.  Pardon?
21  A.  I believe it was four.  I might be incorrect.  What I
22  recall, it was about prescriptions on two patients and
23  injections on two different patients.  The injections may have
24  involved more charges but I would have to be refreshed on that.
25  Q.  If I told you you were charged in ten different counts
```

1  with ten different criminal offenses, would you dispute that,

2  sir?

3  A.  If you're looking at the record, I'd have no reason to.

4  Q.  Okay.  Would you like to take a look at something to

5  refresh your memory?

6  A.  You're an officer of the court.

7         THE COURT:  He doesn't need to.

8  A.  I don't think I need to.

9         THE COURT:  He doesn't need to.  He didn't --

10         MR. WEISS:  Okay.

11         THE COURT:  -- he didn't remember.

12         MR. WEISS:  That's fine.  All right.

13         THE COURT:  Go ahead.

14  BY MR. WEISS:

15  Q.  So first of all, you were charged with a -- with

16  conspiracy to commit health care fraud, correct?

17  A.  Correct.

18  Q.  And that carries a maximum of ten years of imprisonment

19  and a $250,000 fine, correct?

20  A.  Correct.

21  Q.  Okay.  And you're also charged with six counts of

22  substantive health care fraud, correct?

23  A.  Correct.

24  Q.  Each also carrying ten years of imprisonment and a

25  $250,000 fine on each count, correct?

1  A.  Correct.

2  Q.  Okay.  You were charged with conspiracy to possess with

3  intent to distribute and distribute controlled substances which

4  carries up to a 20-year -- 20 years of imprisonment and a --

5  and/or a $1 million fine and not less than three years of

6  supervised release, correct?

7  A.  Correct.

8  Q.  Okay.

9       THE COURT:  Mr. Weiss, I'm going to urge you to stick

10  with the charge and avoid the penalties.  The penalties are not

11  for consideration by the jury.  It's something I'm going to

12  deal with.  And I think the fact that you've demonstrated these

13  are felonies should adequately inform them of the witness's

14  motivation to testify in a particular manner.

15       Go right ahead please.

16       MR. WEISS:  Your Honor, might I inquire of the Court

17  respectfully, with the Court's permission, once I -- once I've

18  completed all the offenses, I wanted to get into what the plea

19  bargain was in terms of his maximum penalty.

20       THE COURT:  I think -- I think that's a different

21  story and I would permit that, but the charges and the

22  penalties maximum I don't think are appropriate, so that would

23  be my ruling.

24       MR. WEISS:  Okay.  Thank you.

25       THE COURT:  Yep.

1   BY MR. WEISS:

2   Q.  All right.  And in addition to the conspiracy to possess

3   with intent to distribute, there were two counts of unlawful

4   distribution of controlled substances, correct?

5   A.  Correct.

6   Q.  Now, in your plea bargain the government agreed to dismiss

7   nine of those charges, right?

8   A.  They did.

9   Q.  And as to the one that you pled guilty to, they made a

10  recommendation to the Court as it relates to a presumptive

11  guideline range, correct?

12  A.  Yes.

13  Q.  Okay.

14       MR. HELMS:  Your Honor, that mischaracterizes the

15  Rule 11 Plea Agreement.  There is no guideline recommendation

16  in that Rule 11 Plea Agreement.

17       MR. WEISS:  Well, with all due respect to Mr. Helms,

18  I am looking on pages 9 and 10 of the Plea Agreement that was

19  filed with the Court, and it indicates that the parties agree

20  to recommend certain provisions.

21       THE COURT:  Hold on a minute.  The -- the -- the --

22  the lawyer asked a question and the witness said yes, so I

23  don't see there's any need for debate, okay?  Let's get the

24  questions and get the answers and move forward.  Go right

25  ahead.

1           MR. WEISS:  Thank you.

2           THE COURT:  Yep.

3    BY MR. WEISS:

4    Q.  Sir, the guidelines that the government agreed to

5    recommend to the Court total up to a level 26.  Do you recall

6    that, sir?

7    A.  You're talking about a language that I don't speak.

8    Again, if you're reading off of that, I have no reason to

9    question your veracity.  I'll take that as fact.

10   Q.  And were you advised that -- you have no criminal history

11   do you, sir?

12   A.  No, not before this.

13   Q.  Okay.  Were you advised that with a guideline range of 26,

14   that presumptive sentencing guideline range would be 63 to

15   78 months?

16   A.  Was that in the court document?

17   Q.  I'm asking you if you were advised of that.

18   A.  I don't recall if that was in the court document.

19   Q.  Okay.  And were you advised that because you were pleading

20   guilty, that the Court could give you a three-level reduction

21   before -- for acceptance of responsibility, which would result

22   in a guideline range of 46 to 57 months?

23   A.  I remember hearing that because -- that there could be a

24   reduction based on my coming forward.

25   Q.  Okay.  And the fact that you are cooperating, I believe

1    Mr. Helms asked you that the government could make a motion to

2    the Court to give you a further reduction for substantial

3    assistance, correct?

4    A.  As best I can remember, I think that was in there.

5    Q.  Okay.  All right.  So did -- was it explained to you that

6    the only people that can file a request of the Court for

7    substantial assistance reduction is the government?

8    A.  That specifically, no.

9    Q.  Okay.  Were you led to believe that someone else other

10   than the government could file a motion for substantial

11   assistance reduction?

12   A.  What I remember is Judge Murphy assuring me when I took

13   the plea that regardless of what else anyone suggested, he

14   would make the decision and it was not bound to anyone else's

15   recommendations.  And beyond that, I'm being asked to interpret

16   a language I don't speak and it's just confusing.  I'm sorry.

17   Q.  But you expect as a result of you appearing here on Friday

18   and today that the government will make a appropriate motion

19   with the Court for you to get even a potentially reduced

20   sentence below the guideline ranges that I've articulated here

21   a few moments ago?

22   A.  No, that's not true.  I have no right to expect anything

23   and that's been made clear.  I have a hope that there will be

24   some consideration, but I have been made clear by -- made it

25   clear by all parties that I have no right to expect anything.

1  Q.  So by cooperating you hope to get an even further reduced

2  potential sentence, correct?

3  A.  Yes, I do.

4  Q.  Okay.  All right.  So you have some motivation to

5  cooperate with the government, correct?

6  A.  Yes.

7  Q.  Okay.  And let's go back to the spring of 2017, correct?

8  A.  Okay.

9  Q.  Okay.  You indicated here just a few moments ago about

10  conversations that you claim you had with Dr. Bothra about what

11  to do and what not to do.  Do you recall that?

12  A.  Yes.

13  Q.  About how to bill and how not to bill.  You recall that?

14  A.  Yes.

15  Q.  Okay.  But you had been involved in anesthesia and pain

16  management long before you came to the Pain Center, correct?

17  A.  Yes.

18  Q.  You provided anesthesia to patients, correct?

19  A.  Yes.

20  Q.  You provided pain management services to patients?

21  A.  Yes.

22  Q.  You did billing?

23  A.  Yes.

24  Q.  And so if Dr. Bothra, according to you, told you something

25  that you had not been doing your entire career, you'd call him

Case 2:18-cr-20800-SJM-APP ECF No. 454, PageID.5032 Filed 07/18/22 Page 48 of 178
Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

48

```
 1   out on it, wouldn't you?  Yes or no.
 2   A.  If I --
 3   Q.  I don't want -- no, with all due respect, I asked the
 4   question.
 5   A.  Well, would you repeat --
 6   Q.  I'd like an answer to --
 7   A.  -- the question?
 8   Q.  -- my question.
 9   A.  Would you repeat --
10          THE COURT REPORTER:  Wait, wait, wait.  I can't take
11   both at the same time.
12   Q.  Sir, I would like an answer to my question.
13   A.  Would you ask the question again then?
14   Q.  Sure.  You knew before you came to the Pain Center how to
15   engage in anesthesia, correct?
16   A.  Yes.
17   Q.  You knew how to engage in pain management, correct?
18   A.  Yes.
19   Q.  You knew how to do billing, correct?
20   A.  Yes.
21   Q.  You didn't need Dr. Bothra to tell you anything about
22   those three topics, did you?  Yes or no.
23   A.  Actually I did.
24   Q.  Okay.  That's fine.  Good.  You've answered it.
25          Now, let me ask you this.  Do you recall back in
```

1  March of 2018 sitting for a deposition?

2  A.  Okay.

3  Q.  Do you recall or you don't?

4  A.  I sat for depositions.  I can't say that I...

5  Q.  Okay.  All right.  If I told you that you appeared in a

6  deposition on March 13, 2018 pertaining to Allstate, it would

7  have been in Grand Rapids, Michigan at about 5:22 in the

8  afternoon, is this ringing any bells with you?

9  A.  Yes, it does.

10  Q.  Okay.  Fine.  And you testified at that deposition under

11  oath, correct?

12  A.  I did.

13  Q.  Okay.  And in response to questions at that deposition --

14       MR. HELMS:  Objection, Your Honor.  I don't know what

15  this transcript is and I don't have a copy so I -- I can -- I

16  can't follow along.

17       THE COURT:  Okay.  If you're going to impeach him,

18  Dr. -- Mr. Weiss, you should probably provide a -- a copy of

19  the transcript or the statement that you're going to use to

20  impeach so that the government lawyers can evaluate it.

21       MR. WEISS:  Does the Court want me to do that before

22  or after my examination 'cuz I only have one copy?

23       THE COURT:  I think you should do it now, to be

24  honest with you.

25       MR. WEISS:  All right.  Could we have a few-minute

1    recess?

2            THE COURT:  Well, not a recess but you can advise the

3    government lawyer what you're intending to do.

4            MR. HELMS:  Respectfully, I can't look at it and then

5    give it back to you 'cuz I can't follow along while you're

6    reading a transcript.

7            MR. WEISS:  You give us documents all the time.

8            THE COURT:  Okay.

9            MR. HELMS:  Yeah, because --

10           THE COURT:  Listen, don't -- do not say things to

11   each other in front of the jury, all right?  We're not having

12   this.

13           Now, the witness that -- the -- the lawyer can

14   impeach the lawyer.  Please show the government lawyer what the

15   statement is you're going to impeach on and then we can go

16   forward from there.

17           Go right ahead.

18   BY MR. WEISS:

19   Q.  Now, according to you, at some point in time in early 2017

20   you became afraid, correct?

21   A.  That was in February.

22   Q.  Okay.  And that's early 2017, isn't it?

23   A.  Yes.

24   Q.  Okay.  All right.

25           THE COURT REPORTER:  Doctor, just please keep your

1    voice up.

2          THE WITNESS:  I'm sorry.

3          THE COURT REPORTER:  That's okay.

4          THE WITNESS:  I have to lean forward so... .  Oh,

5    this moves.  Okay.

6    Q.  And how long had you been licensed in the State of

7    Michigan as a physician, sir?

8    A.  Since 2002.

9    Q.  Okay.  So in early 2017 you had been licensed for

10   approximately 15 years, correct?

11   A.  Correct.

12   Q.  Okay.  And during that period of time you knew that if you

13   see something that isn't right, you have a statutory duty to

14   notify the state regulatory agency, correct?

15   A.  I wasn't aware that it was a statutory obligation.

16   Q.  Okay.  So after 15 years of being licensed you didn't know

17   that you were statutorily obligated to contact the state,

18   correct?

19   A.  I felt I was morally obligated.

20   Q.  Okay.  But you didn't?

21   A.  Well, I didn't know that it was obligation to the state.

22   Q.  Okay.  And how long had it been since you took the

23   Hypocratic Oath?

24   A.  Medical school ended in about 1989.

25   Q.  So that in 2017, that would be about 28 years?

1   A.   Yes.

2   Q.   Okay.  And part of that Hypocratic Oath is you shall do no

3   harm to your patients, correct?

4   A.   Correct.

5   Q.   So by your testimony, when you inject someone in their

6   back unnecessarily you've violated your oath, correct?

7   A.   Correct.

8   Q.   Under the contract that you had with the Pain Center, you

9   had promised to practice confidentiality, did you not?

10  A.   I did.

11  Q.   Okay.  And also as part of HIPAA, which you're aware of,

12  correct, it's a federal private -- patient privacy enactment?

13  A.   Correct.

14  Q.   Okay.  Matters pertaining to patients are also

15  confidential, correct?

16  A.   This is true.

17  Q.   Okay.  So you on your own started to collect documents

18  that belonged to the Pain Center, correct?

19  A.   I did.

20  Q.   Okay.  So you violated your contract, correct?

21  A.   I was --

22  Q.   Yes or no?

23  A.   I don't believe I did.

24  Q.   Okay.  You violated your HIPAA requirements, didn't you?

25  A.   I didn't show it to anyone but attorneys.

Case 2:18-cr-20800-SJM-APP   ECF No. 454, PageID.5037   Filed 07/18/22   Page 53 of 178
Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

53

1    Q.   Oh, so you have lawyers, is that right?

2    A.   Of course.

3    Q.   So what is it -- wait a minute.  Just so I understand,

4    sir, rather than following your statutory duty of notifying the

5    state, you contacted lawyers so you could file a civil lawsuit,

6    correct?

7    A.   I just said that I was unaware that I had a statutory duty

8    to -- to report this to the state.

9    Q.   But you were intelligent enough to contact civil lawyers

10   so you could file a lawsuit, correct?

11   A.   At the time I believed that was the only avenue I had to

12   come forward.

13   Q.   Okay.  So the only avenue that you had to come forward was

14   to file a civil lawsuit and hope to collect a lot of money,

15   right?

16   A.   I did not hope to collect a lot of money.

17   Q.   So you filed a civil lawsuit with the hope that you

18   wouldn't get anything out of it?

19   A.   No.

20   Q.   Okay.

21   A.   But you said a lot of money.

22   Q.   So you're just looking for a little bit of money?

23   A.   I didn't know what it would be.

24   Q.   Okay.  And your lawyers didn't tell you that what you were

25   filing, well, you were going to be asking for treble damages?

1    A.  I believe you're asking me to divulge attorney/client

2    privileged conversations.

3    Q.  Okay.  You did file a lawsuit, did you not, that requested

4    treble damages?

5    A.  I was party to that, yes.

6    Q.  Okay.  And this lawsuit that you have filed was in July of

7    2017, correct?

8    A.  Correct.

9    Q.  Okay.  And your hope was -- is that the government would

10   intervene and prosecute and litigate your civil lawsuit,

11   correct?

12   A.  Yes.

13   Q.  And it's been nearly five years since you filed that civil

14   lawsuit and the government has yet to intervene, isn't that

15   correct?

16   A.  It's true.

17   Q.  So did it dawn on you that perhaps the government didn't

18   think all that much of your lawsuit?

19           MR. HELMS:  Objection.  Calls for speculation.

20           MR. WEISS:  No, I'm asking his opinion.

21           THE COURT:  No, no, no.  That's sustained.

22           Go ahead, Mr. Weiss.

23           MR. WEISS:  Okay.

24   BY MR. WEISS:

25   Q.  The lawsuit, they have not intervened as of yet, correct?

1    A.  As of yet.

2    Q.  All right.  The patient forms that you got and you gave to

3    the government, you weren't present when those various patients

4    signed their forms, correct?

5    A.  No.

6    Q.  Okay.  So you don't know under what circumstances those

7    forms were signed, do you?

8    A.  In every patient, no; in some --

9    Q.  Okay.

10   A.  -- yes.

11   Q.  Because you weren't present.  Let -- let's just be candid.

12   You weren't there so you don't know under what conditions they

13   signed those forms, correct?

14          MR. HELMS:  Objection.  Mischaracterizes his

15   testimony.  He just said in some instances he did know.

16          THE COURT:  Okay.  That's an argument, you can

17   address it later.

18          You can answer that question, witness.  Go ahead.

19   A.  Well, the question leads me into some confusion because,

20   yes, there were times when I had opportunity to see a medical

21   assistant take the form, hand it to a patient, say, "I need you

22   to sign this," and then put it on the shelf.  I didn't have

23   that observation every time, but I believed it was reasonable

24   for me to believe that's what was happening routinely based on

25   what I saw.

```
1   BY MR. WEISS:
2   Q.  All right.  Let's -- let's talk about the form that you
3   identified as being signed by Victoria Loose dated
4   October 27th, 2017, correct?
5   A.  Correct.
6   Q.  Okay.  You were not present when Ms. Loose signed that
7   form, correct?
8   A.  No, I was not.
9   Q.  You don't know under what circumstances she signed that
10  form, correct?
11  A.  Correct.
12  Q.  So you don't know what she was told by the physicians
13  before she signed that, correct?
14  A.  Correct.
15  Q.  Okay.  You made a lot of assumptions, correct?
16  A.  What I assumed was this patient signed it without having
17  the procedure identified and the physician's signature on it.
18  Q.  But you don't know under what circumstances she signed it
19  and what she was told, correct?
20  A.  Nor did I claim.
21  Q.  Okay.  And you said that your last day at the clinic was
22  October 20th, 2017?
23  A.  I believe, yes.
24  Q.  Okay.  And I think you told the agents at one of your
25  interviews that your last day was October 21st, 2017?
```

1    A.  My official date I believe was the 21st, but I was not

2    working on that Saturday.

3    Q.  Okay.

4    A.  So the -- the last day I was physically there was on the

5    20th.

6    Q.  Okay.  So the last day you were physically there was on

7    the 20th, but you have a form that's dated seven days later of

8    the 27th.  So did you go back in the middle of the night and

9    steal forms, sir?

10   A.  I don't know where that form came from.

11   Q.  Well, you were the one -- didn't you tell the government

12   that you took these forms, that you found them out there in

13   plain view?

14   A.  If that form --

15   Q.  No, sir.  Did you tell us this morning --

16   A.  Yes, I did.

17   Q.  -- that you found forms out in plain view?

18   A.  I did.

19   Q.  And you found a form that was dated seven days after your

20   last day of service, correct?

21   A.  If that is -- yeah, that's what's on the form.

22   Q.  Thank you.

23            And that was a week later than when you left?

24   A.  Well, there was --

25   Q.  So my question --

1   A.  -- I'm just stating some were there.

2   Q.  -- to you, sir, is -- please wait till I finish my

3   question.  My question to you, yes or no, did you go there

4   sometime after you stopped working there and took forms that

5   didn't belong to you?

6   A.  No.

7   Q.  Okay.  In terms of the execution of those forms, if I

8   understood you correctly, the physician is to discuss the risk

9   and benefits of the procedure that is going to be conducted,

10  correct?

11  A.  Correct.

12  Q.  Okay.  And at times you weren't present, for example, with

13  Victoria Loose on October 27th, whether she was advised of the

14  risks and benefits of the particular procedures she was

15  consenting to, correct?

16  A.  Correct.

17  Q.  Okay.  And generally the consent form would be discussed

18  and executed at the clinic, correct?

19  A.  No.  It was done in the Interventional Pain Clinic at the

20  time of the injection.

21  Q.  Okay.  Ultimately it becomes a decision between the

22  physician and the patient, correct?

23  A.  Correct.

24  Q.  Okay.

25          (Brief pause)

```
1            MS. McMILLION:  Is there a specific area?

