Case 2:18-cr-20800-SJM-APP ECF No. 455, PageID.5163 Filed 07/18/22 Page 1 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                          SOUTHERN DIVISION


 3
      UNITED STATES OF AMERICA,
 4
                           Plaintiff,
 5        vs.

 6    D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
      D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7    D-4 DR. DAVID LEWIS
      D-5 DR. CHRISTOPHER RUSSO,
 8
                           Defendant.
 9    _____/

10                   JURY TRIAL EXCERPT: VOLUME 24

11         BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                   United States District Judge
12            Theodore Levin United States Courthouse
                   231 West Lafayette Boulevard
13                   Detroit, Michigan  48226
                    Friday, June 24, 2022
14
      APPEARANCES:
15
      For the Plaintiff          BRANDY R. McMILLION
16    United States of America:  BRANDON C. HELMS
                                 U.S. Attorney's Office
17                               211 W. Fort Street
                                 Suite 2001
18                               Detroit, Michigan  48226
                                 313-226-9622
19
      For the Defendant          ARTHUR J. WEISS
20    D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                 Suite 225
21                               Farmington Hills, Michigan  48334
                                 248-855-5888
22

23                               (Appearances continued next page)

24

25
```

Case 2:18-cr-20800-SJM-APP   ECF No. 455, PageID.5164   Filed 07/18/22   Page 2 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

2

```
 1    APPEARANCES:  Continued

 2    For the Defendant            ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:     Warner, Norcross & Judd LLP
 3                                 2000 Town Center
                                   Suite 2700
 4                                 Southfield, Michigan  48075
                                   248-784-5055
 5
      For the Defendant            ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:           Robert Harrison & Associates
                                   40950 Woodward Avenue
 7                                 Suite 100
                                   Bloomfield Hills, Michigan  48304
 8                                 248-283-1600

 9    For the Defendant            RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:         Chapman Law Group
10                                 1441 West Long Lake Road
                                   Suite 310
11                                 Troy, Michigan  48098
                                   248-644-6326
12
                                   JEFFREY G. COLLINS
13                                 Collins & Collins, P.C.
                                   1323 Broadway
14                                 Suite 800
                                   Detroit, Michigan  48226
15                                 313-963-2303

16    For the Defendant            LAURENCE H. MARGOLIS
      D-5 Dr. Christopher          Margolis Law Firm
17    Russo:                       214 South Main Street
                                   Suite 202
18                                 Ann Arbor, Michigan  48104
                                   734-994-9590
19

20

21

22

23
            To obtain a certified copy of this transcript, contact:
24         Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                            Official Court Reporter
25             (313) 234-2616 • www.transcriptorders.com
```

TABLE OF CONTENTS

Page

CLOSING STATEMENT BY MR. MARGOLIS                4

EXHIBITS

Identification                    Offered    Received

NONE

```
 1              Detroit, Michigan
 2              Friday, June 24, 2022
 3                          —  —  —
 4              (Proceedings in progress at 1:39 p.m., all parties
 5              present, jury present)
 6              THE COURT:  Mr. Margolis, if you'd like to proceed,
 7    right ahead.
 8              MR. MARGOLIS:  Thank you, Judge.  I know Your Honor
 9    will advise me if I'm going over or...
10              THE COURT:  Well, we were thinking maybe you wouldn't
11    even get that far.
12              MR. MARGOLIS:  I know and it's possible.
13              Good afternoon, ladies and gentlemen.  What a long,
14    strange trip it's been, huh?  I want to start by thanking you
15    all.  You've been an amazing jury, I can tell.  You take notes,
16    you stay alert, you pay attention.  In 26 years I think you're
17    probably the best jury, and I don't tell every jury that by the
18    way.  It's very clear to me and I think everyone here that you
19    all understand and appreciate the important role, the hugely
20    important, weighty role that you are playing in our criminal
21    justice system, so thank you for that, each and every one of
22    you.
23              And we're almost done.  Your time to gather and
24    discuss is upon us soon.  But before you go, I have one last
25    chance to talk with you all, discuss what the government
```

Case 2:18-cr-20800-SJM-APP   ECF No. 455, PageID.5167   Filed 07/18/22   Page 5 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

5

1    actually presented to you and say my piece about why you should

2    end this long nightmare for Dr. Russo.

3              From the beginning of our journey together I talked

4    to you about a condition we all have experienced one time or

5    another: pain.  I think it is important for us to end our

6    journey together in the same fashion.  What does it mean to be

7    in pain?  What does it mean to suffer chronic pain?  The

8    condition of pain, another person's experience in coping and

9    dealing and living with their chronic pain is the focal point

10   of this case, make no mistake about it, from both sides.  I

11   know that that may have sometimes gotten lost in the mix with

12   all the witnesses and exhibits, but the condition of pain and

13   its impact on people's actions brings us together right here,

14   right now.

15             And there's actually a lot of agreement -- am I okay,

16   Ms. Cavanagh?

17             THE COURT REPORTER:  Yes.

18             MR. MARGOLIS:  There's some agreement in this case

19   with much of what I said to you all in my opening statement,

20   agreement on some of the big issues.  So I want to talk about

21   these important, uncontested facts we can take from this case,

22   themes even.

23             As I discussed in the beginning, chronic pain is

24   real.  Real people suffer chronic pain.  Chronic pain is

25   defined, and we've heard it over and over, as pain that lasts

