Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5517   Filed 02/10/23   Page 1 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3
       UNITED STATES OF AMERICA,
 4
                            Plaintiff,
 5     vs.

 6     D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
       D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
 7     D-4 DR. DAVID LEWIS
       D-5 DR. CHRISTOPHER RUSSO,
 8
                            Defendants.
 9     _____/

10                    JURY TRIAL EXCERPT: VOLUME 18

11            BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                    United States District Judge
12            Theodore Levin United States Courthouse
                    231 West Lafayette Boulevard
13                   Detroit, Michigan  48226
                     Tuesday, June 14, 2022
14
       APPEARANCES:
15
       For the Plaintiff          BRANDY R. McMILLION
16     United States of America:  BRANDON C. HELMS
                                   U.S. Attorney's Office
17                                 211 W. Fort Street
                                   Suite 2001
18                                 Detroit, Michigan  48226
                                   313-226-9622
19
       For the Defendant          ARTHUR J. WEISS
20     D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                   Suite 225
21                                 Farmington Hills, Michigan  48334
                                   248-855-5888
22

23                                 (Appearances continued next page)

24

25
```

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5518   Filed 02/10/23   Page 2 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

2

```
 1    APPEARANCES:  Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
          To obtain a certified copy of this transcript, contact:
24        Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                        Official Court Reporter
25           (313) 234-2616 • www.transcriptorders.com
```

TABLE OF CONTENTS

                                                              Page

Defense Witness:

DR. CHRISTOPHER G. GHARIBO

     Direct Examination by Mr. Rogalski              4
     Cross-Examination by Ms. McMillion             63
     Redirect Examination by Mr. Rogalski          121

EXHIBITS

Identification                          Offered    Received

NONE

1        Detroit, Michigan

2        Tuesday, June 14, 2022

3                    _   _   _

4        (Excerpt of proceedings: Testimony of Dr. Christopher

5        G. Gharibo)

6        (Proceedings in progress at 9:44 a.m., all parties

7        present, jury present)

8        THE COURT:  And next -- next witness from the

9   defense.

10        MR. ROGALSKI:  Your Honor, we call Dr. Christopher

11  Gharibo.

12        THE COURT:  Okay.  Very good.  Good morning, sir.

13  How are you?

14        THE WITNESS:  Good morning.

15        THE COURT:  Raise your right hand.

16          C H R I S T O P H E R   G H A R I B O

17  was called as a witness herein, and after being first duly

18  sworn to tell the truth and nothing but the truth, testified on

19  his oath as follows:

20        THE WITNESS:  I do.

21        THE COURT:  Okay.  Have a seat, relax in the chair.

22  Take your mask down or off so we can hear you.

23        And Mr. Rogalski's going to go ahead.

24        MR. ROGALSKI:  Thank you, Your Honor.

25                    DIRECT EXAMINATION

```
 1   BY MR. ROGALSKI:
 2   Q.  Dr. Gharibo, would you please spell and pronounce your
 3   name for the record please?
 4   A.  G-h-a-r-i-b-o.
 5   Q.  And that's pronounced Ga-reeb-oe [phonetic]?
 6   A.  Yes.
 7   Q.  Thank you.
 8          And first name is Christopher?
 9   A.  Correct.
10   Q.  Okay.  And what -- what is your vocation?
11   A.  My vocation is I practice in New York City.
12   Q.  And you're a practicing physician?
13   A.  Correct.
14   Q.  Okay.  Starting with your educational background in
15   medical school, would you identify your medical education for
16   us please?
17   A.  I went to Rutgers Medical School in Newark, New Jersey.
18   That was followed by one year of internal medicine at Robert
19   Wood Johnson University Hospital in New Brunswick, New Jersey.
20   That was followed by three years of anesthesiology residency at
21   New York University in Midtown New York.  That was followed by
22   one year of Pain Medicine Fellowship in Philadelphia.
23          THE COURT REPORTER:  Excuse me, Doctor.  Could you
24   maybe sit back and a little away?
25          THE WITNESS:  Yeah.
```

1          THE COURT REPORTER:  You can push the microphone a

2    little back.  You've got a good strong voice so there's a

3    little feedback.  Thank you.

4          THE WITNESS:  Sure.

5    Q.  Doctor, are you board certified in any particular

6    specialty?

7    A.  Yes.

8    Q.  When did you become board certified?

9    A.  '96, '97.

10   Q.  In what specialties?

11   A.  Anesthesiology and pain medicine.

12   Q.  And pain medicine.

13          Is your education and training in pain medicine, does

14   that also involve interventional pain medicine?

15   A.  Yes, it does.

16   Q.  Okay.  Are you board certified in interventional pain or

17   is it -- is it a pain medicine board certification?

18   A.  It's a pain medicine board certification.

19   Q.  Okay.  And that encompasses interventional pain management

20   as well, correct?

21   A.  Correct.

22   Q.  Okay.  What are the requirements to become board certified

23   in pain management?

24   A.  Pretty much what I went through in my training, a

25   successful completion of your residency as well as your

1   fellowship.  Subsequent to the anesthesiology residency you got

2   to take a written exam and an oral exam.  Once you pass those,

3   after you've completed your pain fellowship, you become

4   eligible for the pain medicine board certification which is a

5   written exam.

6   Q.  And in the scope of your education and training leading up

7   to your board certification in pain management, can you

8   identify the types of procedures you would have learned and

9   performed in the course of your education?

10  A.  Yes.  So I went to Philadelphia for my fellowship, and at

11  Jefferson we were highly interventional.  It was a model where

12  we pretty much practiced the whole range of pain medicine, and

13  a good part of that was interventional pain medicine, and what

14  I mean by that is largely injections for pain control.  So that

15  ranges from, let's say, muscular injections that we call

16  trigger point injections; other peripheral joint injections

17  otherwise known as hips, knees, shoulders, different small

18  joints of the body; and then spinal injections such as, for

19  example, epidural steroid injections, lumbar facet injections,

20  that is a little joint in the spine, for example, injection of

21  these joints on the back of the back on each side; nerve

22  ablative procedures such as radiofrequency ablation; different

23  types of approaches into the spine from the side or from the

24  middle for sciatica or pinched nerves; variety of implantable

25  technologies such as peripheral nerve stimulation or spinal

Case 2:18-cr-20800-SJM-APP  ECF No. 483, PageID.5524  Filed 02/10/23  Page 8 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

8

1  cord nerve stimulation where leads are placed into the spinal

2  canal and they provide electrical signals to the back of the

3  spinal cord to block the pain; and other similar interventional

4  technologies such as, for example, drug infusion systems that

5  infuse drugs into the spinal canal.

6  Q.  Doctor, where do you currently practice?

7  A.  I practice at New York University.

8  Q.  Okay.  And what position do you hold at New York

9  University?

10  A.  I'm the Medical Director of Pain Medicine for NYU Langone

11  Health.

12  Q.  And what does that -- as a medical director, what does

13  that entail you to do?

14  A.  We have multiple sites in the New York State area,

15  reaching out to Brooklyn and around the city itself.  We have

16  about 15 faculty and about 10 nurse practitioners, residents

17  and fellows to provide musculoskeletal and nerve pain care on

18  an outpatient basis as well as covering the hospitals of the

19  NYU system within the city and outside of the city.

20      I'm responsible for providing clinical coverage and

21  also compliance, JCAHO inspections or Department of Health

22  inspections and other inspections that may occur; any

23  legislation that may come up from New York State or federally

24  that we need to comply with; policy and procedure that aligns

25  with regulations and laws; communication with different parts

1    of NYU, other directors, other faculty, pain and non-pain

2    faculty; development of patient education materials; and just

3    pretty much the whole spectrum end to end as it pertains to

4    pain management.

5    Q.   In addition to what sounds to be your clinical and

6    administrative functions, do you hold any academic functions?

7    You mentioned faculty.  Are you also involved in academia?

8    A.   Yes.

9    Q.   And what's your role in academia?

10   A.   My academic title is Professor of Anesthesiology,

11   Perioperative Care and Pain Medicine within NYU School of

12   Medicine as well as Professor of Orthopedics within the same

13   school.

14   Q.   What percentage of your responsibilities is academic

15   versus clinical and administrative, if you can break that down?

16   A.   It's -- the clinical part between teaching and clinical

17   care, they're really one in the same, there's a lot of overlap

18   there.  The administrative part tends to vary quite a bit

19   depending on what's going on, if there's a new legislation or

20   for getting inspected.  So it -- I'm predominantly clinical by

21   far.  Probably about 90 percent of my week is spent on clinical

22   duties, and if there's something else going on, if there's a

23   meeting, some other time I need to set aside, it can drop to

24   where I may block out a week, for example, where I may do no

25   clinical work at all during that time.

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

1   Q.   Are you involved in any professional associations?

2   A.   Yes.

3   Q.   What associations are those?

4   A.   I'm a part of American Society of Regional Anesthesia and

5   Pain Medicine, American Society of Interventional Pain

6   Physicians.  I am the First Executive Vice-President of the

7   National Society.  I'm the past President of Eastern Pain

8   Association which covers the eastern half of the country.  I am

9   the past President of New York State Society of Interventional

10  Pain Physicians.  I'm a member of International Association of

11  Regional Anesthesia and I'm a member of American Society of

12  Anesthesiologists.  And there are probably a couple of others

13  there too.

14  Q.   And do you publish educational publications in your role

15  with these organizations or in your role as an academic?

16  A.   Yes.

17  Q.   And can you just give us an idea of the type of

18  publications that you've -- or authored or types of journals

19  that you've published in?

20  A.   Most of my publications have focused on appropriate opioid

21  therapy.  That's been something that I've contributed to pretty

22  much my whole career, over about 20, 25 years, both in the --

23  any post-op setting, the subacute setting, as well as chronic

24  opiate setting.  And I sort of -- I sort of grew up in the --

25  you know, the last 20, 25 years or so I got to see the whole

1  spectrum of different opinions on chronic opiate therapies
2  published on that, including contributing to guidelines.  I
3  published on -- on intervention substantially, including
4  contribution to interventional pain medicine guidelines,
5  mechanisms of injury, appropriateness of interventions,
6  especially as it applies to spinal injections, and -- and what
7  the appropriate approach should be and what the current
8  understanding is as far as their indications, safety,
9  mechanisms of injury and whatever you're looking to get out of
10 them.
11 Q.  You've mentioned that you've published or you've
12 participated in the publication of guidelines.  Which
13 guidelines are those?
14 A.  Chronic opiate therapy guidelines and some inter --
15 interventional pain guidelines as well.
16 Q.  On behalf of which organization?
17 A.  American Society of Interventional Pain Physicians and a
18 couple of other organizations there as well.
19 Q.  Okay.  Have you ever been retained previously to render
20 opinion in a court proceeding?
21 A.  Yes.
22 Q.  Can you estimate -- well, can you tell us under what
23 circumstances you've been retained to render opinion in court
24 proceedings?
25 A.  The circumstances have almost always been is this within

1   the standard of care, is this appropriate or not appropriate.

2   The circumstances have come up through managed care

3   organizations have sent me records to review, hospitals have

4   sent me sometimes dozens of records to review, a lot of medical

5   malpractice types of cases both on the sides of patients as

6   well as physicians or nurses.  I've -- I've presented -- I've

7   been on behalf of the government on both the, you know,

8   plaintiff's side and supporting the government as well.  There

9   have been some criminal cases that I've testified in on both

10  sides.

11  Q.  Okay.  And -- and in federal court as well?

12  A.  Yes.

13  Q.  And state court?

14  A.  Yes.

15  Q.  Okay.  Can you approximate the percentage of times you've

16  testified for the government versus the defense?

17  A.  I think most of my government testimony, government case

18  testimony has been on -- now, government is defined by state

19  government as well because sometimes -- and city government

20  too.  I've been on the side of the government most of the time.

21          MR. ROGALSKI:  Your Honor, I tender Dr. Christopher

22  Gharibo as an expert.

23          THE COURT:  Okay.  All righty.  Ladies and gentlemen,

24  as I instructed you earlier in the trial when the United States

25  presented Dr. Mehta, this Dr. Gharibo is here and has the

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5529   Filed 02/10/23   Page 13 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

13

 1   credentials that Mr. Rogalski just established to help you

 2   understand some of the issues in the case because of his

 3   knowledge, training and -- and expertise.  Remember, he is not

 4   familiar with the facts of the case in a firsthand manner.  He

 5   is here to evaluate the facts of the trial and give his -- you

 6   his opinion on them, and you can take them as such and weigh

 7   his credibility as you would any other witness, okay?

 8             All right.  Thank you, Mr. Rogalski.  Go right ahead.

 9             MR. ROGALSKI:  Thank you, Your Honor.

10   BY MR. ROGALSKI:

11   Q.  Doctor, in preparation for your testimony today, what

12   materials have you reviewed?

13   A.  I've reviewed medical records as provided by -- by

14   counsel; I reviewed video recordings; I reviewed variety of

15   different legal documents, interview documents, expert reports;

16   and that's the range,

17   Q.  Okay.  You're being compensated for your testimony today?

18   A.  Yes.

19   Q.  And identify for the Court what you're being compensated.

20   A.  It's $6,000 per court day.

21   Q.  Okay.  With regard to the concept of pain, how do we --

22   how do we define pain medically, how do you define pain?

23   A.  Pain is very complex.  There's a emotional component to it

24   and then there's a medical component to it.  The medical

25   component is divided into what International Association for

1    the Study of Pain calls nociceptive pain versus neuropathic

2    pain.  Now, what that means is nociceptive basically means

3    inflammation, arthritic pain, musculoskeletal pain, any part of

4    the body that degenerates, that inflames, such as surgery, for

5    example, or after you get your knee replaced, you know, six

6    months out you may have some knee pain.  That is structural

7    pain, musculoskeletal pain.  So that's nociceptive, pain of

8    aging pain of wear and tear, pain of narrowing of an area, pain

9    of narrowing of a joint.

10        And then the other medical component is neuropathic

11   pain which basically means nerve pain.  Nerve pain can be, for

12   example, trigeminal neuralgia, sciatica, also known as

13   lumbosacral radiculopathy, pain from the back down the leg,

14   pain down the arm due to pinched nerve, acute herpes zoster,

15   postherpetic neuralgia, that's all nerve pain.

16        Now, what makes pain different than other medical

17   conditions is that it's also impacted by -- by context and by

18   our psychological state of mind.  So let's say if -- if --

19   let's say, you know, somebody gets injured on -- on the war

20   field let's say, they get shot in the hand, there's great

21   tissue injury, but they may not report much pain at all because

22   the psychological state of that circumstance provides

23   tremendous what we call descending inhibition from the brain

24   down.  That can completely block out the pain, suppress the

25   pain.

 1          Versus let's say I get a paper scratch, I'm copying

 2    some articles and I got to do a presentation the next day that

 3    I really don't want to do, and because I don't want to do the

 4    presentation, that paper scratch may really hurt quite a bit,

 5    much more than how much the soldier hurt when -- when they got

 6    their -- their shot in the hand.

 7          So it's subject to modulation by our brain, so that's

 8    the emotional component of pain.

 9          So there's some pain states that are highly

10    psychological like interstitial cystitis, abdominal pain of

11    unknown origin, or fibromyalgia, and there's some pain states

12    that are highly structural and neurological.

13          But the bottom line is that with chronic pain you

14    always have those three components.  In fact, if any of you

15    have chronic pain, there's always a -- a structural component,

16    almost always a structural component, arthritic component, and

17    as that imprints itself into the nervous system, there's a

18    neuropathic component.  And the third thing, the emotional

19    component, is dynamic and it's always there as well because our

20    emotions change all the time every day with -- from hour to

21    hour sometimes.  So it's sort of a -- it's a multidimensional

22    experience and you're trying to address all those three

23    components.

24    Q.  So in the treatment of those three different types of

25    pain, do you approach them differently or do you approach them

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5532   Filed 02/10/23   Page 16 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

16

1    all at once?  How do you go about treating neuropathic pain,

2    nociceptive pain and then the psychological pain, how do you

3    deal with that as a practitioner?

4    A.  You approach them differently and in many ways all at once

5    as well.  And part of what you try to gather is as you're

6    talking with the patient, you begin to get a sense just based

7    on their body language, the words they use and how they respond

8    to your questions, and whether if the pain is positional,

9    mechanical where some things make it better such as walking

10   and -- makes it worse but lying down makes it better, for

11   example.  That type of history that you get from the patient,

12   including how they got up from the chair in the waiting room,

13   how they walked to the exam room, how they sit, their sitting

14   tolerance, standing tolerance, their preferred position while

15   they're being interviewed, gives you some idea of the

16   musculoskeletal nature of the pain.

17        The history also gives you some idea of the

18   neuropathic nature of the pain.  You begin to form what's

19   called a -- sort of a -- what we call a differential diagnosis,

20   the list of possibilities, if you will, that can produce this

21   pain condition because they come together based on your

22   observations, the history and the physical exam.

23        And the psychological part, it -- you begin to pick

24   up on the affect of the patient.  You get a past psychological

25   psychiatric history, you take a look at their past medications

 1    and current medications that are psychoactive in nature, and

 2    then you try to see, so what's the -- where -- where's the home

 3    run here or the double or the triple in that what can I -- what

 4    should I target first?  Is this something that's going to get

 5    better with a knee injection and then everything will be fine,

 6    or is there something else going on, you know, his son just

 7    died in a car accident, let's say, two weeks ago, and I'm sure

 8    that's really affecting him quite a bit.  There may be a great

 9    amount of psychological overlay as a result of that.

10           So that comes out during the history, the physical

11    exam, and as you put that together, you get to put the focus

12    on.  But sometimes I think in the end stage pain with complex

13    pain, especially in -- in patients in pain practices, those

14    patients are presenting in a very dynamic fashion from visit to

15    visit where you really got to sort of approach all three of

16    them, but you really got to get at the source because a lot of

17    the psychological part is secondary to orthopedic disease,

18    neurological disease, failed back surgery syndrome, narrowing

19    of the spinal canal, so you got to -- you got to reduce that

20    substrate.  You got to reduce those pain generators and pain

21    signals in the periphery and -- and in the -- in the spinal

22    cord.

23           And once you begin to sort of decrease the barrage of

24    nerve injury impulses that are getting to the brain, patient

25    begins to feel, hey, I can do more, I can condition myself

1   better, I can exercise, I can maintain a friendship or marriage

2   or job or whatever it may be, and then the anxiety and the

3   depression begins to trend better as well.

4           So it's quite a process.  But getting at the source

5   of the pain, a good diagnosis is very important.  And

6   stabilization of the pain as quickly as possible before the

7   patient loses trust and comfort in you is very important

8   because from the time these patients walk in, you really have a

9   limited amount of time.  If you're not getting anywhere

10  within -- let's say within two months, three months, they're

11  going to go somewhere else, so you've got to kind of just

12  control the pain as best as you can and then trend better.

13  Q.  In -- in the treatment of pain, do you deal with acute

14  pain versus chronic pain differently?

15  A.  Yes.

16  Q.  And so can you distinguish how you would approach an acute

17  pain situation versus a chronic pain situation?

18  A.  So we would distinguish that based on the history where

19  the acute pain circumstances are very simple in a way.

20  Somebody, let's say, just broke a bone, they broke their wrist.

21  Well, that's a clear diagnosis, there's an expected healing

22  timeline for that.  Post-op patient, for example, is another

23  example of that where we know what's causing the pain versus in

24  chronic pain it may be a process.  Sometimes it is clear but it

25  also may not be clear.  It may require a number of visits to

1   make it more clear, but it also tends to be variable from visit

2   to visit.

3   Q.  So would it be fair to say that in your practice as a pain

4   management practitioner and -- and also involved in the

5   treatment utilizing interventional pain techniques, would it be

6   geared more toward the chronic pain as opposed to the acute

7   pain?

8   A.  Definitely more chronic pain.

9   Q.  Okay.  So let's talk about the patient evaluation when a

10  patient first presents to you with chronic pain.  What does the

11  evaluation consist of?  I think you touched on it a little bit

12  but I'd like to get some clarity.  When a patient presents to

13  you with a -- chronic pain symptoms, how would you go about

14  dealing with that patient?

15  A.  It start -- it starts from the time that they're called in

16  the waiting room and how -- what they're doing, whether if they

17  have any assist devices on them such as a cane or a walker; how

18  they walk into the exam room; where they're at as you walk into

19  the exam room: are they sitting, are they pacing, are they

20  standing?

21          And then sometimes they'll be very clear, for

22  example, where there'll be a referral where I'm -- this doctor

23  sent you to me for -- for my back pain, for my sciatica, for my

24  neck and arm pain.  And sometimes it's not so clear: I'm here

25  for pain control.  So you kind of got to just dive in and sort

