UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

D-1 DR. RAJENDRA BOTHRA
D-3 DR. GANIU EDU
D-4 DR. DAVID LEWIS
D-5 DR. CHRISTOPHER RUSSO,

Defendant.
_______________________________/

Case No. 18-20800
Hon. Stephen J. Murphy, III

**JURY TRIAL EXCERPT: VOLUME 9**

BEFORE THE HONORABLE STEPHEN J. MURPHY, III
United States District Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan 48226
Friday, May 27, 2022

APPEARANCES:

For the Plaintiff United States of America:
BRANDY R. McMILLION
BRANDON C. HELMS
U.S. Attorney's Office
211 W. Fort Street
Suite 2001
Detroit, Michigan 48226
313-226-9622

For the Defendant D-1 Dr. Rajendra Bothra:
ARTHUR J. WEISS
30445 Northwestern Highway
Suite 225
Farmington Hills, Michigan 48334
248-855-5888

(Appearances continued next page)

APPEARANCES: Continued

For the Defendant D-1 Dr. Rajendra Bothra:

ALAN T. ROGALSKI
Warner, Norcross & Judd LLP
2000 Town Center
Suite 2700
Southfield, Michigan 48075
248-784-5055

For the Defendant D-3 Dr. Ganiu Edu:

ROBERT S. HARRISON
Robert Harrison & Associates
40950 Woodward Avenue
Suite 100
Bloomfield Hills, Michigan 48304
248-283-1600

For the Defendant D-4 Dr. Davis Lewis:

RONALD WILLIAM CHAPMAN, II
Chapman Law Group
1441 West Long Lake Road
Suite 310
Troy, Michigan 48098
248-644-6326

JEFFREY G. COLLINS
Collins & Collins, P.C.
1323 Broadway
Suite 800
Detroit, Michigan 48226
313-963-2303

For the Defendant D-5 Dr. Christopher Russo:

LAURENCE H. MARGOLIS
Margolis Law Firm
214 South Main Street
Suite 202
Ann Arbor, Michigan 48104
734-994-9590

<u>To obtain a certified copy of this transcript, contact</u>:
Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

TABLE OF CONTENTS


| | Page |
|---|---|
| Government Witness: | |
| JANET GAMBILL | |
| Direct Examination by Mr. Helms | 7 |
| Cross-Examination by Mr. Rogalski | 22 |
| Redirect Examination by Mr. Helms | 33 |


EXHIBITS


| Identification | Offered | Received |
|---|---|---|
| NONE | | |

Detroit, Michigan

Friday, May 27, 2022

_ _ _

(Proceedings commenced at 9:06 a.m., all parties present)

THE LAW CLERK: All rise for the jury.

(Jury entered the courtroom at 9:06 a.m.)

THE LAW CLERK: The United States District Court for the Eastern District of Michigan is now in session, the Honorable Stephen J. Murphy, III presiding.

THE COURT: Okay. Our jurors are all back, they're in their spots.

Let's all be seated and Mr. Lang can call the case out for us.

THE CLERK: The Court now calls Case No. 18-20800, United States versus Rajendra Bothra, et al.

Counsel, please state your appearances for the record.

MR. HELMS: Good morning, Your Honor. Brandon Helms on behalf of the United States.

MS. McMILLION: Good morning, Your Honor. May it please the Court, Brandy McMillion appearing on behalf of the United States.

THE COURT: Welcome.

MR. HARRISON: Good morning, Your Honor, ladies and

gentlemen. Robert Harrison appearing on behalf of Dr. Edu who is standing to my left.

THE COURT: Morning.

MR. ROGALSKI: Good morning, Your Honor. Good morning to the Court. I'm Alan Rogalski appearing on behalf of Dr. Bothra who is to my left.

MR. WEISS: Good morning, Your Honor. May it please the Court, Arthur Weiss, co-counsel for Dr. Bothra.

