Case 2:18-cr-20800-SJM-APP  ECF No. 486, PageID.5677  Filed 03/18/23  Page 1 of 68
Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

1

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3
     UNITED STATES OF AMERICA,
4
                         Plaintiff,
5        vs.

6    D-1 DR. RAJENDRA BOTHRA          Case No. 18-20800
     D-3 DR. GANIU EDU                Hon. Stephen J. Murphy, III
7    D-4 DR. DAVID LEWIS
     D-5 DR. CHRISTOPHER RUSSO,
8
                         Defendants.
9    _____/

10              **JURY TRIAL EXCERPT: VOLUME 21**

11           BEFORE THE HONORABLE STEPHEN J. MURPHY, III
                     United States District Judge
12             Theodore Levin United States Courthouse
                     231 West Lafayette Boulevard
13                    Detroit, Michigan  48226
                      Tuesday, June 21, 2022
14
     APPEARANCES:
15
     For the Plaintiff          BRANDY R. McMILLION
16   United States of America:  BRANDON C. HELMS
                                U.S. Attorney's Office
17                              211 W. Fort Street
                                Suite 2001
18                              Detroit, Michigan  48226
                                313-226-9622
19
     For the Defendant          ARTHUR J. WEISS
20   D-1 Dr. Rajendra Bothra:   30445 Northwestern Highway
                                Suite 225
21                              Farmington Hills, Michigan  48334
                                248-855-5888
22

23                              (Appearances continued next page)

24

25

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5678   Filed 03/18/23   Page 2 of 68
Jury Trial Excerpt: Volume 21 • Tuesday, June 21, 2022

2

```
 1    APPEARANCES:  Continued

 2    For the Defendant          ALAN T. ROGALSKI
      D-1 Dr. Rajendra Bothra:   Warner, Norcross & Judd LLP
 3                               2000 Town Center
                                 Suite 2700
 4                               Southfield, Michigan  48075
                                 248-784-5055
 5
      For the Defendant          ROBERT S. HARRISON
 6    D-3 Dr. Ganiu Edu:         Robert Harrison & Associates
                                 40950 Woodward Avenue
 7                               Suite 100
                                 Bloomfield Hills, Michigan  48304
 8                               248-283-1600

 9    For the Defendant          RONALD WILLIAM CHAPMAN, II
      D-4 Dr. Davis Lewis:       Chapman Law Group
10                               1441 West Long Lake Road
                                 Suite 310
11                               Troy, Michigan  48098
                                 248-644-6326
12
                                 JEFFREY G. COLLINS
13                               Collins & Collins, P.C.
                                 1323 Broadway
14                               Suite 800
                                 Detroit, Michigan  48226
15                               313-963-2303

16    For the Defendant          LAURENCE H. MARGOLIS
      D-5 Dr. Christopher        Margolis Law Firm
17    Russo:                     214 South Main Street
                                 Suite 202
18                               Ann Arbor, Michigan  48104
                                 734-994-9590
19

20

21

22

23
             To obtain a certified copy of this transcript, contact:
24          Linda M. Cavanagh, CSR-0131, RDR, RMR, CRR, CRC
                          Official Court Reporter
25              (313) 234-2616 • www.transcriptorders.com
```

1                          TABLE OF CONTENTS

2                                                              Page

3    Defendant Lewis Witnesses:

4    SEAN WEISS

5       Direct Examination by Mr. Chapman              5
        Cross-Examination by Mr. Helms               40
6       Cross-Examination by Mr. Rogalski            61
        Redirect Examination by Mr. Chapman          63

7

8

9

10

11

12

13

14

15

16

17                               EXHIBITS

18   Identification                    Offered    Received

19   NONE

20

21

22

23

24

25

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5680   Filed 03/18/23   Page 4 of 68
Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

4

1          Detroit, Michigan

2          Tuesday, June 21, 2022

3                            —  —  —

4          Excerpt (Testimony of Sean Weiss):

5          (Proceedings in progress at 11:50 a.m., all parties

6          present, jury present)

7          MR. CHAPMAN:  Your Honor, at this time defense

8    calls -- Dr. Lewis's defense calls Sean Weiss.

9          THE COURT:  Okay.  Mr. Sean Weiss is ready to go.

10         (Brief pause)

11         How are you?

12         THE WITNESS:  Doing well, Your Honor.

13         THE COURT:  Good.  Would you raise your right hand?

14                    S E A N   W E I S S

15    was called as a witness herein, and after being first duly

16    sworn to tell the truth and nothing but the truth, testified on

17    his oath as follows:

18         THE WITNESS:  Yes, sir, I do.

19         THE COURT:  Okay.  Very good.  Have a seat in that

20    black chair.

21         THE WITNESS:  Yes, sir.

22         THE COURT:  Try to relax and speak toward the mic,

23    it'll slide toward you if you need it to, and you can -- oh,

24    you did take your mask off.  That's very good.

25         And Mr. Chapman, go right ahead.

1              MR. CHAPMAN:  Thank you, Your Honor.

2                      DIRECT EXAMINATION

3     BY MR. CHAPMAN:

4     Q.  Mr. Weiss, can you please state your name for the record

5     and spell your last?

6     A.  Sure.  It's Sean Weiss, W-e-i-s-s.

7     Q.  And where are you employed, Mr. Weiss?

8     A.  I'm employed with Doctors Management out of Knoxville,

9     Tennessee.

10    Q.  What do you do for Doctors Management?

11    A.  I'm a partner and I serve as the vice president of

12    compliance for the organization.

13    Q.  And in your role as vice president, what sort of clients

14    do you serve?

15    A.  So I take care of clients that are as small as a

16    one-physician practice all the way up through integrated

17    delivery health systems with more than 5,000 providers.

18    Q.  And when you say take care of, what specifically do you do

19    to take care of those clients?

20    A.  So we perform audits of documentation, we provide training

21    and education for coding, billing, documentation, and I

22    personally provide regulatory compliance services, so I bill

23    corporate compliance programs, I do investigations for

24    potential fraud, waste and abuse.

25    Q.  And how long have you been working in the compliance

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5682   Filed 03/18/23   Page 6 of 68
Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

6

 1   field?

 2   A.   The end of this year will be 28 years.

 3   Q.   And through those 28 years have you regularly engaged with

 4   clients on compliance matters?

 5   A.   Yeah, all the time.

 6   Q.   Do you have any certifications for this line of work?

 7   A.   I do.  I hold ten national board certifications.

 8   Q.   Let's sort of go through some of them.  We don't need to

 9   hit all of them.  But I understand you have a CPC, is that

10   right?

11   A.   Yes.  So the CPC is the Certified Professional Coder.

12   It's through the American Academy of Professional Coders which

13   certifies that I possess the requisite skills in determining

14   proper CPT codes, current procedural terminology.  So if you

15   think of it as when you go to the doctor and they do something

16   for you, there's a five-digit numeric code that gets billed to

17   an insurance company to tell them what transpired during your

18   patient/doctor visit.

19   Q.   The jury's heard a lot about E&M codes and injection

20   codes.  Are those CPT codes?

21   A.   Those are CPT codes.

22   Q.   Okay.  I understand that you also have a different CPC on

23   the payor side, is that right?

24   A.   I do.  I have the CPC-P which means that I've been

25   certified to opine on the claims processing and/or the

1    adjudication of claims.

2    Q.   In sort of -- sort of plain English, does that mean that

3    you have the ability to work for the health insurance companies

4    as well as for the providers?

5    A.   That's correct.

6    Q.   And have you done work with health insurance companies on

7    their behalf?

8    A.   I have.  I've worked for some of the largest insurance

9    companies in the world as well as assisted the government in

10   their work.

11   Q.   I understand you also have a CHC, is that right?

12   A.   Yeah.  CHC is Certified in Healthcare Compliance through

13   HCCA, which is the gold standard in our industry for regulatory

14   compliance.

15   Q.   And what does the CHC allow you to do?

16   A.   So the CHC, which is Certified in Healthcare Compliance,

17   allows me to opine on statutes and regulations from a nonlegal

18   standpoint.  I'm not an attorney but I'm engaged in the

19   regulatory compliance of hospitals, health systems, physician

20   practices.

21   Q.   Do you also have a CMCO?

22   A.   Yeah.  The CMCO is a Certified Medical Compliance Officer.

23   Q.   Okay.  And then --

24           THE COURT REPORTER:  Excuse me, Mr. Chapman.

25           MR. CHAPMAN:  Yes.

1          THE COURT REPORTER:  Mr. Weiss?

2          THE WITNESS:  Yes.

3          THE COURT REPORTER:  Could you just push the mic a

4    little away from you?  There's a very little bit of feedback.

5          THE WITNESS:  Sorry.

6          THE COURT REPORTER:  No, you're fine.

7          THE WITNESS: Apologize.

8          THE COURT REPORTER:  No, no, no, no problem.  Thank

9    you.

10   Q.  While we're on that note, we'll slow it down a little bit

11   too just so make sure that she can catch everything.

12   A.  Absolutely.

13   Q.  Can you tell the jury what a CMIS is?

14   A.  Yeah.  So CMIS is Certified Medical Insurance Specialist.

15   So that means that I have the requisite skills in understanding

16   what they call ANSI codes, which are billed from hospitals,

17   physician practices to insurance companies to basically

18   communicate in their language as to what was done during the

19   course of the visit and why it was done, and that's usually the

20   ICD-10 codes.

21   Q.  Are there any other relevant certifications that you have

22   that would be helpful for the jury in this case?

23   A.  I think there's two that I possess.  The first one is the

24   CPMA, which is the Certified Professional Medical Auditor.

25   Again, that's through the American Academy of Professional

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5685   Filed 03/18/23   Page 9 of 68
Jury Trial Excerpt: Volume 21 • Tuesday, June 21, 2022

9

1   Coders.  That signifies that I hold the requisite skills to

2   perform audits on evaluation and management services, on CPT

3   codes, on diagnoses codes.