2            MR. WEISS:  If I could have a moment, Judge.

3            (Brief pause)

4   Q.  Sir, if we could go back to the deposition that you sat

5   for under oath back in March of 2018, okay?

6   A.  Okay.

7            MR. HELMS:  Your Honor, I apologize.  If Mr. Weiss

8   could just direct me to the page of the transcript.  I have a

9   copy now.

10           THE COURT:  Go ahead, Mr. Weiss.

11           MR. WEISS:  So we're good, Your Honor?

12           THE COURT:  Yep.  Just -- just identify the page

13  you're on.

14           MR. WEISS:  Seven, lines 20 and 21.

15  BY MR. WEISS:

16  Q.  You were asked at that deposition again under oath about

17  your relationship with Dr. Bothra.  Do you recall that, sir?

18  A.  Yes.

19  Q.  Okay.  And do you recall answering, quote, "He insisted

20  that we were free to practice as we wished."  End quote.

21  A.  I did.

22  Q.  That was a true statement?

23  A.  I -- that's a true statement insofar --

24  Q.  Thank you.

25  A.  -- as to what he said.
```

```
 1   Q.  Okay.  That's fine.  That's fine.  But you didn't tell the
 2   physicians that there was anything different than what he said,
 3   correct?
 4   A.  No, I did not.
 5   Q.  Okay.  And this was well after you had left the Pain
 6   Center, correct?
 7   A.  Correct.
 8   Q.  Well after you had filed your lawsuit against Dr. Bothra
 9   and the Pain Center, correct?
10   A.  Correct.
11   Q.  You didn't tell him about that.  You didn't tell him about
12   what you've related here this morning about all these
13   allegations of improprieties, did you?
14   A.  I was not free to discuss those.
15   Q.  Oh, really?  So did you tell these people under oath that
16   "I can only answer part of the question because I'm precluded
17   from answering the rest of the question"?
18   A.  My understanding was that you were asking about --
19   Q.  Sir, did you tell them that there were areas that you
20   could not go into?
21   A.  I don't recall saying that.
22   Q.  No.  Would you take my representation that you don't
23   mention that?
24   A.  You have the deposition, I do not.
25   Q.  Would you like to review it, sir?
```

1  A.  Well, I think that would have been helpful.

2  Q.  Okay.

3          MR. WEISS:  If I may approach, Your Honor.

4          THE COURT:  Okay.

5          MR. WEISS:  For the record, I'm just going -- I'm not

6  going to move for its admission.  Does the Court want it marked

7  for identification purposes?

8          THE COURT:  Well, no, but I don't understand exactly

9  what we're doing here.  It seems like you -- maybe I'm wrong,

10 but you committed him to the proposition that he -- he said

11 things here today that he didn't say at the deposition and he

12 felt he was not at liberty to do that, so I don't know why we

13 have to confront him with a transcript that's not going to show

14 what he's already said is not there, right?

15         MR. WEISS:  Well, that's true, Your Honor, but I did

16 ask him whether he alluded to the fact that there were areas

17 that he was precluded from going into.

18         THE COURT:  Okay.

19         MR. WEISS:  And --

20         THE COURT:  And he said he didn't remember that.

21         MR. WEISS:  And I indicated that there weren't --

22         THE COURT:  Okay.

23         MR. WEISS:  -- that he didn't make that, and I asked

24 him to look at this.

25         THE COURT:  Okay.  That's fine.  That's fine.

1         MR. WEISS:  I'll leave it to the Court's --

2         THE COURT:  No, you can -- you can go over it with

3    him, but it seems to me like we're going to take time looking

4    for something that's not there.

5         But anyway, go ahead.

6    A.  So which page am I looking at?

7    BY MR. WEISS:

8    Q.  Well, take a look at page 7, sir, and you can look at

9    anything in the transcript, but page 7 there's a couple of

10   lines that are highlighted.

11   A.  Yes, I see that.

12   Q.  Did you have a chance to review that, sir?

13   A.  Well, it's just one line, unless there -- I'm just looking

14   to see if there's other areas that are highlighted.  Perhaps

15   you could guide me on that.

16   Q.  Well, as the Court indicated, and I'm making the

17   representation, that at no time during that session did you

18   indicate that there were other areas that you were precluded

19   for whatever reason of going into?

20   A.  I've already agreed to that.

21   Q.  Okay.

22        MR. WEISS:  And if I may retrieve the document, Your

23   Honor.

24        THE COURT:  Yes, of course.

25   Q.  Sir, was it your understanding that filing your qui tam

1    lawsuit for monetary damages authorized you to lie under oath?

2    A.  No, it doesn't.  I haven't been authorized to --

3    Q.  Okay.

4    A.  -- lie under oath by anyone.

5         MR. WEISS:  Thank you, Your Honor.  I don't have

6    anything further.

7         THE COURT:  Okay.  Thank you very much, Mr. Weiss.

8         Mr. Collins is going to make his debut on

9    cross-examination.

10        MR. COLLINS:  Thank you, Your Honor.

11        THE COURT:  Go right ahead, sir.

12                      CROSS-EXAMINATION

13   BY MR. COLLINS:

14   Q.  Good morning, Dr. Kufner.

15   A.  Good morning.

16   Q.  My name is Jeffrey Collins, and along with Ron Chapman we

17   represent Dr. David Lewis.

18        Now, Dr. Kufner, you worked at the Pain Center from

19   May 1st of 2014 to on or about October 20th of 2017?

20   A.  Which has been stated.

21   Q.  Is that correct?

22   A.  It is correct.

23   Q.  All right.  And are you aware that Dr. Lewis started

24   working at the Pain Center on or about November of 2016,

25   correct?

1  A.  I don't remember the exact dates of his appearance but if

2  you say so.

3  Q.  All right.  When you came on board in 2014, Dr. Lewis

4  wasn't there?

5  A.  That's correct.

6  Q.  Right?

7          In 2015 he wasn't there?

8  A.  That's correct.

9  Q.  Right.  So the path of -- of you crossing with Dr. Lewis,

10 if you left in October of '17, was less than one year?

11 A.  Correct.

12 Q.  And during those 11 months Dr. Lewis never shadowed you,

13 right?

14 A.  He never what?

15 Q.  Shadowed you.

16 A.  No.

17 Q.  Right.  And you never shadowed Dr. Lewis?

18 A.  No.

19 Q.  You were -- as you indicated last week, the vast majority

20 of your time was spent at the Eastpointe facility, correct?

21 A.  Well, if I said that, I was misspeaking.  I spent two days

22 a week in Eastpointe and three days a week in the IPC but never

23 in the Warren clinic.

24 Q.  And you never spent any time in the clinic with Dr. Lewis?

25 A.  That's correct.

1   Q.  All right.  So you were never in a position to see him

2   evaluate and assess patients in the clinic?

3   A.  Correct.

4   Q.  All right.  And overall you had very little interaction

5   with Dr. Lewis?

6   A.  I wouldn't say little, but it was not -- we weren't

7   working together but we did -- we were in the injection clinic

8   at the same time having conversations, but -- and I saw him

9   working with patients but I -- we never worked together --

10  Q.  All right.

11  A.  -- save one or two patients.

12  Q.  One or two patients?

13  A.  Where I might have provided sedation while he did the

14  injection.  I don't recall.

15  Q.  Okay.  And one of the interactions that you had with my

16  client was the meeting that you spoke about, the big staff

17  meeting?

18  A.  Oh, okay.  Yes.

19  Q.  Right?  And at that staff meeting you indicated that it

20  was Dr. Lewis who spoke up about the problems on the premises

21  and in the parking lot, right?

22  A.  This is true.

23  Q.  All right.  As a matter of fact, you respected Dr. Lewis

24  for making those statements?

25  A.  I did.

1    Q.  Now, when you were at the Eastpointe facility, Dr. Kufner,

2    you were free to exercise your independent professional

3    judgment in treating patients, correct?

4    A.  That is true.

5    Q.  All right.  And Dr. Lewis likewise, to your knowledge, he

6    was free to exercise his independent professional judgment?

7            MR. HELMS:  Objection.  Objection, Your Honor.  Calls

8    for speculation.

9            MR. COLLINS:  I said if he knew.

10           THE COURT:  I think he can answer that.  Go ahead,

11   Doctor, if you know.

12   BY MR. COLLINS:

13   Q.  As far as you knew, Dr. Lewis could exercise his

14   independent professional judgment in the treatment of patients?

15   A.  As far as I knew, Dr. --

16   Q.  Thank you, sir.  That's all I asked.

17   A.  No, that was not my answer.

18           THE COURT:  Okay.

19   A.  As far as I knew, Dr. Lewis was subject to the pressures

20   that other people had to perform in certain ways in spite of

21   Dr. Bothra's assurance that we could practice as we pleased.

22   Q.  Okay.  And -- and again, your answer right there is

23   premised on an assumption?

24   A.  Fair enough.

25   Q.  Now, you had a signed contract with the Pain Center,

```
1   correct?
2   A.  Correct.
3          (Brief pause)
4          MR. HELMS:  Your Honor, I don't believe that Exhibit
5   151 is in evidence.  I'm not sure.
6          MS. McMILLION:  It's not -- but it's not in evidence.
7          MR. COLLINS:  Okay.  All right.  Thank you.
8          THE COURT:  151 was received so that is in evidence.
9          MR. HELMS:  I apologize, Your Honor.
10         THE COURT:  Okay.  Go ahead.
11         MR. COLLINS:  Okay.  Thank you.
12  BY MR. COLLINS:
13  Q.  You can see the screen in front of you, Dr. Kufner?
14  A.  Yes, I can.
15  Q.  Government's Exhibit 151 is the contract that you executed
16  with the Pain Center, correct?
17  A.  Yes, it is.
18  Q.  And the title of it is "Independent Contractor Agreement,"
19  right?
20  A.  Yes.
21  Q.  It doesn't say employee agreement, right?
22  A.  Correct.
23  Q.  As a matter of fact, when you read down, provision 2(a),
24  it talks about being an independent contractor, correct?
25  A.  Correct.
```

1  Q.  And if I'm reading it accurately, it indicates, "In

2  performing his responsibilities under this agreement,

3  Independent Contractor shall not be considered an employee of

4  TPC and shall, at all times, be deemed and regarded as an

5  independent contractor."

6  A.  That's what it says.

7  Q.  Right.  There is no ambiguity whatsoever in that language?

8  A.  In the language, no.

9  Q.  Right.  It uses the word shall, doesn't say may, correct?

10  A.  Correct.

11  Q.  It doesn't say at some times, it's all the time you are

12  deemed an independent contractor?

13  A.  That's what it says.

14  Q.  And in your mind there is a distinction between being an

15  employee and an independent contractor?

16  A.  Yes, there is.

17  Q.  All right.  As you indicated earlier, in response to a

18  question by Attorney Weiss, as an independent contractor you

19  are free to practice as you wish?

20  A.  That was the language in the contract.

21  Q.  All right.  Now, Dr. Kufner, you received -- you received

22  under the contract a salary and a bonus, right?

23  A.  Correct.

24  Q.  And you had a -- an attorney review the contract before

25  you signed it?

1    A.   I did.

2    Q.   Right.  And the attorney didn't indicate any problems with

3    you signing that contract?  Well, let me rephrase it for you.

4    A.   Attorney -- well, I was advised by purposes -- persons

5    with knowledge that the language of the contract actually made

6    me an at-will employee in spite of saying I was an independent

7    contractor and that there was no risk in that contract to me.

8    Now, granted, this was not a person who was a -- an attorney

9    but he taught contract law in a college and advised me that his

10   opinion was I was an at-will employee in spite of the language

11   in the -- in the contract but that there was no penalty against

12   me if anything was ever to be moved against it.

13   Q.   Thank you, Doctor.

14        My question to you though is there is nothing wrong

15   with there being a bonus provision in the contract?

16   A.   No.  Many places do that.

17   Q.   That's standard practice in the -- in your industry,

18   correct?

19   A.   As far as I know, yes.

20   Q.   So having compensation linked to performing procedures is

21   not at all unusual in your industry?

22   A.   It is not unusual.

23   Q.   Matter of fact, it's standard?

24   A.   Well, I -- outside of academic situations, I -- I believe

25   it's standard.

1   Q.  All right.  And under your contract did you receive a

2   bonus for back braces?

3   A.  No.

4   Q.  Now, the methodology at the Pain Center was to have this

5   multi-disciplinary approach to handling pain, right?

6   A.  As I understood, right.

7   Q.  Right.  It was not a pill mill?

8   A.  No.

9   Q.  The goal was to treat the source of the pain?

10  A.  That was the attitude expressed, yes.

11  Q.  And one approach to treat the source of the pain is

12  injections?

13  A.  Correct.

14  Q.  And Dr. Kufner, you never told a patient that there was a

15  tradeoff, injections for pills?

16  A.  No, I did not.

17  Q.  And to your knowledge, Dr. Lewis never said to a patient

18  there's a tradeoff, injections for pills?

19          MR. HELMS:  Objection, Your Honor.  Calls for

20  speculation.

21  Q.  To your knowledge.

22          THE COURT:  Hold on a minute.  You can answer yes or

23  no.

24  A.  No, sir, I had no knowledge, no.

25  BY MR. COLLINS:

1    Q.   Thank you, sir.

2         The goal of the Pain Center was to wean patients off

3    of the medication?

4    A.   That was stated.

5    Q.   And you are aware, Dr. Kufner, that there is a risk in

6    abruptly cutting someone off of their medication?

7    A.   There can be.

8    Q.   All right.  One risk could be of a withdrawal?

9    A.   This is true.

10   Q.   It could lead to hospitalization?

11   A.   It could.

12   Q.   And so Dr. Kufner, it is not unusual at the Pain Center to

13   have patients who are referred from their primary care

14   physician, right?

15   A.   Correct.

16   Q.   And when they're referred from the primary care physician,

17   they've already been prescribed medications by their -- by

18   their doctor, right?

19   A.   In my clinic that was most often the case.

20   Q.   Most often.  All right.

21        And while you're waiting to -- or trying to work up

22   the file or to get an MRI for instance, you might simply

23   maintain them, maintain their meds until you get what you need?

24   A.   I might.

25   Q.   All right.  Thank you, sir.