```
1    beyond -- I think they give the three months is the -- the
2    standard, but it's -- I call it pain beyond the normal recovery
3    period one would expect, typically expect from an injury or an
4    episode involving acute pain.  More than a few months I think
5    is -- is the consensus.  Tens of millions of Americans suffer
6    from chronic pain, all walks of life, all races, all
7    ethnicities, all genders.  Pain doesn't discriminate.
8          It is a sad but true fact that millions of Americans
9    don't have health insurance.  This group, especially those in
10   our more disadvantaged communities, are often lower income, and
11   Medicaid and Medicare is intended or does cover these lower
12   income citizens, the elderly and the disabled, those who don't
13   have private health insurance as well.
14         It's a fact of this case that many health care
15   practices, many providers don't take these patients, don't
16   serve these uninsured, underinsured people.  There's no law
17   requiring them to do that, to accept these low reimbursement
18   rates that we heard about.  It's a sad reality but also an
19   important fact to remember in this trial.
20         Those without private insurance, the tens of millions
21   of them, must find a practitioner that takes Medicare or
22   Medicaid.  Are those people, are these people not entitled to
23   treatment by advanced pain specialists solely because of their
24   income, their age, this disability or lack of health insurance?
25   Of course they are.  And therefore, of course a specialized
```

Case 2:18-cr-20800-SJM-APP   ECF No. 455, PageID.5169   Filed 07/18/22   Page 7 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

7

1    pain practice serving our massive uninsured population is going

2    to be busy.  No one contested this fact, the reality of our

3    national health care crisis.

4         Many pain patients are dealing with multi-faceted

5    pain, psychosocial issues.  Just look at who the government

6    called to the stand.  That's only a tiny sample.  For these

7    folks, everyday activities are difficult.  Sitting on a toilet

8    from that one witness can be excruciatingly painful and

9    difficult.  Ms. Souligney mentioned, or I believe it was,

10   sitting or just rising to stand up is painful and challenging.

11        These folks also face, and I talked about this in

12   opening, an unconscious or implicit bias.  I ask you to resist

13   that implicit bias.  Trust their complaints of pain.  No one

14   during this trial, including learned counsel on the other side,

15   took issue with the reality of any patient witness's chronic

16   pain or the debilitating effect it had on their lives.  It was

17   also not contested that chronic pain patients are often higher

18   risk and like many of us have preexisting conditions.  These

19   are not pediatric clinics.

20        Remember what Dr. Chiodo said the other day.  Chronic

21   pain patients can be difficult, threatening, commonly

22   presenting with several multiple pain generators.  What exactly

23   is a pain doctor to do, turn and walk away, refuse to treat

24   them?  No.  You do the best you can, you try and work with the

25   patient, as difficult as he or she may be.  That is your job,

1    that is what you signed up to do.

2            People in pain can be hostile and threatening.

3    Security is absolutely necessary in this business.  Remember

4    Dr. Chiodo's testimony about the security protocols at the

5    University of Michigan, in safe and secure Ann Arbor no less.

6    Is it wrong for a pain medicine practice in Warren to also want

7    security on the premises to protect its staff, its doctors, its

8    patients, its nurses, its PAs, its chiropractors, its PTs or

9    physical therapists?

10           The government and the -- in opening and during the

11   trial they -- they talked a lot about it, but it -- it's -- it

12   wasn't spoken much yet by Ms. McMillion, but the government

13   spins this accepted fact of life and told you in their opening

14   to believe that the Pain Center had security due to some

15   illicit activities that were going on there or outside in the

16   parking lot.  There was no actual evidence of drug dealing, no

17   evidence of a wild and lawless parking lot or of a wild and

18   lawless waiting room, no actual evidence of pills being sold.

19   Agents Tolan, Link, Osterling, Kroger and Peterson all

20   repeatedly went to the Pain Center.  They staked it out for

21   months, maybe years.  All -- they had cameras and video

22   equipment.  They showed you nothing, nothing at all.  They

23   testified to seeing nothing of the sort that we were promised.

24           The only evidence offered you on this unfulfilled

25   promise of the government's was that tiny bit of testimony from

1  Dr. Backos.  Do you remember that?  He said he saw the woman on
2  her cell phone, and I -- I quoted it, "looking like she was
3  calculating something."  That was their evidence of drug
4  dealing outside the Pain Center.
5          Remember the government's promise to you in opening
6  statement.  They went to great lengths to paint this picture of
7  the Pain Center as a fraud factory.  That was mentioned many
8  times.  I think Mr. Weiss talked about the buckets of -- three
9  buckets of fraud.  We didn't hear it from Ms. McMillion in her
10  closing; maybe we'll hear it in the rebuttal.  Long lines,
11  overcrowded parking lots, waiting rooms with people sitting on
12  each other.  They told you people would see a pain doctor, go
13  get their prescription and then sell their pills right there in
14  the parking lot.  That's what they told you.  They told you
15  "that's why we had a security guard, the drug dealing from the
16  very prescriptions these doctors wrote," and that's why it was
17  necessary they argued to you.
18          However, Dr. -- Dr. Chiodo explained the reality of
19  what pain practices face today.  He described his clinic's use
20  of panic buttons, roaming security on campus at the U of M.
21  Pain clinics need security, it's as simple as that.  It's a
22  fact of life, sadly.
23          The government told you that -- in their fact -- in
24  their argument that the Pain Center catered to drug dealers and
25  addicts.  They -- they -- they offered you testimony, and --

1    and it was probably some of the closest they get to their

2    argument, is that some patients smelled of marijuana.  Okay.  I

3    can accept that.  But this is not a marijuana case.  Marijuana

4    is legal for recreational use in Michigan.  It's been legal for

5    medical use since 2008.  This was a pain clinic.  The fact that

6    the waiting room smelled like marijuana on occasion is a

7    non-issue.  Patients often brought family members with them.

8    The smell lingers.  We all know that from living in this state.

9    Every -- they presented no evidence -- no drug dealers or

10   addicts as patients, as -- as witnesses.

11        Every single patient witness whom the government

12   called to testify admitted they suffer chronic pain.  They

13   admitted the pain they experience is real and debilitating to

14   them and that they went to the Pain Center for treatment of

15   their chronic pain and that -- and also that the doctors at the

16   Pain Center attempted to treat their chronic pain.  Those are

17   the facts, that is the uncontested evidence, and by and large,

18   it's given to you by the government.  These simple, uncontested

19   facts should guide every decision you make in this case.  It

20   should answer every question you have and really make your

21   decision easy.

22        Let's talk about their inability to prove their case

23   and the failure to deliver on other promises.  Witness after

24   witness the government went to -- with witness after witness

25   the government went to great lengths to try and hammer home its

1    argument that every patient got controlled substances, that no

2    patients were given a physical exam, right?  You -- you've

3    heard that.  It's been a common and repeated argument

4    throughout -- throughout the -- the trial and it's -- it's

5    simply not true.

6              Remember too, this is something that I thought about

7    when Ms. McMillion was speaking and they've been confusing this

8    issue throughout the trial about you can't give them a

9    prescription without -- without having a physical exam, a

10   comprehensive exam.  They're trying to get you to believe that

11   every time you go to a doctor and pick up a script, that

12   they're supposed to provide you a comprehensive physical exam.

13   That's not the law, that's not the standard of care.  You get

14   your initial comprehensive physical exam.  That should be done,

15   I'm not going to say it shouldn't be.  And guess what?  We're

16   going to talk about every patient Dr. Russo saw received a

17   comprehensive physical -- physical exam either from him or Dr.

18   Kufner or Dr. Bothra.

19             So reject their confusing argument that every time

20   you go see a doctor for a pill, forget your pills, you need a

21   comprehensive physical exam.  You don't.  You need one; you

22   don't need one every time.  However, every patient Dr. Russo

23   saw received a comprehensive history and physical exam on their

24   initial visit.  That's when the treatment plan was discussed

25   and initiated.

1       Remember the testimony the other day from -- when

2   I -- when Dr. Chiodo was on the witness stand, it was last

3   week, and we were talking about patient Michelle Morzynske who

4   is deceased or she wasn't here to testify.  She is one of the

5   patient witnesses Dr. Russo is charged with.  After Dr. -- Dr.

6   Chiodo confirmed that Dr. Russo provided sound care to Ms.

7   Morzynske, Mr. Helms got up and asked him a series of general

8   questions.  "What if no physical exam was given," he asked,

9   "would that be a breach of the standard of care?"  "Well,

10  probably I think or yeah" Chiodo -- Dr. Chiodo may have said.

11  "What if no informed consent was given, sir, for the procedure,

12  would that be a breach of the standard of care?"  "Well,

13  probably, yeah, it would."  "What if the risks of opioids were

14  not discussed with the patient, would that be a breach?"  You

15  remember this testimony, right?

16      The problem for the government that this

17  cross-examination revealed was that they were asking Dr. Chiodo

18  a series of hypotheticals about facts that did not actually

19  pertain to the treatment of the particular patient Dr. Chiodo

20  came to discuss, Ms. Morzynske, or her -- Morzynske or her

21  actual care.

22      In fact, if you look at the records, and I can give

23  you the exhibit cite, Ms. Morzynske did undergo a comprehensive

24  physical examination.  In fact, Ms. Morzynske did receive and

25  then sign an informed consent form for the very procedure Dr.

1    Russo performed, witnessed by a nurse in writing, witnessed by

2    Dr. Russo in writing.  It's in evidence at 119A-4 I believe,

3    and I can -- yes.  In fact, Ms. Morzynske did review or receive

4    and sign a narcotics agreement.

5           So I bring this up because it -- it's -- shows that

6    the government questioned Dr. Chiodo about hypothetical -- an

7    alternate reality, a reality that didn't actually exist.  I

8    call it fantasy land, supposed bad facts that didn't actually

9    pertain to Dr. Russo's patient.

10          This ten-minute redirect that I did, not that it was

11   so great, but I think it was important because not only did it

12   show Dr. Russo is wrongfully being charged for that caudal

13   epidural steroid injection he provided to Ms. Morzynske, a

14   procedure that was indicated and objectively verified, no, the

15   exchange with the government attorney and my redirect is much

16   more important than that.  It's illustrative of the huge

17   disconnect in the government's claims when placed next to the

18   real, actual evidence in this case.

19          Dr. Russo's other charge patient, Denise Souligney,

20   also received a comprehensive physical exam.  That's in

21   evidence at Exhibit 122A.  You may recall Ms. Souligney

22   testified to it telling you she -- Dr. Kufner spent a lot of

23   time with her that first day.  We pulled up her records.  I

24   either did it with her or I think we -- I did it with Dr.

25   Chiodo.  He went over all her surgeries, a complete history and

1    physical.  It's all in her records.  You can see for it -- you

2    can see it for yourself.

3            So how can the government contest that exam occurred?

4    She was their witness.  She said it did.  The records reflect

5    it.  So are we to believe their claim that despite what she

6    told us, no exam actually occurred, her medical charts were

7    somehow manipulated, doctored by the doctors?  That's the

8    government's regular fallback here.  It's their standard

9    default position in the face of evidence showing they're

10   flat-out wrong.  They ask you to accept this alternate reality

11   despite what we actually know occurred from the mouth of their

12   own witness even.

13           In reality, comprehensive physical -- physical exams

14   did occur to MM, that's how she's identified in the indictment

15   I believe, Ms. Morzynske, and Denise Souligney.  Ms. Souligney

16   still remembers it going on seven years now after it occurred.

17           And this is like -- because they can't prove it, this

18   is like the government trying to -- they're -- it's claiming a

19   double negative I like to say.  They -- they're trying to shift

20   the burden because their evidence, their witness fails to show

21   what they want you to believe it shows.  This is a theme that

22   runs through the government's case the entire trial.  They want

23   you to reject the evidence that's right in front of you, accept

24   their alternate reality that runs through the entire case.  It

25   has to.  They have no other persuasive evidence to show you.