```
 1   out what's happening.
 2          And then the elements you're looking for, and it
 3   doesn't have to be all of these, but you sort of want to get a
 4   gist of what's going on with the patient with their pain.
 5   You're looking at the location of the pain and occurrence.  How
 6   did it start, was it spontaneous or did -- did something -- did
 7   an incident happen?  Did -- what makes it better and worse,
 8   what are the inciting and alleviating factors?  Is it
 9   positional, do certain positions make it worse and do certain
10   positions make it better?  Is it time of day dependent?  How
11   are you -- when you wake up in the morning, how do you -- how
12   do -- how is your pain as you get out of bed, as you change
13   positions out of bed, out of chair?  How are you a couple of
14   hours after you wake up, let's say close to noon?  How are you
15   at the end of the day?  And how are you when you lie down, when
16   you sit?  How -- how is your pain based on the weather, raining
17   versus a nice spring day?
18          So all those things do impact the diagnosis that we
19   reach, and that's what we try to gather in understanding is the
20   pain nociceptive or neuropathic, inflammatory or nerve?  So
21   nerve pains tends to be, for example, if I have pain down my
22   arm --
23          THE COURT:  All right.  All right.  All right.  All
24   right.  That's enough.  Next question please.
25   Q.  Doctor, would it be fair to say that part of your
```

1  evaluation of pain would involve just simply observing the

2  patient?

3  A.  Yes.

4  Q.  Not even laying hands on them?

5  A.  Correct.

6  Q.  Okay.  And then I would gather from your testimony a

7  component of your evaluation also involves laying hands on the

8  patient and doing palpation, touching the patient, poking the

9  patient.  Would that be fair?

10 A.  Yes.

11 Q.  Okay.  And you've indicated you go through this battery of

12 questions with the patient, and as a result of that, are you

13 able in all situations, all cases able to immediately come to a

14 conclusion as to what your treatment will be for that patient

15 or does this take some time?

16 A.  Not all cases.  It takes time.

17 Q.  Okay.  And so you might not be able to gather all the

18 information you need on the patient's initial visit, correct?

19 A.  Correct.

20 Q.  Okay.  And so the patient may need to come back on several

21 occasions for you to continue to work the patient up, correct?

22 A.  That's correct.

23 Q.  Okay.  And you're continuing to ask questions, you're

24 continuing to observe the patient, correct?

25 A.  Correct.

1    Q.   Okay.  Do you rely on the information that the patient is

2    telling you about their pain?

3    A.   Yes.

4    Q.   Okay.  And I've heard the term that a -- that pain is a

5    fifth vital sign.  Can you -- have you heard that before?

6    A.   Yes.

7    Q.   And can you elaborate on what that means?

8    A.   It's not a vital sign.  It's something that we experience,

9    but there's nothing vital about it but it's -- it's an

10   important signal that the body gives out.

11   Q.   Okay.  And is there a -- you know, a diagnostic mechanism,

12   can you put the patient in a machine and make the diagnosis of

13   pain, or is it really a subjective evaluation of the patient?

14   A.   It's -- it's mostly what the patient states and there's --

15   there's no machine to detect pain.

16   Q.   So you have to rely on what the patient tells you,

17   correct?

18   A.   Yes.

19   Q.   Okay.  Are you able to utilize other perhaps diagnostic

20   imaging to corroborate what the patient is telling you?

21   A.   Yes.  There are other diagnostic tests you can order to --

22   pretty much to see if it matches up with the patient's pain.

23   Q.   Okay.  And what -- what type of diagnostic tools would you

24   use to help corroborate what the patient is telling you?

25   A.   I can start with x-rays, for example, flexion/extension

1    x-rays.  It could be an MRI of a particular joint or of the

2    spine.  It can be a nerve test.  It can be interventional

3    diagnostic testing.  We do a nerve block on the area to see if

4    the pain is emanating from that area.

5    Q.  On an initial evaluation, how much time do you estimate it

6    would take you to do an initial evaluation?  If, let's say, I

7    were to come to your practice and complain of a chronic pain

8    condition, how much time would you spend with me on average?

9    A.  Patients come in through a huge range in terms of how much

10   time they require.  It could be 15 minutes to an hour.  It

11   could be simple pain to complex pain.

12   Q.  So it's going to vary based on the patient?

13   A.  Yes.

14   Q.  Okay.  And what about subsequent evaluations, is there a

15   quantity of time that you would spend on subsequent evaluations

16   or does it vary?

17   A.  It varies.  Again, if the patient is all better, it could

18   be as simple as ten minutes or it could be up to an hour again.

19   Q.  And in the evaluation of a patient, is -- is time a

20   determining factor, face-to-face time a determining factor or

21   are there other factors that would go into your initial

22   evaluation and subsequent evaluation?

23   A.  There are other determining factors.

24   Q.  Such as what?

25   A.  I mean just based on, for example, you may have gotten a

1    call from another physician.  You may have gotten another

2    diagnostic test that's going to play a role in how much time

3    you're going to spend with the patient.

4    Q.  So part of your evaluation, I think it's safe to say, is

5    occurring outside of the room?

6    A.  Yes.

7    Q.  Okay.  And it would involve time spent looking at the

8    chart before you saw the patient?

9    A.  Repeat.

10   Q.  Would the time involve looking at the patient's records

11   before you saw the patient?

12   A.  Yes, it would involve that.

13   Q.  And then the face-to-face time that you're spending with

14   the patient?

15   A.  Yes.

16   Q.  And then after the patient leaves the exam room, are you

17   continuing to evaluate the patient?

18   A.  It depends on what turns up.  If you're contacted, if --

19   if a -- if a nurse contacts you, if a new study becomes

20   available, if a phone note comes in, you would go back to the

21   patient's chart and you're not face to face.

22   Q.  Okay.  So it's not just the face-to-face time that's part

23   of the patient evaluation, regardless of whether it's an

24   initial evaluation or a subsequent evaluation, would that be

25   fair?

1   A.   Correct.

2   Q.   Okay.  Once you've made a diagnosis let's say involving a

3   chronic pain situation, what are the tools that are available

4   to you to treat that chronic pain?

5   A.   We can subdivide them into nonpharmacological, so that

6   could be, for example, acupuncture, massage, physical therapy,

7   bracing.  Those are all nonpharmacological measures to capture

8   the pain and they're very important.  It could be psychological

9   measures, biofeedback, relaxation.  It really depends on what

10  the patient's personality and desires are towards, so you kind

11  of get a feel for that as you're -- as you're talking with the

12  patient.

13          Of course, some patients want to go completely sort

14  of the nonpharmacological and noninterventional route and

15  actually do very well because it's something in their -- in

16  their heart and -- and so they want to do it and they're

17  motivated to do it.

18          Then there are the nonopioid tools, nonopioid

19  medications, so that could be over-the-counters including

20  patches, creams, hot/cold remedy over the counter, it could be

21  antiinflammatories, muscle relaxants, antidepressants, which

22  have some 40, 50 years of experience in treating chronic pain,

23  and other similar nonopioid medications.

24          Then there are opioid medications, very common.  It

25  starts with, for example, Tylenol No. 3, tramadol, Percocet

1    Vicodin, OxyContin and -- and so on, it just goes on and on.

2            And then there are interventions, which are

3    procedures, that can help both diagnostically and

4    therapeutically.

5    Q.   Okay.  As you determine whether you're going to have a

6    nonpharmacological approach or a pharmacological approach or

7    interventional approach, are there benefits and risks that you

8    have to weigh in evaluating which treatment modality that

9    you're going to use?

10   A.   Yes.

11   Q.   And what -- what does that analysis consist of?  Let's

12   start with just the non-opiate medications.  As you look at

13   whether to use, you know, drugs like Motrin or Tylenol or you

14   mentioned the antidepressants, what are the factors that go

15   into that?

16   A.   Yeah.  So in medicine, everything has a -- nothing is

17   free.  What we look at is efficacy, safety, tolerability and

18   patient convenience.  So efficacy means how effective is it and

19   how quickly is it going to capture the pain.  If I do a nerve

20   block, I can capture the pain really quickly and build

21   confidence for the patient and give them a ray of hope.

22           Then there's safety.  For example, you know, just

23   on -- on Monday on last week I have patients coming on very

24   high doses of antiinflammatories.  They were taking Ibuprofen

25   800 milligrams, so that's literally like a four-, five-hour

1   medication, and they're taking a very high dose of that.

2   And -- and the problem with that is that although it's very

3   efficacious, when you take Ibuprofen 800 for bone pain, it's

4   going to work really well, but safety-wise it's not good

5   because there's short-term risk of -- of a heart attack,

6   there's long-term risk of heart attack, bleeding, kidney

7   disease and so on.  So there's good efficacy, poor safety.

8           But tolerability-wise, are they -- do they get

9   nauseous, dizzy?  No, it's pretty clean.

10          So efficacy, safety, tolerability, and then there's

11  patient convenience.  Well, taking Ibuprofen 800, you know,

12  four times a day is not very convenient.  But if I do -- let's

13  say if I do a nerve block and -- and that gives them three

14  months of pain relief, well, that's convenient.

15          So there is that range there.  And there's

16  something -- we tend to favor the nonpharmacological and

17  capturing of the pain.  So that's where, for example, with

18  bracing actually, you can kind of control the pain rapidly

19  because you'll stabilize the spine.  With nerve blocks you'll

20  stabilize the spine.  And in terms of, you know, safety of it,

21  something nonpharmacological is going to be safe and you're not

22  also subjecting yourself to daily medication intake.

23  Q.  You mentioned in the nonpharmacological realm bracing,

24  physical therapy.  How -- are those effective tools in -- in

25  the treatment of chronic pain?

1    A.   Very much so.  They're desirable tools.

2    Q.   Why, what makes them so desirable?

3    A.   Well, it -- it's -- it's huge.  I mean certainly -- I mean

4    it depends on the path of physiology here, but physical therapy

5    allows you to recondition your muscles and your bones and trend

6    in the right direction: good posture, good body mechanics,

7    straighten yourself out.  It may not help immediately, it may

8    hurt while you're going through that physical therapy, but as

9    you go about doing that, you're going to trend better.  You're

10   going to recondition your body, you're going to recruit more

11   muscle fibers, build up muscle, correct your posture, and all

12   of a sudden you're going to optimize how you can feel.

13          And with bracing you're going -- you're going to

14   control the instability, for example.  So if you're picking up

15   signs of instability on the history and the physical exam where

16   you do some provocative maneuvers and it causes narrowing on --

17   on the side of the spine and patient reports pain down the leg,

18   that's probably due to spondylolisthesis.  That basically means

19   slippage of one body over another, for example at L5-S1.  And

20   if that pinches this nerve that is exiting due to that motional

21   instability, you can stabilize that by just wearing some type

22   of a -- a -- it's a structure that stabilizes the spine, and

23   all of a sudden you have good pain control without medications.

24   Q.   So you also mentioned that the opioids are another part of

25   the tools in your toolkit to treat chronic pain.  Are opioids

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

```
 1   an effective tool?
 2   A.   Yes.
 3   Q.   And are -- do you use them in your practice?
 4   A.   Yes.
 5   Q.   Are they widely used in the chronic pain pain management
 6   practice?
 7   A.   Yes.
 8   Q.   Okay.  And then you spoke about interventional tools as
 9   well, and can you elaborate on the type of interventional tools
10   that you utilize in treating chronic pain?
11   A.   I pretty much did a whole range from peripheral injections
12   like trigger point joint injections to spinal injections like
13   facets, epidurals, including implantable such as spinal cord
14   stimulators.
15   Q.   Are these treatment modalities mutually exclusive of each
16   other or can they be used in conjunction with each other?
17   A.   They're used in combination.
18   Q.   Okay.  So you'd have a patient on opiates, you'd have them
19   on -- receiving interventional procedures, you might have them
20   wearing a back brace too, correct?
21   A.   Correct.
22   Q.   Okay.  With the opioids, what are some of the drawbacks
23   that you experience in treating chronic pain?
24   A.   Opioids have been mixed in terms of how effective and how
25   problematic they can be.  Basically they can provide some
```

1    degree of comfort in the immediate future and chronically

2    speaking as well, and there are plenty of patients that are

3    fine on chronic opioid maintenance and they tend to be

4    functional patients.  They're -- they stay employed, their --

5    you know, their social life, their marriage is together,

6    they're able to care of their kids, so that's great.  Then

7    that's fine, that's perfectly okay to prescribe to.

8              But they clearly have a downside in terms of the --

9    the -- the psychoactive potential of opioids, especially the

10   higher end opioids like, for example, OxyContin that comes up

11   to 80 milligrams in one pill or hydromorphone or Dilaudid or

12   prescription fentanyl products.  They can provide good

13   immediate control actually, but they also provide a significant

14   excitatory effect where all of a sudden the individual feels

15   like they can do anything and then four hours later they can't

16   do anything, that crash, and all of a sudden you got to take

17   another one to feel again the same way where you can do

18   anything.  But the problem is if you feel like you can do

19   anything, that there's a problem with that.  And the patients

20   begin to enjoy that excitatory feeling.  They begin to seek it,

21   they become dependent on it, they get addicted to it, they got

22   to take higher and higher doses to maintain it, so it just goes

23   downhill from there, and then they begin to add other things to

24   it.  And that's what we're dealing with sort of across the

25   country now that we're getting a lot better control over but