MR. CHAPMAN: Good morning, Your Honor. Ronald Chapman on behalf of Dr. Lewis who is to my left.

THE COURT: Okay.

MR. COLLINS: And good morning, Your Honor. Jeffrey Collins on behalf of Dr. David Lewis.

MR. MARGOLIS: Good morning, Your Honor. Laurence Margolis on behalf of Dr. Russo.

THE COURT: Okay. Good morning and welcome, one and all, and thanks to our lawyers and jurors for all being on time. Another on time start. We're a little bit after 9:00 o'clock but that's fine.

We did make it to Friday, which is a great development and worthy of -- worthy of note. But now our job is to stay cool and continue to evaluate the testimony and evidence that comes our way and -- and then we'll have a nice three-day weekend, okay?

So with that, I would look to the government for your

next witness.

MR. HELMS: Yes, Your Honor. We call Janet Gambill.

THE COURT: Okay. How you doing today?

THE WITNESS: I'm doing okay. How are you?

THE COURT: Okay. I'm doing great. Can you raise your right hand for me?

J A N E T G A M B I L L

was called as a witness herein, and after being first duly sworn to tell the truth and nothing but the truth, testified on her oath as follows:

THE WITNESS: So help me God, yes.

THE COURT: Excellent. Go ahead and have a seat there, try to relax --

THE WITNESS: Yeah.

THE COURT: -- if possible, chair's reasonably comfortable, and just speak --

THE WITNESS: Thank you.

THE COURT: Yep. Just speak into the mic. You can move that mic toward you so -- yeah. Lower your mask, that's good. You can -- you can slide that unit.

THE WITNESS: Any way I like?

THE COURT: I think you're fine.

THE COURT REPORTER: You can sit back in the chair if you want. No, however -- if you can move the -- well, actually the bench only goes out so far. Just please keep your voice

up.

THE COURT: Okay. Here we go.

Go ahead, Mr. Helms.

DIRECT EXAMINATION

BY MR. HELMS:

Q. Good morning, Ms. Gambill.

A. Good morning.

Q. Could you please state your full name for the record?

A. My name is Janet Lynn Gambill, G-a-m-b-i-l-l.

Q. And are you familiar with the Pain Center?

A. Yes, I am.

Q. Were you a patient there?

A. Yes, I was.

Q. Why did you first go to the Pain Center?

A. I was in a motor -- motor vehicle accident in March of 2011.

Q. And what kind of pain did you have as a result of that accident?

A. Neck pain, lower back pain and right ankle pain.

Q. And how did you find the Pain Center?

A. In the Yellow Pages.

Q. And which doctor -- which doctor or doctors treated you at the clinic?

A. Originally the first doctor was Dr. Bothra.

Q. And at some point did you see another doctor?

A. Yes, I did.
Q. And who was that?
A. It was Dr. Backos.
Q. Okay. When you went to the Pain Center, did you have medical insurance?
A. I had vehicle and medical.
Q. So you -- you also had -- so let me just back that up. You had Medicare?
A. Yes.
Q. And then some of your claims, some of your medical bills might have also been paid by your health insure -- by your auto insurance?
A. Yes, sir.

MR. HELMS: And Ms. Adams, if we could pull up Exhibit 109A, page 143, which is a page from Ms. Gambill's patient file.

BY MR. HELMS:
Q. Ms. Gambill, do you see what's on the page there?
A. Yes, I do.
Q. And what does it say at the top?
A. It says "Auto Patient Name: Janet Gambill. Date of Accident: 10-30 of 04. Titan Insurance Company," and it has the number.
Q. Now, I'll stop you there. Was Titan Insurance the insurance you had when you went to the Pain Center?