4           And the last one that I think has relevance is the

5   CEMA, which means that I -- I hold an advanced certification on

6   evaluation and management auditing, so those codes that you

7   keep hearing about, E&M, I hold an advanced certification on

8   those specifically for E&M services.

9   Q.  And -- and just so the jury's aware, is 99214 an example

10  of that type of E&M code?

11  A.  It is.  It's the second highest level established patient

12  code.

13  Q.  Mr. Weiss, has you -- have you worked on behalf of the

14  government before?

15  A.  I have in whistleblower cases or what is referred to as a

16  qui tam case in the law.

17  Q.  Have you been retained as an expert by the government?

18  A.  I have, yes, sir.

19  Q.  Have you been retained as an expert by the defense in

20  certain cases?

21  A.  I have, yes.

22  Q.  Do you lecture regularly on areas related to billing,

23  coding, health care compliance?

24  A.  I do.

25  Q.  Have you ever reviewed or audited the files of an

1  interventional pain practice?

2  A.  I have.

3  Q.  Are you able to give us a sense of how often or when?

4  A.  Our firm, we audit approximately a million claims a year

5  on behalf of providers and insurance companies across the

6  country.  In my -- in my career, I've probably audited

7  thousands of interventional pain management services.

8  Q.  Okay.  And with respect to your lecturing and speaking,

9  can you give us a sense of where you lecture and educate?

10  A.  Sure.  So this year I've given several keynotes already

11  for the American College of Rheumatology.  I'll be the keynote

12  speaker for the American Medical Billing Association.  I'll be

13  the keynote speaker for the American College of Rheumatology

14  again in Philadelphia, the keynote speaker for the American

15  Neurological Association.  I'm invited to speak at different

16  universities.  I'm waiting for the schedule, but this year I've

17  been invited to speak at Harvard, at Columbia University and

18  Marquette.

19  Q.  Thank you, Mr. Weiss.

20      MR. CHAPMAN:  Your Honor, at this time I'd like to

21  tender Mr. Weiss as an expert in medical billing and coding,

22  auditing and regulatory compliance.

23      THE COURT:  Okay.  It doesn't seem like there's any

24  objection.  So I will remind the jury one more time we have yet

25  another witness who did not perform, engage or participate in

1    the acts of the case but is here to look at the facts of the

2    case as presented to him so that through his knowledge and

3    experience he can help you to understand billing, coding,

4    regulatory compliance and the other things of which he just

5    spoke, okay?

6              And with that consideration, go ahead, Mr. Chapman.

7              MR. CHAPMAN:  Thank you.

8    BY MR. CHAPMAN:

9    Q.   Mr. Weiss, does Medicare have rules, regulations or

10   policies telling providers how to practice?

11   A.   They do.  They have multiple manuals.  They have the

12   Medicare Program Integrity Manual, they have the Medicare

13   Claims Processing Manual, and those get supplemented by

14   different types of sub-regulatory guidance documents.

15   Q.   And Mr. Weiss, do those manuals describe a standard of

16   care or are they payment determinations?

17   A.   They are payment determinations.

18   Q.   And can you explain to the jury what a payment

19   determination means?

20   A.   Sure.  So a payment determination means that there are

21   generally accepted standards of medical practice that are

22   expected to be followed, things that are based on peer review,

23   clinical relevance, industry standards.  And what the

24   government will do is they will create different chapters of

25   these manuals, some of them have 23 chapters, some have 17, and

1    they address a variety of different aspects such as evaluation

2    and management services, as you all have been talking about,

3    which specifically says there are certain requirements from a

4    documentational standpoint in order to be able to support the

5    level of service that has been billed.

6    Q.  And if a provider doesn't follow those requirements, which

7    sound complex, what does Medicare do in response?

8    A.  So there's a lot of things that could potentially happen.

9    The easiest way to explain it is the government uses data

10   analytics to be able to look for any providers who are outliers

11   or who have aberrants in their billing patterns.  From there,

12   they will conduct a different type of audit.  It could be

13   what's called a probe audit, which basically means they -- it's

14   nonstatistically relevant, it's not a statistically valid

15   sample.  They could use a non-probability sample, they could

16   use a cluster sample, a convenient sample.  Basically what

17   they're doing is they're taking a first look to see if there's

18   any variance between what exists in the provider's

19   documentation versus what the best practices, if you would, are

20   outlined in their guidance documents.

21   Q.  Now, Mr. Weiss, when the government wants to audit a

22   practice, are there certain Medicare policies in place that

23   tells regulators, government employees how they should audit

24   that practice?

25   A.  Oh, there's a ton of guidance, yes.

1   Q.  And can you summarize that guidance for the jury with

2   respect to how we look into a practice like the Pain Center and

3   see if they are overbilling?

4   A.  Certainly.  So it's technical, but the -- the first thing

5   that I would point out is Chapter 3 of the Medicare Program

6   Integrity Manual.  Specifically it's Section 3.2.3.4 which

7   specifically identifies something called additional

8   documentation requests.  So that means that the government,

9   whether they're doing a prepayment review, meaning prior to

10  paying a claim, they want to look at the documentation to make

11  sure that it supports the services that are being billed, or

12  they conduct what's called a post-payment review, and it's

13  exactly as it sounds.  Once the claim has been paid, they

14  request documentation.  They have somebody review that

15  documentation to make sure that it supports what the government

16  paid as a service, and if it doesn't, then the government has

17  next steps that it could take in the audit process.

18  Q.  Okay.  So just to summarize, if I'm understanding this

19  correctly, before Medicare pays a bill or a claim, it can

20  request documents to see if that claim is substantiated?

21  A.  Absolutely it can.

22  Q.  After Medicare pays a claim, it can request documents to

23  see if the claim is substantiated?

24  A.  That is correct.

25  Q.  Have you seen or been aware of any pre or post-payment

1    review in this case?

2            MR. HELMS:  Objection, Your Honor.  402 and 403, I

3    don't know how that would be relevant to the claims of

4    criminality in this case.

5            THE COURT:  Did you want to respond to that, Mr.

6    Chapman?

7            MR. CHAPMAN:  Yes, Your Honor.

8            THE COURT:  After Medicare pays a claim?

9            MR. CHAPMAN:  It's -- it's of the highest relevance.

10   The fact that Medicare did not do a pre or post-payment review

11   and only started this case through the use of undercover

12   operatives and an assessment that there was a large amount of

13   claims suggests that the government's not following its own

14   rules.

15           MR. HELMS:  It's not what it suggests, Your Honor.

16   If there's -- if there were or not a post- or pre- -- a pre- or

17   post-investigation bears no relevance to whether or not the

18   claims issue in this case are legal or illegal.

19           THE COURT:  I don't know about an investigation.  Let

20   me look at a rule here real quick.

21           MR. CHAPMAN:  Your Honor, there's probably one

22   question I could ask that would also clarify that.

23           THE COURT:  Just one -- one thing.  You're --

24   you're -- you're dealing with 410.  That was your grounds, Mr.

25   Helms, is that correct, 402 and 410 I think is what you said,

 1    right?

 2            MR. HELMS:  Generally, Your Honor, and also case law

 3    that -- suggesting that whether or not there's been an

 4    administrative review of a client bears --

 5            THE COURT:  All right.

 6            MR. HELMS:  -- no relevance to whether criminal

 7    actions are --

 8            THE COURT:  Ask your next question if you would,

 9    Mr. -- your clarifying question, Mr. Chapman.  Go ahead.

10            MR. CHAPMAN:  Thank -- thank you, Your Honor.  I'd

11    also like to point out the government did bring up an audit in

12    this case and used it to cross-examine Dr. Lewis.

13            THE COURT:  Go ahead.  Go ahead.

14    BY MR. CHAPMAN:

15    Q.  Are there -- is there a Medicare policy that instructs

16    even law enforcement officers on how to conduct investigations

17    like this?

18    A.  There is.  Chapter 4 of the Medicare Program Integrity

19    Manual specifically outlines antifraud training for law

20    enforcement, and specifically it's 4.2.2.5.1.

21            THE COURT:  The question of whether or not you were

22    aware of any pre or post-payment review in this case I think is

23    okay and I'll overrule the objection.  But I would ask Mr.

24    Chapman to limit his question, and just instruct the jury that

25    the question of what happened in the review is not relevant to

```
1    the actual facts in the case but may be considered by you after

2    the jury -- the lawyers argue the case, of course, as to

3    whether or not the claims that the government ultimately

4    brought in the indictment were valid or not, okay, ladies and

5    gentlemen?  All right.  Very good.

6            Go ahead, Mr. Chapman.

7    BY MR. CHAPMAN:

8    Q.  Mr. Weiss, that post-payment review, can that be

9    conducted at --

10           THE COURT:  Well, he didn't answer.  Did you conduct

11   the review?

12           MR. CHAPMAN:  Thank you, Your Honor.

13           THE WITNESS:  No, I was not privy to any documents or

14   any --

15           THE COURT:  Oh, I'm sorry.  Were you aware of any

16   pre- or post-review?

17           THE WITNESS:  No, Your Honor, I was not.

18           THE COURT:  Okay.  All right.  I'm sorry.  Go ahead,

19   Mr. Chapman.

20   BY MR. CHAPMAN:

21   Q.  Can Medicare conduct a post-payment review at any time

22   after the claim has been submitted?

23   A.  For the most part, the answer is yes.  There's statutory

24   limitations on certain things, but yes, at any given time they

25   can do what's called a reopening of a claim for good cause.
```

1    Q.  So we have this pre and post-payment review.  Are there

2    procedures outlined by CMS manuals that tell regulators how

3    they're supposed to conduct that review?

4    A.  There are through -- I'm sorry.

5    Q.  Sorry.  And generally speaking, can you give the jury, I

6    know it's a lot of detail here, but just an analysis of what

7    Medicare generally does to determine if a broad range of claims

8    are false?