```
 1            THE COURT:  Thank you.  All done?
 2            MR. COLLINS:  Oh, no, no, no.
 3            THE COURT:  No?  Seems like a good place to stop.
 4   No, I'm just kidding.  Go -- go ahead, Mr. ...
 5            MR. COLLINS:  I can take a break if the Court wants
 6   but I'll -- I'll -- I'll try to move as quickly as I can.
 7            THE COURT:  No, that's fine.  I just heard you say
 8   thank you and it caught my attention.  Go right ahead.
 9            MR. COLLINS:  All right.
10   BY MR. COLLINS:
11   Q.  Dr. Kufner, the Pain Center had safeguards in place that
12   were designed to discourage pill seekers from even coming,
13   correct?
14   A.  I don't know that that's true at all.
15   Q.  Well, let me give you some examples.  A patient coming in
16   the door would have to sign a contract?
17   A.  Correct.
18   Q.  Right.  And in that contract the patient would have to
19   agree to certain rules set forth by the Pain Center?
20   A.  Agree, yes.
21   Q.  All right.  And some of those rules would be you have to
22   take a urine drug screen, there could be a pill count, things
23   of that nature?
24   A.  Yes.
25   Q.  Right.  And if they were not to comply with these -- these
```

1    rules, then they would not receive service at the Pain Center?

2    A.  No, that's not true.

3    Q.  But the patient -- the contract that the patient would

4    sign, you would agree, would you not, Dr. Kufner, that at the

5    minimum, it puts the patient on notice that they must adhere to

6    certain rules?

7    A.  Agreed.

8    Q.  So the contract that the patient signs has the potential

9    to act as a gatekeeper of keeping pain pill seekers out of the

10   practice?

11   A.  An ineffective gatekeeper.

12   Q.  Right.  I didn't ask you --

13        THE COURT REPORTER:  Excuse me.  Did you say an

14   ineffective?

15        THE WITNESS:  Ineffective.

16        THE COURT REPORTER:  Okay.  Thank you.

17   Q.  You said ineffective, right?

18   A.  Yes.

19   Q.  All right.

20   A.  If somebody is -- is seeking pills, they're going to have

21   to say what they have to say.

22   Q.  Right.  And even though in your opinion it may not be

23   perfect, it is -- it is some quality control that was in place?

24   A.  Poor quality control would be my description, very poor.

25   Q.  All right.  In addition to the contract, there is also

1  urine drug screens, right?

2  A.  Which were very often --

3  Q.  Would you just --

4  A.  -- unreliable.

5  Q.  I asked yes or no, not your explanation.

6  A.  Yes.

7  Q.  All right.  Now, if a patient tested positive for a

8  narcotic or medication which was not prescribed, that patient

9  would get a warning?

10  A.  Yes.

11  Q.  Right.  And if this were an illicit substance like

12  cocaine, that patient would be referred for addiction

13  counseling?

14  A.  Are you --

15  Q.  Correct?

16  A.  -- talking about my practice?

17  Q.  The practice in general at the Pain Center.

18  A.  I can't say that I know that's true because we had so much

19  problem with the quality of Dr. Bothra's lab that at my point,

20  I was wondering could I believe the test or not.

21  Q.  All right.

22  A.  So if I was convinced the patient had a drug problem, yes,

23  they were sent to -- for treatment.

24  Q.  Okay.

25  A.  But there were times when I had to look at -- based on my

1    experience with his laboratory, that I had to look at this and

2    listen to the patient and try to decide where is the truth

3    because I could not trust the numbers that were printed on that

4    page.

5    Q.   My question to you, Dr. Kufner, is simply this.  That

6    there was a process in place at the Pain Center with regard to

7    trying to monitor whether or not a patient is a pain -- seeking

8    pills or not?

9    A.   I agree there was a process.

10   Q.   There you go.

11             And if a patient's urine drug screen came back

12   negative for medication which had been prescribed by the Pain

13   Center, that too would trigger a warning?

14   A.   It would.

15   Q.   Right.  And if it happened a second time, under the

16   process the patient would be discharged?

17   A.   I don't know that to be true.

18   Q.   All right.  You're aware of patients being discharged from

19   the Pain Center?

20   A.   I am aware of patients being discharged and I discharged

21   patients myself, but I can't speak globally about everything

22   that happened in Warren.

23   Q.   All right.  If there were -- if there were a large number

24   of patients that were discharged from Warren as well, you would

25   agree, Dr. Kufner, that that's a revenue stream going right out

1    the door?

2    A.   Yes.

3    Q.   And -- and if -- and if the Pain Center was obsessed with

4    profit and making money, there goes folks right out the door,

5    right?

6    A.   That's one way of looking at it.

7    Q.   And another gatekeeper besides a contract and -- and --

8    and the -- and the drug screening was the practice of the

9    practitioners making sure they had some imaging before a

10   treatment plan was figured out?

11   A.   I'm sorry, they -- they had some what?

12   Q.   By imaging, like an MRI or CAT scan.

13   A.   Oh, imaging, yeah.

14   Q.   Imaging, yeah.

15        That was in place as well, correct?

16   A.   Correct.

17   Q.   Right.

18   A.   And appropriate.

19   Q.   And appropriate.

20        And you were aware were you not, Doctor, that if a

21   patient did not have an MRI, that the Pain Center would

22   patiently give him a couple of times to come back and try to

23   have the MRI, right?

24   A.   Yes.

25   Q.   Right.  And -- but if it got to the point where they could

1   not produce the MRI, they too would be asked to go to another

2   pain center?

3   A.  At some point, yes.

4   Q.  Do you -- do you know a medical assistant by the name of

5   Tatyana, and the last name I don't want to mispronounce it,

6   starts with a B?

7   A.  Tatyana?

8   Q.  Yeah, Tatyana.

9        THE COURT:  Bezpalko.

10   A.  Was she a -- wasn't she a med -- a physician assistant?

11   Q.  Oh, physician assistant, yes.  She -- she passed.

12   A.  I've never worked with her.  I think I only met her once

13   outside of the clinic.  I -- I do not know her.

14   Q.  You don't know her.  Okay.  All right.

15        So you wouldn't be aware she told patients, "Hey, if

16   you don't have a MRI, then you need to find another pain

17   center"?

18        MR. HELMS:  Objection.

19        THE COURT:  That's sustained.

20   BY MR. COLLINS:

21   Q.  Now, last Friday you indicated that you did not like

22   having walk-in patients?

23   A.  No, I did not.

24   Q.  And you didn't like having walk-in patients because of the

25   clientele in which that would attract?

1   A.  We're not talking about somebody who just walks into a

2   clinic during normal business hours and saying can -- can I be

3   seen.  We're talking about advertising a walk-in clinic on the

4   sidewalk on the side of the building and inviting multitudes of

5   patients coming in on a Saturday.  There's -- that may not seem

6   like much of a difference but it's a huge difference, and one

7   might be an act of kindness, the other definitely saying, "Come

8   on, we're taking on everybody," and could lead to a lot of

9   problems.

10  Q.  All right.  But you indicated it could be an act of

11  kindness, correct?

12  A.  Could be.

13  Q.  Right.  Not everyone who will come through the walk-in as

14  a walk-in patient had a drug history, right?

15  A.  Since I did not work in the walk-in clinic, I cannot make

16  a comment to that.

17  Q.  All right.  In your experience at the Pain Center, did you

18  observe patients who may have had struggling with a drug issue

19  but still had a legitimate complaint to their back or -- or --

20  or their knee?

21  A.  Yes.  In fact, I had one that comes to mind.

22  Q.  All right.  And they too are entitled to or they could

23  benefit from the services of the Pain Center?

24  A.  This particular patient received everything except opioids

25  and agreed to follow that plan.

1    Q.  All right.  And I -- I would venture to say, Dr. Kufner,

2    that when you mentioned earlier about your history with pain

3    addiction, right --

4    A.  Yes.

5    Q.  -- that you would be empathetic to that population that

6    may take advantage of a walk-in pain center?

7    A.  Being empathetic does not mean that I would become their

8    supplier because I felt bad for them.

9    Q.  All right.  So you also indicated last Friday that when

10   you were interviewed for the position, that when Dr. Bothra

11   told you that "we treat everybody, no matter your -- your race,

12   your income, where you're from, your insurance," that didn't

13   matter, and when you heard that, you said, "I'm sold."

14   A.  Yep.

15   Q.  Right?

16   A.  That's true.

17   Q.  That's right.  And being able to provide treatment to

18   patients from a vulnerable population allowed you to put that

19   altruistic desire into action, yes or no?

20   A.  I never felt so magnanimous, but yes, it was a good thing.

21   Q.  But as it turned out, Dr. Kufner, you come on board on May

22   the 1st of '14, right?

23   A.  Correct.

24   Q.  When you get indicted, one of the substantive counts of

25   health care fraud against you is from services rendered on May