```
 1              Sure, all the important documents and consent forms
 2    are in order, but that shows you the Pain Center doctored them.
 3    Really?  Did Ms. Souligney not have a comprehensive physical
 4    exam despite her testimony?  Did she not go through the litany
 5    of procedures for her lumbar and sacroiliac pain by Dr. Kufner,
 6    as is in the record and in her charts per her own testimony?
 7    Did the Pain Center make up Ms. Souligney's failed back surgery
 8    syndrome too despite the X-ray in the file showing the hardware
 9    in her lumbar fusion?
10              THE COURT REPORTER:  Mr. Margolis, you need to slow
11    down for me.
12              MR. MARGOLIS:  I'm trying to speed up my time for...
13              THE COURT REPORTER:  Slow down please.
14              MR. MARGOLIS:  I will.
15              Where does such an argument from the government end?
16    Where can it not go?  Was Ms. -- was Ms. Morzynske's MRI fake
17    too, written by the ghost busters doctor?
18              The medical records, while not perfect, were like any
19    other doctor's records: messy and not written for retrospective
20    review, and they were compiled often by separate providers at
21    different times.  You heard Dr. Chiodo on this point.  I think
22    he demonstrated like -- like pulling his hair out and maybe he
23    said it.  He pulls his hair out trying to get his providers to
24    document better.  He told you just because a doctor does not
25    make a chart note of something doesn't mean it didn't happen.
```

```
 1   It's common sense.
 2          Don't buy this burden shifting argument by the
 3   government when they can't prove the point they are trying to
 4   make.  We have no burden to prove anything at all in this case.
 5   Repeatedly claiming records were falsified with no reliable
 6   support is solely intended to mask their evidentiary failures.
 7   It's as simple as that.
 8          The government tells us, you all, it's a fraud
 9   factory.  Every patient gets a back brace.  Every patient gets
10   opioids on their first visit.  Another unfulfilled promise,
11   alternate reality, fantasy land.
12          Michelle Morzynske never got a back brace.  Ms.
13   McMillion said this in her opening, and I believe she walked it
14   back because she was confusing Ms. Morzynske with -- with
15   another patient, but you have the records.  I can recite the
16   exhibit I already cited.  She didn't get a back brace.  She had
17   low back pain.
18          Michelle Morzynske did not get a prescription on her
19   first visit either.  She had that full history and physical, no
20   prescription for Norco, no back brace.  This is Exhibit 119B-6.
21   I may have said B-4 and I apologize.
22          She also was prescribed to go to physical therapy,
23   she was given a gel pack, again -- oh, and asked to get an MRI.
24   No back brace, no Norco.  The government's expert confirmed all
25   this for you during my cross-examination.  As I said, her
```

1    chart's in evidence.

2            Here's another uncontested fact from this trial.  Dr.

3    Russo and his colleagues are highly educated physicians who

4    spent years after medical school in advanced training so they

5    could specifically treat chronic pain patients.  Dr. Russo is

6    an interventional pain doctor who dedicated his professional

7    career to treat real people who suffer from real chronic pain.

8    He had a passion for treating pain.

9            Remember his two-year fellowship, pain fellowship,

10   and then his post-fellowship advanced interventional pain

11   techniques training at the renowned Moffett Cancer Center in

12   South Florida.  There Chris treated patients suffering from the

13   horrific and debilitating pain, late-stage cancer from -- in

14   cancer patients.  That experience of his at the South Florida

15   cancer center tells you all you need to know about Dr. Russo

16   and where his heart is.

17           And this is another important point I want you to

18   remember.  And if I keep doing that, I apologize.  It's a bad

19   habit of mine.  Dr. Russo is not a general practitioner

20   moonlighting at an interventional pain clinic to make extra

21   money, which is something that some doctors do sometimes, and

22   no disrespect to them.  But treating pain, chronic and

23   debilitating pain was Dr. Russo's only job.  This was his

24   career.  Helping these people reducing their pain, trying to

25   help them cope and manage their pain was his life's work.

1          Christopher is no fraud.  He's no illicit drug

2    trafficker, drug prescriber.  He's a highly educated specialist

3    in chronic -- treating chronic pain.  He treated his patients

4    in good faith and to the best of his abilities and always with

5    the intent to alleviate their pain.

6          It is why he joined the Pain Center when he did.

7    Remember, he worked at a successful pain practice in Grand

8    Rapids.  Dr. Russo was recruited to the Pain Center by Dr.

9    Bothra and his friend at the time, Dr. Kufner.  Dr. Russo

10   accepted Dr. Bothra's offer because it was a good opportunity

11   to have more independence, work with his friend and serve a

12   large inner city community, working at a growing pain practice.

13   He didn't join to defraud Medicare or join some nebulous,

14   undefined conspiracy.  He joined to practice medicine with a

15   friend to serve a needy community and be closer to his family.

16   He quit his job in the pain clinic in Grand Rapids to join a

17   legitimate pain practice in Warren, legitimate business with

18   real chronic pain patients.

19          Now, the government did present a couple fake

20   patients to you: the agent and pseudo patient, Andrew Peterson,

21   and the on-again, off-again, crack smoking Butler Henderson.

22   I'm not going to get into them; my colleagues did.  I will note

23   that Dr. Russo never met with either of them, never treated

24   Agent Peterson, never treated Mr. Henderson.  There's no video

25   or audio of Dr. Russo with them.  There's no audio or video of

1    Dr. Russo with any patient in this case, the entire case.  Dr.

2    Russo only treated the real patients with real pain, real

3    imaging.  That's the evidence the government presented to you.

4         Which brings me to the next uncontested fact of this

5    case: diagnosing and treating chronic pain is complicated but

6    it's based on trust.  The practice of pain management, the

7    practice of interventional pain medicine is not a perfect

8    science.  Pretty much every expert who testified agreed to

9    that.  Where in the body does the pain originate from?  What

10   causes it?  How best can the doctor treat it?  Once treated,

11   how long will the pain be gone, how long will it subside?  If

12   it doesn't go away forever, when will the pain come back?

13        These questions remain after a month of trial and can

14   never be definitively answered.  It's not a perfect science.

15   They try to get rid of the pain.  They try to keep it away for

16   six months with an ablation.  They try to get the -- the block

17   from the -- from the diagnostic.  It's not a perfect science.

18        I think every doctor who testified stated this fact

19   too.  They agreed that pain -- pain therapy lessens the pain

20   but doesn't get rid of it forever.  This is true if the chronic

21   pain patient is on low dose opioid therapy, doing physical

22   therapy, undergoing ablations every six months.  It does not

23   leave.  That's why it's deemed chronic.  It's temporary, the

24   relief is temporary.

25        We all have different etiologies, different physical,