```
 1    there's still some work to be done.
 2    Q.  So how you try to get control over the use of opiates in
 3    your patients?  Are there different medications that you
 4    gravitate toward that -- in order to stay away from those
 5    highly potent opioids?
 6    A.  Yes.
 7    Q.  And what would those medications be?
 8    A.  I think one of them is just reducing the risk of the
 9    opioid itself.  So if somebody's getting -- like, there --
10    there's some red flags out there.  For example, oxycodone 30,
11    it may be appropriate in -- in a very small subset, but it's --
12    generally it's -- it's about a four-, five-hour medication.
13    It's a very high dose.  That's -- that's six times more than a
14    regular oxycodone, which is Percocet 5.  So you want to take
15    the patient off of that.
16              There are other concomitant medications that your
17    patient may be on such as, for example, muscle relaxants like
18    Soma, or patients may be on benzodiazepines like Valium or
19    Ativan.  So you kind of want to take them off of that or trend
20    them off of that.
21              And you can't do it too rapidly either because of
22    what we're seeing now is that if you -- if you really sort of
23    do it too rapidly, you run into other problems like emotional
24    decompensation, suicide or, you know, hurting somebody else and
25    so on.
```

1          So it's -- it's almost like a -- it's -- it's quite

2     a -- quite a conundrum to try to -- to do that and it's not

3     hundred percent.  So what you do is you try to take away the

4     psychoactive stuff and trend it better because that's where the

5     mind can potentially lose control.

6          So that's where interventions come into play where

7     20-minute procedure provides 30, 50, 80 percent pain reduction.

8     Spinal stabilization through a bracing or abdominal binder come

9     into play where you can capture the pain: uh-huh, hey, this is

10    really controlling my back, I feel good.  That's extra core.

11         And then it becomes a process that sort of carries

12    itself out where you bring down the medications, but you also

13    got to make sure you don't do too many injections either.  So

14    you kind of got to balance that out, and one way to do that is

15    actually give injections that don't involve steroids.  So

16    epidural steroids, for example, yeah, they may be effective but

17    they may only work two months, and we're not going to do, you

18    know, six to ten a year obviously.  So we tend to gravitate

19    towards those that minimize or eliminate steroids such as facet

20    blocks with radiofrequency so that the body's steroid-free

21    because putting steroids in the spine have their own problems

22    like immunosuppression, affecting your hormonal releases, your

23    own hormone productions.

24         THE COURT:  All right.  All right.  The -- the only

25    thing he wanted to know was how to control opioid use in a

1    patient.

2              Go ahead, Mr. Rogalski.

3              MR. ROGALSKI:  Thank you, Your Honor.

4    BY MR. ROGALSKI:

5    Q.  In an effort to control opiate abuse in patients, what are

6    the tools that you would use or what are the medications that

7    you would use to try to control opiate abuse in patients?

8    A.  You prescribe nonopioids, you do injections, and you

9    maximize nonpharmacological therapies.

10   Q.  Might you use combination opioids that are mixed with

11   other non-opiate medications?

12   A.  Yes.

13   Q.  Such as what?

14   A.  That would be Vicodins, Percocets that contain a -- higher

15   doses of acetaminophen or Tylenol such that if somebody tried

16   to pulverize that or snort that, it's not as desirable because

17   350 milligrams of it is actually Tylenol and only 5 milligrams

18   of it are -- 7.5 milligrams of it is the opioid.

19   Q.  Would that include Norco as well?

20   A.  Yes.

21   Q.  Okay.  Again, because it has the combination of Tylenol

22   plus the opiate?

23   A.  Correct.

24   Q.  And that's less desirable to -- for patient abuse?

25   A.  Yes.

1  Q.  Okay.  In conjunction with your treatment of patients with

2  chronic pain and the use of opiates, do you utilize a narcotic

3  agreement in your practice with your patients?

4  A.  Yes.

5  Q.  And what's the role of the narcotic agreement?

6  A.  That is a patient education tool that some practices use,

7  that they can use to update the patient on once a year or more

8  or less frequently.

9  Q.  Okay.  And what -- what -- what does -- what does the

10  typical -- or in your case, what does your narcotic agreement

11  state, what -- what's the agreement that you are entering into

12  with your patients?

13  A.  That your treatment is a program, not so much a contract

14  but sort of a treatment understanding.  You have your

15  responsibilities that you're going to be compliant.  You're

16  going to go with the whole plan of care, nonpharmacological,

17  nonopioid and opioid.  You're going to report back to the

18  office.  You're going to follow up on the referrals and on the

19  diagnostic -- diagnostic studies that were ordered.  You're not

20  going to what the misuse abuse is, how that's defined.  You've

21  got to go with the prescription, what the prescription entails.

22  You're going to be tested.  That may be pill counts, urine and

23  so on.

24  Q.  Okay.  And what are the consequences if a patient were to

25  violate the narcotic agreement?

1    A.  I guess it depends.  Generally speaking, we tend to --

2    depends on the context and what the -- how it was violated.  I

3    mean if somebody was found selling it is different than if

4    somebody's found, you know, taking an extra pill.

5    Q.  And what if their -- let's say their urines come back

6    negative, what are the consequences, how do you deal with that

7    situation?

8    A.  Depends on the situation: when was the last time they took

9    it, when was their last visit, how long will it take for the

10   medicine to clear, the urine.

11   Q.  Okay.  So would it be safe to say that opioids have a

12   mainstay in the treatment of chronic pain?

13   A.  Yes.

14   Q.  Okay.  You're familiar -- are you familiar with guidelines

15   that have been published by the Centers for Disease Control?

16   A.  Yes.

17   Q.  And can you just generally tell us what those guidelines

18   are with regard to the use of opiates in conjunction with

19   chronic pain?

20   A.  Those guidelines are pretty much as I went over already:

21   combination care, a good diagnosis, biopsychosocial indication,

22   taking out the other high-risk nonopioids like Somas, Valiums

23   and so on, and keeping the doses on the lower end of the range.

24   I would say for pain practices, I would, generally speaking,

25   keep them less than 50, 60.  You can go up to 90-milligram

1    morphine equivalent, maybe 120, but certainly not beyond that.
2    Q.  So can you just describe -- we've had a lot of discussion
3    in this case about the morphine milligram equivalent.  Can you
4    explain to the jury the significance of what that is, what is a
5    morphine milligram equivalent, what's its relevance in pain
6    management?
7    A.  So -- so morphine is the anchor for the morphine milligram
8    equivalent, and that's what the CDC guidelines refer to based
9    on that unit, a morphine equivalent unit.  So -- so when CDC
10   states 30-milligram morphine equivalent, that basically means
11   20 milligrams of oxycodone, for example.  So whatever other
12   product you're using that's not morphine, convert it to
13   morphine to see what the CDC recommends.
14   Q.  And what does the CDC recommend generally that
15   practitioners try to stay within or under?
16   A.  Stay at less than 60; 90, 60 to 90, very individual.
17   CDC's pretty flexible in their recommendations, but keep it as
18   low as possible.
19   Q.  As low as possible.
20        So what you're trying to achieve, if I understand, is
21   trying to achieve the most lowest effective dose of opiate that
22   you can?
23   A.  Yes.
24   Q.  And that's what you strive for in conjunction with the use
25   of opiates in conjunction with chronic pain, correct?

1    A.   In conjunction with interventions and other things, yes.

2    Q.   Okay.  So once you endeavor to utilize opiates in your

3    practice, what are -- what's the physician's responsibility as

4    far as monitoring the patient that's on chronic -- chronic

5    opiate therapy?

6    A.   So the responsibility depends on the -- the overall

7    context.  There are concomitant diseases such as -- medical

8    diseases such as obstructive sleep apnea, cardiovascular

9    conditions where you are going to control the pain because pain

10   itself can be a significant stressor.  It can elevate the heart

11   rate, it could -- which increases the heart's oxygen

12   consumption and can put the patient at medical risk.  So you

13   kind of got to control that pain.  That's a medical

14   responsibility, the -- the medical safety of the patient.  But

15   there's the other end where if you give too much, then there's

16   also organ consequences like, you know, your heart, your

17   stomach, your kidneys and so on.

18           So it's -- it's -- it's a big balancing effort to

19   maximize physical and -- and social function without making the

20   patient sedated.  The -- the whole goal is to make you feel

21   like you, not that I have no pain but I'm not me.  So clean

22   pain control is very important and that's the responsibility.

23   Q.   So what -- now, we talked about the physician's

24   responsibility.  What about the patient's responsibility in the

25   use of opiates in conjunction with chronic pain, what are the

```
 1    patient's responsibilities?
 2    A.   Securely store the medicine so other people don't have
 3    access to it.  Take it as prescribed and go with the whole plan
 4    of care.  Like, for example, you -- you got to -- you got to
 5    get your diagnostic studies, you got to see your other
 6    physicians for other workup, rheumatological, surgical.  You
 7    got to go to physical therapy.
 8              And you got to do your part and you got to -- you got
 9    to give it time.  This is not something where you take a pill
10    and you're fine 45 minutes later.  You've got to give me couple
11    of months or longer to get where you want to be, and that's not
12    going to be perfect.  You got to -- you got to understand that
13    at some point things may never be perfect like how you were
14    when you were 20.  You'll have reasonable expectations.
15    Q.   Now, in conjunction with pain therapy overall, we've
16    talked about the use of bracing, physical therapy, correct, the
17    use of nonpharmacological tools, pharmacological tools
18    involving opiates and non-opiates.  You also mentioned the use
19    of interventional procedures.  Is it just -- you know, are you
20    using these in combination with each other or are you just
21    using one versus the other and seeing how physical therapy
22    might work or the medications, or are you really trying to use
23    all these different tools in conjunction with each other?
24    A.   Generally it's in conjunction, simultaneously.
25    Q.   So it's this multi -- I guess, for lack of a better term,
```

1   multimodal approach to treatment?

2   A.   Yes.

3   Q.   Would that be fair?

4   A.   It can be multimechanistic, multimodal or

5   multidisciplinary.

6   Q.   Okay.  And so when you talk about multi --

7   multidisciplinary, the use of physical therapists,

8   chiropractors --

9   A.   Yes.

10   Q.   -- the pharmacists perhaps, the physician, is the patient

11   part of this equation as well?

12   A.   Yes.

13   Q.   Yeah, okay.  And what is ultimately in -- when you're

14   involved in interventional pain therapy, now you've crossed

15   over from the pharmacological and the nonpharmacological

16   treatments, you've now recommended an interventional approach

17   to treating chronic pain, what's the mainstay, what's really

18   now the focus?

19   A.   What's the last phrase?

20   Q.   What's the focus, what's your --

21   A.   The focus is clean pain control without a psychoactive

22   effect and getting the patient -- giving the patient better

23   physical capacity as rapidly as possible that provides a

24   psychological boost and enables them to physical therapy and do

25   what they need to do.

1   Q.  So with regard to the interventional treatments, let's

2   talk about the different types of treatments that you have

3   available and what they do, how we distinguish them from one

4   another.  Let's say, what's the use of a rhizotomy versus a

5   caudal epidural spinal injection, what's the difference?  Is

6   one shot all the same or are there differences?

7   A.  They're -- they're quite a bit different.  They're

8   peripheral joint injections; that means outside of the spine.

9   So that's something -- just, for example, a greater trochanter

10  bursa injection at the hip is a peripheral injection, and a --

11  a piriformis injection into the muscle is a peripheral

12  injection.  So that's one category.  And -- and it can be quite

13  effective.  It can relieve sciatica.  All of a sudden you can

14  range your hip and cross your legs and stand better, lie on

15  that side and sleep better.

16          And then there's the spinal injections.  And spine is

17  a muscular, skeletal and a neurological structure.  There are

18  muscles all around us.  The yellow cord are the nerves, and the

19  rest, the white stuff, is the bone.  And there are different

20  structures here that can hurt.  These are the facet joints, but

21  you can put cortisone in them or you can do nerve blocks.

22  These are the nerves; you can do epidurals on them.  It depends

23  on the diagnosis.

24          So what's the prevailing diagnosis?  And often it's

25  more than one diagnosis.  You go after the one that you think

1    is causing patients significant complaint, most significant

2    complaint.  So that could be something peripheral or that could

3    be on the spine.  But keep in mind the spine is a very

4    sensitive structure.  That's where all our wiring is, it

5    emanates from there.  We got to limit the steroids, and a

6    variety of things have happened due to steroids, so nerve

7    blocks can be useful where you don't use steroids.

8    Q.  So when you're treating the spine, let's say you have

9    decided to recommend to the patient that they have a

10   rhizotomy -- we've heard a lot about patients receiving

11   rhizotomies in these cases -- is there a process by which you

12   work up the patient to determine whether the rhizotomy is going

13   to work for a particular patient?

14   A.  Yes.

15   Q.  And what's that process?

16   A.  So the process -- this is as per CMS guidelines, local

17   coverage determination documents for different parts of the

18   country, the literature, society guidelines.  Once you have the

19   history and physical exam that's consistent with, let's say,

20   lumbar facet osteoarthritis, you really don't know if that's

21   what's causing the pain.  There's no other diagnostic imaging

22   test, picture test that you can order to determine that that's

23   what's causing the pain.

24          The only way to establish that as the pain generator

25   before you go ahead and burn the nerve is to put them through a

1   nerve block process.  That is two nerve blocks being done on

2   one side or both sides where you're looking to get 80 percent

3   pain reduction.  It used to be 50 percent, now it's 80 percent.

4   And if you're getting more than 80 percent reduction in the

5   patient's pain or improvement in the patient's functional

6   limitation, you can go ahead and do a radiofrequency ablation.

7   So just for one side, for example, that could be three blocks.

8   Two diagnostic is a double confirmation.  The reason it's

9   double is because you're going to burn the nerve, and you want

10   to be sure that that's causing the pain before you burn the

11   nerve, and then a third block which would be the radiofrequency

12   ablation.

13   Q.  Is there any requirement that when you do the diagnostic

14   blocks, when you're making the assessment whether that's the

15   particular area that you need to go in and do the ablation or

16   burning of the nerve, is there any requirement that you do all

17   those diagnostic blocks at the same time or is it permissible

18   to do them on the right first, maybe the left a week later or

19   two weeks later?  What's -- what are the guidelines, what are

20   the requirements?

21   A.  The guidelines don't get into that.  There's no

22   requirement.  It's best to divide it up because it gets to be

23   too much on the patient to block everything, and you're also

24   putting the patient at risk if you block both sides, risk of

25   falls.

1  Q.  Okay.  So it would be appropriate for you to do the right

2  side, identify whether or not you're getting pain relief of

3  greater than 80 percent, that's your diagnostic block, and then

4  have the patient come back in two weeks, do the left side and

5  see if whether you're getting 80 percent pain relief on the

6  left side, and then once you've got this bilateral pain relief

7  from these blocks, you then do the rhizotomy.  When you do the

8  rhizotomy, again, would you differ -- or would you split it up,

9  left side, right side, or would you do it all at once?

10  A.  They're both fine.  If you do both sides, there is

11  post-rhizotomy neuritis that could be very uncomfortable to the

12  patient, so most of the physicians I know do one side at a

13  time.

14  Q.  Okay.  And when you do that procedure, are the patients

15  going to achieve immediate relief or is it going to take some

16  time before they have pain relief?

17  A.  Rhizotomy will take a month to have full effect.

18  Q.  And then how long might it last?

19  A.  It could be three to nine months.

20  Q.  Okay.  Now, during the procedure, during the rhizotomy, do

21  you assess the patient's pain scores pre and postoperatively?

22  A.  We may or may not.

23  Q.  Okay.  Well, assuming that you do, is that a -- is that

24  appropriate technique to assess the patient's pain prior to and

25  subsequent to the rhizotomy?

1    A.   It can be done.

2    Q.   Okay.  During the intraoperative phase?

3    A.   Yes.

4    Q.   Okay.  And let's say a patient has a preoperative pain

5    score of let's say seven or eight and then post-operatively has

6    a pain score of one, does that really tell you whether or not

7    they're going to be successful with that rhizotomy or are they

8    achieving a one pain score simply because of all the medication

9    that has been injected into their spine?

10   A.   It doesn't predict success.

11   Q.   Okay.  And so it really takes time.  You've got to

12   evaluate the patient over the next month, maybe weeks to

13   determine whether or not that rhizotomy's going to be

14   successful, so you'd have the -- would you have the patient

15   come back to your office then for another evaluation?

16   A.   Yes.

17   Q.   And if they still have pain, even though they got the

18   rhizotomy, would you still prescribe opiates or other

19   medications for them?

20   A.   Yes.

21   Q.   Okay.  You mentioned pain generators.  Is it conceivable

22   that a patient might have multiple pain generators as you're

23   working in one area, perhaps treating lumbar sacral area?

24        MS. McMILLION:  Your Honor?

25        THE COURT:  Yes.

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

45