A. Originally, yes.
Q. Okay.
MR. HELMS: You can take that down, Ms. Adams.
BY MR. HELMS:
Q. Ms. Gambill, when you saw Dr. Bothra, where did you see him?
A. At the Pain Center located on Van Dyke Road past 11 Mile.
Q. Was that in Warren, Michigan?
A. Yes, it was, sir.
Q. And when you saw Dr. Backos originally, where did you see him?
A. At the Pain Center, the same place on 11 Mile.
Q. At some point while you were getting -- being treated by Dr. Backos, did he move to a different location?
A. At a later time, yes.
Q. And where was that location?
A. It was located basically before the original Pain Center, to the right, next to the gas station there on 11 Mile.
Q. So a few -- a few streets down?
A. Yes, sir.
Q. Yeah. Do you see Dr. Bothra here today?
A. Can I stand up because I have bad eyes.
THE COURT: You can definitely stand up, yep.
A. Yes, I do.
Q. Where is he located?

A. Right there.
Q. In the corner?
A. Yes, sir.
Q. With the white mask?
A. Yes.
Q. Okay. You may sit down.

At your first visit with Dr. Bothra, what happened? Can you explain the -- the -- what happened in the exam room?
A. First I signed in and then I was put in a room, waited for him to come in, and he went over my -- he had read my medical history, he went over that with me, asked me what type of pain I had. And I was originally seeing a Dr. Albert Bayer before I came to the Pain Center, but he is no longer a doctor so I started seeing the Pain Center that day. I walked over, I sat on the table as he read through my file to see exactly what type of pain I had, and he said neck, lower back, and I told him my right ankle was from a previous accident before this had happened.

He asked if I would benefit from injections because I told him how deep my pain was. And I was originally on Percocet from Albert Bayer, and he said he wanted to lower that to Norco thousand milligram to see if that would help me instead of being on the Percocet. So we went over a plan of action, and after he was done, I got a back brace.
Q. Wait, let me stop you there. When you were in -- when you

were in the room with Dr. Bothra, what kind of exam did he perform on you?

A. He had me stand up, touch -- try to touch my chin to my check, try to touch my toes and -- and turn from side to side, and that was my exam.

Q. That was --

A. And tried to raise my hands up, sorry.

Q. Was there anything else that he had you do?

A. No, sir.

Q. Did he physically touch you?

A. No.

Q. And you -- you mentioned he gave you a plan of care. What was the plan of care that he discussed with you?

A. He -- he discussed pain injections to see if I could benefit from that and getting a back brace and a neck brace to help with my pain, and that -- and then that was it for the day.

Q. Did he tell you what kind of injections you would be getting?

A. No, I don't believe so. I -- and if I do, I don't remember.

Q. Did he have any discussion with you about taking the medicine Norco?

A. Just -- I -- I used to take Percocet, but no, we went -- didn't go over any plan of action at that time. It was pretty

short, simple and we saw the plan, and it was probably about 15 minutes I left.

Q. Did you have any discussion about the risks of taking Norco?

A. No, sir.

Q. And then you subsequently would receive injections?

A. Yes.

Q. In what part of your body?

A. Um, my neck and lower back.

Q. And who gave you those injections?

A. Dr. Bothra.

Q. Only Dr. Bothra?

A. Yes.

Q. And you -- you're sure of that?

A. Yes, I'm positive of that.

Q. Did Dr. Bothra also have -- refer you to Dr. Backos for an EMG and nerve conduction study?

A. Yes, to study the nerves, yes.

MR. HELMS: And Ms. Adams, could we pull up page -- or 109A, page 343?

BY MR. HELMS:

Q. And Ms. Gambill, if you can look in the -- the top procedure part there.

A. August 9th, 2012 --

Q. Ms. Gambill, hold on, let me ask you a question.

A. Sorry.
Q. Okay. So what's the date of this -- what does it say for procedure date?
A. August 9th, 2012.
Q. And who was listed as the requesting physician?
A. Dr. Raja [sic] Bothra.
MR. HELMS: Okay. You can put that down, Ms. Adams. Thank you.
BY MR. HELMS:
Q. Ms. Gambill, do you know if Dr. Edu ever gave you injections?
A. No.
Q. He did or he did not give you --
A. Did not give me injections.
Q. Do you know who Dr. Edu is?
A. Yes, I do. He was an assistant, that when he first came there he was actually an observer.
Q. Are you able to identify Dr. Edu today?
A. Yes, I am.
Q. Where is he located?
A. Right there.
Q. What color mask does he have on?
A. A blue, and a dark-colored suit with a tie and a white shirt.
Q. How often would you receive injections?