9    A.  Sure.  So they start with typically a probe audit, and

10   that probe audit is a random sample of claims either on a

11   prepayment or a post-payment basis to make a determination as

12   to whether or not there are potentially larger issues at play.

13   If there are, then they can expand the audit to then do a

14   focused review.  There's very specific steps outlined in the

15   Medicare Program Integrity Manual for how you go from step to

16   step of an audit.  If there is a belief that there is what's

17   referred to as either a sustained or a high error rate, and a

18   high error rate is outlined as anything greater than or equal

19   to 50 percent, then the government can deploy what's called

20   statistical sampling and/or extrapolation methodologies.

21   Q.  When you say error rate, do you mean that there is a

22   difference between the claim that was submitted and the

23   documentation that was submitted in support of it?

24   A.  Yes, sir.

25   Q.  And do you mean that the -- in 50 percent of cases the

1  documentation did not support the claim?

2  A.  It would have to -- yes.  So in 50 percent or more of the

3  claims that are reviewed, they would have to fail the -- the

4  review.

5  Q.  What if the error rate is below 50 percent?

6  A.  There are instances where they can use statistical

7  sampling, but they have to have good cause for that, and that's

8  outlined in Chapter 8 of the Medicare Program Integrity Manual.

9  Q.  Okay.  So if I understand this correctly, if greater than

10 50 percent of the claims aren't supported by the documentation,

11 they can then take a statistical sample of the practice?

12 A.  Yes, sir.

13 Q.  All right.  How does Medicare take a statistical sample of

14 the practice?

15 A.  This is again the complexity of health care.  So in

16 Chapter 8, it's specifically 8.4.2, there are very specific

17 steps that have to be done, and they do encourage the use of a

18 statistician or a data scientist or an economist, somebody that

19 has the relevance to be able to perform those reviews.  First

20 they tend to use a program called RATS-STATS.  This is a

21 program that was --

22        MR. HELMS:  Your Honor, I'm sorry.  At this point I'd

23 object to this continued irrelevant material.  We're not

24 talking about audits here, and I think the witness has already

25 said he's not aware of any audits performed in this case.

1        MR. CHAPMAN:  Your Honor, we are talking about a very

2    important principle calling statistical sampling and

3    extrapolation which is the government's tool by policy to

4    evaluate practices like this, and the government's standards

5    and investigation standards are very important.

6        THE COURT:  All right.  I'll allow that as -- as a

7    lead-up to the ultimate opinion I assume he's going to render

8    on -- on the statistical issues in this case, but I was

9    concerned he might have been getting into a narrative answer so

10   why don't we try to break that up a little bit.

11       And go ahead, Mr. Chapman.

12       MR. CHAPMAN:  Thank you, Your Honor.

13       THE COURT:  Okay.

14   BY MR. CHAPMAN:

15   Q.  I think I'll -- I'll walk you through statistical sampling

16   a little bit tighter here, Mr. Weiss.

17   A.  Sure.

18   Q.  So first, is statistical sampling a way that the

19   government can look at a large number of files and determine

20   whether or not there were false claims in a large number of

21   patient encounters?

22   A.  Well, statistical sampling won't tell you whether a claim

23   is false or not.  That can only be determined through an actual

24   review.  What the statistical sample will do is it will create

25   sample frames from which if you're using a statistically valid

```
 1   sample, which means that it's been tested either as a Monte
 2   Carlo or a Cochran's theory or, you know, some other component
 3   of testing the accuracy of the sample frames, then an auditor
 4   will use a random numerator to select those claims in that
 5   sample frame.
 6   Q.  Now, when that sample is taken, are the files that are
 7   generated from that sample reviewed by a health care
 8   professional to determine if the claim meets the documentation?
 9   A.  That would be the way to make a determination as to
10   whether or not something is supported or not.
11   Q.  Okay.  Now, when we're doing this review to determine
12   whether or not the claim meets the documentation, are there
13   certain Medicare standards that are out there that tell
14   providers what type of documentation is required in order to
15   meet a claim?
16   A.  There are.
17   Q.  And --
18   A.  Yes.
19   Q.  -- what are those -- what are those categories of I guess
20   guidelines?
21   A.  Sure.  So of the CPT codes, approximately half of the CPT
22   codes have what's referred to as a local coverage
23   determination.  Those are created by the Medicare
24   Administrative Contractors in each region.
25            There's also the possibility of something called a
```

1    national coverage determination.  Those are created by the

2    centers for Medicare and Medicare Services out of Baltimore,

3    Maryland.

4            But then you also have other guidance that comes from

5    the American Medical Association, from specialty societies, and

6    it -- it -- it just depends on the particular codes as to

7    whether or not there's governmental guidance.

8    Q.  Now, Mr. Weiss, have you had an opportunity to look to see

9    if there was a national coverage determination related to SI

10   joint injections?

11   A.  For sacroiliac injections, there's no national coverage

12   determinations.

13   Q.  Okay.  Are you aware of whether or not there is any local

14   coverage determinations which apply to the State of Michigan

15   for sacroiliac joint injections?

16   A.  There are not.

17   Q.  Okay.  So if Dr. Lewis is charged with providing not

18   medically necessary sacroiliac joint injections, are there any

19   local or national coverage determinations that we can look at

20   that guide a doctor on what documentation is required?

21   A.  No.  It would refer to -- it would refer them to review it

22   under Chapter 3 of the Medicare Program Integrity Manual.

23   Q.  And what does Chapter 3 of the Medicare Program Integrity

24   Manual tell you about how Medicare should review a doctor's

25   decision-making in absence of an LCD or an NCD?

1   A.   So in Chapter 3 there's another subsection that talks

2   about in the absence of a local coverage determination, the

3   Medicare Administrative Contractors shall review claims based

4   on medical necessity, and medical necessity is defined as

5   generally accepted standards of medical practice in the

6   industry.

7   Q.   Does Medicare give any deference to a doctor's

8   decision-making by its policies when making a medical necessity

9   determination?

10   A.   There is something in the rules that they use that was

11   first created under the Social Security Act for the benefits

12   purposes, but it is used in Medicare cases.  It's called the

13   treating physician rule.

14   Q.   Okay.  Now, when looking at -- actually going to go in --

15   in a different direction, Mr. Weiss.  Does Medicare have any

16   guidance about when a provider can utilize anesthesia while

17   performing a procedure such as an epidural or rhizotomy?

18   A.   They do.  The Medicare Claims Processing Manual there's

19   specific guidance.

20   Q.   And what does this guidance specifically say about the use

21   of anesthesia for those types of procedures?

22   A.   So for what they call monitored anesthesia care or MAC, a

23   physician who is performing a procedure can either report the

24   monitored anesthesia care in addition to the procedure that he

25   or she is performing, or it could be reported by another

1    anesthesiologist who is rendering the anesthesia portion of the

2    overall service for the procedure.

3    Q.  According to that guidance, would it be inappropriate for

4    a clinic to bill for a procedure, a rhizotomy, and also the

5    anesthesia if two different providers were -- were doing the

6    procedure?

7    A.  No, there's nothing in the guidelines that would prevent

8    it.  It's actually what they suggest.

9    Q.  Now, is there anything to prevent a practice like the Pain

10   Center from providing anesthesia to a patient during a

11   rhizotomy and having only one interventional anesthesiologist

12   in the treatment room?

13   A.  No.

14   Q.  Is that permitted?

15   A.  It is permitted.

16   Q.  So hypothetically if the Pain Center elected to not

17   utilize, let's say, Dr. Bothra and Dr. Lewis in the room

18   together, rhizotomy, anesthesia, but instead just had Dr. Lewis

19   provide the anesthesia, could they make the same amount of

20   money?

21   A.  Most likely, yes.

22   Q.  So then would it be true that by providing an extra

23   anesthesiologist in the room, safety is increased?

24   A.  Potentially.

25   Q.  And the financial benefit is decreased?

1   A.   Potentially.  The -- the -- the rates are calculated the

2   same for anesthesia.  It's a time-based code.  You have a base

3   unit and then you have your time units and it's all based on

4   15-minute increments.

5   Q.   Let's move on to talk about CPT codes.  Do you have

6   training in E&M codes specifically?

7   A.   I do.  I hold an advanced board certification in that.

8   Q.   Have -- have you educated government entities before on

9   the use of CPT codes?

10  A.   I have.  I actually was brought down to train a group of

11  CMS auditors for several days.  During the course of a year I

12  engaged in training and education of different governmental

13  agency auditors, investigators, SMRCs, Unified Program

14  Integrity Contractors.  I've had OIG agents that have engaged

15  in the courses that I've taught, special investigative units

16  from United Health Care, Blue Cross, Humana, Aetna.

17  Q.   Now, Mr. Weiss, we're talking about the time period

18  between 2016 and 2018.

19  A.   Okay.

20  Q.   Did physicians, generally speaking, have any problem with

21  interpreting the documentation requirements for E&M codes 99211

22  to 99214?

23  A.   Yeah, physicians across the country struggle with that.

24  There was actually an OIG study, Office of Inspector General

25  study, that was done that indicated approximately 50 percent of

1  all evaluation and management service claims that were billed

2  to the Centers for Medicare and Medicaid Services were done so

3  incorrectly.  The -- the fatal flaw with that study, in my

4  humble opinion, is that they didn't track to see how many of

5  those denied claims were actually appealed and overturned upon

6  administrative proceedings.

7  Q.  So understanding that physicians have difficulty with

8  this, what does Medicare guidance say is required to bill,

9  let's say, a 99214?

10 A.  So a 99214, so -- and it's important to keep in mind that

11 the E&M guidelines were created between the American Medical

12 Association and the Centers for Medicare and Medicaid Services

13 jointly.  So to bill for a 99214, established patient visit,

14 you would have to meet two out of three key components.  So

15 your key components are your history, your exam and your

16 medical decision-making, and any two of those three would be

17 considered appropriate.  You would need a detailed history,

18 detailed examination and medical complexity of moderate

19 complexity.  And do you want me to explain how you get to

20 those?