```
1   the 28th of 2014?
2   A.  No argument there.
3   Q.  Right.  So in less than a month you go from this
4   altruistic let's help everybody to a charge of providing a
5   service that was unnecessary?
6   A.  It does sound strange.
7   Q.  Doesn't just sound strange; it's the truth.
8   A.  I can't deny that.  That was an allegation.
9   Q.  Now, in July of 2017, that's when you filed the civil
10  lawsuit, right?
11  A.  Correct.
12  Q.  All right.  And that lawsuit, it's like 26 pages, right?
13  A.  I don't remember the exact length.
14  Q.  But in that lawsuit you don't mention anything that Dr.
15  Davis Lewis did that was wrong?
16  A.  I will only speak to what's printed and revealed.  I will
17  not go outside and discuss what sounds like an attorney's
18  conversation, which this seems to me going that way.  Correct
19  me if I'm wrong.
20  Q.  Yes, I will.  Within the four corners of the Complaint,
21  the 26-page Complaint, you make no mention of any bad conduct
22  on the part of my client?
23  A.  As far as I know, no.
24  Q.  And in your 26-page Complaint, Dr. Kufner, you also make
25  no mention of your own criminal conduct?
```

1  A.  That's true.

2  Q.  You -- you -- you just left the -- the -- the fraud that

3  you committed totally out of that Complaint?

4  A.  I did not compose the Complaint.

5  Q.  You reviewed it before it was filed, correct?

6  A.  I did.

7  Q.  And did you say, "Hey, listen, you know what, you -- you

8  left something out, Mr. or Mrs. Lawyer, the fact that I

9  committed health care fraud"?

10 A.  You're going to a place where I'm not willing to answer.

11 Q.  You're -- you're not here to -- to -- to --

12 A.  I'm not here to talk about my conversation with other

13 attorneys which have privilege.

14 Q.  No.  Doctor, in all -- in all due respect, you're here to

15 answer questions.

16 A.  Correct.

17 Q.  And my question to you is -- is really simple and I may

18 have already asked it, and that is simply this.  In your

19 Complaint you make no mention of the criminal conduct that you

20 committed?

21 A.  This is true.

22 Q.  And this is of conduct that is described in your very

23 Complaint?

24 A.  It's true.

25 Q.  So Dr. Kuffman [sic], you're trying to profit from

1  criminal conduct that you yourself committed?

2  A.  I was trying to find some way to come forward with some

3  measure of protection and apparently took a less than ideal

4  path.

5  Q.  All right.

6  A.  And please, my name is Dr. Kufner and not Kuff -- Dr.

7  Kuffman.

8  Q.  I stand corrected.  Thank you, sir.

9       Dr. Kufner, a few months after that civil case is

10 filed in which you ask for treble damages, you have occasion to

11 meet with federal law enforcement agents, correct?

12 A.  Correct.

13 Q.  You didn't meet with these two Assistant United States

14 Attorneys; you met with someone else in their office?

15 A.  Not in my office, no.

16 Q.  I didn't say -- I didn't say in your -- but you -- you met

17 with Assistant United States Attorney Lynn Dodge?

18 A.  Correct.

19 Q.  And there was a special agent there as well from the F --

20 special agent as -- there as well?

21 A.  Correct.

22 Q.  All right.  And the same attorney on your civil case

23 accompanied you on this interview with these federal law

24 enforcement officials?

25 A.  This is true.

1   Q.  And in your interview, it's about five pages single

2   spaced.

3   A.  Okay.

4   Q.  Right.  And in your interview -- and this is

5   September 27th of 2017.  In this interview, once again, you

6   make no mention of your criminal conduct?

7   A.  Apparently.

8   Q.  And -- and -- and -- and so I wasn't at the meeting, but

9   I -- I -- I would be shocked if the agents or -- or the

10  Assistant United States Attorneys didn't encourage you to tell

11  the complete truth.

12  A.  Was there a question there?

13  Q.  Yes.  Were you advised by the agents there to tell us the

14  whole story?

15  A.  I was advised to answer the questions truthfully, and I

16  was -- to my recollection was never asked, "Did you break the

17  law?"

18  Q.  And at the end did they ask the catchall question, Dr.

19  Kufner, which is, "Is there anything you want to add?"

20  A.  Actually I don't recall that being the case.  People were

21  peeling off saying they had to leave.  I was prepared to stay

22  much longer, but it was accommodating the needs, the schedule

23  needs of those people who were interviewing me who were saying

24  we have to end it here, and I had quite a bit more I wanted to

25  say that did not have a chance to bring forward.

1   Q.  Dr. Kufner, you are familiar with the phrase lying by

2   omission?

3   A.  Yes.

4   Q.  Right.  And in this interview with federal agents you

5   never mentioned that you were billing for procedures -- for --

6   billing for services that were never done, you never told them

7   that?

8   A.  I was prepared to talk about these things if I had an

9   opportunity for additional interviews which I thought would

10  happen but did not.

11  Q.  Dr. Kufner, you were being intentionally deceptive with

12  those agents?

13  A.  No, I don't believe that's true.

14  Q.  Dr. Kufner, are you deceptive when there is something in

15  it for you to gain?

16  A.  I think I've already answered that, that I was not

17  expecting a great gain.  I was trying to take an avenue that

18  would protect me as I came forward with this information.

19  Q.  All right.

20  A.  And I admit that I did not -- it did not work out the way

21  I was hoping it would.

22  Q.  In the civil case there is an expectation of monetary

23  gain, correct?

24  A.  Correct.

25  Q.  And in this lawsuit there's a expectation for you of

1    freedom?

2    A.  I had no expectation; I had hopes.

3    Q.  I'm almost done.  When you pled guilty, sir, you had ten

4    counts --

5              THE COURT:  I have an idea.  Since lawyers frequently

6    ask for a minute at the end of their examinations, why don't

7    you do that now.  We'll take a ten-minute comfort break.  We'll

8    come back at about 10:50, we'll let you finish up, Mr. Collins,

9    we'll go to our additional cross-examinations, which we hope

10   may be brief, and then we'll see where we are for lunch.  How's

11   that sound?  You ready for a break, ladies and gentlemen?

12   Okay.  All right.  Thank you all.

13             Let's rise for our jurors and we'll take a ten-minute

14   comfort break.

15             (Jury excused at 10:40 a.m.)

16             THE COURT:  Okay.  Short recess.

17             (Court in recess at 10:41 a.m.)

18             (Proceedings resumed at 10:53 a.m., all parties

19             present)

20             THE LAW CLERK:  All rise.  Court is back in session.

21             (Jury entered the courtroom at 10:56 a.m.)

22             THE COURT:  Jurors are back, everybody's in their

23   seats.  Please be seated, everyone in the courtroom.

24             And Mr. Collins, we're ready for you again.

25             Temperature's okay?  I think it feels pretty good in

Case 2:18-cr-20800-SJM-APP   ECF No. 454, PageID.5070   Filed 07/18/22   Page 86 of 178
Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

86

1    here today.  Yep?  Jurors are nodding assent.

2            Okay, Mr. Collins, go right ahead.

3            MR. COLLINS:  Thank you, Your Honor.

4            THE COURT:  Yes, sir.

5    BY MR. COLLINS:

6    Q.  Dr. Kufner, before a patient goes through a medical

7    procedure that requires sedation, they very often have what was

8    called a time out session with the patient?

9    A.  Yes.

10   Q.  Right.  And a time out session is when the physician along

11   with the anesthesiologist and the medical assistant and the

12   patient as well discuss the procedure that they're -- they're

13   about to do?

14   A.  That's not how it works, no.

15   Q.  Um --

16   A.  At the time of the procedure, before the operator, whether

17   it's a surgeon or an interventional pain doctor, do an

18   interjection, the room is supposed to go quiet.  The person

19   performing the procedure is to identify or have a proxy

20   identify the patient's name, the procedure and who's doing it

21   and everybody's in agreement.  It's not really a discussion.

22   Q.  Everybody's in agreement.  All right.

23           Now, when you entered a guilty plea, you pled to

24   conspiracy to commit health care fraud, right?

25   A.  Correct.

1    Q.  Right.  And when you pled guilty, that was personal to Dr.

2    Kufner, right?

3    A.  Yes, sir, it was.

4    Q.  Right.  You -- you weren't passing judgment on the intent

5    of anyone else other than you?

6    A.  That's true.

7    Q.  Right.  As a matter of fact, in your Plea Agreement

8    there's a section called Factual Basis, right?

9    A.  Correct.

10   Q.  And in that section it indicates that Dr. Kufner himself

11   submitted fraudulent claims to Medicare, Medicaid and Blue

12   Cross that were not supported by his patient notes or other

13   medical records, correct?

14   A.  Correct.

15   Q.  So that word, "Dr. Kufner himself," by himself, that means

16   you would submit those claims on your own?

17   A.  I filled out the claim, the -- the form and submitted it,

18   and that went right through the billing process with the

19   billers.

20   Q.  All right.  And you don't know what the process was of

21   other practitioners at the Pain Center in terms of how they

22   submitted?

23   A.  They used the same form, they circled the same items that

24   I did when they did the same procedures.

25   Q.  Let me ask you this, Doctor.  If you are aware, would this

1  be consistent with the practice as you understood it?

2  A.  Yes.

3  Q.  Let me -- let me pose the question, sir.  A physician

4  would see a patient, write their notes from the exam in --

5  in -- in the file, and would then hand the file off to the

6  medical assistant, correct?

7  A.  Correct.

8  Q.  And the medical assistant would in turn hand the file off

9  to the biller?

10  A.  Correct.

11  Q.  Right.  And there's a billing department at the Pain

12  Center?

13  A.  There was.

14  Q.  I'm sorry?

15  A.  There was.

16  Q.  Yeah, there was, right.  While you were there?

17  A.  Yes.

18  Q.  Right.  There was a director of the billing department?

19  A.  Yes.

20  Q.  Right.  And there were about what, five billers?

21  A.  I didn't keep count.

22  Q.  And once the medical assistant would hand the file off to

23  the billing department, the billing department would in turn

24  submit the claim?

25  A.  Correct.

1   Q.  Right.  And the practitioner, the physician would not

2   review the file before it's submitted for payment?

3   A.  No, we did not have the opportunity.

4   Q.  Right.  And you don't have to review it nor would you

5   approve it, right?

6   A.  Nor would I approve?

7   Q.  Well, you don't -- you don't see it and you don't approve

8   it, right?

9   A.  No.

10  Q.  Right.  And once the bill is submitted, a check comes

11  back, not payable to you, right?

12  A.  Correct.

13  Q.  Payable to the Pain Center?

14  A.  Correct.

15  Q.  With that qui tam case, Dr. Kufner, in addition to those

16  treble damages, in your lawsuit you ask for more than that.

17  Didn't you also ask to be reimbursed for your attorney?

18  A.  I don't recall if that was in there or not.

19  Q.  It wouldn't surprise you if -- if the Complaint says

20  request for attorney's fees?

21  A.  No, it wouldn't.

22  Q.  So you don't want to have to come out of your pocket at

23  all?

24  A.  As far as I knew.  I don't know.

25  Q.  Okay.  Prayer for relief, page 25 of your Complaint, you

1    ask for costs, interest and attorney's fees.

2    A.  You're asking me to --

3    Q.  Do you dispute what's on the page?

4    A.  It's on there.  You're asking me to remember something

5    that happened years ago that --

6         THE COURT:  Okay.

7    A.  -- I can't --

8         THE COURT:  This point's been established.  Go -- go

9    ahead, Mr. Collins.

10         MR. COLLINS:  Thank you, Your Honor.

11         THE COURT:  You're welcome.

12   BY MR. COLLINS:

13   Q.  Earlier today, sir, you indicated I believe on direct

14   examination that you perform procedures that were -- you billed

15   for procedures that were not performed but you did it in good

16   faith?

17   A.  Yes.

18   Q.  Right.  Now, you pled guilty, did you not?

19   A.  I did.

20   Q.  Right.  And when you pled guilty, did you tell the Court

21   that you were acting in good faith?

22   A.  I pled guilty.

23   Q.  Right.  And -- and there was no but?

24   A.  That's true.

25   Q.  Right.  Today there's a but?

1    A.   I'm being asked.

2    Q.   Oh, so if -- if the judge had asked you when you took the

3    plea if you're acting in good faith, your response would have

4    been yes?

5    A.   I -- that is hard for me to imagine in that context and at

6    that time that happening, but if he had asked me for any

7    explanation at the time, I would have given it to the best of

8    my ability.

9    Q.   So -- so are you -- you now blaming the judge --

10   A.   No.

11   Q.   -- for not asking you the question?

12   A.   I think that is twisting my words in a way that is

13   totally -- totally out of -- of the truth.

14          THE COURT:  All right.  We -- we -- we established --

15   we've.

16   A.   I was entering a plea.

17          THE COURT:  Go ahead -- hold on a minute, Doctor.  We

18   established what the plea proceedings revealed and we

19   established what he said today and there is an inconsistency

20   highlighted.  We can proceed beyond that.

21          Go right ahead, Mr. Collins.

22          MR. COLLINS:  I'm satisfied, Your Honor.

23          THE COURT:  Okay.  Thank you.  All right.  Very good.

24   Thank you all.

25          And we're going to see -- hear from Mr. Harrison

1    next.

2              MR. HARRISON:  Thank you.

3              THE COURT:  Let me remind you to pull down your mask

4    and pull your mic closer to you so we don't hear from any court

5    reporters or anything like that.  Go right ahead.

6                        CROSS-EXAMINATION

7    BY MR. HARRISON:

8    Q.  Good morning, Dr. Koofner [phonetic].

9    A.  Good morning.

10   Q.  My name is Bob Harrison and I represent Dr. Edu who is

11   seated behind me.

12             When you were hired at the Pain Center, you were

13   hired as an independent contractor we've established, correct?

14   A.  Correct.

15   Q.  And you were hired to work at the Eastpointe location,

16   correct?

17   A.  Correct.

18   Q.  And at the beginning and at other times the Pain Center

19   encouraged all patients to get physical therapy, true?

20   A.  True.

21   Q.  And every patient had to do more than just take pain

22   medications, true?

23   A.  True.

24   Q.  And --

25   A.  I think there was an asterisk on that that some patients

1    did not fulfill, and I personally had a bare minimum of

2    patients who had things like cancer pain where there was really

3    no other option than medication.  So I can only talk about the

4    general mission that was stated.

5    Q.  Okay.  Sir, I appreciate the answer, but can we have an

6    understanding that if I ask you a question, you answer it

7    without volunteering?

8    A.  Okay.

9    Q.  Is it also true that you did not -- you do not believe

10   that anyone told patients injections were a required tradeoff

11   for pain medication?

12   A.  I can only say I never heard that said.

13   Q.  Did you ever say it?

14   A.  No.

15   Q.  Isn't it also true that Dr. Edu told you that when a

16   patient has exhausted all procedures and nothing helps, you

17   should document that in the patient's chart and refer the

18   patient back to their primary care physician?

19   A.  I can't say that I recall that, no.

20   Q.  Did you tell Special Agent Brian Tolan and FBI Special

21   Agent Steven Osterling and Assistant U.S. Attorney Brandon

22   [sic] McMillion what I just said?

23   A.  If that's in the record.  I'm talking about my memory.

24   I -- I -- I see nothing wrong with that statement.  I just

25   can't tell you that I remembered hearing it.

1  Q.  I'm not suggesting there's anything wrong with it.  I'm

2  just asking if you said it.

3  A.  If it's in the record, then I would agree.

4  Q.  Is it also true that Dr. Edu encouraged that dosages which

5  doctors prescribed should be lowered?

6  A.  I'm trying to remember did I hear him say that or not.  I

7  can't say that either.

8  Q.  Okay.  Was it also true that you were a bit resistant to

9  lower dosages of medications because if you felt the medication

10  was relieving pain, you didn't want anyone else to tell you

11  what to do with the dosages?

12  A.  I felt that every patient should be individualized and

13  some people will need more, some people need less, some people

14  need none at all.

15  Q.  Okay.  You had earlier said, I think when you first

16  testified, that Dr. Bothra told you that you were sent to

17  Eastpointe because Dr. Edo [sic] didn't like you, Edu didn't

18  like you?

19  A.  No, I didn't say that.  I said that I was not allowed to

20  see patients in the Warren clinic because Dr. Edu didn't want

21  me in there, those were Dr. Bothra's words, and liking or not

22  liking me was not part of the issue.  That's personal.

23  Q.  Okay.  Did -- did you believe Dr. Bothra?

24  A.  I had to mull it around, but ultimately no, I don't think

25  it was Dr. Edu's issue.

1    Q.  Okay.  And would it be fair to say that Dr. Edu treated

2    you respectfully?

3    A.  It would be fair.

4    Q.  And you treated him respectfully?

5    A.  I did.

6    Q.  Is it also true that Dr. Edu expressed that he liked you?

7    A.  I knew that I liked him.  I don't know that he ever said,

8    "Dr. Kufner, I like you," but I felt that we had a friendship

9    relationship.

10   Q.  Did it also go so far as to a point when after you had

11   left the Pain Center, you called the Pain Center and you were

12   asking about some supplies and you talked to Dr. Edu and you

13   advised him to leave the Pain Center as soon as possible

14   because there are other things occurring in the background that

15   Dr. Edu was not aware of and that Dr. Edu was a good man and

16   you did not want bad things to happen to him?

17            MR. HELMS:  Objection, Your Honor.  Compound

18   question.

19            THE COURT:  It is.  Let's see if the witness can

20   answer that.  If -- if you understand that and can answer it,

21   Doctor, you can try.  Go ahead.

22            THE WITNESS:  Okay.  This -- this is not going to be

23   a short answer but it's an honest one.  I recall a conversation

24   with Dr. Edu when he contacted me about a program or a proposal

25   from Dr. Bothra about covering the PAs, the physician

1    assistants, which if Dr. Edu would agree to use his NPI as

2    coverage for the physician assistants, which would be legal,

3    not suggesting anything wasn't legal, that then Dr. Bothra

4    could rate -- bill at a higher rate than being -- the patient

5    being seen by a physician assistant alone.  I did not know how

6    this worked, and I called another physician -- physician

7    assistant who was able to advise me that yes, it could be done.

8    And later I remember the words I said was, "I really would like

9    to see you out of there.  I think bad things are going to

10   happen and I think Dr. Bothra would throw you under the bus,"