```
 1    biological makeups.  What may work for you may not work for you
 2    [sic].  What may work for me may not work for someone else.  We
 3    all have different thresholds for pain.
 4            We know pain is subjective, we know pain is hidden,
 5    personal to the one feeling it, only known to others because we
 6    are told.  We have to rely on a person's report of pain to
 7    understand what state of pain they're actually in.  We see
 8    people limp or grimace or walk with a cane like we saw with Ms.
 9    Souligney, but we still don't know exactly how that person --
10    how she is feeling, we can't.  We have to take their word for
11    it, we have to trust them.
12            Pain specialists, like lawyers, teachers,
13    accountants, hairstylists, therapists, the rest of us begin
14    their relationship with their patient with trust, they have to.
15    It's the same as in every adult relationship, it begins with
16    trust.  Doctors trust us when we tell them our pain symptoms.
17    We trust our doctors when it comes to their medical advice.
18            If we're not happy with the advice or treatment, what
19    do we do?  We get a second opinion, ask another doctor, go back
20    to the one who referred us to the specialist in the first
21    place.  We can reject the advice, reject the proposed treatment
22    or procedure.  I said this in my opening and I'll say it again.
23    No grown person is forced to remain in a professional
24    relationship.  No grown person is forced to keep seeing a
25    doctor again and again for years if they aren't getting relief
```

1    from their pain.  These were grown people who made their own

2    health care decisions.

3            The Pain Center provided elective treatment and

4    elective pain therapy.  This wasn't an ER.  They traveled to

5    the Pain Center, they signed a host of informed consents,

6    opioid agreements, regularly reported pain scores to several

7    different people, underwent imaging, fasted before their

8    procedures, endured needles, sedation, had drivers, were

9    assisted in aftercare rooms for cookies and juice.  They

10   regularly met with doctors, nurses, PAs, MAs, all who took

11   their pain scores at different times.

12           Some brought their family with them.  Some had family

13   who treated there.  Some recommended their friends who suffered

14   from chronic pain.  Dr. Lewis sent his mother to treat at the

15   Pain Center.  The last witness knew Dr. Bothra from decades ago

16   and treated with him from that time.  She got knee injections,

17   never got pills.

18           This is your evidence, people, most of it provided to

19   you by the government.  How is that not a legitimate practice?

20   Tell the nice lady who testified last week, I just -- with Dr.

21   Bothra, I can't remember her name, tell her that Dr. Bothra was

22   the CEO of a fraud factory and that the nice and caring Dr. Edu

23   was the factory's vice president.  See what she tells you.  It

24   was a fitting end to this trial that it ended with a patient

25   such as that.  No pills, no inducements, nothing but a

1   four-decade long loyalty to doctors she admired and trusted to

2   care for her and who did care for her.  That sweet lady was not

3   induced to do anything, no patient was.

4         Dr. Russo never forced any patient to undergo any

5   procedures.  There was no testimony presented to you he did.

6   Ms. Souligney signed all her consent forms, so did Ms.

7   Morzynske.  They're asking you to convict on pain scores, pain

8   scores given before and after procedures that had sedation,

9   pain scores given to different people at different times.  It's

10  like the game of electricity: once it goes to somebody else, it

11  always changes.  Can't convict on pain scores.  They want you

12  to convict on pain scores because they can't handle the medical

13  necessity hurdle they can't get over.

14        Ms. Souligney had been undergoing repeated procedures

15  from Dr. Kufner.  She agreed to everything he did.  Said her

16  pain he was treating was real and she reported relief at her

17  followups.  I know years later she may have said something

18  different, but in her records she reported the relief.  Ms.

19  Souligney stated it was, quote, implied that she had to undergo

20  the procedures, but she admitted no one actually required it.

21  No one told her she had to do it to get her pain pills, not Dr.

22  Kufner, not Dr. Russo.

23        The government provided you with no evidence Dr.

24  Russo forced her or any patient to undergo any procedure.

25  These were grown people he cared for.  They too are responsible

1   for their own treatment decisions, and the procedures were

2   always part of the patient's treatment plans, completely within

3   the standard of care for an interventional pain practitioner.

4   Follow the science, examine the evidence, you'll get the result

5   that I'm talking about.  It will show you Dr. Russo diagnosed

6   and then took steps to provide pain relief.  It will show you

7   that he trusted his patients but verified their pain

8   complaints.  It will show you he followed the science.

9        Remember too another uncontested fact from this

10  trial.  Every expert stated it was reasonable for one

11  professional to rely on another to inform their treatment

12  decisions.  That was the -- when I was asking those questions,

13  does the practice of medicine build on itself.  Of course it

14  does, it has to.  It would be impossible to have the health

15  care system that we do without one doctor, one professional,

16  one provider relying on another provider.  It's how it's done

17  by all providers and it's perfectly reasonable and well within

18  the standard of care.

19       And this is important because it was Dr. Kufner, if

20  you may recall, who scheduled the final series of treatments to

21  Ms. Souligney's sacroiliac joints.  Dr. Russo simply followed

22  Dr. Kufner's plan of care, reasonably relied on his documented

23  treatment decisions with his own patient and performed the

24  procedure.  And Ms. -- Ms. Souligney agreed to it, she told us

25  that herself.  She trusted Dr. Kufner.  She -- she felt --

1   she -- she agreed to everything that he -- that he asked of

2   her.

3           I asked in my opening statement how just, in fact,

4   does a pain specialist like Dr. Russo act on his intent to

5   treat pain?  We all learned the answer.  I won't go over it

6   again and again, but that's not a contested issue in this case

7   either.  I think the government spoke on it a little bit in

8   their closing or maybe in their opening.  First you have to

9   diagnose the origin of the pain to define where the pain comes

10  from.  Then once confirmed, you treat the pain.  This is what

11  Dr. Russo did with his two charge patients.

12          Let's talk briefly about the individual charges Dr.

13  Russo faces.  I'll start with Ms. Souligney because she was the

14  only patient witness of Dr. Russo's to testify.  Dr. Russo is

15  charged with five individual counts related to two dates of

16  treatment for Ms. Souligney.  This reminds me of Mr. Harrison's

17  point about the government, quote, overcharging.  I don't know

18  the word he used but it's -- it's -- it's excessive.  For --

19  for two individual dates he's facing five charges.  This is

20  Count 33 and 34 he's charged for the bilateral diagnostic he

21  performed on Ms. Souligney that was to her SI joints.  I

22  believe Ms. McMillion improperly stated it was her lumbar

23  facets that were being treated.  It's an easy mistake to make.

24  This is a difficult and confusing case, there's a lot of

25  different procedures, but I want to make sure you have it

1    right.  In 35 and 36 he's charged for the ablation to her left

2    SI joint that he performed on March 14, 2018.

3              So to make this case against Dr. Russo, they

4    initially brought in Dr. Mehta, and we all recall Dr. Mehta's

5    testimony.  It started off very troubled when cross-examination

6    started.  There was all the mistakes that were pointed out by

7    pretty much all the defense counsel.

8              But as far as his testimony relative to Ms.

9    Souligney, what I believe is important is that he didn't offer

10   any specific evidence relevant to Dr. Russo's care of her.

11   He -- and I was -- I pressed him.  I wanted him to be specific.

12   I don't know if you all remember this, but it's a -- it was an

13   important point, at least for me, during the -- the trial.  I

14   asked him specifically, "What was wrong with the November 16,

15   2017 bilateral diagnostic?"  Dr. Mehta had nothing to say.  His

16   words, "I" -- quote, "I will not be able to answer that."

17   That's their expert traveling across -- halfway across the

18   country making $25,000 to testify against the only named

19   patient who shows up to testify against my client, and he is

20   not able to answer what's wrong with that procedure?