```
1        MS. McMILLION:  I'm going to object to the form of
2   these questions.  If he could just let the witness testify and
3   not try to lead through what -- I know what he's trying to do,
4   but can we just let the witness testify?
5        THE COURT:  I -- I tend to agree.  You've slipped
6   into some lead -- leading questions.  It's difficult for me
7   because I think the material is -- is -- is relevant, and I do
8   think we should have the witness explain, if he cares to, what
9   his view of these -- the -- the proper execution of these
10  procedures are, and I do recognize there needs to be some --
11  some lead-up.  So I'm inclined to sustain the objection but --
12  but mildly, if you know what I mean, Mr. -- Mr. Rogalski.
13        MR. ROGALSKI:  I certainly do, Your Honor.
14        THE COURT:  Okay.  Go ahead.
15  BY MR. ROGALSKI:
16  Q.  So, Doctor, you mentioned pain generators, and what are
17  pain generators?
18  A.  Pain-producing diagnoses.
19  Q.  And might a patient have multiple pain generators?
20  A.  Yes.
21  Q.  And how do you deal with a situation where you have
22  patients with multiple pain generators?
23  A.  You address the predominant pain generators.
24  Q.  And once you've addressed the predominant pain generators,
25  do you just leave the other ones alone or do you treat those as
```

1    well?

2    A.   At some point, once things are optimized, yes.

3    Q.   Okay.  And is it common with patients with chronic pain

4    and injuries to their spine to have multiple pain generators?

5    A.   I missed the word again.  Is it common...

6    Q.   Is it common with patients with chronic pain associated

7    with their spine to have multiple pain generators?

8    A.   Very common.

9    Q.   Okay.  Let's say a patient has been in a motor vehicle

10   accident.  Might they have multiple pain generators?

11   A.   Yes.

12   Q.   And that -- is that because perhaps they sustained

13   multiple injuries to the different regions of their spine?

14   A.   Yes.

15   Q.   Okay.  And according to your testimony, you would treat

16   the predominant pain generator first and then work your way

17   into the other areas if necessary.  Was -- is that -- my

18   understanding, correct?

19   A.   You're correct, yes.

20   Q.   Okay.  So while -- and correct me if I'm wrong, if you're

21   treating a patient where the predominant pain generator is in

22   the lumbar sacral area and you've now achieved pain relief in

23   that area, and then the patient also has pain in the thoracic,

24   mid-back area or in the cervical region, it would be

25   appropriate to have the patient come back and treat those areas

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5563   Filed 02/10/23   Page 47 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

47

1    while you're treating the lumbar sacral area as well?

2    A.  Yes.

3    Q.  So you could be working all up and down the patient's

4    spine as I understand your testimony?

5    A.  Correct.

6    Q.  Because there could be multiple pain generators in

7    different areas of the spine?

8    A.  Yes.

9    Q.  Does the disease process itself lead to other pain

10   generators?  Let's say if I have an injury to my lumbar sacral

11   area and I have a fusion of the vertebra, are there

12   consequences, are they sequelae that might develop as a result

13   of having that joint fixated?

14           THE COURT:  Okay.  Unless we define a lot of terms, I

15   don't think the -- the jury's going to understand that one, so

16   why don't we move to our next relevant question.  Go ahead.

17           MR. ROGALSKI:  So --

18           THE COURT:  Yep.

19           MR. ROGALSKI:  -- what -- Your Honor, what I'm trying

20   to establish is that these patients will develop additional

21   areas of injury above and below the spine.

22           THE COURT:  Okay.  He can speak to that I'm sure.  Go

23   right ahead.

24   A.  If somebody's fused, let's say, at L4-L5, they're going to

25   have, it's just a matter of time, adjacent segment disease at

1   the level below and at the level above in terms of accelerated

2   arthritis and narrowing of the level above or below or both.

3   Q.   Okay.  So then that becomes a new pain generator?

4   A.   Yes.

5   Q.   Above and below?

6   A.   Yes.

7   Q.   Okay.  And then you now have to treat that as well?

8   A.   Yes.

9   Q.   So you're treating the initial site of the injury and then

10  over time you're having to treat above and below that site of

11  injury?

12  A.   Correct.

13  Q.   Okay.

14          THE COURT:  Why don't we take our break.  Are you

15  going to start asking him about his examination of some of the

16  materials in the case?

17          MR. ROGALSKI:  Yes.

18          THE COURT:  Yeah.  All right.  Let's take our break.

19  It's 10:46.  Let's take ten and try to be back well in advance

20  of 11:00.

21          Don't talk about the case during the break, keep your

22  minds open, and we'll -- we'll all rise for our jurors now.

23          (Jury excused at 10:46 a.m.)

24          THE LAW CLERK:  Court is now in recess.

25          (Court in recess at 10:47 a.m.)

```
 1              (Proceedings resumed at 11:09 a.m., all parties
 2         present)
 3              THE LAW CLERK:  All rise for the jury.  The Court is
 4    back in session.
 5              (Jury entered the courtroom at 11:09 a.m.)
 6              THE COURT:  Okay.  The jury's back as usual.
 7    Everybody may be seated.
 8              And Mr. Rogalski will resume the lectern.  Our doctor
 9    is back on the stand and we're ready to go.
10    BY MR. ROGALSKI:
11    Q.  Dr. Gharibo, I want to switch gears.  In conjunction with
12    doing these interventional procedures, in your practice do you
13    utilize any of the sedation techniques?
14    A.  We may or may not.
15    Q.  Okay.  Is there any type of study that you're aware of as
16    to what generally practitioners do with regard to the
17    utilization of sedation techniques?
18    A.  Yes.
19    Q.  And what's the data that you're aware of?
20    A.  Yeah, the data is majority of the community -- community
21    practices use sedation.
22    Q.  And can you elaborate on the type of sedation that they
23    utilize?
24    A.  It -- pretty much the whole range.  It's a dynamic thing,
25    but they get combination of narcotics and benzodiazepines,
```

1    which are sedatives just as an example, but there're different

2    variations on that.

3    Q.   And in your experience, what's -- what's the purpose

4    behind utilizing the conscious sedation techniques?

5    A.   Keep the patient stable, improve the tolerability of the

6    procedure being done in a sensitive area of the body such as

7    the spine.

8    Q.   And why do you need to keep the patient stable?

9    A.   If there's any unexpected motion, there could be physical

10   injury to the nerves in the areas.

11   Q.   Are you familiar with the term legacy patient?

12   A.   Yes.

13   Q.   And what's a legacy patient?

14   A.   Those are complex patients during what we call sort of the

15   opiate era dating back to 90s and early 2000s where those

16   patients were treated with higher dose opioids, that were sort

17   of left on high-dose opioids after new knowledge came into

18   place, new guidelines came into place that insisted that lower

19   doses are safe and just as good, but those patients were sort

20   of stuck on the higher dosages so they're legacy patients.

21   Q.   Okay.  In conjunction with your review of the records in

22   this case, were you asked to review four patient charts?

23   A.   Yes.

24   Q.   And do you recall who those four patients were?

25   A.   Yes.

```
1    Q.   Okay.  Do you recall reviewing a patient record for
2    patient Andrew Peterson?
3    A.   Yes.
4    Q.   Do you recall reviewing audiovisual tape for Mr. Peterson?
5    A.   Yes.
6    Q.   In his undercover capacity?
7    A.   Yes.
8    Q.   Do you recall reviewing a January 4th, 2018 undercover
9    visit by Mr. Peterson?
10   A.   Yes.
11   Q.   Okay.  And the records show in this case that we had a
12   nurse practitioner conducting a new patient evaluation of Mr.
13   Peterson.  Do you recall that?
14   A.   Yes.
15   Q.   And in conjunction with that date of service, we had a
16   medical assistant provide Mr. Peterson with a back brace.  Do
17   you remember that?
18   A.   Yes.
19   Q.   Okay.  In lieu of replaying that tape, given that
20   you've -- seem to have a pretty clear understanding and
21   recollection, based upon your recollection, based upon your
22   review of that information, have you been able to form an
23   opinion regarding whether the back brace and that patient
24   evaluation were medically necessary?
25   A.   Yes.
```

```
1   Q.  And were you able to render an opinion whether the
2   treatment was provided as rendered?
3   A.  Yes.
4   Q.  Is that a yes?  Thank you.
5           And that those services would have otherwise been
6   eligible for reimbursement?
7   A.  Yes.
8   Q.  And what's that opinion?
9   A.  The opinion is -- was that patient presented with back and
10  lower extremity pain.  The diagnosis was such that there was
11  evidence of spinal pain, lumbosacral radiculopathy, which is
12  sciatica or pinched nerve, and there was some evidence of where
13  if you were to stabilize the spine, you can provide that
14  patient with prompt pain control.  It's sort of like an
15  abdominal binder that can stabilize the disk, minimize
16  microslippages.  It can also stabilize the herniation that's
17  occurring which is subject to motion.  So if you put a binder
18  or a brace in place, you can control the pain because you're
19  controlling the range of motion.
20  Q.  Does the fact that Mr. Peterson mentioned when he was
21  being fitted that "huh, it doesn't feel very good," does that
22  render your opinion any different --
23  A.  No.
24  Q.  -- because of that?
25          Do -- is that something you experience in your own
```

1    practice when you fit a patient with a back brace?

2    A.   It's very common because we're used to normally without a

3    brace, so when you put something on, at first it's going to

4    feel different or uncomfortable, but then you get used to it.

5    It can also be adjusted.

6    Q.   Thank you.

7            And for the record, those -- that's Counts 2 and 3 of

8    the indictment, the January 4th, 2018 dates of service for Mr.

9    Peterson, which were the provision of a back brace and an

10   office visit.

11           Do you recall reviewing records for a patient Glenda

12   Roscoe?

13   A.   Yes.

14   Q.   Okay.  And do you recall reviewing the propriety of

15   whether Ms. Roscoe should have received a back brace on

16   December 7, 2013?

17   A.   Yes.

18   Q.   Okay.  And have you formed an opinion whether or not the

19   provision of that back brace to Ms. Roscoe on December 17, 2013

20   was medically necessary?

21   A.   I have.

22   Q.   And whether it was eligible for reimbursement?

23   A.   Yes.

24   Q.   And whether it was provided as documented in the chart?

25   A.   Yes.

1    Q.  And what's your opinion regarding that provision of that

2    back brace on December 17th, 2013?

3    A.   It was medically appropriate.

4    Q.  Can you elaborate as to why?

5    A.   Yes.  So on December 17 patient presented with back, neck,

6    knee and old pain.  The -- the remarkable features here that

7    indicated the back brace are as follows.  During the physical

8    exam there was midline and paravertebral tenderness, and that's

9    an important point, where there was pain on flexion and

10   extension, so forward and backwards produced right leg pain,

11   which indicates instability.  And there was a --

12             MS. McMILLION:  Your Honor?

13             THE COURT:  Yes.

14             MS. McMILLION:  Can I stop the witness and ask what

15   he's reading from?

16             THE COURT:  Yes.  What do you have in front of you

17   there, witness?

18             MR. ROGALSKI:  Your Honor, he has his report, much

19   the same as Dr. Mehta had his report.

20             THE COURT:  Okay.  The report is not admitted, and so

21   accordingly, I'd ask the witness to summarize the report rather

22   than reading it verbatim.  And I take it you've got a copy, Ms.

23   McMillion?

24             MS. McMILLION:  I do, Your Honor.  Thank you.

25             THE COURT:  Okay.  Go right ahead.

1    BY MR. ROGALSKI:

2    Q.  Continue please.

3            THE WITNESS:  I will summarize, Your Honor.

4            THE COURT:  Thank you.

5    A.  The MRI showed a herniation at L5-S1 that correlated with

6    the lumbar range of motion production of the right lower

7    extremity pain.  So essentially you have significant sciatica

8    and evidence of instability at L5-S1 that is producing a -- a

9    disk that's leaking out its inner contents is what that history

10   suggests.

11           So therefore, a bracing, a stabilizer, a binder can

12   control that motion and can manage that microinstability and

13   fix it so that this area does not continue to be irritated.

14   And there will be some discomfort at first when you first put

15   it on, just like if you were to put on any other splint or a

16   similar device, but the body does get used to it and you do get

17   drug-free pain control.

18   Q.  Thank you.  And that relates to Counts 4 of the

19   indictment.

20           With regard to Counts 5, 6 and 7, Dr. Gharibo, do you

21   recall reviewing Ms. Roscoe's patient records for date of

22   service of May 6th, 2014 --

23   A.  Yes.

24   Q.  -- with regard to a rhizotomy to the sacroiliac joint on

25   that date of service?