A. Every week or every two weeks.

Q. Okay. Did the injections help with your back pain or your neck pain?

A. Not really.

Q. Did you tell that to Dr. Bothra?

A. Yes.

Q. How did he respond?

A. He said, "We should keep trying to do this so we can burn your nerves and maybe that will help you with your pain."

Q. Did you ever say that you no longer wanted to receive injections?

A. I said at the time, yes. I said, "I don't think they're helping and I -- I -- I wish not to do these injections."

Q. How did Dr. Bothra respond to that?

A. He actually said that maybe I should be cut as a patient and stop prescribing the medication.

Q. Did you ever have any procedures to have your nerves burned?

A. I do not believe so.

Q. Okay. I'm going to pull up your billing data now from Medicare.

MR. HELMS: Ms. Adams, can we pull up Exhibit 84, page 1, and if we could first highlight January 6th, 2012.

BY MR. HELMS:

Q. Ms. Gambill, do you see on that second line there the

date -- or the date, January 6th, 2012?

A. Yes.

Q. And then two columns over do you see a doctor's name?

A. Yeah. This is to the left you mean? Yes. That is not who did them, sorry.

Q. You see that it says Dr. Edu there?

A. Yes.

Q. And then two columns over or three columns over, can you read what the description is there?

A. Three columns over. Okay. Is it -- can you do the numbers for me? Is it like --

Q. It's next to the 62310.

A. "Injections of substance into upper or -- or middle spine."

Q. Okay. To your knowledge, did Dr. Edu do that injection?

A. No, sir.

Q. Again, who did -- who did your injections?

A. Dr. Bothra did.

Q. Okay. And then if we move to the January 13th, 2012 billings, do you see at the top there, there's a number of procedures listed for January 13th, 2012. Do you see that?

A. Yes, I do.

Q. Okay. If you look three down and four down next to 20553 and J3301, do you see those?

A. Yes, I do.

Q. And what are the descriptions in those columns?

A. "Injections of trigger point in three or more muscles" is 20553, and that J3301, "Injection of" -- I cannot -- "not otherwise specified, 10 -- 10 milligrams."

Q. Did Dr. Edu perform those injections?

A. No, sir.

Q. And then if we move to February 7th, 2012, there's a number of injections listed here. Do you see that?

A. Yes, I do.

Q. And could you read the description for one of them?

A. "Anesthesia for nerve block and injection procedure, prone position."

Q. And then below that?

A. "Injections of upper or middle spine facet joint using imaging guidance."

Q. Did Dr. Edu perform that injection?

A. No, sir.

Q. Okay. I'd like to move now to other -- other treatment you received at the Pain Center. Did you go to physical therapy at the Pain Center?

A. Yes, I did.

Q. Which doctor referred you to physical therapy?

A. Dr. Bothra.

Q. And where did you actually do your physical therapy?

A. In basically the same building, right next door.

Q. Do you know if it was called The Annex?
A. Yes.
Q. Can you describe to the jury what that physical therapy was, the nature of it?
A. Um, when I -- when I walked in there, I signed in, and the first thing I did because I have ankle pain is they did a crockpot with racks in it and they dipped my ankle in it and -- for a short period of time. I pulled it out onto wax paper and they took off the wax. That actually did help.