21 Q.  I'll -- I'll ask those independently.

22 A.  I'm sorry.

23 Q.  Mr. Weiss, are you required to have a physical exam in

24 order to bill a 99214?

25 A.  Not under the 1995 or '97 guidelines, no.

1    Q.  If a physician's exam is visual inspection, would that

2    qualify as sufficient documentation for an examination?

3    A.  Sure, as long as it's documented.

4    Q.  Okay.  So two of the three could be medical

5    decision-making and a patient history?

6    A.  Absolutely.

7    Q.  Is a physician allowed to rely on documentation by other

8    providers at the practice such as a medical assistant or

9    ancillary staff I believe they're called in order to satisfy

10   the documentation requirement for a 99214 let's say?

11   A.  Sure.  There are certain aspects of a patient visit.  So

12   if you think about when you go to the doctor and you're brought

13   back into a room, you have a medical assistant who may say why

14   are you here today, and then they may ask you questions that

15   are tied to what's called a review of systems.  So there's 13

16   review of systems, anything from constitutionals all the way

17   through a psychiatric review of systems.

18          Another portion that could be done by ancillary staff

19   members is the past medical, family or social history.  They

20   call it a PFSH.

21          The only aspect of a history that is required by a

22   physician is called the history of present illness.

23   Q.  Okay.  Mr. Weiss, is there any specific time that is

24   required for a physician to be face to face with a patient to

25   bill any specific E&M code?

1   A.  Not under the 1995 or '97 guidelines, which is what you're

2   talking about.  The only way that time would play any effect on

3   a patient visit is if you have what's referred to as counseling

4   and/or coordination of care where it dominates the encounter by

5   greater than 50 percent of the face-to-face time.  So if Mr.

6   Chapman and I were in a room face to face for an hour and

7   31 minutes of that time was spent counseling and/or

8   coordinating his care, if I did not have a detailed history or

9   detailed exam and medical decision-making of moderate

10  complexity, then I could default to the time element to be able

11  to substantiate billing at a level 4.

12  Q.  Now, Mr. Weiss, if Dr. Lewis billed a 99214 and the family

13  practice physician next door bills a 99214, are they

14  compensated the same or differently?

15  A.  They're compensated the same.  The only way that

16  physicians are compensated differently is if they are located

17  in a different part of the country and they use what's called a

18  geographical practice cost indices.

19  Q.  Okay.  So it takes a lot more education and -- and costs

20  to perform inter -- interventional anesthesiology than primary

21  care, would you agree?

22          MR. HELMS:  Objection.  Calls for speculation.

23          MR. CHAPMAN:  I think he's established that he knows

24  a lot about health care and its delivery, Your Honor.

25          THE COURT:  It's -- you know, that would be a proper

Case 2:18-cr-20800-SJM-APP ECF No. 486, PageID.5704 Filed 03/18/23 Page 28 of 68
Jury Trial Excerpt: Volume 21 • Tuesday, June 21, 2022

28

1    predicate for the question, but I think he can answer it.  Go

2    ahead.  I would -- I would say, as far as you know, not being a

3    doctor yourself, it takes more education and cost to perform

4    interventional anesthesiology than primary care, correct, Mr.

5    Weiss?

6                THE WITNESS:  Yes, Your Honor.

7                THE COURT:  Okay.  All right.  Go ahead, Mr. Chapman.

8    BY MR. CHAPMAN:

9    Q.  And are you saying that Medicare compensates these two

10   providers the exact same rate if they're next door to each

11   other?

12   A.  They do, for evaluation and management services.

13   Q.  Okay.  So when -- when we talk about medical

14   decision-making and its complexity, do interventional

15   anesthesiologists, are they called on to make more complex

16   medical decisions quickly?

17   A.  Well, they are because they're performing procedures,

18   very dedicate -- very delicate procedures around the spine.

19   Q.  Okay.  And so when it comes to the requirements to meet a

20   99214, history and medical decision-making, is it possible for

21   an interventional anesthesiologist to reach that level more

22   quickly than a primary care physician?

23   A.  Oh, sure.

24   Q.  And have you shadowed a lot of physicians before who are

25   billing E&M codes?

1  A.  Yeah, I've shadowed physicians for some of the largest

2  health systems.  By shadowing, that means that I've been in the

3  operating theater to evaluate the procedures, whether it's open

4  heart surgery, brain surgery, limb replacements or -- or hip

5  replacements, things of that nature.  I have shadowed

6  physicians in the offices, in the clinics, in the hospital, in

7  the ICUs, in regular physician practices to basically act as a

8  scribe to determine what they were billing based on their

9  documentation.

10  Q.  Is it possible for a physician to meet the elements of a

11  99214 in, let's say, five minutes?

12  A.  Sure, and sometimes less than five minutes.

13  Q.  Does that depend on the history that was taken by the

14  doctor or ancillary staff and the complexity of the medical

15  decision-making?

16  A.  Yes.

17  Q.  Are you familiar with the phrase meaningful use?

18  A.  Yes.

19  Q.  And can you describe for the jury what meaningful use is?

20  A.  Well, meaningful use is used in a couple of different

21  ways, but one of the ways that it's used is in calculating

22  payments for providers under either a MACRA or a MIPS program

23  which looks at quality, it looks at social determinants of

24  care, things that impact a patient from an environmental

25  standpoint.

1    Q.   Mr. Weiss, I want to change topics and back up.  I forgot

2    to ask a question previously related to E&M.  If, let's say, a

3    special agent from Health and Human Services took the amount of

4    E&M codes that were billed for a certain day and added them up

5    and assumed that they would take the amount of time that is

6    listed in the coding manual and determine that fraud was

7    committed because that would be larger than a 24-hour period,

8    would that be an appropriate way to analyze E&M codes?

9              MR. HELMS:  I would object again, Your Honor, to

10   things that are not relevant to this case.

11             MR. CHAPMAN:  That's what Special Agent Tolan

12   specifically said he was looking for at the very first day of

13   his trial when assessing a large number of codes.  He didn't

14   say it was present in this case --

15             THE COURT:  Hold on a minute.

16             MR. CHAPMAN:  -- but he said that's --

17             THE COURT:  Hold on, hold on.  Let me look at this

18   question.

19             (Brief pause)

20             Okay.  Well, I would say if -- if the evidence was

21   what Mr. Chapman summarized it as being, in your opinion, is

22   that the way you should analyze E&M codes, Mr. Weiss?

23             MR. WEISS:  No, Your Honor.  It would be fatally

24   flawed.

25   BY MR. CHAPMAN:

1   Q.  Why would it be fatally flawed?

2           MR. HELMS:  Your Honor, I'm sorry but Mr. -- Agent

3   Tolan did not testify to that.  He even -- Mr. Chapman just

4   acknowledged, said he -- he said it wasn't present in this

5   case, it wasn't something he was looking for, so I don't know

6   why we're talking about this.

7           THE COURT:  Well, then you can tell the jury that.

8   You -- what you guys are doing now is you're making closing

9   arguments in the form of objections and responses and that's

10  not proper.  I would say let's let the witness give his

11  testimony, and then when it's time for closing argument,

12  depending on how important it is, you can construe for the jury

13  from your point of view what this testimony implicates.

14          Go ahead, Mr. Chapman.

15          MR. CHAPMAN:  Thank you, Your Honor.

16  BY MR. CHAPMAN:

17  Q.  Mr. Weiss, I don't know if I got to ask the followup, but

18  why would it be fatally flawed?

19  A.  Well, for a number of reasons.  One, you -- you first have

20  to have a sample frame.  So if you're trying to extrapolate to

21  come up with potential damages, you need to have sample frames

22  that are done, and you have to do that based on statistical

23  sampling.  You use RAT-STATS or Minitab or some other, excuse

24  me, accepted program.

25  Q.  Does that mean you would have to review the records to

1  determine if the codes were properly billed?

2  A.  Well, absolutely.  But the -- the -- the fatal flaw that

3  gets made a lot of times with just looking at the -- the total

4  number of claims on a day and then adding up what somebody

5  would think is the amount of time it takes to perform that

6  service is that you run into what's referred to as the

7  impossible day, but they're not taking into consideration the

8  use of ancillary staff, incident to billing provisions, or the

9  fact that the time is only applicable if it's related to

10  counseling and/or coordination of care.

11  Q.  Just to describe incident to, does that mean that a doctor

12  is allowed to bill under his or her name for the services of

13  another doctor or nonphysician practitioner when they provide

14  the care to a patient?

15  A.  That's exactly what it means.

16  Q.  Okay.  Now, if the government were -- or if HHS, let's

17  say, were to assume that an entire practice is all fraudulent

18  without looking at a statistically relevant sample of claims,

19  would that be an appropriate determination to make?

20  A.  No.

21  Q.  Why not?

22  A.  Because you have no -- you have nothing to guide you into

23  making a determination as to whether it was a subset of claims

24  that were bad or whether it was the entire universe of claims

25  that was problematic.  That's why you do statistical sampling.

Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

33

1   Q.   If the government or HHS were to assume that an entire

2   practice was all fraud after only review of six hand-selected

3   charts, would that be consistent with HHS policies?

4   A.   I've never seen that before, no.

5   Q.   If the government were to assume that the entire practice

6   was all a fraud or a provider's practice was all a fraud based

7   off only your review of two charts, would that be consistent

8   with HHS policies?

9   A.   No, I've never heard of that.

10  Q.   Okay.  Back to meaningful use.  I apologize.

11  A.   Okay.

12  Q.   At some point in time was there a regulation passed

13  requiring practices like the Pain Center to convert to

14  electronic medical record systems?