11   and I meant it at the time.

12   BY MR. HARRISON:

13   Q.  And did you also say, "I believe you're a good person"?

14   A.  I do, and I still do.

15   Q.  Okay.  Is it fair to say that there is no financial -- no

16   real financial incentive for the independent contractor doctors

17   there to do procedures in the surgery center?

18   A.  That there's no financial incentive?

19   Q.  There's no more than doing procedures in the office, it's

20   about the same remuneration?

21   A.  As far as the percentages in the contracts, in mine the

22   work done in the surgery center was better money than being in

23   the clinic.

24   Q.  I'm talking about the procedures.  Are they about the same

25   in the -- in the surgery center as they are in the -- in the

1  clinic?

2  A.  Oh, you mean when an injection is done for the doctor?

3  Q.  Yes.

4  A.  I would have to see a table.  It's been a long time since

5  I reviewed that.

6  Q.  Okay.

7       MR. HARRISON:  Ms. Adams, could I see Exhibit 121A,

8  page 24?  Could you blow up the -- the bottom half?

9  BY MR. HARRISON:

10  Q.  Dr. Kufner, do you see the date 1-26-15?  Excuse me, 3 --

11  1-26, yeah, 1-26-15?

12  A.  1-26-15, yes.

13  Q.  And does that appear to be Dr. Edu's writing for that

14  entry?

15  A.  Well, it looks familiar.  I can't say that I know for

16  sure.

17  Q.  Okay.  And could you read it for the jury?

18  A.  It says, "Bilateral facet II," which means it's the second

19  test injection to be done.

20  Q.  And these are the list of services for Glenda Roscoe,

21  okay?

22  A.  These are the list of the services -- services for who?

23  Q.  Glenda Roscoe.

24  A.  I'm sorry, I'm not catching that last word.

25  Q.  Glenda Roscoe.

1    A.   Oh.  If that was the name at the top, I think that was

2    correct.

3    Q.   And she was a patient that you saw very often, isn't that

4    true?

5    A.   I see where I did on September 17th left L4 and L5

6    [indiscernible] --

7         THE COURT REPORTER:  Wait, I didn't understand what

8    you just said.  "...left L4 and L5..."

9    A.   L4 and L5 selective nerve root block, which is a type of

10   an epidural.  And on October 14th, 2014th [sic] I asked for

11   knee braces and knee x-rays.  And then on December 15th, 2014 I

12   repeated -- oh, I'm sorry.  Oh, on 12-5-14 I also asked for

13   urine screening.

14   Q.   Was she a patient at Eastpointe?

15   A.   I -- based on the information I have here, I can't say

16   that I know that because I see Dr. Bothra's handwriting

17   preceding that.  I see two visits, and then after that I see

18   someone else's handwriting in 2015 at a time when I was still

19   at Eastpointe, the only physician at Eastpointe, and I wasn't

20   filling those out.  So I would say at that time what I see

21   tells me no, she had started going to Warren or always did.

22   Q.   Do you know if there was a yellow cover sheet on her file?

23   A.   No, I do not.

24   Q.   Do you recall if the procedure that Dr. Edu performed on

25   January 26th, 2015 was a procedure that you had scheduled but

 1  that Dr. Edu was assigned to the injection that day?

 2  A.  I do not remember that, no.

 3          MR. HARRISON:  Could I have a moment please?

 4          THE COURT:  Yes, sir.

 5          (Brief pause)

 6          MR. HARRISON:  Could I have Exhibit 121A, page 20?

 7  BY MR. HARRISON:

 8  Q.  Dr. Kufner, would you look at the bottom portion of that

 9  page?

10          MR. HARRISON:  And Ms. Adams, would you blow it up?

11  A.  It says -- it says, "Wishes to continue with facet blocks.

12  RFA if appropriate.  Will need to get knee x-rays."

13  Q.  I'm sorry.  Excuse me, I don't mean to interrupt you but I

14  made a mistake.  I wanted you to go to the date before,

15  12-9-14.

16  A.  Okay.  It needs to be brought up 'cuz this is all I see.

17  "Repeats 3 to 5 days of significant improvement with facet

18  blocks.  Needs to continue but will wait until" looks like

19  "January."  And --

20  Q.  Okay.  On that date, Dr. Kufner -- I don't want to burden

21  you with reading it all, but on that date, December 9th, 2014,

22  does it indicate in your handwriting that Glenda Roscoe did not

23  want to repeat a procedure and so she was rescheduled to come

24  back on January 6th, 2015?

25  A.  No.  My interpretation was that she gave a positive to the

1    test injection and needs to continue for longer term relief

2    because the injection, obviously three to five days relief, but

3    her choice was to wait until January.

4    Q.   Right.  And then in January she indicated they wants to

5    continue with the facet --

6    A.   That's what --

7    Q.   -- procedure?

8    A.   Yes.

9    Q.   Okay.  And so on the right-hand side it says, "Schedule

10   bilateral facet procedure."

11   A.   Yes.

12   Q.   And -- and on the bottom does it show that on January 21st

13   she was a no show?

14   A.   I don't have that available.

15        MR. HARRISON:  On the bottom, Ms. Adams.

16   A.   Yes.

17   Q.   And does it say, "Reschedule for January 26, 2015"?

18   A.   Yes, it does.

19   Q.   And then on January 26th --

20        MR. HARRISON:  Which is Exhibit No. 121A, page 21,

21   Ms. Adams, please.

22   Q.   -- at the top --

23   A.   Yes.

24   Q.   -- did Dr. Edu do the procedure on January 26th?

25   A.   Yes.

1   Q.   "Bilateral lumbar facet II"?

2   A.   Yes, second test injection, yes.

3   Q.   Okay.  So my original question was isn't it true that Dr.

4   Edu did the procedure that you had previously scheduled?

5   A.   Yes.

6   Q.   And that was because he was scheduled to do the procedures

7   and you did the sedation?

8   A.   Based on the data, I would have to assume that.  I think

9   at that time he and I were the only two doing sedations, so it

10  would have to be me.

11  Q.   Okay.  You had three-plus years of work at the Pain

12  Center?

13  A.   Correct.

14  Q.   You indicated on direct that conditions were dirty?

15  A.   I did.

16        MR. HARRISON:  I have an exhibit I'd like to display

17  to the jury, Your Honor.

18        THE COURT:  Okay.

19        MR. HELMS:  Your Honor, I -- I believe this is a

20  video that Mr. Harrison showed me a couple days ago, and I

21  would object under 402 to relevance and 403 to waste of time.

22        THE COURT:  Okay.  Well, I haven't seen the video, so

23  what is it you're trying to do, Mr. Harrison?  What's your --

24  what -- what -- what -- the government's objecting to your

25  offer, and I'm assuming this is not in evidence but I don't

1    know.  So I'm just wondering what you -- what you would like to

2    do.

3              MR. HARRISON:  Well, I would like to do -- I would

4    like to present a short video that will show the interior of

5    the portions of the Pain Center that I -- it will show a

6    birthday party, which I'll just do a little bit of.  It will

7    show Dr. Kufner and Dr. Edu standing next to each other with

8    Dr. Edu's arm around Dr. Kufner, and then it will show other

9    parts in detail of the Pain Center and the flooring and it is

10   crystal clean.

11             THE COURT:  Okay.  I'm all right with playing that, a

12   brief video to show the condition of the -- of the clinic that

13   may contrast with Dr. Kufner's previous testimony, especially

14   since he's in the video.  Go -- go right ahead.

15             (Video being played)

16             MR. HARRISON:  Mr. Anton, would you move it a little

17   more quickly?  Can you move it some more please?  Please move

18   it further.  I think you went too far.  Go back please.  You're

19   too far.  Move it back.  Further back please and then we'll

20   jump to this.

21             (Video being played)

22             Stop that there.

23   BY MR. HARRISON:

24   Q.  While it's up there, Dr. Koofner [phonetic], do you see --

25   A.  Please, it's Dr. Kufner, like what's at the end of your

1  sleeve.

2  Q.  I'm sorry, how -- I mispronounced it?

3  A.  Kufner, not Koofner [phonetic].

4  Q.  I'm sorry.  Kufner.

5  A.  Thank you.

6  Q.  Does that depict Dr. Edu with his arm around your

7  shoulder?

8  A.  That is.

9  Q.  And does that depict a slight smile on your face too?

10  A.  Yes.  I like Dr. Edu, I still do.

11        MR. HARRISON:  Okay.  Continue now.

12          (Video being played)

13        THE COURT:  Okay.  I tend to think that should do it.

14  Can you ask your next question, Mr. Harrison?

15        MR. HARRISON:  Yes, Your Honor.

16  BY MR. HARRISON:

17  Q.  By the way, were you -- before you came in today, were you

18  outside discussing some things with Mr. Helms?

19  A.  I was.

20  Q.  What were you discussing?

21  A.  He was -- we were just reviewing what we had already

22  talked about and questions that were going to come that I

23  already knew about.

24  Q.  So he discussed with you expected questions that were

25  going to come?

1      MR. HELMS:  Your Honor, I would ask for a curative

2  instruction.  I don't think there's anything improper about

3  letting a witness know who testified on Friday generally what

4  will be covered.

5      THE COURT:  Well, we'll probably -- we'll probably

6  instruct the jury on that, but I -- I take it there was no

7  effort, or maybe I'm wrong, was there any effort to coach your

8  testimony or tell you what to say, Doctor?

9      THE WITNESS:  No.  The only coaching I received so

10  far is to tell the truth.

11      THE COURT:  All right.  Go ahead, Mr. Harrison.

12  BY MR. HARRISON:

13  Q.  After you left the Pain Center, did you go to work at a

14  Pain Center in Oak Park with a James Jayakar?

15  A.  I did.

16  Q.  And did you see patients there?

17  A.  I did.

18  Q.  And did you prescribe narcotics prescriptions but had Dr.

19  Jayakar sign those prescriptions?

20  A.  I made recommendations and he wrote the prescriptions.

21  Q.  Well, you couldn't write the prescription because of your

22  licensure at that time, right?

23  A.  There were very clear instructions from Judge Murphy what

24  I could and cannot do and I followed them to the letter.

25  Q.  I didn't ask you what Judge Murphy instructed you.  I

1   asked you if you didn't write those prescriptions because you

2   couldn't.

3   A.   That's right.

4   Q.   And I think it may have been established but let me make

5   sure.  From July 13th, 2017 until you left, '17 I mean,

6   July 13th, 2017 when you filed the qui tam lawsuit, you

7   continued to work at the Pain Center until October 20th, 2017?

8   A.   Yes, in accordance with my contract and giving proper

9   notice to leave.

10  Q.   Okay.  Now you're doing what I asked you not to do.  I

11  just asked you a question and you then volunteered information

12  that I didn't ask you to do, okay?

13  A.   I apologize.

14  Q.   So let's try to just answer my questions.  Would it be

15  fair to say that at the Pain Center you prescribed the highest

16  dosages of anyone to patients of narcotics Schedule IIs?

17          MR. HELMS:  Objection, Your Honor.  Assumes facts not

18  in evidence, foundation.

19          THE COURT:  As to foundation, if you know the answer

20  to that, you can answer it, Doctor.

21  A.   Um, no, it wouldn't be fair.  There were other people, one

22  person in particular who prescribed a lot more than I did.

23  BY MR. HARRISON:

24  Q.   Did you have disagreements with other doctors there about

25  the dosages, the high doses -- the -- the high doses that you

1   were prescribing?

2   A.  Yeah, we've discussed that already.  I did not believe

3   that I should be limiting based on an arbitrary number decided

4   by somebody else; that I should individualize the treatment.

5   Q.  Would it be true that the same doctor cannot perform both

6   sedation and the procedure?

7   A.  No, that's not true.

8   Q.  Well, so you believe that it's appropriate for the same

9   doctor to perform the sedation as the doctor who performs the

10  procedure?

11  A.  I believe that there are circumstances where a physician

12  can direct an assistant or even provide a dose with somebody

13  doing proper monitoring and then do the procedure, but you

14  cannot do that and then still bill for anesthesia, not sedation

15  but anesthesia services, as well as --

16  Q.  I'm not asking you -- I'm not asking you about billing.

17  So you believe -- do you believe it would have been proper for

18  you, for example, to administer the sedation and do a facet

19  block procedure, just you?

20  A.  It's not something I had thought about, so under

21  circumstances I think it could be justified if there is proper

22  support.  But more typically you would have somebody there, a

23  nurse or medical assistant, putting the drugs in the IV under

24  your direction and that is done commonly.

25  Q.  Well, isn't administering the sedation one of the main

1    functions of an anesthesiologist?

2    A.  It is, but it can be done by other people.

3    Q.  Okay.  And did you do it that way yourself at the Pain

4    Center?

5    A.  I think there were two or three times where -- I

6    remember one I call -- recall specifically where it was Dr.

7    Bothra's patient.  He left, asked me to take over and do the --

8    do the injection, and I directed the sedation and did the

9    injection.

10   Q.  Okay.  And -- and I -- I covered part of this question,

11   but when you were hired as an independent contractor, you were

12   supposed to be practicing on your own at Eastpointe, correct?

13   A.  Correct.

14   Q.  And you did practice on your own because there was no one

15   else, no other physician that worked out of there when you were

16   there?

17   A.  That's true.

18   Q.  And I wanted to ask you about your numbers calculation.  I

19   believe what you said was that you first started seeing 30 to

20   40 patients at Eastpointe, correct?

21   A.   I believe the number I said was 20 to 40 but --

22   Q.   Twenty to 40, okay.

23   A.   Okay.

24   Q.  And then the numbers went up to 40 to 60 or 50 to 60,

25   correct?

1    A.   Correct.

2    Q.   And you saw as many as 60 patients on your own, right?

3    A.   Yes.

4    Q.   You contrasted that with the Pain Center, and you said

5    that when you would look at the sign-in sheets on occasions

6    when you would go to the Pain Center at the end of the day, you

7    would see a sign-in sheet with a hundred and maybe even as many

8    as 120 patients checked off, right?

9    A.   With one practitioner, yes.

10   Q.   And with one practitioner?

11   A.   Yes.

12   Q.   Well, how many sheets did they have there?

13   A.   I'm sorry?

14   Q.   How many sign-in sheets were there?

15   A.   No, I'm suggesting that sign-in sheet was for one

16   practitioner.

17   Q.   Well, how many sign-in sheets would they have there?

18   A.   They had one.

19   Q.   So they only had one practitioner working at the Pain

20   Center?

21   A.   Until Dr. Bothra opted to start hiring physician

22   assistants and nurse practitioners, yes.

23   Q.   Well, wait a minute.  Dr. Edu worked at the Pain Center --

24   A.   Yes.

25   Q.   -- three years before you got there, right?

1   A.   This is correct.

2   Q.   And there were other physicians who worked there, right?

3   A.   Yes.

4   Q.   There was Dr. Backos at one time, right?

5   A.   He had a separate clinic.

6   Q.   Well, it was the annex, right?

7   A.   Yes.

8   Q.   The annex to the Pain Center?

9   A.   Yes.

10  Q.   And Dr.  Russo came to the Pain Center?

11  A.   Yes.

12  Q.   And Dr. Lewis eventually came to the Pain Center as well,

13  right?

14  A.   Yes.

15  Q.   So are you suggesting that none of them had a sign-in

16  sheet?

17  A.   I didn't say that, no.

18  Q.   Well, I asked you if there were other sign-in sheets and

19  you said no, there was only one for one physician?

20  A.   As far as -- well, you're asking again memory of what I

21  saw, and by the time there were multiple physicians in the

22  clinic, I did not really have a full understanding of how these

23  were put down.  But I did testify truthfully that I saw sign-in

24  sheets where I knew there was one physician for the day seeing

25  over a hundred patients a day.

1    Q.  But how would you know that if you didn't work there?

2    A.  Because the other patients hadn't -- or the other

3    physicians hadn't been hired or were doing injections.

4    Q.  Well, the -- the ambulatory surgical center wasn't there

5    when you first started, was it?

6    A.  No, it was not.

7    Q.  Okay.  And Dr. Edu was there when you first started,

8    right?

9    A.  He was.

10   Q.  And Dr. Bothra was there of course, right?

11   A.  He was.

12   Q.  And do you know when Dr. Backos started?

13   A.  Dr. Backos was there before I was.

14   Q.  Okay.  So that's at least three physicians there at the

15   time you came and were there, right?

16   A.  And I also stated Dr. Backos --

17   Q.  Hold it.

18   A.  -- was not on the list.

19   Q.  Hold it.  Hold it.  Just answer my question.

20   A.  Yes.

21   Q.  Now, if three physicians saw the patients on the sign-in

22   sheet, that would be a far lesser number than you yourself were

23   seeing at Eastpointe?

24   A.  But that's not what happened.

25   Q.  I'm asking you if that would be true.

1    A.  If that actually happened, it would be true.

2    Q.  All right.  Now, when you were at Eastpointe were you

3    resentful that you were there and you were isolated, that you

4    had less resources and no colleagues working in the same place

5    with you?

6    A.  Well, there was more than one question there.  Was I

7    resentful that I was isolated?  No, I was grateful that I was

8    isolated.

9    Q.  Okay.  There were no colleagues there.

10   A.  That didn't bother me.

11   Q.  There were no -- there were less resources, right?

12   A.  That I did not appreciate and I said so.

13   Q.  And did you at times indicate that you were being treated

14   as a second-class citizen?

15   A.  I -- I did, and I still believe that to be true.

16   Q.  And you're resentful of that?

17   A.  Stating a mistreatment is -- actually happened does not

18   necessarily mean resentment.  I would not waste my energy to

19   resent.

20   Q.  I thought you just said you were resentful and you still

21   are.

22   A.  I'm sorry?

23   Q.  We'll move on.

24        MR. HARRISON:  Ms. Adams, would you please pull up

25   Exhibit 121A, page 78 and 79?

1    BY MR. HARRISON:

2    Q.  Can you tell us what this is?

3    A.  This is an anesthesia record.

4    Q.  And it's a little hard to see right now so I'm going --

5    at -- at -- at -- at a point -- in a moment I'm going to ask

6    Ms. Adams to enlarge it, but what is this document?

7    A.  This is a record of the medication that was given to

8    Glenda -- this is record of the medications to provide sedation

9    for Glenda Roscoe on January 26th, 2015.

10   Q.  That's the date I had asked you questions about before,

11   correct?

12   A.  Yes.

13   Q.  And that's the date that Dr. Edu did the injections,

14   right?

15   A.  Correct.

16   Q.  And isn't it true, Dr. Kufner, that you are the person who

17   administered the sedation to Glenda Roscoe on that date?

18   A.  This is true.

19   Q.  Okay.

20        MR. HARRISON:  Thank you.

21        THE COURT:  Okay.

22        MR. HARRISON:  Nothing further, Your Honor.

23        THE COURT:  All right.  Thank you.

24        How long are you going to be, Mr. ...

25        MR. MARGOLIS:  How long would you like me to be?