21             Similarly, he gave a vague and generalized conclusion

22   about the March 14, 2018 procedure that Dr. Russo is charged

23   with in Counts 35 and 36.  His testimony, and I -- you may

24   recall this, it was a long time ago, he was one of the first

25   witnesses, but I asked him, 'cuz he grouped in his -- in his

Case 2:18-cr-20800-SJM-APP  ECF No. 455, PageID.5188  Filed 07/18/22  Page 26 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

26

1   report -- I asked him about his report, and he had grouped Dr.

2   Russo's and Dr. Kufner's procedures together with his person,

3   with Ms. Souligney, and I asked him, "Is -- is your opinion

4   based upon the number of procedures that -- that Ms. Souligney

5   received from Dr. Kufner?"  And he affirmed, he said yes, it

6   was, and then he didn't say anything specific as to why it was

7   medically unnecessary therefore for Russo, Dr. Russo to do what

8   he did.

9          And I believe he mentioned lumbar facet work that was

10  done by Dr. Kufner, and perhaps that's a mistake that -- that

11  Ms. McMillion recalls or -- or the reason she made that to you

12  this morning, but Dr. Russo didn't do any work to Ms.

13  Souligney's lumbar facets.  Dr. Russo did work to the

14  sacroiliac joints.  And so Dr. Mehta did not provide any strong

15  evidence of any sort relative to Dr. Russo's injections for Ms.

16  Souligney.

17         I think -- the government I think attempts to argue

18  that Ms. Souligney, with all her pain and surgeries and

19  injuries, did not need the interventional treatments Dr. Russo

20  provided her, but the evidence clearly showed otherwise.

21  First, Dr. Mehta never said that Ms. Souligney's SI joints were

22  fine or that she did not really have any pain there.  The

23  testimony was -- and I think three or four of the experts

24  talked about the lumbar fusions, failed back surgery.  I feel

25  like I could teach a class on lumbar fusion, failed back

1    surgery now.

2          But what they -- if you recall what they said was is

3    that failed back surgery -- and I think Dr. Patel said, well,

4    the surgeons don't -- you know, they take offense to that so

5    there's a different name for it, but it's still known as failed

6    back surgery syndrome I should say.  It causes osteoarthritis

7    above and below the plating, the region where the lumbar fusion

8    occurs.

9          And so there are two distinct pain generators that

10   are frequent, that are common, that typically occur from such

11   surgeries, and that is what Mr. -- Dr. Kufner had been treating

12   this patient in his treatment plan for.  He -- he did work on

13   her lumbar facets, he did repeated work to her SI joints.

14   Three days before he left the practice he scheduled the

15   procedure for the diagnostics to -- to confirm again, which is

16   required, to her SI joints.  Dr. Russo steps in, takes over

17   that patient from her, performs the procedure ordered by her

18   trusted doctor.  Dr. Lewis confirms the blocks work in January.

19          And then interestingly, it's -- Dr. -- because these

20   ablations -- and there was testimony on this -- because these

21   ablations are so demanding on the body, especially probably for

22   someone in Ms. Souligney's fragile, sort of fragile state from

23   all her surgeries and whatnot, they split it up.  You don't do

24   a bilateral RFA, it's too painful, it's too debilitating, so

25   you do one one month, one another month.

1          So Dr. Russo did the ablation to her right SI joint

2    in February.  And what's interesting about this, he's not being

3    charged for that one.  He's being charged for the ablation he

4    did to her left SI joint in March.  So if the February

5    ablation, not being charged for that, that's a concession by

6    the government that that was a medically necessary, legitimate

7    procedure.  So if the February -- uncharged February ablation

8    is okay, by default, de facto, the March ablation is okay.

9          Taking this one step further, if the February

10   ablation was medically necessary, then the November blocks to

11   even get to the February was necessary too.  So by them not

12   charging on the one, they've agreed that all of them were good.

13   That's four counts.

14          Both Dr. Mehta and Ms. Souligney testified that the

15   pain from the failed back surgery syndrome was legitimate and

16   real.  Dr. Mehta admitted it caused the lower back pain and

17   that SI joint pain is a common pain generator from this

18   surgery.  I apologize for repeating myself.

19          After the March ablation, Ms. Souligney's records

20   will show, Ms. -- Ms. Bezpalko in April reported that the

21   patient had received significant relief.  And here's what's

22   important about the last ablation other than the fact that it

23   was completely legitimate, and it really disrupts the

24   government's -- destroys, as far as this patient, the

25   government's inducement theory, and we talked about it with Ms.

1    Souligney I believe as well.  But after Dr. Russo completed the

2    series ordered by Dr. Kufner, Ms. Souligney received no more

3    injections, yet she kept going to the Pain Center, kept getting

4    her Norco.  So how is that an inducement?

5         Dr. Kufner did 18 procedures over a year and a half

6    with this patient.  Three days before he leaves he schedules

7    her for another SI procedure, well after -- to be done well

8    after the six months that he had done the previous one so it

9    was within the two per year.  But Dr. Russo takes over --

10   Kufner, 18 procedures in a year and a half.  Dr. Russo takes

11   over, completes the series in four months, no more procedures

12   for this patient.  She keeps going to the Pain Center, she

13   keeps receiving her Norco, and she stays with the place.  She's

14   not induced to do anything.  She's not told she can't get her

15   pills if she doesn't do more procedures.  The government calls

16   Dr. Russo a criminal for literally doing his job.

17        In Count 54 Dr. Russo was charged for being a -- for

18   being a drug dealer for prescribing Ms. Souligney low dose

19   Norco on the date of her last SI ablation to her left SI.  And

20   I say drug dealer because seriously, if Dr. Russo was on

21   federal property selling crack cocaine to Mr. Henderson, he

22   would be facing the same charge that he's facing in Count 54.

23        This charge, this allegation is absurd.  The

24   government's own witnesses supported Ms. Souligney's pain and

25   absolute need for this prescription.  Ms. Souligney testified

1    she needed it for her pain.  Dr. Mehta testified it can help

2    relieve pain, that he prescribes it still to his patients.  Dr.

3    Chiodo also said it was completely legitimate.  Also remember

4    Dr. Patel prescribed the exact same dosage to Ms. Souligney six

5    months after the fact for the same pain condition.  Patel

6    prescribed her Norco again the next month for the same pain

7    condition.

8            Notably, Dr. Russo wrote the prescription that he's

9    being charged with to take effect five days after the

10   procedure.  Why do I tell you this?  Because it shows that he

11   had reviewed her MAPS report.  He knew he wasn't -- she wasn't

12   due yet.  It shows conscientiousness by Dr. Russo and concern

13   not to give her more Norco than is proper to help relieve her

14   pain as she testified she needed.

15           Ms. Souligney was also a patient on chronic opioid

16   therapy.  She was on opioids before she even came to the Pain

17   Center.  She had over a dozen surgeries with implants and steel

18   throughout her entire body.  These facts alone warrant or

19   provide an independent basis for Dr. Russo to prescribe her low

20   dose opioids when she was due five days after the March 14th

21   procedure.

22           Dr. Chiodo admitted on cross-exam that Ms. Souligney

23   complained of pain after the ablation, that pain after

24   procedures is normal, and that he prescribes Norco for pain to

25   his own patients.

1          Let's go further with her care.  Ms. Souligney was

2    also being prescribed Xanax by her psychiatrist.  Do you all

3    remember that?  The Pain Center, if you remember, did all they

4    could do with this patient to get her to stop taking her Xanax

5    with her low dose opioids.  They had her try and reduce it, try

6    to talk to her psychiatrist and get her off Xanax entirely.

7    Remember Ms. Pursifull?  She even disposed of 29 of her pills.

8    Ms. Souligney called her a witch for doing that.  This shows

9    proper care, conscientious care, and flies directly in the face

10   of the government's narrative.

11         One other point about her care.  Dr. Russo reduced

12   her prescription 25 percent on the first day he saw her, not

13   even in clinic but when he did Kufner's previously scheduled

14   diagnostic in November.  We heard from other patients that Dr.