```
1    A.   Yes.
2    Q.   And were you able to form an opinion as to the medical
3    necessity of that rhizotomy to the right sacroiliac joint on
4    that date of service?
5    A.   Yes.
6    Q.   And what's your opinion?
7    A.   Similar to where you need two diagnostic blocks before you
8    go ahead and do a radiofrequency nerve ablation.  So before a
9    destructive procedure on the nerve, we perform two required
10   diagnostic nerve blocks.
11   Q.   And with regard to Count 44, which was a prescription for
12   hydrocodone with acetaminophen, do you recall for that same
13   date of service a prescription for that combination of
14   medication?
15   A.   Yes.
16   Q.   And have you been able to render or come to an opinion
17   with regard to whether or not that medication was prescribed in
18   the ordinary course of medical practice?
19   A.   Yes.
20   Q.   And what's your opinion, sir?
21   A.   It was within the standard of care, and the reason for
22   that is because after radiofrequency patients develop neuritis,
23   which is much -- which is worse pain than what you walked in
24   with, and that's what patients experience after the local
25   anesthetic wears off.  So in -- in order to maintain their
```

1    function as the local anesthetic wears off and treat their

2    baseline pain and pain of neuritis and the radiofrequency has

3    not kicked in yet, you can give them a pain medication such as

4    Norco.  Norco is a lower abuse medication than something like

5    oxycodone 30 because most of Norco is 10 milligrams of

6    hydrocodone and -- and 325 milligrams of Tylenol or

7    acetaminophen so it's not as desirable to abuse.

8    Q.  Thank you.

9         Do you recall reviewing the patient records for a

10   patient Monica Gibson?

11   A.  Yes.

12   Q.  And do you recall with Ms. Gibson reviewing a date of

13   service of May 6th, 2014 which was -- actually we've determined

14   was a typo, should have been May 16, 2014.  Do you recall

15   looking at the patient records for May 16, 2014 in conjunction

16   with her receipt of a back brace?

17   A.  Yes.

18   Q.  And were you able to render an opinion as to whether or

19   not that back brace was medically necessary?

20   A.  Yes.

21   Q.  And whether or not it was provided as rendered?

22   A.  Yes.

23   Q.  And whether it was eligible for reimbursement?

24   A.  Yes.

25   Q.  And what's your opinion, sir?

1    A.   On May 16th patient presented with low back pain, and that

2    was diagnosed to be due to lumbar facet osteoarthritis.  Again,

3    those are the joints on the back of the spine, and they respond

4    to motion, they'll hurt with motion.  It's like if my hands

5    were arthritic, had older joints, it would hurt to move it.  A

6    nerve block had not been performed yet but it had been ordered,

7    and patient was using a back brace that can stabilize those

8    joints.  It was broken, so it's reasonable to order a new one

9    until the patient gets the diagnostic nerve blocks.

10   Q.   And for the record, that relates to Count 8 of the

11   indictment.

12          Sir, do you recall reviewing patient records for

13   patient Victoria Loose?

14   A.   Yes.

15   Q.   And with regard to Count 9 of the indictment, do you

16   recall reviewing records dated September 13, 2013 regarding the

17   provision to Ms. Loose of a back brace?

18   A.   Yes.

19   Q.   And have you been able as a result of your review to

20   render an opinion as to whether that back brace was medically

21   necessary?

22   A.   Yes.

23   Q.   And whether it was provided as rendered?

24   A.   Yes.

25   Q.   And whether the service was eligible for reimbursement?

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5575   Filed 02/10/23   Page 59 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

59

1    A.   Yes.

2    Q.   And what's your opinion?

3    A.   On September 13th Ms. Loose presented with history of back

4    surgeries.  She had failed back surgery syndrome and that

5    involved a fusion.  So that's a problematic procedure in that

6    given the fusion that's in the back and given the fixation that

7    occurs as a result of the fusion, patient is subject to

8    narrowing, arthritis and instability at the level above and

9    below the fusion.  And what ultimately happens is the other

10   levels begin to jiggle and begin to cause disk pain, facet pain

11   and pain of narrowed canal.

12           Now, this was also a patient that was also on

13   narcotics, Vicodin Extra Strength, and you certainly -- one

14   option could have been going up on the narcotic, for example,

15   but you really want to minimize that as much as possible.  It

16   would have been okay to go up on the narcotic, but a back brace

17   until you can treat the adjacent segment disease is very much

18   reasonable because, again, you're getting drug-free pain

19   control.  It sort of just wraps the back.  You can still move

20   about, but it does control the pain and it -- it -- rapidly,

21   and the patient does get used to it and you can still function

22   and you can take it off as needed and so on.  So it's within

23   the standard.

24   Q.   Thank you.

25           Sir, do you recall reviewing records for that same

1    patient, Ms. Victoria Loose, dated November 11, 2017 in

2    conjunction with her receipt of sacroiliac rhizotomies?

3    A.   Yes.

4    Q.   Okay.  And have you been able to render an opinion as to

5    the medical necessity for her to have received those

6    rhizotomies on November 11, 2017?

7    A.   Yes.

8    Q.   And there were two rhizotomies performed on that date of

9    service, correct?

10   A.   Yes.

11   Q.   And what's your opinion as to the medical necessity of her

12   receipt of those rhizotomies?

13   A.   Similar to the -- any other procedure that needs to be

14   done before the rhizotomy is done, we need dual diagnostic

15   confirmation, dual nerve blocks, and that's what's happening

16   here on those days.  There's a prerequisite number of nerve

17   blocks that are done before the rhizotomy.  You can do both

18   sides or one side at a time, but two need to be done.

19   Q.   In her case, Counts 10 and 11 relate to the rhizotomy done

20   on the right side, if you -- if you recall?

21   A.   Yes.

22   Q.   And again, same question, your opinion as to the medical

23   necessity of that procedure, was it in your opinion medically

24   necessary?

25   A.   Same answer.

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

61

1    Q.   Okay.  And also eligible for reimbursement?

2    A.   Yes.

3    Q.   And provided.

4         Did you have an opportunity to also look at the

5    images associated with that particular procedure on that date

6    of service?

7    A.   Yes.

8    Q.   And describe for the jury what you saw on the images in

9    the medical record.

10   A.   It was appropriately performed with good needle placement.

11   Q.   Thank you.

12        And on November 25th did you also have the

13   opportunity to review her medical records regarding the

14   radiofrequency rhizotomy on the other side of her sacroiliac

15   joint?

16   A.   Yes.

17   Q.   And same question, were you able to perform or render an

18   opinion as to the propriety, the medical necessity of that

19   sacroiliac joint injection on November 25th, 2017?

20   A.   Yes.

21   Q.   And what's your opinion?

22   A.   Same answer.

23   Q.   Okay.  With regard to Count 45 which relates to the

24   unlawful distribution of a controlled substance, on that same

25   date, November 11, 2017, Dr. Bothra prescribed hydrocodone with

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5578   Filed 02/10/23   Page 62 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

62

1    acetaminophen.  Do you recall that in your review?

2    A.  Yes.

3    Q.  120 tablets?

4    A.  Yes.

5    Q.  And based upon your review of the medical records, were

6    you able to form an opinion as to whether or not the

7    prescription for that medication on that date of service was

8    for -- was prescribed in the ordinary course of medical

9    practice?

10   A.  Yes.

11   Q.  And what's that opinion?

12   A.  Patient had radiofrequency ablation that had neuritis,

13   post-procedural discomfort after an ablative procedure, and

14   that's what the Norco was for.

15   Q.  And with regard to Count 46 which is the second unlawful

16   distribution charge involving Ms. Loose, did you have occasion

17   to review the November 25th, 2017 date of service in

18   conjunction with the prescription of hydrocodone with

19   acetaminophen on that date of service?

20   A.  Yes.

21   Q.  And have you been able to form an opinion as to whether or

22   not that medication was prescribed in the ordinary course of

23   medical practice?

24   A.  Yes.

25   Q.  And what's your opinion, sir?

1    A.  Same answer: procedure done, you can give her pain

2    medication to control the pain afterwards.

3    Q.  Sir, do you recall an individual by the name of Hersh

4    Patel?

5    A.  Yes.

6    Q.  And what's your recollection of Hersh Patel?

7    A.  He was a fellow in my program.

8    Q.  Okay.  And when did he graduate, if you recall?

9    A.  I don't recall.

10   Q.  Did you form any special relationship with him as when you

11   were a -- when he was a student of yours?

12   A.  Nothing special.

13   Q.  Would you consider yourself to be a mentor of his?

14   A.  I can't be a mentor to any of the fellows in my program as

15   the medical director, but we have casual conversations,

16   professional conversations, but I wasn't a mentor of him.

17   Q.  Do you recall ever having a conversation with Hersh Patel

18   regarding his employment with Dr. Bothra or at the Pain Center?

19   A.  No.

20           MR. ROGALSKI:  Thank you, Your Honor.

21           THE COURT:  All done?

22           MR. ROGALSKI:  Yes.

23           THE COURT:  Okay.  Cross-examination from the United

24   States.

25                     CROSS-EXAMINATION

1    BY MS. McMILLION:

2    Q.  Can you pronounce your name for me again so I don't say it

3    wrong?

4    A.  Sure.  Ga-reeb-oe [phonetic].

5    Q.  Ga-reeb-oe [phonetic]?

6    A.  Yes.

7    Q.  Okay.  Good -- we're still morning -- good morning, Dr.

8    Gharibo.

9    A.  Good morning.

10   Q.  I just have some questions for you in followup to your

11   direct examination by counsel for Dr. Bothra.

12           I want to start with the scope of your review in this

13   case.  In preparation for your opinion, you reviewed the

14   indictment in this case?

15   A.  Yes.

16   Q.  And you reviewed MAPS data?

17   A.  To the extent it was documented in the record, yes.

18   Q.  So you just looked at the four patient charts?

19   A.  Yes.

20   Q.  And you reviewed three interview reports?

21   A.  I don't recall how many but I did review interview

22   reports.

23   Q.  And was that of the patients for the charts that you

24   reviewed?

25   A.  Yes.

1    Q.   And did you review undercover video in this case?

2    A.   Yes.

3    Q.   Did you review multiple or just one undercover video?

4    A.   Multiple.

5    Q.   And was it all for the same patient or undercover agent?

6    A.   I don't recall.

7    Q.   Okay.  You didn't review any interview reports from the

8    other doctors who've pled guilty in this case, did you?

9    A.   I don't remember.

10   Q.   Did you review any interview reports of any of the

11   employees that worked at the Pain Center that aren't on trial?

12   A.   Interview reports?

13   Q.   Yes.

14   A.   I don't remember.

15   Q.   If I gave you -- well, you have a copy of your report

16   there.  Did you list on the front of your report everything you

17   reviewed in preparation for testifying today?

18   A.   Yes.

19   Q.   And if you take a look at that, would that refresh your

20   recollection as to whether you reviewed any other interview

21   reports by anybody else?

22   A.   I don't recall if I received anything after I made up this

23   list.

24   Q.   And this is dated June 10th of 2022, correct?

25   A.   Yes.

1    Q.  So you've reviewed additional reports in the last five

2    days?

3    A.  No, it's just when I made -- I think this list is

4    complete, I'm pretty sure.  I don't think I received anything

5    since.

6    Q.  Okay.  So you just reviewed the information that counsel

7    provided to you?

8    A.  Correct.

9    Q.  Okay.  And the four patient charts you reviewed were for

10   Andrew Peterson, Glenda Roscoe, Monica Gibson and Victoria

11   Loose, correct?

12   A.  Yes.

13   Q.  You didn't review any other patient charts with respect to

14   patients at the Pain Center, did you?

15   A.  I don't remember any, correct.

16   Q.  And you just walked through some opinions that you gave on

17   the counts in this case, and I believe you started with Count 2

18   and 3 for Mr. Peterson.  You're not offering an opinion on the

19   conspiracy counts in this case, are you?

20   A.  I'm sorry, opinion on?

21   Q.  On the conspiracy counts in this case?

22   A.  Conspiracy?  I don't think so, no.

23   Q.  You weren't asked to provide an opinion with respect to

24   the conspiracy to commit health care fraud?

25   A.  No.  I looked at the records.  I didn't make any other --

1    I mean there was some quid pro quo type of discussions.  Is

2    that what you mean by that?

3    Q.  Were you asked to make an opinion on the conspiracy to

4    commit health care fraud count?

5    A.  I was asked to look at it in terms of was there any

6    this-for-that type of a premise to the practice, so I did

7    provide some opinions on that.

8    Q.  Okay.  But do you have an opinion as to the health care

9    fraud conspiracy?

10   A.  From what I see, the -- the care didn't support health

11   care fraud.  I was asked to look at it from that perspective

12   within the context of these four patients.

13   Q.  But just with these four patients, correct?

14   A.  Yes.

15   Q.  Okay.  And you also weren't asked to look at any

16   additional patients with respect to the conspiracy to

17   unlawfully distribute controlled substances, were you?

18   A.  You're correct.

19   Q.  Okay.  So with respect to the patient files that you

20   reviewed, there were some conversations in your -- or there

21   were some documentation in your report that you believe those

22   patient charts to be incomplete?

23   A.  Yes.

24   Q.  And despite that, however, you were able to make an

25   overall conclusion as it related to those four patients?

1   A.  To the extent that it's documented, yes.

2   Q.  Do you recall giving an affidavit in this case, creating

3   an affidavit in this case?

4   A.  Not as I sit here.

5   Q.  I'm -- I'm sorry, I didn't hear you.

6   A.  Not as I sit here.

7        MS. McMILLION:  Your Honor, may I approach the

8   witness?

9        THE COURT:  Yes.

10  Q.  And if I can have you take a look at that.

11  A.  Yes.

12  Q.  And if you want to turn to that last page.  Is that a

13  declaration that you created?

14  A.  Yes.

15  Q.  Okay.  And this declaration was created in April of 2022,

16  correct?

17  A.  Yes.

18  Q.  And in April of 2022 you declared, under penalty of

19  perjury, that you couldn't offer an opinion in this case, is

20  that correct?

21  A.  At that time, yes.

22  Q.  And have you reviewed anything separate from what you had

23  in April of 2022?

24  A.  Yes.

25  Q.  You've had additional patient records provided to you?

1    A.  I think there was some -- some additional records that

2    were sent to me.

3    Q.  And when did you receive those?

4    A.  It's over four to six weeks ago.

5    Q.  Four to six weeks ago?

6    A.  Yes.

7    Q.  And what additional patient records did you receive

8    between April and today to provide an opinion?

9    A.  There were additional medical records, a good number of

10   pages that were sent to me.

11   Q.  For the four patients?

12   A.  No.  It was for one or more of the patients.  It may have

13   been just been one patient.

14   Q.  So you were provided additional patient records for -- did

15   you receive additional patient records for Victoria Loose?

16   A.  I don't remember the exact people I -- I received the

17   records for.

18   Q.  So as you sit here today, as of April 2022 you said you

19   didn't have enough information to provide an opinion, but

20   you've been provided additional records for just one patient

21   and now you can make an opinion for all four?

22   A.  Yes.  I received some other interviews and some other

23   supportive documents that followed the original medical

24   records.

25        THE COURT:  All right.  Well, during the lunch break

1   you specify -- you find and specify what those are.  You're not

2   going to say, "I think," et cetera.  You're going to specify

3   what you received from April 22 until June 10 and you're going

4   to tell the jury what additional evidence you received in two

5   and a half months to make you change your opinion.  You

6   understand, Doctor?

7           THE WITNESS:  Yes, Your Honor

8           THE COURT:  All right.

9   BY MS. McMILLION:

10  Q.  You testified on direct examination that you were being

11  compensated $6,000 for testifying today, correct?

12  A.  Correct.

13  Q.  Were you also compensated for your review in preparation

14  of the report for this case?

15  A.  Yes.

16  Q.  And how much was that?

17  A.  The -- the -- it would be about 31,000 for reviews and the

18  report, everything included except the court.

19  Q.  And that's at an hourly rate?

20  A.  Yes.

21  Q.  Were you also compensated to draft this declaration?

22  A.  Yes.

23  Q.  So you were paid to say you couldn't make an opinion, and

24  now you're paid to make -- say you can make an opinion?

25  A.  I was asked to make an opinion based on what's available

 1   and conclude, and my report states that I'm going to have

 2   opinions based on what's available to me and that's in my

 3   report.

 4   Q.   Okay.  You talked a little bit about your background and

 5   training and your certification as a board certified in pain

 6   management, correct?

 7   A.   Yes.

 8   Q.   And I believe you stated that you went through a

 9   fellowship program as well as -- let me go back.  You did

10   one-year fellowship as well as residency training, correct?

11   A.   Yes.

12   Q.   And you took a written and oral exam?

13   A.   Yes.

14   Q.   Is that the only way to be certified as a -- to be

15   certified in pain management?

16   A.   There's some other certification bodies.

17   Q.   Is ASIPP one of those certification bodies?

18   A.   For interventional pain they do have certification.

19   Q.   And that's the organization that you serve as the first

20   executive vice-president of?

21   A.   Yes.

22   Q.   Are you aware if any of these defendants are certified by

23   ASIPP?

24   A.   I don't recall as I sit here.  I may have come across that

25   info.  I just don't know.

1    Q.  You said you may have come across that?

2    A.  I -- I may or may not have.  I don't recall.

3    Q.  If any one of these defendants were certified in pain

4    management by ASIPP, that -- and they were convicted of the

5    charges, that wouldn't really look too good for ASIPP, would

6    it?

7    A.  I don't think it indicates one way or the other because a

8    lot of board-certified physicians do good things and bad

9    things.  I don't think it's a reflection on the certification

10   body.

11   Q.  Okay.  And you're testifying here in your capacity

12   personally, not as an ASIPP representative, correct?

13   A.  Yes.

14   Q.  Okay.  In your report that you provided in anticipation

15   for your testimony today, you talked a lot about whether it

16   would be medically appropriate to reach opinions and decisions

17   based on the information that was available for review.  Do you

18   recall that?

19   A.  Yes.

20   Q.  And you, in fact, criticized Dr. Mehta's review because

21   you said he didn't have a statistically determined number of

22   patient files to review, is that correct?

23   A.  Yes.

24   Q.  And did the defense tell you that Dr. Mehta reviewed more

25   than a hundred patient files in this case?

1    A.   Yes.

2    Q.   And you reviewed four?

3    A.   Yes.

4    Q.   So you can provide a statistically sound review of four

5    patient files but he can't of over 100?

6    A.   My review only applies to those four patients, not to the

7    whole practice.  I directly addressed only those four

8    individuals and their care and what was done.

9    Q.   Well, in your report that you produced in preparation for

10   this, did you not make generalizations and opinions based on

11   the practice overall?

12   A.   I made some general statements, but certainly I also put

13   in there this requires a statistically significant number of

14   reviews for us to reach a broader conclusion, and that's within

15   my report.

16   Q.   And so is it your testimony that you had a statistically

17   significant number of patient charts to make the generalization

18   statements that you made in your report?

19   A.   No, that's not my testimony.

20   Q.   So the summaries that you've provided in this report are

21   then therefore not supported by the information that you

22   reviewed?

23   A.   The summaries, what I looked at does not support the

24   general conclusions that -- that -- that have been made by Dr.

25   Mehta.  It's just not enough there to support what he's saying,

1  plus not enough charts were reviewed.  In fact, it goes against

2  it is what -- is my opinion.

3  Q.  Does it support the general statements that you made?

4  A.  Yes, to the extent that those general statements, one way

5  or the other, only goes so far in establishing that, but

6  there's no evidence of anything outside of those general

7  statements.  There's no evidence that what I saw is supporting

8  any fraud, and what I saw was within appropriate medical

9  practice.  And -- and if they were to -- somebody were to

10  extrapolate to the general practice, it's just not supported by

11  the medical record review.

12  Q.  So I'm going to turn your attention to some specific

13  areas, okay?

14  A.  (Nods in the affirmative.)

15  Q.  Now, I know you've talked about this on direct examination

16  as well as in your report, legacy patients.

17  A.  (Nods in the affirmative.)

18  Q.  And you discuss legacy patients as people coming to the

19  Pain Center on high doses of opioids, is that correct?

20  A.  Yes.

21  Q.  And in your report you stated that the Pain Center had a

22  lot of legacy patients?

23  A.  Yes.

24  Q.  You reviewed four patient charts and you can determine

25  that there were a lot of legacy patients?

```
1    A.   I had multiple conversations and -- with -- with counsel
2    as well as reviewing the entirety of the -- not just the
3    medical records but other supporting material, including Dr.
4    Mehta's report.  It gave me an overall sense of this practice.
5    And it did seem like based -- including reviewing Dr. Mehta's
6    report and -- and all the other interviews and all the other
7    nonmedical record documentation, it seemed to be a -- a major
8    pain practice that's accepting patients that have been on
9    opioids, and part of it was based on the referral patterns that
10   I saw within the four individuals where patients were referred,
11   on some opioids, to Dr. Bothra's practice.
12   Q.   So let's talk about the four patients that you did review.
13   Glenda Roscoe, I believe that you summarized her testimony or
14   your testimony on direct exam that she came to the Pain Center
15   in December of 2013, is that correct?
16   A.   Yes.
17   Q.   And what medication was she on when she arrived at the
18   Pain Center?
19   A.   Like to refer to my report.
20   Q.   Absolutely.
21   A.   On December 17th she was on Lortab and Soma.
22   Q.   And is Lortab hydrocodone?
23   A.   Yes.
24   Q.   Is Lortab, in your review, considered a high-dose opioid?
25   A.   It's considered a mod -- it comes as 5 and 10 so it's --
```

1    it's about average.

2    Q.  So it's not a high-dose opioid?

3    A.  It wouldn't be high dose.

4    Q.  Okay.  Let's look at Monica Gibson, and I believe that's

5    page 33 of your report.

6    A.  Yes.

7    Q.  She reported to the Pain Center on what medication?

8    A.  She reported having been on oxycodone 30, OxyContin 80,

9    Vicodin 7.5, Vicodin 10, Dilaudid 4.

10   Q.  And that's based upon the list of medications that she put

11   in her patient chart?

12   A.  Yes.

13   Q.  Is there anything in her patient chart to substantiate

14   that she received any of those medications?

15   A.  I see a list and --

16   Q.  You stated you reviewed MAPS data, is that correct?

17   A.  MAPS data to the extent that it was provided, but this

18   list has a lot to do with what I just stated as well as the

19   June 21st, 2011 documentation of oxycodone 15.

20   Q.  So oxycodone 15 milligrams is what she was prescribed?

21   A.  1-5, yes.

22   Q.  So that's what she was prescribed, not what she came to

23   the Pain Center on, correct?

24   A.  That's what she was prescribed, yes

25   Q.  And did you find it at all odd in that list that she lists