But next I would be taken to a room to where they did electro meds and massage therapy for a timer that was set for ten minutes, and then I was done.
Q. Approximately how long would that physical therapy last?
A. Approximately maybe 25 minutes.
Q. Did you go more than once?
A. Yes.
Q. Was it a similar procedure each time?
A. Yes, sir.
Q. Did you ever do any physical exercises as part of your physical therapy?
A. No. I -- I -- I couldn't really, but no. There was -- there was -- it was just beginning and there was hardly any equipment at the time.
Q. Did anyone work with you on range of motion?
A. No, sir.

Q. Did the therapy help your neck or back pain?
A. No, not really.
Q. What did Dr. Bothra ask you, if anything, about how the physical therapy was helping?
A. Um, I remember that I needed surgery, but he didn't refer me to surgery; Dr. Backos did.
Nothing, I'm sorry.
Q. At some point did you switch to seeing Dr. Backos exclusively?
A. Yes, after my EMG appointment, I don't remember the date, but yes.
Q. And why did you switch to Dr. Backos?
A. Because I was told that if I didn't continue the injections, I -- I wouldn't be there as a patient and I'd be taken off the pain medication.
Q. And did -- did Dr. Backos allow you to continue as a patient without injections?
A. Yes, sir.
Q. Did Dr. Backos require you to get injections?
A. No.
Q. Would you get trigger point injections from Dr. Backos?
A. Yes.
Q. That's something different?
A. Yeah, that -- that's -- it's just like a steroid or an anti-inflamination [sic] that helps with inflamed muscles,

spasms.

Q. Ms. Gambill, did you come up with a nickname for the Pain Center?

A. Yes, I did.

Q. What was that nickname?

A. The Slab.

Q. Why'd you call it The Slab?

A. Because basically you'd go in there, get your injections, come out, sit in a chair, be handed a juice and crackers and wait. I've seen people fall out of chairs looking like zombies. It could be the patients, I don't know, but I just thought it was ridiculous.

Q. Did you ever see anything noteworthy in the Pain Center parking lot?

A. Yes.

Q. What was that?

A. It was a gentleman outside in the wheelchair and I felt bad for him. I was standing out there having a cigarette, and he actually asked me if I would like to buy some of his fentanyl, which at that time I had no clue what fentanyl was, and I said no thank you.

Q. While you were waiting in the lobby, did you overhear patient conversations? And don't tell me what they were, I'm just asking if you did.

A. All the time, yes.

Q. How loud were those conversations?

A. Very loud.

Q. Do you know if staff heard those conversations?

A. Yes, but they basically were behind glass. They kind of ignored it. So, you know, it is what it is.

Q. Did the staff ever give any indication that they heard what patients were talking about?

A. No.

Q. Did you ever see people receive treatment at the Pain Center that you had questions or concerns about?

A. Can you repeat the question?

Q. Yes. Did you ever see people who in particular -- who you in particular were concerned about them receiving treatment at the Pain Center?

A. Yes.

Q. And why was that?

A. Because I'm a compassionate person, I have a heart. I've seen them and they had a lot of medical issues, and I said, "If you want a good surgeon, I would see Dr. Kornblum." I said, "He does help with pain and all that and he can also do surgeries," 'cuz they would all talk about their medical issues right there in the lobby and I felt bad, you know?

Q. When did you last go to the Pain Center?

A. Um, when did I what?

Q. When did you last go to the Pain Center?

A. It was around Christmastime 'cuz I seen the holiday decorations. I seen Dr. Backos for the last time I believe November or December of 2018.

Q. Since your time at the Pain Center, have you had to deal with pain?

A. Absolutely.

Q. Have you had procedures done since your time at the Pain Center?

A. Yes.

Q. What types of procedures?

A. I have a pacemaker in my left butt cheek that controls my bladder and libido. I have a shunt in my left side that controls the fluid of the spinal fluid that goes to my brain.

Q. What's the purpose of the shunt?

A. The purpose of the shunt is it's going to keep me living. It stops my brain from having pressure. Because of so many injections in my back, it messed up my spinal fluid and cord and I constantly have to be in pain and it hurts.