15  A.   Yes, there was, back during the Obama administration.

16  Q.   Was the medical profession ready to accept that at the

17  time?

18  A.   They were not.

19  Q.   Why weren't they ready to accept it?

20  A.   Providers are creatures of habit.  They go through medical

21  school learning what's called the SOAP formats: subjective,

22  objective, assessment, plan.  They handwrite all of their

23  notes.  To expedite being able to see the number of patients

24  that may be on their schedule that day, they create templates

25  to help prompt them to be able to get through certain questions

1   faster, to collect data faster.  When we moved to electronic

2   medical records, it forever changed the physician/patient

3   relationship because it took the interaction away from the

4   physician and patient and it turned it into a point and click

5   on a computer screen.

6   Q.  At that point in time -- what year did this regulation get

7   passed?

8   A.  I believe it was in 2015.

9   Q.  Okay.

10  A.  2014.

11  Q.  And were providers required to convert to electronic

12  medical records if they billed Medicare?

13  A.  There were specific requirements that if they were

14  receiving federal remunerations, that they would have to

15  convert to an electronic medical record.

16  Q.  Does remuneration mean money from the federal government?

17  A.  Reimbursement, I apologize.

18  Q.  That's okay.  At that time were medical records software

19  systems well tooled and ready to accept this large number of

20  providers being required to transfer over?

21  A.  No, they weren't.  I can say that with certainty because I

22  worked with a number of the EMR companies.  I worked with Epic,

23  I worked with GE Centricity on helping to build some of their

24  templates to determine how providers were going to be able to

25  intake information from patients.

Case 2:18-cr-20800-SJM-APP  ECF No. 486, PageID.5711  Filed 03/18/23  Page 35 of 68
Jury Trial Excerpt: Volume 21 • Tuesday, June 21, 2022

35

1    Q.  Were there a lot of growing pains with the medical records

2    software companies in 2015 through 2018 related to

3    documentation?

4    A.  There were, and there are even more so today.

5    Q.  Are you aware of a program called Practice Fusion?

6    A.  I am, yes, sir.

7    Q.  Are you aware of any hiccups with Practice Fusion around

8    that time period that caused a little bit of heartburn for

9    providers?

10   A.  Practice Fusion has been notorious as to having issues

11   with their electronic medical records and their templates.

12   Q.  There's been some testimony, even some evidence in this

13   case that occasionally records would autopopulate with prior

14   treatment.  Is that something that you normally see in the

15   health care field in your review of charts?

16   A.  Yeah.  So as a matter of fact, all electronic medical

17   records set as a default everything to negative.  It's just an

18   expedited way of creating a template.  And then it's up to the

19   provider to go through the template to adjust anything from

20   negative to positive or to expand upon some of that

21   information.  But, yeah, it's -- it's carried forward, it's cut

22   and paste, it's things that we see on a regular basis.

23   Q.  When you say everything to negative, are you saying that

24   the -- the patient chart as it appears before it's untouched by

25   the provider or medical assistant suggests that the symptoms

1   that are reviewed are negative for problems?

2   A.   That's correct.  And that was one of the big flaws in the

3   very beginning with a lot of these practice management systems

4   is that they pushed everything to a default of negative, and

5   the physicians would automatically adjust those where they had

6   positive pertinent responses, and then it would populate all of

7   this information as if a provider had potentially performed

8   reviews on things that may have not been reviewed because they

9   were not relevant to the case.

10          MR. CHAPMAN:  Can we see Government's 120A, which I

11  believe is Andrew Peterson's Practice Fusion chart, and can we

12  blow up the -- I'm having hard time seeing.

13  A.   (Coughing) Excuse me.  I'm so sorry.

14          MR. CHAPMAN:  Looking for the "Review of Systems."  I

15  suppose "Objective" and "Assessment," if we can blow that up,

16  "Objective" and "Assessment."

17  BY MR. CHAPMAN:

18  Q.   I just want to show you a sample.  We see here "Alert and

19  oriented times 3."  Is that the sort of autopopulated negative

20  that you're referring to?

21          MR. HELMS:  Objection, Your Honor, unless there's a

22  foundation laid that he's looked through these files and is

23  sufficiently aware of Practice Fusion autopopulation.

24          THE COURT:  I would agree with that.  Go ahead, Mr.

25  Chapman.

1          MR. CHAPMAN:  Your -- Your Honor, may I respond to

2     that?

3          THE COURT:  Yeah.

4          MR. CHAPMAN:  He -- he's -- he's not looked through

5     this file or reviewed this file, but he is a medical record

6     reviewer and he's speaking to a specific program that was

7     utilized that he's aware of.  I think that he would have a

8     sufficient foundation already for that.

9          THE COURT:  Well, he should be able to testify that

10    he's familiar with the types.  I mean this could have come from

11    anywhere.  So I think tying that expertise and background that

12    you just stated to what you're about to show him I think would

13    probably be required.  Go right ahead.

14         MR. CHAPMAN:  Thank you, Your Honor.

15    BY MR. CHAPMAN:

16    Q.  So let's just briefly look at the general, lungs, gait.

17    You see that a lot of these things are listed as normal?

18    A.  Yes, sir.

19    Q.  Are those the type of autopopulated negatives that you

20    routinely saw in Practice Fusion charts?

21    A.  Yeah, they look very familiar to me.

22    Q.  Now, when --

23         MR. CHAPMAN:  And we can take that down.  Thank you

24    very much.

25    BY MR. CHAPMAN:

1   Q.  When Medicare is reviewing charts and there's negative

2   documentation there, lungs clear, abdomen soft and tender, does

3   Medicare assess an overpayment simply because that information

4   was autopopulated in there?

5           THE COURT REPORTER:  Mr. Chapman, can you move by the

6   microphone please?

7   Q.  Does Medicare assess an overpayment simply because that

8   documentation is in there?

9   A.  That -- that's a -- that's a tough answer because it's

10  subjective, it's dependent upon the individual reviewer.  I

11  mean there's been studies where you could take one piece of

12  documentation like what I was just shown and you could

13  distribute it to multiple coders and you could have ten

14  different opinions as to what it actually is.

15  Q.  Now, let's say that that information is not necessary to

16  support the chief complaint or medical decision-making.  Does

17  that change your answer at all?

18  A.  No.

19  Q.  No.  Okay.

20  A.  I mean at the end of the day, providers, again, are

21  creatures of habit.  You know, they learn, you know, in their

22  specialties, sub-specialities as they're going through school

23  that there are certain body areas, organ systems that they need

24  to evaluate as part of their overall assessment of a patient.

25  They become very comfortable with certain elements that they

1    evaluate, that they examine, so it becomes a routine part of

2    what they do for a patient.

3    Q.  Just a few final questions going back to LCDs and NCDs.

4    Is there a local coverage determination related to facet

5    injections that applies to Michigan?

6    A.  There is.

7    Q.  Okay.  Is -- is violation of a local coverage

8    determination, does that automatically result in a finding of

9    an overpayment by Medicare?

10   A.  Well, no because in local coverage determinations there's

11   a multitude of ways of making a determination as to whether or

12   not something is paid in accordance with the coverage

13   guidelines or it's outside of that.  It could be a strict

14   liability situation or it could be solely based on medical

15   necessity.  So it's not just a black and white answer.  It's --

16   it depends, and I hate to say that.

17   Q.  Is there an appeals process if a provider believes that

18   the service was medically necessary even if it exceeded a local

19   coverage determination?

20   A.  Oh, there's five levels of appeal, absolutely.

21   Q.  And in your experience, have you seen claims paid even

22   though they may fall outside the technical guidelines of a

23   local coverage determination?

24   A.  Happens all the time.

25   Q.  Okay.  Thank you, Mr. Weiss.

```
 1            MR. CHAPMAN:  I don't have any further questions.
 2   A.  Okay.
 3            MR. CHAPMAN:  Thank you.
 4            THE COURT:  Very good.  Now it is Mr. -- Mr. Helms'
 5   turn.  Remember, ladies and gentlemen, these are opinions that
 6   you're free to accept or reject, just like you can weigh the
 7   credibility of any other witness, okay?
 8            All right.  Go ahead, Mr. Helms.
 9                      CROSS-EXAMINATION
10   BY MR. HELMS:
11   Q.  Good morning, Mr. Weiss
12   A.  Good morning, sir.
13   Q.  So at first you were talking about payment determination
14   guidance, correct, from Medicare?
15   A.  Yes.
16   Q.  And that tells a doctor what Medicare will and won't pay
17   for?
18   A.  It will.
19   Q.  And what requirements must be met in order -- in order to
20   submit a proper claim?
21   A.  Depending on the CPT code, yes.
22   Q.  And doctors know that they can't lie or falsify records to
23   meet those requirements, correct?
24   A.  Well, yeah.  You would expect a physician as they submit a
25   claim to submit an accurate claim.
```

1   Q.  And are you aware of how many millions of claims are

2   submitted to Medicare every year?

3   A.  Tens of -- hundred -- about -- yeah, hundreds of millions

4   of claims, yes, sir.

5   Q.  So there's not a time to do an administrative review of

6   every single practice, correct?

7   A.  Well, no, that's not -- that's not true.  An

8   administrative process can be data analytics, and the

9   government is continuously using data analytics as an

10  administrative process to examine practices.  They use Recovery

11  Audit Contractors, UPICs, SMRCS, MACs.

12  Q.  Let's focus on audits.  You were talking about audits.

13  A.  That's correct.

14  Q.  There's not a time -- there's not a -- there's no time to

15  do an audit of every single practice in the United States for

16  Medicare, correct?

17  A.  But that's what I was just answering, they are.  The --

18  the Recovery Audit Contractors, the Unified Program Integrity

19  Contractors, the SMRCs, the Office of Inspector General, these

20  are all contractors, as are the Medicare Administrative

21  Contractors, and they are continuously doing data analytics.

22  Q.  And you think they're auditing every single medical

23  practice in the United States?