```
 1            THE COURT:  You don't want me to answer that.  Why
 2   don't you get started and then we'll inter -- intersperse our
 3   lunch break.
 4            As you're approaching the lectern, some of the
 5   evidence today reminds me of when I was in college and I would
 6   sing things like happy birthday, and my college roommate who I
 7   was really close to said, "What did you do with the money?"
 8   I'd say, "What money?"  And he'd say, "The money that your --
 9   that your mom gave you for singing lessons."
10            Go ahead, Mr. Margolis.
11            MR. MARGOLIS:  That's a good joke.  I used a
12   variation of that.
13            THE COURT:  You did?  Right, right, right.
14            MR. MARGOLIS:  I'd say, "What'd you do with the
15   quarter?"
16            THE COURT:  Yeah.
17            MR. MARGOLIS:  No quarter, quarter.
18            THE COURT:  Your mom gave you for -- yeah.
19            MR. MARGOLIS:  I guess it's a variation.
20            THE COURT:  Well, that's good, that's good.
21            MR. MARGOLIS:  I'm just trying not to use this.
22            MR. CHAPMAN:  Look at what you did with the money you
23   got for tech lessons.
24            THE COURT:  Yeah, right, right, right.
25            MR. MARGOLIS:  Not very good.
```

```
 1                THE COURT:  Exactly, exactly.
 2                MR. MARGOLIS:  I'm not using it.  I just needed it as
 3      a table.
 4                MR. CHAPMAN:  Oh.
 5                THE COURT:  Okay.  All right.  Go ahead, Mr.
 6      Margolis.
 7                MR. MARGOLIS:  Proceed?
 8                THE COURT:  Yep.
 9                MR. MARGOLIS:  Thank you, Your Honor.
10                THE COURT:  You're welcome.
11                          CROSS-EXAMINATION
12      BY MR. MARGOLIS:
13      Q.  Hello.
14      A.  Hello.
15      Q.  My name's Laurence Margolis.  I represent Dr. Christopher
16      Russo.  I'm going to ask you a series of questions.  Similar to
17      what Mr. Harrison requested, I'm also going to request that we
18      limit our answers to yes or no, I don't know, you can say
19      correct.  I want one-word answers.  Can you do that for me,
20      sir?
21      A.  If the questions are clear, I can.
22      Q.  So that would be an I don't know or unclear.  How is that?
23      A.  Thank you.
24      Q.  I want to take you back to 2010.  You and Dr. Russo
25      trained together at Moffett?
```

1   A.  University of South Florida.

2   Q.  Do you train together at Moffett Cancer Center as well?

3   A.  Oh, at Moffett?  That was part of it, yes.

4   Q.  Thank you.

5        At that time you have not met Dr. Bothra?

6   A.  No.

7   Q.  At that time Dr. Russo has not met Dr. Bothra?

8   A.  Correct.

9   Q.  After Moffett Chris moves back to Michigan, correct?

10  A.  At Moffett?

11  Q.  After, sorry?

12  A.  After Moffett?

13  Q.  Yes.

14  A.  I did what?

15  Q.  After Dr. Russo completes his post-fellowship training he

16  moves back to Michigan, yes?

17  A.  Yes.

18  Q.  He starts working at a pain practice in Grand Rapids, yes?

19  A.  Yes.

20  Q.  Called the Javery Clinic?

21  A.  Yes.

22  Q.  For Dr. Keith Javery?

23  A.  Yes.

24  Q.  And this is 2012, is that accurate?

25  A.  I think so, yeah.

1   Q.  And you know -- and at the time you know the Javery

2   Clinic, yes?

3   A.  I knew Dr. Javery.

4   Q.  You visit Chris while he is there?

5   A.  Yes.

6   Q.  And you're not particularly fond, is it fair to say, of

7   Dr. Javery?

8   A.  That would be true.

9   Q.  On a visit to see Chris, if you recall, Dr. Javery had

10  ordered you or asked you in not too nice of terms to get the

11  heck out of the staff area.  Do you remember that?

12  A.  He -- I do, yes.

13  Q.  You found it rude and insulting?

14  A.  I did.

15  Q.  Chris ran out, came out and apologized?

16  A.  Chris was the one who sent me away and apologized doing

17  it.

18  Q.  He came out and said, "I don't run anything here, I'm

19  sorry."

20  A.  Pretty much.

21  Q.  Thank you.

22  A.  He --

23  Q.  Afterwards -- yes or no is fine.

24  A.  I'm sorry.

25  Q.  Thank you, sir.

1           Afterward you and Dr. Russo went to dinner?

2    A.   Yes.

3    Q.   The Chinese Buffet?

4    A.   I'd have to --

5    Q.   I don't know is fine.

6    A.   I -- I don't remember, yeah.

7    Q.   And this is in 2012 still when -- when you were sent to

8    the -- out of Javery's?

9    A.   Probably.

10   Q.   Over the next couple years you and Dr. Russo remained in

11   touch?

12   A.   We did.

13   Q.   Remained friends?

14   A.   Yes.

15   Q.   In 2014 -- and it was May of '14 that you and -- that you

16   started working for the Pain Center?

17   A.   Correct.

18   Q.   Dr. Russo is still with Dr. Javery in Grand Rapids?

19   A.   He was.

20   Q.   In your first year or so you were having a good experience

21   at the Pain Center?

22   A.   Reasonably.

23   Q.   You want Chris to come join you, yes?  Yes or no or I

24   don't know, sir.

25   A.   Well, I wanted him out of Javery but I can't --

1   Q.   Okay.  Fair enough.  You talked to Dr. Bothra about Dr.

2   Russo?

3   A.   I did.

4   Q.   Dr. Bothra asks you to set up a meeting, bring him in,

5   have him come visit.

6   A.   I don't remember it being exactly that way, but I have no

7   objection -- I -- it could have easily gone that way.

8   Q.   Okay.  See if Dr. Russo and Dr. Bothra would make a good

9   fit?

10  A.   Correct.

11  Q.   You tell Dr. Russo that Dr. Bothra is interested?

12  A.   I did.

13  Q.   You assured Chris that the PC is a good place to work?

14  A.   At the time I felt that way.

15  Q.   A multi-disciplinary pain center serving a diverse

16  community?

17  A.   Yes.

18  Q.   You assure Dr. Russo that Dr. Bothra is a man of

19  integrity?

20  A.   At the time, yes.

21  Q.   You assure Dr. Russo that the other doctors are good

22  doctors?

23  A.   Yes.

24  Q.   You said that Dr. Backos takes care of the troublesome,

25  difficult patients, the ones that get the high doses?

1  A.  Yes.

2  Q.  You convince him to come visit the PC, the Pain Center?

3  A.  I don't think it's fair to say I -- say I --

4  Q.  Yes or no, sir?

5  A.  No.

6  Q.  Regardless, he drives out from Grand Rapids to come visit

7  you and Dr. Bothra?

8  A.  Yes.

9  Q.  You introduce him, show him around the place?

10  A.  Yes.

11  Q.  And you were at Eastpointe at the time for the most part,

12  but you met him at the Warren clinic?

13  A.  Correct.

14  Q.  Dr. Bothra makes Chris a verbal offer pretty much on the

15  spot?

16  A.  That would be between those two.  I don't know.

17  Q.  Not in your presence?

18  A.  Not in my presence.

19  Q.  Fair enough.

20        After that day Chris, Dr. Russo comes to your house

21  for dinner or -- at the base of The Thumb in Anchor Harbor?

22  A.  Yeah, I think that happened.  I remember that.

23  Q.  Your wife is there too?

24  A.  Yes.

25  Q.  You discuss the practice?

1   A.   Some I'm sure.

2   Q.   And Chris coming on board possibly?

3   A.   Yes.

4   Q.   You talk about the future?

5   A.   Yes.

6   Q.   You say that Dr. Bothra has plans for the future?

7   A.   Yes.

8   Q.   But Chris isn't ready to leave Javery, Dr. Javery yet,

9   right, and he says no to Dr. Bothra?

10  A.   Yes.

11  Q.   This is late '14, 2015, early '15?

12  A.   Must have been 2015.

13  Q.   Thank you.

14       You and Dr. Russo keep in touch after that?

15  A.   Yes.

16  Q.   You continue to talk on the phone as you had been doing?

17  A.   Occasionally.

18  Q.   Skip to -- and you -- and in some of those conversations

19  you talk about Dr. Russo coming to the practice?

20  A.   I assume it was discussed.

21  Q.   Skip to early 2016.  Dr. Bothra has a new business

22  manager, yes?

23  A.   Yes.

24  Q.   A man named James Jayakar, yes?

25  A.   Correct.

1  Q.  And Mr. Jayakar is a U of M trained MBA that Dr. Bothra

2  hired, yes?

3  A.  I don't know his credentials but he was hired by Dr.

4  Bothra.

5  Q.  Oh, you didn't know he had an MBA from U of M?

6  A.  I knew he had an MBA but not his alma mater.

7  Q.  Fair -- fair enough.

8       Jayakar claims that he's going to modernize the

9  practice, bring it to a -- a more modern level?

10  A.  He did.

11  Q.  A brand new surgery center is built?

12  A.  Yes.

13  Q.  Business is picking up?

14  A.  Yes, it was.

15  Q.  You tell all this to Dr. Russo, yes?

16  A.  I don't remember specifically, no.

17  Q.  You don't recall telling Dr. Russo about Mr. Jayakar?

18  A.  When you said all of this, that was a lot of things.

19  Q.  Understood.  Sorry about that.

20  A.  I don't know that I told him about Dr. Jayakar.  I did

21  tell him that there was plans for a surgical center.

22  Q.  That business is going to be picking up?

23  A.  I might have said that.

24  Q.  That he'll be busy?

25  A.  I'm sorry?

1  Q.  That he would be busy if he comes and joins?  If you don't

2  recall, you don't recall.

3  A.  You're -- you're asking me specifics about conversations

4  years ago.

5  Q.  Okay.  That's -- that's fair.  So that would be an I don't

6  know, okay?  Thank you.

7       Regardless, you know at the time that Dr. Russo is

8  not happy with Javery, Dr. Javery's office, yes?

9  A.  Yes, I do.

10  Q.  That he feels Dr. Javery is too controlling, yes?

11  A.  To put it mildly, yes.

12  Q.  Thank you.

13       That he tries to control the way Chris, Dr. Russo

14  practices medicine, yes.  I'm sorry?

15  A.  Yes.

16  Q.  Thank you.

17       You know that Dr. Russo is looking to get out of that

18  closed environment with Javery?

19  A.  Yes.

20  Q.  And you may not recall but Dr. Russo -- you are aware at

21  the time that Dr. Russo has another offer, yes?  Do you recall

22  that?

23  A.  I do.

24  Q.  From West Michigan Pain?

25  A.  Yes.

1    Q.   A man named Dr. Juneja?

2    A.   Correct.

3    Q.   With offices in Grand Rapids and Mount Pleasant?

4    A.   Big Rapids.

5    Q.   Thank you.  It's two words; I'm not going to be mad at you

6    for that one.

7            But Dr. Russo at the time has a non-compete with Dr.

8    Javery, is that -- do you recall that?

9    A.   That came after the fact.

10   Q.   He can't take Dr. Juneja's offer because it's too close in

11   his territorial area?

12   A.   Actually he could.  He would have to sign Big Rapids --

13   Q.   Sir, sir, I'm sorry.  I appreciate just a yes, no or I

14   don't know.

15   A.   Well, the answer is --

16   Q.   Yes, no?

17   A.   -- no.

18   Q.   Thank you.  That's perfect.  Perfect.  I can take no

19   answers.  I just need to control this.

20           At some point around this time you tell Dr. Russo

21   about Jayakar?

22   A.   I don't recall but I'm not disputing that.

23   Q.   Thank you.

24           Dr. Russo does not know, has never met Mr. Jayakar at

25   that time?

1    A.  I don't think so.

2    Q.  You were the connection?

3    A.  Pardon?

4    Q.  You were -- you were the connection between Dr. Russo and

5    Mr. Jayakar, fair?

6    A.  Fair.

7    Q.  In that sense you -- you vouch for Mr. Jayakar, fair?

8    A.  I -- I -- as I understand the word vouch, I can't say

9    that.

10   Q.  Okay.  Okay.  But you're the connection?

11   A.  I told him about -- about this new guy.

12   Q.  Thank you.

13           That the new guy worked for Dr. Bothra, he's

14   modernizing the practice, "He wants to talk to you," yes?

15   That's what you said to Chris about Mr. Jayakar, correct?

16   A.  I --

17   Q.  Yes, no or I don't know?

18   A.  I don't recall that.

19   Q.  Thank you.  Thank you.

20   A.  Okay.

21   Q.  Dr. -- Mr. Jayakar received Chris's phone number from you,

22   do you recall that?  You put him in touch together?

23   A.  Well, again, I don't recall.

24   Q.  Yes, no or I don't know?

25   A.  I don't recall.

1   Q.   Thank you.

2   A.   Okay.

3   Q.   Jayakar communicated or contacts Dr. Russo and invites him

4   to dinner, yes?  Do you recall that?

5   A.   I have to think.  No, I really don't.

6   Q.   Do you have any reason to dispute that?

7   A.   I'm sorry?

8   Q.   Do you have any reason to dispute that?

9   A.   None whatsoever.

10   Q.   Thank you.

11          Mr. Jayakar drives out to Grand Rapids to speak to

12   Chris, Dr. Russo, yes?

13   A.   I don't remember that part at all.

14   Q.   Do you have any reason to dispute that?

15   A.   No.

16   Q.   He drives out after hours in the pouring rain to take him

17   to dinner and make him an offer.  Do you have any reason to

18   dispute that?

19   A.   No.

20   Q.   Takes him to a fancy dinner.  Did you hear about that?  Do

21   you know that?

22   A.   I might have heard it.  I don't have any recollection.

23   Q.   Thank you.  Thank you.

24          Bone Fish Grill in Grand Rapids, does that ring a

25   bell?

Case 2:18-cr-20800-SJM-APP   ECF No. 454, PageID.5110   Filed 07/18/22   Page 126 of 178
Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

126

1    A.  I know the place.

2            THE COURT:  I don't know that that's relevant,

3    Mr. ...

4            MR. MARGOLIS:  Trying to lodge his --

5            THE COURT:  We understand.

6            MR. MARGOLIS:  -- unlock his memory, Judge.

7            THE COURT:  We -- we understand.  Go ahead.

8    BY MR. MARGOLIS:

9    Q.  Jayakar tells Chris, "We can build this practice around

10   you," yep?

11   A.  I wasn't there.

12   Q.  Okay.  Regardless, Chris takes the offer?

13   A.  I heard that from Chris.

14   Q.  Okay.  And this is late May of 2016, would that sound --

15   A.  I don't remember the dates.

16   Q.  Okay.  June 6th, 2016 is Dr. Russo's first day of work?

17   A.  If you say so.

18   Q.  It's fine.  And then he joins you, Dr. Bothra, Dr. Edu,

19   Dr. Backos?

20   A.  Correct.

21   Q.  Moves from Grand Rapids, lives in an extended stay hotel

22   for the first few months, yes?

23   A.  I don't know.

24   Q.  Did you know he -- soon he -- he buys a one-bedroom condo

25   in Birmingham, did you -- do you remember that?

1    A.   I remember him buying a condo, yes.

2    Q.   Thank you.

3             You may not recall some of these either, sir, so I

4    will -- just a yes, no or I don't recall is fine, okay?  I'm

5    just doing some background here.

6             Shortly after joining the PC Chris's -- Dr. Russo's

7    old ankle injury acts up.  Do you remember that?

8    A.   I do.

9    Q.   He sees a doctor and he's told, "You need surgery."  Do

10   you remember that?

11   A.   I do.

12   Q.   Dr. Bothra -- even though he had just started, Dr. Bothra

13   encourages him get the surgery.  Do you recall?

14   A.   I was not part of that, no.

15   Q.   Okay.  "Take the time off, we'll be fine here."  You don't

16   recall that?

17   A.   I recall that Dr. Bothra offered to help him through this.

18   Q.   Thank you.

19             Dr. Russo has the surgery, yes?

20   A.   He did.

21   Q.   He misses weeks of work?

22   A.   He did.

23   Q.   He's on a knee scooter for a few months?

24   A.   I'm sorry?

25   Q.   He was on a knee scooter for a few months after that?

1    A.   He was.

2    Q.   He eventually has another foot problem while working

3    there, doesn't he, the other foot?

4    A.   No, I don't remember that.

5    Q.   The ulcerated heel.  Do you recall that?

6    A.   No, I don't.  I -- I -- I need to know more.

7    Q.   It was a ulcerated -- ulcer to his heel that became

8    infected.  It required surgery again.  He had two surgeries.

9    Do you recall?

10   A.   I do not recall the second surgery.

11   Q.   Possible they blend together.  I'll move on from that

12   point.

13          I want to talk a little bit about the time that --

14   one of the lawyers went into that as well -- about the time

15   that you -- your time frames overlapped at the Pain Center.

16   You started in '14?

17   A.   Yes.

18   Q.   And Chris started in '16, yes, as far as you know?

19   A.   Okay.  Far as I can remember.

20   Q.   Thank you.

21          And then you leave in October 21st or some part of

22   Oct --

23   A.   20, 21st, yes.

24   Q.   Okay.  Of 2017?

25   A.   Yes.

1    Q.   So that's about a year and five months --

2    A.   Yes.

3    Q.   -- that your time crossed?

4    A.   Yes.

5    Q.   Less the time that he wasn't there because of his recovery

6    from his surgeries?

7    A.   Correct.

8    Q.   And during that entire time anyway you worked at

9    Eastpointe?

10   A.   Yes.

11   Q.   Separate building?

12   A.   Through the same billing office but my billing.

13   Q.   I'm sorry, separate building.

14   A.   Oh, separate building?  Yes.

15   Q.   I'll try to be -- yeah.  And you were -- you were the only

16   doctor there --

17   A.   Correct.

18   Q.   -- in Eastpointe alone from the other doctors?

19   A.   Yes.

20   Q.   Unobserved on a daily basis?

21   A.   Yes.

22   Q.   And it was more than five miles apart, ten miles.  I know

23   there's Warren and Eastpointe.  It's -- on the map it says

24   12 miles but I don't think the clinics were that far.

25   A.   Straight line less, but on -- on the roads it was about

Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

1    12 miles.

2    Q.  Okay.  So it took 15 minutes without traffic?

3    A.  Yeah.  Yes.

4    Q.  Okay.  And during this same time Dr. Russo was exclusively

5    at the Warren office?

6    A.  He was.

7    Q.  Separate practices?

8    A.  Correct.

9    Q.  Separate patients?

10   A.  Yes.

11   Q.  He sees his, you see yours?

12   A.  Correct.

13   Q.  Chris doesn't shadow you?

14   A.  No.

15   Q.  You don't shadow Chris?

16   A.  Nope.

17   Q.  You make your patient decisions?

18   A.  I did.

19   Q.  Chris make -- Dr. Russo makes his patient decisions?

20   A.  He did.

21   Q.  You were very possessive of your patients, yes or no --

22   A.  We were --

23   Q.  -- or I don't know?

24   A.  I can't say it without an explanation.

25   Q.  Yes or no?

 1   A.   No.

 2   Q.   No?  Fair enough.

 3        So you're not very possessive of your patients, you

 4   don't --

 5   A.   That -- that --

 6   Q.   Yes or no?

 7   A.   -- speaks to my attitude.

 8   Q.   Okay.  Sorry.  I'll try to -- you like to keep your

 9   patients your own and only your own?

10   A.   That was the expectation from Dr. Bothra.

11   Q.   Okay.  You were very possessive of your patient charts?

12   A.   Yes.

13   Q.   And Dr. Bothra allows that, he encouraged that, yes?

14   A.   He wanted it.

15   Q.   I'm sorry?

16   A.   He wanted it.

17   Q.   Understood.

18        THE COURT:  Let's get our lunch break at that point.

19        MR. MARGOLIS:  All right.  Okay.

20        THE COURT:  Unless you're almost done.

21        MR. MARGOLIS:  No.

22        THE COURT:  No?  Okay.  12:05 p.m., ladies and

23   gentlemen.  Let's take a half hour.  We'll have our midday

24   recess, then we'll come back a little after 12:30 and hopefully

25   go for another hour and a half and -- and call it a day and

1   hopefully continue to progress the way we have.  Please

2   continue your good efforts about not talking, not discussing

3   the case with yourselves or others.  Enjoy your break and we'll

4   see you back in about 30 minutes.

5           Let's all rise for the jury.

6           (Jury excused at 12:07 p.m.)

7           MR. CHAPMAN:  Before you leave the bench, Your Honor,

8   may we have a moment to discuss the -- the -- the witness

9   conversation outside of the presence of the jury, perhaps

10  before we come back for --

11          THE COURT:  Yeah, what's on your mind about -- about

12  that?

13          MR. CHAPMAN:  Can we do it outside the presence of

14  the witness?

15          THE COURT:  If you want to come up briefly.

16          MR. CHAPMAN:  Thank you.

17          THE COURT:  We don't have white noise so...

18          You can step down, Dr. Kufner.

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you.

21          (Witness excused at 12:08 p.m.)

22          (Side-bar discussion as follows):

23          THE COURT REPORTER:  Okay.  We're going to need it

24  quiet in the courtroom.

25          THE COURT:  Okay.  What's going on?

1       MR. CHAPMAN:  Your Honor, thank you for some time to

2   discuss this.  I understand that Mr. Helms had a conversation

3   with Dr. Kufner while Dr. Kufner was still pending direct

4   examination.

5       THE COURT:  Right.

6       MR. CHAPMAN:  I heard the Court order at least one

7   witness yesterday not to have conversations with anybody

8   pending their testimony.  I understood that to be the Court's

9   order under Federal Rule of Evidence 611 to not have witnesses

10  discuss testimony with others.  I believe government counsel

11  would be included.

12      THE COURT:  Right.

13      MR. CHAPMAN:  I don't have any information about the

14  substance of the conversation, but it's generally understood

15  from my practice -- it's generally understood from my practice

16  that witnesses do not discuss the testimony and do not get

17  prepped for testimony while they are pending their time on the

18  witness stand.

19      THE COURT:  Okay.

20      MR. CHAPMAN:  One other issue, Your Honor.  We were

21  gracious enough to allow this witness to be taken out of order

22  and not object, and certainly the Court decided to do that.

23      THE COURT:  Right.

24      MR. CHAPMAN:  I do have a real big issue with the

25  government taking additional time to prepare Dr. Kufner, its

1    own witness, by taking witnesses out of order and using that

2    against us.

3              THE COURT:  Okay.

4              MR. CHAPMAN:  I request that his direct testimony,

5    that the remaining part of his direct testimony be stricken and

6    his cross-examination still remain on the record in this case.

7              THE COURT:  Okay.  Well, we'll look into that.

8              MR. HELMS:  May I respond, Your Honor?

9              THE COURT:  Wait a minute.  What do you want to say?

10             MR. WEISS:  My recollection is -- and I could be

11   wrong -- my recollection is Mr. Chapman broached this issue

12   with the Court Friday afternoon before we broke for the weekend

13   'cuz we had a feeling or we knew that Dr. Mehta would be

14   starting on Monday, and it is my recollection that the

15   Court specifically instructed the witness, Dr. Kufner, not to

16   discuss his testimony.

17             THE COURT:  All right.  Well, I remember saying that.

18   I don't remember if -- which of the doctors it was, but I do

19   remember saying it.

20             Go ahead, Mr. Helms.

21             MR. HELMS:  Yes, Your Honor.  First, to address Mr.

22   Weiss's comment, it was after Dr. Mehta's testimony while he

23   was on cross-examination.  It has been my understanding under

24   Rule 611 and under case law that when a witness is still on

25   direct examination, that witness is still within the -- there's

1   nothing improper about the attorney representing that witness

2   to meet with that witness, say, in the evening after that -- if

3   the direct testimony is still happening.  I understood Your

4   Honor's instruction regarding Dr. Mehta, that because he was on

5   cross-examination we should no longer consult with him, and we

6   did not.

7           THE COURT:  Okay.

8           MR. HELMS:  And as to the meeting with Dr. Kufner

9   this morning, I will represent it was no longer than three

10  minutes.  I told him generally we're going to be covering a

11  couple of topics and tell the truth and that was the extent of

12  the conversation.

13          THE COURT:  All right.  I don't have any problem with

14  any lawyer talking about non-testimonial issues to include what

15  time to be present, where to go and things like that, but this

16  was slightly more than that in that you told the witness to

17  be -- to be honest and what else did you say to him?

18          MR. HELMS:  I told him we were covering general

19  topics about informed consent and your time at the Pain Center.

20          THE COURT:  You and him?

21          MR. CHAPMAN:  Your Honor, I personally saw notes

22  being reviewed with Mr. Helms and the witness.  I saw it begin

23  when I was going to the bathroom.  The conversation proceeded

24  the entire time I was in the restroom, which I believe was more

25  than three minutes, and Mr. Weiss also saw it when he left the

1    restroom.  I'm not -- not trying to say that Mr. Helms is -- is

2    lying to the Court; just I think his perception of time and

3    potentially what was discussed is not consistent with what I

4    see.  There is a case on point, *Genders vs. United States*.

5              THE COURT:  Let's take a look at that.

6              MR. CHAPMAN:  I haven't fully reviewed it, I just

7    found it, but I will take a look at it and apprise the Court.

8              THE COURT:  I need to do that too.

9              MR. HELMS:  And if I can, that would be helpful.  And

10   also I highly doubt that the remedy in that case was striking

11   the witness's testimony, but I suppose we can take a look.

12             THE COURT:  All right.  Well, I don't know -- I don't

13   know what the legal standard is, but I feel like I have a

14   handle on the facts and I'll get to this after Kufner and the

15   next witness testifies, okay?

16             MR. CHAPMAN:  May I provide Mr. Lang a citation?

17             THE COURT:  I'm sure he'd appreciate that.

18             THE LAW CLERK:  You can send me an email.

19             MR. MARGOLIS:  Just -- this doesn't need to be on the

20   record.

21             (End of side-bar discussion)

22             (Court in recess at 12:13 p.m.)

23             (Proceedings resumed at 12:53 p.m., all parties

24             present)

25             THE LAW CLERK:  All rise for the jury.  The Court is

1   back in session.

2           (Jury entered the courtroom at 12:53 p.m.)

3           THE COURT:  Okay.  Our jurors are all back,

4   everybody's in their spots, and please be seated.

5           If you'd indulge me for a second, Mr. Margolis.

6           MR. MARGOLIS:  Sure.

7           THE COURT:  For everybody involved including the

8   lawyers and the jurors, I've kind of been playing around with

9   the schedule a little bit.  We have -- as you all know, we have

10  a day off on Monday.  It's Memorial Day and we're not going to

11  meet on -- on Monday so you'll have a nice three-day weekend.

12          My intention was to meet on Tuesday and -- and

13  Wednesday, and then if I'm not mistaken -- if I am, Connor will

14  let me know -- Tuesday the whole court is closing down as I

15  understand it.  And we could -- we could meet on Tuesday but it

16  would be difficult 'cuz I'd -- we'd have to get, you know, a

17  marshal here and so on and so forth.

18          And also -- Thursday.  Huh?

19          (Off the record discussion)

20          Oh, June.  Oh, I'm sorry.  Well, there goes that.

21  Mr. -- Mr. Reeder has a -- has a conflict on Tuesday -- on

22  Thursday and possibly -- well, I was off by a week.  The court

23  closure is the 10th, so scratch everything I just said, all

24  right?  I was going to say if we had a court closure and Mr.

25  Reeder's conflict on the same day, we could just not meet on

1    that day, but apparently I was off so we'll have to figure out
2    what to do, all right?
3            JUROR NO. 9:  I'm sorry.
4            THE COURT:  No, don't worry about it.  I understand.
5    We'll get back -- we'll get back to you on that.  But let me
6    tell you one thing: we won't be here on Monday, okay?  All
7    right.  Good.
8            Okay, Mr. Margolis, whenever you're ready.
9            MR. MARGOLIS:  Nothing further from Your Honor?
10           THE COURT:  Nothing further from me, right.  See, the
11   lawyers give it right back to me when I -- when I get a little
12   mouthy, right?  Okay.  Go ahead.
13           MR. MARGOLIS:  Never, Judge.  Thank you.  May it
14   please the Court.
15   BY MR. MARGOLIS:
16   Q.  Good afternoon, Dr. Kufner.
17   A.  Good afternoon.
18   Q.  We were talking about your Eastpointe situation
19   exclusivity, and I only had a few more to go and I want to kind
20   of get back to that point before I move on to another, okay?
21   A.  Sure.
22   Q.  So if I'm repetitive I apologize, but I still need you to
23   stick with your monosyllabic answers if possible if the
24   answer's I don't know.  Are we good with that?
25   A.  Understood.

1   Q.   Thank you.

2        Now I'm out of place.  So I just want to make sure I

3   understand and the Court -- and the Court and jury understands

4   that Eastpointe obviously was a physically exclusive or

5   physically away from the Warren center?

6   A.   Correct.

7   Q.   And it was also away from the place where Dr. Backos was

8   at?  He was at the annex or...

9   A.   Correct.

10  Q.   And that was down the road, a block or two south from the

11  Warren clinic?

12  A.   Yes.

13  Q.   And so we know it was physically separated by I think you

14  said 12 miles, but it also enabled you to treat your own

15  patients the way that you wanted to, right?

16  A.   Yes.

17  Q.   To make your own treatment decisions?

18  A.   Yes.

19  Q.   And you felt good about doing that I assume?

20  A.   I did.

21  Q.   You were able to order the procedures you wanted?

22  A.   Yes.

23  Q.   You were able to order the -- the dosage, the

24  prescriptions of -- of narcotic -- of controlled substances

25  that you wanted?

1    A.   Yes.

2    Q.   And you were able to maintain that for the duration of

3    your stay working as an independent contractor for Dr. Bothra?

4    A.   Yes.

5    Q.   Entirely separate practice from Dr. Russo's?

6    A.   Yes.

7    Q.   Entirely separate practice from the other doctors sitting

8    here?

9    A.   Insofar as the clinic, yes.

10   Q.   And it wasn't just physically, it was also professionally?

11   A.   Yes.

12   Q.   And it was philosophically, you did it your own way?

13   A.   Yes.

14   Q.   And you were able to do it the entire time.  I think I

15   asked that question.

16   A.   I'm sorry?

17   Q.   You were able to do it that way except for your -- when

18   you went for the procedures, you were able to do that your

19   entire three and a half years or whenever you were there?

20   A.   Yes.

21   Q.   Thank you.

22        I want to briefly discuss the Independent Contractor

23   Agreement.  I'm not going to go into each and every detail

24   because I believe it's been discussed at some length, but there

25   are a couple of points that I think should be brought out.  In

1    2014, May 1st, you signed the Independent Contractor Agreement

2    with Dr. Bothra's clinic?

3    A.   Correct.  Yes.

4    Q.   And this is identified as Government's Exhibit 151 I

5    believe.

6          You testified that they're -- they're all similar --

7    well, I can't recall exactly what you testified, but that all

8    the doctors had an Independent Contractor Agreement?

9    A.   Would you like me to clarify?

10   Q.   No thank you.

11         Were you aware that they were modified in some

12   respects for certain doctors, yes or no?

13   A.   Yes.

14   Q.   And, for instance, you -- I think yours said you made

15   90 percent of procedures?

16   A.   Correct.

17   Q.   And Dr. Russo, for instance, made less for that, he made

18   80 percent?

19   A.   I understand that to be true.

20   Q.   Okay.  And you understand that Independent Contractor

21   Agreements are perfectly legal and not uncommon in your

22   profession?

23   A.   Yes.

24   Q.   And the agreement clearly designates you to be responsible

25   to pay your own federal income taxes?

1    A.   Yes.

2    Q.   It doesn't give you any health insurance, you guys are

3    responsible for that?

4    A.   Yes.

5    Q.   And it states that -- at page 5 that the Pain Center has

6    the sole and exclusive control over processing of billing?

7    A.   Yes.

8    Q.   The Pain Center has sole and exclusive control over

9    processing of accounts receivables?

10   A.   Yes.

11   Q.   And it contains an indemnification provision too, doesn't

12   it?

13   A.   A what?

14   Q.   A indem -- indemnification and a hold harmless clause.  Do

15   you recall that?

16   A.   Well, again, we're into a language I'm not -- but if you

17   say it's there, I -- I will agree it's there.

18   Q.   "The Pain Center shall hold Independent Contractor

19   harmless and indemnify him from any liability which may result

20   from services the Pain Center provides" --

21             THE COURT REPORTER:  Wait, wait, Counsel, Counsel.

22             MR. MARGOLIS:  Sorry.

23             THE COURT REPORTER:  Every time you read you speed

24   up.  Okay.  Please repeat it.

25   Q.   "The Pain Center shall hold Independent Contractor

1    harmless and indemnify him from any liability which may result

2    from services the Pain Center provides to its patients except

3    services provided by or under the supervision of the

4    Independent Contractor."  That's what the indemnification --

5    that the hold harmless.  Did you read that or do you understand

6    that provision?

7    A.  Actually I can't say that I do understand it.  It sounds

8    like a --

9    Q.  Yes or no's fine, sir.

10   A.  Well, it's in there so...

11   Q.  Thank you.

12        And did you read it or have your lawyer look at the

13   agreement before you signed it?

14   A.  I had it reviewed, yes.

15   Q.  Thank you.

16        I'm going to speak about some of the various

17   procedures, practices that went on at the center to treat pain,

18   those types of practices.  The Pain Center did more than facet

19   injections, correct?

20   A.  It did.

21   Q.  The Pain Center did more than radiofrequency ablation,

22   correct?

23   A.  Yes.

24   Q.  Those are just simply two types of procedures to treat

25   pain?