15   Russo -- that we heard from other patients who Dr. Russo

16   inherited from Dr. Kufner that he also reduced their Norco by

17   25 percent.  What does the government say about this good-faith

18   effort to reduce Dr. Kufner's Norco prescriptions?  That is

19   suspicious too, shows evidence of fraud.

20         Clearly, the prescription Dr. Russo wrote on

21   March 14th to Ms. Souligney was legitimate, prescribed in the

22   normal course of the treatment of her pain, just like Drs.

23   Mehta, Gharibo, Chiodo and Patel prescribed to their patients,

24   just like Dr. Chiodo said was proper in this instance.

25   Clearly, Dr. Russo wrote this prescription in good faith to

1    treat his patient's pain.

2          I already spoke about how the government inducement

3    theory failed miserably with this witness.

4          However, even if Dr. Kufner implied Ms. Souligney had

5    to follow her treatment plan to continue as a patient, and I

6    think Mr. Harrison touched on this, it does not show any lack

7    of medical -- actually he didn't but I will later.  Even if Dr.

8    Kufner implied she had to follow the treatment plan to

9    continue, it does not show any lack of medical necessity for

10   the injections.  Her pain was still there, her pain was still

11   real, she was still complaining of it.  Chronic pain from

12   lumbar fusions, chronic pain from that failed back surgery

13   syndrome doesn't go away, it's real.

14          And this is where Mr. Harrison said what I'm about to

15   say, and recall what Drs. Gharibo and Chiodo said about this

16   issue.  It's not an illegal inducement if it's part of an

17   established treatment plan, and it clearly was with this

18   patient.  Dr. Kufner also stood by his plan of care for this

19   patient, said there was nothing wrong with the treatments he

20   provided to her.

21          Again, Dr. Russo is being charged with crimes for

22   literally doing his job and doing it well.  In Count 32 Dr.

23   Russo is charged for providing a caudal epidural steroid

24   injection to Michelle Morzynske.  I -- I -- I may have touched

25   on this.  I'll -- I'll speak briefly about it.  Ms. Morzynske

1    passed away, she was unable to testify, she was not here

2    obviously to testify.  Dr. Mehta was the sole witness in regard

3    to this patient's injection procedure, and this was where his

4    mistakes really, really came to the fore.  If you recall, it

5    came to a head.  Mr. Weiss had talked about the mistakes that

6    were done with his patient with the -- the CESI.  I think Ms.

7    McMillion talked about it briefly in her opening, the -- the

8    cervical epidural steroid injection, then in the caudal.

9        But when I asked Dr. Kufner, or sorry, when I asked

10   Dr. Mehta about the mistakes, I said, "Sir" -- 'cuz he had said

11   in his report that there was no -- that the patient was

12   complaining of low back pain and there was no reason, no

13   legitimate medical reason that Dr. Russo would have given her a

14   cervical epidural steroid injection, and we agree with that

15   point.  Back pain doesn't call for a shot to the neck.  And he

16   had placed that three different times, he had put it in three

17   different places in his report, and his final conclusion was

18   patient complained of low back pain, no reason to do a -- a --

19   a cervical epidural steroid injection.

20       He admitted those were substantive mistakes.  He

21   admitted that he had just found them days before trial.  I

22   think he said that he had spoken with -- with the -- the

23   prosecutor about it over the weekend, whatever.  I asked him,

24   "Well, okay, sir.  Then are you going to retract your opinion

25   that low back pain caudal epidural was -- was indicated here is

Case 2:18-cr-20800-SJM-APP   ECF No. 455, PageID.5196   Filed 07/18/22   Page 34 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

34

1   a good thing?"  And he said, "No, I still wouldn't have done

2   it."

3          I'm like, "Okay, tell me why."  And he said, "Well,

4   the -- the -- the science has progressed a little bit."  We

5   talked about Dr. Lax Manchikanti, that -- that well-known,

6   recognized expert.  I read the article that said caudal

7   epidurals for low back pain that has radicular findings

8   radiating down the legs is the perfect, safe, simple, easy,

9   best procedure to do.  He said, "Well, I know that doc -- I

10  know that doctor, he is an esteemed practitioner.  However,

11  that was 20 years ago.  The science has moved on."  And I was

12  like, "Okay.  Well, that's not really the Dark Ages.  People

13  are still doing caudal epidural steroid injections for low back

14  pain, right, sir?"  He said, "Yes, some doctors still do it."

15  I said, "Okay.  Well, then if some doctors still do it, that

16  means, you know, you're not saying those doctors are

17  criminals."  He said, "I would agree with that statement."  So

18  he was really hedging his bets on that one.

19          It's clear that -- and he also admitted that it is an

20  effective pain relieving technique.  It was just clear that it

21  wasn't what he would have chosen.  That doesn't show lack of

22  medical necessity.  I think he said that he would do the -- the

23  intralaminar.  It's a -- a -- Dr. Chiodo said that there's

24  pretty much two procedures that would be indicated for what Ms.

25  Morzynske came in complaining of.  You know, her MRI wasn't

1    horrible but it did show findings.  It did warrant, it did

2    verify or substantiate her pain.  And Dr. Chiodo said this was

3    a perfectly fine, perfectly reasonable procedure to do.  Caudal

4    epidurals are done all the time, he does them all the time.

5            Interestingly, when -- I forgot to mention this.

6    When I was speaking with Dr. Mehta about this, I pointed out

7    that "is it possible that you made your initial wrong finding

8    of the cervical -- talking about the neck injection based on

9    the fact that Ms. Morzynske's husband's chart was also included

10   in Michelle's file?"  The husband Lewis I believe his name was,

11   he had come to the Pain Center, obvious pill seeker.  They

12   kicked him out, didn't give him any medicine.  He was kind of a

13   jerk I think.  And his file, which included an MRI, cervical

14   MRI report, was included in the wife's file, Michelle's.  And I

15   asked him on cross, Mr. -- or Dr. Mehta, and he said that's

16   very possible or that's possible that that's why he made the

17   mistake he did.

18           So it's clear he was not very, what's the word,

19   reliable.  His -- his -- his opinion about why the -- the low

20   back radicular pain was -- was not warranting a caudal was

21   not -- not very credible, especially in light of Dr.

22   Manchikanti's and our expert Dr. Chiodo's opinion that it was

23   entirely reasonable, entirely proper.

24           I want to briefly address the conspiracy counts,

25   Count 1 and Count 43.  There was absolutely no evidence, others

1    have spoken about this, that any unlawful agreement existed to

2    practice in any certain way or to prescribe in any certain way.

3    There's no evidence of any agreement.  There's no evidence,

4    absolutely no evidence that Dr. Russo ever knowingly entered or

5    agreed -- into an agreement, that he agreed to practice in a

6    certain way or prescribe a certain way.  The government's

7    conspiracy theory is literally a conspiracy theory.

8           The only facts they showed or argued is that Dr.

9    Bothra had a meeting where he asked everyone to follow the law,

10   to reduce the opioids and adhere to the 2016 guidelines.  How

11   is that an illegal conspiracy?  It's not.  There were no

12   emails, text messages, voicemails, memos, conversations,

13   whatsoever showing the existence of any agreement, illegal or

14   otherwise, tending to show Dr. Russo was part of some meeting

15   of the minds relating to a conspiracy, no evidence.

16          The actual evidence presented shows only that

17   Bothra rec -- Dr. Bothra recommending to his staff and his

18   contract doctors that they follow the government and CDC

19   guidelines to reduce opioid use in the clinic's patients.  A

20   managing doctor advising the staff to work on reducing opioids

21   in patient care and to follow the recommendations of the

22   federal government and the Centers for Disease Control should

23   be praised by our government.  It's the right way to manage a

24   medical practice.

25          The evidence showed Dr. Russo was an independent

1    contractor, that the doctors were responsible to pay their own

2    taxes and receive no financial benefit from ancillary services

3    from prescribing them.  The doctors had no responsibility for

4    submitting billings for reimbursement other than the superbill

5    and that Dr. Bothra had a large and separate billing

6    department.

7            The evidence showed that contract doctors like Dr.