```
 1   there that the only pain medications that worked were all the
 2   high-dose opioids?
 3   A.  I didn't find it odd.  It's something we hear.
 4   Q.  It's something you hear?
 5   A.  Yes.
 6   Q.  That wouldn't be a red flag?
 7   A.  It may or may not be.
 8   Q.  Do you know what a pill-seeking patient is?
 9   A.  Yes.
10   Q.  Would pill-seeking patients seek high-dose opioids?
11   A.  Yes.
12   Q.  Would pill-seeking patients say that those are the only
13   ones that work?
14   A.  Some do.
15   Q.  And that wouldn't create a red flag when you see a list
16   like that that a patient has submitted to the doctor to say
17   here are the ones that I want?
18   A.  I think this is very common.  It doesn't -- I mean
19   patients stating these didn't help, like, for example, seems to
20   help, did not help at all --
21   Q.  Which ones helped?
22   A.  -- this is quite common.
23   Q.  Which ones helped?
24   A.  The ones that helped is oxycodone 30, oxycodone 80 and
25   Dilaudid 4.
```

Case 2:18-cr-20800-SJM-APP ECF No. 483, PageID.5594 Filed 02/10/23 Page 78 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

78

1    Q.  And are those all high-dose opioids?

2    A.  Yes, they are.

3    Q.  And I believe you talked about with legacy patients they

4    come in at high-dose opioids and then they're lowered, correct?

5    A.  Yeah.  I mean they -- high dose, they're on significant

6    opioids, not just high dose, but they've been treated in the

7    opiate era is what I mean by legacy patients.

8    Q.  Well, your report says that they come in on high-dose

9    opioids, correct?

10   A.  It -- it probably says that, yes.

11   Q.  Okay.  Let's turn to Victoria Loose, page 36 of your

12   report.  And she was initially prescribed what when she came to

13   the Pain Center?

14   A.  Vicodin Extra Strength.

15   Q.  And Vicodin is also hydrocodone?

16   A.  Yes.

17   Q.  Would you consider that a high-dose opioid?

18   A.  7.5, 15, 30, it's a good dose, yes.

19   Q.  So that would be high dose?

20   A.  I think it's a good enough dose, yes, it's a high dose.

21   Q.  It is high dose?

22   A.  Yes.

23   Q.  And did she continue to receive Vicodin while she was a

24   patient there?

25   A.  Yes.

1   Q.  And so under your definition of legacy patients who come

2   in at a high dose and then are lowered, she wouldn't meet that

3   definition, would she?

4   A.  At some point her dose is lowered and she doesn't come

5   back to the office for couple of months I believe, so at some

6   point it was lowered.

7   Q.  And when is that?

8   A.  I think it was after -- it may have been after the

9   rhizotomies.  In November of 2017 if I recall correctly.

10  Q.  And she became a patient in 2013 or 2011 -- I'm sorry,

11  2013?

12  A.  Yes.

13  Q.  So it took four years to lower her dose?

14  A.  Definitely during that time, but I just don't have a

15  recollection of what happened during that time frame.

16  Q.  So again, by your definition, you would state that she was

17  a legacy patient?

18  A.  Yes.

19  Q.  Okay.  Let's turn to Mr. Peterson.  You reviewed the

20  video, and I know counsel didn't replay it.  When Mr. Peterson

21  presented to the Pain Center, what medication was he on?

22  A.  I don't think he was on medications.

23  Q.  So he wouldn't be by definition a legacy patient?

24  A.  Correct.

25  Q.  Okay.  So out of the four patients you reviewed, you just

1   told us that one was a legacy patient, correct?

2   A.  I think certainly Victoria Loose and Monica Gibson and Ms.

3   Glenda Roscoe all can be considered legacy patients to varying

4   degrees.

5   Q.  But part of your definition, it was high-dose opioids, so

6   now it's varying degrees of opioids?  Your definition has

7   changed?

8   A.  Yeah.  I mean high dose, that's a relative term, but these

9   are patients that were on opioids during the opioid era that

10  have been maintained on opioids.

11  Q.  Dr. Gharibo, with all due respect, I'm just going based on

12  what you have in your report.  So my question to you is based

13  on the opinion that you provided in this case, high-dose

14  opioids coming to the Pain Center would have created legacy

15  patients.  Is it now your testimony that it's not high-dose

16  opioids, it can vary?

17  A.  Varying degrees of high-dose opioids, it's -- it's a

18  relative term that operates over a range, and it's within that

19  range.  Higher the dose, higher the we call them legacy

20  patients.

21  Q.  And those are the only four patients you reviewed,

22  correct?

23  A.  That's correct.

24  Q.  So based on those four patients, you can make a general

25  assumption that the Pain Center had legacy patients come to the

1    Pain Center?

2    A.  No.  That was based on my review of the legal documents

3    that I looked at that made a variety of statements as to the

4    type of practice that it is, Dr. Mehta's practice, the

5    interviews that I read, so it wasn't just those four patients.

6    But the knowledge, the intelligence I gathered about the

7    practice was that it was a major practice receiving a lot of

8    pain patients, so there's got to be some legacy patients there,

9    and what I looked at supported that.

10   Q.  So there has to be legacy patients there, but you can't

11   tell me which documents support that?

12   A.  No.  I -- I think, like I said, Dr. Mehta's report, the --

13   the legal documents produced by the government and the -- the

14   interview reports, the knowledge I had about the practice in

15   general supported that it received legacy patients.

16   Q.  What from the interview reports gave you an opinion that

17   there were legacy patients at the Pain Center?

18   A.  I don't remember specifically.

19   Q.  What from the indictment gave you any indication that

20   there were legacy patients at the Pain Center?

21   A.  I don't have a specific source that I can state because

22   it's been quite some time that I looked at those documents.

23   Q.  Okay.  But you recall that it was those documents that

24   made you form your opinion?

25   A.  The entirety of the knowledge that I gathered about the

1    practice.

2    Q.  Okay.  Let's turn to the quid pro quo you just talked

3    about.  You provided an opinion in this case in your report

4    that there was no evidence of quid pro quo in this practice, is

5    that correct?

6    A.  Within the records I reviewed, yes

7    Q.  And you reviewed the four patient -- you've reviewed three

8    interview reports for the patients that you reviewed, correct?

9    A.  Yes.

10   Q.  And in those interview reports, didn't the patients say

11   that they couldn't receive their back inject -- their pain

12   medications unless they got back injections?

13   A.  Yes, they did.

14   Q.  So you just completely discounted what the patient

15   reported?

16   A.  No.  That's part of interdisciplinary pain management

17   where, as per the treatment agreement, you've got to go along

18   with the whole plan of care.  That means you got to get the --

19   what you want and what you may not want that you -- that may

20   not feel good such as, for example, a brace or something

21   nonpharmacological or an injection because we've got to treat

22   the whole thing, not just what you're requesting.

23   Q.  You defined a quid pro quo relationship in your report as

24   one where the practice is prescribing high-dose, pure opioids

25   and TIRF products, is that correct?

1   A.   That could be one way to aim for that, yes.

2   Q.   So there's now an additional definition for what a quid

3   pro quo agreement is while you're on the stand?

4   A.   No, there's -- it's not -- it's not a different

5   definition.  There is just different forms of quid pro quo.

6   But, you know, that this-for-that arrangement can be -- usually

7   it's pure opioids and those patients want more and more, and

8   then, okay, I'll get your -- I'll give you your injection, I'll

9   have your -- the injection you're proposing but give me this

10  instead, and the doses come down and the doses go up.  Here

11  that doesn't seem to be happening.

12  Q.   If patients said, "I want to continue to receive my Norco"

13  and the response was, "That only happens if you get your pain

14  injections," is that not quid pro quo?

15  A.   Within the context, that happens all the time because you

16  want to give the patient a timeline and an opportunity of

17  treatment where ultimately you're able to decrease their

18  opioids.  And if they tell -- that -- that's a pretty routine

19  thing in a pain setting, and you've got to inject them, give

20  them their medication, build trust with the patient, and then

21  you reapproach them to reconsider the dose.

22  Q.   You reviewed -- well, wait, let me back up with respect to

23  your quid pro quo relationship definition, which originally

24  your report was it had to be based on pure opioids and TIRF

25  products and it would not likely be based on hydrocodone.  Do

1    you recall that?

2    A.  Yes, I do.

3    Q.  So it's your testimony that because it's hydrocodone, that

4    would make it not quid pro quo?

5    A.  It's very low probability that it's quid pro quo because

6    hydrocodone comes with acetaminophen.  So if somebody wants to

7    get opioids that they want to abuse or sell, they're going to

8    want the pure opioid.  They're not going to want the opioid

9    with 350 milligrams of acetaminophen in it, so they tend to

10   request the pure opioids like oxycodones, fentanyls.  They may

11   divert it, they may enjoy it, and they want the higher quality,

12   pure opioid, not the combo opioid.

13   Q.  Are you familiar specifically with the commonly diverted

14   drugs in the Metro Detroit area?

15   A.  Repeat please.

16   Q.  Are you familiar specifically with the commonly diverted

17   drugs in the Metro Detroit area?

18   A.  Not specific to -- I don't think I've come across such a

19   document for this area.

20   Q.  And if I told you that hydrocodone is a commonly diverted

21   drug in this area, would you have reason to dispute that?

22   A.  No, that's really --

23          MR. ROGALSKI:  There's really no evidence to that in

24   the record.

25          MS. McMILLION:  There is evidence to that in the

1  record.

2          MR. ROGALSKI:  Objection.

3          THE COURT:  She's asking a hypothetical.  Overruled.

4  Answer the question please.

5  A.  That's one of the most commonly prescribed opioids.

6  There --

7  BY MS. McMILLION:

8  Q.  That's not the question, sir.

9  A.  Yeah.  I wouldn't dispute that but I'm not surprised by

10  that.

11  Q.  Okay.  So again, if you were doing a quid pro quo, you

12  could get a drug that's commonly diverted in the area, correct?

13  A.  Yes.  It just doesn't apply to combo opioids.  That --

14  those arrangements go about escalating doses of pure opioids.

15  Q.  Okay.  So it's your testimony that it can't be quid pro

16  quo because it has acetaminophen in it?

17  A.  I'm not saying it can't be anything.  I'm just saying what

18  the probabilities are.  Those, you know, this-for-that occurs

19  with pure-dose opioids and higher dose opioids, and the common

20  opioids then just -- just about everything can be interpreted

21  as this-for-that because Vicodin 5s, hydrocodone-acetaminophens

22  are the most commonly prescribed opioids within pain and

23  without pain specialists.

24  Q.  Okay.  Let's talk a little bit about steroid injections.

25  On your direct examination as well as in your report you talked

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5602   Filed 02/10/23   Page 86 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

86

1    about the Pain Center minimizing the use of steroid injections,
2    is that correct?
3    A.   Yes.
4    Q.   And did Monica Gibson get cortisone shots?
5    A.   Like to look at my report.
6    Q.   Absolutely.
7    A.   Within this document that lists the procedures I don't see
8    a specific steroid shot, but I wouldn't be surprised if there
9    is one in the record.
10   Q.   Is a cortisone shot a steroid shot?
11   A.   Yes.
12   Q.   Let me direct your attention to page 33 of your report.
13   A.   Okay.
14   Q.   Is there a notation there on June 24th, 2011?
15   A.   I'm sorry, repeat please.
16   Q.   June 24th, 2011.
17   A.   I see it.
18   Q.   And what's that say?
19   A.   It's a -- it's a Dear Barry letter.  "Thank you for
20   referring for back and cervical pain.  I've started with an
21   injection of the right shoulder with cortisone."
22   Q.   So she got a steroid shot, correct?
23   A.   Yes.
24   Q.   Let's look at Victoria Loose.  She got steroid shots too,
25   didn't she?

1    A.   I'm sorry, who's that?

2    Q.   Victoria Loose.

3    A.   Yes.

4    Q.   And did Glenda Roscoe get steroid shots?

5    A.   Like to look at my report.

6    Q.   Mm-hmm.

7              (Brief pause)

8    A.   Yes.

9    Q.   So for those three patients, they all got steroid shots,

10   and you're making a general assumption again about the entire

11   practice not giving steroid shots and minimizing those,

12   correct?

13   A.   Within these four patients certainly steroids were

14   minimized because there were a lot of local anesthetic blocks

15   and radiofrequency ablations were done when they could have

16   been steroid shots.  If you were to extrapolate these four

17   patients to the general practice, yes, steroids were minimized.

18   Q.   We talked a little bit about this.  Oh, well, let me

19   address Andrew Peterson.  Mr. Peterson didn't get any

20   injections, did he?

21   A.   Correct.

22   Q.   Was he offered a steroid shot?

23   A.   Yes.

24   Q.   And he actually didn't follow through with that though,

25   did he?

1   A.   You're correct.

2   Q.   So for all four of the patients for the patient charts you

3   reviewed, they either got steroid shots or were offered steroid

4   shots, correct?

5   A.   Yes.

6   Q.   And you talked in your report a little bit about this,

7   about the protocol, right, that --

8   A.   I'm sorry?

9   Q.   The protocol.

10  A.   Protocol.

11  Q.   That when you do RFAs, you have to do the facet blocks

12  first?

13  A.   Yes.

14  Q.   Looking at even the four patient charts that you have, if

15  I told you that the Pain Center injection protocol was a caudal

16  epidural shot, a caudal epidural shot, a bilateral facet, a

17  bilateral facet, a radiofrequency ablation left, a

18  radiofrequency ablation right, that if that's the protocol that

19  patients went through, were they not all receiving steroid

20  injections as part of that protocol?

21  A.   The -- the caudal injections were steroid injections, and

22  the nerve blocks and the radiofrequency, so therefore all that

23  entire subsequent subset were not steroid injections.

24  Q.   Okay.  But they did get the steroid injections to start,

25  correct?

1    A.   That's correct.  My point, steroids were minimized, not

2    eliminated.

3    Q.   Okay.  In an average interventional pain practice would

4    you expect to see the majority of patients receiving facet

5    injection as opposed to, like, nerve root blocks?

6    A.   It depends.

7    Q.   And what's that dependent upon?

8    A.   If both are present where there's nerve pain and arthritic

9    pain, we tend to treat the nerve pain first.  So that would be

10   like a caudal epidural or lumbar or a transforaminal epidural

11   because you've got to wind down the nerve first.  And then you

12   follow up with treating the arthritic pain, which would be the

13   local anesthetic block with radiofrequency, or you can do

14   steroid injection into the joint without the radiofrequency.

15   So here local anesthetic and radiofrequency were done.

16   Q.   So with the radiofrequency ablation, you testified that

17   you have to undergo dual anesthetic blocks before you can move

18   to the radiofrequency ablation, correct?

19   A.   Yes.

20   Q.   And I think your testimony was that it used to be

21   50 percent and now it's at 80 percent reduction in pain,

22   correct?

23   A.   Yes.

24   Q.   So if a patient doesn't obtain an 80 percent reduction

25   with the diagnostic block, they shouldn't move to the next

1   block, should they?

2   A.  It depends.

3   Q.  So you can -- radiofrequency ablation, and you stated per

4   I believe you said the CMS Medicare guidelines -- let me go

5   back, I don't want to misstate your testimony -- requires a --

6   two nerve blocks, looking for 80 percent pain reduction before

7   the radiofrequency ablation is indicated, is that correct?

8   A.  I don't remember my exact verbiage.  It's 80 percent pain

9   reduction or functional improvement.

10  Q.  So 80 percent functional improvement or just functional

11  improvement generally?

12  A.  You can substitute functional improvement for pain

13  reduction.

14  Q.  And if patients are reporting that they don't have any

15  pain reduction and they don't have any functional improvement,

16  then it would not be medically indicated or necessary within

17  the standard of care to move to the next step in that -- of

18  that protocol, correct?

19  A.  Correct.

20  Q.  Given that there are requirements in order to get to the

21  radiofrequency ablation, does that not lend itself to the

22  possibility that doctors will fabricate reductions in pain?

23  A.  Anything's possible.

24  Q.  And did you review the interview reports of at least the

25  three witnesses that -- or the three patients that you have

Case 2:18-cr-20800-SJM-APP   ECF No. 483, PageID.5607   Filed 02/10/23   Page 91 of 124
Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022
91

1    here that said they did not receive reductions in pain?

2    A.   I don't specifically remember that but I'm sure I came

3    across it.

4    Q.   And if they didn't receive reductions in pain, they should

5    have then not had to move forward in that protocol, correct?

6    A.   Yeah.  So that happens all the time.  You've got to get

7    into the details as you're interviewing the patient because

8    after a nerve block patients state all the time, well, it

9    didn't help me at all.  But when I dive into it further during

10   the interview, well, how -- how much pain relief did you get

11   the day of the nerve block, which is what it comes down to, and

12   how'd you feel as they examined you immediately after the nerve

13   block, for example, you do have 80 percent pain reduction or

14   functional improvement and that's what counts.

15   Q.   And that requires you to then have a followup meeting with

16   that patient, correct?

17   A.   Yes.

18   Q.   And spend some time talking to that patient about their

19   procedure?

20   A.   It can happen immediately after the procedure as well

21   because local anesthetics work right away.

22   Q.   And so are you reporting the local anesthetic pain relief

23   or are you reporting the radiofrequency ablation pain relief?

24   A.   The local anesthetic pain relief.

25   Q.   And if we go back to the nerve block and you do it

1    immediately after, you would be reporting the local anesthetic

2    relief, correct?

3    A.   You're correct.

4    Q.   But for reimbursement under Medicare, it's the actual

5    block that has to provide the 80 percent relief, not the

6    anesthetic, correct?

7    A.   It's the same thing.

8    Q.   So I can get a local anesthetic in my back and say I'm

9    perfectly fine today and hurt tomorrow, and then Medicare is

10   going to continue to pay because someone put a 8 and a 1 on my

11   chart?

12   A.   If you have local anesthetic mediated pain reduction,

13   that's within the standard of care and that's what the CMS

14   guidelines call for.  It's a local anesthetic effect or a nerve

15   block effect, it's the same thing.

16   Q.   How does sedation play into that?

17   A.   You want to perform a -- a procedure in a -- in a -- sort

18   of in a controlled fashion where patients can tolerate the

19   procedure well, and the sedation allows for that to happen and

20   kind of smoothes out the experience.

21   Q.   Would you expect that when patients undergo these

22   interventional procedures, that they all receive the same

23   amount of reduction in pain?

24   A.   It's -- it's going to vary.

25   Q.   It's going to vary?

1   A.  It's going to vary.

2   Q.  And if you were doing that on one to ten scales, what

3   would you expect to see?

4   A.  I'm not clear.

5   Q.  Like, if you had to rate your pain on a scale of one to

6   ten when you start and one to ten when you finish, you say it's

7   going to vary, what would you expect to see?

8   A.  Yeah.  So -- so measuring the pain on that 11-point scale

9   where patients don't report 80 percent there, what we ask the

10  patient is what percent of your pain did we take away?  That --

11  that's the common question that we ask.

12  Q.  So you're saying you don't ask the is it an 8 out of 10,

13  is it a 1 out of 10?

14  A.  You can ask that too.

15  Q.  Okay.  And in asking that, my question is would you expect

16  all of those to be similar for the patients who received the

17  procedures?

18  A.  They -- they would vary.

19  Q.  They would vary.

20          There were some conversations on your direct

21  examination about back braces and prescribing back braces.

22  Would the patients who need back braces also vary?

23  A.  Yes.

24  Q.  Would there be a if anyone presents with lower back brain,

25  they are automatically eligible to receive a back brace?

1  A.  Not every single patient, but there are some practice

2  patterns and styles where a lot of the patients may receive a

3  back brace.

4  Q.  And there would be patients that it would be

5  counterproductive to give back braces as well, correct?

6  A.  It can be.

7  Q.  I want to talk to you a little bit about patient

8  assessment, and not only for injections but also for opioid

9  prescribing.  I believe in your report you indicated that an

10  essential step in determining the treatment of pain is the

11  evaluation of the patient, correct?

12  A.  Yes.

13  Q.  And I think you testified on direct examination that that

14  includes the patient history?

15  A.  Yes.

16  Q.  A physical examination of the patient?

17  A.  Yes.

18  Q.  Diagnostic test?

19  A.  Maybe.

20  Q.  And review of like past medical treatment?

21  A.  Maybe.

22  Q.  So maybe on diagnostic test?

23  A.  Yes.

24  Q.  And maybe on reviewing past treatment if there is any?

25  A.  Yes.

1    Q.  But a patient history, you take that every time?

2    A.  Yes.

3    Q.  You do a physical examination every time?

4    A.  Yes.

5    Q.  And that's both for prescribing as well as for evaluating

6    for injections, is that correct?

7    A.  Yes.

8    Q.  So doctors should be doing individualized assessments of

9    each patient before they prescribe opioids, is that fair to

10   say?

11   A.  Yes.

12   Q.  In a given practice would you expect to see some diversity

13   among the type of medications that patients receive?

14   A.  Depends on the individuals.  There -- there's some

15   colleagues that sort of fall into a pattern and there's some

16   colleagues that operate over a wider range.

17   Q.  But with respect to the patients, if they're receiving

18   individualized treatment, would they all get the same

19   medications?

20   A.  It -- it -- it happens quite commonly because at a -- at a

21   tertiary care center patients are coming in, 60 -- two-thirds

22   of our patients are low back pain patients and -- and chronic

23   neck and arm pain, and they're all on -- they all have pain for

24   quite a while so it -- it falls into a pattern often.

25   Q.  But you wouldn't expect to see any differences in the pain

1    for a car accident victim versus someone who picked up a T.V.

2    wrong today?

3    A.  The pain presentations are remarkably similar.  There --

4    there's nothing arranged there, but by the time they get to the

5    Pain Center, many things have been done and the whole condition

6    has stabilized.

7    Q.  Okay.  I believe you state in your report that the

8    history, the physical examination and the diagnosis are

9    critical to the patient treatment plan of care, is that

10   correct?

11   A.  Yes.

12   Q.  Do you believe you can perform all those necessary steps

13   in less than two minutes?

14   A.  No.

15   Q.  If a doctor was to see 60 to 80 patients per day, would

16   that be enough time to perform individualized assessments to

17   prescribe opioid medications?

18   A.  It -- it depends on review of -- of the record.

19   Q.  What if they're all new patients?

20   A.  Oh, new patients?  I mean depends on the patient

21   complexity and how they're coming to you, what their underlying

22   diagnosis is and the length of the day.

23   Q.  How many patients do you see per day?

24   A.  I would say, generally speaking, it's anywhere from, going

25   to give you a range, 30 to 60.

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

1    Q.   Okay.  On average, if you were to see 80 patients in a day
2    and fully assess them, whether it's for initial -- and I
3    believe you say you need to do assessments for continued opioid
4    prescribing as well, correct?
5    A.   You said eight?
6    Q.   Eighty.
7    A.   Eighty.  Okay.
8    Q.   How much time would you be spending with each patient?
9    A.   It's very tough to -- it would take the whole day,
10   clearly.  It could be an eight-, ten-, 12-hour day.
11   Q.   And if you left at -- if you came in let's just say at
12   8:30 in the morning and left at 3:30, would you have enough
13   time to evaluate all those patients?
14   A.   I don't know.  I would need to take a look at their
15   record.
16   Q.   And you haven't reviewed anything other than the four
17   records, correct?
18   A.   You're correct.
19   Q.   Okay.  In your report you also discuss the need for
20   patients to understand the risks and the side effects and
21   adverse events that come as a result of opioid prescribing,
22   correct?
23   A.   Yes.
24   Q.   And doctors should be discussing those types of things
25   with patients when they're prescribing to them, correct?

1    A.   Somebody in the practice should be discussing, yes.

2    Q.   But there should be a conversation with the patient with

3    regard to the risks that are associated with opioids?

4    A.   Correct.

5    Q.   And I think we've talked a little bit about pain

6    contracts, and you said that that talks about the

7    responsibility of the patient as well as the responsibility of

8    the doctor?

9    A.   They can be used.  They can be used.

10   Q.   They can be used.

11        And in those agreements, if they are used -- do you

12   use those in your practice?

13   A.   I do.

14   Q.   Are you discussing the contents of those agreements with

15   the patients so that they understand what their

16   responsibilities are?

17   A.   It'd be myself, my resident, fellow or nurse practitioner,

18   yes.

19   Q.   So somebody from the practice is going over that document

20   with them?

21   A.   You can -- you're correct.

22   Q.   You also talked about psychosocial history, I want to -- I

23   think I said that right, as a part of risk assessment, and that

24   goes into the prescribed -- whether you're prescribing opioids

25   to a patient, is that fair?

1    A.  Yes.

2    Q.  Can you describe for the jury what psychosocial history

3    is?

4    A.  Your psychiatric history, anxiety, depression, personality

5    disorder, and social history is do you have a family, are you,

6    for example, homeless would be example of the range of that.

7    Q.  Would it also include evaluation of prior drug use?

8    A.  Yes.

9    Q.  And would you agree that a review of a patient's medical

10   chart is part of fully assessing that patient?

11   A.  Yes, it can be over time.

12   Q.  And that would be true -- there would be a need to review

13   patient records when you're prescribing opioids if it's a

14   returning patient?

15   A.  Not all the time.  Majority of the time we don't review

16   past -- past records.  It depends on what we're prescribing.

17   If -- if I'm starting somebody on a very high dose, yeah, I

18   want to see the prior records.  If I'm -- if my doses are at

19   the beginning of the beginning range, as it is in this case,

20   there may not be a need to look at the records because I'm

21   going to start the patient on what I normally start patients on

22   anyway.  I don't have to confirm anything.

23   Q.  In a practice where patients are rotated between doctors

24   and you don't have a direct patient relationship, would you

25   review the patient record to understand what was going on with

1    that patient before you prescribed?

2    A.   You can consider it, yes.

3              MS. McMILLION:  Ms. Adams, can you bring up

4    Exhibit 107A, page 39 please?

5              THE COURT:  Tell you what.  While you're working

6    through that, why don't we take our -- take our lunch break.

7    It's about 12:15 p.m.  We can break for about 45 minutes to

8    55 minutes and that'll give us a good three-hour window in the

9    afternoon.

10             All right, ladies and gentlemen.  We'll take our

11   lunch break at this point.  It's 12:15 p.m.  We may ask you to

12   be ready to go back at 1:00.  Don't talk about the case during

13   your break and we'll see you in a little bit.

14             Let's all rise for our jurors now.

15             (Jury excused at 12:14 p.m.)

16             THE COURT:  Okay.  We'll take our midday break.

17             (Court in recess at 12:14 p.m.)

18             (Proceedings resumed at 1:16 p.m., all parties

19             present)

20             THE LAW CLERK:  All rise for the jury.  The Court is

21   back in session.

22             (Jury entered the courtroom at 1:16 p.m.)

23             THE COURT:  Okay.  Our jurors are all here on time.

24   The lawyers are here on time.  Everybody may be seated.  Good

25   afternoon.

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

1          And Ms. McMillion had Dr. Gharibo as her witness on
2    cross-examination.  Go right ahead.
3          MS. McMILLION:  Thank you, Your Honor.
4    BY MS. McMILLION:
5    Q.  Dr. Gharibo, before we broke for lunch we were discussing
6    whether you would review a patient chart when you were in a
7    practice of this sort where there's no direct patient/physician
8    relationship because the patients rotate between the
9    physicians.  So I believe I asked you right before we left if
10   it would be necessary to fully assess the patient for opioid
11   prescribing to see what the prior practitioner had done.
12   A.  Depends on what you're trying to accomplish during that
13   followup, but it may be necessary or it may be good to take a
14   look at the prior records.
15   Q.  Okay.
16         MS. McMILLION:  Ms. Adams, can I have you bring up
17   Exhibit 107A, page 39, if you can blow that up.
18   BY MS. McMILLION:
19   Q.  And Dr. Gharibo, I'll represent to you that this is a
20   document from a patient chart from the Pain Center,
21   Exhibit 107A, which has already been admitted into evidence,
22   and can you take a moment and just review that?
23   A.  Yes.
24   Q.  And do you know what that is?
25   A.  It -- it's titled "Discharge Notice."

1    Q.  And I believe that it says that this "patient previously

2    tested positive for illicit drugs on multiple visits, which is

3    a violation of our office policy, and also tested negative for

4    his medications on multiple visits, which is also a violation

5    of our office policy."

6            MS. McMILLION:  And Ms. Adams, if I can have you pull

7    out.

8    BY MS. McMILLION:

9    Q.  At the top of that it says "Summit."  Do you see that?

10   A.  Yes.

11   Q.  So this is in a patient's patient chart from his prior

12   medical history.  Would this raise any red flags in terms of

13   evaluating this patient for opioid prescribing?

14   A.  Yes.

15   Q.  And is this something that you would need to address with

16   the patient before you prescribed opioids?

17   A.  Depends on the time -- time frame and what you're

18   prescribing.  You may or may not need to.

19   Q.  If you're prescribing Norco, would you need to address

20   this?

21   A.  I'd like to take a look at it a little bit more if that's

22   okay.

23   Q.  Sure, absolutely, feel free to read it.  Would you -- she

24   can blow it back up for you.

25           MS. McMILLION:  Bertha, can you make it bigger so we

1    can see it?  Thank you.

2    A.  Okay.  And the question is?

3    BY MS. McMILLION:

4    Q.  And so the question is would something like this need to

5    be addressed with the patient before you prescribed them

6    opioids?

7    A.   In the future, if it's for short-term use, let's say if

8    somebody had some acute injury and you only think of

9    prescribing two weeks, you can just give those two weeks,

10   educating that no misuse, abuse, just keep it -- take it as

11   prescribed.  If you're going to take it chronically, you would

12   have to kind of revisit it and see if it's appropriate or not.

13   You would have to -- you would need to address it.

14   Q.  And not addressing this, would you say that would be

15   outside the standard of care for prescribing?

16   A.  It would -- it needs more information, just needs a little

17   bit more context around it for me to opine.

18   Q.  And if I was to tell you that this patient was discharged

19   from his previous practice, his patient charts were provided to

20   the Pain Center and that was a part of his medical record, is

21   that something that would be outside the standard of care to

22   not address his prior discharge?

23   A.  It may or may not be.  I would need to take a look at the

24   record.

25   Q.  Okay.  I believe in your report you stated that "opioids

1    should always be prescribed judiciously.  In patients with a

2    personal or family history of substance abuse requires strict

3    monitoring."  Is that correct?

4    A.  If I said that, yes.

5    Q.  And so a patient like this would require some form of

6    strict monitoring, correct?

7    A.  For chronic, certainly, and depending on what you're

8    prescribing, yes.

9    Q.  Okay.  You talked in your report about the need for

10   followup assessment and accurate documentation in patient

11   charts.  Is that important in pain management practices?

12   A.  Yes.

13   Q.  And I believe your report says, "Followup assessments and

14   documentation are essential to establish the need for continued

15   management with opioids, including explaining the reasons

16   behind dose management."  Do you recall that?

17   A.  Yes.

18   Q.  And you would agree with me that the accuracy of what you

19   put in those patient charts and that documentation is a very

20   important piece, correct?

21   A.  I agree.

22   Q.  And is that because other providers may look at that and

23   rely on it in treatment of that patient?

24   A.  One of the reasons.

25   Q.  Would insurance companies look at that information in

1    terms of determining confirmation of services?

2    A.  It may.

3    Q.  So the accuracy then therefore would be key to make sure

4    that it accurately reflects what was happening, correct?

5    A.  Yes.

6         MS. McMILLION:  Ms. Adams, can I have you bring up

7    Exhibit 120A?

8    BY MS. McMILLION:

9    Q.  And while she's pulling that up, Mr. Gharibo, I'll

10   represent to you that this has been already admitted into

11   evidence and is a summary of the electronic medical record for

12   patient Andrew Peterson.

13        MS. McMILLION:  And, Ms. Adams if I can have you blow

14   up that first column or that first row, sorry, which it may

15   still be small but I'll have you try.  If not, I'll go to the

16   lectern.

17   BY MS. McMILLION:

18   Q.  I'm going to go to the lectern so you can see it better.

19   I'm going to put it here because it may allow me to get a

20   little closer.  Do you see that?

21   A.  Yes.

22   Q.  Okay.  You had an opportunity to watch the undercover

23   recording videos of Mr. Peterson, is that correct?

24   A.  Yes.

25   Q.  And I think as counsel said, I'm not going to belabor and

1    play the video again, the jury's seen it a few times.  Do you

2    recall that video?

3    A.   Generally.

4    Q.   Okay.  And if you were to review the information here

5    based on what's in that video -- and again, I'm not going to

6    play it, but I want to look specifically at the areas that are

7    highlighted.  Do you see that?

8    A.   Yes.

9    Q.   And so in the "Subjective" category where it says "pain is

10   sharp and constant" and "denies misuse, abuse, addiction and

11   diversion," if those things were not covered in that visit but

12   appeared in the patient chart, would that create any issues as

13   to the accuracy of these medical records?

14   A.   You've got to look at the entirety of the documentation

15   including what the patient fills out before they come in, the

16   questionnaires that are given to the patient and the

17   conversation.  It needs to be reflective somewhere within the

18   entirety of the record, not just during the -- the verbal

19   exchange.

20   Q.   Okay.  But if it says pain is sharp and constant and the

21   patient -- the patient said that the pain was dull and achy,

22   would that be a problem?

23   A.   Sharp, constant, what was the second thing?

24   Q.   And if the patient reported that the pain was dull and

25   achy, would that be a problem?

1    A.  If it's a contrast, it may just be -- it may be a

2    misunderstanding or it may be a problem.

3    Q.  Okay.  And "denies misuse, abuse, addiction and

4    diversion," if there was never any conversations about that,

5    would that be an issue?

6    A.  Depends on what's been completed prior to the visit, so it

7    may or may not be.

8    Q.  And looking at the "Objective" column, it says, "Lungs:

9    CTA."  What does that mean?

10   A.  Clear to ascultation.

11   Q.  And what does clear to -- say that again.

12   A.  It's clear to ascultation.

13   Q.  What does clear to ascultation mean?

14   A.  That means listening to the lungs.

15   Q.  And if this patient never had his lungs listened to, would

16   that be an issue?

17   A.  Yes.

18   Q.  "Abdomen: soft and benign."  Would that require a physical

19   examination?

20   A.  It can be -- depends on during the physical exam as to

21   what you're feeling or maybe a specific abdominal physical

22   exam.

23   Q.  But it would require some physical manipulation of the

24   patient, correct?

25   A.  Depends on what they're doing during the physical exam.

1    You can pick up the abdominal symptoms or you can palpate it.

2    Q.  "Skin: warm."  Would that require physical touch of that

3    patient?

4    A.  You can observe that sometimes by profusion to the area

5    and the blood flow to the area, it would appear red, for

6    example, or you can directly contact it.  You're looking at

7    profusion status or blood flow status with that.

8    Q.  Okay.  And then if we move over here -- I'm sorry, my Elmo

9    skills are not the best -- we have "Assessment," "Assessment,"

10   and it says "MAPS reviewed."  Do you recall this video where

11   the patient reported that he had received prescriptions in

12   Wisconsin?

13   A.  I vaguely recall that, yeah

14   Q.  And he -- this was an undercover patient, and I can

15   represent to you that he had not actually received any MAPS.

16   And so if the assessment is that the MAPS were reviewed and

17   there were no MAPS, would that be an issue?

18   A.  It may or may not be.

19   Q.  And then let's go over to "Plan: discussed misuse, abuse,

20   addiction and diversion."  If there was never any conversation

21   with the patient about those issues, would that be an issue?

22   A.  Yes.

23   Q.  "Discussed avoidance of alcohol, benzodiazepines, all

24   other sedating substances and illegal drugs."  Again, if there

25   was no discussion, would there be an issue with the accuracy of

1    these records?

2    A.   I'm not sure if there was a treatment agreement signed,

3    but it needs to be covered somewhere, whether if it's in

4    writing through the treatment agreement or -- or verbally.  So

5    if it's mentioned, it's not an issue, whether in writing or

6    verbally.  If it's not mentioned, it could be an issue.

7    Q.   And I believe you just -- you testified before lunch that

8    with your treatment agreements, somebody from your practice

9    goes over those with the patient, correct?

10   A.   Yes.

11   Q.   Okay.  And I would assume the same would apply here for

12   the "discussed that compliance with the dosing schedule is

13   expected," that's something also that could be included in that

14   treatment agreement?

15   A.   Yes.

16   Q.   But you would expect that somebody from your practice or

17   any practice would discuss that with the patient?

18   A.   I mean that's a given that you've got to comply with how a

19   medication should be taken.  It's -- it's understood, generally

20   speaking.

21   Q.   And so you report things in your patient charts that are

22   just understood and not discussed with patients?

23   A.   No.  Like when you write down what you're prescribing to

24   the patient, it's expected that patient is going to take it as

25   prescribed, whether if it's a nonopioid or an opioid.

1  Q.  Okay.  I want to talk to you a little bit about the counts

2  in this case that you've made opinions on.

3  A.  I'm sorry, I missed a couple words.

4  Q.  The counts that you have opined on that you went over with

5  counsel for Dr. Bothra.

6  A.  Yeah

7  Q.  Counts 2 and 3 related to patient Adrian Peterson.  Do you

8  recall that?

9  A.  Yes.

10  Q.  And the first one was for DME and the second one was for

11  an office visit.  Did you review those?

12  A.  Yes.

13  Q.  And actually I took this down but I could put it back up

14  because it corresponds with the January 4th, 2018 visit.  If

15  the patient chart documentation is falsified, is it still your

16  opinion that it is reimbursable by Medicare and -- or Blue

17  Cross Blue Shield or any federal health care program as

18  medically necessary?

19  A.  I mean if deliberately falsified, it discredits the

20  record, so it does affect the legitimacy of the record.

21  Q.  And that would then therefore also affect the legitimacy

22  of the reimbursement for those claims, yes?

23  A.  Yes.  There's some errors that do occur during

24  documentation though, but if it's willfully falsified, yes,

25  that does affect it.

1    Q.   Okay.

2            MS. McMILLION:   Ms. Adams, can I have you bring up

3    121A-206?

4    BY MS. McMILLION:

5    Q.   Dr. Gharibo, have you had an opportunity to review this in

6    your review of Glenda Roscoe's patient chart?

7    A.   Yes.

8    Q.   Do you see down there at the bottom it says, "After

9    fitting patient with a brace, a 10 percent of reduced pain was

10   experienced"?

11   A.   I do.

12   Q.   If the patient never reported any reduction in pain from

13   use of this back brace, would that be a fabricated record?

14   A.   Would that be a...

15   Q.   Fabricated record.

16   A.   I've got to listen to the conversation to see how they

17   came up with the 10 percent.  Sometimes we do ranges and

18   motion, for example, and what they report during the range of

19   motion.  I would need to review the record.  But if it's

20   deliberately falsified, it's a problem.  If it's the general

21   sense you have, it's not a problem.

22   Q.   And if it's deliberately falsified, would that affect your

23   opinion as to whether this claim is medically necessary and

24   could be reimbursed by a federal health program?

25   A.   No, because, you know, the immediate fitting and the pain

1    reduction that they get from that is not the basis whether if

2    they're going to continue that treatment or not.  You actually

3    would need to give it a run of one week or so to see if the

4    patient is going to benefit.  So the immediate outcome wouldn't

5    determine if it's indicated or not and if it should be

6    reimbursed or not.

7    Q.   What if the patient wasn't fitted with that brace?

8    A.   What if the patient was not fitted?

9    Q.   Yes.

10   A.   Where -- I mean you can give the patient instructions on

11   how to fit the brace.  There are -- there are adjustable

12   braces.  They can do it on their own or you can -- you can do

13   it yourself or have somebody else do it.

14   Q.   Are you familiar with the L6031 code, or 0631, my

15   apologies, for back braces?

16   A.   Not as I sit here of the details of it.

17   Q.   And if I told you that this was billed under the L0631

18   code, you've offered an opinion that that would be proper

19   billing for this back brace, is that correct?

20   A.   My opinion is based on clinical appropriateness and

21   whether the diagnosis fit the treatment, which makes it

22   reimbursable, but I don't have a specific recollection of the

23   specifics of that code.

24   Q.   Okay.  So your opinion is just as to whether the medical

25   presentation of that patient would have supported a back brace?

1    A.   Yes.

2    Q.   It does not take into account that any records have been

3    falsified?

4    A.   Yes.

5    Q.   And it does not take into account the actual code that was

6    billed?

7    A.   I would -- I would have to take a look at the specifics of

8    the code, so it may or may not take that into account, but it

9    assumes the records are accurate and -- and were not willfully

10   falsified.

11   Q.   Okay.  With those brace codes, if you know, I think you

12   just testified that you have to evaluate and follow up 'cuz

13   it's not what immediately is happening at the time.

14   A.   Yes.

15   Q.   And so from your understanding, and again, this is if you

16   know, to bill for a L0631 code for a back brace, would it

17   require that evaluation and followup with the patient?

18   A.   I don't know the details of that code as I sit here.

19   Q.   Okay.

20        MS. McMILLION:  Ms. Adams, can you bring up

21   Exhibit 121A, page 17, and if I can have you blow up those

22   first two notes please.

23   BY MS. McMILLION:

24   Q.   And Dr. Gharibo, you opined on Counts 5, 6, 7 as well as

25   Count 44 which are all dated 5-6-14 there for Glenda Roscoe.

1   Do you see that?

2   A.   Yes.

3   Q.   And on 5-6-14 she received what procedure?  Do you see

4   that there in the "Plan" section?

5   A.   Can I pull up my report to that section?

6   Q.   Absolutely.

7   A.   So that visit is radio -- right side radiofrequency

8   ablation of the SI joint.

9   Q.   And so to go back to the protocol we discussed, to proceed

10  with that radiofrequency ablation on the right side, the prior

11  4-3-14 bilateral SI joint injection would have had to have

12  80 percent pain relief, correct?

13  A.   Eighty percent pain reduction or functional improvement,

14  depending on some physical outcome metric.

15  Q.   And do you see that patient note, the procedure note

16  there, I guess visit note for 4-3-14?

17  A.   I do.

18  Q.   On your screen?

19  A.   I do.

20  Q.   And what's that say?

21  A.   Just going to pull up my report to that section.  It says,

22  "Patient called same day of her" --

23  Q.   No, there -- it's higher than that, I'm sorry, just at the

24  top of the note next to the sticker.

25  A.   On the 4-3-14 note?

Jury Trial Excerpt: Volume 18 • Tuesday, June 14, 2022