MR. HELMS: Is there a Kleenex, Kleenex up there?

THE COURT REPORTER: One second.

(Brief pause)

A. Thank you so much. I really appreciate it.

MR. HELMS: Your Honor, I have no further questions.

THE COURT: Okay. All right. Thank you.

Mr. Rogalski wants to get started.

CROSS-EXAMINATION

BY MR. ROGALSKI:

Q. Ms. Gambill, my name is Alan Rogalski. I represent Dr. Bothra. Do you need a moment to compose yourself?

A. I'm fine.

Q. Are you?

And I have to say I'm sorry that you're in a lot of pain.

Now, you have suffered -- you had two automobile accidents, isn't that correct?

A. Yes.

Q. And then you also fell, isn't that correct?

A. Yes.

Q. Your testimony was that you had one automobile accident, but you actually had two very serious automobile accidents which caused these injuries, correct?

A. I recall two; one for Titan, one for State Farm.

Q. Okay. And that was the source of these injuries, correct?

A. Yes.

Q. Yeah. And then you fell --

A. At my neck and back and lower back.

Q. And then you subsequently fell again, is that correct?

A. No. In 2008 I fell through a porch, which I was working as a manager, and twisted my ankle, went through the porch, and I was in a cast for four years.

Q. Okay. So two automobile accidents and you fell. You suffered some really serious injuries, isn't that correct?
A. Yes.
Q. Okay. And for a period of time you went to the Pain Center, you saw Dr. Bothra, correct?
A. Yes.
Q. Was -- and you mentioned Dr. Kornblum. You went to see Dr. Kornblum for surgery?
A. Later after seeing Dr. Backos I was referred to see Dr. Kornblum, yes, sir.
Q. What year was that?
A. I -- I don't recall. I think it was 2012.
Q. 2012.
Subsequent to your treatment and -- and surgery, and let's just -- as long as we're talking about Dr. Kornblum, what did Dr. Kornblum do for you?
A. He performed neck surgery.
Q. Okay. So in 2012 you then came back to the Pain Center, correct?
A. After -- yes, with neck gear and I was healing, yes, to see Dr. Backos.
Q. Okay. That was your choice?
A. Correct.
Q. Okay. So you came back to the Pain Center 2012. Your care ultimately transitioned to Dr. Backos. When was that?

A. That was in 2012 also.

Q. Okay. And that was your choice to continue care with Dr. Backos, right?

A. Yeah.

Q. Okay. You continued at the Pain Center for 2012, 2013, 2014, 2015 -- is this humorous?

A. No. I have -- I was in the hospital from 2014 of August till January of 2015 from Legionnaires.

Q. Okay. That adds to the complications here, doesn't it?

A. Oh, yes.

Q. Okay. But you were under the care of the Pain Center from 2013, '14, '15, '16, '17, '18 in this environment you called ridiculous?

A. Well, it -- I -- it is what it is. Everyone went there. Why am I the only one --

Q. Excuse me, that's not my question.

THE COURT: Hold on, Mr. Rogalski.

Witness, you just answer the question and don't --

A. Yes, I did. I continued treatment, sir.

Q. That was your volition, that was your decision to continue going back year after year after year, correct?

A. Correct.

Q. Nobody forced you?

A. No.

Q. Nobody -- nobody forced you onto a table to undergo any

injections, did they?

A. I wasn't physically forced.

Q. It's a yes or no question.

A. No, no, I was not.

Q. Okay. After 2013 when you transitioned care to Dr. Backos, did you see any other Pain Center physician other than Dr. Backos?

A. Yes, I did. It was a psychologist.

Q. Dr. Anatole Matulis?

A. I believe so, yes.

Q. After 2013 did you ever receive any medical treatment from Dr. Bothra?

A. Besides the injections, no.

Q. You're saying to this Court that you had injections from Dr. Bothra after 2013?

A. Yes, in my lower back.

Q. That's yes or no.

A. Yes.

Q. You're sure about that as to anything you've testified to today?

A. Yes. And I'd take a lie detector test, sir.

THE COURT: All right. Listen, just no extraneous matter, just answer the question.