24  A.  I believe through data analytics and through the

25  relationships that I have at the Unified Program Integrity

1  Contractors, the OIG agents who are retired who work for me,

2  yes, I believe they're looking at all providers.  It's -- it's

3  not a matter of if a provider gets audited, it's a matter of

4  when, and it's all based on data analytics.

5  Q.  Okay.  Nothing requires an audit before a criminal

6  investigation is -- is -- starts, is there?

7  A.  I'm not following the question, I apologize.

8  Q.  There's no requirement for there to be an audit before a

9  criminal investigation begins that you're aware of, correct?

10  A.  I am not aware of criminal investigations taking place on

11  a provider without a review of medical records.  I mean you

12  have civil investigative demands.  There are processes that go

13  into place.

14  Q.  As a civil case, right?

15  A.  Which tend to lead to criminal cases.

16  Q.  You're not a prosecutor, correct?

17  A.  No, but I've worked with them for 28 years.

18  Q.  You're not an FBI agent?

19  A.  No, sir, but I'm --

20  Q.  You're not an HHS OIG --

21          THE COURT REPORTER:  Wait, wait, wait.  Both of you

22  need to slow down and please don't talk on top of each other.

23          THE WITNESS:  Yes, ma'am.  I apologize.

24  Q.  You're not an FBI agent?

25          THE COURT REPORTER:  And Mr. Helms, you need to slow

```
 1    down too please.
 2    Q.  You're not an FBI agent?
 3    A.  No, I am not.
 4    Q.  You're not an HHS OIG agent?
 5    A.  No, I am not.
 6    Q.  You're not the one making decisions on whether to do a
 7    criminal investigation of a medical practice, correct?
 8    A.  I'm not.
 9    Q.  Okay.  If an audit -- if a audit were to be performed on a
10    medical practice, that would alert the medical practice that
11    they were being looking -- looked into, correct?
12    A.  Not necessarily because it's a routine part of doing
13    business with any insurance company.  It's in their
14    participation agreements that an insurance company, excuse me,
15    can audit them at any time.
16    Q.  Okay.  So if the Pain Center had received an audit saying
17    we're going to look into the number of back injections and back
18    braces you're issuing, you don't think that might raise some
19    concern at the Pain Center?
20    A.  I can't speak to what or what would not raise concern.
21    What I can tell you is getting additional documentation
22    requests is something that happens every single day at
23    practices of all specialties across the country.
24    Q.  And you talked about probe audits, and those don't
25    specifically relate to criminal investigation, right?
```

1   A.  I've seen probe audits used to make determinations on

2   criminal investigations that were then expanded upon.

3   Q.  Okay.  Have you seen any criminal investigations that do

4   not involve probe audits?

5   A.  No.

6   Q.  That's because you're not a federal investigator, correct?

7   A.  I am not, but I also have worked with them for 28 years.

8   Q.  And sampling would be relevant to, say, a civil case,

9   right, so you can get an idea of how much damages there would

10  be?

11  A.  They use them in criminal cases all the time.

12  Q.  Okay.  You're not a federal investigator, correct?

13  A.  No, but I am --

14          THE COURT:  All right.  All right.  Look, "I'm not,"

15  period, not "I'm not but."  All right.  Let's just limit it to

16  the -- answer the question.

17          Go ahead, Mr. Helms.

18          THE WITNESS:  I apologize, Your Honor.

19          THE COURT:  It's all right.

20  BY MR. HELMS:

21  Q.  And the sampling and review, if they are done, would rely

22  on the accuracy and the truthfulness of the documentation in

23  the patient files, correct?

24  A.  That would be a fair statement, yes, sir.

25  Q.  So if those patient files have been falsified, that would

1   affect the ability to do a proper analysis?

2   A.  Potentially if there was a review of the charts.

3   Q.  Okay.  The same thing for a review of E&M code -- E&M

4   codes.  You talked a lot about E&M codes, correct?

5   A.  Say that one more time.  I apologize.

6   Q.  You talked a lot about E&M codes?

7   A.  Yes, sir.

8   Q.  Okay.  And if the documentation supporting a code is

9   false, that would affect whether or not Medicare would pay,

10  correct?

11  A.  The only way you would note -- yes.  I apologize, yes.

12  Q.  As an example, if the documentation was robust but the

13  actual service performed did not meet that level of

14  documentation, if Medicare knew that, they might not pay?

15  A.  Potentially.

16  Q.  Same thing with the review of the history of a patient.

17  If the documentation indicates a robust history was taken but

18  what actually happened was not that, that would affect whether

19  or not Medicare would pay, correct?

20  A.  It -- it would depend on if there was an audit performed

21  of the medical records.  I mean you're asking me to answer a

22  hypothetical general question that I just can't answer without

23  giving an explanation.  I apologize.

24  Q.  It -- it could affect the ability -- it could affect

25  whether or not Medicare would pay?

1  A.  No.

2  Q.  If Medicaid later learned that a documentation was false,

3  that wouldn't affect their ability to pay?

4  A.  If they learned at a later date, but Medicare is a pay and

5  chase system.  Medicare pays all claims that comes into the

6  system unless it violates a prepayment screen, and then if it

7  gets kicked out, then it could potentially go for a manual

8  review for which they would issue an additional documentation

9  request as part of a prepayment review.

10  Q.  And that's because it's a trust-based system, correct?

11  A.  It is a trust-based system, yes, sir.

12  Q.  But you tried to tell me earlier they would audit every

13  single claim.  Weren't you telling me that?

14  A.  I did, through data analytics.

15  Q.  Okay.  As to EMR templates, it's up to the -- to the --

16  it's up to the provider to select which portions of the

17  template to use, correct?

18  A.  That's a fair statement, yes, sir.

19  Q.  Okay.  And you looked briefly at one for a patient named

20  Andrew Peterson, correct?

21  A.  I didn't see the name but yes, one -- one visit, yes.

22  Q.  Exhibit 120A?

23  A.  Yes, sir.

24  Q.  You have no idea how that particular chart was generated,

25  correct?

```
 1   A.  I have -- no, I was not part of reviewing any of the
 2   documents.
 3   Q.  Okay.  For evaluation and management codes, part of the
 4   ability to bill for those involves the -- the level of
 5   documentation in the record, correct?
 6   A.  It's all based on documentation, yes, sir.
 7   Q.  Okay.  So the documentation has to be clear and concise?
 8   A.  (Nods in the affirmative.)
 9   Q.  It has to be --
10        THE COURT REPORTER:  Wait, wait.  You nodded.  You
11   need to answer out loud.
12        THE WITNESS:  I said correct.  I'm sorry, I didn't
13   say it loud enough.  I apologize.
14   Q.  It has to explain the quality of care provided and what --
15   and what services were furnished, correct?
16   A.  Correct.
17   Q.  The records should be complete and legible?
18   A.  Correct.
19   Q.  Each patient encounter should document the reason for the
20   encounter?
21   A.  Correct.
22   Q.  Relevant history?
23   A.  Correct.
24   Q.  Physical exam findings if there are any?
25   A.  If it's applicable.
```

1    Q.   Prior -- prior diagnostic test results?

2    A.   If it's applicable.

3    Q.   The assessment or clinical impression?

4    A.   Yes.

5    Q.   And the medical plan of care?

6    A.   Yes.

7    Q.   That should all be documented to bill for certain E&M --

8    E&M codes, correct?

9    A.   With the exception of those that I said if it's

10   applicable, yes.

11   Q.   The patient's progress should also be documented?

12   A.   Depends on what the encounter's for.  If it's an encounter

13   to follow up as to a prior diagnosis for which they're

14   receiving treatment, you would expect to see something in there

15   that potentially says how the patient's doing.

16   Q.   Yeah.  So for a followup visit you should expect to see

17   any progress the patient's made?

18   A.   Most likely.

19   Q.   And if a procedure had been informed -- performed, you'd

20   expect to see some kind of indication of how that procedure

21   went?

22   A.   The -- the problem that you run into is that providers

23   have a ton of conversations with patients during the course of

24   an encounter, and those questions are most likely asked and

25   answered by the patients.  Sometimes the documentation doesn't

1    reflect that, but it doesn't mean that it didn't happen.

2    Q.   Okay.  So it may not be documented but those things have

3    to happen?

4    A.   They should be happening, yes.

5    Q.   And it's the provider's responsibility to ensure that

6    submitted claims accurately reflect the services provided,

7    correct?

8    A.   That's a fair statement, yes, sir.

9    Q.   It's not the medical biller's responsibility, it's the

10   provider's responsibility, correct?

11   A.   Yes.

12   Q.   Okay.  Now, the more complex the visit, the higher

13   level -- the higher level of code may be used, correct?

14   A.   That is --

15   Q.   In general.

16   A.   -- typically correct, yes.

17   Q.   Okay.  For new patients the general codes are 99201

18   through 99205, correct?

19   A.   Yes, sir.

20   Q.   99201 being simple and straightforward?

21   A.   Yes.

22   Q.   And 99205 being pretty comprehensive?

23   A.   Yes.

24   Q.   Okay.  And for the guidelines applicable to 2013 to 2018,

25   three requirements had to be met for a new patient visit,

1    correct?

2    A.  That is correct.

3    Q.  The comprehensive -- let's say we're talking about a

4    99204, okay?

5    A.  Yes.

6    Q.  There had to be a comprehensive history taken?

7    A.  Yes.

8    Q.  Yes?

9    A.  Yes.

10   Q.  There had to be a comprehensive examination?

11   A.  Yes.

12   Q.  And there had to be medical decision-making of moderate

13   complexity or higher?

14   A.  That is correct.

15   Q.  Okay.  So all --

16          MR. CHAPMAN:  Your Honor?

17          THE COURT:  Yes.

18          MR. CHAPMAN:  I've got a relevance objection.  I'm

19   sorry to interrupt.  But Dr. Lewis has not been charged for any

20   new patient visits or for billing any new patient visits.