```
1    A.   True.

2    Q.   And there are 48 different facet joints in the body?

3    A.   Last time I counted.

4    Q.   And each one of those can be poked with a needle?

5    A.   True.

6    Q.   The Pain Center also did procedures for facial pain?

7    A.   We did.

8    Q.   Dental pain?

9    A.   Yes.

10   Q.   Chronic headaches?

11   A.   Yes.

12   Q.   Pain Center did epidurals?

13   A.   I'm sorry?

14   Q.   Pain Center commonly did epidurals?

15   A.   We did.

16   Q.   Caudal epidurals?

17   A.   Yes.

18   Q.   Cervical epidurals?

19   A.   Yes.

20   Q.   Would you agree that caudal epidural is a relatively

21   common procedure for back pain?

22   A.   Yes.

23   Q.   Simple, easy, effective, cost effective, or simple, easy,

24   effective to treat back pain?

25   A.   Yes, it is, it can be.
```

1   Q.   Have you heard of Lax Manchikanti, Lax, Dr. Lax
2   Manchikanti?
3   A.   I know the name.  I've never met him.
4   Q.   He's a -- would you agree that he's a world-renowned
5   authority on pain?
6   A.   Yes.
7   Q.   Knows his -- his pain medicine, knows his pain practices?
8   A.   Yes.
9   Q.   I want to talk briefly about a Eastpointe patient of yours
10  named Denise Soulignee [phonetic], Souligney.
11  A.   I recognize the name.
12  Q.   Do you remember her?  Do you remember treating her a
13  little bit?
14  A.   I remember the name.
15  Q.   Yeah.  She was one of your longtime patients from 2016
16  pretty much through the time that you left at Eastpointe?
17  A.   Okay.
18  Q.   She had failed back surgery, a host of surgery to her
19  knees, shoulders, remember she had all sorts of problems?
20  A.   I'd have to see the chart.
21  Q.   I mean --
22          MR. MARGOLIS:  May I approach, Your Honor?
23          THE COURT:  Yes.
24          (Brief pause)
25  Q.   When you're finished --

1   A.  If I can refer to this, I -- I think we could move on.

2   Q.  May I approach?  Thanks.

3   A.  If you ask me a question I can't remember.

4   Q.  Yeah.

5   A.  Okay.

6   Q.  So you performed I believe 18 -- you -- you stuck a needle

7   in her -- it's easy for me as a layperson.  I don't have your

8   education or these others.  You -- you poked her with a needle,

9   you gave her 18 independent injections over the course of

10  15 months, is that fair to say?

11  A.  If it's in the chart, it's fair to say.

12  Q.  Okay.  Some of them were -- in '16 you did a bilateral to

13  her SI.  Actually you did about two of those, and those were I

14  believe diagnostic before you did the radiofrequency?

15  A.  Correct.

16  Q.  And -- and this was a longtime patient.  Do you remember

17  actually introducing her to Dr. Russo when he took over at

18  Eastpointe?

19  A.  I saw that in an interview, and with that refresher I -- I

20  believe it happened.

21  Q.  Yeah.  And -- and she loved you, she liked you, you

22  were -- you were her doctor, you were a good doctor for her is

23  what my recollection of the records were.  Do you have that

24  recollection?

25  A.  Honestly, I -- I felt warm to all of my patients, so I

1   don't remember her particularly sticking out.  There were some

2   who expressed their gratitude way more publicly, but if she

3   said that she appreciated me, that's -- I'll -- I'll agree with

4   that.

5   Q.  And you would speak with her about the procedures and tell

6   her what you were recommending and why I would assume?

7   A.  I did.

8   Q.  And you would obtain her consent before you did the

9   procedures?

10  A.  Yes, I would.

11  Q.  Each and every one of those 18 procedures?

12  A.  As I recall.

13  Q.  And you wouldn't have done them if you didn't think they

14  were medically necessary I wouldn't assume?

15  A.  That's absolutely true.  In her case absolutely.

16  Q.  She had significant injuries?

17  A.  She did.

18  Q.  Pins and needles and plates throughout her entire body?

19  A.  Well, you've gone beyond my recollection with that.

20  Q.  Would you have any reason to disagree if that's what I'm

21  saying?

22  A.  I wouldn't disagree.  I mean you have her chart and...

23  Q.  Thank you, sir.

24  A.  Yeah.

25  Q.  And I apologize that I'm engaging you in almost breaking

1     my own rule.

2             So you worked on her lumbar facets, right?

3     A.   I saw that in there, yes.

4     Q.   Yeah.  And that is -- before you pleaded guilty in this

5     matter in Counts 41 -- 40, 41 and 42, you were charged with

6     three different substantive counts of -- of procedures done to

7     Ms. Souligney on her lumbar facets.  Do you recall that?

8     A.   Well, yes, that sounds familiar.

9     Q.   You were never charged with any work you did on Ms.

10    Souligney on her SI joints though, correct?

11    A.   Far as I can recall.

12    Q.   And the work you did on her SI joints, as you've said

13    today, you felt gave her relief?

14    A.   Well, I believe if you look, it's documented that she

15    reported relief.

16    Q.   She reported 80 percent relief and that's why you went

17    ahead and -- and did the radiofrequency ablation?

18    A.   Correct.

19    Q.   And radiofrequency ablation doesn't last forever, right?

20    A.   Typically six months to a year.

21    Q.   And so it's not uncommon for a patient who still

22    experiences pain with that type of failed back syndrome or

23    surgery to have to do more procedures?

24    A.   Yes.

25    Q.   And before you do more procedures you want to make sure

1    it's necessary so you do the diagnostic first?

2    A.   Correct.

3    Q.   Trust what the patient's saying, verify it with the

4    diagnostic?

5    A.   Correct.

6    Q.   Verify it with the imaging?

7    A.   Correct.

8    Q.   With your history, your physical you've done with this

9    person that you've known, worked with, who's consented

10   everything, that you love, that loves you?

11   A.   Well, I don't know that she loves me.

12   Q.   Sorry, loves you as a doctor.

13   A.   I don't know that either.  I'm taking your word for it.

14   Q.   Well, she trusted you and trusts you as a doctor?

15   A.   Okay.

16   Q.   Correct?

17   A.   As far as I know.

18   Q.   Well, that's -- I think you've said that she -- you spoke

19   with her and you obtained her consent to do these procedures.

20   A.   Well, that was my routine.

21   Q.   Understood.  Do you have any reason to believe that you

22   deviated from that routine with Ms. Souligney?

23   A.   No.

24   Q.   Thank you.

25           And so you ended up scheduling procedures for her

1    to -- to work on her SI joints before you left?

2    A.  If it's in the chart, yes.

3    Q.  On 10-17 -- and I can bring it to you if you'd like, sir.

4    I can just read it to you.

5    A.  That's good enough.

6    Q.  On 10-17 --

7           MR. HELMS:  Excuse me, Your Honor.  Can Mr. Margolis

8    identify what he's reading from?

9           MR. MARGOLIS:  Thank you.  I'm looking at

10   Government's Exhibit 122B at page 90, bottom of the page, chart

11   note 10-17, Denise Souligney.

12          MR. HELMS:  Thank you.

13   BY MR. MARGOLIS:

14   Q.  And this is -- is this your handwriting in this chart,

15   sir?

16   A.  You're asking an awful lot from here.

17          THE COURT:  Yes.

18   A.  Yes, it is.

19   Q.  Thank you, Doctor.

20          On 10-17, "Has pain sitting and rising to stand."

21   And it says, "The plan" --

22   A.  Would you like me to read it?

23   Q.  I would.

24   A.  "Sitting -- pain on sitting and rising to a stand," going

25   from sitting to -- to standing up, not necessarily with

1    standing.

2    Q.  And the plan on the side says "caudal bilateral SI" where

3    it says plan.

4         MR. MARGOLIS:  Can I approach?

5         THE COURT:  Yes.

6    A.  Yeah.

7    Q.  I've read so many charts.  What is the plan of care for

8    her?

9    A.  "Schedule bilateral SI."

10   Q.  Thank you.

11        And when you schedule a bilateral SI, if it provides

12   relief and confirms, the next step would be to do the

13   radiofrequency?

14   A.  Correct.

15   Q.  And so you scheduled this on 10-17 of '17, correct?  That

16   was what you just read.

17   A.  If that was the date, yes.

18   Q.  And you left on 10- -- on 11-20?

19   A.  10-20.

20   Q.  Thank you.  Thank you.

21        So when it came up for the procedure to be done, Dr.

22   Russo stepped in and did them?

23   A.  Yes.

24   Q.  And it was reasonable to rely on your treatment plan for

25   her?

1   A.   I'm sorry?

2   Q.   It was reasonable for Dr. Russo to rely on your treatment

3   plan?

4   A.   Yes.

5   Q.   There was some testimony yesterday about Ms. Souligney's

6   reduction in medication, and there was a MAPS report that the

7   government brought out stating that you reduced her MAPS or,

8   sorry, her hydrocodone, her Norco from four -- four times a day

9   to three times a day.  And the MAPS report that was identified

10  states that it was done on November 17 of 2017, but you weren't

11  working then, were you?

12  A.   That was an error on MAPS' part then.

13  Q.   'Cuz you were already gone?

14  A.   Absolutely.

15  Q.   You pretty much -- if you recall, you had her on Norco

16  four times a day?

17  A.   I don't recall.

18  Q.   Okay.  But you would not dispute if the records show that?

19  A.   No.

20          MR. MARGOLIS:  May I approach?

21          THE COURT:  Yes.  You can approach and not have to

22  ask anymore.

23          MR. MARGOLIS:  Thank you, Judge.

24          THE COURT:  Yep.

25  Q.   Are you able to identify this?  I'd like to be able to...

1  A.  No, I don't recognize it as Dr. Russo or Dr. Lewis.

2  Sometimes I have a hard time telling Dr. Edu and Dr. Bothra's

3  handwriting apart.

4  Q.  Understood.  So her Norco was reduced a month or so after

5  you had already left?

6  A.  Yes.

7  Q.  Thank you.

8          And you would agree from your recollection that

9  Denise Souligney had failed conservative treatment?

10  A.  Well --

11  Q.  Yes or no?

12  A.  As it was presented, then yes.

13  Q.  Sir, I'm sorry.

14  A.  I'm sorry.

15  Q.  Oh, no.  As it was presented, yes is what --

16  A.  As she presented to me, yes.

17  Q.  Okay.  Because you prescribed her Baclofen.

18          And sometimes do those procedures hurt, they're

19  painful when someone gets RFA?

20  A.  It can actually increase the pain for a few days before it

21  gets better.

22  Q.  So it's not unreasonable for a physician to prescribe a

23  low dose opioid the day someone has a procedure like that?

24  A.  Sure.

25  Q.  It's -- it is -- it's not unreasonable?

154

1   A.  It's not unreasonable at all.

2   Q.  Thank you.

3         I want to ask you a couple of questions about Dr.

4   Backos.  Similar to Eastpointe, and I think I said this and I

5   apologize, but he was exclusively at the annex?

6   A.  Yes.

7   Q.  He had his own patients?

8   A.  He did.

9   Q.  Maintained his own files?

10  A.  He did.

11  Q.  And he's an addictionologist, PMPR?

12  A.  Yes.

13  Q.  Physical med, physical rehabilitation.  He was not a

14  anesthesiologist like you were or some of the others?

15  A.  Correct.

16  Q.  So Backos, like you, does not work with Dr. Russo and the

17  others at the Pain Center, correct?

18  A.  Correct.

19  Q.  He meets his own patients at his own shop, the annex?

20  A.  Correct.

21  Q.  Separate like you?

22  A.  Correct.

23  Q.  And Backos was charged in the indictment like you were

24  charged in the indictment?

25  A.  He was charged, yes.

1   Q.   And Backos pled guilty?

2   A.   I understand that, yes.

3   Q.   And you pled guilty?

4   A.   Yes.

5   Q.   Backos struck a deal with the government as far as you

6   know?

7   A.   As far as I know.

8   Q.   And you struck a deal with the government?

9   A.   Yes.

10  Q.   Backos is testifying against his old friends and

11  colleagues, yes?

12  A.   He's testifying to the truth.

13  Q.   And you are testifying against your --

14  A.   To the truth.

15  Q.   -- old friends and colleagues?

16  A.   I am testifying to the truth.

17  Q.   Yes or no, sir, is fine.  Yes or no is fine.

18         I want to finish by discussing how things ended, how

19  your three and a half -- your tenure ended at the Pain Center.

20  In February I think you testified is when you start -- February

21  of '17 is when you start looking to leave the practice, yes?

22  A.   Around that time.

23  Q.   You've had enough with Eastpointe and had enough with the

24  Pain Center, yes?

25  A.   Yes.

1    Q.  Had enough of the problems you felt you were having or you
2    were having with Dr. Bothra?
3    A.  Correct.
4    Q.  You and Chris, Dr. Russo, are still good, however, at that
5    time?
6    A.  We are, yes.
7    Q.  Still good friends?
8    A.  I thought so.
9    Q.  He likes you?
10   A.  Well, I still like him.  I have a high --
11   Q.  He respects you, he respects your skills as a doctor?
12   A.  And I his.
13   Q.  You remain at that time personally closer to Chris than
14   any other doctor in the practice?
15   A.  That's true.
16   Q.  Any other employee or nurse or PA or -- or doctor?
17   A.  That's true.
18   Q.  And during this time, from the February to
19   October 20-something, you and Chris would -- Dr. Russo would
20   often meet early at the office before work, that's when you
21   guys would do your talks, no?
22   A.  I don't remember routinely meeting anybody early, anybody.
23   Q.  Not for professional, but wouldn't you stop by the Pain
24   Center before your day started and meet with Dr. Russo, have
25   coffee?  You don't recall having coffee, talking with Chris in

1    the mornings before you went out to Eastpointe?

2    A.   No.

3    Q.   At all?

4    A.   No, I --

5    Q.   Fair enough.  If you don't remember, you don't remember.

6    A.   No, I know it didn't happen.  I didn't go to Warren and

7    then go to Eastpointe.

8    Q.   Okay.  You would never have coffee together and talk about

9    work and --

10   A.   We -- we had coffee and talked about work on occasions but

11   there was no morning meetings.  It wasn't like I came after

12   work --

13   Q.   Definitely not a meeting.  I'm not trying to imply that,

14   sir.

15          THE COURT REPORTER:  Wait.  You know what?  You

16   totally cut him off, Mr. Margolis.

17   Q.   I will seek to move on from that point.  The point I'm

18   trying to get is that you were talking to Chris about leaving,

19   he knew because you told him?

20   A.   I'm sure.

21   Q.   He knew you were not happy with Dr. Bothra?

22   A.   I did not make that any secret.

23   Q.   He asked you what's going on, yes?

24   A.   I don't remember.

25   Q.   You told him you have concerns about money, yes?

1    A.   About?

2    Q.   That it -- that you had concerns over money you felt that

3    you were owed, yes?  Yes or no, sir.

4    A.   This seems foreign to me, I'm -- I'm sorry.

5    Q.   So you never discussed any of the problems with your

6    friend Chris?

7    A.   I discussed problems --

8    Q.   Okay.

9    A.   -- but you're asking me for specifics.

10   Q.   Okay.  You told him -- you tell him that "it doesn't

11   really concern you, Chris, it's between me and Bothra."  Yes,

12   is that fair?

13   A.   If I spoke with him, it would be a fair thing to say.

14   Q.   Thank you.

15        At the very least, Chris understands that you're not

16   happy there and are likely getting out?

17   A.   I'm sure of it.

18   Q.   And he supports you?

19   A.   He did.

20   Q.   He's not a guy who's interested in office politics,

21   correct?

22   A.   I can't say that I know his feelings one way or the other

23   on office politics.

24   Q.   He would be sort of a sounding board for you at times when

25   you would chat about these things, fair to say?

1    A.   Well, we spoke.

2    Q.   He considered you a mentor?

3    A.   I'm sorry?

4    Q.   He considered you a mentor of his?

5    A.   I'd be flattered to hear that.

6    Q.   You're 18 years older, he's not going to tell you what to

7    do, right?

8    A.   No, he didn't.

9    Q.   He's a little sad that it doesn't seem to be working out?

10   A.   It was sad for me.

11   Q.   You -- you would often -- often's the wrong word.  You're

12   not going to like that.  You would go to dinner once or twice

13   during this time at a Korean steakhouse together?

14   A.   Yeah, we did that.

15   Q.   You tell Chris that you're joining or thinking about

16   joining Dr. Juneja?

17   A.   I'm sure I did at some point.

18   Q.   With West Michigan Pain?

19   A.   Yes.

20   Q.   You asked Chris, he should think about joining you there

21   too?

22   A.   I don't remember saying that but it's certainly

23   believable.  I believe that.

24   Q.   You knew at the time that Dr. Juneja had offered Chris a

25   job several years before?

1    A.   I encouraged him to take it.

2    Q.   It was the job that he didn't take to come to the Pain

3    Center?

4    A.   I told Chris it was his decision, but I still wanted

5    him -- thought he would be better off with Dr. Juneja.

6    Q.   Chris says, "I can't do it, I can't leave, I just bought a

7    condo here."  Right, he didn't -- he couldn't do it, yes?

8    A.   It was his decision.

9    Q.   You leave the Pain Center but you still kept in touch?

10   A.   We did.

11   Q.   Have another dinner at the steakhouse?

12   A.   I don't remember but I'm not going to argue.

13   Q.   You talk about Eastpointe, what he needs to know about

14   Eastpointe in those time frames?

15   A.   I'm sure I tried to coach him, yes.

16   Q.   And you -- you knew he was going to take over at

17   Eastpointe --

18   A.   Any physician --

19   Q.   -- in the --

20   A.   -- would do that.

21        THE COURT REPORTER:  Wait, I didn't hear your answer.

22   A.   I'm sorry.  Any physician would -- would share the

23   individuality of a clinic.

24   Q.   Thank you.

25        You say your goodbyes, you wish each other well?

1    A.   Yes.

2    Q.   That's how you leave your old friend Chris?

3    A.   I'm sorry?

4    Q.   That's how you leave your old friend Chris?

5    A.   Correct.

6    Q.   You purposefully kept him in the dark about your lawsuit

7    against Dr. Bothra in the Pain Center, yes or no, sir, just yes

8    or no?  Yes or no?

9    A.   Yes.

10   Q.   You want him to have no idea what you're doing, yes or no?

11   Yes or no, sir?

12   A.   Yes, I had --

13   Q.   You -- thank you.  Yes or no is all I ask.

14   A.   -- not -- I did not want to share.  I --

15   Q.   I understand.  We'll get there, we'll get there, but

16   please --

17          THE COURT REPORTER:  Mr. Margolis, you have to stop

18   talking on top of him.  I can't take two at the same time.

19          MR. MARGOLIS:  Sorry.  Sorry.  Sorry.

20   Q.   I understand what you're trying to tell me and I think

21   we're going to get to the same place, okay?  But you want him

22   to have no idea what you're doing, correct?

23   A.   Yes.

24   Q.   I'm sorry?

25   A.   Yes.

1    Q.  And in during all this time, the coffee that may not have

2    been in the morning but definitely the dinners at the

3    steakhouse and the phone conversations, you stay silent with

4    Chris about --

5    A.  Yes.  Yes.

6    Q.  You were trying to protect him, yes?

7    A.  Best I could.

8    Q.  You don't want to tell him what -- too much about what

9    you're doing, fair?

10   A.  Yes.

11   Q.  But that's being deceptive too, isn't it, sir?  Yes or no?

12   A.  It was a deception.

13   Q.  Yes or no?

14   A.  Yes.

15   Q.  You deceived Chris when you hire a private attorney to

16   investigate Dr. Bothra and the Pain Center, yes?

17   A.  I --

18   Q.  Yes or no, sir?  Yes or no?  Yes or no?

19   A.  No, I -- I --

20   Q.  Okay.

21   A.  -- can't say it if we didn't talk.

22   Q.  Okay.  Fair enough.  Fair enough.  Yes or no please.  She

23   can -- they can -- Mr. Helms can get that out.

24   A.  Okay.

25   Q.  You deceive your old friend when you file a secret lawsuit

1    and don't tell him, yes or no?

2    A.  Yes.  Yes.

3    Q.  You deceive your old friend when you don't tell him about

4    your interview with the FBI, yes or no?

5    A.  I'm --

6    Q.  Yes or no?

7    A.  No, I -- I'm not --

8    Q.  Okay.  That's fine.

9    A.  -- troubled with this.

10   Q.  That's fine.  Yes or no is all I'm asking.

11           You secretly copy files, notes and billing records,

12   yes or no?

13   A.  Yes.

14   Q.  You secretly make videos, yes or no?

15   A.  I did.

16   Q.  You secretly recorded conversations, yes or no?

17   A.  Yes.

18   Q.  You secretly make extensive notes of perceived or

19   regulatory violations, yes or no?

20   A.  Yes.

21   Q.  You secretly detail gas nozzles and humidity levels at the

22   PC, yes or no, at the Pain Center?

23   A.  Say that again.

24   Q.  You detail the humidity levels of the surgical room?

25   A.  No.