8    Russo were able to and did make their own treatment decisions

9    and that Dr. Bothra actually encouraged them to be independent,

10   to make their own individualized treatment decisions.  Dr.

11   Patel testified to this very fact.  Dr. Backos and Kufner had

12   their own patients, practiced in different buildings, exclusive

13   practices.  They too made their own treatment decisions with

14   their own patients.  One cannot conspire -- one cannot

15   illegally conspire to follow the law, but that is what is

16   actually being argued to you by the federal government in this

17   case.

18           Let's talk a little bit about prescriptions.

19           How am I doing on time, Judge.

20           THE COURT:  You have just about 15 minutes left.

21           MR. MARGOLIS:  Ouch.

22           THE COURT:  Maybe a little bit over that, but you're

23   close to an hour, Mr. Margolis.  Go right ahead.

24           MR. MARGOLIS:  Thank you.

25           The government makes great hay with the fact that

1  pain doctors working at a busy pain clinic prescribed a large

2  number of low dose opioids to chronic pain patients over the

3  years.  I've touched upon the long history of the treatment of

4  pain with opium and opioid derivatives.  Opioid therapy,

5  including chronic, long-term opioid therapy, is still

6  considered an effective tool to treat pain.  Every expert in

7  this case has testified to this including the government's

8  expert.  They still prescribe opioids to treat their own

9  patients' pain.  It is within the standard of care for doctors

10  to prescribe opioids for pain including chronic pain.  Why is

11  it now being deemed criminal for Dr. Russo and the others to do

12  it in their practice?  It is a legal and common pain treatment.

13  And remember, Dr. Russo, unlike Dr. Kufner and Backos, steered

14  clear of the high dose, long-term, long-acting opioids.  He

15  always stayed on the low end of the CDC's recommendation.

16  Norco contains Tylenol.  It's safe, much less addictive.

17         The government wants you to disregard the science,

18  the pain, the injuries and look at the number of pills, but

19  they provide you no context, they don't attempt to.  We know

20  the Pain Center treated over 20,000 patients across the various

21  providers.  Mr. Weiss described the -- we don't prosecute

22  McDonald's for all the hamburgers.  A pain doctor prescribes a

23  lot of medicine, but again, what is it -- where is the context,

24  what does it even mean?

25         Why were you not provided statistical analysis?  We

1   did not hear if this was high or low compared to other pain

2   clinics in the area regionally or nationally.  We did not hear

3   where these individual practitioners ranked in the State of

4   Michigan.  I guarantee you if Dr. Russo or any of the others

5   ranked at the top of the list for similar practitioners, you

6   would have been told, presented with a bar graph, but you were

7   not.

8            We did not even hear that that number of pills was

9   excessive in relation to the number of patients I don't

10  believe.  You all were just given numbers, nothing more, no

11  contextual evidence.  Without any context, those numbers really

12  don't mean anything except that the Pain Center saw a lot of

13  patients over the years, and we already knew that.

14           I want to briefly talk about Dr. Kufner and his

15  testimony and -- and remind or go back a little bit about the

16  relationship.  I think he was an important witness.  If you

17  recall, Dr. Russo and Dr. Kufner trained together at the

18  Moffett Cancer Center.  They became friends over the ensuing

19  years.  Kufner began working at the Pain Center in '14, 2014.

20  At the time Dr. Russo was in Grand Rapids at the -- the Javery

21  Clinic.  They both thought highly of -- of one another's

22  surgical skills or -- or -- or skills as a physician.  Dr.

23  Russo trusted Dr. Kufner.

24           Shortly after starting at the PC, at the Pain Center,

25  Dr. Kufner tried to get Dr. Russo to -- to come join him.  I

1    don't know if you all recall that.  He made a good sell to

2    Christopher at the time.  He said come across, and Dr. Russo

3    came over, he met with Dr. Bothra.  It was the first time Dr.

4    Russo had met with Dr. Bothra in 2014.  Again, Dr. Bothra made

5    a large and quite an impression on Dr. Russo.  He had a large

6    staff.  Dr. Bothra offered him a job on the spot, but Chris was

7    not ready to leave Grand Rapids yet.

8         Over the next year and a half Dr. Kufner was -- was

9    persistent.  He -- he -- he wanted Russo, Dr. Russo to join

10   him.  He didn't like -- Dr. Russo also didn't like Dr. Javery.

11   He was a jerk, he was controlling, he didn't let him have his

12   own independence.  So Chris, Dr. Russo eventually accepted the

13   offer in '16, 2016, and for the next year and a half Dr. Russo

14   and Dr. Kufner worked with one another at the Pain Center.

15   They both signed on as independent contractors as I've

16   discussed.  Dr. Kufner and Dr. Backos had their separate

17   practices.  They had their exclusive patients.

18        In '17 Dr. Kufner began having problems with Dr.

19   Bothra.  Dr. Kufner told Chris, told Dr. Russo that he and

20   doc -- that they were having problems.  Now, remember, Dr.

21   Kufner was his own man with his own practice.  He had his own

22   way of doing things.  He tended to prescribe higher doses than

23   the others.  This was known throughout the practice.  He was

24   also a solid physician, Mayo trained physician.  He too cared

25   about his patients.

1          The difference with Kufner was is that he was

2    practicing miles away in Eastpointe at a different building out

3    of the view of the other practitioners.  Dr. Backos too,

4    separate practice, separate building from these doctors.  They

5    ran their own exclusive practices.  Both were violating the

6    law.

7          Dr. Kufner kept a lot from his old friend, Dr. Russo.

8    Never told Dr. Russo that he had hired a lawyer to investigate

9    the Pain Center and Dr. Bothra.  Never told Dr. Russo that he

10   had filed that secret qui tam, qui tam lawsuit against Dr.

11   Bothra and the clinic.  Never told him about taking pictures

12   and notes and documenting the surgical center's regulatory

13   practices.

14         To be clear, Dr. Kufner did tell Dr. Russo he was not

15   happy and that he was thinking about leaving Dr. Bothra.  They

16   had this talk.  We had a little bit of this discussion on the

17   witness stand.  Dr. Kufner recalled some, not -- not all of it,

18   but the short of it was is that he kept Russo, Dr. Russo in the

19   dark.  Dr. Russo said, "Tell me what's going on."  Dr. Kufner

20   said, "It's just between me and Bothra, doesn't concern you."

21   So Chris knew, Dr. Russo knew he was leaving.  What he didn't

22   know is that it would impact him.  Remember what else Dr.

23   Kufner didn't tell Dr. Russo: that he was making the secret

24   recordings and working for the federal government.  He failed

25   to mention this fact when speaking with his old friend.

Case 2:18-cr-20800-SJM-APP   ECF No. 455, PageID.5204   Filed 07/18/22   Page 42 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

42

1          And remember, I talked about this in opening but I
2    think it's important, Dr. Kufner had convinced Dr. Russo to
3    uproot his life, change his career, move from one side of the
4    state to the other, and he kept all his plotting secret.
5          Dr. Kufner came to testify.  You heard him, you heard
6    him admit to the betrayal of his old friend.  It was powerful
7    testimony that he gave.  He admitted to his breach of trust.
8    He admitted his self-interest, his powerful desire to avoid a
9    lengthy prison sentence for his illegal conduct he admitted to
10   doing.
11         The most poignant part of his testimony to me I
12   believe or the most poignant part of his testimony was his
13   admission that he kept Dr. Russo in the dark, that he kept all
14   those secrets from Dr. Russo because he wanted to protect him.
15   Do you remember that testimony?  Think about that for a second.
16   If your good friend is part of some illegality or -- or your
17   agreement or conspiracy to violate the law, you have no reason
18   to protect him.  He's already in on it with you.  Dr. Kufner
19   kept his activities secret.  He did protect Dr. Russo.
20         The other doctor who testified was Dr. Backos.  We
21   don't have much to say about him and he didn't have much to say
22   about Dr. Russo.  Like Dr. Kufner, he worked in a different
23   building.  Unlike Dr. Russo, Backos was not a pain specialist;
24   he was an addictionologist.  He was with Dr. Bothra in the Pain
25   Center since 2012.  He -- Dr. Russo didn't arrive till 2016.

1    Backos pled to crimes that he committed in 2014, two years

2    before Dr. Russo even joined the practice.  Dr. Backos also

3    pled to unlawful prescribing, one individual count, not