```
1   Q.   Yes.
2   A.   Eighty percent relief for two to three days is how I'm
3   reading that.
4   Q.   So that 80 percent relief for two to three days would have
5   then therefore justified that radiofrequency ablation on the
6   right side on May 6th, 2014, correct?
7   A.   It appears so, yes
8   Q.   And if the patient didn't report an 80 percent reduction
9   in pain for two to three days, that radiofrequency ablation
10  procedure should not have been done, correct?
11  A.   It depends on the physical exam.  I mean you need
12  80 percent reduction by some physical metric, physical
13  examination metric or pain intensity metric, looking at 0 to 10
14  number or a percent pain reduction.  One of them needs to be
15  met to go ahead with radiofrequency.
16  Q.   Do you see any documentation of a physical exam on 4-3-14
17  on this patient chart?
18  A.   I don't.  It does say physical exam.  I can't make it out.
19  I think that's a PU and I'm not sure.
20  Q.   You say you see physical exam on there?
21  A.   I think it's PT actually.
22  Q.   Physical therapy and chiropractic care was part of the
23  plan?
24  A.   Yeah, it's physical therapy and chiro, right.
25  Q.   So there's no documentation of a physical exam in this
```

1    patient chart, is there?

2    A.   I don't see it.

3            MS. McMILLION:   Ms. Adams --

4    BY MS. McMILLION:

5    Q.   Well, and based on that, I believe you testified on direct

6    examination when you were asked by counsel for Dr. Bothra that

7    you trust your patients and you trust what they're telling you

8    'cuz they can represent their pain, is that correct?

9    A.   Yes.

10   Q.   So if a patient doesn't represent that they've had relief,

11   then are you supposed to trust that in terms of the care that

12   you're giving them?

13   A.   If -- you could have -- you look at the whole patient in

14   terms of what they're stating and what the physical outcome is,

15   and you trust your exam and what they're stating and you move

16   based on that.

17   Q.   And so does your opinion at all change if this patient did

18   not report 80 percent relief for two to three days and there's

19   no documentation of physical exam on April 3rd, 2014?

20   A.   You've got to look at the -- pretty much what is being

21   stated with respect to that exam.  There needs to be some

22   support for proceeding with radiofrequency.  If it's 80 percent

23   as stated here, it meets it, but if there's some other physical

24   exam or some other range of motion metric that's there, that

25   would need to be met before you go ahead with the

1    radiofrequency.

2    Q.   And you just testified that it's important to make sure

3    that your records are complete and accurate, correct?

4    A.   Yes.

5    Q.   And that's not documented here, is it?

6    A.   Yes.  That -- your -- your records sometimes, generally

7    speaking, they should reflect what you're going to do, but

8    there are some times where lapses occur in our documentation as

9    part of any physician's practice where the intent of the visit

10   is not translated in writing, but certainly that should not be

11   deliberate but there are human -- there are lapses in

12   documentation at times.

13   Q.   Do you have any reason to believe there was a lapse in the

14   documentation here?

15   A.   I think the record is sparse.  There is -- there can

16   definitely be more documented.  But I'm going to trust that the

17   decision that was made was appropriate based on that 80 percent

18   relief or some -- something else that was relieved in -- in

19   recognition of proceeding with the radiofrequency, whether it

20   was pain relief or range of motion relief.

21   Q.   And so if the patient reports none of that, we're no

22   longer trusting her?

23   A.   If it was deliberately falsified, that's a problem.  If it

24   was where the comprehension of the physician reflects that

25   80 percent improvement in -- or if it's less tenderness,

1    improved range of motion or reduction of pain, then -- then

2    it's legitimate.

3           MS. McMILLION:  Ms. Adams, if I can have you bring up

4    Exhibit 116F-209, and this is for Count 9.

5    BY MS. McMILLION:

6    Q.  And again, I think we discussed this for the last one, but

7    I just want to make sure we go through the braces.  There's

8    also a Letter of Medical Necessity for spine for the back brace

9    of Monica Gibson for Count 8 that is similar to this one.  If

10   this information in this document was falsified, would that

11   change your opinion as to Count 8 or Count 9?

12   A.  If it's deliberately falsified, yes.

13          MS. McMILLION:  Ms. Adams, if I can have you bring up

14   Counts -- or I'm sorry, page -- 116E, page 149.

15   BY MS. McMILLION:

16   Q.  And I'll represent to you that this is a procedure note

17   from a joint injection on -- a radiofrequency ablation I think,

18   or no, it's -- this is a rhizotomy on November 11th, 2017, and

19   that corresponds to Counts 10 and 11.

20          MS. McMILLION:  Ms. Adams, if I can have you blow up

21   that center section there.

22   BY MS. McMILLION:

23   Q.  And Dr. Gharibo, do you see where it says, "The patient

24   was seen and examined.  Patient had 90 percent decrease in pain

25   with sacroiliac joint injections."  Do you see that?

1    A.   I do.

2            MS. McMILLION:   And Ms. Adams, if I can have you

3    scroll down to the bottom of that.

4    BY MS. McMILLION:

5    Q.   Where you have a pre-procedure pain score of 7 and a

6    post-procedure pain score of 1, would that justify a billing

7    for a radiofrequency ablation on 11-11-17?

8    A.   Yes.

9    Q.   But if that information was not reported by the patient

10   and that document was falsified, would your opinion change?

11   A.   If the document was deliberately falsified, yeah, my

12   opinion would change.

13           MS. McMILLION:   Ms. Adams, if I can have you bring up

14   116E, page 139.

15   BY MS. McMILLION:

16   Q.   And Dr. Gharibo, I'll represent to you that this is also

17   for the left side radiofrequency ablation on 11-25-17

18   corresponding to Counts 12 and 13 for Victoria Loose.  And

19   you'll see again there that "the patient was seen and examined.

20   Patient had 90 percent decrease in pain with the sacroiliac

21   joint injection," and then down at the bottom a pre- and

22   post-pain score of 7 to 1.  And again, if these documents were

23   deliberately falsified, would that change your opinion as to

24   whether they are medically necessary or reimbursable by a

25   federal health care program?

1   A.   Same answer.

2   Q.   And you also made an opinion on Count 44 to Glenda Roscoe,

3   which was a prescription for Norco, Counts 45 and 46, which

4   were hydrocodone prescriptions for Victoria Loose, and I

5   believe 45 and 46 were on 11-11-17 and 11-25-17 were the dates

6   that we just looked at there and Ms. Roscoe's was on 5-6-14.

7   And you reviewed the interview reports of both Glenda Roscoe

8   and Victoria Loose, correct?

9   A.   Yes.

10  Q.   And both of them stated that they had to undergo these

11  procedures in order to receive their pain medication.

12  A.   I don't have that specific recollection but I'll take your

13  word on it.

14  Q.   And if they only underwent these procedures, which, if

15  those documents were, in fact, falsified, you state were not

16  then therefore medically necessary or reimbursable by a federal

17  health care program, and it was done as a quid pro quo, would

18  the issuance of those hydrocodone scripts be outside the course

19  of professional medical practice?

20  A.   If it was a -- just for that, it'd be outside of the

21  standard of care.  But if it was part of an integrated plan

22  where you're integrating the injections with the prescription,

23  then it's within the standard.

24        MS. McMILLION:  No further questions for this

25  witness, Your Honor

1          THE COURT:  All righty.  Thank you very much.

2          Anyone else?  And we have some redirect questions by

3    Mr. Rogalski.

4          MR. ROGALSKI:  Your Honor, you wanted to clarify with

5    Dr. Gharibo the additional records that he had received.

6          THE COURT:  Yeah, if you want to ask him about that.

7          MR. ROGALSKI:  Sure.

8          THE COURT:  Or I thought maybe Ms. -- Ms. McMillion

9    would, but -- but I -- I -- I -- I thought he was very murky on

10   the records he looked at during the 50 or so days in which he

11   changed his opinion, but I'll -- I'll leave that up to you.  Go

12   right ahead.

13         MR. ROGALSKI:  Sure.

14                        REDIRECT EXAMINATION

15   BY MR. ROGALSKI:

16   Q.  Doctor, do you recall now the additional records that you

17   had received between the date that you signed the declaration

18   which had identified that you didn't feel that you had all

19   records and your testimony today?

20   A.  Yes.

21   Q.  And what do you recall receiving in the interim?

22   A.  Sure.  What I recall is I was able to watch the videos,

23   which I was not able to watch before, in addition to the

24   patient interviews.  I received about 390 additional pages on

25   Ms. Loose, and I received three additional office visit

1    documentation on Mr. Peterson.

2    Q.   Thank you.

3    A.   And I had enough information on Ms. Gibson and Ms. Roscoe

4    to make a determination.

5    Q.   When you opined, and this relates to Andrew Peterson

6    again, Counts 2 and 3 regarding the durable medical equipment

7    and office visit, when you opined on the medical necessity of

8    those treatments, were you relying on the audiovisual that you

9    had observed or the hard copy, single-page record that you

10   subsequently received?

11   A.   It was a -- it was a combination of things.  It's -- you

12   kind of look at everything.  You sort of try to strike a

13   balance there.

14   Q.   Okay.  So combination of both the audiovisual recording

15   and the document that you subsequently released?

16   A.   Yes.

17   Q.   Received?

18   A.   Yes.

19   Q.   Thank you.

20        Is it your assumption that all of the records that

21   you received and relied upon were, in fact, accurate and

22   truthful documents?

23   A.   Yes.

24   Q.   Okay.  You had no knowledge that any of these records were

25   intentionally falsified?