Go ahead, Mr. Rogalski.

MR. ROGALSKI: We can pull up Exhibit 109A, B, C, D,

and E for the Court.

BY MR. ROGALSKI:

Q. And this is a copy of your medical record?

MR. HELMS: Your Honor, we can't pull up five exhibits at once.

MR. ROGALSKI: You can start with A, 109A.

MR. HELMS: Sure.

BY MR. ROGALSKI:

Q. This is a copy of your medical record, ma'am?

A. It's blank over here, sir.

Q. That I don't control.

A. Sorry. Just telling the truth.

Q. And I will represent to you, unless you disagree with me, that your medical record consists of over 552 pages of medical records.

A. Okay, yes.

Q. Your medical records -- and we can go through every single page if you wish.

A. I -- I do not wish to but...

Q. Okay. I will represent to you, and you can disagree with me if you wish and you can go through every single page, but these records demonstrate for the period of 2013, 2014, 2015, 2016, and 2017 until you finished in 2018 --

A. Yes, sir.

Q. -- you never received a single injection or prescription

from Dr. Bothra?

A. Um, I have to decline that because I'd have to get ahold of my ex-attorney who has the file which I do not have on hand.

Q. They're right here.

A. Oh, okay.

Q. And you can go through every --

A. The ones you have, yes, I guess.

Q. This is what the government has introduced as your medical record.

THE COURT: All right. She's not going through every page. Let's get to the point.

What -- what's your offer, Mr. Rogalski?

MR. ROGALSKI: Your Honor, the record demonstrates for the period of January 1st, 2013 through December 6th, 2018, Mrs. Gambill did not receive a single injection or prescription from Dr. Bothra. The only treatment that she received were from Dr. Anatole Matulis and from Dr. Eric Backos.

THE COURT: All right. Are you in a position to agree or disagree with that, witness?

THE WITNESS: I'm going to disagree.

THE COURT: Okay.

MR. ROGALSKI: The record speaks for itself.

BY MR. ROGALSKI:

Q. Prior to coming to the Pain Center, ma'am, you were already on opiates, isn't that correct?

A. Yes, I was prescribed Percocet.

Q. And then when you came, Dr. Backos -- or Dr. Bothra prescribed Norco, correct?

A. Correct.

Q. A much less potent narcotic, isn't that correct?

A. I'm not a doctor but I guess so, yes.

Q. Okay. But you weren't naive to the use of opiates. You'd been on them for some time because of some pretty serious injuries that you sustained.

A. Not a long period of time.

Q. How many years?

A. Maybe a year, if that.

Q. Okay. You were on opiates for a year, you were on Percocet for a year, so by the time you got to the Pain Center, you had been on them for a long period of time, you were a chronic opiate user, isn't that correct?

A. After I left there, yes.

Q. I asked you before you got there.

A. Oh, before I got there? It was a short period of time and could not see my doctor so I had transitioned to the Pain Center.

Q. You had to?

A. Oh, yes, because I was in a horrific amount of pain.

Q. You had nowhere else to go?

A. That's where I decided to go.

Q. That's where you decided to go?
A. Yeah.
Q. You didn't have to go, as you said. You decided to go there.
A. Yes, I did.
Q. And again, for six years after 2013 you decided to go there and continue to receive treatment from a place that you called ridiculous?
A. Well, the patients out there talking their business every day.
Q. I didn't ask you that. I asked you --
THE COURT: Okay. Let her finish.
Q. I -- it's a simple yes or no question.
A. Yes, yes, I did continue to go.
Q. Yeah, that was your own decision to do that.
A. Yes, sir.
Q. Okay. You could have gone to any facility you wanted. You could have gone to the University of Michigan.
MR. HELMS: Your Honor, I think at this point this line of question's been established.
THE COURT: I agree. We can move on.
Go ahead, Mr. Rogalski.
MR. ROGALSKI: All right. Thank you.
BY MR. ROGALSKI:
Q. Are you wearing a back brace now?