21   Every patient discussed in this trial has been a followup.  My

22   examination was limited therefore to followup patients, and I

23   don't think that this line of questioning is relevant.

24          MR. HELMS:  Your Honor, Dr. Lewis is also charged in

25   the health care fraud conspiracy count, and there's been ample

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5727   Filed 03/18/23   Page 51 of 68
Jury Trial Excerpt: Volume 21 • Tuesday, June 21, 2022

51

1    evidence presented in this case that new patient visits and

2    established patient visits --

3            THE COURT:  Well, if it's beyond the scope of direct,

4    not sure that would matter.  He did say that he agreed with you

5    on the three requirements for a new patient visit.  I think you

6    can go into that and explore some of that as a matter of

7    credibility.  Go right ahead.

8    BY MR. HELMS:

9    Q.  Okay.  So for a new patient visit -- visit, 99204, there

10   were those three requirements?

11   A.  Yes, sir.

12   Q.  And they all three had to be met?

13   A.  Yes, sir, unless time dominated the encounter.

14   Q.  So if like -- so if the doctor had met with a patient for

15   45 minutes, then it would have been okay?

16   A.  As long as greater than 50 percent of that total

17   face-to-face time was counseling and/or coordination of care.

18   Q.  And for established patient visits the codes range from

19   992 -- 99211 to 99215, correct?

20   A.  Yes, sir.

21   Q.  And there's only two requirements for those?

22   A.  Two of the three key components.

23   Q.  Yeah.  So it could be a detailed history?

24   A.  Yes, sir.

25   Q.  Or it could be a detailed examination?

1    A.  Yes, sir.

2    Q.  Or it could be medical decision-making of, say, moderate

3    complexity for 99214?

4    A.  That is correct.

5    Q.  So you only need two of those three?

6    A.  Yes, sir.

7    Q.  And the time spent with the patient, the 25 minutes,

8    that's not rigid, right?

9    A.  Say that one more time, I apologize.

10   Q.  The time involved with the patient suggested of

11   25 minutes, that's not a rigid requirement?

12   A.  That is not a rigid requirement.

13   Q.  But it does give a doctor an idea of what level of care is

14   expected at a 99214 visit, correct?

15   A.  Only if it's related to counseling and/or coordination of

16   care.  There's no -- there's no specific time requirements on

17   how long it takes to perform a history exam or determine

18   medical decision-making.

19   Q.  Okay.  And so for a visit that lasts 30 to 60 seconds,

20   within that time period the doctor would have to do, for

21   example, a detailed history and a detailed examination if those

22   are the two being relied on, correct?

23   A.  Yes.

24   Q.  Or they'd have to do a detailed history and medical

25   decision-making of moderate complexity, correct?

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5729   Filed 03/18/23   Page 53 of 68
Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

53

1   A.   Yes.

2   Q.   Within those 30 to 60 seconds?

3   A.   Yes.

4   Q.   And if those things are not happening, it would not be

5   appropriate to bill 99214?

6   A.   That would be correct.

7   Q.   What about if a doctor walked into a room, told a patient

8   to get an MRI and then left within 30 seconds, do you think

9   that falls within 99214?

10  A.   I mean if you're giving me all it was was go get an MRI,

11  no.

12  Q.   No.  You talked briefly on direct about incident to

13  billing.

14  A.   Yes, sir.

15  Q.   Correct?

16          And that means that services are furnished incident

17  to a physician's professional services in the office, correct?

18  A.   That is correct.

19  Q.   Okay.  The physician has to do the initial service,

20  correct?

21  A.   They have to create the initial plan of care.

22  Q.   So it can't be a PA creating the initial plan of care?

23  A.   Under incident to guidelines, that is correct.

24  Q.   It has to be a doctor the first time, right?

25  A.   That is correct.

1   Q.   Okay.  So if -- if a PA wanted to bill incident to, it

2   would have to be a doctor who first saw that patient?

3   A.   Based on this -- the guidelines, yes, sir.

4   Q.   Okay.  And under incident to billing, the physician has to

5   continue to supervise the nonphysician, correct?

6   A.   They -- yeah, there's direct supervision requirements.

7   Q.   And that physician has to remain actively involved in the

8   course of treatment?

9   A.   They have to engage in the patient's care on a basis

10  that's reasonable.

11  Q.   And they don't have to be in the room but they have to be

12  able to provide direct supervision?

13  A.   They have to be immediately available.

14  Q.   Okay.  They have to be like present -- they have to be

15  present in the general office suite to be available?

16  A.   That's a very fair statement, yes.

17  Q.   Okay.  So for an institution that has one office and then

18  another office down the street, if a doctor's in this office,

19  he can't be supervising what's going on in the second office,

20  correct?

21  A.   So this is where incident to billing gets very complex,

22  and there are actually three levels of supervision.  You have

23  general supervision, direct supervision and then direct

24  personal supervision.  Under general supervision, a physician

25  can be out of the office and available to their staff via

1   electronic communications, telephone or something of that

2   nature, but that's where incident to billing guidelines get

3   very complicated.

4   Q.  General supervision, would that pay less than direct

5   supervision?

6   A.  There's no payment variance based on the level of

7   supervision.

8   Q.  What if this doctor in building A is seeing his own

9   patients while physical therapy's happening in building B, can

10   you still bill incident to?

11   A.  Well, yes.  The -- the -- the services are -- you're

12   talking about two completely different services.  You're

13   talking about a physician providing whatever it is that they're

14   doing and then a physical therapist providing services.

15   Typically physician -- physical therapists are credentialed

16   with the Centers for Medicare and Medicare Service; commercial

17   payors it varies.

18   Q.  So a physical therapist can bill under the name of this

19   doctor in building A?

20   A.  If it's to Medicare, under general supervisions, under

21   general supervision guidelines, it could be permissible.

22   Q.  Okay.  So you're saying if doctor A, the -- the doctor in

23   building A never goes to the other building, never watches

24   what's happening, they're supervising that treatment?

25   A.  Through general supervision guidelines.  It's such a

1   complicated issue.  I -- I was -- I was tasked by the Office of

2   Inspector General in 2017 to work on a study specific to

3   incident to to ferret out fraud, waste and abuse, and it's just

4   such a complex situation.  There's too many variables.

5   Q.  Now, you mentioned that there was LCD guidance for facet

6   joint injections, correct?

7   A.  Yes, sir.

8   Q.  As well as media -- medial branch nerve blocks?

9   A.  Yes.

10  Q.  And RFA, correct?

11  A.  Yes, sir.

12  Q.  And the ejection -- the -- I'm sorry, the guidance

13  applicable for back injection in 2013 through 2018 said that

14  facet joint injection techniques were being used in the

15  diagnosis and/or treatment of chronic neck and back pain,

16  correct?

17  A.  I believe so, yes.

18  Q.  But it also says that the evidence of clinical efficacy

19  and utility of those injections had not been well established

20  in the medical literature.  Do you recall that?

21  A.  I'd have to see that.

22  Q.  If I showed you a copy, would that refresh your

23  recollection?

24  A.  That -- that would be great, yes, sir.

25          MR. CHAPMAN:  I've memorized it by now.

1    A.   Okay.  Yes, sir.

2    Q.   Let me know when you're done.

3    A.   Okay.

4         (Brief pause)

5    Q.   Does that refresh your recollection as to what the medical

6    literature indicated about the efficacy of facet joint

7    injections?

8    A.   Yeah.

9    Q.   And it said that it had not been well established in

10   medical literature at that time, correct?

11   A.   That is correct, for steroid injections.

12   Q.   Okay.  It also said there was a singular dearth of

13   long-term outcome reports?

14   A.   It did say that, yes, sir.

15   Q.   Meaning there wasn't much evidence to -- to say how

16   helpful a facet joint injection would be long term, correct?

17   A.   Yes, I would agree with that statement.

18   Q.   Before Medicare would pay for a facet joint injection

19   under the LCD guidelines, a patient had to have at least three

20   months of moderate to severe pain with functional impairment,

21   correct?

22   A.   Per the LCD, yes.

23   Q.   And conservative treatments had to have failed beforehand?

24   A.   Per the LCD, yes.

25   Q.   And non-facet causes had to be ruled out first?

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5734   Filed 03/18/23   Page 58 of 68
Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

58

1    A.   Yes.

2    Q.   Like a fracture?

3    A.   Yes.

4    Q.   Or a tumor?

5    A.   Yes.

6    Q.   Okay.  And a clinical assessment had to be done to

7    implicate the facet joint as the putative source of pain,

8    correct?

9    A.   That is correct.

10   Q.   Okay.  So before a doctor could bill Medicare for a facet

11   injection, he would have to do some kind of an examination to

12   determine if facet joint pain was the actual cause of the pain,

13   correct?

14   A.   You would -- yes.

15   Q.   Okay.  For example, the doctor would have to do an initial

16   evaluation?

17   A.   Correct.

18   Q.   Including a medical history?

19   A.   Yes.

20   Q.   And a focused musculoskeletal and neurological physical

21   examination?

22   A.   Those are recommendations for what would be done, but yes,

23   I -- I understand your point, yes, sir.

24   Q.   That's part of the guidelines, correct?

25   A.   It's part of the guidance.  It's a best practice; it's --

1    it's not an absolute.

2    Q.   Okay.  And for diagnostic facet injections, two are -- are

3    required, correct?

4    A.   Yes.

5    Q.   Okay.  And to indicate facet joint pain, the second

6    injection must provide greater than 80 percent relief of

7    primary pain, correct?

8    A.   Per the LCD, yes.

9    Q.   So if the second injection provided no relief or minimal

10   relief, then facet joint problems would not be indicated under

11   the guidance, correct?

12   A.   Per the LCD.

13   Q.   Okay.  And so it wouldn't be medically appropriate to move

14   on, under the guidance, to radiofrequency ablation procedures

15   in that circumstance, correct?