```
1    Q.  That wasn't in your qui tam case, yes or no?
2    A.  I don't -- it --
3    Q.  Yes or no?  Yes or no?
4    A.  It was --
5            THE COURT:  Maybe you can't answer yes or no.
6            MR. MARGOLIS:  I don't know's a fine answer.
7            THE WITNESS:  I can't answer --
8            THE COURT:  Hold on a minute.
9            THE WITNESS:  -- the question the way it's asked.
10           THE COURT:  Then you say, "I can't answer that yes or
11   no."
12           THE WITNESS:  Okay.
13           THE COURT:  All right?
14           MR. MARGOLIS:  That's fine.
15   BY MR. MARGOLIS:
16   Q.  You secretly photograph drawers of needles, yes or no?
17   A.  Yes.
18   Q.  Bunches of vials and resuscitation equipment?
19   A.  Yes.
20   Q.  All while you still work for the Pain Center?
21   A.  Yes.
22   Q.  All while you're still close friends with Chris?
23   A.  Yes.
24   Q.  You had a thousand chances to tell Chris what you were
25   doing before you quit.
```

```
 1   A.   No.

 2   Q.   Yes or no?

 3   A.   No.

 4   Q.   Yes -- no?  Okay.

 5        You are responsible for him joining the Pain Center?

 6   A.   No.

 7   Q.   He trusted you?

 8   A.   I introduced him.

 9   Q.   Yes or no, sir.  He trusted you?

10        THE COURT:  Mr. -- you know, I -- I -- those are

11   really broad questions, okay?  You can't like ask a question

12   and then yell at him --

13        MR. MARGOLIS:  I'm sorry.

14        THE COURT:  -- yes or no.

15        MR. MARGOLIS:  My apologies.

16        THE COURT:  I mean is the wall black?  Yes.  Okay.  I

17   can see that.  But he trusted you?  There's no possible way he

18   can answer that yes or no.  He might have trusted him, might

19   not.  Might have trusted him one point, might not have.  That's

20   an enormously broad question.  So take it easy with this

21   witness and just ask the questions, get the information you

22   need and move on please.

23        MR. MARGOLIS:  Okay.

24        THE COURT:  Go right ahead.

25   BY MR. MARGOLIS:
```

1    Q.  Chris did look up to you, yes or no?

2    A.  I did not realize that to be the case.

3    Q.  He loved you?

4    A.  I love him.

5    Q.  Your secret actions betrayed his trust in you, yes or no?

6    Yes or no, sir?

7    A.  It was a betrayal and I knew it.

8    Q.  And now you are testifying to try to save yourself, yes or

9    no?

10   A.  I am testifying to --

11   Q.  Yes or no, sir?

12   A.  -- the truth.  I am testifying to the truth.

13   Q.  Also to try and avoid a long prison sentence, yes or no?

14   A.  Yes.

15   Q.  You are self-interested, yes or no?

16   A.  I have my own interests, yes.

17   Q.  And we're desperate to save our own skin, yes or no?  Yes

18   or no?

19   A.  I think that's dramatic.

20   Q.  It is dramatic and this is a dramatic trial.

21          THE COURT:  But that's argumentative and

22   objectionable.

23          MR. MARGOLIS:  Okay.

24          THE COURT:  So finish off please, Mr. Margolis,

25   please.

1    BY MR. MARGOLIS:

2    Q.   You were a respected, double board certified doctor at the

3    Pain Center, yes?

4    A.   Well, I don't know if I would use the word respected.

5    Q.   You made very good money practicing the profession that

6    you loved?

7    A.   I did.

8    Q.   You told Chris that your dispute with Bothra started over

9    money or billings, yes?

10            MR. HELMS:  Objection, Your Honor.  Asked and

11   answered at this point.

12            MR. MARGOLIS:  I don't think it was.

13            THE COURT:  I don't know, but we are beginning to go

14   into what I like to call overkill, so...

15   A.   If you want an answer, I can give you one, but not with a

16   yes or no.

17   BY MR. MARGOLIS:

18   Q.   All I was going to say is that I -- I bet you never

19   thought it would end like all this.

20   A.   Absolutely not.

21   Q.   Thank you, sir.

22            THE COURT:  Okay.  All right.  Thank you very much,

23   Mr. Margolis.

24            Do you have any followup?

25            MR. HELMS:  Yes.  I will try to be brief.

1    THE COURT:  Please do.

2    MR. HELMS:  I think I'll establish it.

3    THE COURT:  Thank you very much.

4                    REDIRECT EXAMINATION

5    BY MR. HELMS:

6    Q.  Dr. Kufner, you were asked questions by counsel for Dr.

7    Bothra about a depo -- deposition transcript.  Do you recall

8    that?

9    A.  Oh, the deposition transcript?  Yes.

10   Q.  I'm going to read the full question and answer for you.

11   The question was, "Now, when you were at the Pain Center, did

12   you have a direct superior or someone that you had to report

13   to?"  Answer, "No, I wasn't -- no.  Dr. Bothra owned it.  He

14   insisted that we were free to practice as we wished."  That was

15   the question asked and the answer that was given.

16        Were you actually free to practice as you saw fit at

17   the Pain Center?

18   A.  Only on paper.  I was not really free.

19   Q.  And why were you not free to practice as you saw fit?

20   A.  Because he was reading every chart, monitoring everything.

21   He never came to me directly but he would send people to me

22   wanting to know why I didn't put a back brace on this person,

23   why didn't you put a knee brace on that person.  And I felt

24   that when I was talking about being treated as a second-class

25   citizen, I was going with the head medical assistant about

```
 1    giving me people who couldn't do the job.  When I went to Dr.
 2    Bothra he would say go back to Moza and she'll give you
 3    whatever.
 4              THE COURT:  Okay.
 5    A.  And I felt like --
 6              THE COURT:  All right.  Next question.
 7    A.  Okay.
 8    Q.  The he you -- you were referring to, that's Dr. Bothra?
 9    A.  Yes.
10    Q.  When you filed your qui tam lawsuit, had you been charged
11    criminally in this case?
12    A.  No.
13    Q.  Okay.  But you were charged after that?
14    A.  Yes.
15    Q.  So you weren't given a free pass for filing your qui tam
16    lawsuit?
17    A.  No.
18    Q.  You were asked questions by counsel for Dr. Lewis about
19    there being a stated goal at the Pain Center of weaning
20    patients off medication.  Do you recall that?
21    A.  About what patients?
22    Q.  About a stated goal of the Pain Center to wean patients
23    off of or at least taper them down on their medication.
24    A.  I remember more than one conversation in that direction.
25    Q.  Okay.  Was that a stated goal or was it an actual goal?
```

1    A.  It was Dr. Bothra's very strong encouragement to at least

2    reduce pills on some of the patients.

3    Q.  And did Dr. Bothra ever say why to reduce pills for those

4    patients?

5    A.  To make it look like it would add legitimacy to our claim

6    that the interventional treatment was to -- was to reduce

7    narcotic use.

8    Q.  So he was trying to make it look like the injection

9    procedures were effective?

10            MR. WEISS:  It's leading, Your Honor.  I'm going to

11   object.

12            THE COURT:  Sustained.

13            MR. WEISS:  Thank you.

14   BY MR. HELMS:

15   Q.  You were asked questions about urine drug screens.  Do you

16   recall that?

17   A.  I do.

18   Q.  Did patients receive pain medication despite having

19   abnormal urine drug testing results?

20   A.  He did.

21   Q.  I'm sorry?

22   A.  Are you asking if the Pain Center received payment for

23   these?

24   Q.  No, no, no.

25   A.  I'm sorry.

1  Q.  I'm asking were there patients at the Pain Center who

2  would receive medication despite having abnormal urine drug

3  screens?

4  A.  There were, yes.

5  Q.  And you had -- you had been asked questions by counsel for

6  Dr. Lewis about a process in place, that this urine drug screen

7  being a process to try to weed out pill seekers.  Do you

8  remember that?

9  A.  I do.

10 Q.  Was this process with drug testing applied inflexibly or

11 flexibly?

12 A.  Flexibly.

13 Q.  Could you elaborate on that?

14 A.  I'm sorry?

15 Q.  Could you elaborate on how it was flexible?

16 A.  Well, a clinical judgment was to be applied, and we had a

17 fairly universal feeling that if it was street drugs, i.e.,

18 cocaine, heroin, that there was a problem and action needed to

19 be taken.  But if a prescription drug that wasn't what was

20 prescribed wasn't there or that there was absence of urine or

21 absence of drug in the urine, that we should talk with the

22 patients and make a decision based on what we believed to be

23 true.

24 Q.  So that decision on whether to continue prescribing pain

25 medication, what would be required by the doctor to do that?

1   A.  Well, in my case, first I had to have the lab results that

2   I believed that I could rely on, and there were incidences that

3   undermined that confidence severely.

4           And there were also times when patients just admitted

5   that they screwed up and took somebody else's pain medicine

6   when they ran out, and we'd have a talk about this is why, this

7   is what.

8           There were also times when I heard excuses I didn't

9   believe and said so.

10          But with the laboratory being so poorly run, I had to

11  consider that as a factor as to what I was going to believe,

12  and that was -- that made it very difficult.

13  Q.  But in your prescribing habits you would at least have

14  conversations with the patients about their screen results?

15  A.  Oh, yes.  There would always be at least the one word,

16  warn.  That would mean we had the conversation.  I didn't have

17  time or inclination to put down a paragraph in there.  Maybe I

18  should have.

19  Q.  As to your qui tam filing, and I don't want you to go --

20  A.  As to?

21  Q.  As to your law -- your civil lawsuit.

22  A.  Yes.

23  Q.  And I don't want you to go into any attorney/client --

24  attorney/client privileged communication, but you did have

25  conversations with your attorneys about the Complaint, is that

1   fair?

2   A.   Yes.

3   Q.   Who ultimately was responsible for filing that Complaint?

4   A.   He was.

5   Q.   The attorney?

6   A.   Yes.

7   Q.   Okay.

8   A.   I wouldn't know how.

9   Q.   And whose ultimate decision was it as to what to put in

10  the Complaint?

11  A.   Whose...

12  Q.   Whose ultimate decision was it as to what to put in the

13  Complaint?

14  A.   His.

15  Q.   And you were asked questions about a specific interview

16  you had with civil AUSAs.  Do you recall that?

17  A.   Lynn Dodge, yes.

18  Q.   Have you since had interviews with the government?

19  A.   What?

20  Q.   Have you since had interviews with federal agents and

21  criminal AUSAs?

22  A.   Oh, after the plea deal, yes.

23  Q.   And in those interviews did you discuss more than what was

24  in your initial interview with Ms. Dodge?

25  A.   I believe I did.

Jury Trial Excerpt: Volume 7 • Wednesday, May 25, 2022

174

1   Q.  And did any of those interviews touch on what you felt you

2   had done illegally?

3   A.  About?

4   Q.  Did any of those interviews touch on things that you felt

5   you had done illegally?

6   A.  Oh, yes.

7   Q.  You were asked questions about the billing process at the

8   Pain Center.  Do you recall that?

9   A.  I do.

10  Q.  You as the doctor, for example, for an office visit, were

11  you the one circling on the paper what level of office visit

12  that was?

13  A.  It was.

14  Q.  And that was the paper given to the medical biller?

15  A.  That would go to medical billing, yes.

16  Q.  And do you have any reason to believe that the medical

17  biller would increase that from, say, a mid-level visit to an

18  extended visit without your knowledge?

19  A.  No.

20  Q.  You were shown a video of a birthday party --

21  A.  Yes.

22  Q.  -- at the Pain Center.  Do you recall that?

23  A.  Yeah.  Well, it -- it was familiar.

24  Q.  Okay.

25  A.  I recognized some faces there, yes.

1  Q.  The rooms that were shown in that video, were either of
2  those involving the operating rooms at the Pain Center?
3  A.  No.
4  Q.  So would those videos have shown anything about the
5  cleanliness or lack of cleanliness in the opting rooms?
6  A.  No.
7  Q.  You were asked a number of questions about whether Dr. Edu
8  and Dr. Russo were your friends.  Do you recall that?
9  A.  Whether Dr. Edu and Dr. Russo were...
10  Q.  Your friends.
11  A.  Yes.
12  Q.  Do you know, and answer only if you know, were they under
13  the same pressures from Dr. Bothra that you were under?
14  A.  Yes.
15  Q.  And so yes, they were?
16  A.  Yes.
17  Q.  Okay.  In 2016, before Dr. Russo actually joined the Pain
18  Center, did you give him any advice as to whether he should
19  join?
20  A.  I mentioned before when he told me he had a choice between
21  West Michigan Pain and the Pain Center, I remember my response
22  was, "I want the decision to be yours but I think you would be
23  better off with Dr. Juneja."
24  Q.  I believe in response to questions from Dr. Russo's
25  counsel you said something about Dr. Bothra wanted you to have

1  your own patient charts, is that fair?

2  A.  Oh, yes.

3  Q.  Why is that, could you elaborate?

4  A.  Well, I know that he did not want me seeing patients in

5  Warren, and I can only speculate why, but especially in the --

6       MR. WEISS:  Excuse me.  If he's speculating, then I'm

7  going to object.

8       THE WITNESS:  I'm not speculating.  I said --

9       THE COURT:  Okay.  All right.

10      THE WITNESS:  -- I can only speculate so I --

11      MR. WEISS:  Your Honor, I --

12      THE WITNESS:  -- I didn't go there.

13      THE COURT:  Okay.  Stop talking everybody at the same

14  time.

15      THE WITNESS:  Okay.

16      THE COURT:  Witness, I think you said you're not

17  going to speculate.  The question is simply to elaborate --

18      THE WITNESS:  Yes.

19      THE COURT:  -- on why you believe Dr. Bothra wanted

20  you to have your own pain charts.  If you could answer that

21  succinctly, we'd be grateful.

22      THE WITNESS:  Yes.  He wanted the -- the simplest

23  answer is he wanted the practices segregated because I was

24  deviating so much from the way he wanted things done.

25  BY MR. HELMS:

1   Q.  You were then asked questions from counsel for Dr. Russo

2   about keeping your civil lawsuit secret from Dr. Russo.

3   A.  I had no choice.

4   Q.  Is it your understanding that your civil lawsuit was under

5   seal?

6   A.  It was under seal and I was advised that I could not speak

7   to anyone about it.

8   Q.  And, in fact, if you did so, you would violate the False

9   Claims Act, wouldn't you?

10  A.  I would have violated and I would have been breaking the

11  law.

12  Q.  So you did not have a thousand chances to talk -- to tell

13  Dr. Russo?

14  A.  And I answered that I did not.

15          MR. HELMS:  No further questions.

16          THE COURT:  All right.  Thank you all very much.

17  Okay.  Very good.  You're finished with your testimony, Dr.

18  Kufner.  You may step down and be on your way.  Thank you for

19  your appearance here today and last week.

20          (Witness excused at 1:42 p.m.)

21          (Testimony of Ronald Kufner concluded)

22                          —  —  —

23

24

25

1          C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 177 comprise a full, true and correct transcript of the

7    excerpt of proceedings taken in the matter of United States of

8    America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis

9    and D-5 Christopher Russo, Case No. 18-20800, on Wednesday, May

10   25, 2022.

11

12                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                         Federal Official Court Reporter
                           United States District Court
14                         Eastern District of Michigan

15

16

17

18

19   Date: July 18, 2022
     Detroit, Michigan

20

21

22

23

24

25