4    conspiracy.  And Backos, like Kufner, was known to prescribe in

5    high doses.

6         The evidence showed that both Backos and Kufner had

7    histories of unlawful drug use and problems with their

8    licenses.  It is not surprising they both pleaded guilty to

9    crimes they alone committed.

10         We can't forget the young and ambitious Dr. Hersh

11   Patel.  He was the individual who was fresh out of his

12   residency when he joined the Pain Center.  This man was on a

13   mission to take the Pain Center down before he officially even

14   joined the practice.  He started taping Dr. Bothra, Edu and

15   Lewis immediately.  He never taped Dr. Russo.  At least there

16   was no evidence brought forth by him that he did.  This is an

17   interesting fact to me because actually maybe he did.  He was

18   there for three and a half months, they did work together on

19   occasion, yet we have no recordings of him talking to Dr.

20   Russo.  He recorded almost nine hours of time with Dr. Lewis

21   and Dr. Edu, he recorded Dr. Bothra, yet nothing with Dr.

22   Russo.  Or did he record Dr. Russo and just choose not to

23   provide it?  We will never know.  What we know is that he

24   provided no relevant evidence to offer against Dr. Russo.

25         I did say something in my opening about him that I

1  was a little wrong about.  You may recall Mr. Helms got up

2  and -- and objected and the judge let us talk about it, but I

3  was -- I was not completely accurate and I like to be credible.

4  I told you in opening that Dr. Patel told the agents when he

5  had called and said -- 'cuz he did call and say, "I saw a

6  different side of the clinic today and I am happy to find that

7  I'm able to practice medicine may own way."  That he did do and

8  that's an important point.

9          What I took from that before the evidence came in was

10  that he had said he was wrong and was expressing doubts, and

11  therefore, you know, he -- he was waffling back and forth.  I

12  was wrong.  The evidence did not show this.  I was actually

13  giving the guy too much credit.  He did say he saw a different

14  side and that he was happy to find that he was able to

15  practice, and he admitted the same when I cross-examined him.

16          Remember he said he was free to prescribe how he

17  wanted, free to not prescribe Norco or opioids at all.  He said

18  he was free to threaten and dismiss patients as he saw fit.

19  Oh, he was -- that was when I was questioning him about --

20  remember he was threatening those patients with arrest.  He

21  threatened that 72-year-old lady, which was -- was not very

22  nice.

23          But if what Dr. Patel said is true, that Dr. Bothra

24  allowed -- that everybody had their own ability to be

25  independent, make their own treatment decisions, prescribe as

Case 2:18-cr-20800-SJM-APP ECF No. 455, PageID.5207 Filed 07/18/22 Page 45 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

45

1    they wanted, kick out as they wanted, threaten with

2    incarceration as they wanted, then that evidence given by Patel

3    in the midst of his cooperating with the government goes to the

4    heart of the government's conspiracy counts.

5            Dr. Patel's testimony was all over the board. He

6    defended the prescription to Henderson Butler but not the

7    legitimate pain patients he saw. He told you he didn't quit

8    because he was worried about breaking his contract with Dr.

9    Bothra, yet this former NYU chief resident also told you he had

10   no problem handing out Norcos illegally. It made no sense. It

11   was completely unreliable. Dr. Patel was only concerned about

12   Dr. Patel and the money he can make, the doctors he can take

13   down and make a name for himself. This is what his ambitious

14   actions and his testimony revealed. He was the most biased

15   witness in the entire case. He did provide us that kernel,

16   however, that the doctors at the Pain Center had their freedom

17   and independence to practice as they saw fit.

18           THE COURT:  Okay, sir.  We better start wrapping up.

19           MR. MARGOLIS:  Thank you, Judge.

20           THE COURT:  Yep.

21           MR. MARGOLIS:  The role of the jury, I will conclude

22   with that.  The Court is going to instruct you on the law.

23   It's vitally important that you follow it.  Your biggest role

24   here with Dr. Russo in my humble opinion is to evaluate the

25   evidence against him individually.  What did the government

1  specifically prove to you about the charges he individually

2  faces about his care of patients?  Those are the questions I

3  would suggest that you ask, separate and distinct from your

4  consideration of the other men.

5        I told you in opening that this is a complicated

6  case.  I don't believe that's the case anymore.  We did deal

7  with unusual and arcane subject matter to be sure, but a lot of

8  this is just simple, plain old common sense.  If you find

9  yourself struggling to find the evidence, then you found your

10 answer.  If you find yourself searching for support of the

11 government's claims, then you already know you have strong

12 doubts.  Maybe you start by asking yourself what did the

13 government tell you their evidence would prove to you?  Did his

14 three bucket fraud theory hold up?  Did they meet all their

15 promises to you?

16       Please also remember that much of the evidence

17 presented had nothing to do with Dr. Russo.  There was very

18 little evidence actually relevant to him, his charges presented

19 in this case.  Many of the witnesses, most maybe, I asked no

20 questions to because they said nothing about Dr. Russo.  You

21 have no recordings or in the room accounts of Dr. Russo's care

22 from any non-patient witness, and there was only one actual,

23 maybe two, patient witnesses that testified.

24       Think about his late arrival to the practice, his

25 extended leave due to surgeries.

Case 2:18-cr-20800-SJM-APP   ECF No. 455, PageID.5209   Filed 07/18/22   Page 47 of 49
Jury Trial Excerpt: Volume 24 • Friday, June 24, 2022

47

1      Think about why it was Dr. Kufner kept his activities
2  secret from Chris and his desire to protect Dr. Russo.
3      There is a complete lack of evidence implicating Dr.
4  Russo in any crime.  It's not my job to provide it.  We have no
5  burden at all.  That's all on them, and it's a steep one.  They
6  had years to investigate and over a month of trial to prove
7  their fraud factory and unlawful prescriptions theories.  They
8  failed to meet their burden.  They didn't prove Dr. Russo
9  intended to do anything wrong or that he did do anything wrong.
10  They failed to prove he committed health care fraud or
11  unlawfully prescribed outside the scope of normal course of
12  practice.
13      And when I began I said -- I first said in a case
14  like this with these horrendous, serious crimes being charged,
15  you would expect the government to put forth overwhelming
16  evidence of Dr. Russo's individual criminality.  I told you
17  they would not be able to come close, and they didn't, not on
18  this evidence.
19      Do not convict Dr. Russo on the alternate reality
20  they ask you to accept.  Do not convict him on speculation and
21  false narratives.  The Pain Center was a legitimate business
22  practicing specialty pain care.  That's the reality Dr. Russo
23  lived in when he went to work every day.  Dr. Russo became a
24  doctor to serve our communities.  He continued on to become a
25  specialist in pain medicine because he had a passion for

1    treating complicated patients and he was good at it.  That's

2    the reality we offer you, that's the reality Dr. Russo lived.

3            You all have a tremendously important role in our

4    system.  It is too ensure justice.  Be just to Dr. Russo, be

5    fair.  His entire fate, his future, his freedom is in your

6    hands.  Do not convict an innocent man.  Dr. Russo is an

7    innocent man.  Please put an end to this awful, yearslong

8    nightmare for Dr. Russo and his family.  Thank you.

9            THE COURT:  Okay.  Mr. Margolis, thank you very much

10   for those remarks.

11           (Excerpt concluded at 2:55 p.m.)

12                         —  —  —

13

14

15

16

17

18

19

20

21

22

23

24

25

1          C E R T I F I C A T I O N

2          I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 48 comprise a full, true and correct transcript taken

7    in the matter of United States of America vs. D-1 Rajendra

8    Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5 Christopher

9    Russo, Case No. 18-20800, on Friday, June 24, 2022.

10

11                         s/Linda M. Cavanagh
                           Linda M. Cavanagh, RDR, RMR, CRR, CRC
12                         Federal Official Court Reporter
                           United States District Court
13                         Eastern District of Michigan

14

15

16

17

18   Date: July 14, 2022
     Detroit, Michigan
19

20

21

22

23

24

25