```
1    A.   Correct, I had no knowledge.
2    Q.   Okay.
3           MR. ROGALSKI:  Nothing further.
4           THE COURT:  All right.  Thank you.  Okay, Doctor.
5    That will conclude your testimony and you may step down and be
6    on your way.  Thank you for being on time and for being here
7    today and safe travels back to your home.
8           THE WITNESS:  Thank you, Your Honor.
9           THE COURT:  Okay.  You are welcome.
10          (Witness excused at 1:47 p.m.)
11          (Excerpt concluded)
12                                _   _   _
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1        C E R T I F I C A T I O N

2            I, Linda M. Cavanagh, Official Court Reporter of the

3    United States District Court, Eastern District of Michigan,

4    appointed pursuant to the provisions of Title 28, United States

5    Code, Section 753, do hereby certify that the foregoing pages 1

6    through 123 comprise a full, true and correct transcript of the

7    proceedings taken in the matter of United States of America vs.

8    D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5

9    Christopher Russo, Case No. 18-20800, on Tuesday, June 14,

10   2022.

11

12                          s/Linda M. Cavanagh
                            Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                          Federal Official Court Reporter
                            United States District Court
14                          Eastern District of Michigan

15

16

17

18

19   Date: February 10, 2023
     Detroit, Michigan

20

21

22

23

24

25