A. No, I am not.
Q. Okay.
A. I can't wear one.
Q. You can't wear one. Okay. Thank you.
MR. ROGALSKI: No further questions for this witness.
THE COURT: Okay. Thank you, sir.
Mr. Harrison?
MR. HARRISON: No thank you, Your Honor.
THE COURT: Okay. No one else?
MR. COLLINS: No questions, Your Honor.
THE COURT: Okay. Very good. Anything else?
MR. HELMS: Just a few questions, Your Honor.
THE COURT: Okay. Quickly.
MR. HELMS: Yes.

REDIRECT EXAMINATION

BY MR. HELMS:
Q. Ms. Gambill, you were asked a question of whether you were forced onto the exam table or the operating table. Do you remember that?
A. Yes.
Q. And you said no physical force?
A. No physical force.
Q. Was there anything else that you wanted to say?
A. Yes, I do. That I was on pain medication and I was threatened to be cut off of them, and when you're addicted to a

medicine like that that's very strong, you cannot just detox yourself, and I was threatened to no longer be a patient in there. So when I went to have the injections done before I seen Dr. Backos for the EMG, it -- I had to get it done. Nobody knows how it is to detox from a medication like that. We didn't have Suboxone at that point in time and it was a horrible experience.

MR. HELMS: And Ms. Adams, could we pull up Exhibit 84 again?

BY MR. HELMS:

Q. And Ms. Gambill, I'll -- I'll represent to you that this is your Medicare claims data. You said you had two different auto insurances when you went to the Pain Center, correct?

A. Yes.

Q. Do you have any idea what your claims data for your auto insurance companies looks like?

A. No, I did not.

Q. Okay. So you don't know one way or another what it would show with regard to injections?

A. No.

Q. Okay.

MR. HELMS: If we go to the next page, Ms. Adams, on 84. One more page. And Ms. Adams, can you blow up maybe the top happen of that page?

BY MR. HELMS:

Q. Ms. Gambill, do you see in the third column over the name Eric Backos?

A. Yes, I do.

Q. So at least by this point, this is when you were seeing Dr. Backos exclusively?

A. Yes, sir.

Q. What did you think of your treatment from Dr. Backos?

THE COURT: Listen, this doesn't have anything to do with the cross-examination and it's minutia, okay?

A. He was good.

MR. HELMS: Your Honor, Mr. --

THE COURT: No. Let's move, okay?

MR. HELMS: No further questions.

THE COURT: All right. Thank you. Are you on any narcotics, opiates or other substances today?

THE WITNESS: I am on Suboxone long-term, and I've been in recovery since I -- since I left the Pain Center. They shut down and had nowhere to go. I moved up north and I'm receiving treatment at this time.

THE COURT: Okay. Does that affect your ability to -- to think, recall, remember or express yourself?

THE WITNESS: No.

THE COURT: Okay. All right. Thank you, ma'am. Your testimony's complete. You may step down and be on your way and I hope you have a good afternoon.



THE WITNESS: Thank you so much.

THE COURT: You're welcome.

(Witness excused at 9:40 a.m.)

(Excerpt concluded)

\- - -

C E R T I F I C A T I O N

I, Linda M. Cavanagh, Official Court Reporter of the United States District Court, Eastern District of Michigan, appointed pursuant to the provisions of Title 28, United States Code, Section 753, do hereby certify that the foregoing pages 1 through 33 comprise a full, true and correct excerpt of proceedings taken in the matter of United States of America vs. D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5 Christopher Russo, Case No. 18-20800, on Friday, May 27, 2022.

s/Linda M. Cavanagh
Linda M. Cavanagh, RDR, RMR, CRR, CRC
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: February 13, 2023
Detroit, Michigan