16   A.   I don't know that I'm qualified to answer that question

17   because that's clinical judgment.

18   Q.   Okay.  So the LCD guidelines say -- would say don't move

19   on to RFAs if the second facet joint injection is not providing

20   significant relief, correct?

21   A.   That's what the guidelines do say.

22   Q.   Okay.  And also for -- for therapeutic facet -- facet

23   joint injections, they can be repeated if the first one

24   provides greater than 50 percent pain relief for at least three

25   months, correct?

```
 1    A.   That's what the guidelines say, yes, sir.
 2    Q.   Okay.  So if you're -- if the patient's not receiving
 3    that, then under the guidelines there's no reason to move on to
 4    a second facet joint injection, correct?
 5    A.   Per the LCD.
 6    Q.   Okay.  And under the LCDs, for -- for radiofrequency
 7    ablation procedures, conscious sedation was common, correct?
 8    A.   Yes, sir.
 9    Q.   Or monitored care anesthesia, that was routinely
10    necessary, correct?
11    A.   Yes, sir.
12    Q.   But for -- for just a facet joint injection, Medicare
13    wouldn't routinely reimburse for anesthesia or sedation,
14    correct?
15    A.   If it's in the LCD.  That's one of the problems that you
16    have with LCDs is that there's such significant variance
17    between the MACs.  Some would actually cover it, some wouldn't.
18    OIG opined on that in a 2014 study that the -- the significant
19    discrepancies in LCDs led to mass confusion for providers.
20    Q.   Well, if I show you the LCD, would it refresh your
21    recollection as to whether or not sedation and anesthesia were
22    appropriate for most facet joint injections?
23    A.   If you're reading from the one from Michigan, I will take
24    your word, sir.
25    Q.   Okay.
```

1        MR. HELMS:  One moment, Your Honor.

2   Q.  For billing purposes, if Medicare did do an audit and

3   determined that an injection was not medically necessary, it

4   wouldn't pay for that claim, correct?

5   A.  If they did a prepayment review prior to paying the claim

6   and they reviewed it and they said we don't find it medically

7   necessary, they would not pay the claim, that is correct.

8   Q.  Or if they did a post-payment review, they would ask for

9   money to be reimbursed to them?

10  A.  A recoupment, yes, sir.

11  Q.  Okay.  And -- and similarly, if anesthesia was used for an

12  injection and Medicare determines that the injection was not

13  medically appropriate, they would ask for -- if they had

14  already paid for it, they would ask for the -- the payment for

15  the anesthesia to be recouped, correct?

16  A.  Potentially.

17        MR. HELMS:  Okay.  No further questions, Your Honor.

18        THE COURT:  Okay.  Thank you.

19        Any other defense lawyers want to examine Mr. Weiss?

20                   CROSS-EXAMINATION

21  BY MR. ROGALSKI:

22  Q.  Good afternoon Mr. Weiss.

23  A.  Hi.

24  Q.  Al Rogalski.

25  A.  Nice to meet you.

```
1    Q.  Nice to meet you.  I'm representing Dr. Bothra.

2             I just want to follow up with the LCD, local coverage

3    determination.  Those are local, broken down into various

4    regions throughout the United States?

5    A.  Yes, sir.

6    Q.  So what we do in Michigan is not going to necessarily be

7    the same as what they would do in California with their

8    Medicare Administrative Contractor?

9    A.  That is a very fair statement, yes, sir.

10   Q.  It varies.

11            Want to talk to you about the incident to

12   requirements.  If we have an organized group practice, let's

13   say five, six interventional anesthesiologists, a physical

14   medicine rehabilitation physician, all really providing

15   interventional practice, can I rely on one of my members of the

16   group practice to provide supervision of one of my subordinate

17   employees?

18   A.  Oh, absolutely.

19   Q.  So my physical therapist working down the street in an

20   annex providing PT could be supervised by one of my group

21   physicians, let's say the physician who's doing physical

22   medicine and rehabilitation?

23   A.  In the same building, absolutely, sure.

24   Q.  Okay.  You mentioned the treating physician rule early in

25   your testimony --
```

1    A.   Yes, sir.

2    Q.   -- in conjunction with the Social Security Act.  Can you

3    elaborate on what the treating physician rule is?

4    A.   Sure.  So the treating physician rule establishes that the

5    Secretary of Health and Human Services will give deference to a

6    treating physician even if it's contradicted by peer-reviewed

7    evidence because, in simple terms, the -- they believe that a

8    physician is the person who's best capable of determining what

9    the care for the patient should be.  That's why they call it a

10   treating physician rule.

11   Q.   And is that because the physician is there face to face

12   with the patient?

13   A.   That and their expertise.

14   Q.   Thank you.

15          MR. ROGALSKI:  Nothing further, Your Honor.

16          THE COURT:  All right.  Thank you.  Anybody else?

17          MR. CHAPMAN:  Yes, just briefly, Your Honor.

18          THE COURT:  Mr. Chapman has some quick followup.  Go

19   right ahead.

20          MR. CHAPMAN:  Thank you, Your Honor.

21                          REDIRECT EXAMINATION

22   BY MR. CHAPMAN:

23   Q.   Mr. Weiss, that LCD that Mr. Helms was just reading to you

24   in detail, was that retired?

25   A.   Yes, it was retired.

Case 2:18-cr-20800-SJM-APP   ECF No. 486, PageID.5740   Filed 03/18/23   Page 64 of 68
Jury Trial Excerpt: Volume  21 • Tuesday, June 21, 2022

64

1    Q.   And can you give us a reason why LCDs might be retired?

2    A.   Because they go through what's called a [indiscernible]

3    advisory committee update, and often --

4              THE COURT REPORTER:  I'm sorry, I'm sorry.

5              THE WITNESS:  Yes, ma'am.

6              THE COURT REPORTER:  They go through what's called a

7    what?

8              THE WITNESS:  A carrier --

9              THE COURT REPORTER:  Oh, okay.

10             THE WITNESS:  -- committee update.

11             THE COURT REPORTER:  Thank you.

12             THE WITNESS:  Or a carrier advisory committee update,

13   I apologize.

14   A.   And basically what -- what happens with those is you have

15   physicians from the seven MACs that will come together along

16   with other stakeholders, specialty societies, lobbyists, CMS,

17   whoever it may be, and they will make a determination as to

18   whether or not the clinical care has changed over a period of

19   time to support a change in how the LCD is written.  They could

20   make it more restrictive, they could make it more lenient, it

21   just depends.

22   Q.   You talked about HHS and the government's ability to do

23   data analytics.  Do you recall that?

24   A.   Yes.

25   Q.   Just -- just briefly, without going into what data

1    analytics is, does the government and HHS currently possess the

2    ability to analyze a clinic's records to determine if more than

3    five facet injections, let's say, were billed over a one-year

4    period?

5    A.   Absolutely.   They use utilization reports.

6    Q.   Would they be able to do that almost immediately through

7    review of the data?

8    A.   Within moments.

9    Q.   Moments.   Okay.

10          Would they be able to use data analytics to determine

11   how many radiofrequency ablations were done within a two-year

12   period?

13   A.   Yes, sir.

14   Q.   How many moments would that take to figure out?

15   A.   Approximately the same, few moments.

16   Q.   Would they be able to use data analytics to determine if a

17   provider was statistically billing a higher number of E&M codes

18   or higher value E&M codes than other providers in the area?

19   A.   Absolutely.

20   Q.   How many moments would that take?

21   A.   The same, a few moments.

22   Q.   The same.

23          What about overutilizing back braces or physical

24   therapy, would they be able to do that same data analytics?

25   A.   Absolutely.

1    Q.  How many moments would that take?

2    A.  The same.

3             MR. CHAPMAN:  No further questions, Your Honor.

4    Thank you.

5             THE COURT:  Well, before we break for lunch, I have a

6    couple of questions of this witness.  You are speaking this

7    year I believe at Harvard, Columbia and Marquette, is that

8    correct?

9             THE WITNESS:  That's what I was asked to do, yes,

10   sir.

11            THE COURT:  And Harvard and Columbia are Ivy League,

12   top-tier institutions, correct?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  Marquette University is a lesser tier

15   organization or institution in Milwaukee, Wisconsin, correct?

16            THE WITNESS:  Yes, sir.

17            THE COURT:  Milwaukee was the town that made beer

18   famous, correct?

19            THE WITNESS:  Yes, sir.

20            THE COURT:  My son is a 21-year-old student at

21   Marquette and I'm a graduate, and I guarantee you between us,

22   we know every bar, restaurant and frat party in that town, so

23   if you need a referral before you get there, you let us know,

24   okay?

25            THE WITNESS:  Yes, sir.

1          THE COURT:  You may be dismissed.

2          THE WITNESS:  Thank you.

3          (Witness excused at 1:10 p.m.)

4          (Testimony of Sean Weiss concluded)

5                          —   —   —

```
 1                    C E R T I F I C A T I O N

 2           I, Linda M. Cavanagh, Official Court Reporter of the

 3    United States District Court, Eastern District of Michigan,

 4    appointed pursuant to the provisions of Title 28, United States

 5    Code, Section 753, do hereby certify that the foregoing pages 1

 6    through 67 comprise a full, true and correct excerpt of the

 7    proceedings taken in the matter of United States of America vs.

 8    D-1 Rajendra Bothra, D-3 Ganiu Edu, D-4 David Lewis and D-5

 9    Christopher Russo, Case No. 18-20800, on Tuesday, June 21,

10    2022.

11

12                              s/Linda M. Cavanagh
                                Linda M. Cavanagh, RDR, RMR, CRR, CRC
13                              Federal Official Court Reporter
                                United States District Court
14                              Eastern District of Michigan

15

16

17

18

19    Date: March 18, 2023
      Detroit, Michigan
20

21

22

23

24

25
```